

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 10, 2016**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 14-35043-BJH** |
| | § | **(Chapter 11)** |
| **SAMUEL EVANS WYLY, et al.,** | § | |
| | § | **JOINTLY ADMINISTERED** |
| **DEBTORS.** | § | |
| | § | **Related to ECF Nos. 4, 75, 516, 923, &** |
| | § | **938** |

## <u>MEMORANDUM OPINION</u>

I.    JURISDICTION, AUTHORITY, AND VENUE ............................................................. 2

II.   PRELIMINARY MATTERS ........................................................................................... 2

   A.  Factual and Computation Stipulations of the Parties ...................................... 2

   B.  Facts Found Due to this Court's Application of Collateral Estoppel............................ 3

   C.  United States' Motion to Exclude the Expert Report, Opinions, and Testimony of
       Joshua S. Rubenstein ........................................................................................... 6

   D.  Dee's Motion for Partial Summary Judgment................................................. 17

III.  FACTUAL AND PROCEDURAL HISTORY .............................................................. 17

IV.   LEGAL ANALYSIS...................................................................................................... 30

   A.  Burden of Proof.................................................................................................. 30

       1.   Bankruptcy Law Burden of Proof – In General ............................... 30

           a)  Prima Facie Validity under Bankruptcy Rule 3001(f)................................. 31

           b)  Have the Debtors Raised Evidence of a Probative Force Equal  to that
               of the Proofs of Claim? ................................................................................ 36

       2.   Tax Law Burden of Proof—In General ............................................. 38

           a)  Gift Tax Deficiencies and the Presumption of Correctness......................... 39

               (1)  Is the IRS' Determination "Arbitrary and  Erroneous?" ......................... 40

               (2)   Burden Shifting under 26 U.S.C. § 7491................................................. 43

           b)  Fraud Penalties for Income Tax and Gift Tax Underpayments ................... 47

           c)  International Failure to File Penalties ............................................................ 49

       3.   The Debtors' Defenses ...................................................................... 49

           a)  Reasonable Cause Defenses........................................................................... 49

           b)  Dee's Innocent Spouse Defense.................................................................... 50

   B.  Was the Debtors' Underpayment of Income Taxes Due to Fraudulent Intent?............ 52

       1.   Relevant Statutes and Badges of Fraud ............................................. 55

           a)  The Complexity of the Offshore System ...................................................... 59

           b)  The Wylys' Willingness to Commit Securities Fraud to  Preserve the
               Secret Offshore System and to Maintain its Tax  Advantages..................... 78

           c)  The Failure to Take Action to Resolve the Conflicting Advice  Sam and
               Charles Received Regarding the 1992 IOM Trusts...................................... 84

           d)  The Creation of False Documents to Support the Settling of  IOM Trusts
               in 1994 and 1995 to Attempt to Obtain Favorable  Tax Benefits for the
               Wylys.............................................................................................................. 87

    e)   The Treatment of the Offshore System as the Wyly Family Piggy Bank .... 98

    f)   The Planned Insolvency of Various IOM Corporations that Owed Annuity Obligations ................................................................. 110

    g)   Understatement of Income ........................................................... 126

    h)   Concealment of Income or Assets ............................................... 133

    i)   Offering False or Incredible Testimony ...................................... 133

    j)   Offering Implausible or Inconsistent Explanations of Behavior ................ 137

    k)   Filing False Documents. ............................................................. 142

    l)   Failure to Cooperate with Taxing Authorities. ............................ 153

C.  Was Dee Willfully Blind? .......................................................................... 155

D.  Is Dee Entitled to the Benefits of the Innocent Spouse Defense? ............................... 159

E.  Did Sam Establish his Reasonable Cause Defense to the Imposition of Fraud Penalties for His Income Tax Underpayments? ........................................................... 177

    1.   The Defense in General .................................................................. 177

    2.   The 1992 Private Annuity Transactions ........................................ 185

    3.   The Settlement of the Bessie IOM Trust and the La Fourche IOM Trust and their Proper Characterization ................................................... 203

    4.   The 1996 Private Annuity Transactions ........................................ 208

    5.   Alleged Reliance on French ........................................................... 216

F.  Were Gifts Made to the Wylys' Children? .................................................... 230

    1.   The Relevant Standards .................................................................. 230

        a)   Defining a Gift ......................................................................... 230

        b)   Determining the Underlying Substance of the Transaction ......................... 232

            (1)   The Economic Substance Doctrine .......................................... 233

            (2)   The Substance Over Form Doctrine ......................................... 234

            (3)   The Step Transaction Doctrine ................................................ 234

    2.   Understanding the Transactions Alleged to be Gifts by Sam to His Children ........................................................................................ 235

        a)   Formation and Funding of the Cayman LLCs ............................ 235

        b)   The Real Estate Holdings ........................................................... 239

        c)   Liquidation of the Cayman LLCs ............................................. 245

    3.   Analysis of Alleged Gifts Made by Sam ........................................ 246

        a)   Cash Used to Purchase, Improve, and Maintain the Cottonwood Ventures I and II Properties ........................................................ 247

b) Cash and Other Assets that were Transferred Into the Cayman LLCs ....... 258

(1) The Interests in IOM Real Estate Companies ......................................... 258

(2) Cash and Other Financial Assets Transferred to the Cayman LLCs ..... 262

4. Understanding the Transactions Alleged to be Gifts by Dee to Her Children ................................................................................................... 265

c) Stargate Horse Farm ................................................................................ 265

d) Little Woody (LL Ranch) ......................................................................... 267

5. Analysis of the Alleged Gifts Made by Dee .................................................. 269

a) Cash Used for the Purchase, Maintenance, Improvement, and Upkeep of the Stargate Horse Farm and Little Woody (LL Ranch) Real Estate Properties ................................................................................................. 269

b) The Promissory Note Due to Dee from the Caroline D. Wyly Irrevocable Trust ........................................................................................................ 274

(1) Overview of the Transaction ..................................................................... 274

(2) Analysis of the Alleged Gift Made by Dee .............................................. 279

(3) Is Dee Liable for Fraud Penalties on her Gift? ........................................ 284

G. Are Penalties Owing for the Failure to File Forms 3520, 3520-A, and 5471? ............ 286

1. Introduction ................................................................................................... 286

2. Statutory Overview ........................................................................................ 287

a) § 6038 and Failures to File Form 5471 ..................................................... 290

b) § 6048(b) and Failures to File Form 3520-A ............................................ 295

c) § 6048(c) and Failures to File Form 3520 ................................................. 296

(1) In General ................................................................................................. 296

(2) Annuity Payments .................................................................................... 298

(3) Real Estate Transactions .......................................................................... 314

(4) Security Capital Loans .............................................................................. 316

(5) Sales of Options to IOM Corporations ..................................................... 323

H. Did the Debtors Establish Their Reasonable Cause Defenses to the Imposition of International Penalties? ..................................................................................... 324

1. Introduction ................................................................................................... 324

a) Review of Provisions of § 6038 ................................................................. 325

b) Review of Provisions of §§ 6048(b) and 6677 ......................................... 325

2. Reasonable Cause and Lack of Willful Neglect ............................................ 326

a) In General .................................................................................................. 326

b)   Reliance on the Advice of Professionals ...................................................... 329

c)   Honest Difference of Opinion.................................................................... 331

d)   Application to Both Debtors ...................................................... 334

    (1)  As to Sam................................................................................ 337

    (2)  As to Dee ................................................................................ 350

I.   Does the Imposition of the International Penalties Violate the Eighth Amendment? . 364

   1.   Applicable Supreme Court Precedent .......................................................... 364

    a)   The Supreme Court Decisions .................................................... 365

    b)   Lower Courts' Interpretations of Supreme Court Precedent ...................... 373

   2.   Are the International Penalties "Fines"? ........................................................ 374

   3.   Alternatively, Are the International Penalties "Excessive?".......................... 380

    a)   As to Sam................................................................................ 384

    b)   As to Dee................................................................................ 391

J.   Do the Equitable Doctrines of Laches or Estoppel Apply Here, or Does the Court have Discretion Regarding the Assessment of Taxes or Penalties Against the Debtors? ............................................................................................. 396

   1.   Does Laches Apply Here? ............................................................. 396

   2.   Does Estoppel Apply Here? ......................................................... 401

   3.   Does the Court have Discretion to Alter the Penalty Amounts?................... 411

K.   Suspension of Interest Under 26 U.S.C. § 6404(g).................................................... 411

   1.   This Court has Jurisdiction to Determine the Amount of Interest Payable by the Debtors, Including Whether the Debtors Are Entitled to Mandatory Interest Suspension under 26 U.S.C. § 6404(g) ............................................. 413

   2.   Mandatory Suspension of Interest Does Not Apply in Any Case Involving Fraud, Precluding Suspension for Sam in the  Relevant Years...................... 416

   3.   Interest Suspension is Moot as to Dee Because She Did Not Commit Tax Fraud and She is Entitled to Innocent Spouse Relief from the Income Tax Underpayments to Which § 6404(g) Interest Suspension Would Apply ....... 417

V.   CONCLUSION......................................................................................... 418

Before the Court are the Motion Pursuant to Bankruptcy Code § 505 to Determine Tax Liability, If Any [ECF No. 4] and the Amended Motion Under Bankruptcy Code Section 505 to Determine Tax Liability, If Any [ECF No. 516] (together, the "**Motions**") filed by Samuel Evans Wyly ("**Sam**") and Carolyn Dee Wyly ("**Dee**," and together with Sam, the "**Debtors**"), respectively, in which the Debtors seek to have this Court determine the allowed claim of the Internal Revenue Service ("**IRS**") against them. The Debtors have also objected to the proofs of claim[1] filed by the IRS against them (together, the "**Claim Objections**").[2] By agreement of the parties, the Motions and the Claim Objections were heard concurrently, as each seeks to have the Court determine the IRS' allowed claims against the Debtors' respective estates. Pursuant to a Scheduling Order agreed to by the parties and entered by the Court [ECF No. 564], trial commenced on January 6, 2016 and concluded on January 21, 2016. Closing arguments were heard on January 27 and 28, 2016. At the Court's direction, the Debtors and the IRS filed post-trial briefs on certain issues on February 5, 2016 and reply briefs to each other's post-trial brief on February 10, 2016. The Motions and Claim Objections are now ripe for ruling.

After carefully considering the arguments of the parties (as advanced orally and in writing both pre and post-trial), the evidence admitted at trial, and its own research of the legal issues raised, this Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[3]

---

[1] On April 15, 2015, the IRS filed Claim No. 18 against Sam's bankruptcy estate in Case No. 14-35043-BJH-11 and Claim No. 11 against Dee's bankruptcy estate in Case No. 14-35074-BJH-11 (together, the "**Proofs of Claim**"). As indicated above, the Debtors' bankruptcy cases are being jointly administered under Case No. 14-35073-BJH-11.

[2] *See* Debtor Sam Wyly's Objection to Proof of Claim No. 18 Filed by the IRS [ECF No. 938] and Debtor Caroline D. Wyly's Amended Objection to Claim Number 11 of the Department of Treasury – Internal Revenue Service [Case No. 14-35074, ECF No. 75].

[3] To the extent that a finding of fact is more properly construed as a conclusion of law, or vice versa, it should be so construed.

**MEMORANDUM OPINION**                                                                                          **1**

## I.    JURISDICTION, AUTHORITY, AND VENUE

The district court of the Northern District of Texas has subject matter jurisdiction over the Debtors' bankruptcy cases (the "**Cases**") pursuant to 28 U.S.C. § 1334, and this Court has authority to determine the amount or legality of tax and the allowance or disallowance of claims against the bankruptcy estates pursuant to 28 U.S.C. § 157(a), (b)(1), (b)(2)(B), and (b)(2)(O), 11 U.S.C. § 505(a),[4] and the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in the Northern District of Texas on August 3, 1984.  As explained by the Fifth Circuit, § 505(a)(1) is a "broad grant of jurisdiction" authorizing the bankruptcy court to determine certain tax issues, subject to statutory exceptions that are not applicable to the Cases.[5]  Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## II.    PRELIMINARY MATTERS

### A.    Factual and Computation Stipulations of the Parties

At the Court's urging, the parties stipulated to a large number of undisputed facts, which are contained in the Joint Stipulations of Fact [ECF No. 1040] (the "**Joint Stipulations**") filed December 30, 2015.  While the Court will not repeat those factual stipulations verbatim in this Memorandum Opinion, it adopts them as if they were set forth herein.

In addition, the parties were able to stipulate to the facts that will be necessary for them to compute the amount of tax, interest, and penalties that may result from this Court's determination

---

[4] 11 U.S.C. § 505 expressly provides that a bankruptcy court may determine a debtor's tax liability:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine--

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title[.]

[5] *See I.R.S. v. Luongo (In re Luongo),* 259 F.3d 323, 328–30 (5th Cir. 2001) (citing legislative history referencing the jurisdictional nature of § 505).

**MEMORANDUM OPINION**                                                                                    2

of the factual and legal issues in dispute among them, which are included in the parties' Computation Stipulations [ECF No. 1106] (the "**Computation Stipulations**") filed January 26, 2016. The Computation Stipulations, like everything else in the Cases, is complicated and detailed, so suffice it to say that the Court is not going to repeat those stipulations here, but it adopts them as if they were set forth herein.[6]

**B.** **Facts Found Due to this Court's Application of Collateral Estoppel**

On May 29, 2015 the IRS filed its Motion for Partial Summary Judgment on the Application of Collateral Estoppel to Facts and Conclusions Established in the Securities and Exchange Commission v. Sam Wyly et al. Litigation [ECF No. 611] (the "**Motion for Partial Summary Judgment**"), seeking this Court's determination that certain findings of fact and conclusions of law made in connection with a civil action pending in federal district court in the Southern District of New York (the "**SDNY Court**") were binding on the Debtors in connection with this Court's resolution of the Motions and the Claim Objections. In summary, the Securities and Exchange Commission (the "**SEC**") sued Sam and his brother, Charles Wyly ("**Charles**"),[7] among others, for securities fraud in connection with certain securities transactions undertaken by various offshore trusts and other offshore corporations that Sam and Charles were associated with in a case styled *SEC v. Wyly et al.*, Case No. 10-5760-SAS (S.D.N.Y.) (the "**SEC Action**"). Following a jury trial on the liability phase and a bench trial on the remedies phase of the SEC Action, the SDNY Court entered judgment against Sam and the probate estate of Charles, who died in 2011, for $123,836,958.75 and $63,881,743.97, respectively, plus prejudgment interest.[8]

---

[6] The Court wishes to express its appreciation to the parties for the enormous efforts that went into simplifying this trial whenever possible. The Joint Stipulations and the Computation Stipulations saved weeks of trial testimony.

[7] Dee is Charles' widow. Dee and Charles were married for 56 years and they filed joint tax returns throughout their marriage.

[8] *SEC v. Wyly*, 56 F.Supp.3d 394, 434 (S.D.N.Y. 2014) ("For the foregoing reasons, Sam Wyly must disgorge $123,836,958.76 and Charles Wyly must disgorge $63,881,743.97. The Wylys shall also pay prejudgment interest

The SDNY Court's decision contained numerous findings of fact that either the jury or it had made, along with its conclusions of law, which the IRS sought to have this Court give collateral estoppel effect to here, as these same offshore trusts and other offshore corporations and the transactions that they engaged in for a number of years are at the heart of the IRS' tax claims against the Debtors here.

For the reasons stated in its Memorandum Opinion and Order [ECF No. 789] entered on August 24, 2015, this Court granted the IRS' Motion for Partial Summary Judgment, thereby giving collateral estoppel effect to sixty-four (64) specific facts and/or legal conclusions established in the SEC Action.[9]  While the Court will not repeat them here, it adopts them and will quote them and/or discuss them when relevant to this Court's specific determinations here.[10]

As will be explained more fully below, of particular significance here is the SDNY Court's determination that certain of the offshore trusts at issue in the SEC Action and here are foreign grantor trusts of Sam and Charles.  Because of this determination by the SDNY Court, and because this Court has given collateral estoppel effect to the SDNY Court's determination, the Debtors and the IRS agree that there were substantial underpayments of income taxes by the Debtors,[11]

---

for the entire period of the fraud through December 1, 2014, calculated in accordance with this Opinion and Order."). Sam's bankruptcy schedules list the judgment, including prejudgment interest, at $198,118,825.16.  *See* Amended Schedule F, Case No. 14-35043, ECF No. 472 at p. 88 of 94.

[9] *See* Memorandum Opinion Exhibit A.  The Court will cite to these findings by the number assigned to each on Exhibit A (*e.g.,* Collateral Estoppel No. 1).

[10] This Court heard substantial evidence that overlaps with that the jury and the SDNY Court heard in the SEC Action. While various witnesses who testified there were not called here, the parties agreed to rely on their testimony in the SEC Action here.  While this Court did not retry the legal determination of whether the Bulldog Trusts and the Bessie Trusts (as defined by the SDNY Court) were grantor trusts to Sam and Charles, having decided to apply collateral estoppel to that determination of the SDNY Court at the IRS' request, many of the factual findings made there (and to which this Court has applied collateral estoppel) were proven here also.  Where the Court quotes from findings of fact made in the SEC Action in this Memorandum Opinion to which it has applied collateral estoppel, the Court will also note if that finding was independently proven here too.  Unless the Court specifically notes otherwise, the finding here was proven by clear and convincing evidence.

[11] At certain points in this Memorandum Opinion, the Court refers to understatements of income instead of underpayments of income taxes.  The parties agree that it is the Debtors' respective understatements of income that resulted in their respective underpayments of income taxes here.

**MEMORANDUM OPINION**                                                                                                  **4**

including (i) for Sam tax years 1992 through 2003, 2005 through 2006, and 2010, and (ii) for Dee tax years 1992, 1994 through 2003, 2006, 2008, 2011, and 2013.[12]

The reference above is the first time that the Court has used the phrase "foreign grantor trust" in this opinion and it will use it and other related terms throughout this opinion.  Of course, it is important to understand what the Court is referring to when using these terms.  A foreign trust is defined in 26 U.S.C. § 7701 as "any trust other than a trust described in subparagraph (E) of paragraph (30)."[13]   Subparagraph (E) of paragraph (30) in turn defines when a trust can be considered a "United States person," which is if "(i) a court within the United States is able to exercise primary supervision over the administration of the trust, and (ii) one or more United States persons have the authority to control all substantial decisions of the trust."[14]   In other words, if the trust is not subject to primary supervision by a court within the U.S. and control over the trust is exercised by a non-U.S. person, it is a foreign trust.  The difference between grantor and non-grantor trusts is explained as follows:

> Although trusts are usually separate taxable entities, the grantor trust rules may require that a portion or all of a trust be ignored for income tax purposes. When this occurs, the grantor (or in some cases a beneficiary or trust powerholder) is deemed to own the trust assets. When the assets of a trust are deemed owned by its grantor under Sections 671 through 677 or Section 679 of the Internal Revenue Code (the Code), the trust is called a "grantor trust."[15]

---

[12]This agreement is contingent upon (i) the SDNY Court's determination of foreign grantor trust status being affirmed on appeal, which appeal is currently pending before the Second Circuit Court of Appeals, and/or (ii) this Court's collateral estoppel decision being affirmed on appeal, assuming such an appeal is taken.

[13] 26 U.S.C. § 7701(a)(31).  Prior to August 20, 1996, a "foreign" trust was defined as a trust "the income of which, from sources without the United States which is not effectively connected with the conduct of a trade or business within the United States, is not includible in gross income under subtitle A."  26 U.S.C. § 7701(a)(31) (1996).

[14] 26 U.S.C. § 7701(a)(30)(E).

[15]ROBERT T. DANFORTH, ET AL. TAX TREATMENT OF GRANTOR TRUSTS ¶ 7.01, 1999 WL 1017325 (2016).

The "grantor trust rules" referred to above are contained in 26 U.S.C. §§ 671 through 679.[16]  By implication, a trust that is not a "grantor trust" is a "non-grantor trust," and is treated as its own taxable entity under the Internal Revenue Code.

### C. United States' Motion to Exclude the Expert Report, Opinions, and Testimony of Joshua S. Rubenstein

The IRS filed a Motion to Exclude the Expert Opinions of Joshua S. Rubenstein [ECF No. 923] (the **"Rubenstein Motion"**) prior to trial.  Because the Rubenstein Motion was heard the day before trial was scheduled to commence, and because the Court did not have sufficient time to rule on the Rubenstein Motion before the Debtors called Mr. Rubenstein (**"Rubenstein"**) to testify at trial, the Court allowed Rubenstein to testify, subject to his testimony being stricken if the Court decided to grant the Rubenstein Motion.  For the reasons explained below, the Rubenstein Motion is granted in part and denied in part.  Those portions of Rubenstein's testimony that are excluded are stricken from the record.

Rubenstein is a lawyer and partner at the firm of Katten Muchin Rosenman, LLP.  The Debtors offered Rubenstein as an expert in "trust and estate law and taxation of trusts, with specific experience and knowledge regarding these areas during the 1990s, and also as an expert regarding practices concerning the establishment and administration of foreign trusts during the 1990s."[17]  Rubenstein was to provide "an opinion as to how practitioners advised clients with respect to the application of the grantor trust rules to foreign trusts during the 1990's (the 'relevant time period') and how foreign trusts, as opposed to domestic trusts were drafted and administered at the time."[18]  The purported purpose of Rubenstein's opinion is to assist the Court in the evaluation of the

---

[16] 26 U.S.C. § 671-79.

[17] Tr. Trans. 331:18-24 (Cole).

[18] Appendix to Rubenstein Motion [ECF No. 926] at App. 0004.

**MEMORANDUM OPINION**                                                                                       **6**

Debtors' reasonable cause defense to their failure to file Forms 3520, 3520-A, and 5471, as well as to assist the Court in its evaluation of the Debtors' alleged fraudulent intent for purposes of the IRS' recovery of fraud penalties under 26 U.S.C. § 6663.[19]

In the Rubenstein Motion, the IRS objected to Rubenstein's proposed testimony on multiple grounds. First, the IRS contended that Rubenstein's opinions would consist of statements of the law and legal analysis that would usurp this Court's role as both fact finder and the "one spokesman of the law."[20] Second, the IRS argued that Rubenstein's failure to apply his expert knowledge to the specific facts of these Cases made his opinions both irrelevant and unreliable under *Daubert* and Federal Rule of Evidence 702.[21] Finally, the IRS argued that Rubenstein's lack of experience with private annuity transactions in a foreign trust context rendered him unqualified under Federal Rule of Evidence 702 to give any opinion related to the private annuity transactions at issue here.[22]

We turn first to the IRS' argument that Rubenstein's opinion consisted of impermissible recitations of the law and legal conclusions. It is all but axiomatic that the judge should be the sole source of the applicable legal standard in any case, and that expert testimony that attempts to tell the fact finder what law to apply is improper.[23] Likewise, expert testimony that states a legal opinion that tells the fact finder what result to reach is improper.[24]

---

[19] *Id.*

[20] *Askanase v. Fatjo*, 130 F.3d 657, 672-73 (5th Cir. 1997) (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988)); *see* Rubenstein Motion at 2-17.

[21] *See* FED. R. EVID. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); Rubenstein Motion at 17-22.

[22] *See* Rubenstein Motion at 20-22.

[23] *See Askanase*, 130 F.3d at 672-73; *Burkhart v. Washington Metr. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

[24] *See Askanase*, 130 F.3d at 672-73; *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996).

Much of Rubenstein's expert opinion consisted of explanations of what Internal Revenue Code provisions and IRS regulations did or do not allow during the relevant time period or today. For example, at one point Rubenstein testified that, until 2010, it was permissible under the law for a beneficiary of a foreign non-grantor trust to engage in uncompensated use of trust property without paying tax on the fair rental value of that use.[25] Testimony such as this—which explained black letter law as it stands today or as it stood in years past—consisted of legal conclusions and was therefore inadmissible. This Court is capable of determining the law applicable to the Cases on its own, without Rubenstein's assistance. All of Rubenstein's testimony that simply told the Court what the law was or is will be stricken.

However, not all of Rubenstein's testimony consisted of statements that were simply impermissible legal analysis, opinions, and conclusions. In addition to giving general statements of both past and present law, Rubenstein also made statements that the law that governed offshore trusts and the tax treatment of such trusts during the relevant time period was, in the eyes of many practitioners, including him, uncertain.[26] The purported purpose of this testimony was, again, to assist the Court in assessing the Debtors' reasonable cause defense and the presence or absence of fraudulent intent[27]—*i.e.*, according to the Debtors, given the fact of uncertainty among experienced tax professionals, how could the Debtors possibly have acted with fraudulent intent here? More specifically, the Debtors argue that if lawyers practicing in the area of cross-border trust and estate taxation felt that the law governing the taxation of offshore trusts like the ones at issue here was uncertain, then this in turn would tend to corroborate that the Debtors were uncertain about the

---

[25] Tr. Trans. 450:20-452:4 (Rubenstein). Citations in this Memorandum Opinion to "Tr. Trans." refer to the transcript of the January 2016 trial on the Motions and Claim Objections, while citations to "SEC Tr. Trans." refer to the trial transcript in the SEC Action. The pin cites are page:line – page:line.

[26] *See, e.g.*, *id.* at 468:22-469:13 (Rubenstein) (discussing uncertainty among practitioners during the relevant time period as to how to treat a trust with only contingent United States beneficiaries under 26 U.S.C. § 679).

[27] Appendix to Rubenstein Motion [ECF No. 926] at App. 0004.

state of the law, and any missteps that the Debtors made in following that law would be more reasonable and less likely to be fraudulent.

The admissibility of this testimony regarding the fact of alleged uncertainty among members of the cross border trust and estate and tax bars as to how to interpret and apply the law during the relevant time period was a close call.  As the Fifth Circuit has noted, "the task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one."[28]  In general, a fact finder is "qualified to determine intelligently and to the best degree possible both the reasonableness of a client relying upon the advice of an attorney…retained to render such advice and whether the client did so in good faith after making full disclosure" on its own, and that "expert testimony as to the legal basis underlying the advice" does not assist the fact finder.[29]  However, *in U.S. v. Burton*,[30] the Fifth Circuit also stated that:

> Evidence of legal uncertainty, *except as it relates to defendant's effort to show the source of his state of mind*, need not be received, at least where, as here, the claimed uncertainty does not approach vagueness and is neither widely recognized nor related to a novel or unusual application of the law.

The Debtors have not introduced any evidence that the purported uncertainty in the law at issue here approached vagueness, a phrase that harkens back to the Fifth Circuit's decision in *U.S. v. Garber*,[31] which in turn seems to have been limited to its "unique, indeed near bizarre, facts."[32] However, even if they did, the Court concludes that Rubenstein's testimony regarding the fact of uncertainty as to the law among the relevant bars during the relevant time period need only be

---

[28] *Owen v. Kerr-McGee Corp.,* 698 F.2d 236, 240 (5th Cir. 1983).

[29] *U.S. v. West*, 22 F.3d 586, 599 (5th Cir. 1994).

[30] 737 F.2d 439, 444 (5th Cir.1984) (emphasis added).

[31] 607 F.2d 92 (5th Cir. 1979).

[32] *Burton*, 737 F.2d at 444.

**MEMORANDUM OPINION**                                                                                   **9**

admitted if the Debtors *knew of* this legal uncertainty, as this is the only way this legal uncertainty could have affected their states of mind.

As explained below, knowledge that there was uncertainty regarding the proper legal characterization of the various offshore trusts at issue here can be imputed to Sam and Charles back to 1993.[33]   Moreover, the evidence shows that by 2003 at the latest, Sam and Charles had actual knowledge of this uncertainty.[34]   Thus knowledge of this legal uncertainty may have had some influence on Sam's and Charles' states of mind.   On this basis, Rubenstein's testimony regarding the fact that there was uncertainty as to the law among the bar is relevant and admissible, and is not an impermissible legal conclusion.   However, for the reasons more fully explained below, the Court gives this testimony little weight.

As the IRS pointed out in its cross-examination of Rubenstein, Rubenstein offered no opinion as to (and was unaware of) whether Sam, Charles, or any Wyly advisor felt that there was any uncertainty in the applicable law during the relevant time period.[35]   Rubenstein's failure to connect his testimony to the specific facts of the Cases makes his testimony of less use in evaluating Sam's and Charles' actions or intent,[36] and thus the Court gives this testimony little weight.

In closing out the analysis of the IRS' first argument—that Rubenstein's testimony consisted of impermissible legal conclusions—the Court will identify other testimony that

---

[33] As explained *infra* at pp. 26-28, 84-87, French (who served as the Wylys primary counsel and trusted agent for about twenty years, IRS Ex. 1199 ¶ 4 (p. 6)) learned in 1993 that an experienced international tax lawyer, Charles Lubar, who French hired on the Wylys' behalf, believed that the 1992 IOM trusts were properly characterized as foreign grantor trusts as to Sam and Charles.   The Court imputes this knowledge to Sam and Charles under agency principles.

[34] *See* pp. 26-28, *infra.*

[35] *See* Tr. Trans. 513:23-514:22 (Rubenstein).

[36] There is no evidence suggesting that Dee was involved in any decisions regarding the structure of the offshore system at issue here.   Nor is there any evidence suggesting that Dee knew of any uncertainty in the law during the relevant time period.   Thus, Rubenstein's testimony has virtually no relevance as to Dee.

**MEMORANDUM OPINION**                                                                                           **10**

Rubenstein gave that did not consist of impermissible legal conclusions. Although Rubenstein is a lawyer, this does not automatically mean that all of his testimony must therefore consist of statements of the law or legal conclusions. Rubenstein is permitted to "testify as to legal matters when those matters involve questions of fact."[37] Here, Rubenstein offered testimony as to whether certain practices—such as the settlement of trusts with nominal amounts of money, the use of protectors[38] with expansive powers, or the use of "accommodation grantors"[39]—were viewed as normal or proper by the cross-border trust and estate and tax bars during the relevant time period. The question of what members of the bar thought, as opposed to what the actual state of the law was, is a factual one. Although counsel for the Debtors or the IRS can explain what the true state of the law during the relevant time period was or is today via briefing or oral argument, proving what the cross-border trust and estate and tax bars *thought* the law was or how they *viewed* the law is a factual inquiry that requires resort to expert testimony as opposed to argument. Rubenstein's testimony regarding the views of the bar during the relevant time period—like his testimony regarding the fact of uncertainty in the law during the relevant time period—is admissible. However, the Court must still analyze the relevance and reliability of such testimony under *Daubert*.

Thus, we turn to the IRS' second argument, that Rubenstein's testimony is inadmissible because it is irrelevant and unreliable under *Daubert* and Federal Rule of Evidence 702. Two Supreme Court cases guide our analysis of the admissibility of expert opinion evidence on the

---

[37] *Askanase*, 130 F.3d at 672 (citation omitted); *see Waco Intern., Inc. v. KHK Scaffolding Houston, Inc.*, 278 F.3d 523, 533 (5th Cir. 2002) (lawyer could testify as to "issues an attorney typically investigates in determining whether to pursue an *ex parte* seizure order").

[38] As explained by Rubenstein, a trust protector is an intermediary between the settlor of a trust and its beneficiaries, on the one hand, and the trustee, on the other hand. Trust protectors are usually individuals. Tr. Trans. 355:9-15 (Rubenstein).

[39] As explained by Rubenstein, an accommodation grantor describes a situation where a third party creates and forms a trust as an accommodation to the person who is going to grow the wealth in that trust. *Id.* at 479:2-8 (Rubenstein).

basis of whether it is both relevant and reliable: *Daubert v. Merrell Dow Pharm., Inc.*[40] and *Kumho Tire Co., Ltd. v. Carmichael*.[41] At the outset, we note that this is a bench trial and that "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case…where…a…judge sits as the trier of fact in place of a jury."[42] This makes perfect sense, as this Court's "chief role when determining the admissibility of expert testimony under *Daubert* is that of a 'gate-keeper,'"[43] and there is little need for the Court to serve as a gate-keeper for itself.

Nevertheless, the basic holding of *Daubert,* as expanded upon by *Kumho Tire Co., Ltd.,* is very simple—in order to be admissible, expert testimony must be both (i) relevant, and (ii) reliable.[44] *Daubert* defined the standards for admissibility of expert opinion evidence under Federal Rule of Evidence 702, and was decided within the specific context of a scientific expert.[45] In *Kumho Tire Co., Ltd.*[46] the Supreme Court explained how to apply *Daubert's* holding and its specific indicia of reliability to non-scientific testimony:

> We conclude that *Daubert's* general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *See* Fed. Rule Evid. 702. We also conclude that a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. *See General Electric Co. v. Joiner*, 522 U.S. 136, 143, 118 S. Ct. 512, 139 L.Ed.2d

---

[40] 509 U.S. 579 (1993).

[41] 526 U.S. 137 (1999).

[42] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *see Wells Fargo Bank N.A. v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 329 (5th Cir. 2013) (quoting *Gibbs* for this proposition).

[43] *See Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[44] *See U.S. v. Tucker*, 345 F.3d 320, 327 (5th Cir. 2003) (quoting *Daubert*, 509 U.S. at 589); *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)).

[45] *Daubert*, 509 U.S. at 589.

[46] 526 U.S. at 141-42.

508 (1997) (courts of appeals are to apply "abuse of discretion" standard when reviewing district court's reliability determination).

As indicated by the Supreme Court in *Kumho Tire Co., Ltd.*,[47] the relevance and reliability inquiry under *Daubert* is necessarily very fact specific.[48] Furthermore, a trial court's decision whether to admit expert testimony, and how to determine the reliability of such testimony, is subject to an abuse of discretion review.[49] According to the Fifth Circuit, "[d]istrict courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous."[50]

The IRS' main argument as to why Rubenstein's testimony does not pass muster under *Daubert* is that Rubenstein did not opine on anything the Wylys did or any facts specific to the Cases. Instead, Rubenstein gave a general assessment of what the bar thought was normal or proper practice regarding offshore trusts during the relevant time period and opined as to areas where the bar thought that the law was uncertain. At the outset, the Court notes that the language of Federal Rule of Evidence 702(d) requiring an expert to apply their principles and methods "to the facts of the case" does not per se exclude expert testimony that does not refer to the facts of the particular case before the fact finder.[51] However, despite the permissibility of "general principles" expert testimony, such expert testimony is not automatically relevant.

---

[47] 526 U.S. 137 (1999).

[48] *See Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999).

[49] *Kumho Tire Co., Ltd*, 526 U.S. at 152; *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 274 (5th Cir. 1998) ("Fortunately, the Supreme Court recently resolved a disagreement among the circuits about the standard for reviewing a district court's admission or exclusion of expert testimony. In *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997), the Court held that we should review such decisions for an abuse of discretion.").

[50] *Tucker*, 345 F.3d at 326 (citation omitted).

[51] *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment ("it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case…The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles."); *see also Daubert*, 509 U.S. at 591-92 (discussing how expert testimony must "fit" the facts of the case).

As the IRS pointed out during its cross-examination of Rubenstein, Rubenstein does not apply his concept of normal or proper practice to the facts of the Cases or to anything that the Wylys did.[52] Nor does he know whether the Wylys or their advisors viewed the law governing their offshore transactions as uncertain.[53] Thus, this Court has no way of knowing whether the scope of normal or proper practice that Rubenstein describes encompasses anything that the Wylys did. Nor is this Court able to say for certain whether the legal uncertainties that Rubenstein described influenced the Wylys or their advisors. The lack of connection between Rubenstein's testimony and the Wylys' actions raises relevance concerns.

Despite these concerns, Rubenstein's testimony that, during the relevant time periods: (i) the use of protectors in the context of foreign trusts was permissible and even common, (ii) de facto control of trustees by grantors was not out of the ordinary, and (iii) the use of "accommodation grantors" was thought to be legitimate is admittedly of some relevance here. It is helpful for the Court to understand that these practices—in and of themselves—were not considered to be inappropriate by the cross-border trust and estate and tax bars during the relevant time period.[54] However, without any opinion as to whether the manner in which the Wylys themselves implemented their offshore system falls within the scope of the "usual" practices that Rubenstein describes, the Court can draw few useful conclusions from Rubenstein's testimony. While the Court can conclude that, in at least some situations, the use of protectors, accommodation grantors, and other devices that Rubenstein described was seen by the trust and estate and tax bars during the relevant time period as appropriate, the Court has no way of knowing

---

[52] *See* Tr. Trans. 511:24 (Rubenstein) ("I'm not opining on what the Wylys did.").

[53] *See* Tr. Trans. 513:23-514:22 (Rubenstein).

[54] *Cf. Daubert*, 509 U.S. at 491-92 (describing relevance under Federal Rule of Evidence 702 as whether the testimony is helpful to the trier of fact).

how these same bars would have viewed the Wylys' particular uses of these same devices. Though there is admittedly some relevance to Rubenstein's testimony, it is limited.

Despite its limited relevance, Rubenstein's opinions are reliable for what they are as shown by his curriculum vitae (CV), testimony at the *Daubert* hearing, and testimony at trial—his recollections based on his experience as an admittedly prominent and accomplished cross-border trust and estate and tax lawyer who practiced during the relevant time period, coupled with some confirmatory research.[55] Rubenstein's opinions were testable both by exploring the research that was cited in his expert report and by probing the accuracy of his own recollections. Indeed, the IRS did this at trial by pointing out that Rubenstein did not speak to any practitioners specifically to confirm his recollection of the cross-border trust and estate and tax bars' views during the relevant time period. Nevertheless, Rubenstein did engage in substantial research and pointed out that he spoke to practitioners "every day of every week" in the course of his work.[56]

As the Supreme Court counseled in *Daubert*,[57] "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Despite the various issues with Rubenstein's testimony, this Court finds that Rubenstein's opinions that are not impermissible legal conclusions are somewhat relevant and reliable, and therefore admissible under the principles of *Daubert*.[58] As this is a bench trial, the Court need not be concerned with any possible undue prejudice outweighing the probative value of Rubenstein's testimony under Federal Rule of

---

[55] *See* Wyly Ex. QN (Rubenstein's CV detailing his extensive experience); Hr'g Trans. January 5, 2016 46:7-57:20 (Rubenstein's testimony at the *Daubert* hearing regarding his qualifications), 57:21-59:25, 68:8-17 (Rubenstein's testimony at the *Daubert* hearing discussing how he formed his opinions); Tr. Trans. 333:9-335:16 (additional trial testimony by Rubenstein discussing his qualifications); 478:16-22 (additional trial testimony by Rubenstein discussing how he formed his opinions).

[56] *See* Tr. Trans. 499:9-15 (Rubenstein).

[57] 509 U.S. at 596.

[58] *See id.*

Evidence 403.[59] The Court is capable of giving Rubenstein's testimony its proper weight, which it views as limited in light of the concerns outlined above.

Finally, we address the IRS' third argument—that Rubenstein was not qualified to give an opinion on the private annuity transactions at issue here. The IRS argued that Rubenstein's lack of experience with private annuity transactions in a foreign trust context rendered him unqualified under Federal Rule of Evidence 702 to give any opinion related to the private annuity transactions at issue here.[60] According to the Fifth Circuit, qualification of experts should not become a battle of labels, where the expert's expertise is labeled broadly and the needed expertise is labeled narrowly in an attempt to disqualify experts.[61] Furthermore, the Fifth Circuit has stated that "it is well established that an expert's qualifications depend upon his knowledge, skill, experience, training, or education, and the trial court is afforded the widest possible discretion in deciding whether a witness qualifies as an expert"[62] and that those challenging a trial court's determination that an expert is qualified or not face a "heavy burden."[63]

Rubenstein is an experienced cross-border trust and estate and tax lawyer, as his CV amply demonstrates.[64] Furthermore, Rubenstein's uncontradicted testimony was that utilizing a foreign trust, as opposed to a domestic trust, does not change the character of the private annuity transaction itself.[65] Thus, Rubenstein's experience advising taxpayers as to annuities issued by

---

[59] *Gulf State Util. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519-20 (5th Cir. 1981).

[60] *See* Rubenstein Motion at 20-22.

[61] *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012).

[62] *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985).

[63] *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998).

[64] *See* Wyly Ex. QN (Rubenstein's CV).

[65] *See* Hr'g Trans. January 5, 2016 55:1-15 (Rubenstein) ("Well, the private annuity rules don't make any difference on the private annuity side whether you do it with an individual with a domestic trust or foreign trust. There are different estate tax concerns when you do them with trusts, specifically foreign trusts, that make it riskier. So during that time period, I did that for people in their individual capacities as opposed to adding the estate tax complications.").

domestic trusts makes him qualified to testify here. For these reasons, the Court rejects the IRS' argument and will permit Rubenstein's testimony to the extent set forth above.

### D.     Dee's Motion for Partial Summary Judgment

Dee filed a Motion for Partial Summary Judgment [ECF No. 879] on November 16, 2015, seeking to have this Court determine that there was no evidence in the record to support the IRS' claim for fraud penalties under 26 U.S.C. § 6663. The IRS opposed Dee's motion, which motion was heard on December 21, 2015, shortly before trial was scheduled to commence. Given (i) other more pressing matters in preparing for trial, and (ii) the timing of when the parties filed briefs on Dee's innocent spouse defense, which the Court wanted to read and understand before ruling on her motion for partial summary judgment, the Court simply ran out of time to rule on her motion before trial. The motion is now moot, as the issues were fully tried by the parties.

## III.    FACTUAL AND PROCEDURAL HISTORY

While the parties stipulated to many facts as noted previously, the Court will briefly summarize certain facts in order to put its legal analysis into context. This summary is, by definition, incomplete, and more facts will be found and analyzed throughout this Memorandum Opinion.

As noted previously, Sam and Charles are brothers who grew up in modest circumstances in northeast Louisiana. Charles was about a year older than Sam and they were close friends and business associates throughout their adult lives. As relevant here, Sam founded his first company, University Computing Company in 1963.[66] At this point he brought in Charles—who had been working in Houston for IBM—and grew University Computing Company to a successful public company.[67] Then, Sam and Charles bought the Bonanza Steakhouses company when it was

---

[66] Tr. Trans. 390:18-25 (Sam).
[67] *Id.* at 390:19-394:10 (Sam).

insolvent and grew it from 15 or 20 stores to about 600 stores;[68] bought Gulf Insurance whose business included annuities;[69] founded Earth Resources;[70] bought Computer Technology company;[71] and founded Datran, an innovative firm that attempted a digital data transmission business in competition with AT&T.[72] Sam then co-founded Sterling Software, Inc. ("**Sterling Software**") with Charles and served as its Chairman of the Board from 1981 through its acquisition by Computer Associates in 2000.[73] The common stock of Sterling Software was publicly traded on the New York Stock Exchange.[74]

Sam was the Chairman of the Executive Committee and a Director of Sterling Commerce, Inc. ("**Sterling Commerce**") from December 1995 through its acquisition by SBC Communications in 2000.[75] The common stock of Sterling Commerce was publicly traded on the New York Stock Exchange.[76] Sterling Commerce was a wholly owned subsidiary of Sterling Software until March 1996 when Sterling Commerce completed an initial public offering in which it sold approximately 18.4% of its outstanding common stock.[77] In September 1996, Sterling Software declared a special dividend and distributed all the Sterling Commerce shares it owned to all the Sterling Software shareholders.[78]

Sam was the Chairman of the Board of Michaels Stores, Inc. ("**Michaels Stores**") from 1984 through July 2001 and Vice-Chairman of the Board from July 2001 through its acquisition

---

[68] *Id.* at 398:9-400:6 (Sam).

[69] *Id.* at 401:22-402:22 (Sam).

[70] *Id.* at 402:23-408:5 (Sam).

[71] *Id.* at 408:15-409:8 (Sam).

[72] *Id.* at 409:9-411:19 (Sam).

[73] Joint Stipulations ¶ 2.

[74] *Id.*

[75] *Id.* ¶ 4.

[76] *Id.*

[77] *Id.* ¶ 5.

[78] *Id.*

**MEMORANDUM OPINION**                                                                                    **18**

by a consortium of private equity firms in 2006. [79] The common stock of Michaels Stores was publicly traded on the New York Stock Exchange.[80]

Charles was a co-founder of Sterling Software and served as its Vice-Chairman of the Board from 1984 through its acquisition by Computer Associates in 2000.[81] Charles was a member of the Executive Committee and a Director of Sterling Commerce from December 1995 through its acquisition by SBC Communications in 2000.[82] Charles was the Vice-Chairman of the Board of Michaels Stores from 1984 through July 2001 and the Chairman of the Board from July 2001 through its acquisition by a consortium of private equity firms in 2006.[83] Charles was killed in an automobile accident in Colorado on August 7, 2011.[84]

Given the wide variety of business ventures Sam and Charles were involved in, they needed administrative help. Sharyl Robertson ("**Robertson**") started working for the Wylys as a bookkeeper in the late 1970s and eventually became chief financial officer of Highland Stargate, Ltd., a Texas Limited Partnership, which is the Wyly family office located in Dallas ("**Highland Stargate**" or "**Wyly family office**").[85] In late 1998, she left that position and became employed full time by Maverick Capital, Ltd. ("**Maverick**"), an investment management company that was established and initially run by Sam and his eldest son, Evan.[86]

---

[79] *Id.* ¶ 3.

[80] *Id.*

[81] *Id.* ¶ 8.

[82] *Id.* ¶ 10.

[83] *Id.* ¶ 9.

[84] *Id.* ¶ 6.

[85] *Id.* ¶ 16.

[86] *Id.* ¶ 16; Tr. Trans. 423:6-24 (Sam).

**MEMORANDUM OPINION** 19

Keeley Hennington ("**Hennington**") began working for Highland Stargate in January 1999 as tax director.[87] She became chief financial officer of Highland Stargate in June 2000 and still remains there in that position today.[88]

Given the wide variety of business ventures the Wylys were involved in, they also needed legal help. Michael French ("**French**") is an attorney licensed to practice law in Texas.[89] He was an equity partner in the law firm of Jackson Walker from 1976 through 1992 and a non-equity partner in that firm from 1992 through 1995.[90] Jackson Walker was the Wylys' law firm and French was their primary lawyer, controlling the Wyly business within the firm.

French testified that he left Jackson Walker to become a consultant to two Wyly-related entities—Sterling Software and Michaels Stores.[91] French also testified that after leaving Jackson Walker he worked with the Wylys to help set up Maverick, which was an investment management business.[92] When asked why he left Jackson Walker, French had a one-word explanation— "money."[93] He then elaborated, "I made more money as a consultant to Sterling Software and Michaels Stores and the other activities, Maverick activities."[94]

When Jeannette Meier, the general counsel of Sterling Software, expressed a preference for Jones Day as an outside law firm, French also became a "consultant" to Jones Day from 1995

---

[87] Joint Stipulations ¶ 17.

[88] *Id.*

[89] *Id.* ¶ 11.

[90] *Id.*

[91] SEC Tr. Trans. 1697:9-12 (French).

[92] *Id.* at 1697:11-12 (French).

[93] *Id.* at 1698:6 (French).

[94] *Id.* at 1697:9-10 (French).

**MEMORANDUM OPINION**                                                                          **20**

through 2000, after which Jones Day started doing work for Sterling Software and Michaels Stores.[95]  French was paid a consulting fee by Jones Day for bringing Wyly business to the firm.[96]

Starting in 1995, French officed with the Wylys at the Wyly family office.  From 1993 to 2000, the Wylys decided the amount of French's total compensation paid by entities controlled by or affiliated with them.[97]  In 1996, Sam and Evan promised French that his income would be at least $1.5 million per year or the Wylys would personally pay him the difference between what he made from the Wyly related entities and $1.5 million.[98]  French also served as a director of Michaels Stores from July 1992 through March 2000, and as a director of Sterling Software from September 1992 through August 2000.[99]

Dee is Charles' widow, having met and married him during college at Louisiana Tech.[100] Dee did not finish college after Charles and she were married.[101]  Charles and she had five children and she was their primary caregiver.[102]  During her 50 plus year marriage to Charles, Dee was a homemaker.[103]  She was not involved in Charles' business ventures and did not talk business with him.[104]  Charles provided for the family financially and Dee took care of their home.[105]

By 1990, Sam and Charles had accumulated enormous wealth.  As the SDNY Court found, and was independently established here, "in early to mid-1991, Sam Wyly asked Robertson to

---

[95] Tr. Trans. 698:17-699:14 (Sam).

[96] SEC Tr. Trans. 1710:19-25, 1711:9-15 (French); IRS Ex. 1199 ¶ 25 (p. 10) (Annex A, Admissions of Defendant Michael C. French).

[97] IRS Ex. 1199 ¶ 26 (p. 10) (Annex A, Admissions of Defendant Michael C. French).

[98] *Id.*

[99] Joint Stipulations ¶ 12.

[100] Tr. Trans. 149:20-15:14 (Dee).

[101] *See* Appendix to Debtor Caroline D. Wyly's Motion for Partial Summary Judgement [ECF No. 880] at app. 46 (deposition excerpt).

[102] Tr. Trans. 150:24-151:7 (Dee) (one of the children did not survive to adulthood), 168:5-15 (Dee).

[103] *Id.* at 168:5-15 (Dee).

[104] *Id.* at 151:8-152:2 (Dee).

[105] *Id.* at 151:8-152:2 (Dee), 168:5-15 (Dee).

**MEMORANDUM OPINION**                                                                                    21

attend a seminar held by lawyer and trust promoter David Tedder ["**Tedder**"] on the use of foreign trusts as a method of asset protection and tax deferral."[106] Robertson circulated a memo about Tedder's proposed system of "Asset Protection and Tax Deferral" (the "**Tedder Seminar Memo**") to Sam, Charles, Evan, French, and an in-house CPA, Ethel Ketter.[107] In the Tedder Seminar Memo, Robertson identified six goals, four of which implicated the IRS:[108]

1. Never pay probate unless there is a tax advantage in your state (not in Texas).

2. Whenever possible eliminate inheritance tax - Tedder says everyone can reduce it to zero.

3. Wherever possible reduce income tax - both domestically and foreign.

4. Never let a creditor get your asset, no matter how bad your mistake. (In 18 years of practice, Tedder's firm has never had a creditor successfully pierce the asset protection setup).[[109]]

5. Be able to change your asset protection/tax savings system.

6. Feel comfortable with the setup you've got. If your [*sic*] not comfortable with a foreign setup don't do it.

The Tedder Seminar Memo further identified "[t]he three major sources of creditor problems— unknown creditor, IRS-inheritance, IRS-income tax."[110]

The Tedder Seminar Memo also warned to "[a]lways show your chart to the creditor, rely on law not secrecy."[111] The Tedder Seminar Memo also laid out an aggressive tax transaction in which assets are exchanged to a foreign system for an annuity, warning that due to the aggressive

---

[106] Collateral Estoppel No. 5; SEC Tr. Trans. 156:25-157:7 (Robertson); Robertson Dep. Tr. 76:19-77:2; IRS Ex. 85 (June 12, 1991 memorandum from Robertson to Sam, Charles, Evan, French, and Ethel Ketter, in-house CPA for the Wyly family office, discussing Tedder's seminar on asset protection and tax deferral).

[107] IRS Ex. 85.

[108] *Id.* at SEC00150261 (under section titled "Goals").

[109] At trial, Sam admitted that the term "creditor" includes the IRS, which is the largest creditor in the Cases. Tr. Trans. 1047:24-1048:8, 1364:2-4 ("Q. By 'asset protect,' you meant the risk that creditors could get to your assets, is that correct? A. Yes. Q. And one of those creditors would include the Internal Revenue Service. Is that correct? A. Yes.").

[110] IRS Ex. 85 at SEC00150261.

[111] *Id.* at SEC100150263 (under heading "Items to be Prepared to Do").

nature of the transaction that the taxpayer should "file every tax form available and any support schedule that seems pertinent."[112] Tedder later provided the Wylys with written information about his firm's view of asset protection, including a document entitled "An Overview of Asset Protection Estate and Income Tax Reduction Using Domestic and International Structures."[113] The goal, as stated in the overview, "is to ensure that a creditor will never be able to touch or get control of your assets, and allow you to maintain complete control of all your assets."[114]

Sam was interested in the programs outlined in the Tedder Seminar Memo and related documents. Thus, as found by the SDNY Court, and independently established here, "[s]hortly thereafter, the Wylys, Robertson, and French attended another Tedder seminar in New Orleans."[115] There, Tedder gave a presentation about the tax advantages of foreign trusts.[116] The SDNY Court also found, as do we, "Tedder, French, and the Wylys then had a private meeting at Sam Wyly's house in Malibu, California. At that meeting, Tedder 'talked about establishing trusts that would provide tax deferral, and how the Wylys could transfer assets to those trusts and get tax deferral on the growth of those assets.'"[117]

Specifically, in Malibu, Tedder told the Wylys that they could establish offshore trusts in the Isle of Man ("**IOM**") and transfer their stock options in Michaels Stores and Sterling Software to those trusts in exchange for annuities.[118] Tedder further stated that capital gains earned on securities held in the Isle of Man Trusts would not be taxed by U.S. tax authorities. As the SDNY

---

[112] *Id.* at SEC100150281 (under heading "Problems").

[113] IRS Ex. 525.

[114] *Id.* at SWYLY004776.

[115] Collateral Estoppel No. 5; Tr. Trans. 696:23-627:16 (Sam, however, testified that he did not attend the New Orleans conference); SEC Tr. Trans. 168:2-12 (Robertson testifying that she attended the New Orleans seminar along with Sam, Charles, and French), 1716:14-1717:3 (French testifying he attended the New Orleans seminar with Sam and Charles).

[116] French Depo Tr. 1717:1-20.

[117] Collateral Estoppel No. 5; Tr. Trans. 1050:19-1059:11 (Sam); IRS Ex. 525; SEC Tr. Trans. 1718:4-8 (French).

[118] Tr. Trans. 1050:23-1059-30 (Sam); SEC Tr. Trans. 1719:7-17 (French); IRS Ex. 525.

Court found, as do we, "Tedder recommended transferring the Wylys' stock options in Sterling Software and Michaels Stores to a foreign trust in exchange for a private annuity 'in a tax-free kind of transaction.' Under Tedder's plan, it was 'expressly intended that [the Wylys]… irrevocably surrender the enjoyment, control, ownership, and all economic benefits attributable to the ownership of the [options] which are sold in exchange for the private annuity.'"[119]

In part because of the complexity of the record keeping required to support the Wyly offshore system, and in part because of their desire for secrecy and to make access to the records of the offshore system more difficult for their creditors, including the IRS, to obtain if there was ever a challenge to the offshore system, Sam and Charles implemented an offshore version of their Dallas family office in the mid-1990s called Irish Trust Company ("**Irish Trust**"), an entity domiciled in the Cayman Islands and indirectly owned by two of the Wyly IOM trusts.[120]

Michelle Boucher ("**Boucher**") became a trusted Wyly advisor in approximately 1995 and then became a protector of the Wyly IOM trusts in 2001.[121] Boucher is a Canadian citizen who resides in the Cayman Islands.[122] The Wylys first met Boucher when she was working for

---

[119] Collateral Estoppel No. 6; Tr. Trans. 1050:19-1051:16 (Sam), 1052:9-1059:11 (Sam); SEC Tr. Trans. 1719:3-17 (French); IRS Ex. 525 (written information Sam received from Tedder titled "An Overview of Asset Protection Estate and Income Tax Reduction Using Domestic and International Structures").

[120] Joint Stipulations ¶¶ 110-111 (stipulations as to formation and ownership structure); SEC Tr. Trans. 1008:6-1011:20 (Boucher testifying that documents were moved and kept offshore to, among other reasons, make them more difficult for third parties to obtain); IRS Ex. 1199 ¶ 61 (p. 15) (Annex A, Admissions of Defendant Michael C. French) ("One purpose of Boucher's employment was to maintain records for the Isle of Man Trusts and the Offshore Companies in the Cayman Islands so that the records would not be maintained in the United States."); Tr. Trans. 1370:1-6 (Sam testifying that one of the purposes for hiring Boucher was so that records would not be maintained in the United States); IRS Ex. 95 at SWYLY013049, § 1.C (Memorandum dated May 12, 2000 from Robertson to Sam, Evan, and others expressing a concern regarding future regulations that may require submission of audited financial statements and access to offshore trust documents, and stating the "solution" of hiring a "'lawyer' custodian to hold the trust deeds, which disclose beneficial ownership. The lawyer would be instructed by the protectors and the trustee not to release the trust deeds to anyone without joint consent. This would slow the process of delivery of the trust deeds down, giving the ability to flee the jurisdiction if it was deemed necessary.").

[121] Joint Stipulations ¶ 68; Tr. Trans. 556:24-557:12 (Evan).

[122] Tr. Trans. 1744:11-16 (Sam).

MeesPierson in the Cayman Islands, where one of her clients was Maverick.[123]   Acting on behalf of Sam and Charles, Robertson approached Boucher around 1995 and offered her a position as chief financial officer of Irish Trust.[124]   Boucher accepted and continued in this position until 2010, when her role changed to consultant to Irish Trust.[125]   Boucher remains at Irish Trust today.   At Irish Trust, Boucher reported to Robertson, French, and later Donnie Miller (Dee's son-in-law and executor of Charles' probate estate), and Evan (Sam's eldest son).[126]

Prior to becoming a trust protector herself, Boucher served as a conduit, the person who communicated the Wylys' recommendations between the protectors (Robertson and French) and the various IOM trustees.[127]   Francis Webb, an employee of IFG, one of the trust management companies who served as trustee for certain of the Wyly IOM trusts,[128] summarized a meeting with French and Robertson concerning the hiring of Boucher and the movement of all records concerning the Wyly IOM trusts to the Cayman Islands in a memorandum dated September 29, 1995.[129]   Webb's memorandum states that French and Robertson were concerned about the trail of communications to the trustees and records maintained in the United States:[130]

> We were already aware of the roles played by Michael French and Sharyl Robertson, representing Maverick Capital and the Wyly Family, and firstly the role of Michelle Boucher was explained.... *We will* therefore *have prime contact with Michelle in most situations as she is to act as the focus of communications and maintain records etc. which should not be seen in the USA....Michael and Sharyl are anxious that any trail of communications between themselves, Michelle and MeesPierson does not give rise to any potential claim that control is being exercised in the USA. Consequently we may anticipate that there will be telephone communications only from Dallas; suggestions possibly put forward via Michelle*

---

[123] *Id.* at 556:24-557:12 (Evan).

[124] *Id.* at 556:24-557:12, 559:1-14 (Evan); Joint Stipulations ¶ 113.

[125] Joint Stipulations ¶ 113.

[126] SEC Tr. Trans. 987:4-988:4 (Boucher).

[127] *Id.* 995:25-996:17 (Boucher).

[128] Tr. Trans. 787:19-21, 912:18-913:3 (Evan).

[129] IRS Ex. 409.

[130] *Id.* at 81822-823 (emphasis added).

*Boucher but it was agreed that there should be formal recommendations made by the Trustees to the Protectors Committee wherever appropriate to maintain a required direction of control.*

After a chance meeting in the Cayman Islands in mid-2003 between Charles Lubar ("**Lubar**"), a prominent international tax attorney, and Boucher, Boucher learned that Lubar (i) had previously concluded that there was a "significant risk" that the 1992 IOM trusts settled by Sam and Charles would be treated as grantor trusts to them under the Internal Revenue Code, and (ii) had informed French of his firm's conclusions a decade earlier.[131]  Boucher informed Hennington, which led to a flurry of activity.[132]

First, Hennington and Boucher met with Lubar at his London office where Lubar's concerns with the offshore system dating back to 1993 were discussed in detail.  Hennington and Boucher informed Sam and Charles, among others, of Lubar's legal conclusions.[133]  Of note, while numerous witnesses at trial expressed surprise over this news because it was contrary to other advice that had been allegedly received,[134] Sam was not one of the witnesses expressing surprise.[135]

---

[131] French's concerns about the proper tax treatment of the 1992 IOM trusts and his decision to get a second opinion from Lubar's firm are discussed in detail *infra* at pp. 84-87.

[132] Tr. Trans. 1925:3-1968:9 (Hennington testifying regarding the series of events that occurred after Boucher's chance meeting with Lubar at a conference in the Cayman Islands).

[133] IRS Ex. 96 (memorandum dated June 30, 2003 prepared by Hennington to inform the Wyly family of the issues that Lubar had raised); Tr. Trans. 1945:17-1949:21 (Hennington prepared the memo for the purpose of "relaying all of the issues that Lubar had raised" and to provide the "worst-case scenario" to the family), 1949:22-1954:19 (Hennington recounts a meeting with the Wyly family to discuss the worst-case scenario and Lubar's recommendation that he meet with the IRS on their behalf on an anonymous basis).

[134] Tr. Trans. 592:19-596:8 (Evan), 844:5-8, 960:9-17 (Evan) ("This was a surprise…. In fact, this was a surprise because it was the opposite of what we had been hearing all along."), 970:10-24 (Evan), 1776:18-24 (Cousins) ("I believe that they were very, very upset because Mr. Lubar indicated there was a problem with the '92 trusts, and they didn't know that there was going to be a problem and didn't know what to do about it."), 1944:16-19 (Hennington) ("Q: Did you understand Mr. Lubar to be raising issues that were inconsistent with the advice previously given by Meadows Owens concerning the trusts? A: Absolutely."), 1349:20-1349:24 (Donnie Miller) ("Q. Was it fair to say that pretty much Charles Wyly, Sam Wyly, Evan Wyly, everyone intimately connected with this offshore structure was discomposed, to say the least, by this memo. A. Yeah. We were surprised."), 1358:3-1359:9 (Donnie Miller) (Surprised by memo in 2003 because "I thought we were always compliant with regulations").

[135] Tr. Trans. 1409:9-1423:16 (Sam's testimony regarding IRS Ex. 96, which contains the mid-2003 memoranda in which Hennington and Boucher expressed Lubar's conclusions regarding issues surrounding the trusts).  Sam's

---

Second, acting as agents for Sam and Charles, Hennington and Boucher hired Lubar to re-analyze all of the issues surrounding the Wyly offshore system, which he did and which confirmed his original conclusions.  Lubar ultimately recommended an anonymous meeting with the IRS on the Wylys' behalf to see if a global resolution of the tax issues surrounding the Wyly offshore system could be achieved, which recommendation the Wylys accepted and authorized.[136]  Thus, in August 2003, Lubar and other Wyly attorneys had a meeting with the IRS, on an anonymous basis, to discuss the Wyly IOM offshore system and activities undertaken offshore in an attempt to secure a global resolution of the Wyly's looming tax issues.[137]  Although the parties have different perspectives on this meeting, it is sufficient for our purposes to simply state that nothing ultimately came from this meeting.

Third, because the extended due date of Sam's 2002 tax return was quickly approaching (October 15, 2003), and given that Meadows Owens had been advising the Wylys for years and had apparently given advice to them previously about the offshore system,[138] the Wylys, acting through Hennington, requested additional advice from Meadows Owens.[139]  By this time, the

---

testimony consists mainly of him acknowledging that the IRS' counsel correctly read the document into the record.  Although Sam claims he does not remember the memorandum, he admits that he likely would have received it due to its importance and the fact it was sent by Hennington and Boucher.  Further, when asked whether French had conveyed Lubar's concerns raised in 1993 regarding the status of the 1992 trusts, Sam simply testified "I don't know."  *Id.* at 1419:5-11.  And, when questioned as to whether this was too important of a topic for French not to have informed Sam, Sam testified: "[i]t's certainly an important topic, but it's the sort of thing delegated to attorneys—to Mr. French and other attorneys."  *Id.* at 1420:17-21.  Sam, however, did not testify as to any surprise in 2003 when he heard the news; he simply testified that he could not remember whether he was previously told.  Remarkably, on redirect, Sam unequivocally testified that neither Owens, French or any of Sam's lawyers or CPAs ever told him that was anything seriously wrong with the IOM trusts "as a tax matter."  *Id.* 2935:12-23 (Sam).  This is just one example of the many times that Sam's memory on redirect was superior to that during cross.

[136] *Id.* at 976:9-18 (Evan), 1936:6-1944:1 (Hennington), 1956:12-19 (Hennington).

[137] *Id.* at 1956:20-1958:23 (Hennington).

[138] Meadows Owens gave no formal written opinion letters to the Wylys. Rather, Meadows Owens' advice was provided orally or in less formal writings.  As will be discussed in detail in connection with the Court's analysis of Sam's reasonable cause and good faith defense, he received advice from numerous lawyers and other professionals about the offshore system and the tax consequences of it to him from 1992 to the present.  *See* pp. 177-230, *infra.*

[139] Tr. Trans. 970:25-971:6, 976:2-8 (Evan).

primary lawyer at Meadows Owens that the Wylys used, Rodney Owens ("**Owens**"), had passed away.[140] However, other Meadows Owens attorneys that had worked with Owens on Wyly matters—primarily Charles Pulman ("**Pulman**") and Trey Cousins ("**Cousins**")—met with Hennington and quickly made recommendations on available alternatives, one of which was that the Wylys make formal disclosures of the tax positions identified by Lubar on their tax returns. Specifically, Meadows Owens recommended that Sam file a Form 8275 disclosure with his about-to-be filed 2002 tax return, which is a from that can be filed with the IRS when the position being taken on a tax return has only a reasonable basis of being sustained, in order to attempt to avoid accuracy related penalties from being imposed by the IRS.[141] Because Dee and Charles had already filed their 2002 joint tax return, Meadows Owens recommended that Dee and Charles file a Form 8275 disclosure with their 2003 joint tax return (filed in October 2004), which they did.[142]

Early in 2004, the IRS commenced an audit of the Wylys' returns for the 2000 tax year. From the beginning of the audit it was clear that the IRS was examining the offshore trusts and the annuity transaction undertaken offshore.[143]

The Permanent Subcommittee on Investigations of the United States Senate undertook an investigation of tax haven abuses. The Wylys offshore system was one of the offshore systems investigated. That investigation became public knowledge sometime in 2005.[144] Hennington testified that attorneys hired by the Wylys reviewed all of the files maintained in the Wyly family

---

[140] *Id.* at 1774:4-5 (Cousins) (Owens passed away in July 2003); 1970:5-1972:13 (Hennington).

[141] IRS Ex. 98 at WYLYSEC01105084 (Notes from October 8, 2003 meeting between various Meadows Owens attorneys and Hennington detailing options and recommending the filing of a Form 8275), Joint Ex. 106 (Sam's 2002 tax return) at SWYLY021498-500 (Attachment to Form 8275).

[142] Joint Ex. 130 (Dee and Charles' 2003 tax return) at SWYLY029540-542 (Attachment to Form 8275).

[143] Tr. Trans. 2073:21-2074:13 (Hennington) ("[The IRS] made clear that [the foreign trusts and annuities] was the focus of their audit when they started in '04.").

[144] *Id.* at 2114:9-16 (Hennington).

office and over 700 boxes of documents in off-site storage in response to document requests made in relation to the investigation.[145]

By April of 2005, Bickel & Brewer and Donald Lan[146] of Kroney Mincey PC were hired as counsel for the Wylys to handle the government's on-going tax and securities investigations. Prior to the filing of the Wylys' 2005 federal income tax returns in October 2006, Bickel & Brewer learned that certain IOM trusts settled in 1994 and 1995 had not been funded with the amount of funds required by the trust deeds of settlement,[147] which raises additional concerns about the validity of the IOM offshore system as will be discussed *infra* at pp. 87-98.

On July 30, 2010, the SEC sued Sam, Charles, and French, among others, in the SEC Action, asserting ten counts of securities fraud. French settled with the SEC.[148] As noted previously, following a jury trial on the liability phase and a bench trial on the remedies phase of the SEC Action, the SDNY Court entered judgment against Sam and the probate estate of Charles, for $123,836,958.75 and $63,881,743.97, respectively, plus prejudgment interest,[149] finding that Sam and Charles had committed securities fraud. This decision is currently on appeal to the Second Circuit Court of Appeals.

On October 19, 2014, shortly before judgment was entered against him in the SEC Action, Sam filed his Case here. Shortly thereafter, Dee filed her Case here. The Cases are being jointly administered. On the day each Case was filed, the Debtor's respective Motion was filed. The IRS

---

[145] *Id.* at 2114:20-2115:21 (Hennington).

[146] Upon the Debtors' applications, Lan was retained as special tax counsel here, after notice and a hearing. *See* employment orders at ECF No. 261 and 367 (Kroney Morse Lan, PC employment orders) and 749 and 750 (Lan Smith Sosolik, PLLC employment orders).

[147] Tr. Trans. 2076:21-2078:24 (Hennington).

[148] *See* IRS Ex. 1199 (Consent of Michael C. French).

[149] *SEC v. Wyly*, 56 F.Supp.3d at 434.

**MEMORANDUM OPINION**                                                                29

timely filed the Proofs of Claim against each of the Debtors and the Debtors filed the Claim Objections, which brings us to the present dispute before the Court.

## IV. LEGAL ANALYSIS

### A. Burden of Proof

Like most aspects of the Cases, the burden of proof analysis is complicated. The fact that the IRS is asserting federal tax liability in the context of the Proofs of Claim implicates not only the burden-shifting analysis applicable to proofs of claim in bankruptcy generally, but also multiple additional burden shifting doctrines and statutory allocations of burdens of proof that apply specifically to tax matters. None of these burden of proof analyses are exactly alike, so the Court will proceed in the only way it can—by analyzing each burden of proof framework before coming to its ultimate conclusions.

### 1. Bankruptcy Law Burden of Proof – In General

In bankruptcy, a proof of claim filed in accordance with Bankruptcy Rule 3001[150] is "prima facie evidence of the validity and amount of the claim."[151] However, this prima facie validity may be rebutted[152] by the objecting party producing evidence "of a probative force equal to that of the creditor's proof of claim."[153] In 2000, the Supreme Court held, in a bankruptcy case involving a proof of claim asserting tax liability, "bankruptcy does not alter the burden imposed by the substantive law."[154] Thus, once an objecting party produces evidence rebutting a proof of claim, the burden then lies with whichever party it would normally according to the relevant substantive

---

[150] In the body of this Memorandum Opinion, the Court will refer to a specific Bankruptcy Rule of Procedure as "Bankruptcy Rule" followed by the applicable rule number.

[151] FED. R. BANKR. P. 3001(f); *see In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

[152] *Fidelity Holding Co., Ltd.*, 837 F.2d at 698.

[153] *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985); *see Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059 (5th Cir. 1998).

[154] *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 17 (2000).

law.[155]  Here, that relevant substantive law is federal tax law, which often, but not always, puts the initial burden of proof on the taxpayer.

The Debtors' arguments here regarding burden of proof implicate every step of the bankruptcy burden of proof analysis, to which we now turn.

### a)   Prima Facie Validity under Bankruptcy Rule 3001(f)

The Debtors initially argue that the burden of proof lies with the IRS because the Proofs of Claim were not filed in accordance with Bankruptcy Rule 3001, and thus do not constitute prima facie evidence of the validity or amount of the IRS' claims.[156]  In particular, the Debtors argue that the Proofs of Claim fail to comply with Bankruptcy Rule 3001 for three reasons: (i) they do not contain an itemized statement of the interest, fees, expenses, or charges required in individual bankruptcies under Bankruptcy Rule 3001(c)(2)(A),[157] (ii) they were not executed in accordance with Official Form 10 as required by Bankruptcy Rule 3001(b) because the IRS bankruptcy specialist who signed the Proofs of Claim "signed and filed the IRS Claims without any factual basis whatsoever, instead relying on IRS staff professionals to investigate and prepare the forms for his signature,"[158] and (iii) they lack sufficient information for the Debtors to evaluate the bases of them.[159]  The Debtors also argue that the IRS' supposed missteps in failing to comply with Bankruptcy Rule 3001 are exacerbated by the fact that the Proofs of Claim contained numerous errors.[160]

---

[155] *See In re 1701 Commerce, LLC*, 511 B.R. 812, 822 (Bankr. N.D. Tex. 2014); *In re Aviva America, Inc.*, 2005 WL 6441404, at *3-4 (Bankr. N.D. Tex. June 21, 2005) (quoting *In re Armstrong*, 320 B.R. 97, 102-03 (Bankr. N.D. Tex. 2005)).

[156] Debtors' Brief in Support of Motion for Order Determining the Respective Burdens of Proof [ECF No. 936] ("**Debtor's Burden of Proof Brief**") ¶ 3.

[157] *Id.* ¶ 11.

[158] *Id.* ¶ 14.

[159] *Id.* ¶ 18.

[160] *Id.* ¶¶ 16-17.

Although much of the "fuss" surrounding the burden of proof issues revolved around the now-stipulated income tax liability amounts reflected in the Computation Stipulations, the Court undertakes the burden of proof analysis because of its potential relevance to other areas of dispute in the Cases.[161]   For the reasons explained below, the Court rejects the Debtors' arguments and will accord prima facie validity to the Proofs of Claim.

Regarding the failure of the IRS to attach an itemized statement of the interest, fees, expenses, or charges to the Proofs of Claim, it must first be noted that such failure was not complete.  In the Proofs of Claim filed by the IRS in these Cases, the IRS did break out the amount of income tax due and interest on income tax due on a year-by-year basis, as well as the amount of gift tax due and interest on gift tax due on a year-by-year basis.[162]   However, the IRS did not similarly break out the amounts of penalties due on a year-by-year basis.[163]   For the reasons explained below, the Court concludes that this failure was harmless under the highly unique facts of these Cases.

---

[161] The Fifth Circuit, agreeing with many other courts that have explored the operation of burden shifting in the tax context, has pointed out that "the operation of this burden-shifting scheme is irrelevant when both parties have met their burdens of production and the preponderance of the evidence supports one party." *Brinkley v. C.I.R.*, 808 F.3d 657, 664 (5th Cir. 2015) (citing *Knudsen v. C.I.R.*, 131 T.C. 185, 189 (2008) ("[A]n allocation of the burden of proof is relevant only when there is equal evidence on both sides.")). The Fifth Circuit has held that when both sides have met their burden of production and where the preponderance of evidence nevertheless favors one party, any error in the allocation of the burden of proof is harmless. *Brinkley*, 808 F.3d at 664 (citing *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 332 (5th Cir. 2010); *Blodgett v. C.I.R.*, 394 F.3d 1030, 1039 (8th Cir.2005)).  Indeed, the Fifth Circuit has gone so far as to explicitly state that "[t]he tax court need not decide whether the burden shifted where, as here, both parties offered some admissible evidence." *Whitehouse Hotel, Ltd. P'ship*, 615 F.3d at 332 (5th Cir. 2010) (citing *Blodgett* 394 F.3d at 1039). This is because "[i]n a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance." *Id.* (quoting *Blodgett*, 394 F.3d at 1039).
The parties here have presented mountains of evidence, and so the Fifth Circuit's observations that allocation of burden of proof is sometimes unimportant may well apply here.  Of course, this "it makes no difference" caveat does not apply to the IRS' burden for its assertion of fraud penalties, as the IRS must prove fraud by clear and convincing evidence, not a preponderance of the evidence.  Out of an abundance of caution, however, this Court undertakes the burden of proof analysis.

[162] *See* Case No. 14-35043, Claim No. 18 at 3; Case No. 14-35074, Claim No. 11 at 3.

[163] *See* Case No. 14-35043, Claim No. 18 at 3; Case No. 14-35074, Claim No. 11 at 3.

Bankruptcy Rule 3001(c)(2)(D) provides the appropriate remedies that a court *may* invoke for a creditor's failure to attach the itemized statement required by Bankruptcy Rule 3001(c)(2)(A). These remedies include precluding the IRS from presenting the omitted information (unless the Court determines that the IRS' failure to include this information "was substantially justified or is harmless"[164]) or awarding other appropriate relief.

In light of the highly unique facts of these Cases, the Court does not choose to exercise either of these (or any other) remedies. These Cases involved a great deal of back-and-forth between the parties, as is to be expected when billions of dollars of potential tax liability hang in the balance.[165] The IRS met with the Debtors shortly after filing the Proofs of Claim, at which meeting it made a presentation explaining how it had calculated its claims against them.[166] This presentation—along with the open lines of communication that existed between the parties' respective counsel throughout the pre-trial and trial phases of the Motions and Claim Objections— eventually allowed the parties to come to the Computation Stipulations resolving the vast majority of the calculations relevant to the Debtors' ultimate tax liability, once the Court determines certain factual and legal issues that remain in dispute between them. The presentation and these open lines of communication caused the essential purpose of the itemized statement required by Bankruptcy Rule 3001(c)(2) to be satisfied.

The Advisory Committee Notes that accompany Bankruptcy Rule 3001 state that subsection (c)(2) was added:

> to require additional information to accompany proofs of claim filed in cases in which the debtor is an individual. When the holder of a claim seeks to recover-in addition to the principal amount of a debt-interest, fees, expenses, or other charges, the proof of claim must be accompanied by a statement itemizing these additional

---

[164] FED. R. BANKR. P. 3001(c)(2)(D)(i).
[165] Tr. Trans. 1582:23-1596:1 (Herrick).
[166] *Id.* at 2766:21-2769:5 (Pfiffner).

amounts with sufficient specificity *to make clear the basis for the claimed amount.*[167]

Even though the IRS did not attach a completely itemized statement as required by Bankruptcy Rule 3001(c)(2)(A), it did "make clear the basis for the claimed amount" to the Debtors through the itemized statement that was attached to its Proofs of Claim, its presentation to the Debtors, and through regular communication with Debtors' counsel. The IRS did not act as a recalcitrant creditor who refused to provide information to the Debtors. On the contrary, the evidence shows that the IRS was very forthcoming with information about how it calculated its claims, and because of this, at least in part, the parties were able to come to the Computation Stipulations.

In light of the fact that the Debtors were supplied with a great deal of information regarding the amounts of interest and penalties asserted in the Proofs of Claim, the IRS' failure to supply a fully itemized statement of interest, fees, expenses, or other charges as required by Bankruptcy Rule 3001(c)(2)(A) was harmless, and did not affect the Proofs of Claim's prima facie validity.

The Debtors also argue that the Proofs of Claim are not prima facie valid because the IRS insolvency specialist who signed them relied on other IRS staff to prepare them and simply accepted their calculations as true and accurate without checking them.[168] The Court is less troubled by this than the Debtors, as "IRS employees possess the properly delegated authority to file a proof of claim and participate in bankruptcy proceedings on behalf of the United States."[169] The IRS insolvency specialist who signed the Proofs of Claim testified that this authority was delegated to him pursuant to IRS Delegation Order 25-3.[170] Moreover, "Rule 3001 is not

---

[167] FED. R. BANKR. P. 3001 advisory committee's note to 2011 Amendments (emphasis added).

[168] *See, e.g.,* Tr. Trans. 1633:1-1637:23 (Carey).

[169] *In re Fuller*, 204 B.R. 894, 897 (Bankr. W.D. Pa. 1997) (citing *In re Schibilsky*, 185 B.R. 81 (Bankr. N.D. Ga. 1995); *In re Harrison*, 177 B.R. 564 (Bankr. S.D. Ohio 1994)); *IRS Delegation Order 25-3* (available at https://www.irs.gov/irm/part1/irm_01-002-052.html#d0e534).

[170] Tr. Trans. 1648:7-12 (Carey).

inflexible."[171]  The Debtors failed to cite a single case where a court denied an IRS proof of claim prima facie validity because the signatory did not personally perform the claim calculations.  This Court was likewise unable to locate such a case.  That is likely because the fact that the signing insolvency specialist did not personally prepare the underlying calculations does not affect the claims' prima facie validity.  As a practical matter here, given the variety of different components of the IRS' claims against the Debtors and the complexities of the claim calculations, it is unlikely that a single person could have actually calculated the amounts and then signed the claim.  So, unless multiple people then have to sign a single claim on behalf of the IRS, the Debtors' argument is untenable.  For all of these reasons, the Court rejects the Debtors' argument.

Finally, the Debtors argue that the Proofs of Claim are deficient because "[t]he IRS Claims lack any explanation as to the basic facts on which the IRS relies to determine the alleged liabilities; instead the IRS Claims contain only bare-bones legal conclusions without reference to any facts whatsoever."[172]  The Court rejects this argument as it overlooks the fact that the Proofs of Claim are based on a statute, not on a writing, and therefore it is not necessary for the IRS to attach *any* supporting documentation to the Proofs of Claim in order to comply with Bankruptcy Rule 3001.[173]  Where, as here, the IRS chose to attach support to the Proofs of Claim when it was not required to do so and then made a specific presentation to the Debtors to explain the bases of its claims against them,[174] the Debtors' contention that the Proofs of Claim did not provide sufficient notice cannot be taken seriously.

---

[171] *In re Today's Destiny, Inc.*, 2008 WL 5479109, at *5 (Bankr. S.D. Tex. Nov. 26, 2008).

[172] *See* Debtors' Burden of Proof Brief [ECF No. 936] ¶ 20.

[173] *See Carlisle v. Dept. of Justice (In re Carlisle)*, 320 B.R. 796 (M.D. Pa. 2004); *Vines v. I.R.S. (In re Vines)*, 200 B.R. 940, 949 (M.D. Fla. 1996) (citing cases).

[174] Tr. Trans. 2766:21-2769:5 (Pfiffner).

When all is said and done, the Proofs of Claim fulfilled their "essential purpose of providing objecting parties with sufficient information to evaluate the nature of the claims."[175] The Proofs of Claim substantially comply with Bankruptcy Rule 3001, and are thus prima facie evidence of the validity and the amount of the IRS' claims against the Debtors under Bankruptcy Rule 3001(f).

> **b)** **Have the Debtors Raised Evidence of a Probative Force Equal to that of the Proofs of Claim?**

The Debtors next argue that even if the Proofs of Claim are afforded prima facie validity, they have raised evidence of a probative force equal to that of the Proofs of Claim.[176] If this is true, then the burden of proof lies with whichever party it normally would under federal tax law.[177]

The Debtors imply that they could raise evidence of equal probative force to the Proofs of Claim merely by stating that the IRS' claimed amounts are "too high."[178] Their reliance on *In re 804 Congress, L.L.C.*,[179] however, is misplaced. *In re 804 Congress, L.L.C.* involved creditors asserting claims for contractual attorney fees who did not attach any supporting documentation to the proof of claim.[180] In that case, the bankruptcy court held that in a situation where no documents are provided to support a claim based on a writing—in clear contravention of Bankruptcy Rule 3001(c)(1)—a mere questioning of the claim's reasonableness could be construed as evidence of equal probative force to the proof of claim itself. Here, however, the Proofs of Claim are based on a statute, and no documents were required to be attached to them in the first instance. Thus, *In re 804 Congress, L.L.C.* is clearly distinguishable.

---

[175] *In re Davis*, 2011 WL 1302222, at *10 (Bankr. E.D. Tex. March 31, 2011).

[176] Debtors' Burden of Proof Brief [ECF No. 936] ¶ 4.

[177] *In re Simmons*, 765 F.2d at 552; *see In re Southland Corp.*, 160 F.3d at 1059.

[178] Debtors' Burden of Proof Brief [ECF No. 936] ¶ 4.

[179] 529 B.R. 213, 220 (Bankr. W.D. Tex. 2015).

[180] *Id.*

Accordingly, we must further examine what sort of evidence could meet the standard of "equal in probative force" and whether the Debtors raised such evidence here. As this Court recently held, once the prima facie validity of a proof of claim under Bankruptcy Rule 3001(f) is established:

> The burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question.[181]

Here, the Proofs of Claim seek amounts from the Debtors that fall into four basic categories: (i) income taxes, (ii) gift taxes, (iii) fraud penalties, and (iv) failure to file penalties.[182] As noted previously, shortly before trial commenced, the parties reached agreement on the Computation Stipulations, which will enable the parties to calculate the amounts owed to the IRS depending on this Court's analysis of certain legal and factual issues that remain in dispute among them, rendering the pre-trial dispute over the burden of proof on the amount of the Debtors' income tax underpayments and gift tax underpayments moot.

However, a dispute remains regarding whether any gifts were actually made by the Debtors, for which the IRS is asserting gift taxes (and associated penalties). The Debtors have raised legal arguments that create doubts as to whether gifts were made. The Debtors also

---

[181] *In re Margaux City Lights Partners, Ltd.*, 2014 WL 6668982, at *3 (Bankr. N.D. Tex. Nov. 20, 2014) (quoting *In re Rally Partners, L.P.*, 306 B.R. 165, 168–69 (Bankr. E.D. Tex. 2003)).

[182] The Internal Revenue Code imposes obligations on U.S. taxpayers to report certain information about certain foreign business entities that they control. The failure to timely file these information returns on, as relevant here, Forms 3520, 3520-A, and 5471, results in the imposition of penalties for the taxpayer's failure to file the required form. *See* pp. 286-324, *infra.*

introduced evidence suggesting that the transactions that remain at issue were not gifts.[183]  These arguments and evidence together form evidence that is of a probative force equal to that raised by the Proofs of Claim regarding the alleged gift tax issues.  Thus, the ultimate burden of proof will be where federal tax law places it, as discussed further below.

The parties likewise agree—as does this Court—that the IRS bears the burden of proving its claim for fraud penalties (for both income and gift tax underpayments) by clear and convincing evidence.[184]  But, even without their agreement, the Debtors presented evidence of a probative force equal to the Proofs of Claim regarding the fraud penalties being sought by the IRS.[185]  Thus, the ultimate burden of proof on the issue of fraud penalties lies where the substantive federal tax law places it, as discussed further below.

Regarding the IRS' claims for international failure to file penalties, the Debtors also raised legal arguments that cast into doubt at least some of the IRS' assertions that the Debtors failed to file certain required forms.[186]  Thus, the burden of proof on the issue of whether the Debtors are liable for international failure to file penalties also lies where federal tax law places it, as discussed further below.

## 2.  Tax Law Burden of Proof—In General

As noted previously, in 2000, the Supreme Court held that "bankruptcy does not alter the burden imposed by the substantive law."[187]  Because the Debtors have rebutted the Proofs of Claim as to the Debtors' alleged liability for gift taxes, fraud penalties, and international failure to file penalties, we must now determine where federal tax law places the burden of proof on these issues.

---

[183]  *See, e.g.,* Tr. Trans. 627:7-628:2 (Evan), 632:3-628:16 (Evan), 1515:14-1519:1 (Laurie), 1565:21-1566:13 (Laurie), 2141:13-2142:15 (Hennington), 2185:4-2192:6 (Hennington).

[184]  *See* pp. 47-48, *infra.*

[185]  *See* pp. 177-230, *infra.*

[186]  *See, e.g.,* Debtors' Post-Trial Brief [ECF No. 1118] at 51-87.

[187]  *Raleigh*, 530 U.S. at 17.

### a)    Gift Tax Deficiencies and the Presumption of Correctness[188]

The burden of proof analyses—there are two relevant here—regarding gift tax deficiencies are by far the most complicated of the tax law burden of proof analyses that this Court must address. However, before reaching those analyses we must discuss one of the general rules regarding burden of proof in tax matters—*i.e.*, the presumption of correctness. In tax court proceedings, after the IRS has made a determination that a certain amount of tax is due, the burden of proof is usually on the taxpayer to show that the IRS' determination is incorrect. As the Supreme Court has stated, "[u]nquestionably the burden of proof is on the taxpayer to show that the *Commissioner*'s determination is invalid."[189] Not surprisingly, the Fifth Circuit agrees: "it is well settled that the courts afford IRS determinations of deficiency a presumption of correctness."[190] Of course, in order to be afforded a presumption of correctness, the IRS' deficiency determination must be "supported by a minimal factual foundation."[191] If for some reason the presumption of correctness does not apply to the IRS' determination of tax liability, then the IRS has the burden of proving that the taxpayer owes tax.

Fifth Circuit precedent supports the view that a proof of claim filed by the IRS should be afforded the presumption of correctness. In *Portillo v. C.I.R.*,[192] the court noted that there is really no prescribed form for the statutory deficiency notice that normally contains the IRS' determination which receives the presumption of correctness, and that this notice simply must, at a minimum: (i) advise the taxpayer that the IRS has determined that a deficiency exists for a

---

[188] While the Court acknowledges that the parties have stipulated to the amount of the income tax deficiencies, thus mooting the burden of proof dispute as to these deficiencies, this analysis would have applied to them if the dispute remained live.

[189] *Helvering v. Taylor*, 293 U.S. 507, 515 (1935).

[190] *Yoon v. C.I.R.*, 135 F.3d 1007, 1012 (5th Cir. 1998) (internal citation omitted).

[191] *Neilson v. U.S.* (*In re Olshan*), 356 F.3d 1078, 1084 (9th Cir. 2004) (quoting *Palmer v. U.S.*, 116 F.3d 1309, 1312 (9th Cir.1997)).

[192] 932 F.2d 1128, 1132 (5th Cir. 1991) (citing *Donley v. C.I.R.*, 791 F.2d 383 (5th Cir.1986)).

particular year, and (ii) specify the amount of the deficiency or provide the information necessary

to compute the deficiency.  In *Data Industries Corp. of Texas v. I.R.S.*,[193] the Fifth Circuit stated:

> Data Industries makes two contentions in its effort to overturn the District Court's
> order. First, Data contends that, notwithstanding the prima facie correctness of a
> claim filed in bankruptcy proceedings, the presumptive correctness arising from the
> underlying tax assessment cannot be invoked unless the Government produces
> additional evidence such as a copy of the assessment certificate. This contention
> simply has no merit, particularly since all pertinent information relating to the IRS
> assessment was contained in the proofs of claim filed by the Government in the
> bankruptcy proceedings.

Under this precedent, the Proofs of Claim are entitled to the presumption of correctness,[194]

unless the Debtors' two arguments as to why the presumption of correctness does not apply here

have merit.

### (1)     Is   the   IRS'   Determination   "Arbitrary   and Erroneous?"

The Debtors first argue that the presumption of correctness should not apply because the

IRS' determinations of gift tax deficiencies are arbitrary and erroneous.[195]  If the presumption of

correctness does not apply, then the IRS has the burden of proving up its claim that gift tax is owed

by one or both Debtors.  In *In re Olshan*,[196] the Ninth Circuit described how a taxpayer is able to

shift the burden of proof to the IRS by arguing that the IRS' deficiency determination was arbitrary

and erroneous:

> A bankruptcy court adjudicating a tax claim by the IRS must apply the burden-of-
> proof rubric normally applied under tax law. In an action to collect taxes, the
> government bears the initial burden of proof. That burden is satisfied by the IRS'
> deficiency determinations and assessments for unpaid taxes, which are presumed
> correct so long as they are supported by a minimal factual foundation. However, a
> showing by the taxpayer that a determination is arbitrary, excessive or without
> foundation shifts the burden of proof back to the IRS. Thus, once the debtor rebuts

---

[193] *Data Indus. Corp. of Texas v. I.R.S. (In re Data Indus. Corp. of Texas),* 489 F.2d 1038, 1039 (5th Cir.1974) (per curium).

[194] The Court notes that the parties have not argued to the contrary.

[195] *See* Debtors' Burden of Proof Brief [ECF No. 936] ¶¶ 19-22.

[196] 356 F.3d at 1084 (internal citations and quotations omitted).

the presumption, the burden reverts to the IRS to show that its determination was correct.

Although *Olshan* states that the burden will be shifted to the IRS when its determinations are "arbitrary, excessive, or without foundation," the standard in the Fifth Circuit uses different words—*i.e.,* that the IRS' determinations must be "arbitrary and erroneous."[197] Moreover, as the *Olshan* court notes "where an assessment is based on more than one item, the presumption of correctness attaches to each item. Proof that an item is in error destroys the presumption for that single item; the remaining items retain their presumption of correctness."[198] However, "a pattern of arbitrariness or carelessness" may destroy the presumption for the entire assessment.[199] In the Fifth Circuit, the idea behind the "arbitrary and erroneous" analysis is that the IRS must have "some factual foundation" for its claims that unreported income is owed.[200]

*Portillo v. C.I.R.*[201] is a leading Fifth Circuit case applying an arbitrary and erroneous analysis. In *Portillo*, a taxpayer who worked as a contractor reported receiving $10,800 in income from a client, and that client subsequently issued a Form 1099 reporting that the taxpayer had received more than three times this amount.[202] The IRS then sought to collect additional tax from the taxpayer.[203] According to the client who issued the 1099 to the taxpayer, the vast majority of the difference between the $10,800 reported by the taxpayer and the much higher amount reported by the client was based on cash payments for which no records existed.[204] The IRS did little

---

[197] *Portillo*, 932 F.2d at 1132-33.

[198] *In re Olshan*, 356 F.3d at 1084 (internal marks omitted) (quoting *U.S. v. Stonehill*, 702 F.2d 1288, 1294 (9th Cir. 1983)).

[199] *Id.* at 1084-85.

[200] *Portillo*, 932 F.2d at 133; *Felt v. C.I.R.*, 98 T.C.M. (CCH) 372, 2009 WL 3460725, at *11 (2009) (quoting *Portillo* for this proposition).

[201] 932 F.2d 1128 (5th Cir. 1991).

[202] *Id.* at 1131.

[203] *Id.*

[204] *Id.*

**MEMORANDUM OPINION**                                                                                      41

investigation to determine whether the taxpayer had actually received the extra income reported by his client.[205] Since the IRS insisted that its determination that additional tax was owed be afforded the presumption of correctness, the taxpayer was placed in the unenviable position of needing to prove a negative—that he had not received these cash payments.[206] The Fifth Circuit held that the IRS' determination was arbitrary and erroneous because faced with a 1040 from Portillo that was inconsistent with a 1099 on file, the IRS simply assumed that Portillo was the dishonest one without engaging in any further investigation or substantiation.[207] Thus, the IRS' determination that additional tax was due had no factual foundation.

These Cases do not present a situation where the IRS' claim for gift taxes is arbitrary and erroneous by virtue of having absolutely no evidentiary foundation.[208] The IRS reviewed a voluminous record of information gathered from the Wylys and third parties before filing the Proofs of Claim. Nor are they cases where the IRS failed to consider the Wylys' tax returns and other information relevant to the alleged gifts.[209] In fact, the Debtors' objections to the IRS gift tax claims are largely legal, not factual. Obviously, allocation of burden of proof and shifts thereof is relevant only to factual issues, not legal ones.[210]

For these reasons, the Court finds that the Proofs of Claim were not arbitrary and erroneous.

---

[205] *Id.* at 1134.

[206] *Id.* at 1133.

[207] *Id.* at 1134

[208] *U.S. v. Janis*, 428 U.S. 433, 442 (1976) ("Certainly, proof that an assessment is utterly without foundation is proof that it is arbitrary and erroneous."); *Portillo*, 932 F.2d at 1132-33.

[209] The Debtors rely upon *Pearce v. C.I.R.*, 946 F.2d 1543 (5th Cir. 1991) (per curiam) (unpublished) and provided the Court with a copy of the opinion. Debtors' Burden of Proof Brief [ECF No. 936] ¶¶ 19-20. However, *Pearce* is distinguishable because, in that case, the IRS failed to actually review the underlying return, which is clearly not the case here. The record clearly shows that the IRS carefully reviewed all of the Wyly tax returns prior to filing its Proofs of Claim. *See Scar v. C.I.R.*, 814 F.2d 1363, 1368 (9th Cir. 1987) (holding "the IRS must consider information that relates to a particular taxpayer before it can be said that the [IRS] has 'determined' a 'deficiency' in respect to that taxpayer.").

[210] *See Stobie Creek Inv., LLC v. U.S.*, 82 Fed. Cl. 636, 664 n.20 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010); *Estate of Morgens v. C.I.R.*, 133 T.C. 402, 409, 2009 WL 4980468 (2009); *In re Waters*, 2008 WL 384571, at *7 (Bankr. D. Conn. Feb. 8, 2008).

### (2)    Burden Shifting under 26 U.S.C. § 7491

The Internal Revenue Code provides one more opportunity for the Debtors to shift the burden to prove gift tax deficiencies to the IRS—*i.e.*, 26 U.S.C. § 7491.  An analysis under § 7491 focuses on the taxpayer's actions and asks if the taxpayer has submitted credible evidence and demonstrated "good behavior" by comporting with certain statutory requirements.  Specifically, 26 U.S.C. § 7491 provides as follows:

(a) Burden shifts where taxpayer produces credible evidence.--

(1) General rule.--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

(2) Limitations.--Paragraph (1) shall apply with respect to an issue only if--

> (A) the taxpayer has complied with the requirements under this title to substantiate any item;

> (B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and

\*\*\*

(3) Coordination.--Paragraph (1) shall not apply to any issue if any other provision of this title provides for a specific burden of proof with respect to such issue.

\*\*\*

(c) Penalties.--Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

As explained by the district court in *Southgate Master Fund, LLC,*[211]

The legislative history of Section 7491 defines "credible evidence" as "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted

---

[211] *See Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. U.S.,* 651 F.Supp.2d 596, 649 (N.D. Tex. 2009), *aff'd,* 659 F.3d 466 (5th Cir. 2011).

(without regard to the judicial presumption of IRS correctness)." S. Rep. No. 105–174, 1998 WL 197371, at *45. Additionally, "[a] taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions, frivolous claims, or tax protestor-type arguments. The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief." Id. at *45–46.

This is not a case where either side has raised implausible factual assertions, frivolous claims, or tax protestor-type arguments. Rather, the Court finds, based on the evidence discussed more thoroughly in other sections of this opinion,[212] that the Debtors have introduced credible evidence questioning whether gifts were made and thus their liability for gift taxes. Thus, the Court must next consider whether the Debtors' behavior here satisfied the other statutory requirements.

As this is not a case involving deductions, losses, or credits, the substantiation requirement of § 7491(a)(2)(A) seems to meld into the record keeping requirement of § 7491(a)(2)(B). The legislative history of § 7491 confirms this:[213]

> Nothing in the provision shall be construed to override any requirement under the Code or regulations to substantiate any item. Accordingly, taxpayers must meet applicable substantiation requirements, whether generally imposed or imposed with respect to specific items, such as charitable contributions or meals, entertainment, travel, and certain other expenses. Substantiation requirements include any requirement of the Code or regulations that the taxpayer establish an item to the satisfaction of the Secretary. Taxpayers who fail to substantiate any item in accordance with the legal requirement of substantiation will not have satisfied the legal conditions that are prerequisite to claiming the item on the taxpayer's tax return and will accordingly be unable to avail themselves of this provision regarding the burden of proof. Thus, if a taxpayer required to substantiate an item fails to do so in the manner required (or destroys the substantiation), this burden of proof provision is inapplicable.

The legislative history of § 7491 in turn cites to 26 U.S.C. §§ 6001, 6038, and 6038A as examples of "generally imposed" substantiation requirements. Section 6001 states, in part, that "[e]very

---

[212] *See* pp. 230–286, *infra.*

[213] H.R. CONF. REP. 105-599, 241, 1998 U.S.C.C.A.N. 288, 310; *see also Southgate Master Fund, L.L.C.,* 651 F.Supp.2d at 649 (using legislative history to interpret § 7491).

person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe." Likewise, §§ 6038 and 6038A require taxpayers to file information regarding certain foreign-owned corporations and partnerships. Thus, the very examples that Congress gives of "substantiation" requirements are in actuality requirements to keep records. With this in mind, these substantiation requirements will be analyzed under the framework of § 7491(a)(2)(B)'s record keeping requirement.[214]

Under § 7491(a)(2)(B), the taxpayer must maintain all required records to qualify for a shift in the burden of proof to the IRS. The Motions and Claim Objections involve a multitude of documents, and the IRS' case-in-chief was proven largely by documentary evidence. Although there is evidence in the record that French asked that certain documents received by IOM trustees be destroyed, these documents were not destroyed and indeed were submitted as evidence at trial.[215] These are not cases where there was evidence of relevant records not being kept. Indeed, the evidence shows that the Wylys and their family offices kept voluminous records and retained them for long periods of time as opposed to improperly destroying them.[216] As the Court notes later in its opinion, there is no evidence that the Wylys kept inadequate books or records or kept a double set of books.[217] Thus, the Court finds that the Debtors maintained all records required under the Internal Revenue Code.

---

[214] *Southgate Master Fund, L.L.C.,* 651 F.Supp.2d at 649 (analyzing these two elements under the same framework and using the same evidence).

[215] *See e.g.,* IRS Exs. 412 (fax dated July 10, 1995 from French to Buchannan stating "[p]lease dispose of this fax after reading, as there will be ample documentation as needed") and 413 (fax dated July 10, 1995 from French to Cairns stating "[a]s with my other fax, I suggest that you dispose of this one as there will be adequate subsequent documentation of any transaction").

[216] Tr. Trans. 638:3-14 (Evan), 639:6-9 (Evan), 1895:12-1897:5 (Hennington).

[217] *See* p. 58 n.261 & p. 286, *infra.*

Under § 7491(a)(2)(B) taxpayers must also cooperate with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews in order to qualify for a shift in the burden of proof. The legislative history of § 7491 explains the cooperation requirement in this way: [218]

> the taxpayer must cooperate with reasonable requests by the Secretary for meetings, interviews, witnesses, information, and documents (including providing, within a reasonable period of time, access to and inspection of witnesses, information, and documents within the control of the taxpayer, as reasonably requested by the Secretary). Cooperation also includes providing reasonable assistance to the Secretary in obtaining access to and inspection of witnesses, information, or documents not within the control of the taxpayer (including any witnesses, information, or documents located in foreign countries).

Although it is true that the Wylys exercised their rights during the audit process, they did not refuse to meet with IRS agents and worked diligently to respond to information document requests ("**IDRs**") submitted to them by the IRS.[219] In addition, the Wylys provided access to searchable databases containing literally millions of documents in response to approximately two hundred IDRs issued over the course of the IRS' examination.[220] These were certainly not cases where efforts at compliance were at best half-hearted and belated. Thus, the Court finds that the Debtors cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews.

For these reasons, the Court is satisfied that the Debtors have met their burden under 26 U.S.C. § 7491. Thus, at the end of a long journey through multiple burden of proof analyses, the

---

[218] S. REP. NO. 105-174, 45, 1998 WL 197371 (1998).

[219] Tr. Trans. 1759:6-1763:25 (Cousins generally discussing his strategy for representing clients during the IRS audit process, including steps to keep the audit focused), 1794:7-1798:25 (Cousins discussing Meadows Owens' involvement in the 2004 audit, including responses to IRS document requests).

[220] *Id.* at 1578:10-1583:4 (Herrick).

burden lies with the IRS to prove the Debtors' liability for gift taxes by a preponderance of the evidence.[221]

### b) Fraud Penalties for Income Tax and Gift Tax Underpayments

The burden of proof analysis regarding fraud is much more straightforward than the gift tax analyses. The statutes and procedural rules governing practice before the tax court make it clear that the IRS bears the burden of proving fraud by clear and convincing evidence.[222] The Fifth Circuit has also held that it is the IRS who bears the burden of proof on the issue of whether a taxpayer has committed civil tax fraud, and that the IRS must establish this civil fraud by clear and convincing evidence.[223]

That the IRS bears the burden of establishing a taxpayer's fraud by clear and convincing evidence seems to be universally understood, and statements to this effect are found in both tax court cases and Circuit level cases outside of the Fifth Circuit.[224] Just as it must prove fraudulent underpayment under § 6663 by clear and convincing evidence, so too must the IRS prove fraudulent failure to file gift tax returns under § 6651 by clear and convincing evidence.[225]

---

[221] *Brinkley*, 808 F.3d at 663-64 (IRS' deficiency determination upheld when it was supported by a preponderance of the evidence); *Leland v. C.I.R.*, 110 T.C.M (CCH) 586, 2015 WL 8981508, at *2 (2015) (tax deficiencies are determined based on a preponderance of the evidence standard); *Estate of Mitchell v. C.I.R.*, 101 T.C.M. (CCH) 1435, 2011 WL 1598623, at *5 (2011) (valuation for gift tax purposes decided based on a preponderance of the evidence).

[222] *See* 26 U.S.C. § 7454(a) (**"**In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary."); Tax Court Rule 142(b) ("In any case involving the issue of fraud with intent to evade tax, the burden of proof in respect of that issue is on the respondent, and that burden of proof is to be carried by clear and convincing evidence.").

[223] *See, e.g., Estate of Lisle v. C.I.R.*, 341 F.3d 364, 368 (5th Cir. 2003), *mandate recalled and modified on other grounds by* 431 F.3d 439 (5th Cir. 2005); *Patton v. C.I.R.*, 799 F.2d 166, 171 (5th Cir. 1986) ("[t]he Commissioner bears the burden of proving fraud, which must be established by clear and convincing evidence."); *Toussaint v. C.I.R.*, 743 F.2d 309, 312 (5th Cir. 1984) ("The Commissioner has the burden of proving, by clear and convincing evidence, that some portion of the deficiency assessed was produced by fraud with intent to evade taxes."); *Goldberg v. C.I.R.*, 239 F.2d 316, 320 (5th Cir. 1956) (IRS must establish fraud by clear and convincing evidence).

[224] *See, e.g., Maciel v. C.I.R.*, 489 F.3d 1018, 1026 (9th Cir. 2007); *Carreon v. C.I.R.*, 107 T.C.M. (CCH) 1040, 2014 WL 91959, at *6 (2014); *Garavaglia v. C.I.R.*, 102 T.C.M. (CCH) 286, 2011 WL 4448913, at *25 (2011), *aff' d*, 521 Fed. Appx. 476 (6th Cir. 2013); *Prowse v. C.I.R.*, T.C. Memo 2006-120, 2006 WL 1593998, at *7 (2006).

[225] 26 U.S.C. § 7454(a); *Putnam v. C.I.R.*, 110 T.C.M. (CCH) 199, 2015 WL 4880980, at *9 (2015) (citing *Clayton v. C.I.R.*, 102 T.C. 632, 646–53, 1994 WL 135337 (1994)); *George v. C.I.R.*, 110 T.C.M. (CCH) 190, 2015 WL 4747544, at *7 (2015); *Caton v. C.I.R.*, 103 T.C.M. (CCH) 1488, 2012 WL 1034062, at *2 (2012) ("In deciding

---

Moreover, courts agree that the IRS must carry its burden of establishing fraud by clear and convincing evidence separately for each tax year at issue.[226]  In addition, at least one tax court judge has ruled that fraudulent intent must be proven at the time of filing the return for each year in question.[227]

26 U.S.C. § 6663—the statute mandating penalties for fraudulent underpayment of taxes—itself also contains instructions to follow regarding burdens of proof, and states in subsection (b) that "[i]f the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud."[228]  In turn, § 6663(c) states that  "[i]n the case of a joint return, this section shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse."[229]

As relevant here then, the burden of proof regarding its claims for fraud penalties pursuant to 26 U.S.C. §§ 6663 and 6651 is on the IRS, who must carry that burden by clear and convincing evidence.  Of course, and as the parties agree, if the IRS carries its burden of proof, the statute of limitations under 26 U.S.C. § 6501(c)(1) remains open for each year in which the IRS proves the return was fraudulent.[230]

---

whether a failure to file is fraudulent under section 6651(f), we consider the same elements that are considered in imposing the addition to tax for fraud under former section 6653(b) and present section 6663.").

[226] *See Carreon*, 2014 WL 91959, at *6; *Hatling v. C.I.R.*, 104 T.C.M. (CCH) 475, 2012 WL 5199405, at *8 (2012); *Norris v. C.I.R.*, 102 T.C.M. (CCH) 26, 2011 WL 2670580, at *4-5 (2011); *DiLeo v. C. I. R.*, 96 T.C. 858, 873, 1991 WL 108769 (1991) ("Respondent has the burden of proving by clear and convincing evidence that some part of an underpayment for each year in issue was due to fraud.").

[227] *Brown v. C.I.R.*, 106 T.C.M. (CCH) 630, 2013 WL 6244549, at *45 (2013) (citing *Gleis v. C.I.R.*, 24 T.C. 941, 952, 1955 WL 784 (1995), *aff'd*, 245 F.2d 237 (6th Cir.1957); *Holmes v. C.I.R.*, T.C. Memo. 2012–251, at *37).

[228] 26 U.S.C. § 6663(b); *cf. Toussaint*, 743 F.2d at 312 (interpreting § 6653) (citing *Webb v. C.I.R.*, 394 F.2d 366, 378 (5th Cir.1968)); *Loftin & Woodard, Inc.*, 577 F.2d 1206, 1236 (5th Cir. 1978).

[229] 26 U.S.C. § 6663(c).

[230] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 138 ("The IRS has the burden of proving exceptions to the general limitations period.  To meet this burden, the IRS must, again, satisfy the two-prong fraud test for each year.  Thus, the

### c)    International Failure to File Penalties

Again, the burden of proof analysis regarding international failure to file penalties is

straightforward.  26 U.S.C. § 7491(c) provides that:

> Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

Thus, the IRS has the burden of production and must come forward with "sufficient evidence" that

it is appropriate to impose international failure to file penalties on the Debtors.[231]

### 3.    The Debtors' Defenses

The Debtors assert various defenses to their liability to the IRS.  Each is discussed below.

### a)    Reasonable Cause Defenses

The Debtors assert multiple reasonable cause defenses under multiple sections of the

Internal Revenue Code. These reasonable cause defenses, if proven by the Debtors, will allow

them to avoid liability for various penalties asserted by the IRS in the Proofs of Claim.  First, the

Debtors assert a reasonable cause defense to the IRS' assertion of fraud penalties under 26 U.S.C.

---

IRS again must prove (1) that the Wylys underpaid their tax for that year, and (2) that some part of that underpayment for that year was due to intentional wrongdoing with the specific purpose to evade a tax believed to be owing." (internal quotation marks omitted)); IRS' Pre-Trial Brief [ECF No. 1018] at 3 ("The United States asserts that the statute of limitations for the income and gift tax periods at issue is open due to the fact that the Wylys committed civil tax fraud."); *see Jacoby v. C.I.R.*, 109 T.C.M. (CCH) 1365, 2015 WL 1518058, at *5 (2015) ("The Commissioner has the burden of proving exceptions to the general limitations period. To satisfy his burden in this case, respondent must show by clear and convincing evidence that: (1) an underpayment exists; and (2) Mr. Jacoby intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. This is the same as his burden under section 6663 to prove applicability of the civil fraud penalty..." (internal citations omitted)); *Potter v. C.I.R.*, 107 T.C.M. (CCH) 1101, 2014 WL 289021, at *3 n.3 (2014) ("Because we conclude that petitioner's underpayments were due to fraud, there is no period of limitations."); *Seiffert v. C.I.R.*, 107 T.C.M. (CCH) 1017, 2014 WL 92058, at *8 (2014) ("Respondent's burden of proof under section 6501(c)(1) is the same as that imposed under section 6663."); *see also Payne v. C.I.R.*, 224 F.3d 415, 423-24 (5th Cir. 2000) (using fraud penalty standards and concepts in order to determine whether the statute of limitations remained open under § 6501(c)(1)).

[231] 26 U.S.C. § 7491(c); *accord McLauchlan v. C.I.R.*, 558 Fed. Appx. 374, 380 (5th Cir. 2014) (unpublished); *Rhodes v. C.I.R.,* 152 Fed. Appx. 340, 342 (5th Cir. 2005) (unpublished); *see also Juha v. C.I.R.,* 103 T.C.M. (CCH) 1338, 2012 WL 833226, at *6 (2012) ("The Commissioner has the initial burden of producing evidence to support the applicability of a section 6662(a) penalty. Sec. 7491(c). To meet this burden, the Commissioner must come forward with sufficient evidence to show that it is appropriate to impose the penalty.").

§ 6664(c).[232]  Second, they assert a reasonable cause defense to the IRS' assertions of international failure to file penalties under 26 U.S.C. § 6677(d).[233]  Third, they assert a different reasonable cause defense to a different set of international failure to file penalties under § 6038(c)(4)(B).[234]

All of these reasonable cause defenses would negate a taxpayer's liability upon similar showings of a combination of "reasonable cause," "good faith," and a "lack of willful neglect." Absent contrary guidance from Congress (and there is no such contrary guidance here), it makes sense to assume that these phrases have the same meaning throughout the Internal Revenue Code.[235]  According to Fifth Circuit precedent, "the [taxpayer] bears the burden of proof on a reasonable cause defense."[236]  And, the evidentiary standard is by a preponderance of the evidence.[237]

### b)     Dee's Innocent Spouse Defense

Dee's "innocent spouse defense" is codified at 26 U.S.C. § 6015.  It provides an exception to the general rule of federal income taxation that a husband and wife filing a joint return are jointly

---

[232] 26 U.S.C. § 6664(c)(1) provides that "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

[233] *Id.* at § 6677(d) provides that "[n]o penalty shall be imposed by this section on any failure which is shown to be due to reasonable cause and not due to willful neglect. The fact that a foreign jurisdiction would impose a civil or criminal penalty on the taxpayer (or any other person) for disclosing the required information is not reasonable cause."

[234] *Id.* at § 6038(c)(4)(B) provides that "[f]or purposes of this subsection and subsection (b), the time prescribed under paragraph (2) of subsection (a) to furnish information (and the beginning of the 90-day period after notice by the Secretary) shall be treated as being not earlier than the last day on which (as shown to the satisfaction of the Secretary) reasonable cause existed for failure to furnish such information."

[235] *See Moore v. U.S.*, 2015 WL 1510007, at *4 (W.D. Wash. April 1, 2015).

[236] *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. U.S.*, 568 F.3d 537, 548 (5th Cir. 2009) (citing *Montgomery v. C.I.R.*, 127 T.C. 43, 66 (2006)).

[237] *See CNT Investors, LLC v. C.I.R.*, 144 T.C. 161, 223 (2015) (citing *Neonatology Assocs., P.A. v. C.I.R.*, 115 T.C. 43, 99, 2000 WL 1048512 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002)); *McClellan v. C.I.R.,* 106 T.C.M. (CCH) 492, 2013 WL 5849873, at *12 (2013); *Lehrer v. C.I.R.*, 92 T.C.M. 81, 2006 WL 2129797, at *2 (2006).  Although no case that the Court was able to locate states that specific reasonable cause provisions in §§ 6038 and 6677 must be proven by a preponderance of the evidence, the above-cited cases make it clear that reasonable cause defenses in general must be proven by this standard.

and severally liable for the taxes due on that return.[238]   According to the Fifth Circuit and the plain language of the statute, "[s]ection 6015 provides three distinct types of relief for taxpayers who file joint returns."[239]   Under § 6015(b), all joint filers have the opportunity to qualify for relief if they meet the five requirements established under § 6015(b)(1)(A)-(E).[240]   Under § 6015(c), taxpayers who are no longer married may limit their income tax liability to their separate liability amount.[241]   Finally, § 6015(f) provides a kind of wildcard provision for spouses who do not qualify for relief under §§ 6015(b) or (c).

Dee claims that she is eligible for innocent spouse relief under §§ 6015(b) and (c), but not § 6015(f).   As relevant here, Dee bears the burden of proof on the innocent spouse defense:

> Except for the knowledge requirement of § 6015(c)(3)(C) (the provision disallowing election of separate liability to a spouse with actual knowledge of the item giving rise to the deficiency), the taxpayer bears the burden of proving that she has met all the prerequisites for innocent spouse relief.   *See Reser v. Comm'r*, 112 F.3d 1258, 1262–63 (5th Cir.1997).   Section 6015(c)(3)(C) explicitly places the burden of proof on the Secretary.[242]

Dee must satisfy her burden here by a preponderance of the evidence.[243]   For § 6015(c)(3)(C), the IRS must meet its burden by a preponderance of the evidence.[244]

Armed with this understanding of the applicable burdens of proof, we turn to the substantive issues we must address.

---

[238] *See* 26 U.S.C. § 6013(d)(3) ("if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."); *Cheshire v. C.I.R.*, 282 F.3d 326, 331 (5th Cir. 2002). As was pointed out previously, Dee and Charles filed joint tax returns throughout their marriage until Charles' death in 2011.

[239] *Cheshire*, 282 F.3d at 331.

[240] 26 U.S.C. § 6015; *Cheshire*, 282 F.3d at 331-32.

[241] 26 U.S.C. § 6015(c)(1) (referring to subsection (d) for instructions on how to calculate this separate amount); *Cheshire*, 282 F.3d at 332.

[242] *Cheshire*, 282 F.3d at 332.

[243] *Hollimon v. C.I.R.*, 110 T.C.M. (CCH) 187, 2015 WL 474779, at *2 (2015); *Stergios v. C.I.R.*, 97 T.C.M. (CCH) 1057, 2009 WL 151485, at *4 (2009).

[244] *Richard v. C.I.R.*, 101 T.C.M. (CCH) 1689, 2011 WL 2553379, at *2 (2011); 26 C.F.R. § 1.6015-3(c)(2)(i).

### B.      Was the Debtors' Underpayment of Income Taxes Due to Fraudulent Intent?

As noted previously, to prevail here on its claim for fraud penalties under 26 U.S.C. § 6663, the IRS must prove, by clear and convincing evidence for each tax year in question, that: (i) the Debtors underpaid their respective income tax that year,[245] and (ii) the underpayment for that year was due to fraud.  Fraud for this purpose is defined as intentional wrongdoing, with the specific purpose of avoiding a tax known or believed to be owed.[246]  As was obvious from the outset of the Cases, which were filed in large part to bring these tax issues to conclusion, the parties have a vastly different perspective on what transpired here.

From Sam's perspective, he is the embodiment of the American dream—small town boy of modest background makes good through, among other things, a close family, hard work, intelligence, business savvy, some good ideas, and a willingness to take entrepreneurial risks, which combine to transform him into one of the wealthiest individuals in the world.  This spin on the tale at trial started with a lengthy tracing of Sam's and Charles' childhood in small towns in northeastern Louisiana, through their teenage years as Boy Scouts (including a recitation of the Boy Scout oath) and student athletes (according to Sam, he was the better student and Charles was the better athlete), to college at Louisiana Tech where Charles met and ultimately married Dee, his wife of 56 years before his death in 2011, to Sam's graduate school at the University of Michigan on scholarship, to Sam's first job at IBM where he met his friend Ross Perot, who was just starting

---

[245] Given the SDNY Court's determinations that the relevant IOM trusts were grantor trusts to Sam and Charles, and subject to (i) that determination not being overturned on appeal, and (ii) this Court's decision to apply collateral estoppel effect to that determination not being overturned on appeal, the Debtors, the probate estate of Charles, and the IRS have stipulated to the amounts of income tax underpayments and gift tax underpayments (assuming this Court finds that gifts were made) that are owing to the IRS.  As a result, only the second prong (that the underpayment(s) for each relevant year was due to fraud) must be proven by the IRS here.

[246] *Gagliardi v. U.S.*, 81 Fed. Cl. 772, 777 (2008) ("The term 'fraud,' as used in the statutory provisions authorizing the assessment of civil fraud penalties against taxpayers, means intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing.); *Pesky v. U.S.*, 2013 WL 97752, *3 (D. Idaho Jan. 7, 2013) ("fraud is intentional wrongdoing on the part of the taxpayer with the specific intent to avoid a tax known to be owing").

**MEMORANDUM OPINION**                                                                                        52

out in the business world like he was, to the start of Charles and his first business venture, and so on. The upshot of Sam's story is that he is a loyal American, who loves his family[247] and country, and who has never complained about his obligation as an American citizen to pay taxes, which he has done each and every year of his life as advised by his professionals[248] and as required by applicable law.

Conversely, while the IRS does not dispute the impressive rags to riches story of Sam and Charles, or the impressive nature of their overall business successes, it spins its own tale of two brothers, who are extraordinarily wealthy by the early 1990s and who decide to evade taxes in order to preserve as much wealth as possible for themselves and their families by taking much of their wealth offshore in known tax havens, where they continued (and Sam continues to this day) to exercise control over the offshore assets through trustees who follow their every "wish."[249] The upshot of the IRS' story is that Sam and Charles, along with their army of lawyers and other professionals, set up one of the most complicated offshore structures ever seen, and then manipulated that structure in such a way as to evade their legitimate tax obligations. And then, when the highly secretive offshore system was about to be fully exposed, Sam asked certain of his

---

[247] That Sam loves his family, and vice versa, is obvious. The same is true for Dee. Throughout trial, the courtroom has been filled with a combination, albeit sometimes different combinations, of the Debtors' children and perhaps grandchildren. Two of Sam's children testified at trial, Evan and Laurie, and their love and respect for their father was clear. It is also clear that Sam has instilled in his children the importance of family remaining close through family trips, periodic but regular family meetings, a focus of which is simply staying in touch and letting each other know what is going on in their respective lives, and the like. Dee's son-in-law, Donnie Miller, who is married to Dee's eldest daughter, Martha, and who is the executor of Charles' probate estate, also testified at trial and it is clear that Donnie was close to Charles and is close to Dee.

[248] Sam told a story of making a modest and innocent mistake on an early tax return he filed which taught him that the tax laws were complicated and that he should hire professionals to assist him in complying with them, which he has done ever since. The mistake there cost him $134. Tr. Tran. 379:5-388:1; 694:4-11 (Sam).

[249] As used here "wishes" is a term of art and much evidence will be discussed throughout this Memorandum Opinion about how Sam and Charles made their "wishes" known to the trustees of the IOM trusts, who then implemented those "wishes" even when sound business judgment might have suggested it was imprudent to do so.

**MEMORANDUM OPINION** 53

most trusted advisors if he could avoid his looming potential tax problems by renouncing his American citizenship.[250]

This Court's job is to take the parties' respective stories, of which there is certainly evidence of support in the record, and decide which version of the facts or, in all likelihood, combination of versions of the facts, is most credible and reflects what happened here (by clear and convincing evidence if the IRS is to prevail on their fraud penalty claims). To say this has been a difficult process of weighing the conflicting evidence and arguments is a great understatement. The Court's analysis of the fraud penalties issue—as it relates to the Debtors' income tax underpayments—follows.

As virtually every case addressing fraud penalties pursuant to 26 U.S.C. § 6663 acknowledges, a taxpayer rarely confesses his or her fraud in what the parties here have called a Perry Mason moment.[251]  And, not surprisingly given the parties' respective stories, there was no Perry Mason moment here.[252]  However, when direct proof of fraudulent intent is not available, fraud may be established by circumstantial evidence and reasonable inferences drawn from the record.[253]  Courts have developed a nonexclusive list of badges of fraud useful in determining whether there is circumstantial evidence of fraudulent intent.  Among the badges of fraud that can be gathered from the case law are the following: (i) understatement of income, (ii) inadequate maintenance of records, (iii) failure to file tax returns or make estimated tax payments, (iv) offering

---

[250] Collateral Estoppel No. 43; *see also* IRS Exs. 396 (February 2, 2004 audit letter from the IRS to Dee and Charles referencing the transfer of stock options to foreign trusts), 380 (email dated February 3, 2004 from Hennington to Boucher and Pulman stating "Sam really wants us to explore what happens if he is not a US citizen—we can discuss tomorrow, I just did not want to forget."), 381 and 382 (internal Meadows Owens memoranda dated February 4 and 28, 2004, respectively, analyzing taxation of expatriates); Tr. Trans. 1018:17-1025:3 (Sam).

[251] *Cf. Richardson v. C.I.R.*, 509 F.3d 736, 743 (6th Cir. 2007) ("It is the rare taxpayer who announce to the world his intent to defraud the Federal Government.").

[252] Although the IRS claimed one during its closing argument through a misstatement of what eliminations on a consolidated financial statement mean.

[253] *See Richardson*, 509 F.3d at 743-44; *Carreon*, 2014 WL 91959, at *6.

implausible or inconsistent explanations of behavior, (v) concealment of income or assets, (vi) failure to cooperate with tax authorities, (vii) engaging in illegal activities, (viii) dealing in cash, (ix) offering false or incredible testimony, and (x) filing false documents.[254]   The taxpayer's background, level of education, and relative business sophistication is also a relevant consideration, as it informs the court about the taxpayers ability to understand the transactions at issue.[255]   Although no single factor may necessarily be sufficient to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of fraud.[256]

### 1.  Relevant Statutes and Badges of Fraud

With this general statement of the law in mind, the Court begins by analyzing the relevant statutes and the badges of fraud it believes applicable here.  26 U.S.C. § 6663 provides:

> (a) Imposition of penalty.--If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

> (b) Determination of portion attributable to fraud.--If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

---

[254] *See, e.g., Estate of Trompeter v. C.I.R.*, 279 F.3d 767, 773 (9th Cir. 2002) (quoting *Bradford v. C.I.R.*, 796 F.2d 303, 307-08 (9th Cir. 1986)); *Hatling*, 2012 WL 5199405, at *10-11. The implication of these varied lists of badges of fraud is that these lists are illustrative, rather than exhaustive. *See Niedringhaus v. C.I.R.*, 99 T.C. 202, 211 (1992); *Miller v. C.I.R.*, 94 T.C. 316, 334 (1990); *see also Webb*, 394 F.2d at 378 ("A summary of the above standards demonstrates their tutorial limitations: We must determine whether it is clearly erroneous that the taxpayer's intent to defraud the government was proven, as to any part of the deficiency, by clear and convincing evidence. Our path in fraud determinations is even more obstacle-pocked because we have no cinematography of the mind nor do we have books approaching impeccable accuracy. Nevertheless, courts have attempted to avoid deciding each case viscerally and have established certain factual checklists.").

[255] *See Richardson v. C.I.R.*, 91 T.C.M. (CCH) 981, 2006 WL 931912, at *22 (2006) ("In examining these factors [badges of fraud], this and other courts have further noted that the taxpayer's background, his or her level of education, and prior history of filing proper returns, and the context of the events in question are relevant to the inquiry.").

[256] *Prowse*, 2006 WL 1593998, at *7 (citing cases); *Inner-City Temp., Inc. v. C.I.R.*, 60 T.C.M. (CCH) 726, 1990 WL 130150 (1990) ("This and other courts frequently list various factors or 'badges of fraud,' but such lists of various kinds of circumstantial evidence from which fraudulent intent can be inferred are nonexclusive. The fact finder must weigh all of the evidence of record, and not merely check off the presence or absence of the various possible kinds of circumstantial evidence.") (internal citations omitted). *Cf. Spies v. U.S.*, 317 U.S. 492, 499 (1942) (fraud may be inferred from "any conduct, the likely effect of which would be to mislead or conceal.").

(c) Special rule for joint returns.--In the case of a joint return, this section shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse.

In turn, 26 U.S.C. § 6664 provides, in relevant part, that:

(b) Penalties applicable only where return filed.--The penalties provided in this part shall apply only in cases where a return of tax is filed (other than a return prepared by the Secretary under the authority of section 6020(b)).

(c) Reasonable cause exception for underpayments.--

(1) In general.--No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

(2) Exception.--Paragraph (1) shall not apply to any portion of an underpayment which is attributable to one or more transactions described in section 6662(b)(6).[257]

And, while the Debtors assert a reasonable cause and good faith defense to the imposition of fraud penalties for their income tax underpayments (and which will be discussed *infra* at pp. 177-230), their initial argument is a bit more nuanced. In short, the Debtors argue that we do not need to get to their reasonable cause and good faith defense as to their income tax underpayments, as the IRS has failed to prove fraudulent intent by clear and convincing evidence, as it is required by law to do. And, the nuance comes by virtue of the Debtors' argument that their reliance on the advice of their various professionals in preparing and filing their tax returns in each of the relevant years negates any possible fraudulent intent. In other words, according to the Debtors, we received all this advice from all these professionals who said what we are doing was appropriate, so how could we have possibly avoided payment of a tax we believed we owed?[258] So, before analyzing

---

[257] 26 U.S.C. § 6662(b)(6) states that: "[a]ny disallowance of claimed tax benefits by reason of a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law."

[258] The Court does not accept the Debtors' argument that reliance on the advice of counsel can negate fraudulent intent as a matter of law if there is clear and convincing circumstantial evidence of sufficient badges of fraud to prove fraudulent intent indirectly. If the Debtors' argument were true, there would be no need for the reliance on advice of

the Debtor's reasonable cause defense, the Court determines whether the IRS carried its burden of proof to establish fraudulent intent by clear and convincing evidence for each of the relevant years for each taxpayer, starting with Sam.[259]

It bears repeating that the lists of badges of fraud relied upon by courts is described as a non-exclusive list, clearly indicating that the courts have flexibility to analyze the particular facts and circumstances of their cases and to supplement the "typical" or "usual" badges of fraud with ones that may be unique to the facts of any specific case.[260]  As is presumably apparent from the parties' 122 pages of stipulated facts and the additional facts that are set forth herein for context, the facts and procedural history of the Cases are truly unique.  In short, the complexity of the offshore system of trusts and corporations implemented by Sam and Charles (and unknowingly acquiesced in by Dee) is nothing short of mind-numbing (as any reader of this Memorandum Opinion will soon see), with identically named domestic and foreign corporations, and layers upon layers of foreign entities, the business purpose of many of which remains unclear in the record following the conclusion of three weeks of evidence.  So, from this Court's perspective, while certain of the "usual" or "typical" badges of fraud are applicable here, they do not fully address what this Court must grapple with.  Thus, the Court will analyze those of the "usual" badges of fraud that could support a finding of fraudulent intent here, along with other badges of fraud that are more tailored to our unique facts and circumstances.

_____

counsel defense set forth in the statute.  That reliance would simply be used to negate fraudulent intent as a matter of law as the Debtors assert here, precluding the IRS from carrying its burden of proof in every such case.

[259] Almost all of the badges of fraud found applicable to Sam are equally applicable to Charles since his actions offshore are virtually in lockstep with Sam's actions.  Although Charles' probate estate is not a formal party to the Motions, its counsel was present throughout the trial as was its executor, Donnie Miller, after he provided this Court with his testimony and was released from the rule.  Because Dee and Charles filed joint tax returns until his death in 2011, and because Dee asks this Court to determine her liability to the IRS during those joint return years and thereafter, the Court has concluded that it must decide if Charles committed tax fraud for at least two reasons: (i) to decide if the statute of limitations on those years (1992-2011) remains open given the IRS' assertion of tax fraud against Dee and Charles, and (ii) to decide the extent to which Dee participated in Charles' alleged fraud.

[260] *See Niedringhaus*, 99 T.C. at 211; *Miller*, 94 T.C. at 334.

The more "usual" badges of fraud that the Court will analyze include:[261] (i) understatement of income, (ii) concealment of income or assets, (iii) offering implausible or inconsistent explanations of behavior, (iv) offering false or incredible testimony, (v) filing false documents, and (vi) failure to cooperate with tax authorities.  In addition, the Court will consider: (i) the complexity of the offshore system and whether there was any legitimate business purpose to that complexity, (ii) the Wylys' willingness to commit securities fraud to preserve their secret offshore system and to maintain its tax advantages, (iii) the Wylys' failure to take action to resolve the conflicting advice they received regarding the 1992 IOM trusts, (iv) the creation of false documents to support the settling of the IOM trusts in 1994 and 1995 to attempt to obtain favorable tax benefits for the Wylys, (v) the treatment of the offshore system as the Wyly family piggy bank, directing purchases of art, jewelry, home furnishings, and real estate for the benefit of individual Wyly family members, while legal title to those assets remains offshore purportedly out of the reach of creditors, including the IRS, and (vi) the planned insolvency of various of the IOM corporations that were supposed to be what made the purpose of the offshore system one of legitimate tax avoidance (not tax evasion).  Our analysis starts with the specifically tailored badges of fraud.

---

[261] The other "usual" badges of fraud are simply not present here.  Specifically, there is no credible evidence in the record that the Wylys (i) failed to keep adequate records or kept a double set of books and records, (ii) failed to file tax returns or make estimated tax payments, (iii) engaged in criminal activities, and/or (iv) dealt in cash.  The fact that these badges of fraud are not present supports a finding of no fraudulent intent.  However, as the case law makes clear, the use of badges of fraud is not a simple process of counting up the badges and seeing how many are on each side of the fraud or no fraud equation.  Rather, the presence of several badges suggesting fraudulent intent can outweigh those that do not.  *Cf. Sanchez v. C.I.R.*, 108 T.C.M. (CCH) 216, 2014 WL 4251054, at *6 (2014) ("Although no single factor is necessarily sufficient to establish fraud, a combination of several of these factors may be persuasive evidence of fraud."); *Prowse*, 2006 WL 1593998, at *7 (citing *Petzold v. C.I.R.*, 92 T.C. 661, 700, 1989 WL 27845 (1989)); *Paschal v. C.I.R.*, 68 T.C.M. (CCH) 366, 1994 WL 424015, at *12 (1994).

### a) The Complexity of the Offshore System

The offshore system of trusts and corporations set up by Sam and Charles starting in 1992 is enormously complex. In summary, Sam and/or Charles established 16 offshore trusts and 38 offshore corporations, each of which was owned by one of the 16 offshore trusts. The offshore trusts were all settled in the IOM, which is an autonomous and self-governing island nation in the middle of the Irish Sea between Great Britain and Ireland. While the IOM is a dependency of Great Britain, it is not part of the United Kingdom.[262] The foreign corporations were established in either the IOM (32 of the corporations) or the Cayman Islands (6 of the corporations). In addition to these 54 offshore trusts and corporations, there were 10 domestic corporations established in Nevada, each of which (i) shared an identical name with an IOM corporation, and (ii) was involved in a complicated annuity transaction that will be discussed further below. Finally, Sam and Charles caused a number of other domestic entities to be created that then facilitated complicated real estate transactions that will be discussed in detail in connection with the Court's gift tax analysis.[263]

With this general background of the offshore system in mind, we turn to the specifics of each brother's offshore system. On March 11, 1992, Sam settled the Bulldog Non-Grantor Trust ("**Bulldog IOM Trust**") in the IOM.[264] The Bulldog IOM Trust was intended to be a non-grantor trust to him under 26 U.S.C. §§ 671 – 679.[265] Sam contributed corpus of $100.00.[266] The beneficiaries of the Bulldog IOM Trust included (i) the British Red Cross and the Community

---

[262] Joint Stipulations ¶ 18.

[263] *See* pp. 230-286, *infra.*

[264] Joint Stipulations ¶ 19.

[265] Joint Ex. 1 (Trust Agreement of the Bulldog Non-Grantor Trust) ¶ 5.9(a) (stating the trustee shall not "[k]nowingly take any action or do any act which may cause this Trust to become a grantor trust for United States income tax purposes.").

[266] Joint Stipulations ¶ 19.

Chest of Hong Kong and their respective successors, and (ii) Sam's children and issue, specifically including, but not limited to, Evan A. Wyly ("**Evan**"), Laurie W. Matthews ("**Laurie**"), Lisa L. Wyly ("**Lisa**"), Kelly Wyly ("**Kelly**"), Andrew Wyly ("**Andrew**"), and Christiana P. Wyly ("**Christiana**"), but contingently, that is, only after the expiration of the second anniversary following Sam's death.[267] The following IOM Corporations are wholly owned by Bulldog IOM Trust:[268]

| IOM Corporations | Date Established |
|---|---|
| Morehouse Limited | March 24, 1992 |
| West Carroll Limited | March 24, 1992 |
| Tensas Limited | March 24, 1992 |
| Richland Limited | March 24, 1992 |
| East Carroll Limited | March 24, 1992 |
| East Baton Rouge Limited | March 27, 1992 |
| Moberly Limited | January 31, 1996 |
| Locke Limited | February 8, 1996 |

On December 4, 1992, Sam settled the Lake Providence International Trust ("**Lake Providence IOM Trust**") in the IOM.[269] The Lake Providence IOM Trust was intended to be a non-grantor trust to him under 26 U.S.C. §§ 671 – 679.[270] Sam contributed corpus of $100.00.[271] The beneficiaries of the Lake Providence IOM Trust included (i) the British Red Cross and the Community Chest of Hong Kong and their respective successors, and (ii) Sam's children and issue, specifically including, but not limited to, Evan, Laurie, Lisa, Kelly, Andrew, and Christiana, but contingently, that is, only after the expiration of the second anniversary following Sam's death.[272]

---

[267] Joint Ex. 1 ¶¶ 1(a), 5.2(a) & Schedule A.

[268] Joint Stipulations ¶ 21.

[269] *Id.* ¶ 22.

[270] Joint Ex. 2 (Trust Agreement of the Lake Providence International Trust) ¶ 5.9(a) (stating the trustee shall not "[k]nowingly take any action or do any act which may cause this Trust to become a grantor trust for United States income tax purposes.").

[271] Joint Stipulations ¶ 22.

[272] Joint Ex. 2 ¶¶ 1(a), 5.2(a) & Schedule A.

Sarnia Investments Limited, an IOM corporation ("**Sarnia Investments Limited (IOM)**"), established on January 8, 1991, was ultimately wholly owned by Lake Providence IOM Trust.[273]

On December 14, 1992, Sam settled the Delhi International Trust ("**Delhi IOM Trust**") in the IOM.[274] The Delhi IOM Trust was intended to be a non-grantor trust to him under 26 U.S.C. §§ 671 – 679.[275] Sam contributed corpus of $100.00.[276] The beneficiaries of the Delhi IOM Trust included (i) the British Red Cross and the Community Chest of Hong Kong and their respective successors, and (ii) Sam's children and issue, specifically including, but not limited to, Evan, Laurie, Lisa, Kelly, Andrew, and Christiana, but contingently, that is, only after the expiration of the second anniversary following Sam's death.[277] Greenbriar Limited, an IOM corporation ("**Greenbriar Limited (IOM)**"), established on November 10, 1992, was wholly owned by Delhi IOM Trust.[278]

On February 2, 1994, Keith King ("**King**"), a resident of the IOM, settled the Bessie Trust ("**Bessie IOM Trust**") in the IOM.[279] The Bessie IOM Trust was intended to be a grantor trust to King under 26 U.S.C. §§ 671 – 679.[280] The beneficiaries of the Bessie IOM Trust at various points in time were (i) King, Sam, Sam's wife, Sam's issue, (ii) The University of Michigan, any Church of Christ Scientist, the Community Foundations of Texas, (iii) Camp Leelanau and Camp

---

[273] Joint Stipulations ¶ 24.

[274] *Id.* ¶ 25.

[275] Joint Ex. 3 (Trust Agreement of Delhi International Trust) ¶ 5.9(a) (stating the trustee shall not "[k]nowingly take any action or do any act which may cause this Trust to become a grantor trust for United States income tax purposes.").

[276] Joint Stipulations ¶ 25.

[277] Joint Ex. 3 ¶¶ 1(a), 5.2(a) & Schedule A.

[278] Joint Stipulations ¶ 27.

[279] *Id.* ¶ 28, Joint Ex. 4.

[280] SEC Trial Tr. 3751:24-3752:4, 3752:15-18 (French); IRS Ex. 806 at WYLYSEC00010968 (February 16, 1994 memorandum from Lubar to French "Re: Foreign Trusts" in which Lubar states that trusts settled by nonresident aliens—*i.e.*, King and Cairns—"will be 'grantor trusts' for all U.S. federal income tax purposes…[but] because the Grantor [King and/or Cairns] is a nonresident alien as to the United States…, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return.").

Kohahna, (iv) The Episcopal School of Dallas, (v) the wife or widow of Evan and all the children and more remote issue of Evan, and (vi) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[281] The following IOM Corporations and Cayman Island Exempted Corporations were wholly owned by Bessie IOM Trust, along with other IOM corporations not listed but separately discussed below:[282]

| **IOM Corporations** | **Date Established** |
|---|---|
| Yurta Faf Limited (IOM) | June 28, 1994 |
| Audubon Asset Limited (f/k/a Fugue Limited) | October 18, 1995 |
| ("**Audubon Asset Limited (IOM)**") | |
| Newgale Limited (IOM) | March 12, 2003 |

| **Cayman Exempted Corporations** | **Date Established** |
|---|---|
| Orange L.L.C. (Cayman) | June 1, 2001 |
| FloFlo L.L.C. (Cayman) | June 1, 2001 |
| Bubba L.L.C. (Cayman) | June 1, 2001 |
| Pops L.L.C. (Cayman) | June 1, 2001 |
| Balch L.L.C. (Cayman) | June 1, 2001 |
| Katy L.L.C. (Cayman) | June 1, 2001 |

The Cayman Exempted Corporations listed above were liquidated in 2006 and ownership of their assets reverted 100% to the Bessie IOM Trust (to the extent there remained any assets after the payment of liabilities).[283] The IOM Corporations listed above remain in existence today, as do those discussed immediately below.

Mi Casa Limited, an IOM corporation ("**Mi Casa Limited (IOM)**"), established on March 28, 2001, was initially wholly owned by the Bessie IOM Trust. Mi Casa Limited (IOM) was later

---

[281] Joint Exs. 4 ¶ 1(2)(e) & Schedule 3 (SWYLY053814), 5, 6, 8, and 10.

[282] Joint Stipulations ¶ 36. The other corporations wholly owned by Bessie IOM Trust are Mi Casa Limited (IOM), Cottonwood I Limited (IOM), Cottonwood II Limited (IOM), Spitting Lion Limited (IOM), and Rosemary's Circle R Ranch Limited (IOM).

[283] Tr. Trans. 2091:6-2092:19 (Hennington). That the liquidation occurred in 2006 is reflected in the demonstrative exhibits submitted by the parties. *See* Memorandum Opinion Exhibits D-G. The charts attached to this Memorandum Opinion are, for the most part, agreed demonstrative exhibits. Although the Debtors and the IRS submitted competing charts regarding the Cottonwood Ventures properties and Stargate Horse Farm, the exhibits agreed as to the basic ownership structure of the properties, which is the purpose for which they are being used here.

owned by FloFlo L.L.C. (Cayman) and the Bessie IOM Trust.[284] After the liquidation of FloFlo L.L.C. (Cayman), Mi Casa Limited (IOM) is once again wholly owned by the Bessie IOM Trust.[285]

Cottonwood I Limited, an IOM corporation ("**Cottonwood I Limited (IOM)**"), established on July 14, 2000, was initially wholly owned by the Bessie IOM Trust. As of June 1, 2002, Cottonwood I Limited (IOM) was owned by Bubba L.L.C. (Cayman) and Bessie IOM Trust.[286] After the liquidation of Bubba L.L.C. (Cayman), Cottonwood I Limited (IOM) was once again wholly owned by the Bessie IOM Trust.[287]

Cottonwood II Limited, an IOM corporation ("**Cottonwood II Limited (IOM)**"), established on July 14, 2000, was initially wholly owned by the Bessie IOM Trust. As of June 1, 2001, Cottonwood II Limited (IOM) was owned by Orange L.L.C. (Cayman), Pops L.L.C. (Cayman), FloFlo L.L.C. (Cayman), Bubba L.L.C. (Cayman), Katy L.L.C. (Cayman), Balch L.L.C. (Cayman), and the Bessie IOM Trust.[288] After the liquidation of Orange L.L.C. (Cayman), Pops L.L.C. (Cayman), FloFlo L.L.C. (Cayman), Bubba L.L.C. (Cayman), Katy L.L.C. (Cayman), and Balch L.L.C. (Cayman), Cottonwood II Limited (IOM) is once again wholly owned by the Bessie IOM Trust.[289]

Spitting Lion Limited, an IOM corporation ("**Spitting Lion Limited (IOM)**"), established on February 3, 2000, was initially wholly owned by the Bessie IOM Trust.[290] As of June 1, 2001, Spitting Lion Limited (IOM) was owned by Orange L.L.C. (Cayman), Pops L.L.C. (Cayman),

---

[284] Joint Stipulations ¶ 43.
[285] *See* Memorandum Opinion Exhibit D.
[286] Joint Stipulations ¶ 44.
[287] *See* Memorandum Opinion Exhibit E.
[288] Joint Stipulations ¶ 45.
[289] *See* Memorandum Opinion Exhibit F.
[290] Joint Stipulations ¶ 46.

FloFlo L.L.C. (Cayman), and Bubba L.L.C (Cayman).[291] After the liquidation of Orange L.L.C. (Cayman), Pops L.L.C. (Cayman), FloFlo L.L.C. (Cayman), and Bubba L.L.C (Cayman), Spitting Lion Limited (IOM) is once again wholly owned by the Bessie IOM Trust.[292]

Woody Creek Ranch Limited, an IOM corporation formed on September 30, 1999 (whose name was changed to Two Mile Ranch Limited on April 14, 2000, and ultimately to Rosemary's Circle R Ranch Limited on August 26, 2003) ("**Rosemary's Circle R Ranch Limited (IOM)**"), was initially wholly owned by Devotion Limited (IOM), another Sam IOM corporation discussed further below.[293] As of April 11, 2000, Rosemary's Circle R Ranch Limited (IOM) was owned by the Bessie IOM Trust and Orange L.L.C (Cayman).[294] As of June 1, 2001, Rosemary's Circle R Ranch Limited (IOM) was owned by Orange L.L.C. (Cayman), Pops L.L.C. (Cayman), FloFlo L.L.C. (Cayman), Bubba L.L.C. (Cayman), Balch L.L.C. (Cayman), Katy L.L.C. (Cayman), and the Bessie IOM Trust.[295] After the liquidation of Orange L.L.C. (Cayman), Pops L.L.C. (Cayman), FloFlo L.L.C. (Cayman), Bubba L.L.C. (Cayman), Balch L.L.C. (Cayman), and Katy L.L.C. (Cayman), Rosemary's Circle R Ranch Limited (IOM) is once again wholly owned by Bessie IOM Trust.[296]

On July 18, 1995, the La Fourche Trust ("**La Fourche IOM Trust**") was settled in the IOM by Shaun Cairns ("**Cairns**"), an IOM resident.[297] The La Fourche IOM Trust was intended to be a grantor trust to Cairns under 26 U.S.C. §§ 671 – 679.[298] The beneficiaries of the La Fourche

---

[291] *Id.*

[292] *See* Memorandum Opinion Exhibit G.

[293] Joint Stipulations ¶ 47.

[294] *Id.*

[295] *Id.*

[296] *See* Memorandum Opinion Exhibit H.

[297] Joint Stipulations ¶ 48, Joint Ex. 17.

[298] SEC Trial Tr. 3751:24-3752:4, 3752:15-18 (French); IRS Ex. 806 at WYLYSEC00010968 (February 16, 1994 memorandum from Lubar to French "Re: Foreign Trusts" in which Lubar states opines that trusts settled by nonresident aliens—*i.e.*, King and Cairns—"will be 'grantor trusts' for all U.S. federal income tax purposes…[but]

IOM Trust at various points in time were (i) Sam, Sam's wife, Sam's issue, (ii) The University of Michigan, the First Church of Christ Scientist, the Leaves, Inc., the Community Foundations of Texas, (iii) Denison University and A Grass Roots Aspen Experience, (iv) the Humboldt Legal Foundation, (v) Cairns, and (vi) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[299]  Devotion Limited, an IOM corporation ("**Devotion Limited (IOM)**"), established on July 18, 1995, was wholly owned by La Fourche IOM Trust.[300]  Relish Limited, an IOM corporation ("**Relish Limited (IOM)**"), was also wholly owned by the La Fourche IOM Trust.[301]

On March 11, 1992, Sam settled the Tallulah International Trust ("**Tallulah IOM Trust**") in the IOM with $100.00.[302]  Tallulah IOM Trust was a grantor trust to Sam under 26 U.S.C. §§ 671 – 679.[303]  Tallulah IOM Trust terminated and was dissolved on December 31, 1996.[304]  The beneficiaries of the Tallulah IOM Trust were (i) Sam, Sam's spouse, and Sam's issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[305]

On December 21, 1995, Sam settled The Crazy Horse Trust ("**Crazy Horse IOM Trust**") in the IOM with $100.00.[306]  Crazy Horse IOM Trust was a grantor trust to Sam under 26 U.S.C.

---

because the Grantor [King and/or Cairns] is a nonresident alien as to the United States…, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return.").

[299] Joint Exs. 17 ¶ 1(2)(e) & Schedule 3 (SWYLY053860), 19, 20, 21, and 23.

[300] Joint Stipulations ¶ 56.

[301] *See* Memorandum Opinion Exhibit B.  The date Relish Limited (IOM) was formed is not in the record.

[302] Joint Stipulations ¶ 57.

[303] *Id.*

[304] *Id.*

[305] Joint Ex. 25 ¶ 1(2)(f) & Schedule 3 (SWYLY001310).

[306] Joint Stipulations ¶ 60.

§§ 671 – 679.[307] Crazy Horse IOM Trust terminated and was dissolved on December 31, 1996.[308] The beneficiaries of the Crazy Horse IOM Trust were (i) Sam, Sam's spouse, and Sam's issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[309]

On December 28, 1995, Sam settled The Arlington Trust ("**Arlington IOM Trust**") in the IOM with $100.00.[310] Arlington IOM Trust was a grantor trust to Sam under 26 U.S.C. §§ 671 – 679.[311] Arlington IOM Trust terminated and was dissolved on December 31, 1996.[312] The beneficiaries of the Arlington IOM Trust were (i) Sam, Sam's spouse, and Sam's issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[313]

On January 23, 1996, Sam settled The Sitting Bull Trust ("**Sitting Bull IOM Trust**") in the IOM with $100.00.[314] Sitting Bull IOM Trust was a grantor trust to Sam under 26 U.S.C. §§ 671 – 679. Sitting Bull IOM Trust terminated and was dissolved on December 31, 1996.[315] The beneficiaries of the Sitting Bull IOM Trust were (i) Sam, Sam's spouse, and Sam's issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[316]

A chart depicting Sam's overall offshore system is attached as Exhibit B.

---

[307] *Id.*

[308] *Id.*

[309] Joint Ex. 26 ¶ 1(2)(f) & Schedule 3 (SWYLY053892).

[310] Joint Stipulations ¶ 62.

[311] *Id.*

[312] *Id.*

[313] Joint Ex. 27 ¶ 1(2)(f) & Schedule 3 (SWYLY00887).

[314] Joint Stipulations ¶ 64.

[315] *Id.*

[316] Joint Ex. 28 ¶ 1(2)(f) & Schedule 3 (SWYLY000942).

While using fewer entities, a similarly complex offshore system was established simultaneously by Charles. Specifically, on March 23, 1992, Charles settled the Pitkin Non-Grantor Trust ("**Pitkin IOM Trust**") in the IOM.[317] The Pitkin IOM Trust was intended to be a non-grantor trust to him under 26 U.S.C. §§ 671–679.[318] Charles contributed corpus of $100.00.[319] The beneficiaries of the Pitkin IOM Trust included (i) the British Red Cross and the Community Chest of Hong Kong and their respective successors, and (ii) Charles' children and issue, specifically including, but not limited to, Martha Wyly Miller ("**Martha**"), Charles J. Wyly, III ("**Chip**"), Emily Wyly ("**Emily**"), and Jennifer Wyly Lincoln ("**Jennifer**"), but contingently, that is, only after the expiration of the second anniversary following Charles' death.[320] The following IOM Corporations are wholly owned by the Pitkin IOM Trust:[321]

| **IOM Corporations** | **Date Established** |
|---|---|
| Rugosa Limited | October 31, 1989 |
| Little Woody Limited | March 27, 1992 |
| Roaring Fork Limited | April 3, 1992 |
| Roaring Creek Limited | April 3, 1992 |

On December 4, 1992, Charles settled the Castle Creek International Trust ("**Castle Creek IOM Trust**") in the IOM.[322] Castle Creek IOM Trust was intended to be a non-grantor trust to him under 26 U.S.C. §§ 671 – 679.[323] Charles contributed corpus of $100.00.[324] The beneficiaries of the Castle Creek IOM Trust included (i) the British Red Cross and the Community Chest of

---

[317] Joint Stipulations ¶ 75.

[318] Joint Ex. 35 (Trust Agreement of Pitkin Non-Grantor Trust) ¶ 5.9(a) (stating the trustee shall not "[k]nowingly take any action or do any act which may cause this Trust to become a grantor trust for United States income tax purposes.").

[319] Joint Stipulations ¶ 75.

[320] Joint Ex. 35 ¶¶ 1(a) & Schedule A at § 2.

[321] Joint Stipulations ¶ 77.

[322] *Id.* ¶ 78.

[323] Joint Ex. 36 (Trust Agreement of the Lake Providence International Trust); *id at* ¶ 5.9(a) (stating the trustee shall not "[k]nowingly take any action or do any act which may cause this Trust to become a grantor trust for United States income tax purposes.").

[324] Joint Stipulations ¶ 78.

**MEMORANDUM OPINION** 67

Hong Kong and their respective successors, and (ii) Charles' children and issue, specifically including, but not limited to, Martha, Chip, Emily and Jennifer, but contingently, that is, only after the expiration of the second anniversary following Charles' death.[325]  Quayle Limited, an IOM corporation ("**Quayle Limited (IOM)**"), established on January 15, 1992, is wholly owned by the Castle Creek IOM Trust.[326]

On February 2, 1994, King settled The Tyler Trust ("**Tyler IOM Trust**") in the IOM.[327] Tyler IOM Trust was intended to be a grantor trust to King under 26 U.S.C. §§ 671 – 679.[328]  The beneficiaries of Tyler IOM Trust at various points in time were (i) King, Charles, Dee, Charles' issue, (ii) the First Church of Christ Scientist or any United States Church associated with the Christian Science faith, (iii) Lady Thatcher's Archive at the Cambridge Foundation, (iv) Donald R. Miller, Jr., all the children and remote issue of Donald R. Miller, Jr., Deborah Paige Miller, and (vi) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[329]  The following IOM Corporations are wholly owned by Tyler IOM Trust:[330]

| **IOM Corporations** | **Date Established** |
|---|---|
| Soulieana Limited (IOM) | July 26, 1995 |
| Elysium Limited (IOM) | July 10, 1995 |
| Gorsemoor Limited (IOM) | January 29, 1999 |
| Little Woody Creek Road Limited (IOM) | November 5, 1999 |
| Stargate Farms Limited (IOM) | December 18, 2000 |

---

[325] Joint Ex. 36 ¶¶ 1(a) & Schedule A at § 2.

[326] Joint Stipulations ¶ 80.

[327] *Id.* ¶ 81, Joint Ex. 37.

[328] SEC Trial Tr. 3751:24-3752:4, 3752:15-18 (French); IRS Ex. 806 at WYLYSEC00010968 (February 16, 1994 memorandum from Lubar to French "Re: Foreign Trusts" in which Lubar states opines that trusts settled by nonresident aliens—*i.e.*, King and Cairns—"will be 'grantor trusts' for all U.S. federal income tax purposes…[but] because the Grantor [King and/or Cairns] is a nonresident alien as to the United States…, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return.").

[329] Joint Exs. 37 ¶ 1(2)(e) & Schedule 3 (SWYLY016442), 38, 40, and 41.

[330] Joint Stipulations ¶ 87.

Jourdan Way Limited (IOM)                                never funded[331]

On July 8, 1995, Cairns settled The Red Mountain Trust ("**Red Mountain IOM Trust**") in the IOM.[332] Red Mountain IOM Trust was intended to be a grantor trust to Cairns under 26 U.S.C. §§ 671 – 679.[333] The beneficiaries of Red Mountain IOM Trust are (i) Charles, Dee, Charles' issue, (ii) the First Church of Christ Scientist or any United States Church associated with the Christian Science faith, (iii) Cairns, and (iv) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[334] Elegance Limited, an IOM corporation ("**Elegance Limited (IOM)**") established on July 10, 1995, is wholly owned by Red Mountain IOM Trust.[335]

On March 23, 1992, Charles settled the Woody International Trust ("**Woody Int'l IOM Trust**") with $100.00 in the IOM.[336] Woody Int'l IOM Trust was a grantor trust to Charles under 26 U.S.C. §§ 671 – 679. Woody Int'l IOM Trust terminated and dissolved on December 31, 1996.[337] The beneficiaries of Woody Int'l IOM Trust were (i) Charles, Dee, Charles' issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[338]

---

[331] The date Jourdan Way Limited (IOM) was formed is not in the record. Per the agreed demonstrative exhibit submitted by the parties, Jourdan Way Limited (IOM) was never funded. *See* Memorandum Opinion Exhibit C.

[332] Joint Stipulations ¶ 88, Joint Ex. 42.

[333] SEC Trial Tr. 3751:24-3752:4, 3752:15-18 (French); *see* IRS Ex. 806 at WYLYSEC00010968 (memorandum to French dated February 16, 2004 in which Lubar opines that trusts settled by nonresident aliens—*i.e.*, King and Cairns—"will be 'grantor trusts' for all U.S. federal income tax purposes…[but] because the Grantor [King and/or Cairns] is a nonresident alien as to the United States…, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return.").

[334] Joint Exs. 42 ¶ 1(2)(e) & Schedule 3 (SWYLY000763), 44, and 46.

[335] Joint Stipulations ¶ 94.

[336] *Id.* § 95.

[337] *Id.*

[338] Joint Ex. 48 ¶ 1(2)(f) & Schedule 3 (SWYLY000252).

**MEMORANDUM OPINION**                                                                                          **69**

On December 28, 1995, Charles settled the Maroon Creek Trust ("**Maroon Creek IOM Trust**") with $100.00 in the IOM. Maroon Creek IOM Trust was a grantor trust to Charles under 26 U.S.C. §§ 671 – 679.[339] Maroon Creek IOM Trust terminated and dissolved on December 31, 1996.[340] The beneficiaries of Maroon Creek IOM Trust are (i) Charles, Dee, and Charles' issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[341]

On January 23, 1996, Charles settled The Lincoln Creek Trust ("**Lincoln Creek IOM Trust**") with $100.00 in the IOM. Lincoln Creek IOM Trust was a grantor trust to Charles under 26 U.S.C. §§ 671 – 679. Lincoln Creek IOM Trust terminated and dissolved on December 31, 1996.[342] The beneficiaries of Lincoln Creek IOM Trust were (i) Charles, Dee, Charles' issue, and (ii) such persons or classes of persons appointed as beneficiaries by the Trustees with the prior written consent of the Trust Protectors.[343]

A chart depicting Charles' overall offshore structure is attached as Exhibit C.

Once the offshore system was established (or at least part of it was established), Sam and Charles undertook a series of complex annuity transactions in order to get substantial amounts of their wealth offshore in the IOM. Specifically, in 1992 and 1996, Sam and Charles entered into multiple transactions whereby they transferred securities that they had earned from Sterling Software, Sterling Commerce, and Michaels Stores in exchange for private annuities. These transactions are described in detail in Joint Stipulations ¶¶ 119-160, but two of Sam's transactions will be summarized here for context.

---

[339] Joint Stipulations ¶ 98.

[340] *Id.*

[341] Joint Ex. 49 ¶ 1(2)(f) & Schedule 3 (SWYLY000183).

[342] Joint Stipulations ¶ 100.

[343] Joint Ex. 50 ¶ 1(2)(f) & Schedule 3 (SECI0017268).

For example, in 1992, Sam transferred 375,000 options to purchase stock in Michaels Stores to East Baton Rouge Ltd. (Nevada), a newly formed entity that had no assets, in exchange for an unsecured private annuity.[344] Immediately thereafter, East Baton Rouge Ltd. (Nevada) transferred the options and the obligation to pay the private annuity to East Baton Rouge Limited (IOM), an IOM entity that had no assets or liabilities prior to the transfer of the options and the private annuity obligation to it.[345] East Baton Rouge Ltd. (Nevada) was wholly owned by East Baton Rouge Limited (IOM), which was wholly owned by the Bulldog IOM Trust.[346] Sam did five more similarly structured private annuity transactions in 1992, but using five different Nevada and IOM corporations.[347]

The structure of the private annuity transactions changed in 1996,[348] although those transactions were equally complex for no apparent business reason. For example, on December 29, 1995, Sam assigned 650,000 options to purchase stock of Sterling Software to Crazy Horse IOM Trust, a foreign trust he settled, which trust then assigned the options to Locke Limited (IOM), an entity wholly owned by the Bulldog IOM Trust, in exchange for an unsecured private annuity payable to Crazy Horse IOM Trust. Crazy Horse IOM Trust was then terminated, the effect of which was to put the right to receive the annuity payments to Sam who, as just noted, was

---

[344] Joint Stipulations ¶ 119; Joint Ex. 58 (Private Annuity Agreement) § 3.1 ("The parties hereby agree that there is and shall be no security or collateral for the payment of the Annuity hereunder.") and § 2.4(a) ("The parties further acknowledge that the Obligor [East Baton Rouge Ltd. (Nevada)] presently lacks the liquidity to easily make the annuity payments that would be required hereunder if the annuity payment commencement were not deferred."); Lubar Depo. Tr. 39:7-40:5 (discussing his concerns that the annuities were being issued by companies that had no other assets).

[345] Joint Stipulations ¶ 119; Lubar Depo. Tr. 39:7-40:5

[346] *Id.* ¶¶ 21, 119.

[347] *Id.* ¶¶ 121, 123, 125, 127, and 129. *See also* Wyly Ex. B.

[348] Although certain annuity transactions were initiated in late December 2015, this Memorandum Opinion classifies them as part of the 1996 annuity transactions for ease of reference.

**MEMORANDUM OPINION**                                                                  71

the grantor of the now-liquidated Crazy Horse IOM Trust. Sam did five more similarly structured annuity transactions in 1996, using different entities.[349]

The structure of the annuity transactions undertaken by Charles was identical to those undertaken by Sam in 1992 and 1996. Charles did four private annuity transactions in 1992[350] and four more in 1996.[351]

After deferring receipt of his annuity payments,[352] Sam began receiving annuity payments on some of the annuities in 2004 and on others in 2007.[353] Similarly, after deferring receipt of his annuity payments,[354] Charles' annuity payments commenced in 2003, 2004, and/or 2006.[355] To date, in exchange for approximately $105 million worth of options, Sam has received—and paid tax on—approximately $282 million in annuity payments.[356] However, Sam has forgiven

---

[349] Joint Stipulations ¶¶ 131, 133, 137, 139, and 141. *See also* Wyly Ex. B.

[350] Joint Stipulations ¶¶ 145, 147, 149, and 151.

[351] *Id.* ¶¶ 153, 155, 157, and 159.

[352] *See* Joint Exs. 59, 61, 63, 65, 67, and 69, whereby Sam deferred annuity payments scheduled to commence on his 65th birthday to his 70th birthday, and 71, 73, 75, 77, and 79, whereby Sam deferred annuity payments scheduled to commence on his 68th birthday to his 73rd birthday. Although the record reflects that Sam entered into six annuity transactions in each of the relevant years, the record does not contain the Private Annuity Agreement or an Amendment to Private Annuity Agreement related to Yurta Faf Limited (IOM).

[353] Joint Stipulations ¶ 175 (annuity payments by year); Joint Exs. 58-79 (Annuity Agreements and Amendments to Annuity Agreements).

[354] *See* Joint Exs. 81, 82, and 85, whereby Charles deferred annuity payments scheduled to commence on his 65th birthday to his 70th birthday, and 89, 91, 93, and 95, whereby Charles deferred annuity payments scheduled to commence on his 68th birthday to his 73rd birthday. Dee similarly extended annuity payments that were scheduled to commence on her 65th birthday to her 70th birthday. Joint Ex. 87.

[355] Joint Stipulations ¶ 173 (annuity payments by year); Joint Exs. 80-95 (Annuity Agreements and Amendments to Annuity Agreements). Then, beginning in late 1999, Dee and Charles undertook a further highly complicated transaction in which all of the annuity agreements they had entered into which were held by an IOM corporation were transferred to Stargate Investments, Ltd, a Texas limited partnership ("**Stargate Investments (Texas)**"). A chart prepared by the parties depicting this transaction is attached as Exhibit K to this Memorandum Opinion. The evidentiary record is largely silent as to the reasons for the complexity of this further transaction. To date, in exchange for approximately $55 million worth of options, Dee and Charles have received—and paid tax on—approximately $112 million in annuity payments. As noted previously, Charles died in the summer of 2011, after which annuity payments on his life ceased. Dee continues to receive some annuity payments. More precisely, Stargate Investments (Texas) received all of the annuity payments, but Dee and Charles reported all of the annuity payments received by Stargate Investments (Texas) as ordinary income and as self-employment income on their joint federal income tax returns for the 2003 through 2011 tax years. Dee reported all of the annuity payments received by Stargate Investments (Texas) as ordinary income and as self-employment income on her individual federal income tax returns for 2012 and 2013. *See* Joint Stipulations §§ 161-162, 173, 174.

[356] Joint Stipulations ¶ 175.

approximately $60,972,221 in annuity payments from three IOM corporations (and agreed to forego all future annuity payments from those corporations)[357] and does not expect to receive $70,544,877 in annuity payments currently due (or any further annuity payments) from another four IOM corporations,[358] because all of those corporations have been rendered insolvent financing the Wyly "family's lifestyle and domestic business interests,"[359] thereby enabling the remaining Wyly wealth to remain offshore untaxed,[360] as will be discussed further below. And, as the IRS correctly points out (and as will be discussed further below), the annuity payments only commenced after the Wylys admittedly learned of serious potential risks associated with their offshore system and/or when it became apparent to them that the offshore system would likely come under public scrutiny through some combination of (i) the filing of certain disclosures their then tax lawyers recommended they file with the IRS regarding potential problems with the

---

[357] These corporations are (i) Tensas Limited (IOM), of which Sam forgave $14,913,153.13 in annuity payments, (ii) East Baton Rouge Limited (IOM), of which Sam forgave $20,947,937.97 in annuity payments, and (iii) East Carrol Limited (IOM), of which Sam forgave $25,111,130.26 in annuity payments.

As to Tensas Limited (IOM), *see* IRS Ex. 1131 at 582 (letter agreement whereby Sam agrees to accept Tensas Limited (IOM)'s assets valued at $2,068,000 in forgiveness of all past due annuity payments totaling $5,403,975 in principal, plus $787,742.13 in interest, and all future annuity payments) and IRS Ex. 1132 at 1495 (Tensas Limited (IOM)'s unaudited financial statement valuing future annuity payments owing to Sam, prior to forgiveness, at $10,789,436).

As to East Baton Rouge Limited (IOM), *see* IRS Ex. 1135 at 855 (letter agreement whereby Sam agrees to accept East Baton Rouge Limited (IOM)'s assets valued at $1,987,646 in forgiveness of all past due annuity payments totaling $3,416,187, plus interest of $252,553.97, and all future annuity payments) and IRS Ex. 1136 at 527 (East Baton Rouge Limited (IOM)'s unaudited financial statements valuing future annuity payments owing to Sam, prior to forgiveness, at $19,266,843).

As to East Carrol Limited (IOM), *see* IRS Ex. 1134 at 4427 (letter agreement whereby Sam agrees to accept East Carrol Limited (IOM)'s assets valued at $1,283,807.74 in forgiveness of all past due annuity payments totaling $3,142,095 and all future annuity payments) and IRS Ex. 1133 at 607 (East Carrol Limited (IOM)'s unaudited financial statements valuing future annuity payments owing to Sam, prior to forgiveness, at $23,252,843). *See* Tr. Trans. 2647:23-2671:70 (Sam).

[358] *See* Amended Bankruptcy Schedule B, Exhibit B-16 [ECF No. 472] at p. 55 of 94. However, at trial, Sam testified he was not expecting any further payments from those entities at all. Tr. Trans. 2941:1-8 (Sam). *See also* pp. 110-125, *infra*.

[359] IRS Ex. 96 at WYLYSEC01112402 (memorandum dated June 20, 2003 from Hennington and Boucher to, among others, Sam and Charles).

[360] Tr. Trans. 2671:3-7 (Sam) ("Q. And the funds in the offshore system, including East Carroll, Tensas, and East Baton Rouge, funds were spent at your direction to buy homes, art, and invest in Wyly-related businesses. Correct? A. That sounds -- that sounds correct.").

positions they had taken on prior filed tax returns, (ii) an IRS audit, (iii) an impending Senate subcommittee investigation of them and tax haven abuses in general**,** and (iv) investigations of securities fraud allegations against them by, among others, the SEC.[361]

The Wylys offered some explanation for the complexity of their offshore structures, but often those explanations only lead to an analysis of other badges of fraud. For example, Sam's private annuity transactions in 1992 involved six Nevada corporations[362] and six identically named IOM corporations and Charles' private annuity transactions that year involved four Nevada corporations and four identically named IOM corporations. All of those transactions could have been accomplished in a single transfer for Sam (and another for Charles), as one of the attorneys on whose advice the Debtors are relying, Michael Chatzky ("**Chatzky**"), admitted on cross-examination.[363] However, if structured as a single assignment of opinions and warrants, the IOM entity that ultimately received the options and warrants would have been subject to SEC reporting requirements, which the Wylys were desperate to avoid. In fact, considerable effort went into attempting to insure that no IOM entity held more than 5% of the stock of Sterling Software, Sterling Commerce, and/or Michaels Stores, on whose boards Sam and Charles sat, as will be discussed further below.[364]

---

[361] As will be further discussed, the IRS contends that the record supports a finding that the Wylys never intended for the annuities to be paid. According to the IRS, the Wylys didn't need for the money to come back to the United States through annuity payments that would be taxed to them as ordinary income when received, after they and their lawyers had devised complicated structures that enabled the family to enjoy the benefits of their offshore wealth in the United States tax-free. *See* pp. 98-110, *infra.*

[362] The Nevada entities were used to avoid payment of excise taxes on the transfers of the options and warrants. *See* Tr. Trans. 1203:2-11) (Chatzky) ("the primary reason why the Nevada corporation was used is because it was believed…that if a foreign corporation issued an annuity, that there would be an excise tax imposed on the foreign corporation in the amount of 1 percent of the consideration for the annuity. Subsequent research showed that that wasn't the case…"). While the Court is not troubled by the use of a Nevada corporation to avoid excise tax, the use of so many and the reason that so many were used—*i.e.*, to attempt to avoid SEC reporting requirements by keeping each entity's ownership below the required reporting threshold as discussed *infra* at pp. 78-83—is more problematic and indicative of fraud.

[363] Tr. Trans. 1269:20-25 (Chatzky).

[364] *See* pp. 78-83, *infra.*

**MEMORANDUM OPINION**                                                                                                     74

Similarly, no explanation was provided as to why the 1996 private annuity transactions were structured as they were (other than the attempt to avoid SEC reporting once again).  As noted previously, unlike the 1992 annuity transactions, in 1996 Sam assigned options and warrants in Sterling Software, Sterling Commerce, and/or Michaels Stores to four IOM grantor trusts he had settled in 1992, 1995 and 1996 (Tallulah IOM Trust, Crazy Horse IOM Trust, Arlington IOM Trust, and Sitting Bull IOM Trust), who then assigned the options and warrants to six IOM corporations (Locke Limited (IOM), Moberly Limited (IOM), Sarnia Investments Limited (IOM), Audubon Asset Limited (IOM), Yurta Faf Limited (IOM), and Devotion Limited (IOM)) in exchange for those corporations issuing an annuity back to the four IOM trusts.  Shortly after those four IOM trusts received the annuities, the trusts were terminated and the annuity contracts were assigned to Sam, who had been the grantor of those trusts.  So, if the purpose of the transaction was for Sam to assign options and warrants to offshore entities in exchange for annuities, why not do it simply and directly?  The inference the IRS asks this Court to draw from the elaborate and apparently unnecessary structure is that the use of so many entities and so many transfers would make the scheme harder to unravel and understand, which is a reasonable inference given the absence of any evidence suggesting a legitimate business purpose to this myriad of entities and transfers.

Similarly complex structures were undertaken through the Bessie IOM Trust's ownership of five IOM corporations (Mi Casa Limited (IOM), Cottonwood I Limited (IOM), Cottonwood II Limited (IOM), Rosemary's Circle R Ranch Limited (IOM), and Spitting Lion Limited (IOM)) that were used to indirectly purchase and hold title to real estate in the United States through the five IOM corporations establishment of a domestic "management" trust, which would then establish a Texas or Colorado limited liability company depending on where the real property was

located, which would hold legal title to the real property.  As the IRS correctly points out, if the Bessie IOM Trust had wanted to invest in U.S. real estate, it certainly could have done so in a much simpler structure.  But, the layers upon layers of entities made it that much more likely that the existence and complexity of the offshore system could remain secret from the IRS.  And, through this structure, a Wyly family member or former family member could obtain a small percentage ownership interest in the management trust and then, according to Wyly family tax lawyers, enjoy the benefits of that real property, by living in a home rent free or operating a business rent free in the property.  In addition to the alleged lack of economic substance to these structures, the IRS attacks them as gifts from Sam to the respective family member(s) who enjoyed the use of the real property, which will be discussed further below.[365]

Another IOM entity owned by the Bessie IOM Trust, Audubon Asset Limited (IOM),[366] and an entity owned by Tyler IOM Trust, Soulieana Limited (IOM),[367] were used to purchase works of art, household furnishings, jewelry, and similar items of personal property that were then provided to various Wyly family members to use and enjoy pursuant to "possession agreements" between the IOM entity and the applicable Wyly family member.[368]  While these transactions will

---

[365] *See* pp. 230-264, *infra.*

[366] Joint Stipulations ¶ 36.

[367] *Id.* ¶ 87.

[368] *See, e.g.,* Tr. Trans. 934:1-14 (Evan), 1561:11-1563:22 (Laurie), 2259:14-2262:6 (Hennington); Wyly Exs. QF (Possession Agreement dated April 2, 2004 between Laurie and her husband, on the one hand, and Audubon Asset Limited (IOM), on the other, permitting Laurie to hang various pieces of art, including Audubon plates and a Picasso painting, in her home); IRS Exs. 20, 22, 24, and 25 (invoices detailing substantial amounts of jewelry, art, antiques, and home furnishings purchased by Soulieana Limited (IOM) for use by Dee and Charles); IRS Ex. 21 at WYLYSEC00130636 (fax coversheet from Amy Browning of the Wyly family office to Huntsman Gallery directing that invoices for purchases by Dee be issued to Soulieana Limited (IOM) and that "[t]he Wyly name should not be noted on the invoices"); IRS Ex. 203 at 145098 (letter dated December 1, 2000 from Trident Trust to Man & Partners discussing drafting of Possession Agreements for assets owned by Soulieana Limited (IOM) and used by Dee and Charles, explaining that: "[w]e should appreciate your assistance in the preparation of a Possession Agreement Letter in respect of personal chattels, owned by [Soulieana Limited (IOM)], presently in the possession of individuals on an informal basis. *** The schedule of chattels will be extensive and comprise items of antiques, furniture, paintings and prints, silverware, glassware, porcelain and ceramics, miscellaneous objects of art and jewelry.  The value in total is in excess of $4 million."). As reflected on IRS Ex. 444, sometime around December 2000, Charles agreed to purchase from Soulieana Limited (IOM) all items it purchased on his and Dee's behalf with a cost of $10,000 or less, which

---

**MEMORANDUM OPINION**                                                                                              76

be analyzed in greater detail in connection with the Court's analysis of another badge of fraud – *i.e.*, the use of the offshore system as the Wyly families' personal piggy bank, the point here is structural – if the two IOM trusts had wished to own items of personal property, they could have simply made the purchase and held title to the asset directly. However, the additional layer of entities made it more likely that the offshore system would remain undiscovered by the IRS.

As the above analysis demonstrates, the Wyly's offshore system was more complex than it needed to be. There is little credible evidence in the record suggesting a legitimate business reason requiring this level of complexity. As the Court can now independently attest, attempting to understand the structure and the myriad of transactions undertaken through the structure has required days and days (if not weeks and weeks) of thoughtful analysis. With little legitimate business explanation for the complexity, the Court infers—which inference is unquestionably supported by the record—that a primary reason for making the offshore system this complex was the hope that no one, including the Court, could ever figure out what was going on here and why. This badge of fraud was established by clear and convincing evidence from 1992 through 2013 as to Sam, which are all of the tax years at issue in the Motions, and from 1992 through 2011 as to Charles.

As this badge of fraud relates to Dee, however, the Court concludes that there is simply no evidence that Dee participated in the formation of the offshore system to any great extent, although she did sign some documents that Charles asked her to sign—albeit, without reading them. Dee testified credibly that (i) she was not involved in Charles' business affairs, (ii) never discussed business with him, and (iii) trusted him such that when he asked her to sign a document she would,

---

totaled "around $381K," and setting a minimum cost threshold of $10,000 for future purchases by Soulieana Limited (IOM). IRS Ex. 444 at SEC/ITC0104002; Tr. Trans. 2386:18-2390:18 (Hennington discussing Charles' purchase of the assets from Soulieana Limited (IOM)).

without question. The Court believes her and simply cannot imagine her even being interested in having a conversation with Charles about the complexities of the Wyly offshore system. Although Dee is intelligent, she is not financially sophisticated. The Court is satisfied that even if she had asked Charles questions, it is unlikely that she would have understood the implications of what she heard—particularly given the complexities of the offshore system here.

By way of background, and to give context for the above findings, Dee and Charles met and married while in college at Louisiana Tech. While Dee completed three years of college, she did not finish her degree after they married. In short, Dee was a homemaker who raised their children while Charles supported the family financially.[369] Dee is now 82 years old; the offshore system began to be established when she was about 58. After having asked no questions about Charles' business affairs for 36 plus years of their married life to that point, it strains credibility to think that she would have started in 1992 when the offshore system began to be implemented.

For these reasons this badge of fraud does not apply to Dee.

b) **The Wylys' Willingness to Commit Securities Fraud to Preserve the Secret Offshore System and to Maintain its Tax Advantages.**

The SDNY Court made the following findings and conclusions, which this Court has given collateral estoppel effect to and most of which were independently established here:

> Between 1992 and 1996, Sam and Charles Wyly created a number of IOM trusts, each of which owned several subsidiary companies. Michael French, the Wylys' family attorney, Sharyl Robertson, the Chief Financial Officer ("CFO") of the Wyly family office, and Michelle Boucher, the CFO of the Irish Trust Company, a Wyly-related entity in the Cayman Islands, served as protectors of the IOM trusts. French, Robertson, and Boucher conveyed the Wylys' investment recommendations to the trust management companies administering the Wylys' IOM trusts (the "IOM trustees"). All of the IOM trustees' securities transactions were based on the

---

[369] *See* p. 133 n.573-57, *infra.*

Wylys' recommendations and the IOM trustees never declined to follow a Wyly recommendation.[370]

The Wylys served as directors of Michaels Stores, Sterling Software, Sterling Commerce, and Scottish Annuity and Life Holdings, Ltd. ("Scottish Re"). As part of their compensation, the Wylys received stock options and warrants. "Between 1992 and 1999, Sam and Charles Wyly sold or transferred to the [IOM] trusts and companies stock options in Michaels Stores, Sterling Software and Sterling Commerce" in exchange for private annuities while simultaneously disclaiming beneficial ownership over the securities in public filings with the SEC. Between 1995 and 2005, the IOM trusts and companies exercised these options and warrants, separately acquired options and stock in all four companies, and sold the shares, without filing disclosures.[371]

The jury found that the Wylys were beneficial owners of the Issuer securities transferred to, held, and sold by the IOM trusts because the Wylys, directly or indirectly, had or shared voting and/or investment power over these securities. Thus, the jury concluded that the Wylys failed to accurately disclose the extent of their beneficial ownership in the Issuer securities under sections 13(d) and 16(a) of the Securities Exchange Act (the "Exchange Act"). The jury also found that the Wylys caused the Issuers to violate section 14(a) of the Exchange Act, because the Wylys misrepresented the extent of their beneficial ownership to the Issuers in their Director and Officer ("D&O") questionnaires, which were incorporated by the Issuers in proxy statements.[372]

In addition to these disclosure violations, the Wylys were found liable for securities fraud in violation of section 10(b) of the Exchange Act and section 17(a) of the Securities Act of 1933 (the "Securities Act"), and for aiding and abetting the Issuers' and the IOM trusts' securities law violations.[373]

In early to mid-1991, Sam Wyly asked Robertson to attend a seminar held by lawyer and trust promoter David Tedder on the use of foreign trusts as a method of

---

[370] Collateral Estoppel No. 1; Joint Stipulations ¶¶ 18-74 (Sam IOM entities), 75-109 (Charles IOM entities), 68 (Sam protectors), 104 (Charles protectors); SEC Tr. Trans. 1731:24-1732:1 (French discussing being a protector with Robertson); 1736:9-1737:15 (French testifying that the IOM trustees never refused a direction), 294:17-23 (Robertson testifying she does not recall an instance where an IOM trustee refused a recommendation), 555:3-8 (Robertson testifying that no material securities transactions were initiated without Sam's or Charles' input), 997:5-10 (Boucher testifying all securities transactions were initiated by Charles or Sam), 1114:20-23 (Boucher testifying she does not recall a single instance between 1995 and 2005 where a trustee refused to implement a recommendation).

[371] Collateral Estoppel No. 2; Joint Stipulations ¶¶ 3-4, 8-10, and 13-14, (discussing positions the Wylys held with various companies) and 119-176 (discussing annuity and stock transactions); Tr. Trans. 1692:6-1694:24 (Sam testifying that trust holdings were kept below 5% to avoid SEC filing requirements), 1696:7-1697:5 (Sam testifying that it wasn't until 2005, and after the SEC investigation began, that he and Charles filed documents with the SEC disclosing that either of them beneficially owned securities in Michaels Stores, Sterling Software, Sterling Commerce, or Scottish Re), 1914:4-1915:8 (Hennington discussing compensatory nature of the options transferred to the IOM corporations).

[372] Collateral Estoppel No. 3.

[373] Collateral Estoppel No. 4.

asset protection and tax deferral. Shortly thereafter, the Wylys, Robertson, and French attended another Tedder seminar in New Orleans. Tedder, French, and the Wylys then had a private meeting at Sam Wyly's house in Malibu, California. At that meeting, Tedder "talked about establishing trusts that would provide tax deferral, and how the Wylys could transfer assets to those trusts and get tax deferral on the growth of those assets."[374]

Specifically, Tedder recommended transferring the Wylys' stock options in Sterling Software and Michaels Stores to a foreign trust in exchange for a private annuity "in a tax-free kind of transaction." Under Tedder's plan, it was "expressly intended that [the Wylys] . . . irrevocably surrender the enjoyment, control, ownership, and all economic benefits attributable to the ownership of the [options] which are sold in exchange for the private annuity."[375]

The Wylys pursued the offshore program primarily for its tax advantages.[376]

However, because Tedder suggested transferring stock options in publicly traded companies – Sterling Software and Michaels Stores – any such transaction would implicate the securities laws. French testified that he raised concerns about whether the Wylys would continue to have filing obligations as directors of Sterling Software and Michaels Stores, even after the transfers. Tedder responded that making SEC filings could threaten the Wylys' tax benefits, because "disclosure of the offshore trusts in SEC filings may lead the IRS to discover and investigate the tax issue, and . . . the IRS might use the Wylys' SEC filings against them if the tax issue was ever litigated."[377]

But Sam Wyly corroborated French's account by testifying that Tedder told him that SEC filings 'could trigger tax problems if you had these things on file and [were] reporting the trust shares on [Schedule] 13Ds.' Further, it would be logical

---

[374] Collateral Estoppel No. 5; SEC Tr. Trans. 156:25-157:7 (Robertson); Robertson Depo. Tr. 76:19-77:2; IRS Ex. 85 (June 12, 1991 memorandum from Robertson to Sam, Charles, Evan, French, and Ethel Ketter, in-house CPA for the Wyly family office, discussing Tedder's seminar on asset protection and tax deferral); Tr. Trans. 696:23-627:16 (Sam, however, testified that he did not attend the New Orleans conference); SEC Tr. Trans. 168:2-12 (Robertson testifying that she attended the New Orleans seminar along with Sam, Charles, and French); SEC Tr. Trans. 1716:9-1718:8 (French testifying regarding the various seminars and meetings); Tr. Trans. 1050:19-1059:11 (Sam testifying regarding the various seminars and meetings); IRS Ex. 525 (written information Sam received from Tedder titled "An Overview of Asset Protection Estate and Income Tax Reduction Using Domestic and International Structures").

[375] Collateral Estoppel No. 6; Tr. Trans. 1050:19-1051:16 (Sam), 1052:9-1059:11 (Sam); SEC Tr. Trans. 1719:3-17 (French); IRS Ex. 525 (written information Sam received from Tedder titled "An Overview of Asset Protection Estate and Income Tax Reduction Using Domestic and International Structures").

[376] Collateral Estoppel No. 7; IRS Exs. 130 (November 11, 1991 memorandum from French to Sam discussing tax benefits of foreign trusts), 93 (tax savings chart reflecting a fax date of November 1, 1996 and bearing the notation "Sam likes the #'s!"), 85 (June 12, 1991 communication from Robertson to Sam, Charles, and others) at SEC100150261 (listing the six "goals" of the Tedder tax scheme, three of which are to avoid taxes—"(1) Never pay probate…. (2) Whenever possible eliminate inheritance tax…. (3) Wherever possible reduce income tax- both domestically and foreign.").

[377] Collateral Estoppel No. 8; SEC Tr. Trans. 1719:7-1721:6 (French); IRS Ex. 1199 ¶ 9 (p.7) (Annex A, Admissions of Defendant Michael C. French).

to draw an inference that the Wylys would have been concerned about taking inconsistent positions in their SEC and IRS filings when millions of dollars of tax savings were at stake.[378]

The jury found that the Wylys always had beneficial ownership over the options, warrants, and securities held by the IOM trusts.[379]

Thus, the Wylys were obligated to disclose, on the filings required by sections 13 and 16, any time they or the trusts transacted in those securities. Because beneficial ownership under the securities laws turns on having voting and/or investment power, truthful SEC filings would have forced the Wylys to admit having some element of control over the securities held by the trusts. To the Wylys, this would mean conceding some element of control over the trustees. But the Wylys believed – rightly or wrongly – that it was critical to conceal their control of the trustees in order to maintain the tax-free status of the trusts, including income from transactions in the Issuer securities.[380]

Footnote 91.[[381]] (Sam Wyly) ("We took steps to avoid control, and those are steps to create the appearance of avoiding control. It's reality and it's appearance. You want the appearance to match the reality.") Accord PX 890 (11/3/00 email from Robertson to Evan Wyly) ("Remember that it is critical from a U.S. tax standpoint that there is no appearance that the Wyly's [sic] are in control of the trusts or the protectors.").[382]

Because the Wylys made public filings showing the transfer of options to foreign trusts, and at other times publicized their relationship to the foreign trusts, the Wylys also took affirmative steps to minimize the trusts' SEC filings to conceal the ultimate exercise and sale of those options. For example, the Wyly family office tracked the percentage of ownership each trust management company had in a particular Issuer to avoid triggering mandatory SEC reporting. Thus, as Sam Wyly testified, not making SEC filings was logically "something that consistently went on" throughout the duration of the offshore system.[383]

---

[378] Collateral Estoppel No. 9.

[379] Collateral Estoppel No. 10.

[380] Collateral Estoppel No. 11; Tr. Trans. 727:5-14 (Sam); IRS Ex. 86 (email from Robertson to Evan dated November 3, 2000 and stating "[r]emember that it is critical from a U.S. tax standpoint that there is no appearance that the Wyly's [sic] are in control of the trusts or protectors.").

[381] While this may appear to be a formatting error in this Memorandum Opinion, it is not. Rather, when the IRS submitted its proposed collateral estoppel findings from the SEC Action, it submitted findings made by the SDNY Court in footnotes as well as in the body of the court's opinion. So, footnote 91 as quoted here is footnote 91 in the SDNY Court's opinion, which is Collateral Estoppel No. 12 on Exhibit A to this Memorandum Opinion. Anytime a footnote is quoted in this body of this Memorandum Opinion, it is a footnote finding of the SDNY Court in the SEC Action, to which this Court has given collateral estoppel effect.

[382] Collateral Estoppel No. 12; Tr. Trans. 727:5-14 (Sam); IRS Ex. 86 (November 3, 2000 email from Boucher to Evan).

[383] Collateral Estoppel No. 13; SEC Tr. Trans. 246:11–248:2 (Robertson testifying regarding tracking ownership of stock among trust management companies, transferring stock between companies, and hiring new trust management

---

**MEMORANDUM OPINION**                                                                 81

Even when it would have been otherwise helpful to assert beneficial ownership over the stock held by the foreign trusts, such as during Sam Wyly's proxy battle for control of Computer Associates (the acquirer of Sterling Software) in February 2002, the Wylys chose not to do it in fear of inconsistent tax positions. From these facts, it is logical to draw the inference that making misleading statements in SEC filings, or not making SEC filings at all, was part of the Wylys' plan to maintain the appearance of separation and independence from the foreign trusts.[384]

Footnote 95. See PX 1101 (2/26/02 email from Keeley Hennington, tax director and, starting in 2000, CFO of the Wyly family office, to Boucher, attaching Hennington's note to Sam Wyly) ("The trusts are record owners of the shares on C[omputer] A[ssociates]' books. If it is represented [that] there are $2.9 shares [sic], I think it is likely CA may say we show the Wyly's [sic] only own 1.5M options and again the difference would need to be explained…. Our friendly IRS agent is still looming around and although he has verbally agreed not to look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.").[385]

The Wylys ultimately hired Tedder to help establish the first group of offshore trusts and subsidiary companies in 1992 (together with the Plaquemines Trust, the "Bulldog Trusts"). These trusts were settled by Sam or Charles Wyly and had beneficiaries including the Wylys' wives and children and several charitable organizations. The trust deeds permitted the protectors to "add[] or substitut[e]" a charitable organization "by notice in writing to the trustees." These trusts were explicitly set up as "non-grantor trust[s] rather than [] grantor trust[s] under Section 671-678 of the Code." Under the terms of the trusts, no United States beneficiary could receive a distribution from the trust until two years after the settlor's death.[386]

Footnote 97. (Robertson). The 1992 Trusts relevant to the remedies phase are: 1) the Bulldog Non-Grantor Trust; 2) Lake Providence International Trust; 3) the Delhi International Trust; 4) the Pitkin Non-Grantor Trust; and 5) the Castle Creek

---

companies to avoid any single company owning more than 5% of the issuer which triggers mandatory reporting); *accord* Harris Depo. Tr. 89:6-91:10 (reading from his dictated notes from a February 14, 1996 meeting with French and Robertson held in Dallas—"[o]ne of the reasons they [the Wylys] have a variety of offshore trusts is that holdings in Sterling Software or [Sterling Commerce] held by a trust company for various trusts…are amalgamated for SEC purposes and any trust company holding an aggregate of more than 5% of any one class of shares in a company has certain fairly onerous filing requirements with the SEC. [French and Robertson] confirmed that they were always aware of this as far as the various Wyly entities were concerned and that we need not review this, but we might just need to think about other trusts possibly holding these stocks."). Tr. Trans. 1382:8-1384:21 (Sam being impeached with his testimony from the SEC trial that ownership levels were kept under 5% in order to avoid reporting requirements).

[384] Collateral Estoppel No. 14; IRS Ex. 372 (February 26, 2002 email from Hennington and Boucher to Sam) at SEC/ITC0105445 ("There needs to be a good answer to the increase in shares from what was publicly represented during the CA proxy fight. I think that those watching this will raise this issue and there needs to be an answer that does not jeopardize the offshore system.").

[385] Collateral Estoppel No. 15; IRS Ex. 372 (February 26, 2002 email from Hennington and Boucher to Sam) at SEC/ITC0105445.

[386] Collateral Estoppel No. 16; SEC Tr. Tran. 169:10-12 (Robertson). *See, e.g.,* Joint Ex. 1 (Trust Agreement of the Bulldog Non-Grantor Trust) ¶¶ 1(a) (definition of "Beneficiaries"), 4.2(b), 5.2(a).

International Trust.  In 1995, the Bulldog Trust settled the Plaquemines Trust, which had a class of beneficiaries including Sam Wyly's children. These trusts are referred to as the "Bulldog Trusts" for purposes of this Opinion and Order. The terminology was coined by defendants' expert, Professor Robert Danforth, and has been adopted by the parties in their briefing and argument.[387]

As the above findings and conclusions make clear, and the record here independently establishes, Sam and Charles went to great lengths, using elaborate webs of entities, to avoid accurately and completely reporting the extent of their offshore holdings and the securities transactions that were occurring offshore at their direction.  As found by the SDNY Court, and as independently established here, the offshore program was pursued primarily for its tax advantages.[388]  That Sam and Charles were prepared to commit securities fraud to attempt to preserve those tax benefits is clear as Tedder told them before the first offshore trust was ever established (and the first private annuity transaction was ever undertaken) that "disclosure of the offshore trusts in SEC filings may lead the IRS to discover and investigate the tax issue, and…the IRS might use the Wylys' SEC filings against them if the tax issue was ever litigated."[389]

These facts support the existence of a badge of fraud by clear and convincing evidence as to Sam and Charles from the outset of the implementation of the Wyly offshore system in 1992 through 2005.  However, there is no evidence that Dee participated in the securities fraud.  While she may have benefited from it, that alone is insufficient for it to constitute a badge of fraud against her here.

---

[387] Collateral Estoppel No. 17; SEC Tr. Tran. 169:10-12 (Robertson).  *See, e.g.,* Joint Ex. 1 (Trust Agreement of the Bulldog Non-Grantor Trust) ¶¶ 1(a) (definition of "Beneficiaries"), 4.2(b), 5.2(a).

[388] *See* p. 80 n.376, *supra.*

[389] *See* p. 80 n.377, *supra.*

c)      **The Failure to Take Action to Resolve the Conflicting Advice Sam and Charles Received Regarding the 1992 IOM Trusts**

In his role as the Wylys' primary outside lawyer, French handled the details and was fully authorized to hire and consult with specialist advisors when he considered it necessary.[390] Moreover, as the Wylys' primary outside lawyer, French was intimately involved in the creation and maintenance of the Wyly offshore structure from its inception in 1992 until his relationship with the Wylys ended in 2001.[391]   In fact, while not a tax specialist, French played a key role in the implementation of the Wyly offshore system and in facilitating many of the transactions undertaken through that system until his relationship with the Wylys ended in 2001.[392]

As was found in the SEC Action, and was independently established here:[393]

[i]n 1993, French approached the law firm of Morgan, Lewis & Bockius ("**Morgan Lewis**") to discuss whether the Bulldog Trust was 'a grantor or non-grantor trust.' Morgan Lewis prepared a memorandum concluding 1) that there was a 'significant risk that the [Bulldog] Trust will be characterized as a grantor trust under § 679 [because] income is being currently accumulated for the benefit of U.S. beneficiaries,' and 2) that '[i]t is also likely that the Trustee's power to add or substitute other foreign charities (within the class [of beneficiaries]) causes the Trust to be characterized as a grantor trust under § 674.  Charles Lubar, the partner

---

[390] Tr. Trans. 547:25-548:23, 553:11-23 (Evan testifying that the Wylys "always went to Mike first," and that "Mike would be kind of the lead, but he would bring in whatever specialist he needed. And if there wasn't someone at Jackson Walker that could do it, then he would bring in, you know, an outside attorney.")

[391] A letter agreement dated January 24, 1997 signed by Sam and French set forth "certain arrangements with respect to (i) my retention by you as legal counsel in connection with all family and family-related business activities; (ii) my interest in the investment management business … [Maverick Fund]; and (iii) an overall guaranteed level of income that I will have going forward from various activities on behalf of your families, and certain related or associated activities." SEC Tr. Trans. 1706:11-20 (French).  The letter stated that French was retained as "legal counsel for the Wylys" because Sam "insisted" that their conversations be subject to attorney/client privilege, "whatever I did."  *Id.*  1706:2-10 (French). *See also* Tr. Trans. 699:15-21 (Sam) ("Q. Okay. What role did Mr. French play in setting up the Isle of Man trusts? A. Well, he was the – chief lawyer, chief architect, who – I mean, there were others who worked on it, but he was the – I would say the leader of a team of lawyers and certified public accountants who worked on it."), 709:1-20 (Sam explaining how French was charged to oversee and recruit the legal specialists hired to establish the trusts); Joint Stipulations ¶ 11 ("Mr. French served as primary counsel for Sam Wyly and Charles Wyly until early 2001 when the relationship was severed.").

[392] Joint Stipulations ¶ 11; p. 84 n.391, *supra.*

[393] Collateral Estoppel No. 18.  These facts were established here by clear and convincing evidence with the exception of whether French was given the Lubar memorandum.  While the record here is clear that Lubar discussed its contents with French, it is equivocal on whether French was actually given a copy of the memorandum in 1993.  *See* Lubar Depo. Tr. 93:13-25 (Lubar testifying that he had discussed the issues with French, but could not remember if he provided French with a copy of the memorandum).

---

**MEMORANDUM OPINION**                                                                                    84

at Morgan Lewis retained to work on this matter, gave the memorandum to French and spoke with him about its conclusions.[394]

To amplify this finding a bit based on our record, Lubar was an experienced tax lawyer with impressive credentials. He graduated from Yale University in 1963 magna cum laude, received his JD from Harvard Law School in 1966 and received an LLM in tax from Georgetown University in 1967.[395] Lubar explained the significance of the distinction between foreign grantor and non-grantor trust status as follows: "[i]f you are a U.S. citizen and you set up a foreign trust that is treated as a grantor trust, then you are treated as owning all of the income of that trust, even if it is a completed gift to the foreign trust."[396] If the foreign trust was a valid non-grantor trust, "[t]here would be no tax."[397]

Recall that Sam settled the Bulldog IOM Trust as a foreign non-grantor trust in 1992 and that Charles settled the Pitkin IOM Trust as a foreign non-grantor trust then too. Obviously, if Lubar's concerns were well-founded, the impact on the Wyly offshore system and the annuity transactions undertaken by Sam and Charles in 1992 created substantial tax problems for them.

On this record there can be no doubt that French was Sam's and Charles' agent. French was undoubtedly acting on their behalf when he went to Lubar for a second opinion, as he had been authorized to do, on whether the 1992 IOM trusts settled by Sam and Charles were non-grantor trusts.[398] That French sought a second opinion in 1993 is significant because it confirms

---

[394] Lubar Depo. Tr. 13:10-14:6, 16:11-19:5 (discussing his initial contact with French and the results of his analysis). Although the underlying memorandum was not admitted into the record here, it is thoroughly discussed in deposition testimony given by Lubar, which was admitted into the record by agreement of the parties. *See id.* at 17:6-19:5, 93:5-95:18.

[395] *Id.* at 9:12-18.

[396] *Id.* at 15:4-8.

[397] *Id.* at 15:12.

[398] Tr. Trans. 548:13-16 (Evan discussing how French was authorized to seek out other attorneys to give advice), 549:8-22 (Evan discussing how the Wylys perceived no material difference when French moved from Jackson Walker to Jones Day in 1995 "[a]nd while the secondary attorneys might have changed … we still looked to him [French] first as kind of our trusted counsel on who should be the best person. And he continued to find outside attorneys if there wasn't a specialist inside Jones Day that could handle the situation."), 553:19-23 (Evan) ("And Sam was in a

that: (i) French had lingering concerns about Tedder's legal opinion (ghost-written by Chatzky) concerning the tax consequences to the Wylys of the 1992 annuity transactions undertaken by Sam and Charles through the Bulldog IOM Trust and the Pitkin IOM Trust, respectively, and (ii) supports this Court' later finding that French had no specialized tax knowledge with which to evaluate the proper status of the offshore trusts and the tax consequences flowing from the Wylys' 1992 annuity transactions. Significantly, knowledge of four facts can be imputed[399] to Sam and Charles from French's actions as their agent: (i) that French had lingering concerns about the proper characterization of the 1992 IOM trusts and the tax consequences flowing to the Wylys from the 1992 annuity transactions and the Wylys' reporting requirements regarding the 1992 IOM trusts, (ii) that French sought a second opinion from Lubar, a prominent international tax lawyer, (iii) that French learned that Lubar believed there was a "significant risk" that the 1992 IOM trusts would be characterized as grantor trusts to Sam and Charles, and (iv) that French learned that the tax consequences to the Wylys were vastly different if the 1992 IOM trusts were grantor trusts as to Sam and Charles.

Charged with knowledge of these facts, neither Sam nor Charles did anything further themselves, or acting through French, to resolve the conflicting advice they now had from two tax professionals they had hired to give them advice—Tedder and Lubar. And, rather than resolve this legal uncertainty, Sam and Charles continued with the offshore structure in its then form. And, they then chose to expand the offshore structure the following years through the settling of other foreign trusts with falsified documents, which we discuss below, and by continuing to transact

---

really good -- kind of at a high level, and so if Mike needed some kind of high-level direction, he would come and ask Sam, but then, you know, Mike would go off and, you know, handle the details."), 709:1-20 (Sam explaining how French was charged to oversee and recruit the legal specialists hired to establish the 1994 and 1995 trusts); Joint Stipulations ¶ 11 ("Mr. French served as primary counsel for Sam Wyly and Charles Wyly until early 2001 when the relationship was severed.").

[399] See pp. 89-98, infra, for a discussion of imputation.

business through the offshore system. These facts support the existence of a badge of fraud by clear and convincing evidence from 1993 through 2013 as to Sam and from 1993 through 2011 as to Charles.

However, there is no evidence that Dee *ever* knew about Lubar's conclusions—whether in 1993 or in 2003[400]—or that if she had known she would have understood the implications of those conclusions. This badge of fraud does not apply to Dee.

### d) The Creation of False Documents to Support the Settling of IOM Trusts in 1994 and 1995 to Attempt to Obtain Favorable Tax Benefits for the Wylys

The SDNY Court made the following findings and conclusions, which are independently established here:

> The following year, French asked Lubar to advise the Wylys about whether a trust settled by "a foreign person who had done business with Sam Wyly" would be treated as a grantor trust. Lubar advised that "as long as there wasn't an indirect transfer of assets by the U.S. person and the foreign person put the money up, and there were certain powers in the trust, then it would be a foreign grantor trust, and the distributions then would not be taxable." For the purposes of rendering his opinion, Lubar assumed that the foreign grantor would be the "sole transferor of property to the trust[]," unless the taxpayers transferred funds "on an 'arm's length' basis."[401]

> In 1994 and 1995, two foreign citizens established several trusts for the benefit of the Wylys and their families (collectively, the "Bessie Trusts"). The Bessie Trust and the Tyler Trust were purportedly settled by Keith King, an individual associated with Ronald Buchanan, an IOM trustee selected by the Wylys, with initial contributions of $25,000 each. However, no such contribution was ever made. The trusts "were settled with a factual dollar bill . . . plus an indebtedness of $24,999 each on the part of Keith King as settlor." That indebtedness was immediately forgiven.[402]

---

[400] As discussed previously in this Memorandum Opinion, Lubar was consulted again in 2003—this time by Hennington and Boucher acting as Sam's and Charles' agents—and he reconfirmed his 1993 conclusions then after reanalyzing the legal issues. *See* p. 26, *supra.*

[401] Collateral Estoppel No. 19. Lubar Depo. Tr. 27:4-23; IRS Ex. 806 (February 15, 1994 memorandum from Lubar to French regarding "Tax Consequences of Grantor Trusts) at SYLYSEC00010967-0968.

[402] Collateral Estoppel No. 20; Joint Exs. 4 (Deed of Settlement, Bessie IOM Trust), 37 (Deed of Settlement, Tyler IOM Trust); SEC Tr. Trans. 3755:10-3757:22 (French testifying regarding King's failure to fund); IRS Exs. 214 (November 16, 1995 fax from French to Buchanan regarding Boucher's inability to find any records that King ever

Footnote 107. The 1994/1995 trusts relevant to this Opinion and Order are: 1) the Bessie Trust; 2) the La Fourche Trust; 3) the Red Mountain Trust; and 4) the Tyler Trust. These trusts will be referred to as the "Bessie Trusts," as per Professor Danforth's grouping.[403]

The La Fourche Trust and the Red Mountain Trusts [*sic*] were purportedly settled by Shaun Cairns, another individual associated with Buchanan, also with initial contributions of $25,000 each. Cairns testified that French prepared letters stating that Cairns was establishing the trusts "to show [his] gratitude for [the Wylys'] loyalty to our mutual ventures and [their] personal support and friendship," and asked Cairns to sign them. In truth, Cairns had never met nor dealt with the Wylys before establishing the trusts, and had provided only $100 towards the trusts. Shortly after these trusts were settled, Cairns's trust management company was hired to serve as trustee for some of the Wylys' IOM trusts.[404]

These transactions were shams intended to circumvent the grantor trust rules. French and Buchanan, acting as the Wylys' agents, recruited King and Cairns to create a falsified record of a gratuitous foreign grantor trust. The trust documents are admittedly false – King and Cairns never contributed $25,000 towards the initial settlement.[405]

There were no gratuitous transfers here. First, I am doubtful that King provided even the factual $1 towards the trusts. In a November 26, 1995 fax to French, Buchanan writes that "Keith never produced the money." Buchanan explains that the King-related trusts "were settled with a factual dollar bill" only so that "there [was] no question of the[] [trusts] being voidable by reason of the absence of assets" pending the Wylys' transfer of options. Even if King had contributed the $1, the premise that an unreimbursed dollar bill is sufficient to establish a tax-free foreign grantor trust cannot be taken seriously. Second, Cairns's transfer of $100 cannot be considered gratuitous because shortly after settling these trusts, he received lucrative work from the Wylys as trustee. Finally, in light of the falsified trust

---

funded the Bessie IOM Trust, the Tyler IOM Trust, and the South Madison IOM Trust, and noting similar issues with the La Fourche IOM Trust and Red Mountain IOM Trust), 178 at 02517 (November 26, 1995 faxes from Buchanan to French regarding funding issues, stating the Bessie IOM Trust and Tyler IOM Trust had each been funded with "a factual Dollar bill").

[403] Collateral Estoppel No. 21.

[404] Collateral Estoppel No. 22; Joint Exs. 17 (Deed of Settlement, La Fourche IOM Trust), 42 (Deed of Settlement, Red Mountain IOM Trust); IRS Ex. 414 (letter from Cairns to Sam dated July 18, 1995); Cairns Depo. Tr. 43:3-18 (French prepared the letter), 46:5-8; 56:9-12 (discussing Cairns' failure to fund the trusts with $25,000), 46:18-47:4; 158:6-7 (Cairn's admitting he did not know Sam and that the letter was provided to him by French); Joint Stipulations ¶¶ 66 and 102 (showing that Cairn's company, Wychwood Trust Limited, served as trustee for Delhi IOM Trust, La Fourche IOM Trust, and Red Mountain IOM Trust).

[405] Collateral Estoppel No. 23; p. 88 n.404, *supra* (as to Cairns); p. 87 n.402, *supra* (as to King); Tr. Trans. 583:23-584:7 (Evan testifying that King was a stockbroker who had done some, but not a lot, of business with Maverick).

---

**MEMORANDUM OPINION**                                                                                        88

deeds and supporting documentation surrounding these trusts, it would be unjust to consider anyone but the Wylys to be the true grantors of these trusts.[406]

As was unquestionably established—both here and in the SEC Action—the establishment of the Bessie IOM Trust and the Tyler IOM Trust by King in 1994 and the establishment of the La Fourche IOM Trust and the Red Mountain IOM Trust by Cairns in 1995 was highly irregular from the outset. Of significance, the SDNY Court found that French and Buchanan were acting as Sam's and Charles' agents. This Court has given collateral estoppel effect to that finding, but at least as to French, the record here independently supports such a finding—by clear and convincing evidence. Moreover, that French was acting within the scope of that agency when he (i) consulted with Lubar about the potential tax ramifications to U.S. beneficiaries of a foreign trust settled by a non-U.S. person, and (ii) then proceeded to facilitate the implementation of those trusts through false documentation and other acts cannot be questioned.[407]

The law is clear, Sam and Charles, as French's principals, are charged with French's conduct in (i) facilitating the creation of the 1994 and 1995 IOM trusts, and (ii) creating false

---

[406] Collateral Estoppel No. 24; Joint Stipulations ¶¶ 66 and 102 (showing that Cairn's company, Wychwood Trust Limited, served as trustee for Delhi IOM Trust, La Fourche IOM Trust, and Red Mountain IOM Trust); Cairns Depo. Tr. 46:5-8; 56:9-12 (discussing his failure to fund the trusts with $25,000); IRS Exs. 214 (November 16, 1995 fax from French to Buchanan regarding Boucher's inability to find any records that King ever funded the Bessie IOM Trust, the Tyler IOM Trust, and the South Madison IOM Trust, and noting similar issues with the La Fourche IOM Trust and Red Mountain IOM Trust) and 178 at 02517 (November 26, 1995 faxes from Buchanan to French regarding funding issues, stating the Bessie IOM Trust and Tyler IOM Trust had each been funded with "a factual Dollar bill"); Tr. Trans. 583:23-584:7 (Evan testifying that King was a stockbroker who had previously done some, but not a lot, of business with Maverick); SEC Tr. Trans. 3753:5-14 (French testifying that he believed that King had made substantial money previously dealing with the Wylys in South African bonds).

[407] Tr. Trans. 709:1-20 (Sam explaining how French was charged to oversee the legal specialists hired to establish the trusts), 703:11-25 (Sam explaining that "he [French] was sort of the coordinator or the commander of the lawyers who -- who worked on it" while Sam considered himself more the "leader of the companies."). Sam's approach of letting French handle his transactions was confirmed by Evan. *See id.* 548:13-16 (Evan discussing how French would seek out other attorneys to give advice—"So Mike would be kind of the lead, but he would bring in whatever specialist he needed. And if there wasn't someone at Jackson Walker that could do it, then he would bring in, you know, an outside attorney."), 549:14-22 (Evan discussing how the Wylys perceived no material difference when French moved from Jackson Walker to Jones Day in 1995 "[a]nd while the secondary attorneys might have changed … we still looked to him [French] first as kind of our trusted counsel on who should be the best person. And he continued to find outside attorneys if there wasn't a specialist inside Jones Day that could handle the situation."), 553:19-23 (Evan) ("And Sam was in a really good -- kind of at a high level, and so if Mike needed some kind of high-level direction, he would come and ask Sam, but then, you know, Mike would go off and, you know, handle the details.").

documentation that purports to support the creation of the trusts. In explaining why this is so, the Court will first analyze the law regarding the general rule that an agent's conduct is imputed to his principal and will then explain why the Debtors' attempt to distinguish their situation from this general rule is ineffective.

First, and of significance, the Debtors have never argued that French was not the Wylys' agent regarding the implementation of the Wyly offshore system. Nor could they. Under Texas law, "an agency relationship arises when the principal consents to the agent acting on the principal's behalf."[408] An agency relationship need not be expressly established, and instead may be implied based on the conduct of the parties under the circumstances.[409]

Second, the evidence here unquestionably established that French was acting as Sam's and Charles' agent regarding the implementation of the Wyly offshore system from 1992 until his association with the Wylys' ended in early 2001.[410] For example, when explaining the roles of Robertson and French regarding the implementation of the 1992 IOM trusts, Evan testified that Robertson "as CFO, she did a lot of the research as well because there's accounting and finance related to this as well. So she would head up that part of the details, and Mike [French] would head up the legal details. That's typically how it worked whenever they worked on a project."[411] Then, Evan explained how the allocation of responsibility to implement the 1994 and 1995 IOM trusts was allocated between Robertson and French when he testified "[t]hat was handled by Mike French and Shari Robertson again…We really left the legal part for Mike to work on. We left the

---

[408] *Davis-Lynch, Inc. v. Asgard Tech., LLC*, 472 S.W.3d 50, 60 (Tex. App. – Houston [14th Dist.] 2015, no pet. h.) (citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549 (Tex. App.—Houston [14th Dist.] 2003, no pet. h)); *see Welch v. Coca-Cola Enter., Inc.*, 36 S.W.3d 532, 539 (Tex. App.—Tyler 2000, pet. withdrawn) ("An 'agent' is one who is authorized by another to transact business or manage some affair for him.") (citing cases).

[409] *Welch*, 36 S.W.3d at 540.

[410] Joint Stipulations ¶ 11; p. 89 n.407, *supra*.

[411] Tr. Trans. 570:4-11 (Evan).

accounting and financial part for Shari to work on. So we didn't get into too much of the details, but we felt comfortable that it was, you know, a fair and appropriate structure."[412] Sam also admitted that French acted with his authority with respect to the offshore system when he testified that French was "sort of the coordinator or the commander of the lawyers" who worked on creating the entities to create the offshore system.[413]

It is well settled that "a principal is chargeable with notice or knowledge concerning a matter within the scope of the agency, received by his agent while acting within the scope of his authority."[414] Comment b to § 5.03 of the Restatement (Third) of Agency illustrates the operation of, and reasoning behind, this legal rule:[415]

> Imputation charges a principal with the legal consequences of having notice of a material fact, whether or not such fact would be useful and welcome. If an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact. If the agent has reason to know a fact, the principal is charged with the legal consequences of having reason to know the fact. A principal may not rebut the imputation of a material fact that an agent knows or has reason to know by establishing that the principal instructed the agent not to communicate such a fact to the principal. Imputation thus reduces the risk that a principal may deploy agents as a shield against the legal consequences of facts the principal would prefer not to know.

The Fifth Circuit, citing Texas law, also agrees that "[i]t is a fundamental rule of agency law that notice to the agent constitutes notice to the principal."[416] Moreover, long standing precedent from the Texas Supreme Court holds that an agent's knowledge may be imputed to a principal,[417] as has

---

[412] *Id.* at 587:12-588:3 (Evan).

[413] *Id.* at 703:4-25 (Sam).

[414] Annotation, Imputing Agent's Knowledge to Principal, 104 A.L.R. 1246.

[415] Restatement (Third) of Agency § 5.03 (2006).

[416] *Minter v. Great American Ins. Co. of New York*, 423 F.3d 460, 472 (5th Cir. 2005) (citing *Elite Towing, Inc. v. LSI Fin. Group*, 985 S.W.2d 635, 642–43 (Tex. App.—Austin 1999, no pet. h.)); *see also Berkley Reg. Ins. Co. v. Philadelphia Indem. Ins. Co.*, 600 Fed. Appx. 230, 235 (5th Cir. 2015) ("In Texas, it is well settled that if an agent's acts are within the scope of his authority, then notice to the agent of matters over which the agent has authority is deemed notice to the principal.") (quotations and citations omitted).

[417] *Victory v. State*, 158 S.W.2d 760, 764 (Tex. 1942) ("[t]he knowledge of the agent is imputed to the principal."); *see also Goldstein v. Union Nat. Bank*, 213 S.W. 584, 587 (Tex. 1919) ("Under general and well-settled principles of

its more recent jurisprudence, which confirmed that Texas law "regard[s] it as well settled that if an agent's acts are within the scope of his authority, then notice to the agent of matters over which the agent has authority is deemed notice to the principal."[418]

While an agent's knowledge is *not* imputed to the principal when the agent is acting in a manner that is actively adverse to that of his principal,[419] that adverse interest exception to the general rule is not applicable here, as French's actions were not adverse to the Wylys but were to benefit them.  Even the Debtors agree in their post-trial briefing that the adverse interest exception is inapplicable here—*i.e.*, we "have *never* argued that the 'adverse interest exception' applies."[420]

In an attempt to get out from under their agent's *objective* acts or conduct here, the Debtors argue that French's *subjective* fraudulent intent cannot be imputed to Sam and Charles for purposes of determining whether Sam and Charles underpaid their taxes in any year with fraudulent intent for purposes of 26 U.S.C. § 6663.  The Court agrees that it is improper to impute French's subjective fraudulent intent to Sam and Charles when it is Sam's and Charles' subjective intent that is at issue in determining whether fraud penalties are appropriate here, but that is not what the Court is doing, as will be explained below.

Moreover, relying on the Restatement (Third) of Agency, the Debtors argue that "[i]n other words, imputation is the general rule, but there is an exception 'when knowledge as distinguished

---

law and equity the acts of a duly authorized agent within the scope of his authority bind the principal, and carry to him, constructively, notice of all material facts comprised in the transaction."). *See also Berkley Reg. Ins. Co.,* 600 Fed. Appx. at 235.

[418] *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 300 (Tex. 1981) (citing *Victory v. State*, 158 S.W.2d 760 (1942)); *see also Trevino v. HSBC Mortg. Serv., Inc. (In re Trevino)*, 535 B.R. 110, 133 (Bankr. S.D. Tex. 2015) ("It is a basic tenet of agency law that knowledge of an agent may be imputed to the principal.").

[419] *See, e.g., Standard Sav. & Loan Ass'n v. Fitts*, 39 S.W.2d 25, 26, (Tex. 1931) (knowledge of agent obtained in scheme to defraud principal not imputed to principal); *Askanase v. Fatjo*, 828 F. Supp. 465 (S.D. Tex. 1993) ("An agent's knowledge is not imputed to his principal if he acts entirely for his own or another's purpose.") (citing *FDIC v. Shrader & York*, 991 F.2d 216, 223 (5th Cir. 1993)).

[420] Debtors' Post-Trial Reply [ECF No. 1121] at 16 (emphasis in original).

from reason to know is important,' and circumstances exist where personal knowledge – as opposed to imputed knowledge – is the relevant question."[421] The Debtors go on to state that "case law bears out these principles and shows that only the Debtors' personal knowledge – not imputed knowledge – should be considered for purposes of the fraud penalties."[422] Significantly, the Debtors then cite to five cases decided in the tax law area and provide a parenthetical explanation of the holding of those cases. However, if those cases are examined closely, what the courts there are addressing is whether the specialized knowledge of a tax advisor can be imputed to the taxpayer in the context of the taxpayer's reliance on the advice of a tax professional to defeat the recovery of fraud or negligence penalties by the IRS.

For example, the first case cited by the Debtors is *Henry v. C.I.R.,*[423] with a parenthetical explanation as follows: ("holding that 'there is no evidence that [accountant] ever told [taxpayer] of this risk or of the [relevant treasury] regulation, and [accountant's] knowledge of the risk cannot be imputed to [taxpayer]'"). First, that is not the actual holding of the case, but irrespective of this, the quote does appear in the decision. Second, the Ninth Circuit's point in *Henry* is simply that the specialized knowledge of the accountant cannot be imputed to the taxpayer consistent with the Supreme Court's decision in *U.S. v. Boyle*[424] where the Supreme Court observed:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the [Tax] Code himself would nullify the very purpose of seeking the advice of a presumed expert

---

[421] Debtors' Post-Trial Brief [ECF No. 1117] at 15.

[422] *Id.*

[423] 170 F.3d 1217, 1220-21 (9th Cir. 1999).

[424] 469 U.S. 241, 251 (1985).

in the first place. 'Ordinary business care and prudence' do not demand such actions.[425]

The next case cited by the Debtors is *Davis v. C.I.R.*,[426] along with the following parenthetical ("[t]o hold a taxpayer guilty of fraud, who [files a return] without actual knowledge that a return is false, and after a full disclosure to the expert preparing the same, would be untenable.") While this quote appears in the Tenth Circuit's decision, once again it appears in the context of imputing the tax expert's knowledge to the taxpayer as the court made clear when it also stated:

> [t]o impute to the taxpayer the mistakes of his consultant would be to penalize him for consulting an expert; for if he must take the benefit of his counsel's or accountant's advice *cum onere*, then he must be held to a standard of care which is not his own and one which, in most cases, would be far higher than that exacted of a layman.[427]

By way of one last example, the Debtors next cite *Haywood Lumber & Min. Co. v. C.I.R.*,[428] along with the following parenthetical ("[t]o impute to the taxpayer the mistakes of his consultant would be to penalize him for consulting an expert[.]"). While this quote appears in the Second Circuit's decision, it is simply repeating the substance of the *Davis* court's holding, but now in the context of deciding whether the taxpayer's reasonable cause defense should prevent the imposition of a 25% penalty.

As the Debtors themselves acknowledge later in their Post-Trial Brief, "[s]pecial rules have developed in the tax context for purposes of determining how to analyze taxpayer's relations with their advisors."[429] According to the Debtors, "[b]ecause tax law is such a complex area, specific

---

[425] *Henry*, 170 F.3d at 1220-21 (quoting *Boyle*, 469 U.S. at 251).

[426] 184 F.2d 86 (10th Cir. 1950).

[427] *Id.* at 88.

[428] 178 F.2d 769 (2d Cir. 1950).

[429] Debtors' Post-Trial Brief [ECF No. 1117] at 29.

rules have developed regarding the ability of taxpayers to rely on tax advice."[430]  According to the Debtors, because of this complexity,

> taxpayers have no obligation to second-guess or monitor their tax advisors. Because the imputation of knowledge rule that exists in other areas of the law is grounded in the principal's ability to monitor his agent to ensure compliance with the agent's duty to transmit material facts to the principal, imputation conflicts with the special tax rule that no monitoring is required.[431]

The Court agrees with these statements and the holdings of the courts in *Henry*, *Davis*, and *Haywood Lumber*.  But, what the Debtors' arguments overlook is that French was not the Debtors' specialized tax advisor.  French had no specialized competence to address tax matters.  That's why the Wylys looked to, among others, Tedder, Chatzky, Lubar, Owens, Pulman, and Cousins for their tax advice—not French.  French was a securities lawyer.[432]  And, in the context that this Court is discussing, French was simply the Wylys' agent; in essence, their middleman.  Instead of the Wylys going to Lubar themselves for his tax advice, they sent French.  So French, directly, and they, indirectly, consistent with the holdings of these cases and the Supreme Court in *Boyle*, may be able to reasonably rely on the advice of their specialized tax advisors, but the Court is not imputing Lubar's specialized tax knowledge to the Wylys for purposes of analyzing this objective badge of fraud.

Rather, all the Court is doing is imputing to Sam and Charles certain things their agent, French, did—again, not as their specialized tax advisor, but as their agent charged with responsibility to facilitate the implementation of the offshore system.  So what acts did French do in his capacity as the person responsible to facilitate the implementation of the offshore system?

---

[430] *Id.*

[431] *Id.* at 30.

[432] *See* Tr. Trans. 1394:16-24 (Sam testifying that French was a securities lawyer and that "I don't recall him [French] being concerned about tax things); SEC Tr. Trans. 3758:7-8 (French) ("I'm not the tax lawyer. I'll take that disclaimer again.").

First, French went to Lubar and told Lubar to assume, as relevant here, three facts for purposes of offering his advice on the tax consequences to U.S. citizen beneficiaries (Sam and his family, and Charles and his family) of transactions done within valid foreign grantor trusts settled by an individual who is a nonresident alien of the United States (King and Cairns). The three facts French told Lubar to assume were true were: (i) "[t]he Grantor, although not related to the Taxpayers, has known the Taxpayers for a considerable period of time," (ii) "[the Grantor] will establish the Trusts for the Taxpayers' benefit as an entirely gratuitous act," and (iii) "[a]ll moneys contributed to the Trusts, now or in the future, will belong to the Grantor, and he has not previously and will not in the future receive any consideration, reimbursement, or other benefit for, or in respect of, this act, directly or indirectly."[433]

Second, after enlisting Buchanan's help, French asked two virtual strangers to the Wylys—King and Cairns—to settle foreign grantor trusts with $25,000 of King's and Cairns' own money per trust—a total of $50,000 for each of them. One must wonder why French would ask virtual strangers to settle the trusts (given the facts he told Lubar to assume were true) or that either King or Cairns would settle trusts with $50,000 of their own money for the benefit of Americans one of them (King) barely knew[434] and the other of them (Cairns) did not know at all,[435] particularly since it was to be "an entirely gratuitous act." Of course, as was later discovered, they did not settle the trusts with the required money. None of the 1994 or 1995 Wyly IOM trusts was settled with the $25,000 that each Deed of Settlement required.

---

[433] *See* IRS Ex. 806 at WYLYSEC00010967 (¶ 1). The facts that French told Lubar to assume were true were not true—King and Cairns had not known Sam and Charles "for a considerable period of time;" King and Cairns did not establish his respective trusts as "an entirely gratuitous act;" and Cairns did "receive consideration, reimbursement or other benefits" for settling these trusts.

[434] King was a stock broker that had previously done some, but not a lot, of business with Maverick. Tr. Trans. 583:23-584:12 (Evan); SEC Tr. Trans. 3753:5-14 (French).

[435] Cairns Depo. Tr. 46:22-47:4, 158:6-7.

Third, after Cairns agreed to settle his trusts, French prepared and had false documents signed to attempt to create a paper record to show that the Cairns-settled trusts "fit" into the proper mold for (i) the establishment of a valid foreign trust by a non-U.S. grantor, and (ii) the Wylys to obtain the tax benefits such a structure would offer. In short, French "papered" the transactions in such a way that the trusts might later withstand scrutiny by the IRS—or so French and his principals, Sam and Charles, hoped.[436]

Fourth, shortly after these trusts were settled, Cairns' trust management company was hired to serve as trustee for some of the Wylys' IOM trusts.[437] Thus, Cairns received "consideration, reimbursement, or other benefit …, directly or indirectly," for purportedly settling these trusts for the benefit of Sam, Charles, and their respective families.

Fifth, although the record does not reflect that King received business from the Wylys after settling the Bessie IOM Trust and the Tyler IOM Trust, it does reflect that King had previous dealings with Maverick,[438] trading in South African bonds. This is why French reached out to King to settle the trusts, because French believed that King had made a substantial amount of money on these dealings, and had reason to "want to give something back" to the Wylys.[439]

These acts undertaken by French, acting within the scope of his agency, in order to obtain favorable tax treatment for the Wylys offshore transactions undertaken through the 1994 and 1995 IOM trusts supports the existence of a badge of fraud from the date of the creation of each trust through 2013 as to Sam and from 1992 through 2011 as to Charles.

---

[436] *See* IRS Ex. 92 (letter dated July 18, 1995 from Cairns to Sam).

[437] Collateral Estoppel Nos. 22-24; Joint Stipulations ¶¶ 66 and 102, (showing that Cairn's company, Wychwood Trust Limited, served as trustee for Delhi IOM Trust, La Fourche IOM Trust, and Red Mountain IOM Trust).

[438] Tr. Trans. 583:23-584:7 (Evan).

[439] SEC Tr. Trans. 3753:5-14 (French).

One final point must be addressed. During closing arguments, the Wylys' counsel argued that French had gone rogue – out acting on his own without the Wylys' knowledge. The Court rejects this argument for at least two reasons. First, it is simply incredible that a "trusted advisor"—French; in fact, one of the Wylys' "most trusted advisors"[440] –would go rogue. And, if he was acting out as they now argue, that they would keep him around for another six years all the while guaranteeing him an annual income of at least $1.5 million.[441] On this record, that is not a credible assertion and the Court rejects it. Second, as a matter of law, it does not matter if French was a rogue actor. Sam and Charles chose to rely on him to act as their agent to facilitate the implementation of their offshore system, and they are stuck with what he did on their behalf.

However, there is no evidence that Dee *ever* knew about the falsified documents or other things that were done to try to make the 1994 and 1995 IOM trusts fit into the proper mold for a valid foreign trust settled by a non-U.S. person. Moreover, there is no evidence that French was Dee's agent in connection with the implementation of the offshore system. This badge of fraud does not apply to Dee.

### e) The Treatment of the Offshore System as the Wyly Family Piggy Bank

The IRS argues, and the Court agrees, that the Wyly family treated the offshore system as their personal piggy bank, of that there is no doubt on this record. The record is replete with instances where a Wyly family member would purchase an item and, after making the purchase, figure out a way to have it paid for with offshore funds.

---

[440] Tr. Trans. 549:15-19 (Evan), 789:16-20 (Evan agreeing that French was one of the Wylys' "most trusted advisors"), 1420:8-10 (Sam). Joint Stipulations ¶ 11.
[441] IRS Ex. 1199 ¶ 26 (p. 10) (Annex A, Admissions of Defendant Michael C. French).

A prime example is the purchase of an expensive piece of art, Noon Day Rest, by Cheryl Wyly, Sam's wife. Cheryl apparently attended an art auction at Sotheby's in London where she found a painting she liked by a British artist, John Frederick Herring. The invoice is dated July 10, 1996 and the purchaser is shown to be Mrs. Cheryl Wyly, along with the address of their Dallas home.[442] The purchase price is £155,000. Nine days later French sends a memorandum to Ronald Buchanan at Lorne House Trust, the IOM trust management company that served as trustee for the Bessie IOM Trust, in which French directs that the painting be purchased with offshore funds:[443]

> Attached is language from the Deed of Settlement of the Bessie Trust. This language <u>clearly</u> authorizes a purchase of personal property for personal use or enjoyment in specie by any beneficiary.
>
> Unless there is a clear and unequivocal requirement of IOM law (which I doubt), that any such purchase that is specifically authorized by the trust agreement must nevertheless be weighed against the investment returns that could otherwise be obtained on the funds, then I must assume that this transaction is authorized and lawful. If you wish to search for such a legal prohibition, you should do so at your own expense and not that of the Trust.
>
> The Protectors have already recommend [*sic*] this transaction. Please advise if you are willing to proceed on that basis in light of the <u>explicit</u> authorization for the transaction contained in the Trust Deed.
>
> We need to resolve this issue at once.

In a rare instance of an offshore trustee pushing back against a recommendation of the Wyly trust protectors (French and Robertson at that time), Buchanan wrote back to Boucher stating his concerns regarding the purchase:[444]

> Thank you for your overnight fax.[[445]] We will put in train the necessary actions *but we would draw to the Committee of Protectors' attention that they are*

---

[442] IRS Ex. 364 at IOM 37827.

[443] *Id.* at IOM 37820 (emphasis in original).

[444] *Id.* at IOM 37826 (emphasis added). Recall the earlier meeting where French and Robertson instructed Webb, another IOM trustee, to deal through Boucher to keep communications offshore. *See supra* at pp. 25-26. The Court reasonably infers that French and Robertson had a similar conversation with all the Wyly IOM trustees when Boucher was hired, including in this instance, Buchanan.

[445] Although the overnight fax was from French, not Boucher.

*recommending the substitution of a very safe, income-producing asset by one which might be difficult to sell at a profit at short notice and which generates no income, especially since it is suggested that the Trustees should buy it – through Fugue Limited, which is wholly owned by the Bessie Trust – at 222% of the pre-auction estimated price.*

We would therefore ask them to confirm, either directly to us or though you under your delegated authority, that:

they do not believe that the beneficiaries will need the income which the proposed purchase price could have generated in the near or medium-term future.

that [*sic*] they believe that, over the long term, the painting will gain appreciably more in value than would Treasury Bills with the income reinvested."

On July 24, 1996, French sent a draft letter back to Buchanan, asking if the draft letter will suffice and, if it will, advising that he will get it signed by Sam.[446] Although Buchanan asked for confirmation that the *trust protectors* believed that the beneficiaries will not need the income and that they believe that the painting will appreciate in value more than Treasury Bills would earn, no trust protector responds; rather, Sam apparently responds, saying that the beneficiaries of the Bessie IOM Trust have no need for the money,[447] although it is unclear in the record whether Sam actually signed the draft letter prepared by French, as no signed copy was introduced into evidence. Moreover, the draft letter ignores the IOM trustee's question of whether the painting will appreciate in value.[448]

Then, on July 26, 1996, Sotheby's reissues an invoice for Noon Day Rest—but now to Fugue Limited, Mr. Ronald Buchanan Esq. C/O Lorne House Trust at the trust company's IOM address.[449] Fugue Limited (n/k/a Audubon Asset Limited (IOM)) is one of the IOM corporations wholly owned by the Bessie IOM Trust,[450] of which Lorne House Trust (acting through Buchanan)

---

[446] IRS Ex. 364 at IOM 37824-25.

[447] *Id.* at IOM 37825.

[448] *Id.*

[449] *Id.* at IOM 37813.

[450] Joint Stipulations ¶ 36.

**MEMORANDUM OPINION**                                                                    **100**

served as trustee.[451]  Noon Day Rest was immediately hung in the home of Sam and Cheryl in

Dallas after Fugue Limited's purchase of it, where it hung until it was recently sold pursuant to an

Order of this Court.

During his trial testimony, Sam appeared to recall little about the transaction, but when he

realized what painting he was being cross-examined about he testified "[i]t's a Herring.  Yeah, we

love Herrings."[452]  Buchanan's inquiry about appreciation of the painting from an investment

perspective proved insightful (although he ignored his own instincts as Sam "wished"), as Noon

Day Rest was recently sold at an art auction in Dallas, for an amount substantially less than the

amount paid to acquire it.[453]

Two things stand out about this transaction.  First, Cheryl made the purchase as the initial

invoice demonstrates.  After the fact, the purchase is recharacterized as an offshore purchase.

Second, it is the first instance in the record where trust protectors recommend that offshore funds

be used to purchase personal property for use by a Wyly family member.  When Buchannan (the

relevant IOM trustee) expresses concern regarding the wisdom of an entity owned by the Bessie

IOM Trust making the purchase, he is sharply reprimanded by French and directed to make the

purchase, which brings to mind a comment from Sam that an IOM trustee would simply be fired

if he failed to follow a Wyly "wish".[454]  In an instance where Buchannan tries to exercise

independent judgment, he is immediately shut down.  Clearly, this transaction set the tone for

future dealings between the Wylys and the various IOM trustees, demonstrating that Sam's and

Charles' "wishes" were to be followed without question.

---

[451] *Id.* ¶ 66.

[452] Tr. Trans. 2037:17 (Sam).

[453] *See* Notice of Funds Received from Dallas Auction Gallery Sale [ECF No. 921-1] at p. 1 of 13.

[454] SEC. Tr. Trans. 1004:1-3 (Boucher) (Q: Do you recall Sam Wyly joking, "Well, we'll just fire the trustees if we [*sic*] don't do what they [*sic*] tell them? A: Yes.").

While the record is replete with other instances on the Sam side of the Wyly family, the Court will only discuss one other example in detail and six others briefly before turning to the Charles side of the Wyly family. On January 25, 2000, Hennington emails Owens at the Meadows Owens law firm, copying two of Sam's children and Boucher, stating:[455]

> *Evan, Lisa, Laurie and Kelly are planning to purchase a house for their mother using off-shore funds*. I think we would like to use the same Texas LLC, Texas Trust and off-shore corp to get this done. The house will cost around $850,000. I assume we will need her to come in for 1% to the trust. They are coming up with names now and Michelle Boucher is starting the process for the off-shore side. Can you please get someone started ASAP on drawing up these documents. I do not think it should take a lot of time since we have basically done this a few times now. We have told her to give us 2 weeks to have the necessary documents drawn up. I will get you the names in the next few days. Please let me know if there is anything else we should be thinking about. As always, thanks for your help.

Owens responds 20 minutes later:[456]

> Will do, with pleasure. Please forward names of mother, offshore company and Texas Trust name, as well as legal description of property, and finally the total capital needed. To which file do you want this billed? If to one of the offshore Trusts, please ask Shari to let me know which one. This is fun!

Two days later, on January 27 Hennington emails Owens again stating:[457]

> Here are the names for the entities to do Rosemary Acton's house that *Lisa, Laurie, Evan and Kelly are purchasing.*
>
> Offshore corp – Spitting Lion Limited
>
> Domestic Texas Trust – Spitting Lion Management Trust
>
> Domestic Texas LLC – Spitting Lion LLC
>
> Michelle Boucher is going to let me know as soon as the name is approved (I do not think we will have a problem). *We are planning to fund $900,000 from off-shore to cover closing costs, etc*. I am assuming Rosemary will come into trust with $9,000. Does anyone else need to be co-settlor of the trust?? Please let me know if you need anything else.

---

[455] IRS Ex. 87 at WYLYSEC01112940 (emphasis added).

[456] *Id.*

[457] *Id.* at WYLYSEC01112942 (emphasis added).

Four days later, on February 1, Hennington emails Owens to advise: "they have formed the off-shore entity Spitting Lion Limited. Would you please let me know where the other stuff is or who is working on it so I can bug them. As with everything, it has a short fuse. Thanks."[458]

There are so many problems captured by this rather simple 4-page exhibit of emails that the Court is almost at a loss where to begin. First, the emails make clear that four of Sam's children have decided to buy their mother and Sam's first wife, Rosemary Acton, a house in Dallas. That's a lovely thought, but they apparently don't want to use their own money or pay gift tax on their gift to her, so they decide to use offshore funds, which leads us to the second issue. The use of offshore funds is not their decision to make—*i.e.*, "Evan, Lisa, Laurie, and Kelly are planning to purchase a house for their mother using off-shore funds," followed by "[w]e are planning to fund $900,000 from off-shore to cover closing costs, etc." Rather, it is the decision of the Trustee of the Bessie IOM Trust, which will ultimately own Spitting Lion Limited (IOM), through which this transaction is ultimately undertaken. However, as the emails also make clear, there is not a single thought in anyone's mind that the offshore Trustee will not simply do as instructed by the Wylys—*i.e.,* "Michelle Boucher is starting the process for the off-shore side," followed by "[w]e have told her [Rosemary Acton] to give us 2 weeks to have the necessary documents drawn up," and concluding with "I do not think we will have a problem."

Hennington was right—there was apparently no problem offshore, as the Spitting Lion transaction was consummated through the creation of Spitting Lion Limited (IOM) on February 3, 2000 as a wholly owned corporation of the Bessie IOM Trust, and Rosemary Acton was provided a $850,000 home in which to live for her contribution of $9,000 to Spitting Lion Management

---

[458] *Id.* at WYLYSEC01112941.

Trust for a 1% ownership interest in that trust, which enabled her, according to Owens' alleged advice, to live in the home rent free for the remainder of her life.[459]

Finally, the Court has puzzled over Owens' comment in his original reply "This is fun!" For context, the Court understands that Owens was the lawyer who came up with the rather complex structure the Wylys used—repeatedly—to bring offshore money back onshore for real estate transactions like this one, where one or more Wyly family member would have the use and enjoyment of the property without it being taxed as a distribution from an offshore trust and without the family member having to pay tax on the value of their use of the property. As one of Owens' law partners, Pulman, explained in his testimony:[460]

> Rodney [Owens] was a very good lawyer and a creative lawyer, and he worked very hard for his clients. Rodney came up with the idea that generally in the real estate area, co-tenants can use property, they both have the right to it, and the use of it is not income from one to the other. So --
>
> Q. Excuse me. Is that under state law or federal law?
>
> A. It's under state law, but it's general -- it's co-tenants, joint tenants can use any kind of property, but we were talking about real estate. So the concept was we were going to have a foreign corporation, because of the liability and because of the estate tax, that would be the investor. But then we had to have a structure so we could have co-tenants, but not owning the property directly, so Rodney came up with the idea of this joint manage -- of this management trust. And the management trust would own the entity that owns the real estate. And the management trust was structured specifically to say that the -- that the grantors -- in this case, it would be Sam Wyly and the offshore company -- would have the right to use of the property as co-tenants, and that if they withdrew, which either partner had the right to do at any time, they would get back what they put in, plus their percentage share of the value of the property. So we were trying to structure it so that it was truly a co-ownership arrangement that under state law, whether it would be Texas or Colorado, would have the right as a co-tenant, and the LLCs agreements were also drafted consistently so that the owners -- so that the co-grantors or the management trust would have the right to use the property as co-tenants.

---

[459] This transaction will be explained more fully when analyzing the IRS' claim that this transaction gives rise to a gift. *See* pp. 235-264, *infra*.

[460] Tr. Trans. 2542:1-2543:10 (Pulman).

Pulman went on to explain that Owens took a personal interest in the Wylys and reviewed all of the work done by other lawyers at Meadows Owens on a Wyly matter.[461]

Turning back to Owens' "this is fun!" remark, the only realistic inference the Court can draw from this rather unfortunate comment is that Owens thinks it is "fun!" to have devised a clever structure to bring money onshore for Wyly family members' use tax free (in his view) and to then see his structure being implemented several times, as Hennington's email makes clear— *i.e.*, "Can you please get someone started ASAP on drawing up these documents. I do not think it should take a lot of time since we have basically done this a few times now."[462]

This same structure was used on the Sam side of the family on at least four other occasions—in connection with the Rosemary Circle R Ranch property near Aspen Colorado, for the use and enjoyment of Lisa and Kelly, two of Sam's daughters; for the Cottonwood I and Cottonwood II condominium purchases in Aspen, also for the use and enjoyment of Kelly (she operates an art gallery on the first floor of the condominium (the Cottonwood I transaction) and apparently has an apartment and office on the second floor of the condominium (the Cottonwood II transaction);[463] and in connection with the Mi Casa property located in Dallas, where Laurie, another of Sam's daughters, lives with her husband and children.[464]

Finally, as found by the SDNY Court, in June 2002, Sam Wyly contacted a broker directly and instructed him to 'hold on' to 100,000 shares of TYCO stock, overriding a previous order from the IOM trustee, based on an earlier Wyly recommendation, to sell all TYCO shares."[465]

---

[461] *Id.* at 2556:14-19.

[462] IRS Ex. 87 at WYLYSEC01112940.

[463] Other Wyly family members also use the apartment and office.

[464] These transactions are discussed in more detail later in this Memorandum Opinion. *See* pp. 235-264, *infra.*

[465] Collateral Estoppel No. 26; *see also* IRS Ex 1245 (email chain regarding sale of 169,000 shares of Tyco stock).

Turning to the Charles side of the Wyly family, the same structure devised by Owens was used to bring offshore money onshore to purchase real estate for the use and enjoyment of his and Dee's children at least twice. First, Little Woody LLC, which was owned by Little Woody Management Trust, which was owned by Little Woody Creek Road Limited (IOM) (98%) and Emily (1%) and Jennifer (1%), which was owned in turn by the Tyler IOM Trust, bought a piece of real estate near Aspen in 2001 (LL Ranch) for the use and enjoyment of Emily and Jennifer, two of Charles and Dee's daughters.[466] Second, Stargate Sport Horses, LP, which was owned by Stargate Horse Properties, Inc. (91.21%) and Stargate Sport Horse Management LLC (8.79%), which was owned by Stargate Farms Limited (IOM), which was owned in turn by the Tyler IOM Trust, bought a piece of property in Texas where Emily ran an equestrian center for several years, after which it was liquidated after experiencing net operating losses over the life of the Tyler IOM Trust's indirect "investment."[467]

For other examples of property desired by a family member being purchased by them, but then paid for by an offshore entity, we turn to Dee's testimony at trial. Charles gave Dee two very expensive pieces of jewelry for Christmas in 2000, a diamond necklace and a diamond ring that he purchased from Eiseman Jewels in Dallas for $759,000 and $667,000, respectively. The invoice reflecting the sale to Charles is dated November 21, 2000.[468] The invoice reflects that it is to be shipped to Aspen Colorado, where Dee and Charles have a home and where they were spending

---

[466] Joint Stipulations ¶¶ 434, 437, 439, 440, and 442. Emily and Jennifer share a home on the ranch. Tr. Trans. 2187:2188:6 (Hennington).

[467] Joint Stipulations ¶¶ 378-380, 384, 387, and 410; Tr. Trans. 2184:6-2185:19 (Hennington). Although the Joint Stipulations state that Stargate Horse Properties, Inc. (Nevada) was the 98% owner, while Stargate Sport Horse Management LLC (Texas) was the 2% owner, the agreed demonstrative chart provided to the Court states that Stargate Horse Properties, Inc. (Nevada) was the 91.21% owner, while Stargate Sport Horse Management LLC (Texas) was the 8.79% owner. Although the Court notes this discrepancy, it is not material to its decision.

[468] IRS Ex. 18 at RDE 26.

Christmas that year. Because the jewelry is to be shipped out of state, no Texas sales tax is charged to Charles.[469] Dee testified:[470]

Q. So, they were given to you in Aspen. Is that right?

A. Right, by my husband.

Q. Now, with respect to this ring and this necklace, it's fair to say that you didn't consider anyone else other than yourself as the owner of those two pieces of jewelry. Is that correct?

A. Correct.

Q. And, in fact, do you still possess these items?

A. Yes.

Q. They're in a safe in your home?

A. Yes.

However, apparently unbeknownst to Dee, Soulieana Limited (IOM), an entity wholly owned by the Tyler IOM Trust, paid for those two pieces of jewelry at Charles' direction, and Soulieana Limited (IOM) also claims to own those pieces of jewelry, which are kept in Dee's safe in Dee's home in Dallas, which home is the same home she shared with Charles when he was alive. Soulieana Limited (IOM) purchased other jewelry that Charles gave Dee and that Dee considers herself to be the owner of.[471]

Moreover, Dee purchased pieces of art from the Huntsman gallery, which were hung in one of her homes – either in Dallas or Aspen, but which were paid for by Soulieana Limited

---

[469] *Id.*
[470] Tr. Trans. 231:1-16 (Dee).
[471] *See, e.g.*, IRS Ex. 20; Tr. Trans. 240:15-18 (Dee).

(IOM).[472] For example, on February 10, 1997, Amy Browning, who worked at the Wyly family office,[473] sent a fax to Paul at Huntsman stating:[474]

> Pursuant to my telephone conversation, *please invoice the recent purchase by Dee Wyly* as follows:
>
> Soulieana Limited
> Lorne House Trust Limited
> c/o Lorne House
> Castletown, Isle of Man
> British Isles
>
> Each invoice should be accompanied by a picture of the item being purchased. In addition, please send these invoices and the necessary documentation to the attention of Shari Robertson, 8080 North Central Expressway, LB 31, Dallas TX 752-6. *The Wyly name should not be noted on the invoices.*
>
> If you have any questions, do not hesitate to contact me.

As another example, the Court will note Dee's purchases from Marguerite Theresa Green & Associates, which is an interior design firm Dee used when Charles and she remodeled their home in Dallas. Dee testified that, with Ms. Green's assistance, she selected a number of items—largely collectibles and furnishings—for their Dallas home.[475] Yet, once again, those items were invoiced to, and paid for by, Soulieana Limited (IOM).[476]

---

[472] Like the jewelry Charles gave her, there is no evidence that Dee knew the items were paid for by an IOM corporation. The payment arrangements were taken care of by someone in the Wyly family office—in this instance Amy Browning—at Charles' direction. Dee considers the items to be hers.

[473] Tr. Trans. 266:24-267:2 (Dee confirming that Ms. Browning worked in the Wyly family office).

[474] IRS Ex. 21 (emphasis added).

[475] Tr. Trans. 262:24-263:1-2 (Dee).

[476] Again, without evidence that Dee knew who paid for the items. *See, e.g.*, IRS Ex. 25. The record contains many other examples where Soulieana Limited (IOM) paid for personal property used by the Wyly family. *See* IRS Exs. 22 (February 22, 1997 invoice from Huntsman Gallery of Fine Art indicating that several works were sold to Dee but invoiced to Soulieana Limited (IOM)), 433 (May 29, 1997 fax and attached invoices, sent to Buchanan from Boucher, stating that "[t]he protectors for Tyler recommend that Soulieana acquire the following art work…Bank wiring instructions are as follows…"), 1240 (January 22, 1997 handwritten note to Buchanan from Robertson stating "[w]e are recommending the purchase of investment grade collectibles, antiques and art for Soulieana[.] We recommend purchases totaling approximately $3,500,000…Invoices and photos of all art work will be forwarded thru Michelle Boucher. The 'collection' will be located at 5906 Deloache, Dallas, TX.").

Finally, in late 2000, someone apparently decided it would be a good idea to create a better paper trail, so what the Court will refer to as "possession agreements" were thereafter entered into by the offshore entity who had paid for the items and the person who had selected them and had possession of them in the United States. An example of such a possession agreement between Soulieana Limited (IOM) and Charles is IRS Exhibit 26.[477] Of note, Schedule A lists the items Soulieana Limited (IOM) claims to own, the location of the items, their acquisition dates, from whom the items were purchased, and the total cost of each item in USD. This schedule includes 9 pages (single spaced) of art purchases; wall sculptures; photographs (several original Ansel Adams photographs); china and silver; and furniture, furnishings, and ornaments, all of which are located at Charles' and Dee's home in Dallas.

There are many other examples in the record that amply support the finding that Sam, certain of Sam's family members, and Charles considered the offshore system to be their personal piggy banks, through which they could purchase items using offshore money on a tax-free basis. This badge of fraud is established by clear and convincing evidence as to Sam from 1996 through 2013 and for Charles from 1997 through 2011.

The record, however, does not support such a finding with respect to Dee. Although the record shows that Dee purchased items paid for with offshore funds, her uncontroverted testimony was that (i) she was not aware of this,[478] and (ii) her lifestyle did not measurably change as a result

---

[477] Although a signed copy of IRS Ex. 26 is not in the record, Hennington testified that the agreement or a very similar one was executed. Tr. Trans. 2267:3-6 (Hennington). *See also* Wyly Ex. QF (executed Possession Agreement dated April 2, 2004 permitting Laurie to possess various art, including Audubon plates and a Picasso painting purchased by Audubon Asset Limited (IOM)).

[478] Dee repeatedly, and credibly, testified that she was unaware of the source of the funds used to purchase the furnishings, art, and antiques in her homes. *See, e.g.,* Tr. Trans. 264:19-20, 263:23-25, 264:12-20, 268:5-18, 270:8-15, 274:16-22, 274:17-22; 279:5-17, 281:6-14, 289:11-14. This is the same for jewelry that she considers herself the owner of. *See* p. 110 n.480, *infra.*

of Charles establishing the various IOM trusts and corporations.[479]  Indeed, Dee was surprised that

Soulieana Limited (IOM) claims to be the owner of various pieces of jewelry Charles gave her,

believing she is the owner.[480]

### f)     The Planned Insolvency of Various IOM Corporations that Owed  Annuity Obligations

As discussed previously, Sam did six private annuity transactions in 1992 and six more in

1996.  Charles did four private annuity transactions in each of those years (though one in 1992

involved Dee).  With respect to the 1992 annuity transactions, Sam, Dee, and Charles were each

scheduled to begin to receive payments when they reached the age of 65 (which was 1998 for

Charles, and 1999 for each of Sam and Dee).[481]  With respect to the 1996 annuity transactions,

Sam and Charles were each scheduled to receive additional annuity payments when they reached

the age of 68.[482]  However, the payment commencement date for each set of annuities was

extended, so that Sam, Dee, and Charles would begin to receive payments on the 1992 annuity

transactions on their 70th birthdays, and payments on the 1996 annuity transactions on their 73rd

birthdays.

---

[479] Tr. Trans. 155:3-10 (Dee testifying she and Charles moved to Highland Park in 1970), 155:16-25 (Dee and Charles moved to the house on Deloache in the mid-1970s), 158:11-14 (Dee considered herself wealthy when she lived in the Deloache house), 158:15-18 (Dee and Charles owned a home in Aspen in the 1970s), 319:16-18 (Dee) (receiving jewelry after the IOM trusts were formed did not change her lifestyle), 1327:18-23 (Donnie Miller) (the family used private and charter aircraft as early as the 1960s), 1334:1-17 (Donnie Miller) (family was wealthy decades before the IOM structure was established in the 1990s, and there was no significant change in lifestyle after 1992), Wyly Exs. PX (1988 Form 1040 showing adjusted gross income of $909,959), PY (1989 Form 1040 showing adjusted gross income of $3,388,981), QB (1990 Form 1040 showing adjusted gross income of $740,173), and PZ (Charles' personal balance sheet as of December 31, 1991 showing total assets (at fair market value) of $57,415,111); Tr. Trans. 2141:1-9 (Hennington) (Charles and Dee's net worth exceeded $50 million in 1991, the year before the first offshore trust was settled).

[480] See, e.g., Tr. Trans. 231:1-16, 238:7-11, 240:15-18, 244:18-24 (Dee testifying regarding jewelry given to her by Charles, but paid for by Soulieana Limited (IOM), of which she considers herself the owner), 251:4-19 (Dee was unaware that Soulieana Limited (IOM) paid for jewelry she believes she owns).

[481] See Joint Exs. 58, 60, 62, 64, 66, and 68 (Sam), 86 (Dee), and 80, 83, and 84 (Charles).

[482] See Joint Exs. 70, 72, 74, 76, and 78 (Sam) and 88, 90, 92, and 94 (Charles).  Although the record reflects that Sam entered into six annuity transactions in each of the relevant years, the record does not contain the Private Annuity Agreement or an Amendment to Private Annuity Agreement related to Yurta Faf Limited (IOM).

In 2003, Charles began receiving annuity payments,[483] as did Dee and Sam in 2004. To the date of his death in 2011, which terminated the annuities payable to him, Dee and Charles received, and paid tax on, $112,693,782.00 in annuity payments.[484] To date, Sam has received, and paid tax on, $281,852,553.00 in annuity payments.[485] Dee is still receiving some annuity payments, as is Sam.

However, several of the IOM corporations that owed annuity payments to Sam became insolvent, causing them to be unable to pay and causing Sam to forgive those payments and any future payments from them prior to his bankruptcy filing here. For example, in a letter dated May 31, 2013 from Tensas Limited (IOM) to Sam, Tensas Limited (IOM) stated that it was not in a position to make the required annuity payment and that it did not anticipate being able to do so in the future.[486] The letter acknowledged that Tensas Limited (IOM) had not made full payments to Sam since 2010 and, consequently, owed Sam a total annuity payment of $5,403,975, plus accrued interest to May 31, 2013 of $787,742.13, with further interest accruing at a daily rate of $1,006.77.[487] Tensas Limited (IOM) proposed assigning to Sam all of the assets then belonging to Tensas Limited (IOM)—approximately $2,068,000 in cash—as full and final payment against all outstanding annuity payments and annuity interest owed, plus any future annuity payments due under its agreement with Sam.[488] Sam accepted the proposal, signing the letter "as full and final payment against all outstanding annuity payments and annuity interest owed, plus any future

---

[483] Dee and Charles assigned their rights to receive annuity payments to Stargate Investments (Texas), an entity they wholly-owned and controlled. *See* pp. 274-284, *infra*.

[484] Joint Stipulations ¶¶ 173-174.

[485] *Id.* ¶¶ 175-176.

[486] IRS Ex. 1131 at EOI-IOM-SW-0000017582.

[487] *Id.*

[488] *Id.*

annuity payments."[489]  And, having reached this result with Sam, it appears that Tensas Limited (IOM) was voluntarily liquidated.[490]  According to the Tensas Limited (IOM) Financial Statements for the year ended December 31, 2012, the value of the annuity for future payments was $10,789,436.[491]  Thus, Sam agreed to forego approximately $14,913,153 million owed to him by Tensas Limited (IOM).[492]

Sam forgave other annuity obligations owing from IOM corporations.  In a letter dated the same day, May 31, 2013, East Baton Rouge Limited (IOM) notified Sam that it was not in a position to make the required annuity payment of $2,467,258 and that it did not anticipate being able to do so in the future.[493]  The letter acknowledged that East Baton Rouge Limited (IOM) had not made full payments to Sam since 2011 and, consequently, owed Sam a past due annuity payment of $3,416,187, plus accrued interest to May 31, 2013 of $252,553.97, with further interest accruing at a daily rate of $786.19.[494]  Just like Tensas Limited (IOM), East Baton Rouge Limited (IOM) proposed assigning to Sam all of the assets then belonging to it—approximately $1,987,646 in cash—as full and final payment against all outstanding annuity payments and annuity interest owed, plus any future annuity payments due under its agreement with Sam.[495]  Sam accepted the proposal, thereby accepting about $2 million in satisfaction of an approximate $3.6 million current

---

[489] *Id.*

[490] IRS Ex. 1132 at EOI-IOM-SW-000001493, § 1.2 ("Discussions are on going with the annuitant in order to agree [to] a scheme of arrangement which would allow the remaining assets of the company to be offset against current and future obligations of the company to the annuitant so that the company can be liquidated shortly thereafter.").

[491] *Id.* at 495.

[492] Sam's testimony was in rounded amounts, and resulted in his estimate of approximately $14 million in annuity payments being forgiven by Tensas Limited (IOM).  Tr. Trans. 2657:19-2658:6 (Sam).

[493] IRS Ex. 1135 at EOI-IOM-SW-0000013855.

[494] *Id.*

[495] *Id.*

obligation[496] and agreeing to forgo future payments valued at $19,266,843 million.[497] East Baton Rouge Limited (IOM) was apparently then liquidated.[498]

Similarly, by letter dated October 4, 2013, East Carroll Limited (IOM) notified Sam that it was not in a position to make the required annuity payment of $3,142,095 and that it did not anticipate being able to do so in the future.[499] Just like the other IOM corporations just discussed, East Carroll Limited (IOM) proposed assigning to Sam all of the assets then belonging to it— approximately $1,283,807.74 in cash—as full and final payment against all outstanding annuity payments and annuity interest owed, plus any future annuity payments due under its agreement with Sam.[500] Once again, Sam accepted the proposal, thereby accepting approximately $1.3 million in satisfaction of a $3.1 million obligation and agreeing to forgo future payments valued at $23.2 million.[501] East Carroll Limited (IOM) was presumably then liquidated.[502]

Sam and Charles structured the IOM corporations that were liable to make the annuity payments in such a manner that they could manipulate whether annuity payments would be made due to the planned illiquidity or insolvency of the IOM corporations, including by moving funds between the various IOM and Cayman corporations and deciding when loans would be repaid (as discussed below). While the IOM corporations owing annuity obligations to Sam were provided

---

[496] *Id.*

[497] IRS Ex. 1136 at EOI-IOM-SW-0000000527. Sam's testimony was in rounded amounts, and resulted in his estimate of approximately $20.5 million in annuity payments being forgiven by East Baton Rouge Limited (IOM). Tr. Trans. 2665:18-24 (Sam).

[498] IRS Ex. 1136 at EOI-IOM-SW-0000000526 § 1.2 (Discussions are on going with the annuitant in order to agree [to] a scheme of arrangement which would allow the remaining assets of the company to be offset against current and future obligations of the company to the annuitant so that the company can be liquidated shortly thereafter.").

[499] IRS Ex. 1134 at EOI-IOM0SW00000014427.

[500] *Id.*

[501] IRS Ex. 1133 at EOI-IOM0SW-0000000607 (line item "Waiver of annuity payable").

[502] The Court reasonably presumes this liquidation, despite the absence of language in its financial statements similar to that found in Tensas Limited (IOM)'s and East Baton Rouge Limited (IOM)'s financial statements. Whether the company was liquidated, however, is not material to this Court's decision.

stock options worth at least the value of the annuities they issued, by 2003, Hennington and Boucher advised Sam and Charles, among others, that several of those corporations had insufficient assets to fulfill those annuity obligations.[503]   In other words, their insolvency was a virtual certainty, unless the Wylys infused these corporations with additional funds from other IOM or Cayman corporations, something that they had done in the past and continued to do from time to time.   For example, in 2007, Audubon Asset Limited (IOM) borrowed money from three of the Cayman LLCs to pay the $5,793,464 annual annuity payment owed to Sam,[504] and Moberly Limited (IOM) borrowed $8 million from Morehouse Limited (IOM) to pay the $8 million annual annuity payment owed to Sam.[505]   But, nothing in the record explains why loans were sometimes made to fund annuity payments but not always made.

As a result, and as the Court analyzed the trial record, it wondered about the timing of the forgiveness of these annuity receivables since these IOM corporations had not been able to make a full payment to Sam for years.  Specifically, why were the annuity receivables forgiven in 2013? Why were loans not made?   The Court has come to an answer—albeit one that shows further efforts to protect the offshore system and family members from creditor collection actions, as explained below.

Given that we know that nothing happened offshore unless Sam or Charles "wished" for it to happen, the Court reasonably infers that Sam "wished" that the letters proposing that the annuity

---

[503] *See, e.g.,* IRS Ex. 96 at WYLYSEC011112396 (July 30, 2003 memorandum from Hennington and Boucher to Sam, Charles, Evan, and Donnie Miller discussing concerns regarding payment of upcoming annuity obligations, including: (i) "[t]he annuity payments will bankrupt several of the IOM companies, which could bring the validity of the annuity transaction into question," (ii) "[a]fter a few years of payments, the companies will be left with non-liquid assets," and (iii) "[t]he possibility of in-kind payments…may call into question the validity of the transaction and the 'arms-length' nature of the transactions."

[504] IRS Ex. 1266 (October 18, 2007 Meeting Minutes, Audubon Assets Limited (IOM) regarding loans from Katy, Orange, and Balch).

[505] IRS Ex. 1267 (October 18, 2007 Meeting Minutes, Moberly Limited (IOM)) §§ 2.1, 2.2, and 3.

obligations due to him be forgiven be sent to him. So, Sam "wished" for the offers to forgive the annuity receivables to be sent to him and he then accepted the offers he caused to be made. But, why did Sam "wish" for these letters to be sent to him in May and October of 2013? The answer is obvious if you think about it—even briefly. Trial in the SEC Action commenced on March 31, 2014,[506] which date had been known by the parties from at least July 23, 2013.[507] Sam was "cleaning up" the offshore system just in case the SEC prevailed in its claims against him there. If the SEC obtained a judgment against Sam and he had annuity receivables owing to him, the SEC could attempt to collect those receivables in order to collect on its judgment. That could trigger the possible unraveling of other offshore transactions and entities that Sam "wished" to avoid. How do you avoid this possibility? Simple, forgive the annuity receivable and liquidate the IOM obligor, which is what the Court reasonably infers Sam directed be done here. Thus, by the time any judgment was entered against him, there was no annuity receivable to collect and no entity to collect it from.

Moreover, and as noted previously, other IOM corporations could not fulfill their annuity obligations to Sam by the time Sam filed his Case here in October 2014. Specifically, Audubon Asset Limited (IOM) owed him $43,085,167, Moberly Limited (IOM) owed him $16,519,813, Yurta Faf Limited (IOM) owed him $1,007,096, and Locke Limited (IOM) owed him $9,932,801 in annuity payments.[508] According to Sam's testimony at trial, no payment is realistically expected from any of these IOM corporations.[509] Moberly Limited (IOM) is unable to make annuity

---

[506] *See SEC v. Wyly*, 56 F.Supp.3d at 401 ("I presided over a jury trial on nine of the ten claims from March 31 to May 7, 2014. On May 12, 2014, the jury returned a verdict against both Sam and Charles Wyly on all nine claims.").

[507] *See* Post-Fact Discovery Scheduling Order at 3 (Case No. 10-cv-05760 at ECF No. 196) (setting the start of trial as Monday, March 31, 2014).

[508] *See* Amended Bankruptcy Schedule B, Exhibit B-16 [ECF No. 472] at p. 55 of 94 (listing the annuity payments and stating "no payment expected in the near term").

[509] Tr. Trans. 2941:1-8 (Sam).

**MEMORANDUM OPINION** 115

payments to Sam[510] because it loaned its money to Greenbriar Limited (IOM) and no payments are due from Greenbriar Limited (IOM) for years.[511] Audubon Asset Limited (IOM) is not in a position to make annuity payments to Sam[512] because its assets have been invested in illiquid assets like art or its indirect interest in real estate in Texas and/or Colorado[513] being enjoyed by a Wyly family member(s). Locke Limited (IOM) is illiquid due to $11 million in loans it made to other IOM entities that remained outstanding as of 2013,[514] while its annuity liability to Sam was valued at $59,183,748.[515]

And, once again, the only credible inference to make from the evidentiary record is that Sam "wished" for (i) Moberly Limited (IOM) to loan money to Greenbriar Limited (IOM) and he dictated the terms of that loan, (ii) the assets that Audubon Asset Limited (IOM) purchased to be purchased, and (iii) the loans that Locke Limited (IOM) made to be made. And, equally clear is that if Sam "wished" for assets to be sold so that his annuity payments could be made, that would happen too. But, Sam does not "wish" for that to happen because that might require a Wyly family

---

[510] *See* IRS Ex. 1267 (meeting minutes for Moberly Limited (IOM) discussing loans from Morehouse Limited (IOM) to fund annuity payments).

[511] *See* IRS Ex. 1268 §§ 3.1-3.4 ("The Chairman [of Moberly Limited (IOM), Anna Kawalek] reminded the Meeting that the Company [Moberly Limited (IOM)] had loaned funds of $26,508,820 to Greenbriar Limited [(IOM)] ("Greenbriar"). The Chairman advised that the Company had received a letter from Greenbriar enquiring as to whether the Company intended to make a formal demand for repayment of any part of the loaned funds prior to 2018…. After due consideration, it is resolved—THAT the Company does not intend to make a formal demand for any part of the loan due from Greenbriar before 2018 and that the Company will write to the directors of Greenbriar to confirm this formally.").

[512] IRS Ex. 1266 (October 18, 2007 meeting minutes for Audubon Asset Limited (IOM) discussing loans from various Cayman LLCs to fund annuity payments). Sam expressed no surprise that Audubon Asset Limited (IOM) needed to borrow money to make the annuity payments owing to him. Tr. Trans. 2041:11-12 (Sam) ("It's not a surprising thing.").

[513] *See, e.g.,* Joint Stipulations ¶¶ 332, 334, and 337 (funds transferred from Audubon Asset Limited (IOM) related to the Cottonwood Ventures I property); Wyly Ex. QF (Possession Agreement dated April 2, 2004 permitting Laurie to possess various art, including Audubon plates and a Picasso painting purchased by Audubon Asset Limited (IOM)); IRS Ex. 364 (documenting circumstances surrounding purchase of Noon Day Rest by Fugue Limited (IOM) n/k/a Audubon Asset Limited (IOM)).

[514] IRS Ex. 1269 (Locke Limited (IOM)'s unaudited Directors' Report and Financial Statements for the Year Ended 31 December 2013) at 6 (showing a loan to Bulldog IOM Trust of $3,055,728 and to Moberly Limited (IOM) of $8,028,596).

[515] *Id.* at 7 (showing a $69,183,748 annuity obligation as of December 31, 2013).

---

**MEMORANDUM OPINION** 116

member to give up their use and enjoyment of a house, a piece of art, jewelry, or other items of property and, of course, would cause him to pay tax on the annuity payment he then received, while the net receivable after tax would be available to pay to his creditors with allowed claims here. From Sam's perspective, it is much better to have uncollectable annuity receivables and leave the bulk of the IOM structure in place offshore, which makes it much more difficult for his creditors with allowed claims here to collect on those claims.

In total, Sam has forgiven $60,972,221 in annuity obligations, and will not collect another $70,544,877 in annuity obligations—all because Sam "wished" for that to be the outcome. But we get a bit ahead of ourselves in the timeline, to which we return.

It is clear from the evidence that there were concerns about the commencement of annuity payments and the effect of reporting those payments as income on Sam's and Charles' tax returns. And, while the record supports an inference that these concerns had existed for some time, they are captured in a memorandum dated June 30, 2003 from Hennington and Boucher to Sam, Charles, Evan, and Donnie Miller.[516] To put the timing in perspective, this memorandum is prepared after Hennington and Boucher have met with Lubar in London to discuss his concerns with the Wyly offshore system, most of which concerns were communicated to French in 1993 as discussed *supra* at pp. 26-28. The memorandum starts with a background section as follows:[517]

> As you are aware, we have been planning for some time for the commencement of the annuity payments. As we have studied the impact of these payments we have become increasingly concerned with the logistical problems of paying the annuities. Our concerns include the following:
>
> 1. When the payments are reported on your 1040, they will be on a separate line on page one for annuity payments. *It is almost certain given the large amount of these payments that the reporting will result in an IRS audit. There is also a high*

---

[516] IRS Ex. 96.
[517] *Id.* at WYLYSEC011112396 (emphasis added).

*likelihood that as a result of this audit the entire structure of the foreign system will be audited by the IRS.*

*2. As the annuities pay over your lifetime you will pay 35% ordinary tax on all payments. In addition, whatever is not consumed in living expenses will be included in your estate and taxed at up to 55%.* See the attached spreadsheet detailing the impact of these taxes.

*3. The annuity payments will bankrupt several of the I0M companies, which could bring the validity of the annuity transaction into question.*

*4. After a few years of payments, the companies will be left with non-liquid assets, which will result in payments being made in-kind.* This is mostly the case with real estate, Green Mountain and First Dallas, which cannot be easily liquidated to make payments. It could also be the case with assets that could be negatively impacted by a liquidation like Michaels, Maverick, or Ranger.

*5. The possibility of an in-kind payment raises a few issues. First, the value of the property will be taxed at 40% with no resulting cash to pay the tax. Secondly, the acceptance of property in-kind may also call into question the validity of the transaction and the 'arms-length' nature of the transaction. The annuities are structured as retirement annuities and most annuitants would not deem non-liquid assets acceptable payment.*

From these statements and others made in the June 30, 2003 memorandum, the Court makes several inferences of significance. First, these statements shed light on why Sam and Charles decided to defer receipt of the annuity payments in the first place. Sam and Charles knew that given the amount of the required annuity payments, the reporting of them as income to them on their tax returns would "almost certain[ly]" trigger an IRS audit, something that they had expended great effort (and committed securities fraud) to avoid from the outset.

Second, supporting the Wyly family's lifestyle had left the IOM corporations with the annuity obligations without the financial ability to make their required payments. Additional explanation is required. The principal means Sam and Charles used to move money from the IOM corporations was through Security Capital, Ltd. ("**Security Capital**"). Security Capital, a Cayman Island corporation formed in August 1998, is wholly owned by Security Capital Trust, whose

grantor and trustee was Queensgate Bank & Trust.[518] As explained herein, Security Capital was a conduit entity that would receive offshore funds from various Wyly IOM corporations and then loan those funds to Sam, Charles, and/or Wyly-related businesses in order to domesticate the offshore funds.[519] In fact, Boucher testified that Security Capital was created to act as a loan company.[520] As Sam or Charles "wished" loans to be made, money was loaned from IOM corporations, including Richland Limited (IOM), Morehouse Limited (IOM), East Carroll Limited (IOM), Locke Limited (IOM), and Greenbriar Limited (IOM), among others, to Security Capital, which would then loan substantially similar amounts to Sam, Charles, or a Wyly-related onshore entity.[521] In fact, Boucher could not recall Security Capital ever making a loan that wasn't to a Wyly family member or a Wyly-related entity.[522]

Indeed, the record is replete with evidence that money was moved from one IOM corporation to another at the whim of the Wylys for a variety of purposes including (i) enabling

[518] Joint Stipulations ¶¶ 285-286. Although the exact ownership structure was never clearly established on the record, Boucher testified that "Security Capital was established and managed by a trust company group in Cayman that was familiar with Maverick and another group of funds that the [Wyly] family had been involved with, and with Irish Trust and the Wyly group. They had an understanding and knowledge of the family group as a whole." SEC Tr. Trans. 1075:7-11 (Boucher).

[519] See Tr. Trans. 2347:6-12 (Hennington testifying that Security Capital was the entity that facilitated the loans); IRS Ex. 712 (undated correspondence from Hennington to Charles discussing a loan of offshore funds to Charles – "He [Owens] is more comfortable making a loan to you from an IOM Company. To add another layer we will have the IOM Company loan to Security Capital and Security Capital will loan to you. Security Capital is a company we set up to administer these types of transactions and Michelle [Boucher] and I like having another company in the middle."); IRS Ex. 212 (January 29, 2002 email from Boucher to Hennington titled "Security Capital loan to Sam" and stating "I had to move money around to get it in the right place to fund this. So Devotion is buying $15Million of Ranger from Sarnia, to get the money to Sarnia who will loan it to Greenbriar, who will loan it to Security Capital etc…"); IRS Ex. 213 (September 25, 2002 email from Hennington to Owens discussing structure of a $6 million loan from Security Capital to Charles utilizing funds from Gorsemoor Limited (IOM), which was a subsidiary of Tyler IOM Trust).

[520] SEC Tr. Trans. 1071:16-18 (Boucher); IRS Ex. 91 (chart prepared by Wyly counsel Bickel & Brewer showing "pass-through loans" involving IOM corporations and Security Capital).

[521] SEC Tr. Trans. 1071:22-1074:24 (Boucher).

[522] Id. at 1077:10-22 (Boucher) ("Q: A person on the street couldn't just walk in to Security Capital and get a loan for their mortgage, correct.? A: No. Q: It was money that was borrowed, largely borrowed, from the Isle of Man subsidiary companies and then loaned out based on recommendations, correct? A: Of course." See IRS Ex. 91.

Security Capital to loan funds to Sam, Charles, and Wyly-related entities,[523] (ii) making funding available for real estate, art, jewelry and other personal property purchases already discussed,[524] and (iii) making investments in other Wyly-related business ventures.[525] This memorandum itself makes this point clearly when it says "[b]ased on current and projected cash flow analysis, there is a need to bring a substantial value of assets onshore to provide for general expenses and maintenance of the family's lifestyle and domestic business ventures."[526]

Finally, the fact that the IOM corporations will become unable to make the payments at all, or will be left with illiquid assets, which will result in in-kind payments being made, will call into question the validity of the annuity transactions and the arms-length nature of those transactions. It goes without saying that getting the wealth associated with the options and warrants, which underlie the annuity transactions, offshore was the primary purpose for establishing the IOM trusts in the first place. Thus, the inability to make annuity payments when due puts the entire system at risk and jeopardizes the enormous tax savings realized through the implementation of the offshore structure.

While these inferences are strongly supported by the record (by clear and convincing evidence), another that the IRS asks this Court to make is not. The IRS argues that the record

---

[523] See IRS Ex. 91 (chart prepared by Wyly counsel Bickel & Brewer showing "pass-through loans" involving IOM corporations and Security Capital); Joint Stipulations ¶¶ 292 (detailing assets transferred from IOM corporations to Greenbriar Limited IOM, which were then loaned to Security Capital), 303-306 (detailing the loan of these funds to the Cayman LLCs); Tr. Trans. 2688:3-2691:20 (counsel stipulating to the flow of assets from the IOM corporations to Greenbriar, to Security Capital, to the Cayman LLCs), 2693:20-2694:2 (Sam testifying that millions of dollars in offshore funds were invested into Green Mountain and Ranger, a Wyly-related business and investment fund, respectively).

[524] See, e.g., Tr. Trans. 2022:19-22, 2024:19-2026:7 (Sam explaining that real estate, furnishings, art, and jewelry were purchased by IOM entities for his and his family's use), 2671:3-7 (Sam agreeing that funds in the offshore system, including those of IOM corporations who were ultimately unable to make annuity payments, were used at Sam's direction to buy homes, art, and invest in Wyly-related businesses).

[525] Tr. Trans. 2929:2930:5 (Sam testifying that offshore funds were used to make investments in Wyly-related businesses through letters of wishes).

[526] IRS Ex. 96 at WYLYSEC01112402 (no. 1 under "other factors to consider").

supports an inference that Sam and Charles *never* intended to have the offshore corporations obligated on the private annuity contracts make payments to Sam, Dee, and Charles as contractually obligated to do. The Court cannot make that leap, as it stretches the record too far. While there is some evidence to support the IRS' argument at least as of 1996,[527] the Court is not convinced—certainly not by the evidentiary standard of proof required here (clear and convincing evidence)—that Sam and Charles entered into the annuity transactions intending, from the outset, that the annuities would not be paid. And, while the document the IRS points to for its argument could be read as the IRS asks the Court to read it, that is not the only credible reading. Specifically, the IRS points to its Exhibit 93, which is an analysis of the Wyly Offshore Tax Savings (By Year and Since Inception), and which has two lines of particular importance to the IRS' argument here. The first line is the Annuity Payable (Potential add back).[528] The second line is the Equity Valuation (Potential if annuity not paid) line. According to the IRS, by calculating the tax savings if the annuity is not paid, the Wylys are admitting that they did not intend to have the annuities paid to them. However, another equally plausible reading of this document is, as the Debtors' argue, simply that the Chief Financial Officer of Highland Stargate was calculating what would happen if the annuities were not paid for whatever reason, for example if they were terminated by Sam's or Charles' death. And, of course, we know that Charles' annuities terminated upon his death in 2011, which is at least part of the reason that he has received less in annuity payments than has Sam.

---

[527] But the Court rejects outright the argument made in closing that the elimination of the annuity payments on a consolidated Wyly family financial statement was, as was argued, the Perry Mason moment in our trial. Such eliminations are commonplace on consolidated financials and are simply immaterial to any issue before this Court in this trial.

[528] IRS Ex. 93 at SEC/ITC01388418.

**MEMORANDUM OPINION**

Moreover, the Wylys in fact received annuity payments and paid tax on these payments. While the Court is not convinced that Sam and Charles intended from the outset that the annuities never pay out (such that there would never be any income received onshore that would be taxed to them as ordinary income), the Court is satisfied that along the way they had a better idea that was facilitated by their "creative" lawyers– *i.e.*, if they could get the money onshore to support their families' lifestyles through loans to themselves and other family members, direct purchases of assets by IOM entities for the family members' use and enjoyment, or indirect transfers of offshore funds through a myriad of onshore management trusts and limited liability companies or limited partnerships (and do it tax free if Owens was correct), they simply didn't need to bring the money onshore through the mechanism originally intended—*i.e.*, the annuity payments, which everyone agreed would be taxable to them at ordinary income rates.

The Court asked a question in closing that is of significance to it in evaluating this badge of fraud, which question could not be, or was not, answered by Debtors' counsel—where is the money that should have been available offshore to make the annuity payments to Sam when they came due? If there was a legitimate explanation—frankly, even a bad explanation—for where the money went the Court wanted to hear it. But, when questioned, the Debtors' various counsel could only state that they were not aware of any evidence in the record showing where the money went.[529]

In the absence of direct evidence tracing[530] the monies realized from the sale of the stock received through the exercise of the options and warrants offshore, which was the money that was supposed to be available to make annuity payments to the Wylys when they came due, to investments that simply didn't pan out or some other even unreasonable explanation of bad money

---

[529] Tr. Trans. 3531:14-3540:10 (closing argument).

[530] The Court is not using the word "tracing" in a formal sense of tracking receipt of funds and expenditures of funds to the penny. It just wanted some reasonably detailed explanation of where the money went. The silence was deafening.

management by the IOM trustees that controlled the IOM corporations that owed the annuity obligations, the Court will draw the inferences it believes the record amply supports—by clear and convincing evidence. In short, the Wylys raided the offshore system, causing money to be moved from offshore entity to offshore entity where it was "needed" at the time to finance the latest Wyly purchase or domestic business venture, as directed by Sam through making his every "wish" known to the IOM trustees who allegedly controlled the IOM entities—at least on paper. This badge of fraud—the planed insolvency of the IOM corporations that owed annuity obligations— is established as to Sam, by clear and convincing evidence, from 1996 through 2013.

However, there is simply insufficient evidence in the record to support the application of this badge of fraud to Dee. Although a document was admitted at trial that indicates that Dee forgave an annuity obligation owed to her through Stargate Investments (Texas), for the reasons explained below, the Court concludes that there is no evidence in the record that supports a finding that Dee understood the import of this document. Thus, this badge of fraud does not apply to Dee.

For context, the Court notes that Dee's receipt of annuity payments works differently than Sam's. Recall that Dee and Charles assigned all of their rights to receive annuity payments from the various IOM corporations that were a part of Charles' offshore system to Stargate Investments (Texas).[531] Charles and Dee each own half of Stargate Investments (Texas) through their respective Revocable Trusts.[532] Thus, Dee receives half of all annuity payments made to Stargate Investments (Texas).[533]

---

[531] Tr. Tran. 2150:1-2151:4 (Hennington); Wyly Ex. OW (Partnership Agreement for Stargate Investments, Ltd.) at Exhibit A; Joint Stipulations ¶ 161.

[532] Wyly Ex. OW § 2.2; Joint Stipulations ¶ 162.

[533] *See* Wyly Ex. OW at § 3.1; Caroline D. Wyly's Motion for an Order Approving the Allocation of Future Payments Made on Past-Due Annuity obligations and Providing Notice of the Sale of the Underlying Assets Related Thereto [ECF. No. 634] (hereinafter "Annuity Allocation Motion"), Order Granting Annuity Allocation Motion [ECF 721].

One of the private annuity agreements assigned to Stargate Investments (Texas) was between Dee and Rugosa Limited (IOM).[534] Prior to Dee's assignment of this private annuity agreement to Stargate Investments (Texas), Rugosa Limited (IOM) was required to make annuity payments to Dee from age 65 until her death.[535] Acting on behalf of Stargate Investments (Texas), in 2011 Dee accepted a proposal to settle the amounts owing on this private annuity agreement because Rugosa Limited (IOM) became insolvent. Specifically, IRS Exhibit 401 is a draft document titled "RUGOSA LIMITED SCHEME OF ARRANGEMENT between the Company and its Creditors" ("**Scheme of Arrangement**") with the phrase "DRAFT – 27 September 2011" crossed out at the top.[536] The Scheme of Arrangement is signed by Dee as the general partner of Stargate Investments (Texas).[537] The Scheme of Arrangement states that Rugosa Limited (IOM) is insolvent and that "the Company also has an ongoing liability to Stargate [Investments (Texas)] to pay to it an annuity calculated in accordance with detailed provisions contained in the Stargate Annuity; this annuity is payable for so long as Ms [*sic*] Caroline D Wyly shall remain alive."[538] The Scheme of Arrangement values Dee's right to receive future payments at $8,988,971 and her past due payments at $5,067,119,[539] and proposes that Rugosa Limited (IOM) will pay all of its creditors "approximately thirty-nine per cent of the debts owed to each Creditor by the Company; payment of sums due under the Scheme will be in full and final settlement of each Creditor's Claim."[540] Thereafter, Rugosa Limited (IOM) made an annuity payment of $5,538,594 to Stargate

---

[534] *See* Wyly Ex. OW at Exhibit A.

[535] Joint Ex. 86 (Private annuity agreement entered into between Dee and Maroon Limited, a Nevada Corporation); Joint Stipulations ¶¶ 151-52, 161 (The private annuity agreement was transferred from Maroon Limited, a Nevada Corporation to Rugosa Limited (IOM), and Charles and Dee transferred all of their private annuity agreements to Stargate Investments (Texas)); Wyly Ex. OW.

[536] IRS Ex. 401 at CW-IDR-0000000112.

[537] *Id.* at CW-IDR-0000000131.

[538] *Id.* at CW-IDR-0000000119.

[539] *Id.*

[540] *Id.* at CW-IDR-0000000123.

Investments (Texas),[541] which was slightly over 39 percent of the total value of Dee's past due and future annuity payments as listed in the Scheme of Arrangement.[542]

There is little evidence in the record regarding the Scheme of Arrangement other than: (i) it exists, and (ii) Dee signed it. While Dee testified that her signature appears on the document, she also credibly testified that she had no knowledge of the information that was referenced in it.[543] Beyond asking Dee whether the signature on the Scheme of Arrangement was hers—it is—and whether she had any knowledge of the statements contained within it—she did not—the IRS asked Dee no further questions about the Scheme of Arrangement.[544] Based on the limited evidence in the record regarding the Scheme of Arrangement and Dee's uncontroverted testimony at other points during trial, the Court infers that the Scheme of Arrangement was simply one more document that Dee had placed in front of her by people she trusted, and she signed this document without question.

In order for the Court to conclude that this badge of fraud applies to Dee, the Court would have to conclude that Dee understood the effect of the Scheme of Arrangement. Based on Dee's uncontroverted testimony during trial that she had no involvement in the family's financial affairs and no understanding of the offshore system, the Court cannot so conclude. For these reasons, this badge of fraud does not apply to Dee.[545]

---

[541] *See* Joint Stipulations ¶ 173.

[542] *See* IRS Ex. 401 at 119.

[543] Tr. Trans. 314:10-316:8 (Dee).

[544] *Id.* Dee was not asked any questions about the Scheme of Arrangement on redirect.

[545] The parties stipulated that annuity payments were not made during certain years by at least one offshore entity on an annuity payable to Charles. *See* Joint Stipulations ¶ 173 (Roaring Creek Limited (IOM) did not make payments in 2005-2008).

**MEMORANDUM OPINION**

### g) Understatement of Income

As reflected in the Computation Stipulations, Sam understated his income in the following tax years: 1992 through 2003, 2005 through 2006, 2010.[546] Similarly, Charles and Dee or Dee understated their or her income in the following tax years: 1992, 1994 through 2003, 2006, 2008, 2011, 2013.[547]

Accordingly, this badge of fraud is present for the listed years, unless it requires some sort of intentional or deliberate conduct, to which we now turn. For the reasons explained below, the Court concludes that while an understatement of income that is not intentional has little weight as a badge of fraud, Sam engaged in an intentional understatement of income from 1999 forward due to his deferral, forgiveness, and non-receipt of annuity payments.[548] This badge of fraud does not apply to Dee because any understatement of income by her was not intentional.

Sam argues that, "to constitute a badge of fraud, underpayment of income must be knowing or deliberate."[549] It is true that when listing the classic badges of fraud, the Fifth Circuit has indicated that "*[i]ntentional* understatement of income, substantial in amount per se or substantial in relation to the total reported income" is a badge of fraud.[550] However, other courts listing badges

---

[546] Computation Stipulations at Attachment A. This agreement is contingent upon (i) the SDNY Court's determination of foreign grantor trust status being affirmed on appeal, which appeal is currently pending before the Second Circuit Court of Appeals, and/or (ii) this Court's collateral estoppel decision being affirmed on appeal, assuming such an appeal is taken.

[547] *Id.* at Attachment B. This agreement is subject to the same contingencies as stated in the immediately preceding footnote.

[548] Even without this badge of fraud, the IRS has carried its burden of proof regarding Sam's liability for fraud penalties under 26 U.S.C. § 6663.

[549] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 121.

[550] *Webb,* 394 F.2d at 378 n.11 (emphasis added) (citing Balter, Tax Fraud and Evasion, pp. 8-54 and 8-55 (3 ed. 1963)); *see also Loftin & Woodard, Inc.*, 577 F.2d at 1239 (listing the same badges of fraud as *Webb*); *Hatling,* 2012 WL 5199405, at *2 ("Fraud 'does not include negligence, carelessness, misunderstanding or unintentional understatement of income.'" (quoting *U.S. v. Pechenik*, 236 F.2d 844, 846 (3d Cir. 1956)). The Fifth Circuit has also been clear that understatement of income, standing alone, is not enough to prove fraud, but that consistent and substantial understatement of income is by itself strong evidence of fraud. *Webb* 394 F.2d at 378; *Merritt v. C.I.R.*, 301 F.2d 484, 487 (5th Cir. 1962).

of fraud have dropped this "intentional" qualifier, indicating that a mere understatement of income can constitute a badge of fraud.[551] Thus, there are authorities that cut both for and against Sam's argument that only an *intentional* understatement of income can be a badge of fraud.

Common sense concerns also cut both ways on this issue. On the one hand, underpayment of tax—which necessarily comes about by way of understatement of income or overstatement of deductions—is itself an element of civil tax fraud under 26 U.S.C. § 6663.[552] Therefore, in a case where fraud penalties are applicable, there will almost always be an understatement of income. Thus, unless understatement of income as a badge of fraud is always a given for the IRS in any case that does not involve overstated deductions, then it seems that the mere fact that an understatement of income exists should not be a badge of fraud, and some kind of intent should be required.

On the other hand, there are also problems with stating that understatement of income *must be intentional* in order to constitute a badge of fraud. At least one court has pointed out that if it is shown that a taxpayer intentionally understated income, that this is not just a badge of fraud, it is direct proof that fraud has occurred.[553] Indeed, civil tax fraud is defined as an underpayment of tax with the specific purpose to evade a tax known or believed to be owing.[554] If the IRS in fact shows that a taxpayer has *intentionally* understated his or her income, then it seems that the fraud inquiry could end there. Resort to the badges of fraud as circumstantial evidence that fraud occurred is no longer necessary, because there is now direct evidence that fraud occurred.

---

[551] *See, e.g.*, *Estate of Trompeter*, 279 F.3d at 773 (quoting *Bradford,* 796 F.2d at 307-08).

[552] *DiLeo*, 96 T.C. at 873 (§ 6653 case); *see Morse v. C.I.R.*, 419 F.3d 829, 832 (8th Cir. 2005); *Carreon,* 2014 WL 91959, at *6.

[553] *See Garavaglia*, 2011 WL 4448913, at *26 (letter from accountant to taxpayer discussing intentional writing down of tax liabilities was direct evidence of fraud).

[554] *Webb*, 394 F.2d at 377 (quoting *Mitchell*, 118 F.2d at 310).

However, before we agonize too much over these apparent inconsistencies, we must stress two things. First, the Supreme Court has noted that "any conduct, the likely effect of which would be to mislead or to conceal" can indicate tax fraud.[555] Thus, the phrasing that courts choose to employ when enumerating their lists of badges of fraud may be more of a product of the particular cases at hand than any hard and fast rule regarding understatement of income. Second, because this Court is bound by Fifth Circuit precedent, it will follow *Webb* and require the understatement of income here to be intentional.[556]

Sam engaged in intentional understatement of income of a certain, albeit subtle, kind. Although Sam did not do something as simple as omit wages from his return or neglect to report a realized capital gain, he did engage in a subtler form of intentional understatement of income when he deferred and eventually forgave annuity payments contractually due to him from IOM corporations that should have been paid to him. Moreover, Sam's income was intentionally understated when he manipulated the assets of other of the IOM corporations that owe annuity obligations to him such that those obligations are now uncollectible.

At trial, Sam testified that it was his understanding that annuity payments he received from the complicated annuity transactions he entered into in 1992 and 1996 involving the transfer of the options and warrants offshore would be taxed as ordinary income to him when he actually received

---

[555] More fully, the Supreme Court stated in *Spies*, 317 U.S. 492, 499 (1943) that:

> Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.' By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.

[556] *Webb*, 394 F.2d at 378 n.11.

those annuity payments from the IOM corporation that had received the options and warrants in exchange for issuing an annuity payable to him: [557]

> Q. (By Mr. Daniel) Mr. Wyly, how did you understand that taxes will be paid on the assets that were placed into the trust?

> A. [By Sam] That taxes would be paid when they were paid back a –in cash to— on the annuity I received or any other distribution…

And, despite Sam's argument that the annuity transactions were done to simply defer taxes upon the exercise of the options and warrants transferred offshore, not avoid the payment of taxes, Sam then took actions that insured that those taxes would never be paid.

As found previously, Sam caused several of the IOM corporations that owe annuity obligations to him to become insolvent by manipulating how their assets were used by him and other members of his family.[558] While the IOM corporations owing annuity obligations to Sam were provided stock options worth at least the value of the annuities they issued to Sam, after supporting Sam's extended families' lifestyles, several of those IOM corporations are no longer able to make their contractually required annuity payments to Sam, as their assets were dissipated consistent with Sam's "wishes."

So, where did the cash these IOM corporations realized upon the exercise of the options and the sale of the associated stock go? The short answer is it went wherever Sam "wished" it to go. And, as previously found, Sam "wished" for it to be used to purchase, among other things, (i) domestic real estate on which homes for Wyly family members were built in Texas and Colorado (also using offshore monies), (ii) two floors of the Paragon building in Aspen, which provided Sam's daughter Kelly with space for her art gallery, a condominium and an office, and (iii) art,

---

[557] Tr. Trans. 719:15-20 (Sam).

[558] *See* pp. 110-125, *supra*.

jewelry, and other items of personal property, which various members of Sam's family keep in their homes and continue to use and enjoy today.[559] All of these purchases were made with offshore funds using structures Sam allegedly believed prevented them from being taxed as gifts or other distributions from offshore.[560] And, to be sure, Sam "wished" for each of these expenditures of offshore funds to be made, which expenditures, along with other uses of the funds that Sam "wished" to occur, drained certain of the annuity obligors' assets such that they were no longer able to make their contractually required annuity payments to Sam.

By manipulating the IOM corporations and their assets in this way, Sam intentionally insured that the annuity payments he was due could not be paid to him, thus enabling him to escape his obligation to pay tax on the annuity income he was contractually entitled to receive. And, instead of liquidating assets or otherwise ceasing his families' extravagant expenditures, Sam deferred all annuity payments due to him for five years.[561] Then, once the deferred payment date was reached, Sam began accepting less than full annuity payments from certain of those corporations whose monies had been used for other purposes.[562] Ultimately, Sam chose to forgive certain of the annuity obligations due to him totaling $60,972,221.[563] And, as Sam admitted at trial, another $70,544,877 in annuity obligations due to him from certain IOM corporations that

---

[559] *See* pp. 98-110, 110-125, *supra.*

[560] *See* pp. 235-264, *infra.*

[561] *See* Joint Exs. 59, 61, 63, 65, 67, and 69, whereby Sam deferred annuity payments scheduled to commence on his 65th birthday to his 70th birthday, and 71, 73, 75, 77, and 79, whereby Sam deferred annuity payments scheduled to commence on his 68th birthday to his 73rd birthday.

[562] Tr. Trans. 2039:9-2052:23 (Sam describing on cross examination how, beginning as early as 2007 it became necessary to move money around the offshore system in order to meet annuity payment obligations); IRS Exs. 1131 at EOI-IOM-SW-0000017582 (letter dated May 31, 2013 from Tensas Limited (IOM) to Sam stating that Tensas Limited (IOM) "has not made full payments to you since 2010"); however, ¶ 175 of the Joint Stipulations shows that the last full payment from Tensas Limited (IOM) was received in 2008, 1135 at EOI-IOM-SW-0000013854 (letter dated May 31, 2013 from East Baton Rouge Limited (IOM) to Sam stating that East Baton Rouge Limited (IOM) "has not made full payments to you since 2011"); Amended Bankruptcy Schedule B, Exhibit B-16 [ECF No. 472] at p. 55 of 94 (indicating that, as of September 30, 2014, $70,544,877 in annuity payments from the offshore system were outstanding as to Sam with "no payment expected in the near term").

[563] *See* pp. 110-125, *supra.*

received valuable options and warrants in exchange for its annuity obligation to him are now uncollectible.[564]

As previously found, all of this happened because Sam "wished" for that to be the outcome here.[565] In this way, Sam insured that he did not pay the taxes he was obligated to pay. Sam deferred the commencement date of his annuity payments in 1998[566] knowing that his receipt of large annuity payments would likely trigger an IRS audit, thereby exposing the extent of his offshore system.[567] While the private annuity agreement amendments recite that Sam deferred the annuities because he wasn't ready to retire at age 65 or 68,[568] inferring that Sam did not yet need the annuity income, that testimony rings hollow given that Sam began borrowing money from offshore through Security Capital in 2002 on sweetheart terms.[569] And, of course, we know that Security Capital had no money of its own to loan to Sam; rather, it borrowed the money it loaned

---

[564] See Amended Bankruptcy Schedule B, Exhibit B-16 [ECF No. 472] at p. 55 of 94. Although Sam scheduled these obligations as not paying in the near term, at trial he testified that he expects no further payments at all. Tr. Trans. 2941:1-8 (Sam).

[565] See pp. 110-125, supra.

[566] See Joint Exs. 59, 61, 63, 65, 67, 69, 71, 73, 75, 77, and 79.

[567] See IRS Ex. 96 at WYLYSEC01112396 (memorandum drafted by Hennington to Sam, Charles, Evan, and Donnie: "As you are aware, we have been planning for some time for the commencement of the annuity payments. As we have studied the impact of these payments we have become increasingly concerned with the logistical problems of paying the annuities…. 1. When the payments are reported on your 1040, they will be on a separate line on page one for annuity payments. It is almost certain given the large amount of these payments that the reporting will result in an IRS audit. There is also a high likelihood that as a result of this audit the entire structure of the foreign system will be audited by the IRS.").

[568] IRS Exs. 59, 61, 63, 65, 67, 69, 71, 73, 75, 77, and 79 (1998 private annuity amendments for Sam, all attesting that "WHEREAS, the intent of a deferred Private Annuity was to provide payment upon the retirement of Mr. Sam Wyly; and WHEREAS, Mr. Sam Wyly warrants that he does not anticipate retiring on the stated annuity commencement date…Whereas, Mr. Sam Wyly desires the deferral of the private annuity until his anticipated retirement; and Whereas, the obligor…agrees to defer the Private Annuity…"); IRS Exs. 59, 61, 63, 65, 67, and 69 (deferred annuities scheduled to begin paying on Sam's 65th birthday until his 70th birthday) and IRS Exs. 71, 73, 75, 77, and 79 (deferred annuities scheduled to begin paying on Sam's 68th birthday until his 73rd birthday); see also Tr. Trans. 1239:1-9 (Chatzky testifies that the annuities were deferred because "it was explained to me that originally Sam Wyly had intended to retire at the age of 68, and then I guess as time marched on, he enjoyed working, and he wanted to work for another five years; and, therefore, he – he had other sources of income than the annuity payment.").

[569] See Wyly Exs. B ($15 million promissory note by Sam in favor of Security Capital effective January 30, 2002), E ($25 million promissory note by Sam in favor of Security Capital effective March 1, 2003), and F ($10 million promissory note by Sam in favor of Security Capital effective July 15, 2003).

MEMORANDUM OPINION                                                                                    131

to Sam from one or more of the IOM corporations that form a part of Sam's offshore system. We also know that Sam would not pay income tax on loan proceeds—*i.e.*, the money he borrowed from offshore to support his families' lifestyle, but that he would have paid tax on any annuity income he received from offshore. Finally, we know that Sam began using the offshore funds to support extravagant purchases of real estate for the benefit of himself and his family members beginning in late 1999 and continuing into early 2001.[570]

Because Sam deferred his annuity payments in 1998 as part of a scheme to keep the extent of his offshore system secret from the IRS and then began to excessively manipulate how funds within the offshore system were used by at least 1999,[571] the Court concludes that this badge of fraud is present as to Sam beginning in 1999 through 2013, the last year at issue in the Motions and Claim Objections.

Dee's situation is different. While Charles' and Dee's annuity payments were also deferred,[572] it is clear that Dee was not the person who chose to defer their receipt of annuity payments. This is because Dee relied completely on Charles regarding all business, legal, and tax

---

[570] Joint Stipulations ¶¶ 43-47 (referring to the creation of Rosemary's Circle R Ranch Limited (IOM) in 1999; Cottonwood I Limited (IOM), Cottonwood II Limited (IOM), Spitting Lion Limited (IOM) in 2000; and Mi Casa Limited (IOM) in 2001); 306-320 (describing the Rosemary's Circle R Ranch structure), 321-377 (describing the Cottonwood I Limited (IOM) and the Cottonwood II Limited (IOM) structures), 465-432 (describing the Spitting Lion Limited (IOM) structure). Recall that the Cayman LLCs that owned Rosemary's Circle R Ranch Limited (IOM), Cottonwood I Limited (IOM), Cottonwood II Limited (IOM), Mi Casa Limited (IOM), and Spitting Lion Limited (IOM) were all funded with money that originated from the offshore system and was routed through Security Capital. Joint Stipulations ¶¶ 292, 303-305. *See also* pp. 98-110, *supra;* 235-264, *infra.*

[571] As French testified, the first large purchase of personal property occurred in mid-1996 with the purchase of Noon Day Rest by Sam's wife, Cheryl. And, while expensive, that item pales in comparison to the expense associated with the real estate purchases. *See* SEC Tr. Trans. 1947:12-1949:7 (French referring to the purchase of Noon Day Rest: "Q. This was the first time the trusts in the Isle of Man, that you remember, were used to buy some kind of personal property, right? A. That is, I believe, correct."); *see also* IRS Ex. 364 (documenting circumstances surrounding purchase of Noon Day Rest and its purchase price of £155,000.). *See also* pp. 98-110, *supra;* 235-264, *infra.*

[572] *See* Joint Exs. 81, 82, and 85, whereby Charles deferred annuity payments scheduled to commence on his 65th birthday to his 70th birthday, and 89, 91, 93, and 95, whereby Charles deferred annuity payments scheduled to commence on his 68th birthday to his 73rd birthday. Dee similarly extended annuity payments that were scheduled to commence on her 65th birthday to her 70th birthday. *See* Joint Ex. 87.

matters.[573] On this record, the Court doubts that Dee understood that deferrals of annuity payments occurred or the significance of those deferrals.[574] Furthermore, there is no evidence in the record that annuity payments due to Dee will not be able to be made per the annuity agreements. For these reasons, this badge of fraud does not apply to Dee.

### h) Concealment of Income or Assets

It is obvious from the facts already found that the Wylys went to considerable effort to conceal the extent of their offshore assets and activities. There is little to be gained here by repeating this analysis except to say that the IRS has established this badge of fraud—by clear and convincing evidence—as to Sam from 1992 to through 2013. However, once again, there is insufficient evidence in the record to support such a finding as to Dee.

### i) Offering False or Incredible Testimony

Sam was not a great witness at trial. His memory was vastly superior on direct examination than it was on cross-examination. He easily remembered events dating back to his childhood in Louisiana; his college years and professors who made an impact on him there; the progression of his wide-ranging business ventures; to concerns over the domestic banking industry in the 1980s, and on and on through events to the present day. However, on cross-examination, his memory seemed to fail him and he was impeached regularly with either the deposition testimony he gave in connection with the Motions, the testimony he gave during trial of the SEC Action, or documentary evidence. [575]

---

[573] The evidence shows that Dee relied entirely on Charles regarding all business, tax, and legal matters throughout their marriage. Tr. Trans. 159:20-160:15 (Dee) (relied entirely on husband throughout marriage); 159:18-19 (Dee) ("Q. Have you ever prepared a tax return? A. Oh, heavens no."); 172:17-19 (Dee) (never discussed tax matters with husband).

[574] *Id.* at 322:6-14 (Dee testifying that she does not know what a limited partner, general partner, limited partnership, or annuity is), 188:22-189:9 (Dee testifying she had never heard of Lincoln Creek IOM Trust), 192:8-11 (Dee testifying that she had never heard of Maroon Limited (IOM)).

[575] *See id.* at 1026:11-25 (Sam denies knowing that the offshore system was aggressive, but then admitting he recalls hearing "that word" from either French or another lawyer with respect to the offshore system, but qualifying it with

And, while the Court appreciates that Sam is 81 and suffers from some health issues, the Court accommodated those issues by scheduling Sam's testimony early each day as his counsel requested in two hour or less increments, which meant Sam's testimony occurred over nine trial days. Moreover, breaks were taken any time Sam's counsel or he requested one. And, of course, neither Sam's age nor his health issues explains the obvious disparity between his ability to recall facts on direct as opposed to cross-examination.

That Sam was an uncooperative witness on cross-examination by the IRS was obvious. That he had to be impeached frequently to get him to admit to fairly obvious facts is equally clear. In fact, given the difficulty in getting Sam to admit facts that were obviously true, the Court encouraged his counsel to offer to stipulate to those facts when Sam was asked a question that he was struggling to crisply answer, assuming it wasn't more prejudicial to Sam's case to do so than a patient and tedious cross-examination followed finally by a grudging admission from Sam would be. However, that rarely happened and so a slow and tedious cross-examination of Sam continued for days, with Sam regularly being impeached by either documentary evidence or his own prior testimony, resulting in what should have been an easy answer finally being given.

---

"I don't recall for what particular purpose they were speaking of its being seen as aggressive."); 1034:7-9 (Sam testifying he did not know if Robertson also warned him the offshore system was aggressive) and 1034:10-1044:4 (Sam being impeached with IRS Ex. 85, a memo from Robertson containing her notes from a Tedder seminar stating the strategy was aggressive, to which Sam responds "[t]hat's what it says" and, when pressed for a yes or no answer, admitting "[i]f I had to choose between no and yes, I would go with yes."), 1035:6-8 (Sam did not recall testifying that he would read anything Robertson copied him on) and 1037:7-17 (Sam's prior deposition testimony that "[y]eah, yeah, I read anything that Shari Robertson copied me on. I mean, I would see it."); 1364:10-19 (Sam denying the offshore system was helped by secrecy, claiming "[i]t was an open book") and 1367:15-19 (impeaching Sam with his testimony from the SEC Action—"Question: And that goal, making it harder for people to get to your money in the Isle of Man, was helped by secrecy. Right? Answer: Yes."); 1382:20-24 (Sam testifying that he did not know that his lawyers, with his knowledge, tried to keep the IOM trusts' ownership of securities under 5% to minimize SEC reporting requirements) and 1382:25-1392:10 (impeaching Sam with his testimony from the SEC Action); 2052:9-14 (Sam stating he does not remember personally writing off annuity payments) and 2647:23-2670:17 (impeaching Sam with letters he personally signed forgiving past due and future annuity payments). These are just a few of many examples of Sam being impeached while testifying before the Court.

Sam's obvious reluctance to answer questions asked of him directly reflects poorly on him. As a result, the Court does not have confidence that it can rely on Sam's testimony to accurately reflect what really transpired here, absent other, disinterested evidence corroborating his testimony.

Attempting to apply this badge of fraud on a year-by-year basis is problematic, as it is less susceptible to that type of breakdown than most of the other badges of fraud.[576]  Rather, the presence of this badge of fraud casts a shadow over a taxpayer's entire course of conduct.  This is understandable because, in most instances, the taxpayer offers false or incredible testimony after the fact—often at trial or during an IRS examination—rather than during a specific year in which it is alleged that fraud has occurred.

The Fifth Circuit grappled with these principles in *Toussaint v. C.I.R.,*[577] where a taxpayer made a truly incredible claim—that his grandfather, an admittedly poor man, had given him a Picasso painting worth $190,000, which he failed to register or insure and simply stored in his closet for years.  After the painting was stolen, Toussaint filed a police report in which he claimed that three items were stolen: one car battery, one brown business suit and the Picasso. Toussaint carried a casualty loss deduction related to the supposed theft of the Picasso back and forward on his tax returns, resulting in deficiencies for years 1971 through 1975.[578]  The IRS disagreed with these deductions.  At trial before the tax court, Toussaint testified that not one but several suits were stolen (he did not know how many nor could he describe any of them—even the "brown" one) and that not one but several car batteries were stolen.  He could not explain why he failed to

---

[576] This is also true with respect to the badge of fraud of offering implausible or inconsistent explanations of behavior, to which we will apply the same timing analysis.  *See* pp. 137-142, *infra.*

[577] *Toussaint v. C.I.R.*, 743 F.2d 309 (5th Cir. 1984).

[578] *Id.*

report these additional items as stolen to the police.  Moreover, to the police, Toussaint described the Picasso painting as depicting a boat on an island but he could give no further details.  Before the tax court, Toussaint testified that the painting actually depicted "a woman" from about the waist up.  Possibly, he said, there was a small boat in one corner of the painting. Again, Toussaint could not explain the discrepancy in the two descriptions of the subject matter of the painting, nor could he describe the painting further.

In affirming the tax court's imposition of fraud penalties for all five of the years at issue there, the Fifth Circuit noted that "in an action for fraud, the honesty of the accused is not only important, it is controlling."[579]  The Fifth Circuit affirmed based in part on the implausible and false nature of Toussaint's testimony, even going so far as to note that it most likely would have found clear error if the tax court had found that Toussaint had *not* committed tax fraud.[580]  In assessing Toussaint's testimony as an indicator of fraud, the Fifth Circuit did not proceed on a year by year basis, but instead viewed the incredible nature of Toussaint's testimony as casting a shadow over his conduct in all of the tax years at issue.[581]  The Fifth Circuit did caution, however, note that "[a]lthough mere refusal to believe the taxpayer's testimony does not discharge the Commissioner's burden, the lack of credibility of the taxpayer's testimony, the inconsistencies in his testimony and his evasiveness on the stand are heavily weighted factors in considering the fraud issue."[582]

Similar to the Fifth Circuit in *Toussaint*, tax court judges have also looked to a taxpayer's false or incredible testimony[583] as indicative of fraud generally as opposed to applying it on a year-

---

[579] *Id.* at 312.

[580] *Id.* at 312-13.

[581] *Id.* at 309-13.

[582] *Id.* at 312 (internal citation omitted).

[583] *Delvecchio v. C.I.R.*, 2001 WL 617192, at *7 (2001) ("Joseph's lack of credibility is evidence of his fraudulent intent."); *In re Tandon*, T.C. Memo. 1998-66, 1998 WL 130148, at *13 (1998) ("Petitioner's lack of credibility is a

by-year basis.  This approach makes sense here.  Thus, this badge of fraud is found as to Sam for 1992 through 2013.

Conversely, while Dee is uninformed on a wide range of business issues and activities, she was credible.  The Court is convinced that she testified truthfully; and thus, this badge of fraud does not apply to Dee.

### j)    Offering Implausible or Inconsistent Explanations of Behavior

It is hard to believe that Sam didn't know what French was up to on his behalf—both when French (i) received a second opinion from Lubar in 1993 due to French's lingering concerns about the proper legal characterization of the Bulldog IOM Trust and the resulting tax treatment to the Wylys of the 1992 annuity transactions, and (ii) created false documents to "paper" the 1994 and 1995 IOM trusts in such a way that those trusts would "fit" the mold for foreign grantor trusts of a non-resident alien in order that the Wylys, as beneficiaries of those trusts, could obtain favorable tax treatment for transactions undertaken through them.[584]  That Sam would not know of French's concerns and actions seems inconsistent with what the Court has learned about him here.

While Sam may be an "idea guy" who hires the best and the brightest to run his ventures or otherwise work for him because they know more about the business or their work than he does, as he described himself and as others described him, it is abundantly clear that Sam does not suffer fools gladly.  Sam is obviously a very smart man, who is incredibly savvy in the business world and who expects to be kept informed and for things to happen as he directs.  You don't amass the

---

factor in considering the fraud issue. As we stated earlier, petitioner's testimony was at times questionable, vague, conclusory, not credible, and unsupported by the evidence in the record. This is evidence of fraud." (internal citation omitted)); *Welker v. C.I.R.*, 74 T.C.M. (CCH) 956, 1997 WL 633257, at *4 (1997) ("A taxpayer's lack of credibility, inconsistent testimony, or evasiveness are factors in considering the fraud issue."); *Ferry v. C.I.R.*, 70 T.C.M. (CCH) 1102, 1995 WL 634440, at *8 (1995) ("The taxpayer's evasiveness on the stand, inconsistencies in his testimony, and the lack of credibility of such testimony are heavily weighted factors in considering the fraud issue.").

[584] *See* pp. 84-98, *supra*.

kind of wealth that he was able to amass unless you are smart, savvy, prepared to take risks and cut loose dead weight. That he had no idea what French was doing, or that there were problems associated with the offshore system that was put in place at his direction, is highly unlikely if not unthinkable.

A businessman as savvy and sophisticated as Sam could not truly believe that it was appropriate for him to do what he did here. Put hundreds of millions of dollars of value offshore in exchange for unsecured annuity obligations from newly-formed domestic and IOM corporations that owned no assets other than the stocks and warrants that he assigned or sold to them. And then, after those options and warrants are exercised by the IOM corporations and the stocks are sold, thereby generating hundreds of millions of dollars of cash in the corporations owing him the annuity obligations, Sam manipulated the corporations in such a way that the obligations owing to him cannot now be paid. However, his lifestyle and the lifestyle of his loved ones have not suffered. In fact, the Wyly family lifestyles have prospered through the enormous wealth that his offshore-directed activities have permitted him to accumulate tax-free.[585] As the SDNY Court

---

[585] The outcome here might have been different if the IOM corporations owing the annuity obligations had simply been left alone to invest the money they realized from the exercise of the options and sale of the associated stock—even in investments Sam "wished" the IOM trustees to make, as he is a savvy and successful businessman after all—and then those IOM corporations simply transferred the realized profits to other IOM entities to do with what the trustees decided (again, even consistent with Sam's "wishes"). In other words, had the IOM corporations owing the annuity obligations not been raided to support the families' lifestyles, leaving them unable to satisfy their annuity obligations to Sam (and Charles until his death) as they came due, and income tax had been paid on all of that income when received, we might not be here today. And, even after the offshore entities were raided to support the families' lifestyles, Sam could have "wished" for assets to be liquidated so that loans could be repaid and/or solvency could be restored and his annuities paid per the agreements with him. But, he didn't "wish" for that. And, as a result, it didn't happen. Why? Because Sam (and Charles) got greedy and were prepared to "risk" litigation with the IRS once the offshore system was fully exposed because, as businessmen who had taken business risks all their lives, they expected to be able to settle with the IRS for "pennies on the dollar." IRS Ex. 1199 ¶ 57 (p. 15) (Annex A, Admissions of Defendant Michael C. French) ("Sam Wyly said if the IRS challenged his use of the Offshore Trusts, he would litigate with the IRS for years and then settle for pennies on the dollars. French knew that Sam Wyly previously litigated against the IRS for years and then settled."). Sam was questioned regarding his pennies-on-the-dollar statement during cross examination. He testified he did not recall the statement, and IRS' counsel sought to impeach him with French's Consent. Tr. Trans. 1027:1-16 (Sam). Sam's counsel objected on hearsay grounds and, since the IRS did not have a persuasive response, that objection was sustained. Id. at 1027:17-1034:5. The Court notes, however, that a redacted copy of French's Consent, which still includes the pennies-on-the-dollar statement, was subsequently admitted into evidence by agreement of the parties. Id. at 2900:9-13.

found, and was independently established here,[586]

> [r]easonable and savvy businessmen do not engage in such activity unless it is profitable. Of course it was profitable – by transferring property, including valuable options and warrants, to the trusts, by exercising the options and trading in secret, and using the proceeds to reinvest in other ventures, the Wylys were able to accumulate tremendous tax-free wealth.

It is abundantly clear here that the IOM trustees chosen by Sam (and Charles) did not have an original thought or idea for the last 25 years. Or, if they had had one (and Sam or Charles didn't like it), they were bullied into acquiescing to a Wyly "wish" under threat of being fired ("removed" in trust speak) if they didn't go along.[587] In short, all original thoughts and ideas came from Sam, Charles, another family member, or one of their "trusted" or "creative" advisors. But, rest assured, Sam and/or Charles blessed each and every idea. The record is clear—nothing happened offshore without Sam's or Charles' express approval, all under the guise of expressing their demands or directions as "wishes." In short, money moved or didn't move within the offshore system as Sam and/or Charles, and no one else, "wished." For example, when Laurie wanted to know if she could use the structure that she and two of her sisters had used in Colorado for the homes they use and enjoy there,[588] she did not go to the trustee of the Bessie IOM Trust to ask permission to use that same structure in Dallas for the home she and her husband have lived in for the last fourteen or so years (rent free), she went to her dad—Sam. And, with his blessing, it happened, as did the overwhelming majority of the funding for the design and building of the home.[589] Although the

---

[586] Collateral Estoppel No. 56.

[587] SEC. Tr. Trans. 1004:1-3 (Boucher) (Q: Do you recall Sam Wyly joking, "Well, we'll just fire the trustees if we [*sic*] don't do what they [*sic*] tell them? A: Yes."). *See, e.g.,* pp. 98-101, *supra.*

[588] Lisa, Laurie, and Kelly built homes on the Colorado property. Tr. Trans. 931:17-932:15 (Evan), 1514:24-1515:2 (Laurie) ("I live in a house here in Dallas on Crooked Lane that is owned by – by an Isle of Man trust, and I also have a second home I – that I go to in Colorado on the ranch). The record is unclear, however, whether Laurie's sisters share a home or enjoy separate homes on the ranch.

[589] Recall that Laurie was required to put in 1% in order to be a co-owner, who then has the legal right, according to Meadows Owens, to use and enjoy the asset without paying for the fair rental value of the asset. Tr. Trans. 2542:1-2543:10 (Pulman).

record does not divulge exactly how much in offshore funds were used to build the Mi Casa home, financial statements appear to value the home at a book value of $3,215,000 as of November 30, 2015.[590] All without a whimper from the trustee of the Bessie IOM Trust.

This badge of fraud has been established by clear and convincing evidence as to Sam from the outset of the offshore system in 1992 through 2013.[591]

As it relates to Dee, the IRS asks this Court to conclude that Dee's story is equally incredible—but for different reasons. The IRS says she had to have known about what was going on here because, among other things, she: (i) signed some of the documents concerning the offshore system, (ii) signed and filed false and fraudulent tax returns, and (iii) she learned of the Senate investigation of her family's offshore system but did nothing thereafter. According to the IRS' theory, once Dee learned of the Senate investigation, she should have asked Charles tough questions and when she wasn't satisfied, she should have hired independent counsel to advise her with regard to the offshore system and what she needed to do. The Court has several problems with this argument.

First, the IRS asks too much of Dee under the facts and circumstances here. While it is admittedly surprising that after learning of the Senate investigation of her family she didn't speak to Charles about it, there is no evidence in the record to the contrary. And, after listening carefully to her testimony and observing her demeanor, the Court is convinced that she was being truthful and candid. That she didn't participate in business affairs is clear; that she doesn't understand her financial circumstances—now or then—is clear. Charles took care of her and the family

---

[590] Wyly Ex. G (Financial Statements) at HST_PSI230623 (FloFlo balance sheet under category "Loans & Advances Receivable" showing Mi Casa Limited (IOM) with a book and fair market value of $3,215,000 each).

[591] The Court concludes that this badge of fraud is established for each of the years at issue in the Motions for the same reasons explained in connection with the Court's analysis of the badge of fraud of offering false or incredible testimony. *See* pp. 133-137, *supra.*

financially and she took care of the children and the home. Even after his death in 2011, Dee has not had to grapple with learning about business issues, leaving those issues to her son-in-law and executor of Charles' probate estate, Donnie Miller, and Hennington, the CFO of the Wyly family office. The Court is satisfied that Dee is a genuinely nice person who was largely oblivious to both the facts of the offshore system and its expected tax advantages, the controversy surrounding it, and the securities fraud that occurred to try to protect it. That she may be unsophisticated in financial matters or a beneficiary of the family wealth does not make her story incredible.

Second, the IRS assumes that had she consulted independent counsel that counsel would have given her different advice from that Sam and Charles received in 2003 from Meadows Owens regarding the filing of the Form 8275 disclosures with their tax returns. While it is certainly possible that she would have gotten different advice, that conclusion is pure speculation on this record.

Third, the IRS audit of the offshore system was already underway by the time Dee learned of the Senate investigation. It would not be unreasonable for Dee (or her separate counsel) to conclude that the issues would get resolved there in a reasonable period of time, even assuming Dee was aware of the audit.

Finally, given what the Court has learned about Dee and Charles' marriage, the Court can infer what would have happened, in all likelihood, if Dee had done as the IRS suggests. She grills Charles, which would have, again in all likelihood, resulted in him simply reassuring her that all was fine—Sam and he had consulted various professionals throughout the time the offshore system was in existence and had been assured that it was legal. By now it is 2005, Dee is about 72 and has been a homemaker for about 50 years during which she knew virtually nothing about the offshore system or Charles' business affairs. Really – at this point she should have hired her own

lawyer to investigate what her husband of 50 years assured her had been amply investigated and was fine? To be honest, that seems the more implausible of the behavior options under the circumstances here.

After carefully considering the evidence, the IRS has failed in its proof of this badge of fraud as to Dee.

### k) Filing False Documents.

So, what documents does the IRS claim were false or misleading when filed with it by the Wylys? The IRS argues that: (i) the manner in which the Debtors reported the annuity payments they received from the offshore system on their tax returns was false and misleading, (ii) the Forms 3520 and 3520-A[592] that the Debtors did file were false and misleading, particularly in light of the Forms 3520 and 3520-A that should have been filed and were not, and (iii) the Debtors' tax returns were false and misleading because they (a) underreported their income from offshore, and (b) chose to check "no" in response to the Form 1040 question "[d]uring [relevant year], did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust?"[593] Each is addressed below.

Throughout trial, the IRS argued that the manner in which the Debtors reported annuity income from the offshore system was misleading. Instead of reporting annuity income on the face of their tax returns on line 16a, which is labeled "Pensions and annuities,"[594] the Debtors reported

---

[592] A Form 3520 is an information return filed with the IRS annually to report certain transactions with foreign trusts. Form 3520-A is the "Annual Information Return of Foreign Trust with a U.S. Owner."

[593] *See, e.g.,* IRS Ex. 163 (Sam 2013 tax return) at 17 (Schedule B, Part III, Question 8). For tax years 1992 through1995, the question was "[w]ere you the grantor of, or transferor to, a foreign trust that existed during [relevant year], whether or not you have any beneficial interest in it?" *See, e.g.,* Joint Ex. 97 (Sam 1993 tax return) at SWYLY020260 (Schedule B, Part III, Question 12). Since both questions ask whether the taxpayer is a grantor of a foreign trust that existed during the relevant year, the two versions of the question are not materially different for our current purpose.

[594] *See, e.g.,* IRS Ex. 159 at 1.

their annuity income from the offshore system on Schedule C, and labeled this income simply as "ANNUITIES."[595] The IRS contrasted the way this offshore annuity income was reported and the way other annuity income Sam received domestically was reported. Unlike the IOM annuity payments, a domestic annuity payment Sam received was reported as income on line 16a of his tax return, and included the name of the entity making the payment to him.[596] In contrast, when Sam reported his offshore annuity income on Schedule C, the name of the IOM corporation(s) making the payment(s) to him was not included.[597]

At trial, a revenue agent involved with the Wylys' audit, Charles Herrick ("**Herrick**") testified that this manner of reporting is unusual—*i.e.*, "annuity income is generally reported on Line 1 or on the face of the return. Here it was on a Schedule C, which is unusual."[598] Herrick also testified that the way in which Sam, Charles, and Dee reported their offshore annuity income caused some confusion during the audit and caused the IRS to be uncertain whether the annuity income was actually reported by them on their tax returns.[599]

In contrast, Hennington explained why Sam, Charles, and Dee reported offshore annuity income in the way that they did. Specifically, she testified that the offshore annuities were reported on Schedule C because these annuity payments needed to be subject to self-employment tax.[600]

---

[595] *See, e.g., id.* (Schedule C begins 53 pages into the exhibit, which is not Bates numbered).

[596] Tr. Trans. 2215:5-2217:19 (Hennington); Joint Ex. 108 (Sam 2004 tax return) at SWYLY021663 (Question 16a) and SWYLY021723 (Form 1040 Pensions and Annuities).

[597] *See* Joint Exs. 110 (Sam 2006 tax return) at SWYLY022259 (Schedule C) and SWYLY022351 (Schedule C, Statement 16), 111 (Sam 2007 tax return) at SWYLY022974 (Schedule C) and SWYLY023031 (Schedule C, Statement 19), 112 (Sam 2008 tax return) at SWYLY023109 (Schedule C) and SWYLY023174 (Schedule C, Statement 23); IRS Exs. 74 (Sam 2004 tax return) at pp. 4 and 120, 75 (Sam 2005 tax return) at pp. 13 and 90, 159 (Sam 2009 tax return) at pp. 33, 53, 160 (Sam 2010 tax return) at pp. 9 and 60, 161 (Sam 2011 tax return) at 8 and 66, 162 (Sam 2012 tax return) at pp. 9 and 65, 163 (Sam 2013 tax return) at pp. 9 and 69. The referenced tax returns that are IRS exhibits are neither consecutively nor Bates numbered, so the Court's pin cite is to the number of pages into the exhibit the referenced information may be found.

[598] Tr. Trans. 1592:20-1593:4 (Herrick).

[599] *Id.* Slightly over half of the income adjustments in the Computation Stipulations were due to the fact that this annuity income had, in fact, been reported. *Id.* at 1594:21-1595:11 (Herrick).

[600] *Id.* at 2202:19-2217:19 (Hennington).

**MEMORANDUM OPINION** 143

According to Hennington, reporting the offshore annuity income on line 16a would have led to the Wyly family office's tax software calculating a tax amount that was too low.[601] Hennington also testified that domestic annuity payments were reported with the name of the entity making the annuity payment included because "there would have been a 1099 that needed to be matched" against it by the IRS.[602]

In its Amended Proposed Findings of Facts and Conclusions of Law, the IRS argues that this characterization of the offshore annuity payments as self-employment income is specious, because there was no nexus between the income received and the trade or business operated by Sam and Charles.[603] However, Hennington testified that she understood that because the stock options transferred in exchange for the offshore annuity obligations had been received by Sam and Charles as compensation, the required nexus for the payments to be subject to self-employment tax exists.[604] Moreover, Hennington did not come up with this reporting position herself; she testified that Pulman, a tax lawyer at Meadows Owens, and French advised her that the Wyly offshore annuity income was subject to self-employment tax.[605]

Hennington's explanation that the offshore annuity income was subject to self-employment tax is not unreasonable. 26 U.S.C. § 1402 defines "net earnings from self-employment" as "the gross income derived by an individual from any trade or business carried on by such individual" less any applicable deductions.[606] According to the Fifth Circuit, "[t]he common-law determines

---

[601] *Id.*

[602] *Id.* at 2217:3-7 (Hennington).

[603] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] at 202-203 (§ VIII, ¶¶ 112-119).

[604] Tr. Trans. 2202:19-2217:19 (Hennington).

[605] *Id.* at 2507:4-2508:2, 1914:4-1915:14 (Hennington).

[606] 26 U.S.C. §§ 1401, 1402. Net earnings from self-employment also include some partnership income. 26 U.S.C. § 1402(a).

whether a taxpayer is self-employed...."[607]  In its Amended Proposed Findings of Facts and Conclusions of Law, the IRS cites a number of cases for the proposition that "in order to be classified as net earnings from self-employment under 26 U.S.C.S. § 1402(b), there must be a nexus between the income received and the trade or business that was actually operated by a taxpayer."[608]  These cases go on to say that "[t]he income must arise from some actual (whether present, past or future) income-producing activity" and that "self-employment income is determined by the source of the income, not the taxpayer's status at the time the income is realized."[609]

Although the Court does not here decide whether the Wylys' annuity payments needed to be subject to self-employment tax, the Court notes that the Debtors' belief that such payments would be treated as self-employment earnings under the "nexus" test cited by the IRS makes sense. The IRS' own expert characterized the stock options that initially funded the offshore system as "compensatory stock options…and that income, then, is basically considered wage income under the Internal Revenue Code."[610]  This understanding comports with Hennington's understanding. From the Court's perspective, (i) Hennington provided a coherent explanation as to why the offshore annuity income was reported in the manner that it was, and (ii) although the IRS complains that the source of the annuity payments was not disclosed, the instructions to Form 1040 do not require that the source be identified and the IRS has not cited us to anything requiring the disclosure of the source.

---

[607] *Dillon v. C.I.R.*, 902 F.2d 406, 408 (5th Cir. 1990).

[608] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] at 202-03 (§ VIII, ¶ 114) (citing *Newberry v. C.I.R.*, 76 T.C. 441, 444 (1981); *Wuebker v. C.I.R.*, 205 F.3d 897, 901 (6th Cir. 2000), *abrogated on other grounds*; *Schelble v. C.I.R.*, 130 F.3d 1388, 1391-1392 (10th Cir. 1997); *Harris He Wang v. C.I.R.*, 2014 Tax Ct. Summary LEXIS 42, *9-10 (unpublished)).

[609] *Schelble*, 130 F.3d at 1392 (quoting *Newberry*, 76 T.C. at 446).

[610] Tr. Trans. 3103:23-3106:7 (Dubinsky).

The IRS also argues that the manner in which the Debtors went about reporting—or not reporting—their dealings with the offshore system on Forms 3520, 3520-A, and 5471[611] was false and misleading. The Court notes that one of the largest portions of the IRS' claims against the Debtors consists of penalties for the Debtors' failures to file these forms.[612] The Debtors' failures to file these forms—when they were actually required to be filed[613]—can be properly considered as a part of the badge of fraud of filing false documents. This is because, as the Supreme Court has noted, "any conduct, the likely effect of which would be to mislead or conceal" can be weighed as a badge of fraud.[614] As found in other portions of this opinion, Sam and Charles attempted to structure, and in certain circumstances succeeded in structuring, their offshore transactions in such a way as to avoid reporting requirements that would reveal the true nature and extent of their offshore holdings.[615] But, even when required, the Wylys chose not to file those forms as part of their efforts to keep the extent of their offshore holdings secret from the IRS.

Moreover, the Forms 3520 and 3520-A that the Wylys did file were, in the context of their overall offshore system, at least misleading. First, most of the forms that were filed related to entities that were not significant players in the Wyly offshore system—*i.e.*, the forms were filed

---

[611] Form 5471 is another information return to be filed by U.S. taxpayers with respect to certain foreign corporations.

[612] *See* Computation Stipulations ¶¶ 7.A-12.B, 20.A-25.B.

[613] As will be explained in the International Penalties section of this opinion, the Wylys successfully structured certain offshore transactions in a way that did not require the filing of these forms. *See* pp. 286-324, *infra*.

[614] *Spies*, 317 U.S. at 499.

[615] *See* pp. 286-324, *infra; IRS Ex. 567 at SWYLY007639 (email dated December 9, 2002 from Hennington to Alan Stroud, a lawyer at Meadows Owens, stating: "I am sure I read this at the time and overlooked or did not pay attention to the 3520 filing requirement. It seems that we would have preferred to not have anything reportable on the note if that was a possibility."); IRS Ex. 570 (email dated January 9, 2003 between Hennington and Boucher where Hennington expresses concern that certain loans may be subject to reporting requirements); SEC Tr. Trans. 1720:14-1721:6 (French) (Tedder told Sam that making SEC filings could jeopardize the tax status of the offshore system). In addition, a revenue agent involved in Sam's and Charles' audit testified that he had still not received certain audited financials that the Isle of Man corporations were under an obligation to prepare, and that this did "seem a little disconcerting." Tr. Trans. 1625:23-1627:1 (Herrick). The revenue agent also admitted "we're at about 94 percent that we have now" and that "given the dollar amount in question here, it's not going to make a material difference in the number…we're at trial now. We aren't going to change the number anymore." *Id.*

for entities that were not the entities through which the majority of the Wyly offshore transactions were conducted.[616]  This, when considered in the context of the other similar forms that were required to be filed but were not, makes the filed forms misleading.  Second, many of the forms that were introduced into evidence here were not signed and not dated,[617] signed but not dated,[618] or were completely missing their signature pages,[619] despite the fact that both Forms 3520 and 3520-A contain a signature and date line and are to be signed under penalty of perjury.[620]  Finally, and oddly, two of the Forms 3520 that the parties stipulate that Sam filed for transactions that occurred during the 1992 tax year used versions of IRS forms that would not have been available until 1995, despite that fact that § 6048—in 1992, 1995, and currently—requires a Form 3520 to be filed on or before the ninetieth day after a reportable event.[621]  Although Sam signed these two forms under penalty of perjury, they were not dated on the signature line.[622]  Notably, while the

---

[616] *See* Joint Exs. 142-175, which are all of the Forms 3520 and Forms 3520-A in the record.  For example, Forms 3520 and 3520-A were filed for the grantor trusts that Sam settled through which the 1996 annuity transactions were undertaken—*i.e.*, Sitting Bull IOM Trust, Crazy Horse IOM Trust, Arlington IOM Trust, and Tallulah IOM Trust. Joint Exs. 145-162. The only Form 3520 filed for the Bulldog IOM Trust was signed and dated by Sam as the settlor on June 6, 1992, was filed on a whitepaper schedule despite the existence of an IRS form that could have been used, and shows that $100 was transferred into the trust. Joint Ex. 142.  Likewise, the only Form 3520 filed for the Lake Providence IOM Trust was signed and dated by Sam as the settlor on January 25, 1993, was filed on a whitepaper schedule despite the existence of an IRS form that could have been used, and shows that $100 was transferred into the trust.  Joint Ex. 144.  The singular Form 3520 for Delhi IOM Trust was signed by Sam on the same date and was also a whitepaper schedule that showed $100 being transferred into the trust. Joint Ex. 145.  No Forms 3520 or 3520-A were filed for Bessie IOM Trust or La Fourche IOM Trust.

[617] *See* Joint Exs. 150, 153-157, and 160-162.

[618] *See* Joint Exs. 146 and 147.

[619] *See* Joint Exs. 148, 149, 151, and 152.

[620] *See, e.g.,* Joint Ex. 150.

[621] *See* 26 U.S.C. § 6048, Joint Exs. 146 (Form 3520 filed and signed by Sam as grantor of Tallulah IOM Trust showing transfer of $61,770,607 involving Tallulah IOM Trust. This form is not dated, and although the transfer is listed as occurring on September 8, 1992 the form itself indicates in its upper left-hand corner that it was revised in June of 1995. According to Statement 3 attached to this form, the transfer consisted of an investment in a limited partnership interest in "Tallulah Limited."), 147 (Form 3520 filed and signed by Sam as grantor of Tallulah IOM Trust showing transfer of $5,265,566 involving Tallulah IOM Trust. This form is not dated, and although the form lists the transfer as occurring on April 30, 1993, the form itself indicates in its upper left-hand corner that it was revised in June of 1995. According to Statement 3 attached to this form, the transfer consisted of an investment in a limited partnership interest in "Tallulah Limited").

[622] Joint Exs. 146 and 147.

Joint Stipulations indicate that those Forms 3520 and 3520-A that are in the record as Joint Exhibits 142 through 175 were filed with the IRS, there is no stipulation that they were timely filed.[623]

Although some required Forms 3520 and 3520-A were filed for trusts that had a larger role in the Wyly offshore system, those forms by no means gave a complete picture of the operation of the trusts or the extent of their holdings. For example, Sam filed a Form 3520 for the Bulldog IOM Trust, which indicated that the trust had been created and that $100.00 of property was transferred into it.[624] Charles filed a similar, single Form 3520 for the Pitkin IOM Trust indicating that it had been settled with $100.00.[625] However, no annual Forms 3520-A were filed for either the Bulldog IOM Trust or the Pitkin IOM Trust, as was required since Sam was the owner of the Bulldog IOM Trust under the Grantor Trust Rules and Charles and Dee were the owners of the Pitkin IOM Trust under the Grantor Trust Rules.[626] The failure to file the Forms 3520-A makes the earlier filed forms misleading.

From the Court's perspective, the misleadingly incomplete picture the filed forms provide of the Wyly offshore system when you consider the other forms that were required to be filed, but were not, strongly suggest that Sam and Charles acted with fraudulent intent.[627]

---

[623] *See* Joint Stipulations ¶¶ 223-256; Joint Exs. 142-175. The fact that these forms had to have been filed years late is of no economic consequence here, however, as the IRS is not seeking to recover penalties from the Wylys for any late filing of a form that the parties stipulated was filed.

[624] Joint Ex. 142.

[625] Joint Ex. 163.

[626] *See* pp. 295-296, *infra.*

[627] This finding applies to years 1992 through 2013, even though the IRS does not seek International Penalties for years 1992 through 1995. The IRS does not seek penalties for 1992 through 1995 presumably because during these years, the penalties under § 6677 and § 6038 were relatively de minimis and increased in 1996 and 1997 respectively. *See* Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 6677, 110 Stat. 1755 (increasing penalties under § 6677); Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 6038, 111 Stat 788 (increasing penalties under § 6038). Nevertheless, § 6038 still required that Sam and Charles file Forms 5471 in years 1992 through 1995. *See, e.g.*, 26 U.S.C. § 6038(a), (e)(1) (1994). This is because the relevant definitions of control under § 6038(e)(1) and "the rules prescribed by section 318(a) for determining ownership of stock" to which subsection (e)(1) refers—and by which the Court concludes that Sam and Charles were required to file Forms 5471—have not been amended from 1992 to date. *See* 26 U.S.C. §§ 318(a), 6038(e)(1). Since Sam and Charles did not file any Forms 5471 from 1992 through 1995, the badge of fraud of filing false or misleading documents still exists for these years due to the absence of Forms 5471 during those years. This badge of fraud also exists during 1994 and 1995 as to Sam and Charles for

Finally, the IRS argues that the Wylys' tax returns were false and misleading in two ways—*i.e.*, by (i) underreporting their offshore income, and (ii) falsely answering a question on their tax returns. The Court agrees with the IRS with respect to (i) for all tax years in which there was unreported income and agrees with the IRS with respect to (ii), at least with respect to tax years 1992 through 2002 as to Sam and 1992 through 2003 as to Charles and Dee, as explained below.

It is certainly true that the Wylys' underreported their offshore income on their tax returns, as the parties stipulated in the Computation Stipulations. In that sense, the IRS is obviously correct—the Wylys' tax returns for those years in which there was unreported income were false. As found previously, for Sam that is tax years 1992 through 2003, 2005 through 2006, and 2010; while for Dee that is tax years 1992, 1994 through 2003, 2006, 2008, 2011, and 2013.

Moreover, it is true that the Wylys' checked "no" in response to the Form 1040 question "[d]uring [relevant year], did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust?" from 1992 through 2013 as to Sam and from 1993 through 2013 as to Charles and/or Dee.[628] And, in that sense, the IRS is again obviously correct—the Wylys' tax returns for those years were false given the SDNY Court's determination in the SEC Action that certain of the IOM trusts were grantor trusts as to Sam and Charles, which determination we have given collateral estoppel effect to here.

But even without the SDNY Court's grantor trust determination, checking the "no" box was misleading on their tax returns once Sam and Charles were on notice of Lubar's advice that

---

an additional reason. Section 6048(a)(1) required a Form 3520 to be filed upon "the creation of any foreign trust by a United States person." 26 U.S.C. § 6048(a)(1) (1994). Thus, when the Bessie IOM Trust and the Tyler IOM Trust were created in 1994 and the La Fourche IOM Trust and Red Mountain IOM Trust were created in 1995, Sam and Charles should have filed Forms 3520 documenting these events. *See* Joint Stipulations ¶¶ 28, 48, 81, 88. This means that the badge of fraud of filing false or misleading documents exists in 1994 and 1995 by virtue of the fact that these Forms 3520 were not filed.

[628] Charles and Dee checked the box "yes" on their 1992 joint tax return. IRS Ex. 27A at SECI00028718 (Question 12).

there was a significant risk that the 1992 IOM trusts were properly characterized as grantor trusts as to them. While their 1992 tax returns were filed before they were on notice of Lubar's advice, every other return they filed that checked "no" in response to the Form 1040 question "[d]uring [relevant year], did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust?," was filed with knowledge of the significant risk that they could be found to be the grantor of a foreign trust that existed during each year from 1993 through 2013.[629]

Equally, if not more, troubling is the fact that even when Sam and Charles knew they had established trusts in the IOM that they intended to be characterized as grantor trusts as to them— *i.e.*, all of the trusts involved in the 1996 annuity transactions (Sitting Bull IOM Trust, Tallulah IOM Trust, Arlington IOM Trust, and Crazy Horse IOM Trust as to Sam and Maroon IOM Trust, Woody International IOM Trust, and Lincoln Creek IOM Trust as to Charles)—they still checked the box "no." Again, this made their tax returns false and misleading from 1992-1996, the years in which those trusts were in existence.

But, to be fair, for tax years 2002 through 2013, Sam attached Form 8275 disclosures to his filed tax returns.[630] Similarly, for tax years 2003 through 2011, Charles and Dee attached Form

---

[629] *See* Joint Exs. 97 (Sam 1993), 103 (Sam 1999), 104 (Sam 2000), 110 (Sam 2006), 111 (Sam 2007), 112 (Sam 2008), 120 (Dee and Charles 1993), 127 (Dee and Charles 2000), 128 (Dee and Charles 2001), 129 (Dee and Charles 2002), 130 (Dee and Charles 2003), 133 (Dee and Charles 2006), 134 (Dee and Charles 2007), 135 (Dee and Charles 2008), IRS Exs. 29A (Dee and Charles 1994), 30 (Dee and Charles 1995), 31 (Dee and Charles 1996), 32 (Dee and Charles 1997), 33 (Dee and Charles 1998), 34 (Dee and Charles 1999), 40 (Dee and Charles 2004), 42 (Dee and Charles 2005), 50 (Dee and Charles 2009), 52 (Dee and Charles 2010), 54 (Dee and Charles 2011), 55 (Dee 2012), 56 (Dee 2013), 71 (Sam 2002), 135 (Sam 1992), 140 (Sam 1994), 141 (Sam 1995), 142 (Sam 1996), 151 (Sam 1997), 152 (Sam 1998), 154 (Sam 2001), 74 (Sam 2004), 75 (Sam 2005), 155 (Sam 2003), 159 (Sam 2009), 160 (Sam 2010), 161 (Sam 2011), 162 (Sam 2012), 163 (Sam 2013). Charles and Dee checked "Yes" in response to this question on their 1992 tax return. IRS Ex. 27A (Dee 1992). There is no explanation in the record as to why they checked the box "Yes" in 1992, but "No" thereafter.

[630] *See* Joint Exs. 110 (Sam 2006), 111 (Sam 2007), 112 (Sam 2008); IRS Exs. 71 (Sam 2002), 74 (Sam 2004), 75 (Sam 2005), 155 (Sam 2003), 159 (Sam 2009), 160 (Sam 2010), 161 (Sam 2011), 162 (Sam 2012), 163 (Sam 2013).

8275 disclosures to their filed tax returns.[631] According to the Debtors, the attachment of the Forms 8275 to their respective tax returns should cure the false and misleading problem created by their failure to check the correct box on their tax returns—at least in the years in which those forms were filed. The Court agrees, as explained below.

The Form 8275 disclosures were substantially identical for both Debtors. Beginning with Sam's 2002 tax return, the attached Form 8275 disclosure noted that he had created a trust in a foreign country and that—although he did not regard himself as the grantor of the trust—this conclusion might run counter to certain IRS regulations issued in 2000 under 26 U.S.C. § 679, as well as certain statutory provisions of 26 U.S.C. § 674.[632] The Form 8275 disclosure attached to Charles' and Dee's 2003 tax return was substantially identical to the Form 8275 disclosure attached to Sam's 2003 tax return and which contained essentially the same information as Sam had provided the prior year.[633] In tax year 2004, most of the previously disclosed information remained in the Form 8275 disclosure, along with certain additional information. Specifically, the Form 8275 disclosures attached to Sam's and Charles and Dee's 2004 respective tax returns included information that property had been transferred to subsidiaries of the foreign trusts in exchange for private annuities, and it was admitted that there were "one or more trusts."[634] However, while the Form 8275 disclosures attached to the 2002 and 2003 tax returns estimated the amount of income tax that Sam and Charles might owe if they were in fact grantors of the IOM trusts, Form 8275 disclosures for tax years 2004 and later omitted this information.[635] The Form

---

[631] See Joint Exs. 130 (Dee and Charles 2003), 133 (Dee and Charles 2006), 134 (Dee and Charles 2007), 135 (Dee and Charles 2008), 141 (Dee 2013); IRS Exs. 40 (Dee and Charles 2004), 42 (Dee and Charles 2005), 50 (Dee and Charles 2009), 52 (Dee and Charles 2010), 54 (Dee and Charles 2011).

[632] See, e.g., IRS Ex. 155 (Sam 2003 tax return) at 47-50.

[633] See Joint Ex. 38 (Dee and Charles 2003) at SWYLY029539, 71 (Sam 2002) at 78-81, 155 (Sam 2003) at 47-146.

[634] See, e.g., IRS Exs. 40 (Dee and Charles 2004) at 65, 74 (Sam 2004) at 86.

[635] See IRS Exs. 71 at 80 (Sam 2002, estimating $13 million), 155 at 49 (Sam 2003, estimating $6 million); Joint Ex. 130 at SWYLY029541 (Dee and Charles 2003, estimating $7 million), Note that, according to the Computation

8275 disclosures attached to the Wylys' 2005 and later tax returns (i) admitted that there were multiple trusts, (ii) added that the trusts were created in the IOM, (iii) began differentiating between the 1992 trusts and the 1994/1995 trusts, and (iv) stated that there were funding issues regarding the 1994/1995 trusts that the taxpayers had discovered in 2006.[636]  The Form 8275 disclosure attached to the Wylys' 2007 tax returns described the 1999 Options Sales, pursuant to which Sam and Charles each sold options to subsidiaries of IOM trusts for cash.[637]  The Form 8275 disclosure Sam attached to his 2013 tax return added brief notes about how some of his views were in opposition the SDNY Court's grantor trust determination in the SEC Action.[638]

Since all that checking the box "yes" on the tax returns would have disclosed is that Sam or Charles and Dee were the grantor of a foreign trust or had transferred property to a foreign trust in a given year, and because the Form 8275 disclosures that the Wylys attached to their tax returns in the years identified above contained that basic information, the Court agrees with the Debtors that they cured their failure to check the correct box on their tax returns, at least from tax years 2002 through 2013 as to Sam and 2003 through 2011 as to Charles and Dee.

In summary and as it relates to Sam, after examining all of the documents that were filed with the IRS that the IRS labels as false or misleading, the Court concludes that (i) Sam's tax returns were false in the years in which he underreported income (1992-2003, 2005-2006, 2010) and in the years in which no Form 8275 disclosure was attached to his tax returns (1992-2001), and (ii) the Forms 3520 and 3520-A that he filed were false and misleading, particularly in light of the Forms 3520, 3520-A, and 5471 that should have been filed and were not (1992-2013), as

---

Stipulations, Sam owes a little over $16 million in income tax for 2002 and a little over $5 million in income tax in 2003.  Dee and Charles owe a little over $3.25 million for 2003.  *See* Computation Stipulations at Attachments A and B.

[636] *See, e.g.,* IRS Exs. 42 (Dee and Charles 2005) at 62-69, 75 at 69-105 (Sam 2005).

[637] *See* Joint Exs. 111 at SWYLY023014-23015 (Sam 2007), 134 at SWYLY030969 (Dee and Charles 2007).

[638] IRS Ex. 163 at pp. 43, 45, 47 (Sam 2013).

the IRS was never provided with an accurate portrayal of Sam's offshore system until he was forced to disclose the extent of his offshore holdings during the IRS audit. Accordingly, this badge of fraud applies to Sam.

However, this badge of fraud does not apply to Dee, as the Court is satisfied that Dee (i) did not know that the tax returns and other forms she signed that were filed with the IRS were in any way false or misleading, and (ii) did not participate in any decision to attempt to keep the extent of the offshore holdings secret through less than complete and candid reporting.

<b>l)      Failure to Cooperate with Taxing Authorities.</b>

The evidence here is conflicting. Certainly, the IRS has pointed to instances where incomplete information was provided to them in connection with an earlier, but unrelated, audit, or where inaccurate information was provided on a tax return. Overall, however, the Court is persuaded that at least as to the 2004 audit of the offshore system, the one truly relevant here, the Wylys have cooperated with the taxing authorities.

The IRS has not established this badge of fraud by clear and convincing evidence as to either Sam or Dee.

In conclusion, the IRS has established, by clear and convincing evidence, the following badges of fraud in the following years as to Sam:

| Badges of Fraud as Applied to Sam | | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| The Complexity of the Offshore System | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| The Wyly's Willingness to Commit Securities Fraud to Preserve the Secret Offshore System and to Maintain its Tax Advantages | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | |
| The Failure to Take Action to Resolve the Conflicting Advice They Received Regarding the 1992 IOM Trusts | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| The Creation of False Documents to Support the Settling of Foreign Trusts in 1994 and 1995 to Attempt to Obtain Favorable Tax Benefits for the Wylys | 1994 Trusts | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| | 1995 Trusts | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| The Treatment of the Offshore System as the Wyly Family Piggy Bank | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| The Planned Insolvency of Various IOM Corporations that had Annuity Obligations to Sam | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Understatement of Income | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Concealment of Income or Assets | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Offering False or Incredible Testimony | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Offering Implausible or Inconsistent Explanations of Behavior | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Filing False or Misleading Documents | Tax Returns | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | | | ✓ | | | |
| | Forms 3520, 3520-A, and/or 5471 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Failure to Cooperate with Taxing Authorities | | | | | | | | | | | | | | | | | | | | | | | |

As the above summary demonstrates, there are numerous badges of fraud present as to Sam each year from 1992 through 2013. And, as noted previously, while the sheer number of badges is not determinative, the significance of the badges under the facts and circumstances here have convinced the Court that the IRS has carried its burden of proof regarding Sam's liability for fraud penalties under 26 U.S.C. § 6663 for each year from 1992 through 2013.

However, as explained above, the IRS has not proven, by clear and convincing evidence, the existence of any badge of fraud as to Dee, which is obviously insufficient for it to carry its

burden of proof as to Dee. But, the IRS has one final argument in its arsenal that it uses to attempt to prove Dee's intentional failure to pay taxes known or believed to be owing—*i.e.*, the doctrine of willful blindness, to which we now turn.

### C. Was Dee Willfully Blind?

It is undisputed that the doctrine of willful blindness arose in connection with a wide range of criminal statutes. However, in *Global-Tech Appliances, Inc. v. SEB S.A.*,[639] the Supreme Court concluded that the willful blindness doctrine could be applied in civil lawsuits (there a patent infringement action). According to the Supreme Court, there are two basic requirements of the willful blindness doctrine: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."[640] If both elements are satisfied, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."[641]

Although the tax court has applied the willful blindness doctrine in at least two tax fraud cases to satisfy the knowledge requirement, it is not entirely clear that its application is appropriate here.[642] In the first place, both of these tax court cases involved relatively sophisticated taxpayers. Specifically, one involved a tax lawyer[643] and the other involved a taxpayer who was "well-educated in the intricacies of the business world, and [was] deeply involved in that world for almost 40 years."[644] Thus, these taxpayers bear little resemblance to Dee. Secondly, one of these cases—

---

[639] 563 U.S. 754, 131 S. Ct. 2060 (2011).

[640] *Id.* at 2070.

[641] *Id.* at 2070-71.

[642] *See Fiore v. C.I.R.*, 105 T.C.M. (CCH) 1141, 2013 WL 195628 at *8 (2013); *Fields v. C.I.R.*, 72 T.C.M. (CCH) 675, 1996 WL 530108, at *14 (1996).

[643] *Fiore*, 2013 WL 195628, at *1 ("Owen Fiore was a tax lawyer with a small but prominent practice.").

[644] *Fields*, 1996 WL 530108, at *1.

*Fiore v. C.I.R.*[645]—notes that "[w]illful blindness is a relatively underdeveloped area of law in Tax Court jurisprudence-at least in fraud cases… Willful-blindness fraud is more thoroughly described in criminal law."

When the doctrine of willful blindness has been applied in the criminal law context, it is not always necessary to show that the defendant engaged in affirmative acts to avoid knowledge of wrongdoing to invoke the willful blindness doctrine because "in some cases the likelihood of criminal wrongdoing is so high, and the circumstance surrounding a defendant's activities and cohorts are so suspicious, that a failure to conduct further inquiry or inspection can justify the inclusion of the deliberate ignorance instruction."[646] Nevertheless, even in the criminal context, circumstances where a willful blindness instruction to a jury is appropriate are rare.[647] And, as the Fifth Circuit stated in *U.S. v. Jones*,[648] negligence, carelessness, or foolishness is not enough to establish willful blindness.

Assuming that the doctrine of willful blindness applies here, if Dee acted with willful blindness, this Court could find the knowledge requirement for fraud penalties satisfied. And, while a case could be made that Dee's conduct here falls more closely into the negligence, carelessness, or foolishness category, the Court will analyze willful blindness to see if it would change the outcome here. Thus, the Court must determine whether it is reasonable to find here— by clear and convincing evidence—that Dee (i) subjectively believed that there was a high probability that she (and Charles while he was alive) had (a) understated income on her (their) tax

---

[645] *Fiore*, 2013 WL 195628, at *8.

[646] *U.S. v. Faulkner*, 17 F.3d 745, 766 (5th Cir. 1994).

[647] *U.S. v. Jones*, 664 F.3d 966, 979 (5th Cir. 2011) (quoting *U.S. v. Mendoza–Medina*, 346 F.3d 121, 132 (5th Cir.2003)).

[648] *Id.* at 979 n.3.

returns or (b) underpaid her (their) taxes, and (ii) then took deliberate actions to avoid learning of the fact of her (their) understated income or underpaid taxes.

After carefully considering the evidence, this Court concludes that there is insufficient evidence from which a reasonable fact finder could find, utilizing the clear and convincing evidence standard, that Dee subjectively believed that there was a high probability that she (and Charles while he was alive) had (i) understated income on her (their) tax returns or (ii) underpaid her (their) taxes. This is certainly true from 1992 through 2003. During those years, what did Dee know such that she could form a subjective belief of a high probability of understated income or underpaid taxes? At best, the record supports a finding that Dee knew that: (i) Charles had established a series of offshore trusts and related entities in the IOM, (ii) she had signed certain documents in connection with certain of the IOM trusts, the IOM corporations, or her annuity agreements issued by an IOM corporation, (iii) they lived a lavish lifestyle purchasing expensive jewelry, art, and home furnishings, and (iv) she had signed their joint tax returns.

However, on this record, the Court cannot find that Dee: (i) understood the offshore system—complex or not, (ii) understood any of the documents she had signed in connection with the offshore system—which she had not read and the Court is satisfied that if she had read she would not have understood to any great extent, (iii) knew that the items of expensive jewelry, art and home furnishings that Charles and she had purchased had been paid for by one or more of the IOM trusts or corporations, and (iv) understood their joint tax returns—which she had not read and the Court is satisfied that if she had read she would not have understood to any great extent. In point of fact, Dee's lifestyle did not change after the offshore system was established, which could have put her on notice that something was amiss. By 1990, Charles and she were rich by anyone's standard and she had become accustomed to a lifestyle that most would consider lavish.

She made purchases and someone in the Wyly family office paid the bills. Nothing changed in that regard on or after 1992.

But, even assuming that she knew and understood that Charles had established an extremely complicated offshore system; that, standing alone, is not illegal or fraudulent. Moreover, even assuming that she had read and understood the documents she had signed—nothing in them would have put her on notice of anything that should have created a subjective belief of a high probability that Charles and she had understated their income or underpaid their taxes. Their joint tax returns were extremely complicated documents that she had no role in preparing. From her perspective, they continued to be prepared as they always had—by people within the Wyly family office whom she trusted. From this Court's perspective, there is simply insufficient evidence to find—by clear and convincing evidence—that Dee knew something that should have created a subjective belief in her that there was a high probability that Charles and she had understated their income or underpaid their taxes during those years.

Now, let's analyze the later years. An IRS audit focused on the Wyly offshore system started in 2004, the Senate began investigating the Wyly offshore system in 2005,[649] the SEC began investigating Charles and Sam for alleged securities fraud about that time and, in 2010, the SEC sued Charles and Sam, among others, in the SDNY Court for alleged securities fraud. Even assuming that Dee knew all of these facts, which is not clear on this record, should knowledge of these facts have created in Dee a subjective belief of a high probability that Charles and she had understated their income or underpaid their taxes? The Court answers this question no, as to answer the question yes requires the Court to find that Dee could understand (i) the legal issues being raised by the IRS in its audit, (ii) what the Senate was investigating and what conclusions,

---

[649] Tr. Trans. 2114:9-16 (Hennington).

if any, they reached, (iii) what securities fraud was, much less what Charles was alleged to have done or ultimately found to have done, and (iv) the relevance of the securities fraud allegations to the issue of understated income or underpayment of taxes.

Again, recognizing that Dee is an intelligent but financially unsophisticated woman, the Court is convinced that she has not understood the legal issues being litigated here (many of which are the same issues that were being investigated elsewhere), which strongly suggests that she would not have understood them in that context either. In short, her three years of college and her 50 plus years as a homemaker and mother did not equip her with the ability to understand the highly complicated legal issues sufficiently such that she could form a subjective belief of a high probability that Charles and she (or she after Charles' death) had understated their (her) income or underpaid their (her) taxes. And, without such a subjective belief, we do not get to the required second element of willful blindness—*i.e.*, that Dee then took deliberate actions to avoid learning of the fact of her (their) understated income or underpaid taxes.

On this record, the IRS failed to prove—by clear and convincing evidence—that Dee was willfully blind; and thus, the IRS has failed to carry its burden of proof on the required second element of its claim for fraud penalties as to Dee for any year in which there is a stipulated underpayment of tax.

### D.  Is Dee Entitled to the Benefits of the Innocent Spouse Defense?

Next, the Court must decide whether Dee is entitled to innocent spouse relief pursuant to 26 U.S.C. § 6015 with respect to her liability for any income tax deficiencies that may be

determined for the years 1992 through 2011.[650]  Because the tax returns for the years 2012 and

2013 are not joint returns, innocent spouse relief cannot be at issue for those years.

As noted previously and as a general rule, when married persons file a joint income tax

return they become jointly and severally liable for the tax due with respect to that return.  However,

Congress concluded that under certain circumstances, such liability could be unfair.  As relevant

here, Dee seeks "innocent spouse" relief pursuant to 26 U.S.C. § 6015(b) and (c).

For the reasons explained below, this Court is satisfied that Dee is entitled to innocent

spouse relief under § 6015(b), which provides that relief from joint and several liability is available

if:  (i) a joint return was filed, (ii) there is an understatement of tax attributable to the erroneous

items of one individual filing the return, (iii) the spouse requesting relief did not know, and had no

reason to know, of the understatement at the time of signing the return, (iv) taking into account all

the facts and circumstances, it would be inequitable to hold the requesting spouse liable for the

deficiency in tax resulting from the understatement, and (v) the requesting spouse asserts the

innocent spouse defense within two years of the IRS commencing collection activities.[651]  Dee has

clearly established the first[652] and the last[653] elements for tax years 1992 through 2011.  Thus, the

---

[650] There is no innocent spouse relief for gift tax liability.  The innocent-spouse provisions apply only to income taxes imposed by subtitle A of the Internal Revenue Code, plus any related interest or penalties.  *See* 26 C.F.R. § 1.6015-1(a)(3).

[651] 26 U.S.C. § 6015(b)(1)(A)-(E).

[652] The IRS asserts that innocent spouse relief is only available through 2009 because Charles did not sign the 2010 through 2013 tax returns. However, the Court disagrees with the IRS and concludes that the returns for 2010 and 2011 are joint returns notwithstanding the lack of Charles' signature and that Charles died in 2011. *See* 26 U.S.C. § 6013(a)(2) ("no joint return shall be made if the husband and wife have different taxable years; except that if such taxable years begin on the same day and end on different days because of the death of either or both, then the joint return may be made with respect to the taxable year of each."). Dee's 2010 and 2011 tax returns were filed as joint returns. IRS Exs. 52 (Dee and Charles' original 2010 joint return), 53 (Dee and Charles' amended 2010 joint return), 54 (Dee and Charles' 2011 joint return), 55 (Dee's 2012 single return), 56 (Dee's 2013 single return).

[653] *See* pp. 176-177, *infra*.

Court's analysis will focus on the remaining elements. As discussed previously, Dee bears the burden of proof by a preponderance of the credible evidence.[654]

As just noted, § 6015(b)'s second required element is that there is an understatement of tax on the return attributable to erroneous items of the other spouse.[655] An understatement of income is defined as the excess of (i) the amount of the tax required to be shown on the return for the taxable year, over (ii) the amount of the tax that is shown on the return, reduced by any rebate.[656] An erroneous item is any item resulting in an understatement or deficiency in tax to the extent that such item is omitted from, or improperly reported (including improperly characterized) on an individual joint income tax return.[657] For example, unreported income from an investment asset resulting in an understatement or deficiency in tax is an erroneous item.[658] Similarly, ordinary income that is improperly reported as capital gain resulting in an understatement or deficiency in tax is also an erroneous item.[659] An erroneous item is also an improperly reported item that affects the liability on other returns—*i.e.*, an improper net operating loss that is carried back to a prior year's return.[660] Penalties and interest are not erroneous items.[661] Rather, relief from penalties and interest will generally be determined based on the proportion of the total erroneous items from which the requesting spouse is relieved.[662]

---

[654] *See* pp. 50-51, *supra.*

[655] 26 U.S.C. § 6015(b)(1)(B).

[656] *Id.* §§ 6015(b)(3), 6662(d)(2)(A).

[657] 26 C.F.R. § 1.6015-1(h)(4).

[658] *Id.*

[659] *Id.*

[660] *Id.*

[661] *Id.*

[662] *Id.*

As noted previously, the parties have stipulated that there is understated income on Dee and Charles' joint tax returns for years 1992, 1994 through 2003, 2006, 2008, and 2011.[663] After carefully considering the evidence at trial, the Court finds that all of the understated income for each of those years is attributable solely to Charles' activities.[664] Dee's uncontroverted testimony demonstrates that she had limited knowledge of, or involvement in, the establishment of the offshore trusts by Charles and Sam, had no specific knowledge of, or involvement in, the operation of the offshore trusts, and was not generally involved in the family's business and financial affairs.

Section 6015(b)'s third required element is that the requesting spouse establish that, in signing the return, she did not know and had no reason to know that there was such an understatement. A requesting spouse has knowledge or reason to know of an understatement if she actually knew of the understatement, or if a reasonable person in similar circumstances would have known of the understatement.[665] All of the facts and circumstances are considered in determining whether a spouse had knowledge or reason to know, including (i) the nature of the item relative to other items, (ii) the couple's financial position, (iii) the requesting spouse's educational background and business experience, (iv) the extent of the requesting spouse's participation in the activity at or before the time the return was signed about items that a reasonable person would question, (v) whether the requesting spouse failed to inquire, at or before the time the return was signed, about items on the return or omitted from the return that a reasonable person would question, and (vi) whether the erroneous item represented a departure from a recurring

---

[663] This agreement is contingent upon (i) the SDNY Court's determination of foreign grantor trust status being affirmed on appeal, which appeal is currently pending before the Second Circuit Court of Appeals, and/or (ii) this Court's collateral estoppel decision being affirmed on appeal, assuming such an appeal is taken.

[664] Indeed, Dee credibly testified that every penny of the income that was earned during her marriage was earned by her husband Charles. Tr. Trans. 164:2-4 (Dee).

[665] 26 C.F.R. § 1.6015-2(c).

pattern reflected in prior years' returns—*e.g.*, omitted income from an investment regularly reported on prior years' returns.[666]

Courts generally agree on the knowledge test in omitted income cases. For example, in *Cheshire v. C.I.R.*,[667] the Fifth Circuit stated that the proper test is whether the taxpayer knew or had reason to know about the omitted income itself, or knew or had reason to know about the income-generating transaction, referred to as the knowledge of the transaction test.[668] In *Cheshire*, the taxpayer took a large retirement distribution, part of which was used to pay off their mortgage.[669] The money used to pay off the mortgage was improperly deducted from the taxpayer's taxable income.[670] Without deciding whether the case presented facts of an omitted income or erroneous deduction case, the court found that the taxpayer had actual knowledge of the income generating transaction, a retirement distribution, so innocent-spouse relief was not available.[671]

However, in *Braden v. C.I.R.*,[672] a husband who knew that his wife had inherited money from her father's estate, but did not know that some of the money was from withdrawals from her father's IRA accounts and some from interest income, did not know or have reason to know of the understatement.[673] According to the tax court, this case could be distinguished from *Cheshire* because there the wife had actual knowledge of the underlying transaction—a distribution from a

---

[666] *Id.*

[667] 282 F.3d 326 (5th Cir. 2002).

[668] *Id.* at 333-34 & n.16.

[669] *Id.* at 330.

[670] *Id.* at 331 (the amounts in dispute "roughly correspond to the improperly deducted amounts that the Cheshires used to pay off their mortgage").

[671] *Id.* at 334-35. ("Appellant's defense consists only of her mistaken belief that money spent to pay off a mortgage is properly deductible from retirement distributions. Ignorance of the law cannot establish an innocent spouse defense to tax liability.").

[672] 81 T.C.M. (CCH) 1380, 2001 WL 283021 (2001).

[673] *Id.* at *1-2.

pension plan—while the husband in its case did not know the essential facts of the transaction that defined its character for federal income tax purposes.[674] Rather, the husband thought the money emanated from his father-in-law's estate, which would not be taxable, and the tax court found no indication that the husband should have known some of the money was from IRA accounts and interest income, which are both taxable.[675]

Another example illustrating omitted income is *Pietromonaco v. C.I.R.*,[676] where the tax court erred in denying innocent-spouse relief to a spouse who had only a high school education, and who paid household expenses from a joint checking account, but otherwise had no access to her family's finances and had no knowledge of her husband's business activity.[677] The tax court's finding that she should have known of income understatements from a cursory review of joint returns, because she was aware of her expenditures, was erroneous; her husband controlled their bank accounts, and the couple had savings built up over their 40-year marriage that could have accounted for amounts by which expenditures exceeded their reported income.[678] The couple also lived the same lifestyle both before and after the underreporting, and the taxpayer received no gifts or other benefits from the income her husband failed to report.[679]

If a spouse has actual knowledge of the underlying transaction that produced the omitted income, innocent-spouse relief will be denied, even when the spouse did not fully understand the

---

[674] *Id.* at *6.

[675] *Id.*

[676] 3 F.3d 1342 (9th Cir. 1993).

[677] *Id.* at 1334-36.

[678] *Id.* at 1346.

[679] *Id.*

tax significance of the transaction.[680]  In *Penfield v. C.I.R.*,[681] an ex-husband not only knew of pension withdrawals his ex-wife made, but had been instrumental in persuading his ex-wife to make those withdrawals.  Therefore, the tax court properly denied the ex-husband innocent-spouse relief.[682]

     With this background in mind, we return to the facts and circumstances to be considered in determining whether a spouse had knowledge or reason to know, including (i) the nature of the item relative to other items, (ii) the couple's financial position, (iii) the requesting spouse's educational background and business experience, (iv) the extent of the requesting spouse's participation in the activity at or before the time the return was signed about items that a reasonable person would question, (v) whether the requesting spouse failed to inquire, at or before the time the return was signed, about items on the return or omitted from the return that a reasonable person would question, and (vi) whether the erroneous item represented a departure from a recurring pattern reflected in prior years' returns.[683]  Many of these circumstances have been discussed in connection with the Court's fraud penalties and willful blindness analysis and will not be repeated here.[684]  However, in summary and as previously found, Dee's uncontroverted, credible testimony

---

[680] *Cheshire,* 282 F.3d at 333 ("courts have agreed that in omitted income cases, the spouse's actual knowledge of the underlying transaction that produced the income is sufficient to preclude innocent spouse relief (the 'knowledge-of-the-transaction test'); *Reser v. C.I.R.*, 112 F.3d 1258, 1265 (5th Cir. 1997) ("Courts have generally agreed that when the substantial understatement of tax liability is attributable to an *omission of income* from the joint return, the relevant inquiry is whether the spouse seeking relief knew or should have known of an income-producing *transaction* that the other spouse failed to report. In short, in omission of income cases, the spouse's knowledge of the underlying transaction which produced the omitted income is alone sufficient to preclude innocent spouse relief." (emphasis in original) (footnote omitted)); *Penfield v. C.I.R.*, 84 T.C.M. (CCH) 424, 2002 WL 31239480 at *4 (2002) ("When the substantial understatement of tax liability is attributable to an omission of income from the joint return, the spouse's knowledge or reason to know of the underlying transaction which produced the income is sufficient to preclude relief under section 6015(b)(1)."). In *Cheshire,* the taxpayer knew about the entire amount of retirement distributions even though she did not know the distributions were taxable." (internal citation omitted)).

[681] 2002 WL 31239480, at *5.

[682] *Id.*

[683] 26 C.F.R. § 1.6015-2(c).

[684] *See* pp. 52-159, *supra.*

is that she was not involved in Charles' business affairs. And, while Dee signed some documents in connection with the offshore system, the Court is satisfied that she understood very little about it or the income that was being generated offshore and not reported on their joint tax returns.

After carefully considering the record and the relevant facts and circumstances, the Court is satisfied that (i) Dee did not know about the underlying transactions that produced the unreported income from the offshore system, and (ii) a reasonable person in similar circumstances would not have known about these transactions. In short, Dee did not have the educational background or sophistication in business and tax matters to know if her tax returns contained any understatements of income. And, a reasonable person with the same educational background and lack of business sophistication as Dee would not have had a different understanding. Accordingly, Dee satisfies the third element for innocent-spouse relief under § 6015(b).

Section 6015(b)'s fourth required element is that, when considering all of the facts and circumstances, it would be inequitable to hold a requesting spouse jointly and severally liable for an understatement.[685] One relevant factor for this purpose is whether the requesting spouse significantly benefitted, directly or indirectly, from the understatement.[686] Indeed, the Fifth Circuit has characterized this factor as "the most important factor in determining inequity."[687] A

---

[685] 26 U.S.C. § 6015(b)(1)(D).

[686] 26 C.F.R. § 1.6015-2(d).

[687] *Cheshire*, 282 F.3d at 338 (internal marks omitted) (quoting *Reser*, 112 F.3d at 1270). Although the Fifth Circuit made this statement in the context of innocent spouse relief under § 6015(f) rather than § 6015(b), the language of § 6015(f) is largely identical to that of § 6015(b)(1)(D) (the subsection at issue here) and tax courts have indicated that it is appropriate to treat the considerations under these two subsections as identical. *See, e.g., Scott v. C.I.R.*, 2015 WL 5730002, at *6 (2015) (implying that considerations under the two subsections are the same); *Alt v. C.I.R.*, 119 T.C. 306, 316 (2002) ("The language of section 6015(f)(1)…does not differ significantly from the language of section 6015(b)(1)(D)…Further, the equitable factors we considered under section 6015(b)(1)(D) are the same equitable factors we consider under section 6015(f)."). The tax court has also held that cases interpreting the inequity factors under the predecessor statute to § 6015(b)(1)(D)—§ 6013(e)(1)(D)—are relevant to the inequity factors under § 6015(b)(1)(D). *Campbell v. C.I.R.*, 91 T.C.M. (CCH) 735, 2006 WL 345827, at *8 (2006); *McClelland v. C.I.R.*, 89 T.C.M. (CCH) 1329, 2005 WL 1220492, at *6 (2005).

significant benefit is any benefit in excess of "normal support."[688]  Evidence of direct or indirect

benefit may consist of transfers of property or rights to property, including transfers that may be

received several years after the year of the understatement.[689]  Thus, for example, if a requesting

spouse receives property from the non-requesting spouse that is beyond normal support and is

traceable to items omitted from gross income that are attributable to the non-requesting spouse,

the requesting spouse will be considered to have received a significant benefit from those items.[690]

"Normal support" is not measured absolutely; there is no dollar amount above which

support is deemed out of the ordinary.  Normal support is determined by comparing the couple in

question's standard of living during the tax years for which there is an alleged deficiency to the

years before.  If a couple's standard of living during the tax years in question is beyond what the

couple normally enjoyed, that can be evidence of a "significant benefit" that should have put the

requesting spouse on notice.  As the Fifth Circuit explained in *Sanders v. U.S.*,[691] "one person's

luxury can be another's necessity, and the lavishness of an expense must be measured from each

family's relative level of ordinary support."  An illustrative case is *Kistner v. C.I.R.*[692]  There, the

tax court, citing *Sanders*, examined the lifestyle of a wealthy couple:

> During 1979 and 1980, petitioner clearly lived a very affluent lifestyle. However,
> prior to 1979, petitioner was already living in the McClure residence, with its pool,
> clubhouse and tennis court, during one half of the year, and in the furnished Florida
> condominium during the other half of the year. Petitioner also was already
> benefitting from the other domestic services of the Robichauds and the use of the

---

[688] *Cheshire*, 282 F.3d at 338.

[689] *Id.*

[690] *Id.*

[691] 509 F.2d 162, 168 (5th Cir. 1975).

[692] 69 T.C.M. (CCH) 1873, 1995 WL 49287 (1995). Although *Kistner* was decided under a precursor to the current innocent spouse statute, the *Kistner* court based its decision on the following factors: "[i]n determining whether it is inequitable to hold a spouse jointly liable, we should take the following into account: (1) [w]hether the spouse significantly benefited from the items omitted from gross income, (2) whether the spouse is deserted, divorced or separated, and (3) all other relevant facts and circumstances." *Id.* at *6 (internal citations omitted).  These are among the factors that are discussed in the current IRS regulations governing the innocent spouse inequity inquiry. *See* 26 C.F.R. § 1.6015-2(d).

A-frame cabin in Michigan. The extent of the personal use of Tem-Cole's airplanes prior to 1979 is unclear, but the evidence suggests that Tem-Cole did own airplanes prior to 1979 that were used by petitioner and by Mr. Weasel.

Petitioner's standard of living during 1979 and 1980 was also not unusual in light of Mr. Weasel's wealth and level of income. As mentioned, Mr. Weasel had a net worth of approximately $8.6 million in prior years, and he received in prior years annual dividend distributions and compensation totaling over $1 million.[693]

The tax court concluded that because the taxpayer had enjoyed a lavish lifestyle for years, there was nothing unusual about her lifestyle that caused her to significantly benefit from the understatements of income on her tax returns.[694]   The petitioner was, therefore, entitled to innocent-spouse relief.[695]

As with the petitioner in *Kistner,* Dee experienced no meaningful improvement to her lifestyle during the tax years at issue. As previously found, the Wylys were extremely wealthy before the offshore trusts were established, allowing Dee to enjoy what the IRS characterizes as an opulent lifestyle.  And, she continued to enjoy that same lifestyle after the offshore system was established.   While the IRS points to purchases of expensive art or jewelry as evidence of "significant benefit" to Dee, as the Treasury Regulations and case law makes clear, significant benefit means something above and beyond the lifestyle the taxpayer previously enjoyed.  On this record, it is clear that Dee's lifestyle did not change in any meaningful way after the establishment of the offshore trusts and related corporations.

In addition to whether the requesting spouse significantly benefitted from the understatement, the tax court has also held that a material factor in determining whether it would be inequitable to hold the requesting spouse liable is whether "the failure to report the correct tax liability on the joint return results from concealment, overreaching, or any other wrongdoing on

---

[693] *Id.* at *6-7.

[694] *Id.* at *7.

[695] *Id.*

the part of the *nonrequesting* [sic] spouse."[696]  If the non-requesting spouse (here Charles) has

engaged in concealment, overreaching, or wrongdoing, this factor weighs in favor of granting the

requesting spouse (here Dee) innocent spouse relief.[697]  For example, in *Haltom v. C.I.R.*,[698] the

tax court noted that:

> [t]he second factor we look at is whether the failure to report resulted from
> wrongdoing on the part of the nonrequesting spouse. This factor weighs heavily in
> Linda's favor. It was, after all, Jerry who embezzled the money, not Linda, and we
> have already found that she had no reason to know of either the embezzlement or
> its omission from their return.

Thus, wrongdoing on the non-requesting spouse's part can weigh in favor of granting innocent

spouse relief to the requesting spouse.  This is because "[a] purpose of section 6015 relief 'is to

protect one spouse from the overreaching or dishonesty of the other.'"[699]

   This factor weighs in favor of Dee.  This Court previously found that Dee (i) did not commit

tax fraud, as none of the badges of fraud it carefully examined applied to Dee,[700] and (ii) was not

willfully blind to the fact that Charles was committing tax fraud.[701]  Conversely, Charles was

involved in the formation of the offshore system and, like Sam, controlled the movement of money

and assets through the offshore system.  In fact, Charles' offshore system and offshore activities

largely mirrored those of his brother Sam, whom the Court has found committed tax fraud by clear

and convincing evidence.[702]  The failure to report the correct tax liability on Charles' and Dee's

joint tax returns results from concealment, overreaching, and other wrongdoing on Charles' part,

---

[696] *Hall v. C.I.R.*, 108 T.C.M. (CCH) 199, 2014 WL 4119029, at *13 (2014) (emphasis added) (citing *Alt*, 119 T.C. at 314); *Johnson v. C.I.R.*, 97 T.C.M. (CCH) 1860, 2009 WL 1855767, at *6 (2009).

[697] *See Varela v. C.I.R.*, 108 T.C.M. (CCH) 483, 2014 WL 5365663, at *5 (2014); *Johnson*, 2009 WL 1855767, at *6; *Alt*, 119 T.C. at 314.

[698] *Haltom*, 2005 WL 2132599, at *7.

[699] *Becherer v. C.I.R.*, 2004 WL 2930977, at *3 (2004) (quoting *Purcell v. Commissioner*, 826 F.2d 470, 475 (6th Cir.1987)).

[700] *See* pp. 52-155, *supra*.

[701] *See* pp. 155-159, *supra*.

[702] *See* pp. 52-155, *supra*.

not Dee's. Thus, this inequity factor—which the tax court ranks along with the significant benefit factor as the "most heavily weighted" in the inequity analysis—favors Dee greatly.[703]

The regulations interpreting § 6015(b) indicate that there are other factors that may be taken into account when determining whether it would be inequitable under all of the facts and circumstances to hold a requesting spouse liable,[704] including "the fact that the requesting spouse has been deserted by the nonrequesting spouse, the fact that the spouses have been divorced or separated, or that the requesting spouse received benefit on the return from the understatement."[705] The first factor identified in the regulations—desertion—is inapplicable to Dee,[706] as Charles did not desert her. As to the second factor identified in the regulations—divorce or separation—the tax court has held that "[a]t worst…widowhood may be a neutral factor, but we find it completely untenable that this factor weighs against relief."[707] This is because the inequity that this factor is attempting to measure is the inequity that occurs when a requesting spouse is left to deal with the consequences of tax liability on his or her own by virtue of the absence of their partner. As the tax court in *Von Kalinowski v. C.I.R.*[708] stated:

> As things presently stand, petitioner and Mr. Von Kalinowski remain married. The two have not separated, and petitioner has not been left by her husband to "face the music". Instead, petitioner continues to enjoy the lifestyle and financial security that are largely attributable to her husband's assets and income. Simply put, petitioner has not been deserted in the sense foreseen by the legislators who enacted the predecessor to the section 6015(b)(1) relief from joint liability.

---

[703] *See Haltom*, 2005 WL 2132599, at *7.

[704] 26 C.F.R. § 1.6015-2(d).

[705] *Id.*

[706] Those tax courts who analyze the desertion factor tend to group it with the factor of whether the spouses are divorced or separated. *See Hall*, 2014 WL 4119029, at *13. As the Court explains below, under the analysis that the tax court applies to the divorce or separation factor, the fact that Dee is a widow is treated as a neutral factor in the Court's inequity analysis.

[707] *Haggerty v. C.I.R.*, 102 T.C.M. (CCH) 563, 2011 WL 6029929, at *4 (2011).

[708] *Von Kalinowski v. C.I.R.*, 81 T.C.M. (CCH) 1081, 2001 WL 77034, at *8 (2001).

Normally, it would seem a simple matter to conclude that a widow such as Dee has been left to "face the music" regarding her tax liability on her own. Although Dee still enjoys a great deal of financial security, she has been deprived of Charles' income, and many of the assets that she previously shared with him are now entangled in his probate estate. However, IRS Revenue Procedures, which are discussed further below, state that a widow or widower will be treated as no longer married for the purposes of the inequity analysis only if he or she "is not an heir to the non-requesting spouse's estate that would have sufficient assets to pay the tax liability."[709] This makes sense, as a widow or widower whose deceased spouse's probate estate has sufficient assets from which the tax liability can be paid has not been left to deal with that tax liability on his or her own.

Here, although Dee is Charles' heir, it is unclear whether Charles' probate estate will have sufficient assets with which to pay the tax liability at issue here. Dee bears the burden of proof on the innocent spouse defense, and since it is unclear on this record whether Charles' probate estate will be sufficient to pay the tax liability at issue here, the Court cannot conclude that her status as a widow is equivalent to that of divorce or separation for the purposes of the Court's inequity analysis. Again, however, the tax court has pointed out that "[a]t worst…widowhood may be a neutral factor" and that it would be completely untenable that this factor weighs against relief.[710] The Revenue Procedures come to a similar conclusion, and state that "[i]f the requesting spouse is still married to the nonrequesting spouse, this factor is neutral."[711] Thus, this factor is neutral as to Dee.

---

[709] Rev. Proc. 2013-34, 2013-43 I.R.B. 397.

[710] *Haggerty*, 2011 WL 6029929, at *4 (2011).

[711] Rev. Proc. 2013-34, 2013-43 I.R.B. 397.

As to the third factor identified in the regulations—benefit on the return—a "benefit on the return" encompasses situations where the non-requesting spouse's understatement leads to a tax benefit for the requesting spouse, such as a refund that is higher than that to which the couple would have otherwise been entitled[712] or a deduction by one spouse that offsets income of the other spouse.[713]  No party has argued that Dee received a benefit on her return as a result of the understatement at issue here; and thus, this factor will not be addressed further.

The regulations interpreting § 6015(b) also advise that "[f]or guidance concerning the criteria to be used in determining whether it is inequitable to hold a requesting spouse jointly and severally liable under this section," Revenue Procedure 2000-15 "or other guidance published by the Treasury and IRS" is relevant.[714]  Revenue Procedure 2000-15 provides a list of seven factors to consider, including (i) whether the requesting spouse is separated or divorced from the non-requesting spouse, (ii) whether the requesting spouse would suffer economic hardship by virtue of not being able to pay for basic living expenses, (iii) whether the requesting spouse was abused by the non-requesting spouse, (iv) whether the requesting spouse knew or had reason to know of the items giving rise to the deficiency, (v) whether the non-requesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability, (vi) whether the requesting spouse significantly benefitted from the items giving rise to the deficiency, and (vii) whether the liability for which relief is sought is solely attributable to the non-requesting spouse.[715] The most recent version of these Revenue Procedures, Revenue Procedure 2013-34, has added two additional factors to consider: (viii) whether the requesting spouse has made a good faith effort to

---

[712] *See Agudelo v. C.I.R.*, 110 T.C.M. (CCH) 24, 2015 WL 4086310, at *9 (2015).

[713] *See Hopkins v. C.I.R.*, 121 T.C. 73,82-86 (2003).

[714] *Id.*

[715] Rev. Proc. 2000-15, 2000-1 C.B. 447 (superseded by Rev. Proc. 2013-34, 2013-43 I.R.B. 397).

comply with the income tax laws in the taxable years following the taxable year or years to which the request for relief relates, and (ix) the mental and physical health of the requesting spouse both during the years in question and at the time relief is requested (collectively, the "**Revenue Procedures Factors**").[716]

While the tax court has considered the Revenue Procedures Factors in determining whether it would be inequitable to hold the requesting spouse liable, it has concluded that they are not controlling.[717] This Court will similarly consider them.

The Court has already considered the first Revenue Procedures Factor, and agrees with the tax court that widowhood is at worst neutral in the inequity analysis. This factor is neutral as to Dee.[718]

The second factor—economic hardship—is neutral here too. While Dee can certainly pay reasonable basic living expenses even if she is held liable for the tax at issue here given her wealth, the Revenue Procedures provide that "[i]f denying relief from the joint and several liability will not cause the requesting spouse to suffer economic hardship, this factor will be neutral."[719]

The third factor asks whether Dee was abused. Nothing in the record suggests that Charles abused Dee; in fact, that thought is laughable on this record. But, again, the absence of this factor is neutral.[720]

---

[716] Rev. Proc. 2013-34, 2013-43 I.R.B. 397.

[717] *Hall*, 2014 WL 4119029, at *13 (citing *Cutler v. C.I.R.*, 105 T.C.M. (CCH) 1704, 2013 WL 1875975, at *3 (2013)).

[718] *Haggerty*, 2011 WL 6029929, at *4.

[719] Rev. Proc. 2013-34, 2013-43 I.R.B. 397.

[720] *See Cutler*, 2013 WL 1875975, at *7 (interpreting predecessors to the most current Revenue Procedures and labeling the abuse factor as neutral in a case where there were no allegations of abuse); Rev. Proc. 2013-34, 2013-43 I.R.B. 397 (stating that "[f]or purposes of this revenue procedure, if the requesting spouse establishes that he or she was the victim of …then depending on the facts and circumstances of the requesting spouse's situation, the abuse may result in certain factors weighing in favor of relief when otherwise the factor may have weighed against relief…" but remaining silent on the effect of there not being abuse.).

The fourth factor is whether Dee knew or had reason to know of the items giving rise to the deficiency at issue.  As the Court has already noted in its analysis of § 6015(b)(1)(C), she did not.[721]  As found previously, Dee relied entirely on Charles to handle all tax and business matters throughout their marriage,[722] and was completely unaware of the workings of the offshore system Charles established.[723]  Thus, this factor weighs in Dee's favor.[724]

The fifth factor asks whether the non-requesting spouse (here Charles) has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability.  The tax court has noted in the case of a widowed spouse that "[c]ustomarily we find that this factor is neutral if it does not weigh in favor of relief."[725]  Since Charles and Dee never divorced, but Dee is Charles' widow, this factor is neutral as to Dee.

The sixth factor is whether the requesting spouse significantly benefitted from the unpaid income tax liability or understatement.  As previously found, this factor weighs in favor of relief for Dee.[726]

The seventh factor inquires whether the liability for which relief is sought is solely attributable to the non-requesting spouse.  This factor does not appear in the most recent version of the Revenue Procedures Factors, and in any case was already analyzed by the Court in its

---

[721] *See* pp. 162-166, *supra.*

[722] Tr. Trans. 159:20-160:15 (Dee) (relied entirely on husband throughout marriage).

[723] *Id.* at 164:5-165:3 (Dee) (first heard the name Soulieana at her deposition in July 2015, never discussed IOM structure with anyone before bankruptcy case filed), 165:22-166:23; 174:16-24 (Dee) (didn't ever see Eiseman or Marguerite Green invoices at the time purchases were made), 182:10-183:3; 183:18-20 (Dee) (never heard of Tyler IOM Trust or Keith King), 184:20-185:11, 186:12-15 (Dee) (never heard of Red Mountain IOM Trust or Shaun Cairns), 322:6-14 (Dee) (does not know what a limited partner, general partner, limited partnership, or annuity is), 188:22-189:9 (Dee) (never heard of Lincoln Creek IOM Trust), 192:8-11 (Dee) (never heard of Maroon Limited (IOM)).

[724] Rev. Proc. 2013-34, 2013-43 I.R.B. 397 ("If the requesting spouse did not know and had no reason to know of the item giving rise to the understatement, this factor will weigh in favor of relief.").

[725] *Haggerty*, 2011 WL 6029929, at *5 (citing *Bland v. C.I.R.*, 101 T.C.M. (CCH) 1023, 2011 WL 94742 (2011); *Akopian v. C.I.R.*, 102 T.C.M. (CCH) 350, 2011 WL 4550127 (2011)).

[726] *See* pp. 166-168, *supra.*

discussion of 26 U.S.C. § 6015(b)(1)(B). As previously found, this factor weighs in favor of relief for Dee, but as this factor does not appear in the most current listing of Revenue Procedures Factors and is not analyzed as a Revenue Procedures Factor by those tax courts interpreting the most recent procedures, the Court will not weigh this factor in Dee's favor.[727]

The eighth factor weighs against relief if the requesting spouse has not made a good faith effort to comply with the income tax laws in the taxable years following the taxable years to which the request for relief relates. This factor weighs against Dee, as there is no evidence in the record indicating that she has "changed course" from the positions that Charles and she took on their joint returns since he passed away. For example, Dee's tax returns in 2012 and 2013 still continue to indicate that she is not the grantor of a foreign trust.[728]

Finally, the ninth factor asks whether Dee is in poor mental or physical health or was in poor mental or physical health at the time the returns were filed. There is no evidence that Dee is—or over the time period at issue ever was—in poor mental or physical health. Thus, according to the tax court and the Revenue Procedures, this factor is neutral as to Dee.[729]

After carefully considering all possible factors identified by the courts or the Revenue Procedures, and after carefully considering "all the facts and circumstances" as § 6015(b)(1)(D) instructs it to do,[730] the Court has only found one factor that weighs against Dee's request for innocent spouse relief. The other factors are either neutral or weigh decidedly in her favor.

---

[727] *See Wang v. C.I.R.*, 108 T.C.M. (CCH) 394, 2014 WL 4976232, at *15 (2014) (tax court case interpreting most recent Revenue Procedures Factors and not analyzing this factor); *Hall*, 2014 WL 4119029, at *13-*17 (same); Rev. Proc. 2013-34, 2013-43 I.R.B. 397 (most recent Revenue Procedures, which do not analyze this factor as a part of the inequity analysis).

[728] *See* IRS Ex. 55 (Dee 2012) at 8, 56 (Dee 2013) at 4. The Court concludes elsewhere in the Memorandum Opinion that Dee is in fact a grantor of the various Isle of Man trusts that make up Charles' offshore system. *See* pp. 290-295, *infra*.

[729] *Haggerty*, 2011 WL 6029929, at *6; Rev. Proc. 2013-34, 2013-43 I.R.B. 397.

[730] 26 U.S.C. § 6015(b)(1)(D).

Significantly, the two most important factors, as identified by either the Fifth Circuit or the tax court, weigh decidedly in her favor. Dee experienced no meaningful change to her lifestyle as a result of the tax fraud at issue here, and this tax fraud was entirely attributable to Charles. These two facts go to the heart of the two factors that courts have considered to be the most important in assessing whether it is inequitable to hold the requesting spouse liable. The one lesser factor that weighs against Dee—compliance with tax laws after the years for which relief is sought—is also mitigated by the particular circumstances of her Case. Dee's credible testimony at trial was that even after Charles' death, she continued to rely on the Wyly family office to prepare her tax returns and to handle her finances, and that she has never had any reason to suspect that the Wyly family office was deficient in their duties.[731] While Dee's lack of knowledge regarding her tax responsibilities is not commendable, her lack of knowledge also means that any noncompliance with tax laws on her part is unintentional. Thus, having carefully weighed all of the facts and circumstances, the Court finds that the fourth element of § 6015(b) is satisfied, as it would be inequitable to hold Dee liable for the deficiency in tax at issue here.

While the Court does not believe that the fifth element for innocent-spouse relief under § 6015(b) is in dispute here, it concludes that it is satisfied nonetheless. To elect the application of § 6015(b), a requesting spouse must file Form 8857 (or other similar statement under penalty of perjury containing the same information required on Form 8857) with the IRS no later than two years from the date of the first collection activity against the requesting spouse with respect to the joint tax liability.[732] Collection activity can be any of the following: an 26 U.S.C. § 6330 notice, an offset of an overpayment of the requesting spouse against a liability under 26 U.S.C. § 6402,

---

[731] Tr. Trans. 160:10-161:14 (Dee).
[732] 26 C.F.R. § 1.6015-5(b)(1).

the filing of a suit by the United States against the requesting spouse for the collection of the joint tax liability, or the filing of a claim by the United States in a court proceeding in which the requesting spouse is a party or which involves property of the requesting spouse (such as a proof of claim filed in a taxpayer's bankruptcy case).[733]  Dee has asserted her right to innocent spouse relief on a timely basis.

For these reasons, the Court concludes that Dee carried her burden of proof and established each of the required elements for innocent spouse relief under 26 U.S.C. § 6015(b).  Because the Court has concluded that Dee is entitled to innocent spouse relief under § 6015(b), it need not reach the parties' arguments about her entitlement to such relief under § 6015(c).

### E.    Did Sam Establish his Reasonable Cause Defense to the Imposition of Fraud Penalties for His Income Tax Underpayments?

#### 1.  The Defense in General

Because the IRS carried its burden of proof on its claim for fraud penalties under 26 U.S.C. § 6663 as to Sam's underpayments of income tax, we must now analyze his reasonable cause defense.  As noted previously, to establish this defense, Sam must prove—by a preponderance of the credible evidence—that there was "reasonable cause" for his income tax underpayments and that he acted in "good faith with respect to [the] underpayment[s]."[734]  Moreover, 26 C.F.R. § 1.6664-4 provides, in relevant part, that:

(a) In general. No penalty may be imposed under section 6662 with respect to any portion of an underpayment upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to, such

---

[733] *Id.* § 1.6015-5(b)(2)(i). One of the examples laid out under § 1.6015-5(b)(4) specifically discusses a proof of claim: "**Example 5.** W files a Chapter 7 bankruptcy petition on July 10, 2000. On September 5, 2000, the United States files a proof of claim for her joint 1998 income tax liability. W elects relief with respect to the 1998 liability on August 20, 2002. The election is timely because it is made within two years of the date the United States filed the proof of claim in W's bankruptcy case." 26 C.F.R. § 1.6015-5(b)(4).

[734] 26 U.S.C. § 6664.

portion. Rules for determining whether the reasonable cause and good faith exception applies are set forth in paragraphs (b) through (h) of this section.

(b) Facts and circumstances taken into account—(1) In general. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.… Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith. Reliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith. Similarly, reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect. Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. (See paragraph (c) of this section for certain rules relating to reliance on the advice of others.)

\*\*\*

(c) Reliance on opinion or advice—(1) Facts and circumstances; minimum requirements. All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice (including the opinion of a professional tax advisor) as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law. For example, the taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith. In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied. The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith. For example, reliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.

> (i) All facts and circumstances considered. The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.

(ii) No unreasonable assumptions. The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

\*\*\*

(2) Advice defined**.** Advice is any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty. Advice does not have to be in any particular form.

And, while this regulation does not expressly refer to fraud penalties under § 6663, the Court believes it has applicability here, as do the parties. Both the Debtors[735] and the IRS[736] cite to 26 C.F.R. § 1.6664-4 in connection with their reasonable cause based on reliance on the advice of counsel arguments.[737] Furthermore, tax courts have also cited to this regulation in assessing the merits of reasonable cause defenses raised by taxpayers in order to avoid fraud penalties, even

---

[735] For example, Sam relies on the definition of "advice" in § 1.6664-4(c)(2) in support of his argument that he need not have read the opinions or memoranda that contained the advice he received. *See* Debtors' Post-Trial Brief [ECF No. 1117] at 49. The Debtors cite to § 1.6664-4 at other points as well. *See* Debtors' Amended Proposed Findings of Fact and Conclusions of Law [ECF No. 1102] at 180 n.723; Debtors' Post-Trial Brief [ECF No. 1117] at 31 n.41, 40 n.64, 47 n.82, 50; Debtors' Post-Trial Reply [ECF No. 1121] at 24-25, 36 n.92, 41, 43, 45.

[736] *See, e.g.,* IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶¶ 243, 245, 246; IRS Pre-Trial Brief [ECF No. 1018] at 120-21. IRS Post-Trial Brief [ECF No. 1118] at 6-9, 13, 17, 19; IRS Post-Trial Reply [ECF No. 1120] at 19, 22, 23.

[737] The Court acknowledges that 26 C.F.R. §1.6664-4(c) was not in effect for all of the years at issue, and again stresses that it is using this regulation only as a guide when engaging in an analysis of all of the facts and circumstances surrounding Sam's reasonable cause and good faith defense/attempted negation of fraudulent intent. Section 1.6664-4(c)'s explanation of reliance on the advice of a professional was first added to the regulation in 1995, *see* T.D. 8617, 1995-2 C.B. 274, and underwent some language tweaks in 2003, *see* T.D. 9109, 2004-1 C.B. 519.

MEMORANDUM OPINION                                                                 179

though the regulation applies to "penalties imposed under section 6662"—*i.e.,* accuracy-related

penalties as opposed to fraud penalties.[738]

Assessing whether someone has established reasonable cause and good faith—which is

what Sam must establish here in order to avoid fraud penalties—is a facts and circumstances

analysis that takes into account all of the relevant variables, and that "turns on the quality and

objectivity of the professional advice which they obtained."[739]  The tax court has summarized the

relevant considerations for establishing reasonable cause based on reliance on the advice of

counsel in this way: [740]

> To establish reasonable cause through reliance on the advice of a tax adviser, the
> taxpayer must meet the following three-prong test, laid out in *Neonatology Assocs.,*
> *P.A. v. Commissioner,* 115 T.C. at 98–99: (1) the adviser was a competent
> professional who had sufficient expertise to justify reliance, (2) the taxpayer
> provided necessary and accurate information to the adviser, and (3) the taxpayer
> relied in good faith on the adviser's judgment.

Some of the same tax courts who use the 26 C.F.R. § 1.6664-4 framework in order to analyze

reasonable cause in a fraud context also utilize the *Neonatology* test in order to assess whether a

---

[738] 26 C.F.R. § 1.6664-4(a); *see, e.g., Sanchez*, 2014 WL 4251054, at *9 (citing to § 1.6664-4 when assessing reasonable cause in a fraud context); *McClellan v. C.I.R.*, 106 T.C.M. (CCH) 492, 2013 WL 5849873, at *11 (2013) (same).

[739] *Brinkley v. C.I.R.*, 808 F.3d at 669 (internal marks omitted) (quoting *Klamath*, 568 F.3d at 548); *see Whitehouse Hotel Ltd. P'ship,* 755 F.3d at 249 ("Different facts in these reliance-on-advice cases certainly can lead to different results. We determine whether a taxpayer acted with reasonable cause on a case-by-case basis, evaluating the totality of the facts and circumstances." (citation and quotation marks omitted)); *Southgate Master Fund, L.L.C.*, 659 F.3d at 493 ("We determine whether a taxpayer acted with reasonable cause on a case-by-case basis, evaluating the totality of the facts and circumstances."); *see also American Boat Co., LLC v. U.S.*, 583 F.3d 471, 481 (7th Cir. 2009) ("Relying on a professional, however, will not always get a taxpayer off the hook. To constitute reasonable cause, the reliance must have been reasonable in light of the circumstances.").  Of course, in asserting that reasonable cause depends on the quality of the professional advice that is received, the Court does not imply that Sam may not rely on advice merely because it turned out to be wrong.  As the Supreme Court has pointed out in *U.S. v. Boyle*, when a professional advises a taxpayer on a matter of tax law, such as whether a liability exists or whether a return must be filed, it is reasonable for the taxpayer to rely on that advice without seeking a second opinion, even if that advice turns out to be wrong. *See Boyle*, 469 U.S. at 251; *Whitehouse Hotel Ltd. P'ship,* 755 F.3d at 249; *Stanford v. C.I.R.*, 152 F.3d 450, 461-62 (5th Cir. 1998). This is because "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney." *Whitehouse Hotel Ltd. P'ship,* 755 F.3d at 249 (quoting *Boyle*, 469 U.S. at 251).

[740] *Thomas v. C.I.R.*, 105 T.C.M. 1403, 2013 WL 690599, at *3 (2013).

**MEMORANDUM OPINION**                                                                 180

taxpayer has established reasonable cause based on the reliance on the advice of professionals.[741]

Even those courts that do not explicitly cite either § 1.6664-4 or the three-pronged *Neonatology* test assess the same facts and circumstances that both the regulation and the three-prong test examine. These courts explore whether the advisor the taxpayer relied on had all of the necessary facts,[742] whether the advisor was qualified to render reliable advice by virtue of expertise and lack of conflicts of interest,[743] and whether the taxpayer in fact relied on the advice actually received from the advisor.[744]

---

[741] *See, e.g., Sanchez*, 2014 WL 4251054, at *9.

[742] *See, e.g., Grossman v. C.I.R.*, 182 F.3d 275, 278 (4th Cir. 1999) ("A taxpayer's reliance on his or her accountant to prepare accurate returns may indicate an absence of fraudulent intent. However, as the tax court noted, a taxpayer can only rely on an accountant when that accountant has been supplied with all the information necessary to prepare the returns accurately" (internal citations and quotation marks omitted)); *Alexander Shokai, Inc. v. C.I.R.*, 34 F.3d 1480, 1486 (9th Cir. 1994) ("Taxpayers also contend that they properly relied on Edward Bartelt's expertise in preparing their tax returns. Although Taxpayers made their U.S. bank records available to Edward Bartelt, they failed to disclose the Gosen payments, the Gosen agreements or the oral contingent agreement to him. Taxpayer's failure to make a 'full' disclosure precludes their reliance on Edward Bartelt's preparation of their tax returns."); *Biaggi v. C.I.R.*, 79 T.C.M. (CCH) 1488, 2000 WL 146797, at *5 (2000) ("Since petitioner admits that he never told his accountants that he owned the Wedtech stock, his reliance on his accountants is not a defense to fraud."); *Hill v. C.I.R.*, 74 T.C.M. (CCH) 673, 1997 WL 582148, at *7 (1997) (reliance on advice of professional no defense to fraud when advisor did not have all of taxpayer's income information); *Scallen v. C.I.R.*, 54 T.C.M. (CCH) 177, 1987 WL 49208 (1987) ("While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent, this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns." (quoting *Temple v. C.I.R.*, 67 T.C. 143, 162 (1976)); *Whyte v. C.I.R.*, 52 T.C.M. (CCH) 677, 1986 WL 21695 (1986) (taxpayer could not rely on advisor when they did not provide "all of the necessary tax information"); *Lamb v. C.I.R.*, 50 T.C.M. (CCH) 1209, 1985 WL 15133 (1985) (taxpayer attempted to rely on professional to negate fraudulent intent but could not because all information not provided to professional).

[743] *See Richardson*, 509 F.3d at 740 (taxpayer ignored advice of independent attorney who advised that trust arrangement was illegal, and instead followed advice of trust management company that promoted the trust arrangement); *Sanchez*, 2014 WL 4251054, at *9 (tax advisor not competent because she did not finish college and was not a CPA); *Tarpo v. C.I.R.*, 98 T.C.M. (CCH) 282, 2009 WL 3048627, at *8 (2009) ("James asserts that he had reasonable cause for his return position and that he acted in good faith. Sec. 6664(c). He claims that the entire fiasco is Mattatall's fault, and that his good faith reliance on Mattatall reasonably caused him to act the way he did. While that excuse might work when a licensed and reputable tax professional offers the advice, it doesn't work here.").

[744] *See Richardson*, 509 F.3d at 740 (taxpayer ignored advice of independent attorney who advised that trust arrangement was illegal, and instead followed advice of trust management company that promoted the trust arrangement); *Alexander Shokai, Inc.*, 34 F.3d at 1486 ("Kenneth Bartelt advised Taxpayers that the Gosen payments were not taxable until they were brought to the United States. We agree with the tax court that Mr. Alexander did not rely on that advice because he failed to report the Gosen payments as income even after he had partially transferred them to accounts in the United States."); *Graham v. C.I.R.*, 2005 WL 730078, at *17 (2005) (taxpayers ignored advice that income was taxable); *Davis v. C.I.R.*, 78 T.C.M. (CCH) 178, 1999 WL 549152, at *14 (1999) (Taxpayer's actual, good faith reliance on members of his staff and professionals negated fraudulent intent); *Hill*, 1997 WL 582148, at *7 (reliance on advice of professional no defense to fraud when taxpayer did not follow advisor's advice); *Watson v. C.I.R.*, 54 T.C.M. (CCH) 1601, 1988 WL 4340 (1988) (same); *Hinojosa v. C.I.R.*, 44 T.C.M. (CCH) 216, 1982 WL 10649 (1982) ("If petitioners had given Mr. Ibanez the correct figures, they would have appeared on the appropriate

As noted previously, the Debtors assert that their reliance on the advice of professionals not only establishes a valid reasonable cause defense, but that it also negates the Debtors' fraudulent intent and prevents the IRS from meeting its initial burden under 26 U.S.C. § 6663.[745] It is indisputable that the IRS bears the burden to prove civil tax fraud by clear and convincing evidence, and that proof of civil tax fraud includes showing that the Debtors intended to avoid taxes that they knew or believed to be owing.[746] It is also true that whether a taxpayer relied on a professional in taking a tax position has bearing on that taxpayer's intent.[747] However, many courts that are faced with taxpayers who attempt to avoid fraud penalties based on reliance on the advice of counsel nevertheless treat such reliance as a defense rather than as a matter to be considered in assessing whether the IRS has met its initial burden to prove fraudulent intent.[748] Regardless, after

return. We recognize that petitioners had some difficulty with the language. However, they are intelligent, competent, and experienced business people whom we believe were sophisticated enough to realize what was transpiring. Accordingly, we find for respondent on the fraud issue…").

[745] *See, e.g.,* Debtors' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1102] at 154-55 ("The Wylys never intentionally failed to pay any tax they believed they owed. At all times, the Wylys acted on the advice of competent tax advisors, and they paid all taxes they believed were due. The IRS has no evidence that the Wylys believed that the conclusions of their advisors on these complex and uncertain issues were wrong. Thus the IRS cannot carry its burden as to fraud.").

[746] *See* p. 52, *supra.*

[747] *Davis*, 18 T.C.M. (CCH) 178, 1999 WL 549152, at *14 ("Petitioner's reliance upon third parties to keep his books and records and to prepare his returns indicates the absence of fraudulent intent. Petitioner, in good faith, relied on members of his staff to turn over all of his books and records and otherwise make a full and complete disclosure to his third party return preparers." (internal citations omitted)); *Garcia v. C.I.R.*, 103 T.C.M. (CCH) 1829, 2012 WL 1957703, at *8 (2012) ("As a result of Mr. Garcia's failure to supply Mr. Ostrem with information necessary to accurately prepare his personal tax returns (or notify Mr. Ostrem that the information supplied by California Radomes was incorrect), Mr. Garcia's purported reliance on Mr. Ostrem does not prove his lack of fraudulent intent. Indeed, Mr. Garcia's efforts to conceal information from Mr. Ostrem is evidence of Mr. Garcia's intent to conceal and deceive." (internal citations omitted)); *Medieval Attractions N.V. v. C.I.R.*, 72 T.C.M. (CCH) 924, 1996 WL 583322, at *59 (1996) ("We agree that there are many badges of fraud present in these cases. We conclude, however, that respondent has not negated the alternative explanation, petitioners' reliance on C & L, by clear and convincing evidence."); *Lamb v. C.I.R.*, 50 T.C.M. (CCH) 1209, 1985 WL 15133 (1985) (taxpayer attempted to rely on professional to negate fraudulent intent).

[748] *See, e.g., Durrett v. C.I.R.*, 71 F.3d 515, 518 (5th Cir. 1996) ("Good faith reliance on professional advice concerning tax laws is a defense."); *Sanchez*, 2014 WL 4251054, at *9; *Price v. C.I.R.*, 87 T.C.M. (CCH) 1239, 2004 WL 859198, at *15 (2004) (evaluating reliance on a professional as a defense to fraud); *Hill*, 1997 WL 582148; *see also Davis*, 1999 WL 549152, at *14 (reliance on a professional negated fraudulent intent because it was reasonable); *Gruber v. C.I.R.*, 69 T.C.M. (CCH) 2718, 1995 WL 315694, at *11 (1995) (evaluating badges of fraud and then discussing whether reliance on an accountant could establish a defense to fraudulent intent); *Whyte*, 1986 WL 21695 (discussing reliance on a professional alternatively as a matter of negating fraudulent intent and as a defense to fraud). Some courts also seem to consider a reliance on counsel that was not in good faith to actually support a finding of fraudulent

a careful review of the record and after considering all pertinent facts and circumstances, this Court concludes that the advice Sam received neither negates his fraudulent intent nor establishes his reasonable cause and good faith defense.[749]

In answering the question of whether Sam reasonably relied in good faith on the advice he received from various lawyers as to the income tax treatment of his offshore system and the transactions undertaken through that system under Federal tax law, the Court must decide whether the advice Sam received was based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances, after: (i) considering why Sam entered into the transactions and structured them in a particular manner, and (ii) whether Sam disclosed any fact that he knew, or reasonably should have known, to be relevant to the proper tax treatment of an item. Moreover, the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of Sam or any other person. As the regulation itself states, the advice must not be based upon a representation or assumption which Sam knew, or had reason to

---

intent. *See, e.g., Merritt*, 301 F.2d at 487 ("Consistent and substantial understatement of income is by itself strong evidence of fraud. This proof, coupled with the showing that the records were both incomplete and inaccurate, and that the petitioner did not supply the bookkeeper with all of the data necessary for maintaining complete and accurate records, is enough to warrant the Tax Court in finding fraud."); *Houser v. C.I.R.*, 70 T.C.M. (CCH) 131, 1995 WL 432633, at *13 (1995) (fact that taxpayer misled person who prepared his taxes indicated fraudulent intent); *Watson*, 1988 WL 4340 ("We do not rely solely on Joann's testimony as evidence of petitioner's fraudulent intent to evade taxes. Petitioner testified that he asked Mrs. Proctor, his tax return preparer, whether he needed to report hobby income and that she replied 'no.' Mrs. Proctor took the stand and directly contradicted petitioner's testimony. She stated that at no time had petitioner discussed any fur trading activities or any other income producing hobby, and that had she been aware of such a hobby she would have included income derived from the activity on petitioner's returns.").

[749] In so finding, the Court acknowledges that at least some tax courts have held that while reliance on a promoter cannot establish reasonable cause, it can in some circumstances negate fraudulent intent. *See Carreon*, 2014 WL 91959, at *7; *Alexander v. C.I.R.*, 106 T.C.M. (CCH) 198, 2013 WL 4606105, at *16 (2013). Nevertheless, the Court finds that Sam's reliance on Tedder's law firm, under the facts and circumstances here, did not negate Sam's fraudulent intent.

know, was unlikely to be true. Finally, even if all of these requirements are satisfied, that does "not necessarily establish that the taxpayer reasonably relied on the advice … in good faith."[750]

With this background in mind, Sam's reasonable cause and good faith defense as to his income tax underpayments fails here, as to all tax years in which there was an underpayment of income tax. In explaining its determination, the Court will first examine what advice Sam received and from whom,[751] grouping that advice when appropriate, and will then analyze Sam's reasonable cause and good faith defense in light of that advice. Some of the advice upon which Sam is alleged to have relied in good faith is contained in formal written opinions issued by various lawyers, while other advice is captured in written memorandum or emails, while still other advice was allegedly received orally. Generally, each category of advice will be discussed in chronological order, followed by the Court's findings about that advice and Sam's reasonable reliance on it in good faith.[752]

---

[750] 26 C.F.R. § 1.6664-4(c).

[751] Sam received some advice that is not relevant to the issues we will discuss here in detail. For example, Sam received twelve written opinions from Chamberlain, Hrdlicka, White, Williams, & Martin dated October 15, 2003, each one addressing whether each of the twelve annuity transactions that Sam undertook in 1992 and 1996 were listed transactions mandating disclosure under 26 C.F.R. § 1.6011-4(a). The firm concluded that they were not. *See* Wyly Exs. DM-DX. Similarly, Sam received twelve substantively identical opinion letters from De Castro, West, Chodorow, Glickfeld, & Ness, Inc. dated October 15, 2003 addressing whether each of the twelve private annuity transactions was a "reportable transaction" under 26 U.S.C. § 6011; while worded differently, the same question addressed by the Chamberlain Hrdlicka firm. The De Castro West firm reached the same conclusion that the Chamberlain, Hrdlicka firm reached—the annuity transactions were not subject to disclosure as a reportable transaction. *See* Wyly Exs. DM-DX. The fact that the private annuity transactions were not a listed transaction is not in dispute among the parties here; thus, these opinions are not relevant to any issue in dispute.

[752] In their pre-trial briefing, the Debtors argue that they have established reasonable cause for two reasons: (i) because they relied on the advice of their counsel, and (ii) because there was an honest difference of opinion as to the proper application of the tax law at issue here. The Court analyzes the Debtors' honest difference of opinion argument in the context of the Debtors' reasonable cause defenses to the imposition of International Penalties, and ultimately concludes that the Debtors' honest difference of opinion argument is identical to their reliance on the advice of counsel argument. *See* pp. 331-334, *infra*. The observations that the Court makes regarding the interchangeability of these two arguments apply with equal force to all of the Debtors' reasonable cause arguments, in both the International Penalties context and the tax fraud context.

## 2. The 1992 Private Annuity Transactions

As discussed previously, Sam entered into six complicated private annuity transactions in 1992, on which he paid no income tax at the time the transactions were undertaken. Sam received a written legal opinion from Pratter, Tedder & Graves dated February 28, 1992 "concerning the 1992 federal income tax consequences that were likely to apply to the proposed sale of 'Securities' … in exchange for a private annuity, with such sale occurring during the 1992 taxable year."[753] Like all written opinions, it was based upon certain facts, which as the opinion letter itself cautions "assumes that the program will be implemented in a manner that is unmodified from the proposed program described herein."[754] The opinion letter further cautions that "any change or deviation from the proposed plan of action described herein might produce different tax consequences than those set forth in this opinion."[755] The factual foundation underlying this opinion letter is described, in relevant part, as follows:[756]

> It is our understanding that you are considering the sale of Securities to a domestic corporation which will issue a private annuity in exchange for the Securities….

> It is our further understanding that the domestic corporation intending to purchase the Securities in exchange for the issuance of the private annuity is wholly owned by a foreign corporation which is wholly-owned by a foreign nongrantor trust.

> We also understand that the possession and/or enjoyment of the Securities being exchanged for the private annuity will reside exclusively with the acquiring corporation, and you will not preserve or reserve any control of any kind or character over such Securities or any income therefrom that would constitute a retained interest in the possession and/or enjoyment of the Securities being exchanged for the private annuity. It is thus expressly intended that you will irrevocably surrender the enjoyment, control, ownership, and all economic benefits attributable to the ownership of the Securities which are sold in exchange for the private annuity.

---

[753] Wyly Ex. BO. Dee and Charles received identical opinion letters from Pratter, Tedder & Graves. *See* Wyly Exs. BP (Charles), BQ (Dee).

[754] Wyly Ex. BO at 6221.

[755] *Id.* at 6222.

[756] *Id.* at 6222-6224.

The opinions that were then given by Pratter, Tedder & Graves based upon this factual predicate include, among others, an opinion that: (i) the sale of the Securities in exchange for a private annuity is not a taxable event to Sam in 1992,[757] (ii) the exchange of Securities for a private annuity of equivalent actuarial value is likely to be excluded from federal gift tax,[758] (iii) the subsequent exercise of the Securities by the obligor (the domestic corporation) will likely not generate a taxable event to the annuitant (Sam),[759] and (iv) Sam's subsequent contribution of the annuity to a grantor trust of which he is the grantor-settlor will likely not cause the income tax consequences to vary from those already described.[760]  The opinion letter concluded with the usual caveats that: [761]

> [s]hould there be any change in the applicable tax laws or the facts and circumstances relating to the events described herein, the opinions expressed herein necessarily require a reevaluation in the light of such changes….
>
> Our analysis is based on the facts and/or assumptions contained in this letter.  If such facts and/or assumptions are inaccurate or incomplete, our analysis and conclusions are equally inaccurate or incomplete and might vary substantially from those contained herein.

Similarly, the six Nevada corporations acquiring the options and warrants from Sam and issuing the unsecured private annuities to him received written opinion letters dated April 2, 1992 from Pratter, Tedder & Graves.[762]  These opinion letters were identical (except for the name of the entity to whom the letter is addressed).[763]  For ease, only one letter—*i.e.*, the letter addressed to East Baton Rouge Limited—will be analyzed in detail.  In summary, the firm concluded, "[b]ased

---

[757] *Id.* at 6225 (opinion A).

[758] *Id.* at 6226 (opinion B).

[759] *Id.* at 6239 (opinion H).

[760] *Id.* at 6240 (opinion I), although this transfer never occurred.

[761] *Id.* at 6242.

[762] As did the four Nevada corporations that acquired the options and warrants from Charles.  *See* Wyly Exs. BS, BU, BV, and BZ.

[763] *See* Wyly Exs. BR, BT, BW, BX, BY, and CA.

**MEMORANDUM OPINION**                                                                                                    **186**

on the information presented to us as expressed herein that it is more likely than not that the anticipated federal tax treatment ...will be as we opine herein."[764]   As relevant here, the firm provided two opinions.  The first described the anticipated tax treatment to East Baton Rouge Limited of its acquisition and subsequent sale of the options and warrants it was to acquire from Sam in exchange for issuing a private annuity to Sam.  The second opinion explained East Baton Rouge Limited's anticipated tax treatment if it subsequently relinquished its obligation to pay the annuity to Sam by paying the assuming party assets of a value worth the equivalent of the annuity liability being relinquished.  The upshot of these two opinions was that if East Baton Rouge Limited entered into a contract with a foreign corporation (that does not and will not engage in business within the United States and has no office or agent in the United States) pursuant to which the value of the cash and/or other assets exchange by it equals the value of the annuity obligation at the time of such transactions, "it is more likely than not that there should be no federal income tax consequence to [it] as [it has] incurred no economic gain or loss."[765]

So, as relevant here, taking the February and April opinion letters together, Pratter, Tedder & Graves advised Sam that it is more likely than not that: (i) Sam's sale of options and warrants to six domestic corporations that were owned by six foreign corporations that were, in turn, owned by a foreign non-grantor trust in exchange for the issuance of a private annuity of equivalent value to him will not trigger income tax or gift tax consequences to him in 1992, and (ii) the subsequent relinquishment of the options and warrants by the six domestic corporations to the six foreign corporations (who did not and will not engage in business within the United States and who had no office or agent in the United States) in exchange for the foreign corporations' assumption of

---

[764] Wyly Ex. BR at WYLYSEC01103165.
[765] Id. at WYLYSEC01103167.

the domestic corporations' annuity obligations to Sam, will not trigger income tax consequences to the domestic corporations.

There is no dispute here that (i) the domestic corporations—*i.e.*, the six Nevada corporations Sam caused to be formed—were wholly owned by the foreign corporations—*i.e.*, the six similarly named IOM corporations that Sam caused to be formed, (ii) the six similarly named IOM corporations were wholly owned by the Bulldog IOM Trust that Sam settled, (iii) the annuity Sam received was of equivalent value to the options and warrants he sold to the Nevada corporations, and/or (iv) the six IOM corporations did not and have not engaged in business within the United States and had no office or agent in the United States. However, another key factual and legal predicate to the 1992 opinion is that the Bulldog IOM Trust, which owned the six IOM corporations directly and the six Nevada corporations indirectly, be a foreign non-grantor trust. Surprisingly, there is no Pratter, Tedder & Graves opinion letter, or any other opinion letter, addressing this key predicate to the tax treatment of the 1992 annuity transactions undertaken by Sam. While Sam received opinion letters from Tedder, Chatzky & Berends[766] addressing the legal characterization of two other trusts he established in the IOM in December 1992—*i.e.*, the Lake Providence IOM Trust and the Delhi IOM Trust—those opinion letters were not received until

---

[766] Chatzky testified that he worked with Tedder's firm from time to time on particular clients, but that at some point in time they became partners in the same firm. While Chatzky could not be precise as to the timing, they became partners sometime between the April 1992 opinion letters just discussed and the May 19, 1993 opinion letters. Tr. Trans. 1134:12-1136:24 (Chatzky). Moreover, by February 22, 1996, Tedder and Chatzky were no longer law partners because Tedder "had a penchant for making statements to people that were either questionable or flatly untrue …." *Id.* at 1137:15-17. According to Chatzky, this made him uncomfortable, so the firm dissolved and Chatzky returned to practicing law through his own firm, Chatzky & Associates. *Id.* at 1138:18-1139:9. After the dissolution of their law firm, Chatzky testified that he no longer worked on common clients with Tedder, *id.* at 1139:16-20, and has never seen him again, *id.* at 11411-5.

May 19, 1993.[767] And, while Chatzky testified that he "believes" there were opinions issued for the Bulldog IOM Trust,[768] no such opinion(s) was introduced into evidence.[769]

With this background in mind, we can now evaluate Sam's reasonable cause and good faith defense surrounding the income tax consequences of the 1992 annuity transactions he undertook. There are at least two insurmountable problems with Sam's defense as it relates to the 1992 annuity transactions as explained below.

First, the law is clear that Sam cannot rely upon an opinion of a promoter of the tax scheme in question to support a reasonable cause and good faith defense. When the Court uses the term "promoter," it is invoking the concept that reliance on a professional "may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about."[770] Reliance on a professional who stands to profit considerably from a taxpayer's participation in a

---

[767] *See* Wyly Exs. CB (Lake Providence IOM Trust) at SWYLY005378 and CC (Delhi IOM Trust) at SWYLYSEC01100186. The letters are identical and, based on the factual assumptions contained in the letters, the firm opines that "it is more likely than not that the trust will be construed to constitute a valid non-grantor trust for United States taxation purposes provided that the trust operates in accordance with the terms and provisions contained in the Trust Agreement."

[768] Tr. Trans. 1170:9-11 (Chatzky).

[769] In fact, while Debtors' counsel attempted to refresh Chatzky's recollection using a draft opinion letter dated February 2, 1992, that draft is unsigned and was not offered into evidence. Accordingly, there is no evidence in the record as to whether an opinion regarding the Bulldog IOM Trust was ever finalized, signed and issued to Sam. It goes without saying, therefore, that we have no idea on this record what such an opinion, if ever finalized, signed and issued, would have said.

[770] *Neonatology Assocs.*, 115 T.C. at 98; *see also Gustashaw v. C.I.R.*, 696 F.3d 1124, 1139 (11th Cir. 2012) ("Reliance is not reasonable if the adviser was a promoter of the transaction or otherwise had a conflict of interest about which the taxpayer knew or should have known."); *Stobie Creek Inv., LLC*, 608 F.3d at 1381 ("Reliance is not reasonable, for example, if the adviser has an inherent conflict of interest about which the taxpayer knew or should have known."); *American Boat Co.*, 583 F.3d at 481 ("A taxpayer is not reasonable, however, in relying on an adviser burdened with an inherent conflict of interest about which the taxpayer knew or should have known."); *Mortensen v. C.I.R.*, 440 F.3d 375, 387 (6th Cir. 2006) ("advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment."); *Addington v. C.I.R.*, 205 F.3d 54, 59 (2d Cir. 2000) ("It is unreasonable for taxpayers to rely on the advice of someone who they know has a conflict of interest."); *Chamberlain v. C.I.R.*, 66 F.3d 729, 732 (5th Cir. 1995) ("taxpayers may not rely on someone with an inherent conflict of interest"); *Goldman v. C.I.R.*, 39 F.3d 402, 408 (2d Cir. 1994) (it is not reasonable for a taxpayer to rely on a professional they know is "burdened with an inherent conflict of interest.").

transaction on which that professional advises—or who is not an independent professional—may not be reasonable.[771] This is because, in order to establish reasonable cause or to negate fraudulent intent, a taxpayer must rely on a professional in good faith.[772] The promoter status of a tax advisor goes to the heart of whether a taxpayer's reliance was in good faith. As one tax court has phrased it: "[t]he caselaw is clear on this point—promoters take the good-faith out of good-faith reliance."[773]

Tax courts have also noted "what exactly makes a tax adviser a promoter has been less than clear."[774] Some courts have defined a promoter as "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction."[775] However, these courts have also noted that this definition needs to be applied with caution because of its potential breadth, and tend to only apply it "when the transaction involved is the same tax shelter offered to numerous parties."[776] However, another tax court used the broad definition of "promoter" without similar caveats, applying this definition where the promoter in question "charged $120,000 … set up the various entities and coordinated the deal from start to finish."[777]

---

[771] *See Neonatology Assocs.*, 115 T.C. at 98.

[772] *Id.* at 99.

[773] *6611, Ltd. v. C.I.R.*, 105 T.C.M. (CCH) 1309, 2013 WL 560866, at *29 (2013) (citing *106 Ltd. v. C.I.R.*, 684 F.3d 84, 90–91 (D.C. Cir. 2012), *aff 'g* 136 T.C. 67 (2011); *Neonatology Assocs.*, 115 T.C. at 98.

[774] *106, Ltd.*, 136 T.C. at 78.

[775] *Id.* at 79 (quoting *Tigers Eye Trading, LLC v. C.I.R.*, 97 T.C.M. (CCH) 1622 (2009)).

[776] *Id.*; *see also Blum v. C.I.R.*, 130 T.C.M. (CCH) 1099, 2012 WL 129801, at *16 (2012), *aff'd*, 737 F.3d 1303 (10th Cir. 2013) (adopting the same caveat).

[777] *Paschall v. C.I.R.*, 137 T.C. 8, 23 (2011) (internal quotation marks omitted) (citing *106 Ltd.*, 136 T.C. at 79 (*quoting Tigers Eye Trading*, 97 T.C.M. 1622 (2009)); *see also New Phoenix Sunrise Corp. v. C.I.R.*, 132 T.C. 161, 193 (T.C. 2009) (reliance on Jenkins and Gilchrist who "actively participated in the development, structuring, promotion, sale, and implementation" of a transaction was unreasonable, no caveat given.); *Maguire Partners-Master Investments, LLC v. U.S.*, 2009 WL 4907033, at *21 (C.D. Cal. 2009) ("Finally, the partnerships have failed to demonstrate that they sought and received disinterested and objective tax advice because the tax advice that they did receive came from Arthur Andersen, which also arranged the transactions resulting in the increased basis that is at issue in this case. Therefore, the partnerships have failed to demonstrate that they acted in good faith as required by the reasonable cause exception of I.R.C. § 6664(c)(1).").

Many definitions of "promoter" are negative—*i.e.* they define what a promoter is not as opposed to what a promoter is. One tax court noted that a tax advisor is not a promotor when the advisor (i) has a long-term and continual relationship with the client, (ii) does not give unsolicited advice regarding the tax shelter, (iii) advises only within his field of expertise (and not because of his regular involvement in the transaction being scrutinized), (iv) follows his regular course of conduct in rendering his advice, and (v) has no stake in the transaction besides what he bills at his regular hourly rate."[778] The Federal Circuit has noted that "[a]dvice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question."[779] According to the Fifth Circuit, "taxpayers may not rely on someone with an inherent conflict of interest," *i.e.* a promoter.[780]

The SDNY Court found Tedder to be a promoter in the SEC Action;[781] and, as noted previously, this Court gave collateral estoppel effect to that finding here. And, while the Wylys now argue that Tedder was not a "promoter," their own documents refer to him as such. For example, IRS Exhibit 96 is an internal memorandum from Hennington and Boucher to, among others, Sam and Charles, in which they state "David Tedder, the attorney who originally promoted the 1992 trusts and annuity transactions is now in jail, having been prosecuted for various offences including fraud."[782] Moreover, that Tedder promoted, sold, or pitched the complex offshore

---

[778] *106 Ltd.*, 136 T.C. at 79 (citing *Countryside Ltd. P'ship. v. C.I.R.*, 132 T.C. 347, 352–55 (2009)).

[779] *Stobie Creek Inv. LLC*, 608 F.3d at 1382 (citing cases).

[780] *Chamberlain*, 66 F.3d at 732 (citing *Goldman v. C.I.R.*, 39 F.3d 402 (2d Cir.1994)); *see also Streber v. C.I.R.*, 138 F.3d 216, 219 (5th Cir. 1998) (citing *Chamberlain* for this proposition).

[781] Collateral Estoppel No. 5 ("In early to mid-1991, Sam Wyly asked Robertson to attend a seminar held by lawyer and *trust promoter* David Tedder on the use of foreign trusts as a method of asset protection and tax deferral) (emphasis added).

[782] *See* IRS Exs. 96 (memo from Hennington and Boucher to, among others, Sam and Charles) at WYLYSEC01112395 § V.c, Ex. 97 (memo from Boucher and Hennington to, among others, Charles and Sam) at 2 ("They [the IRS] are not comfortable from a reasonable cause basis for penalties if the taxpayer relied solely on the legal opinion written by the same person who was promoting the structure (Teddar [*sic*].").

system and related annuity transactions to Sam and Charles, and that he would tell Sam and Charles anything they wanted to hear, is clear from both Sam's direct testimony and Chatzky's testimony explaining why Tedder and he ceased practicing law together, respectively.[783] As explained by Chatzky, he and Tedder are no longer law partners because Tedder "had a penchant for making statements to people that were either questionable or flatly untrue ...."[784] Chatzky gave an example of a client asking Tedder if an estate planning concept had ever been tested by the IRS, has it ever been audited, and the "correct answer is 'No, it hasn't been tested ... [or] audited' [b]ut David Tedder would say, 'oh, yeah, it's been audited hundreds of time, and the IRS in each case passed it.'"[785] According to Chatzky, this made him uncomfortable, so their law firm dissolved and Chatzky returned to practicing law through his own firm, Chatzky & Associates.[786] Thus, this Court is satisfied that even without giving collateral estoppel effect to the SDNY Court's finding in the SEC Action, Tedder's law firm, Pratter, Tedder & Graves, promoted the offshore scheme to Sam and Charles and thus the firm's opinions cannot be relied upon by Sam in asserting his reasonable cause and good faith defense with regard to the 1992 annuity transactions.

Now, to attempt to avoid the well-settled law that he cannot rely upon the advice of a "promoter," Sam argues that Tedder did not really write the opinions that Tedder signed on behalf of Pratter, Tedder & Graves. Rather, Sam argues that Chatzky actually researched and ghost-wrote the opinions signed and issued by Tedder's firm. Factually, that is true. Chatzky testified at trial that he wrote the opinions that Tedder's firm then issued to the Wylys. Significantly, however,

---

[783] Tr. Trans. 1052:1-4 (Sam admitting to having referred to Tedder as "a pitchman, a salesman, and a rainmaker" and that Tedder and Chatzky were the "architects" of the offshore system). *See also* SEC Tr. Trans. 1717:4-15 (French testifying that Tedder "had something to sell and he was a little bit of a salesman"), 3773:5-11 (French testifying he thought of Tedder as "a little bit of like a hustler"); Wyly Ex. OB at WYLYSEC01112416-2417 (Lubar referring to Tedder as a promotor).

[784] Tr. Trans. at 1137:15-17 (Chatzky).

[785] *Id*. at 1137:18-1138:21 (Chatzky).

[786] *Id*. at 1138:18-1139:9 (Chatzky).

when asked on direct examination why Tedder signed the opinions instead of him, Chatzky

testified that "[his] understanding" was that the Wylys "engaged Pratter, Tedder & Graves to …

draft the opinions and, therefore, the opinions were submitted to David Tedder for his

signature."[787] So, while Chatzky met Sam at the Malibu meeting where Tedder "pitched"[788] the

offshore system and the private annuity deal to Sam and Charles, Chatzky apparently considered

Tedder to be the Wylys' lawyer, not himself. Moreover, Chatzky testified that the opinion was[789]

> his [Tedder's] opinion. He can change his mind or he cannot sign it or he can make
> adjustments or amendments, whatever. And I'm not aware of any such changes
> that he made. So his [Tedder's] involvement, really, was to read the opinion and
> either sign it or contact me for – with questions.

Ironically, Sam's own trial testimony makes clear that he was relying on the advice of

Pratter, Tedder & Graves, as he misunderstood who Chatzky was at the Malibu meeting. Sam

clearly thought Chatzky was another lawyer at Pratter, Tedder & Graves, and that Chatzky was

the more scholarly of the two attorneys.[790] But Sam was wrong—at least as to who Chatzky was.

Chatzky was not a lawyer at Pratter, Tedder & Graves. Chatzky had his own law firm and, while

he worked with Tedder from time to time, there is no evidence in the record that Chatzky was

retained by the Wylys at this time to give advice to the Wylys.[791]

---

[787] *Id.* at 1190:17-23 (Chatzky).

[788] Sam confirms that Tedder "pitched" his offshore system to Sam and Charles at a meeting at Sam's home in Malibu in 1992. Tr. Trans. 1050:23:21-25 (Sam). Sam was then asked—"You've described Mr. Tedder as a pitchman, a salesman, and a rainmaker. Is that correct," to which Sam replied "yes." *Id.* at 1052:1-4. Sam was then asked "and he was the architect of this offshore system, wasn't he?" Sam's responds "[h]e and his firm, including Mr. Chatzky, were the architects of it." *Id.* at 152:5-8.

[789] Tr. Trans. 1162:8-17 (Chatzky).

[790] *Id.* 702:4-11 (Sam explaining that after Tedder's New Orleans seminar, "the next thing after that was I had a session with the—the two principals in the law firm in California who were out there. Michael Chatzky was sort of the legal scholar who wrote the documents to set it up, and David Tedder was sort of the []rain maker, the marketer of the— for the legal services."); 1051:23-25 (Sam stating "I think I described him [Tedder] as the rainmaker and the more scholarly attorney as Mr. Chatzky—of the partners of the firm, is my take on it."), 1074:3 (Sam) ("Q. And Pratter, Tedder & Graves as Mr. Tedder's law firm. Is that correct? A. Yes, Mr. Tedder, Mr. Chatzky and others.").

[791] *See id.* at 1190:18-23 (Chatzky) ("It's my understanding that the party, the client—Sam Wyly or Charles Wyly, whoever the appropriate client was at the time—engaged Pratter, Tedder, & Graves to—to draft the opinion and,

But, even assuming that Chatzky gave Sam advice in 1992 and 1993—*i.e.*, the advice contained in the opinion letters he ghost-wrote for Pratter, Tedder & Graves to issue to the Wylys and the offshore entities they caused to be formed in those years, there is no opinion that it is more likely than not that the Bulldog IOM Trust will be construed to be a valid non-grantor trust for United States tax purposes. As noted previously, that was a key factual assumption underlying the 1992 opinions issued by Pratter, Tedder & Graves (as ghost-written by Chatzky) to Sam.

Because Tedder's law firm promoted the offshore system to Sam and Charles, the advice Sam received from Pratter, Tedder & Graves cannot be used to establish a reasonable cause and good faith defense as a matter of law. Moreover, without evidence of the receipt of advice concerning the legal characterization of the Bulldog IOM Trust as a foreign non-grantor trust, a key factual and legal assumption underlying the advice received was not established. For either of these reasons, Sam's reasonable cause and good faith defense fails as to the 1992 annuity transactions in each tax year in dispute among the parties unless Sam received advice regarding the proper legal characterization of the Bulldog IOM Trust as a foreign non-grantor trust thereafter.

Moreover, as discussed previously, French, acting as Sam's agent, learned in 1993 that Lubar had concluded that there was a "significant risk" that the 1992 IOM trusts—*i.e.*, as relevant to Sam, Bulldog IOM Trust, Lake Providence IOM Trust, and Delhi IOM Trust—would be characterized as grantor trusts as to Sam under 26 U.S.C. § 679 because income was being accumulated for the benefit of U.S. beneficiaries.[792] Moreover, French learned that Lubar had concluded that the IOM trustee's power to add or substitute other foreign charities would cause the 1992 IOM trusts to be characterized as grantor trusts as to Sam under 26 U.S.C. § 674. For the

---

therefore, the opinions were submitted to David Tedder for his signature."). In 1992, when Chatzky ghost wrote the opinion letters for Tedder, he and Tedder were not partners. *Id.* at 1135:21-11136:3 (Chatzky).

[792] *See* pp. 26, 86, *supra*; Collateral Estoppel No. 18.

reasons already explained, what French learned from Lubar regarding the proper legal characterization of the 1992 IOM trusts is imputed to Sam, once his agent and trusted advisor French learned it.[793] And, as previously found, Sam did nothing further to investigate Lubar's conclusions thereafter until October 2003, when the Meadows Owens firm was asked to confirm Lubar's analysis—both Lubar's original analysis from 1993 and his updated analysis from mid-2003. Thus, from 1993 through September 2003,[794] Sam could not have relied in good faith on the advice he received from Pratter, Tedder & Graves—even assuming that firm was not a tax promoter and/or that Sam somehow received informal "advice" from them or someone else that the Bulldog IOM Trust was likely a valid non-grantor trust, of which there is no evidence in the record and we know that no formal written opinion was ever signed and issued to Sam to that effect—as Sam was on notice of the fact that an international tax lawyer hired on his behalf by French, Lubar, had an alternative view of the tax attributes of the 1992 IOM trusts and related transactions, which Sam ignored.

The record is silent on any other advice actually received by Sam regarding the proper legal characterization of the Bulldog IOM Trust as a foreign non-grantor trust from 1993 to October, 2003. While Meadows Owens—specifically, Owens—began representing the Wylys on tax and estate planning matters in 1998, there is no evidence in the record that Meadows Owens ever independently investigated the proper legal characterization of any of the 1992 IOM trusts as foreign grantor or non-grantor trusts during that time period. And, while Evan testified as to the topics on which Owens gave the Wylys advice at certain Wyly family meetings during this time

---

[793] *See* pp. 84-87, *supra*.

[794] As will be explained later, acting on Sam's behalf, Hennington received advice from Meadows Owens in October 2003 that Sam had a "reportable position" contrary to Lubar's conclusions—both those expressed originally in 1993 and those expressed in mid-2003, after Lubar did further research at Hennington's request, again acting on Sam's behalf. *See* pp. 199-201, *infra*.

period, and outlines of discussion topics covered by Owens at those meetings were introduced into evidence at trial,[795] the statements attributed to Owens were not admitted for their truth,[796] but rather to establish Sam's state of mind—*i.e.*, what he understood about the trusts as it may be relevant to his fraudulent intent or lack thereof or his reasonable cause and good faith defense or lack thereof.[797]

But even considering Evan's testimony in this regard, it is not terribly helpful. For example, Evan testified regarding the topics discussed by Owens at a Wyly family meeting in approximately April 2000 as delineated in IRS Ex. 110.[798] For the most part, Evan was asked to read the topic headings contained in Owen's discussion outline, and Evan then confirmed that the topic was discussed, that advice was given by Owens on that topic and that he and his father heard the advice and to the best of Evan's knowledge, his father followed the advice given. Of course, without knowing exactly what advice, if any, was *actually* given by Owens, it is of no real consequence here that Sam heard it, as it is not possible to evaluate the relevance of the actual advice to Sam's reasonable cause and good faith defense. Moreover, that Sam followed the advice suffers from the same flaw plus another—*i.e.*, the "to the best of Evan's knowledge" caveat makes the testimony of virtually no assistance to the Court's evaluation of Sam's defense, as there is

---

[795] *See, e.g.*, Wyly Ex. KL (Confidential Conference Outline dated July 14, 1999), IRS Ex. 110 (Confidential Conference Outline dated April 25, 2000), & IRS Ex. 111 (Confidential Conference Outline dated September 7, 2000).

[796] Owens died in July 2003. Thus, he did not testify at trial and the IRS objected to the admission of any testimony from Sam or Evan concerning what Owens had told them on hearsay grounds. That lead to the Debtors' arguments that the purported advice was not being offered for its truth, but rather the impact the receipt of that purported advice had on Sam's state of mind.

[797] As the Court stated in ruling on the IRS' objection to the admission of Evan's testimony regarding advice given by Owens to Sam, "[g]iven that it is being stipulated that the evidence is coming in not for the truth of the matter asserted but the impact that the statements, whatever they are, whether accurate or not, had on the state of mind of Sam Wyly and then, I guess as corroboration, Evan Wyly since he was also at the meeting, the Court will admit it for that limited purpose." Tr. Trans. 1674:9-20 (oral ruling).

[798] Tr. Trans. 1084:16-1089:13 (Evan); Laurie recalled the family meetings covering more personal matters than financial matters, *id.* 1512:6-8, and she could not recall anything specific Owens discussed at such meetings, *id.* 1510:4-12. Hennington recalled Owens attending a family meeting that she attended, and that Owens discussed the IOM trusts and corporations "in a broad sense, Rodney gave an overview to the family." *Id.* 1922:2-14 (Hennington).

nothing in the record from which the Court can conclude that Evan would have any reason to know if his father followed some particular advice given to his father by Owens or not.

Similarly, Evan testified about IRS Exhibit 111, another Owen's discussion outline dated September 7, 2000, confirming that Owens gave advice on each topic, that Sam and he heard the advice, and to the best of Evan's knowledge, his father followed that advice. This testimony was similarly unhelpful for the reasons just explained—and another, as explained below.

The Owens' outline for the September 2000 meeting discusses "Tax Characterization of 1992 Trusts, During Charitable Interest Term" and goes on to state that "[t]he 1992 Trusts are characterized as 'foreign nongrantor trusts' ['FNGT'] for so long as the Grantor is living, plus two (2) years thereafter."[799] That statement is true, as far as it goes. That is certainly what the original documents say—but that statement does not reflect any independent analysis of the proper legal characterization of the 1992 IOM trusts by Owens or his firm. Moreover, we know that the status of the 1992 IOM trusts was analyzed by Meadows Owens in October 2003, which strongly suggests that such analysis had not been done before, or the earlier memoranda from Owens' files at the firm would have been relied upon instead or simply updated.

Finally, and as alluded to previously, what is missing from Evan's testimony is any detailed understanding of what Owens actually said under each discussion topic[800] and/or, more importantly, what Owens actually did in order to give the advice that Evan testified Owens gave. Did Owens independently analyze the original transactions to come to an independent opinion

---

[799] IRS Ex. 111 at SWYLY009417 (emphasis in original).

[800] Of course, the IRS objected on hearsay grounds to Evan attempting to testify as to what Owens actually said at the family meetings. And, the Court was prepared to sustain the objection, which led to the Debtors' argument that the testimony was being offered, not for the truth of the matter asserted but for its impact on Sam's state of mind. As the Court stated in ruling on the IRS' objection to the admission of Evan's testimony, "[g]iven that it is being stipulated that the evidence is coming in not for the truth of the matter asserted but the impact that the statements, whatever they are, whether accurate or not, had on the state of mind of Sam Wyly and then, I guess as corroboration, Evan Wyly since he was also at the meeting, the Court will admit it for that limited purpose." Tr. Trans. 1674:9-20 (oral ruling).

regarding their validity, proper legal characterization, and proper tax treatment or did he simply assume that the original Tedder and/or Chatzky opinions were correct and he then proceeded to update those opinions based upon changes in the tax laws? Did Owens ever see the earlier opinion at all? Or, did Owens just rely on French, Robertson, or later Hennington, who could have told him what had already been done and then built onto that existing structure? On this record the Court has no idea what Owens was or was not told, and/or did or did not do to independently analyze the original structures as implemented by the Wylys. And, while some Meadows Owens' memoranda were introduced into evidence at trial, those memoranda pertain to other topics, not the legal characterization of the 1992 IOM trusts or the validity of the 1992 annuity transactions and their proper tax treatment.[801]

Moreover, even assuming that Owens undertook independent research regarding the 1992 annuity transactions and their tax treatment at this time, we have no idea what facts Owens based his independent analysis and advice upon, as the IRS correctly argues. Sam did not give Owens the facts, nor did Evan. In fact, no witness could articulate the facts upon which any advice Owens gave was based. The best that anyone could do was to say that Owens appeared knowledgeable and that he was given access to anything he needed. For example, Evan testified that Owens "was very well informed on the Isle of Man trusts. We had several family meetings with him where he went into a lot of details on each of the trusts. It was very clear he had a wealth of knowledge regarding those trusts." [802] However, on cross-examination, Evan was unable to delineate what specific facts Owens' advice was based upon.[803]

---

[801] *See, e.g.,* IRS Exs. KJ (a memorandum to French and Robertson regarding loans from foreign grantor and non-grantor trusts (without analyzing the Wyly trusts per se)) and KM (a memorandum to Owens and Pulman from Stroud (at Meadows Owens) discussing the disadvantages of direct foreign investments in U.S. real property).

[802] Tr. Trans. 604:25-605:4 (Evan).

[803] *Id.* at 752:5-754:7 (Evan).

From the Court's perspective, the fact that Owens appeared knowledgeable is not a sufficient predicate from which the Court can find that his opinions, assuming any relevant to these issues were actually given, were based on adequate facts to make them sound. Lawyers can often appear knowledgeable, but whether they know all the relevant facts that will enable them to give informed and reliable advice is a different question, which simply cannot be answered on this record.

That brings us to 2003. Recall that Boucher learned of Lubar's 1993 conclusions about the proper legal characterization of the 1992 IOM trusts as grantor trusts as to Sam in 2003 through a chance meeting with him in the Cayman Islands, which led to a flurry of activity as discussed *supra* at pp. 26-28. Recall that Hennington and Boucher met with Lubar in mid-2003 in London to discuss his conclusions regarding the 1992 IOM trusts and the private annuity transactions undertaken through them in 1992 and that their notes from that meeting are summarized in a memorandum[804] they prepared dated June 30, 2003 addressed to Sam, Charles, Evan and Donnie, as discussed *supra* at pp. 117-120. Finally, recall that this led to an August 2003 anonymous meeting with the IRS on the Wylys' behalf as Lubar had recommended.

When this meeting with the IRS had not resolved anything by mid to late September 2003 and Sam's deadline to file his 2002 tax return was quickly approaching (October 15, 2003), Hennington testified that she turned back to Meadows Owens, who had been advising the Wylys about various aspects of the offshore system and transactions within that offshore system for a few years, for advice on what to do. Specifically, Hennington, acting as Sam's agent, asked Meadows Owens to advise them what they should do with Sam's 2002 tax return given Lubar's conclusions that: (i) the Bulldog IOM Trust "should be classified as a grantor trust because [a] the Trust should

---

[804] IRS Ex. 96.

be treated as having U.S. beneficiaries and [b] the Trustee may add beneficiaries,"[805] and (ii) that the 1992 annuities could be attacked by the IRS on various grounds as summarized in the memorandum Boucher and she had prepared dated June 30, 2003.[806] Because Owens had died earlier that year, Hennington turned to two other Meadows Owens' partners—*i.e.*, Pulman and Cousins—for this advice.

So, what advice did Pulman and Cousins give the Wylys and when was it given? First, we know that Pulman testified that they did not have a lot of time to consider the issues as Hennington came to them in late September.[807] Second, we know that Hennington met with Pulman, Cousins and two other Meadows Owens' lawyers on October 8, 2003 to discuss five options that Meadows Owens had determined could be pursued by Sam given his October 15 filing deadline for his 2002 tax return.[808] One of those options was for Sam to file a Form 8275 disclosure with his 2002 tax return, on which Sam would disclose Lubar's conclusions regarding the tax positions Sam had previously taken and was continuing to take. This was the option recommended by Meadows Owens and is the option that Sam pursued. Third, we know that in preparation for the meeting with Hennington, Pulman received a memorandum from Michelle Weinstein dated October 1, 2003, in which she stated her disagreement with Lubar's conclusions under 26 U.S.C. § 674(a).[809] Fourth, we know that on October 19, 2003, Pulman received a memorandum from David Kniffen,

---

[805] IRS Ex. 99 at WYLYSEC01109030.

[806] IRS Ex. 96 at WYLYSEC01112399-2401.

[807] Tr. Trans. 2561:7-11 (Pulman testifying that Hennington met with Cousins around September 19, 2003, while Pulman was out of the office); 2563:19-2564:2 (Meadows Owens was asked for advice regarding Sam's tax return that was due October 15, 2003); 2567:17-18 ("we didn't have a lot of time. Between late September and October 15th.").

[808] Wyly Ex. OC. Tr. Trans. 1974:20-1983:1 (Hennington discussing Wyly Ex. OC).

[809] Wyly Ex. LQ. *See also* Wyly Ex. OC (Cousins' notes from an October 8, 2003 meeting among various Meadows Owens attorneys and Hennington in which Meadows Owens explained five options to address Sam's upcoming tax filing deadline in light of Lubar's memorandum and anonymous meeting with the IRS); Tr. Trans. 2564:6-8, 2605:20-2606:13 (Pulman discussing Wyly Ex. LQ).

in which he stated his disagreement with Lubar's conclusions under 26 U.S.C. § 679, among other provisions.[810]

Based on Pulman's testimony at trial, it appears that he advised Hennington in late October 2003 that he believed the Wylys had a "reportable position"[811] that was contrary to Lubar's conclusions about the grantor trust status of the 1992 IOM trusts.[812] However, Pulman never personally advised the Wylys that the 1992 IOM trusts were properly characterized as foreign non-grantor trusts.[813] Moreover, on this record it does not appear that Meadows Owens ever gave advice confirming the validity and proper legal characterization of the 1992 IOM trusts and the tax consequences flowing from transactions undertaken through those trusts.[814]

So, where does this leave us in evaluating Sam's reasonable cause and good faith defense as to the validity and proper tax treatment of the 1992 annuity transactions? We know that (i) a

---

[810] Wyly Ex. LR; Tr. Trans. 2566:9-2571:24, 2618:16-2621:17 (Pulman discussing Wyly Ex. LR).

[811] According to Pulman, a "reportable position" "means basically that the position in the tax law is arguable… it's an arguable position that can go either way."). Tr. Trans. 2620:6-18 (Pulman).

[812] Tr. Trans. 1981:19-1982:2 (Hennington discussing October 8, 2003 meeting with various Meadows Owens lawyers where the attorneys recommended that the Wylys file Form 8275 disclosures because "it allowed us to fully report the [Lubar] issue and protect against penalties, but at the same time we had a reportable position to continue to prepare the tax returns in the manner that we always had."); Wyly Exs. LQ (internal Meadows Owens memorandum dated October 1, 2003, analyzing 26 U.S.C. § 674 and concluding there could be two reasonable interpretations of the statute) and LR (internal Meadows Owens Memorandum dated October 19, 2003, analyzing 26 U.S.C. §§ 674 and 679 and concluding there was an arguable position that the 1992 trusts were non-grantor trusts); Tr. Trans. 2564:6-8, 2605:20-2606:13, 2566:9-2571:24, 2618:16-2621:17 (Pulman discussing Wyly Exs. LQ and LR).

[813] Tr. Trans. 2587:25-2588:13 (Pulman) ("Q: You never came to a final conclusion whether the '92 trusts were non-grantor trusts. Correct? A: I didn't issue – I didn't come to an opinion whether they were foreign non-grantor. I came to a view as to whether [there] was a reportable position. Q. Right. Just for purposes of the tax return? A. Yes.").

[814] *Id.* at 1787:9-1788:8 (Cousins testifying regarding Wyly Ex. OD, a discussion points memorandum used for an October 15, 2003 meeting between Cousins, Sam, and Evan, and stating "[w]e could not tell whether or not Mr. Lubar's concerns were correct."). *See also* 2529:16-19 (when Pulman began working on Wyly matters in 1999, Owens told him "there was an offshore trust and that it was a foreign grantor trust that had been grandfathered by the '95 legislation"); IRS Ex. 112 (Confidential Conference Outline dated September 7, 2000, which Owens used to explain the trust structure to Hennington when she was first appointed CFO of Highland Stargate) at 2 (stating the 1992 trusts are nongrantor foreign trusts) and 6 (stating the 1994 and 1995 trusts are foreign grantor trusts); Wyly Ex. LI at SWYLY09114-9117 (memorandum dated January 29, 2001 from Owens to the Wylys c/o Hennington and Boucher stating "[a]ll of the foreign trusts are currently exempted from U.S. income tax regimes based upon the non-foreign grantor trust (NFGT) and/or foreign grantor trust (FGT) characterization."). However, there is no persuasive evidence in the record that Owens or any other attorney with Meadows Owens did anything other than accept the classifications stated in the Tedder opinion letters or trust documents themselves as correct.

key assumption underlying the original Pratter, Tedder & Graves opinion to Sam about the tax treatment of those transactions was that the Bulldog IOM Trust be a valid non-grantor trust, (ii) there is no evidence that Pratter, Tedder & Graves actually issued such an opinion to Sam in 1992, 1993, or at any other time, (iii) in 1993 Lubar advised French, acting as Sam's agent, that there was a significant risk that the 1992 IOM trusts would be characterized as foreign grantor trusts as to Sam, (iv) at least with respect to the Bulldog IOM Trust, there is no advice contrary to Lubar's from 1993 to mid-2003 when Lubar is asked by Hennington and Boucher to do further research and to reanalyze the 1992 transactions, which (a) he does, (b) confirms his original conclusions that the 1992 IOM trusts are properly characterized as foreign grantor trusts as to Sam and Charles, and (c) raises even further concerns about the validity of the 1992 annuity transactions for other reasons, and (v) Pulman advised Hennington, another of Sam's agents, that he disagreed with Lubar's conclusions or, at least, that Sam had a "reportable position" with regard to those issues.[815] So, in short and at best, by late 2003 Sam arguably had conflicting advice from experienced tax professionals he hired to give him that advice. From the Court's perspective, Sam cannot now pick the advice he prefers—*i.e.*, Pulman's advice that he has a "reportable position" that the 1992 IOM trusts are non-grantor trusts as to him—and then claim to have reasonably relied upon it in connection with his reasonable cause and good faith defense.

So, for all of these reasons, Sam has failed to carry his burden of proof to establish his reasonable cause and good faith defense as to the proper legal characterization of the Bulldog IOM Trust and the tax treatment of the 1992 annuity transactions undertaken by him through domestic

---

[815] Tr. Trans. 2587:24-2588:13 (Pulman testifying that he never came to an opinion regarding whether the 1992 trusts were non-grantor trusts; he only "came to a view as to whether [there] was a reportable position."); 2620:6-18 (Pulman explaining that a "reportable position" "means basically that the position in the tax law is arguable… it's an arguable position that can go either way."); 2621:4-17 (Pulman testifying that Kniffen (another Meadows Owens attorney) "came to a view that there was an arguable position that [the 1992 trusts] were non-grantor trusts—foreign non-grantor trusts.").

and foreign corporations indirectly and directly owned by the Bulldog IOM Trust from 1992 through 2013, the years at issue in the Motions and the Claim Objections.

### 3. The Settlement of the Bessie IOM Trust and the La Fourche IOM Trust and their Proper Characterization

That brings us to Sam's 1994 and 1995 IOM trusts—*i.e.*, the Bessie IOM Trust and the La Fourche IOM Trust. Recall that these trusts were set up as foreign trusts settled by a non-US person—*i.e.*, King and Cairns, respectively, and that the Court has already concluded that the settling of these trusts was highly irregular, if not fraudulent, from the outset.[816] Perhaps ironically, Lubar is the tax professional who advised the Wylys on the proper structure of these trusts and their proper tax treatment assuming that structure was implemented. As is usually the case with legal advice, Lubar's advice here was predicated on certain facts that he assumed to be true for purposes of giving his advice. Unfortunately, those facts were not true as explained below, although Lubar had no reason to know of their falsity at the time he wrote his memorandum.

Specifically, by letter dated February 16, 1994, Lubar sent a memorandum to French, as Sam's agent, on the tax consequences for U.S. beneficiaries of trusts established by a non-resident alien of the United States.[817] As the memorandum itself makes clear, Lubar was asked to "prepare a memorandum regarding the U.S. federal income tax treatment of U.S. citizen beneficiaries (the 'Taxpayers') of foreign (*i.e.*, non-U.S.) 'grantor trusts' (the 'Trusts') established by an individual (the 'Grantor') who is a nonresident alien of the United States."[818] Lubar was told by French to assume the following facts:[819]

> 1. *The Grantor, although not related to the Taxpayers, has known the Taxpayers for a considerable period of time and will establish the Trusts for the Taxpayers'*

---

[816] *See* pp. 87-98, *supra.*

[817] *See* IRS Ex. 806.

[818] *Id.* at WYLYSEC00010967.

[819] *Id.* at WYLYSEC00010967-968.

*benefit as an entirely gratuitous act.* All moneys contributed to the Trusts, now or in the future, will belong to the Grantor, and *he has not previously and will not in the future receive any consideration, reimbursement, or other benefit for, or in respect of, this act, directly or indirectly.* Further, the Taxpayers have not previously made gifts to the Grantor exceeding US$10,000 in any taxable year.

2. The Trusts have been established in the Isle of Man as typical discretionary trusts. Under their terms, the trustee (the "Trustee") has been given broad powers to manage and dispose of the Trusts' principal and income, subject, in most cases, to the consent of a protector (the "Protector"). Neither the Trustee nor the Protector is a beneficiary of the respective Trusts. The Trusts are irrevocable but may be modified by the Trustee in certain respects, including the naming of additional beneficiaries.

3. The Trusts will acquire a majority share interest in a non-U.S. corporation ("Newco") organized to engage in, <u>inter alia</u>, the insurance business, exclusively outside the United States. Neither the Taxpayers nor any person related to the Taxpayers, directly, indirectly or constructively, will transfer any money or other property to Newco except on an "arm's length" basis [fn 2], and if the Taxpayers provide services to Newco as employees, independent contractors or otherwise, directly or indirectly, they will be compensated solely on an arm's length basis.

[fn 2] For this purpose, a transfer is considered to be "arm's length" if undertaken on terms, including financial terms, that would be made between wholly unrelated persons in comparable circumstances.

Based upon these predicate facts, Lubar offers several opinions. As relevant here, Lubar

opines that[820]

Because of the broad discretionary powers afforded to the Trustee and the fact that the Grantor is also a beneficiary of the Trusts, *the Trusts will be 'grantor trusts' for all U.S. federal income tax purposes pursuant to the provisions of sections 671 et seq. for so long as the Grantor lives.* As a consequence, *the Grantor will be considered to be the owner* of the portion *of the Trusts* (including the shares of Newco) attributable to the property that he transfers to the Trusts, and *all items of income, deduction or credit attributable to such portion will be included in computing the Grantor's taxable income and credits for U.S. federal income tax purposes.*

*However, because the Grantor is a nonresident alien as to the United States and neither the Trusts nor Newco will have any income from U.S. sources or effectively connected with the conduct of a U.S. trade or business, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return.*

---

[820] *Id.* at WYLYSEC000100968-969 (emphasis added).

In the assumed circumstances, the Grantor will be the sole transferor of property to the Trusts and will, accordingly, be treated as owner of all the interests in the Trusts. Thus, all income of the Trusts will be notionally taxed to the Grantor for U.S. federal income tax purposes, and *the Taxpayers, U.S. citizen beneficiaries of the Trusts, will not be subject to U.S. tax on any distributions received from the Trusts that are attributable to income realized by the Trusts during the Grantor's lifetime*….Further, because the Grantor will be treated as owner of the shares of Newco held by the Trusts, the Taxpayers will not be considered to own any shares thereof for purposes of the provisions applicable to "controlled foreign corporations" ("CFC" or "foreign personal holding companies" ("FPHC") and likely will not be considered to own any shares of Newco for purposes of the "passive foreign investment company ("PFIC") provisions. *Thus, the Taxpayers should not have any current U.S. tax liability or reporting obligations in respect of income realized by Newco during the Grantor's lifetime* (other than compensation that the Taxpayers may receive from newco, directly or indirectly, for services performed on its behalf).

As previously found, certain of those predicate facts were simply not true. Neither King (the grantor of the Bessie IOM Trust) nor Cairns (the grantor of the La Fourche IOM Trust) had known Sam "for a considerable period of time." Indeed, Evan testified that King was merely a stockbroker who did some business, but "not a lot," with Maverick.[821] Moreover, we know that French prepared a letter for Cairns to sign stating that he was establishing the La Fourche IOM Trust "to show [his] gratitude for [Sam's] loyalty to our mutual ventures and [his] personal support and friendship," all of which was untrue as Cairns testified. In fact, Cairns did not know Sam at all:[822]

Q. Is there any language in [the letter] that was not provided to you by Mr. French?

A. No, all of it was provided.

---

[821] Tr. Trans. 583:23-584:7 (Evan); *see also* SEC Tr. Trans. 3753:5-14 (French testifying that he believed that King had made substantial money previously dealing with the Wylys in South African bonds, which is why he was recruited by French); Collateral Estoppel No. 23 ("These transactions were shams intended to circumvent the grantor trust rules. French and Buchanan, acting as the Wylys' agents, recruited King and Cairns to create a falsified record of a gratuitous foreign grantor trust.").

[822] Cairns Depo Tr. 46:18-47:4, 158:6-7.

Q. [The letter] says here, "This is to show my gratitude for your loyalty to our mutual ventures and your personal support and friendship." Were you in fact a friend of Mr. Sam Wyly?

A. No, but I was a friend of Ronnie Buchanan's.

**

Q. You never talked to him, never met Mr. [Sam] Wyly?

A. No.

In addition, neither the Bessie IOM Trust nor the La Fourche IOM Trust was established as an entirely gratuitous act." Indeed, as a stockbroker dealing with Maverick, King had already earned commissions from dealings with Wyly entities (though not through a direct relationship with Sam).[823] And, soon after the trusts were established, Cairns' trust management company was hired to serve as trustee for some of the Wylys' IOM trusts, including the La Fourche IOM Trust he allegedly settled for Sam's benefit.[824]

Moreover, as found by the SDNY Court and as independently found here:[825]

There were no gratuitous transfers here. *First*, I am doubtful that King provided even the factual $1 towards the trusts. In a November 26, 1995 fax to French, Buchanan writes that "Keith never produced the money." Buchanan explains that the King-related trusts "were settled with a factual dollar bill" only so that "there [was] no question of the[] [trusts] being voidable by reason of the absence of assets" pending the Wylys' transfer of options. Even if King had contributed the $1, the premise that an unreimbursed dollar bill is sufficient to establish a tax-free foreign grantor trust cannot be taken seriously. Second, Cairns' transfer of $100 cannot be considered gratuitous because shortly after settling these trusts, he received

---

[823] Tr. Trans. 583:23-584:7 (Evan); *see also* SEC Tr. Trans. 3753:2-14 (French).

[824] Collateral Estoppel No. 22 ("Shortly after these trusts were settled, Cairns's trust management company was hired to serve as trustee for some of the Wylys' IOM trusts.") Joint Stipulations ¶¶ 66 and 102, (showing that Cairn's company, Wychwood Trust Limited, served as trustee for Delhi IOM Trust, La Fourche IOM Trust, and Red Mountain IOM Trust).

[825] Collateral Estoppel No. 24; Cairns Depo. Tr. 46:5-13; 56:9-12 (discussing his failure to fund the trusts with the stated $25,000); SEC Tr. Trans. 3755:10-3757:22 (French testifying regarding King's failure to fund); IRS Exs. 214 (November 16, 1995 fax from French to Buchanan regarding Boucher's inability to find any records that King ever funded the Bessie IOM Trust, the Tyler IOM Trust, and the South Madison IOM Trust, and noting similar issues with the La Fourche IOM Trust and Red Mountain IOM Trust), 178 at 02517 (November 26, 1995 faxes from Buchanan to French regarding funding issues, stating the Bessie IOM Trust and Tyler IOM Trust had each been funded with "a factual Dollar bill").

> lucrative work from the Wylys as trustee.  Finally, in light of the falsified trust deeds and supporting documentation surrounding these trusts, it would be unjust to consider anyone but the Wylys to be the true grantors of these trusts.

Indeed, it appears that King's and Cairn's failure to fund the trusts was discovered as early as November 1995.[826]

As 26 C.F.R. § 1.6664-4 itself makes clear "the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person."[827]  Because Lubar's advice was based on unreasonable factual assumptions given to him by French, Sam's agent, Sam cannot have reasonably relied on Lubar's advice here.

For all of these reasons, Sam has failed to carry his burden of proof to establish his reasonable cause and good faith defense as to the proper legal characterization of the Bessie IOM Trust and the La Fourche IOM Trust and the tax consequences attributable to those trusts.  In coming to this conclusion the Court has rejected the IRS' contention that Sam must have *actually* read the opinions or the memoranda containing the advice he purports to have reasonably relied upon in good faith before he is entitled to assert a reasonable cause and good faith defense.  While it is true that Sam admitted that he had not read most, if not all, of those legal opinions or memoranda containing the relevant advice, he is not required to have done so.  As the Debtors' Post-Trial Brief makes clear, the definition of "advice" contained in the applicable regulation allows advice to be provided "to or for the benefit of" Sam and permits Sam to rely upon that advice "directly or indirectly."[828]

---

[826] IRS Exs. 214 (November 16, 1995 fax from French to Buchanan regarding funding issues), 178 at 02517 (November 26, 1995 faxes from Buchanan to French regarding funding issues).

[827] 26 C.F.R. § 1.6664-4(c)(ii).

[828] *Id.* § 1.6664-4(c)(iii)(2).

**MEMORANDUM OPINION**                                                                207

However, in coming to its conclusion, the Court has also rejected Sam's argument that he did not know that the factual assumptions contained the opinions or memoranda were wrong and that somehow, his lack of understanding allows him to reasonably rely on the advice contained therein—even though it was based on erroneous facts and assumptions. The fallacy of this argument is apparent on the face of the same regulation that defines "advice" favorably to Sam—*i.e.*, 26 C.F.R. § 1.6664-4, which simply provides that "the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person."[829] Nowhere does the regulation state that the taxpayer must know of the unreasonable factual assumptions. It is an objective test; the factual assumptions must be reasonable. Here they were not. Moreover, the advice itself conditions its efficacy on the accuracy of the factual assumptions expressly stated in the memorandum. Here, those assumptions were inaccurate, and therefore the advice is of no force and Sam cannot have reasonably relied upon it.

### 4. The 1996 Private Annuity Transactions

We next turn to the six complicated private annuity transactions Sam entered into in 1996, on which he paid no income tax at the time the transactions were undertaken. Recall that those transactions were structured differently from the 1992 annuity transactions. For example, in 1996 Sam assigned 650,000 options to purchase stock of Sterling Software to Crazy Horse IOM Trust, a foreign trust he settled in 1995, which trust immediately assigned the options to Locke Limited (IOM), an entity wholly owned by Bulldog IOM Trust, in exchange for an unsecured private annuity payable to Crazy Horse IOM Trust. Crazy Horse IOM Trust was then liquidated, the effect

---

[829] *Id.* § 1.6664-4(c)(ii). Obviously, French is that other person. Just as advice can be received directly or indirectly under the regulation, factual assumptions can be given directly by the taxpayer or indirectly by another person acting on the taxpayer's behalf.

of which was to put the right to receive the annuity payments to Sam, who as just noted, was the grantor of the now-liquidated Crazy Horse IOM Trust.  Sam undertook five more similarly structured annuity transactions in 1996.

We will group the transactions by the IOM trust that owned the IOM entity issuing the private annuity.  So, that means that Sam's two assignments of options to Crazy Horse IOM Trust, which options were then assigned to Locke Limited (IOM) and Moberly Limited (IOM) in exchange for two unsecured private annuities payable to Crazy Horse IOM Trust will be analyzed together, as Locke Limited (IOM) and Moberly Limited (IOM) are both wholly owned by Bulldog IOM Trust.  Then, we will analyze Sam's assignment of options to Arlington IOM Trust, which options were then assigned to Sarnia Investments Limited (IOM) in exchange for an unsecured private annuity payable to Arlington IOM Trust, as Sarnia Investments Limited (IOM) is wholly owned by Lake Providence IOM Trust.  Followed by an analysis of Sam's two assignments of options to Tallulah IOM Trust, which options were then assigned to Audubon Asset Limited (IOM) and Yurta Faf Limited (IOM) in exchange for two unsecured private annuities payable to Tallulah IOM Trust, as Audubon Asset Limited (IOM) and Yurta Faf Limited (IOM) are wholly owned by Bessie IOM Trust.  Finally, we will analyze Sam's assignment of options to Sitting Bull IOM Trust, which options were then assigned to Devotion Limited (IOM) in exchange for an unsecured private annuity payable to Sitting Bull IOM Trust, as it is wholly owned by La Fourche IOM Trust.

Returning to Sam's two assignments of options to the Crazy Horse IOM Trust, the Crazy Horse IOM Trust received a written opinion letter from Chatzky and Associates[830] dated February 22, 1996.[831] The opinion letter notes that

> [y]ou have requested the law firm of Chatzky and Associates, a Law Corporation to review and comment on the proposed sale of compensatory "Nonqualified Options"…in exchange for a private annuity, with such sale to occur during the 1996 taxable year for United States income tax purposes and United States income withholding tax purposes.[832]
>
> ***
>
> Our opinions are based on the correctness of the facts and circumstances set forth herein, and our understanding that the factual scenario set forth hereinbelow is complete, accurate, true, and correct.[833]
>
> ***
>
> It is our view based on the information presented to us as expressed herein that it is more likely than not that the anticipated federal United States tax treatment relating to the matters discussed herein will be as we opine herein.[834]

Then, Chatzky sets forth the facts that the firm is relying upon. Several of those facts are relevant here, including

> 4. Sam Wyly transferred these options to The Crazy Horse Trust, a foreign situs grantor trust that is recognized as a "grantor trust" for United States income tax purposes.[835]

---

[830] Chatzky and Tedder are no longer working together or law partners. Tr. Trans. 1136:15-1137:2 (Chatzky testifying that he had ended his partnership with Tedder by February 22, 1996). Chatzky's firm has been retained by this time to represent the Wylys. IRS Ex. 108 (fax from French to Chatzky dated February 1, 1996 discussing Chatzky's fee structure).

[831] See Wyly Ex. CI. Chatzky and Associates also issued four substantively identical opinion letters dated November 27, 1996 to Crazy Horse IOM Trust, Arlington IOM Trust, Sitting Bull IOM Trust, and Tallulah IOM Trust. See Wyly Exs. CL, CN, CO, and CR. These written opinions do not change the Court's analysis of Sam's reasonable cause and good faith defense as it relates to the 1996 annuity transactions.

[832] Wyly Ex. CI at SWYLY010365.

[833] Id. at SWYLY010366.

[834] Id. at SWYLY010367.

[835] Id.

5.  You anticipate that The Crazy Horse Trust will transfer the non-statutory options to an underlying foreign corporation that is wholly owned by a *foreign situs non-grantor trust*.[836]

6.  It is anticipated that the wholly owned underlying foreign corporation of a *foreign non-grantor trust* will issue a private annuity to The Crazy Horse Trust in exchange for the receipt of non-statutory options of an equivalent value.[837]

Based upon these facts, among others, Chatzky and Associates provides the following

opinions

A.  Pursuant to the general federal income tax treatment of property exchanged for a private annuity the sale of non-statutory options to a foreign corporation in exchange for The Crazy Horse Trust's receipt of a deferred private annuity of equivalent value is not a taxable event in the year 1996.[838]

\*\*\*

B.  The private annuity is not intended to contain a gift or bargain sale element, and the exchange of non-statutory options for a private annuity of equivalent actuarial value is likely to be excluded from federal gift tax.[839]

\*\*\*

C.  The annuity payments must be unsecured to avoid immediate taxation of The Crazy Horse Trust in 1996 with respect to the disposition of the non-statutory options in exchange for an annuity of an equivalent value.[840]

\*\*\*

E.  The disposition of compensatory non-statutory options by The Crazy Horse Trust, a grantor trust, in an arm's length transaction under which non-statutory options are transferred in exchange for the receipt by The Crazy Horse Trust of a substantially nonvested private annuity of an equivalent value issued by the obligor corporation is not a taxable event in the year 1996.[841]

\*\*\*

---

[836] *Id.* (emphasis added).

[837] *Id.* (emphasis added).

[838] *Id.* at SWYLY010369.

[839] *Id.* at SWYLY010371.

[840] *Id.* at SWYLY010373.

[841] *Id.* at SWYLY010376.

**MEMORANDUM OPINION**                                                                          **211**

F. The subsequent exercise of the non-statutory options by the obligor will not likely generate a taxable event to The Crazy Horse Trust because the compensation element will remain opened [*sic*] until the year The Crazy Horse Trust receives its annuity payments.[842]

\*\*\*

G. The private annuity contract is likely to be treated as being held by a natural person.[843]

There is no dispute here that: (i) the Crazy Horse IOM Trust is a foreign situs grantor trust (to Sam), (ii) Locke Limited (IOM) and Moberly Limited (IOM) issued private annuities to the Crazy Horse IOM Trust in exchange for their receipt of the options, and (iii) the annuity was of equivalent value to the options. However, as with the 1992 annuity transactions analyzed *supra* at pp.185-203, a key factual predicate to Chatzky's legal opinion is that the Bulldog IOM Trust, which owned Locke Limited (IOM) and Moberly Limited (IOM), the two corporations issuing annuities to the Crazy Horse IOM Trust, be a foreign non-grantor trust. As discussed at length above, Sam never received any advice that the Bulldog IOM Trust is properly characterized as a foreign non-grantor trust on which he can reasonably rely. As a result, and for the same reasons set forth above in connection with the 1992 annuity transactions, Sam's reasonable cause and good faith defense fails with respect to these two annuity transactions throughout the tax years in question here.

Turning to Sam's assignment of options to Arlington IOM Trust, who then assigned those options to Sarnia Investments Limited (IOM) in exchange for an unsecured private annuity payable to Arlington IOM Trust, Arlington IOM Trust also received a written opinion letter from Chatzky

---

[842] *Id.* at SWYLY010379.
[843] *Id.* at SWYLY010381.

and Associates[844] dated February 22, 1996.[845]   The opinion letter issued to the Arlington IOM

Trust is identical to the opinion letter received by the Crazy Horse IOM Trust quoted above except

that all references to the Crazy Horse IOM Trust are changed to Arlington IOM Trust.   There is

no dispute here that: (i) Arlington IOM Trust is a foreign situs grantor trust (to Sam), (ii) Sarnia

Investments Limited (IOM) issued a private annuity to Arlington IOM Trust in exchange for its

receipt of the options, and (iii) the annuity was of equivalent value to the options.

However, a key factual predicate to Chatzky's legal opinion is that Lake Providence IOM

Trust, which owned Sarnia Investments Limited (IOM), the entity issuing the annuity to Arlington

IOM Trust, be a foreign non-grantor trust.   And, of possible significance to his reasonable cause

and good faith defense, on May 19, 1993, Sam received a written opinion letter from Tedder,

Chatzky & Berends in which the firm opines that:[846]

> [w]e have reviewed this Trust Agreement [for Lake Providence Trust] and have
> determined that it is more likely than not that the trust will be construed to constitute
> a valid non-grantor trust for United States taxation purposes provided that the trust
> operates in accordance with the terms and provisions contained in the Trust
> Agreement.

So, if this advice is not tainted by Tedder's status as a promoter of the offshore system to the

Wylys, the advice that was missing from the Court's analysis of the 1992 annuity transactions

undertaken through corporations wholly owned by the Bulldog IOM Trust has been supplied.   In

other words, a key factual predicate in the Chatzky and Associates' 1996 opinion that the entity

issuing the annuity to Arlington IOM Trust be wholly owned by a foreign non-grantor trust may

now be satisfied.

---

[844] Chatzky and Tedder are no longer working together or law partners.  Tr. Trans. 1136:15-1137:2 (Chatzky testifying that he had ended his partnership with Tedder by February 22, 1996). Chatzky's firm has been retained by this time to represent the Wylys.  IRS Ex. 108 (fax from French to Chatzky dated February 1, 1996 discussing Chatzky's fee structure).

[845] *See* Wyly Ex. CK.

[846] Wyly Ex. CB at SWYLY005378.

But, as already found,[847] Tedder's firm, Pratter, Tedder & Graves promoted the offshore system and the annuity transactions to the Wylys in late 1991 and 1992. That the firm name changed when Chatzky joined Tedder's firm and then issued the May 19, 1993 opinion letter just discussed does not change the firm's status as the promoter of the offshore system and the annuity transactions. Accordingly, and for the reasons already explained, Sam cannot rely upon the May 19, 1993 opinion of Tedder, Chatzky & Berends as part of his reasonable cause and good faith defense.

And, without an ability to rely on the May 19, 1993 opinion of Tedder, Chatzky & Berends, the analysis of this transaction and Sam's reasonable cause and good faith defense is the same as the analysis of the 1992 annuity transactions and Sam's reasonable cause and good faith defense. As a result, and for the same reasons set forth above in connection with the 1992 annuity transactions, Sam's reasonable cause and good faith defense fails with respect to this annuity transaction throughout the tax years in question here.

As noted previously, we will analyze Sam's two assignments of options to Tallulah IOM Trust together, as those options were assigned to two IOM corporations—Audubon Asset Limited (IOM) and Yurta Faf Limited (IOM)—that are wholly owned by Bessie IOM Trust. Like the other 1996 annuity transactions just discussed, Tallulah IOM Trust received a written opinion letter from Chatzky and Associates dated February 22, 1996 that is identical to the opinion letter received by the Crazy Horse IOM Trust quoted above except that all references to the Crazy Horse IOM Trust are changed to Tallulah IOM Trust.[848] There is no dispute here that: (i) Tallulah IOM Trust is a foreign situs grantor trust (to Sam), (ii) Audubon Asset Limited (IOM) and Yurta Faf Limited

---

[847] *See* pp. 185-195, *supra.*
[848] *See* Wyly Ex. CE.

(IOM) each issued a private annuity to Tallulah IOM Trust in exchange for its receipt of the options, and (iii) each annuity was of equivalent value to the options.

However, a key factual predicate to Chatzky's legal opinion is that the Bessie IOM Trust, which owned Audubon Asset Limited (IOM) and Yurta Faf Limited (IOM), the corporations issuing the annuities to Tallulah IOM Trust, be a foreign non-grantor trust. Of course, as discussed above, we know that the Bessie IOM Trust was not a foreign non-grantor trust; it was established as a foreign grantor trust (to King) under 26 U.S.C. §§ 671 – 679.[849] Once again, a key factual predicate to Chatzky's opinion is not satisfied, preventing Sam from relying on that opinion in good faith. Moreover, Sam offered no evidence of any other advice he received in connection with these private annuity transactions. For these reasons, Sam's reasonable cause and good faith defense fails with respect to these annuity transactions throughout the tax years in question here.

Finally, we analyze Sam's assignment of options to Sitting Bull IOM Trust, which assigned the options to Devotion Limited (IOM) in exchange for a private annuity. Devotion Limited (IOM) was wholly owned by La Fourche IOM Trust. Like the other 1996 annuity transactions just discussed, Sitting Bull IOM Trust received a written opinion letter from Chatzky and Associates dated February 22, 1996 that is identical to the opinion letter received by the Crazy Horse IOM Trust quoted above except that all references to the Crazy Horse IOM Trust are changed to Sitting Bull IOM Trust.[850] There is no dispute here that: (i) Sitting Bull IOM Trust is a foreign situs grantor trust (to Sam), (ii) Devotion Limited (IOM) issued a private annuity to Sitting Bull IOM

---

[849] SEC Trial Tr. 3751:24-3752:4, 3752:15-18 (French); IRS Ex. 806 at WYLYSEC00010968 (February 16, 1994 memorandum from Lubar to French "Re: Foreign Trusts" in which Lubar states opines that trusts settled by nonresident aliens—*i.e.*, King and Cairns—"will be 'grantor trusts' for all U.S. federal income tax purposes…[but] because the Grantor [King and/or Cairns] is a nonresident alien as to the United States…, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return."). Although it was recharacterized by the SDNY Court as a foreign grantor trust as to Sam in the SEC Action.

[850] *See* Wyly Ex. CF.

Trust in exchange for its receipt of the options, and (iii) the annuity was of equivalent value to the options.

However, a key factual predicate to Chatzky's legal opinion is that La Fourche IOM Trust, which owned Devotion Limited (IOM), the entity issuing the annuity to Sitting Bull IOM Trust, be a foreign non-grantor trust. Of course, as discussed above, we know that La Fourche IOM Trust was not a foreign non-grantor trust; it was established as a foreign grantor trust (to Cairns) under 26 U.S.C. §§ 671 – 679.[851] Once again, a key factual predicate to Chatzky's opinion is not satisfied, preventing Sam from relying on that opinion in good faith. Moreover, Sam offered no evidence of any other advice he received in connection with this private annuity transaction. For these reasons, Sam's reasonable cause and good faith defense fails with respect to this annuity transaction throughout the tax years in question here.[852]

### 5. Alleged Reliance on French

The Debtors assert that they reasonably relied on French, their longtime attorney and advisor, for tax advice regarding the offshore system. The Court disagrees for two reasons. First, the Court finds that French—who is admittedly not a tax lawyer—was not qualified to give tax

---

[851] SEC Trial Tr. 3751:24-3752:4, 3752:15-18 (French); IRS Ex. 806 at WYLYSEC00010968 (February 16, 1994 memorandum from Lubar to French "Re: Foreign Trusts" in which Lubar states opines that trusts settled by nonresident aliens—*i.e.*, King and Cairns—"will be 'grantor trusts' for all U.S. federal income tax purposes…[but] because the Grantor [King and/or Cairns] is a nonresident alien as to the United States…, the Grantor will have no actual U.S. tax liability or obligation to file a U.S. income tax or information return."). Although, once again, the SDNY Court recharacterized the La Fourche IOM Trust as a foreign grantor trust as to Sam in the SEC Action.

[852] Each entity issuing a private annuity—whether in 1992 or in 1996—received an opinion from Chatzky and Associates dated April 15, 1998 addressing "the impact that Income Tax Regulation Section 1.1001-3 has on the modification of a private annuity agreement issued by you…." *See, e.g.*, Wyly Ex. CS at SWYLY002638. This opinion was apparently requested because Sam amended the annuity agreements to defer the commencement date of his receipt of annuity payments. The upshot of these opinions is that (i) "it is unlikely that the modification of the timing of the private annuity payments will be considered a modification of a 'debt instrument,'" *id.* at 2643, and (ii) "it is likely that the Private Annuity will not be a debt instrument for purposes of Internal Revenue Code Section 1001, and thus this significant modification of a debt instrument analysis will be inapplicable to the transaction," *id.* at 2655. The other eleven opinion letters are identical except that the addressee is changed to be another of the IOM corporations issuing an annuity to Sam or for his benefit. *See* Wyly Exs. CT, CU, CV, CZ, DA, DB, DD, DH, DJ, DK, and DL. These twelve opinion letters have no effect on the above analysis of Sam's reasonable cause and good faith defense.

advice to the Wylys regarding the offshore system. Second, the Court finds that French did not actually give any tax advice of his own to the Wylys regarding the offshore system. Instead, at the Wylys' request, he acted as a middleman, relaying to them the tax advice of actual tax lawyers he consulted with on their behalf.

That French was acting in a dual capacity here—*i.e.*, (i) as the Wylys' lawyer on issues he was competent to advise on, and (ii) as the Wylys' trusted agent, empowered to hire other expert advisors with respect to those issues on which he was not, bears brief emphasis. As previously found, French was charged by Sam and Charles, his principals, with the responsibility to oversee the implementation of the Wyly offshore system from a legal perspective. That French was a trusted advisor to the Wylys when the offshore system was initially established and transactions began to be undertaken through it is beyond dispute on this record. However, the Wylys recognized that French did not have the required legal expertise himself to address all of the relevant legal issues that the implementation of the offshore system would require (recall that French was a securities lawyer), so French was authorized to hire, on the Wylys' behalf, whomever French believed necessary to implement the offshore system in such a way as to accomplish the Wylys' goals. And, while French obviously gave some legal advice along the way himself, he was much more than a lawyer here—he served as Sam's and Charles' agent, charged with the responsibility to implement the Wyly offshore system. It is in this middleman or agent role that French received tax advice on the Wylys' behalf from experienced international tax professional(s), but French gave Sam and Charles no tax advice of his own, as he himself

acknowledged when he testified that he acted as "basically a business adviser,"[853] and not as a tax lawyer—"I'm not the tax lawyer. I'll take that disclaimer again, okay."[854]

    With French's middleman or agent role firmly in mind, we turn to the first reason that the Wylys' cannot rely upon French's purported tax advice—*i.e.*, French was not qualified to give tax advice on the offshore system. Whether a particular professional is qualified enough to give tax advice that a taxpayer can reasonably rely upon is a fact sensitive inquiry, but that a professional must be at least minimally qualified is beyond question. In certain situations, it will not be enough that the advisor was a lawyer or a certified public accountant.[855] Indeed, a lawyer's choice to consult with an undisputed tax expert on a matter may be an implicit acknowledgment that he is not competent to give tax advice about a particular matter.[856] While the Fifth Circuit has stated in dicta that "[i]t cannot be a requirement…that a lawyer or accountant must be shown in fact to be a 'tax expert' before reliance on his advice is reasonable,"[857] it has also acknowledged that a taxpayer must rely on a competent professional,[858] and that "[r]eliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on the 'quality and objectivity of the professional advice.'"[859]

---

[853] SEC Tr. Trans. 1707:2-4 (French).

[854] *Id.* at 3758:7-8 (French).

[855] *Mediaworks, Inc. v. C.I.R.*, T.C. Memo 2004-177, 2004 WL 1682832, at *8 (2004) ("the mere fact that Jung is a certified public accountant does not necessarily make him a competent tax adviser."); *Glassley v. C.I.R.*, T.C. Memo 1996-206, 1996 WL 208817, at *33 (1996) (taxpayers did not establish the tax expertise of their accountants or an attorney who was the brother of one of the taxpayers).

[856] *See, e.g., Hermax Co., Inc. v. C.I.R.*, 11 T.C. 442, 445 (1948) ("Petitioner apparently turned over its tax matters, along with the keeping of its books of account, to a public accountant. The record does not show that he had any 'expert knowledge' of Federal tax laws. Indeed, his own testimony indicates that he had not. He testified that he consulted with Swick, who was 'the tax man' in his accounting firm, thus indicating that he, Imhoff, was not a 'tax man.'").

[857] *Mayflower Inv. Co. v. C.I.R.*, 239 F.2d 624, 627 (5th Cir. 1956).

[858] *See Whitehouse Hotel Ltd. P'ship*, 755 F.3d at 249; *New York Guangdong Fin., Inc. v. C.I.R.*, 588 F.3d 889, 896 (5th Cir. 2009).

[859] *Klamath*, 568 F.3d at 548 (5th Cir.2009) (quoting *Swayze v. U.S.*, 785 F.2d 715, 719 (9th Cir. 1986)).

Although there are no bright line tests regarding competence of tax professionals to which the Court can turn, an examination of the case law allows us to glean some helpful standards.

*Neonatology Associates, P.A. v. C.I.R.*[860] is a leading tax court case discussing when— for purposes of a reasonable cause defense—a taxpayer may reasonably rely on the advice of a professional in order to escape penalty liability. The taxpayers there argued that they should not be liable for penalties because they had established reasonable cause via their reliance on professionals.[861] The *Neonatology* court laid out the following test for establishing reasonable cause based on reliance on professional tax advice:

> for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.[862]

The *Neonatology* court further noted that it may not be reasonable to rely on a professional's advice when the taxpayer knew, or should have known, that the professional lacked "the requisite expertise to opine on the tax treatment of the disputed item."[863] Specifically, the *Neonatology* court found that the taxpayers there had not established reasonable cause based on reliance on the advice of professionals in part because the only professional on whom the taxpayers could prove they actually relied was an insurance agent who was not, and had never held himself out as, a tax professional.[864] This insurance agent also stood to gain financially from the sale of the insurance

---

[860] 115 T.C. 43 (2000).

[861] *Id.* at 97-99.

[862] *Id.* at 99.

[863] *Id.*

[864] *Id.* at 99-100.

products at issue to the taxpayers.[865]  Although the taxpayers alleged that they had also relied on the advice of other, more qualified professionals, the taxpayers were ultimately unable to prove that they actually relied on the advice of any other professionals besides the insurance agent.[866]

As a lawyer French is obviously more qualified to give tax advice than an insurance agent who alleged no tax expertise and was not a lawyer.  However, this does not necessarily mean that the Wylys could reasonably rely on French's tax advice, assuming he gave them any.  *CNT Investors, LLC v. C.I.R.*[867] demonstrates why.  *CNT Investors* involved a taxpayer who was a funeral home owner with a mortuary science degree ("**Carroll**") who "[a]lthough … an astute and successful businessman, he understood only basic tax principles and lacked sophistication in various stock and bond type financial matters. Hence he sought counsel and assistance from professional advisers on legal and accounting issues relating to the funeral home."[868]  One of these professionals was J. Roger Myers ("**Myers**"), "the funeral home's de facto general counsel."[869] Myers' tax expertise was summed up in this way:

> As of 1999 Mr. Myers had practiced law for almost 30 years, most of them spent in a business-oriented private practice involving some civil litigation. Although he did not hold himself out as a tax lawyer and typically referred clients to specialists for complicated income tax advice, Mr. Myers had taken basic Federal income and estate tax courses in law school, had previously prepared estate tax returns, and had advised Mr. Carroll on general tax law principles.[870]

Carroll ran into tax problems when he was contemplating retiring and selling his funeral home.[871]

Myers and Carroll's CPA determined that it would not be possible for Carroll to sell his funeral

---

[865] *Id.*

[866] *Id.*

[867] 144 T.C. 161 (2015).

[868] *Id.* at 166.

[869] *Id.*

[870] *Id.*

[871] *Id.* at 168-69.

home without triggering significant taxable gain.[872] One day, however, Myers stumbled across a potential solution to this problem:

> In 1999 Mr. Myers encountered a potential solution. Over lunch with a longtime acquaintance, local financial adviser Ross Hoffman, Mr. Myers described Mr. Carroll's problem in general terms, explaining that he had a client who needed to transfer appreciated assets out of a corporation for estate planning purposes. Mr. Hoffman advised Mr. Myers that he knew of a strategy that might work.
>
> Earlier in the year Mr. Hoffman had attended a Las Vegas conference sponsored by Fortress Financial, a New York-based tax planning firm. Erwin Mayer, an attorney with the law firm Jenkens & Gilchrist, gave a seminar at the conference on a strategy he called a "basis boost" that could allegedly increase the tax basis of low-basis assets. The basis boost strategy Mr. Mayer presented was, in substance, a Son–of–BOSS transaction.[873]

Hoffman was not a lawyer and admitted that he did not completely understand the basis boost transaction.[874] However, he put Myers in touch with another attorney who gave him a "memorandum prepared by Jenkens & Gilchrist describing and analyzing the transaction. Myers reviewed the memorandum and consulted some of the legal authorities cited therein, albeit not in extreme detail."[875] Hoffman thereafter presented that basis boost transaction to Carroll and his wife at a meeting Myers attended.[876] Carroll decided to go forward with the basis boost.[877]

As it turned out, the basis boost transaction was not a legitimate way for Carroll to save taxes, and Carroll found himself in tax court facing significant penalties.[878] The *CNT Investors* court used the *Neonatology* court's three-part test for assessing whether Carroll had demonstrated

---

[872] *Id.*

[873] *Id.* at 169. Although not relevant here, Son of BOSS is a type of tax shelter that was designed and promoted by tax advisors in the 1990s to reduce federal income tax obligations on capital gains from the sale of a business or other appreciated asset. It's informal name comes from the name of an earlier tax shelter, BOSS ("Bond and Option Sales Strategy") that it somewhat resembled.

[874] *Id.* at 170.

[875] *Id.* at 171.

[876] *Id.*

[877] *Id.*

[878] *Id.* at 182-83.

reasonable cause based on reliance on the advice of counsel,[879] finding that the question of whether

Myers' had sufficient expertise on which Carroll could justifiably rely posed a difficult question,

in part because the law regarding what constitutes sufficient expertise does not lay out a bright line

test:

> Rather than set a specific standard, the regulations under section 6664(c) outline certain baseline competency requirements. First, rather than mandate that the adviser possess knowledge of relevant aspects of Federal tax law, the regulations stipulate only that "reliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked" such knowledge. Sec. 1.6664–4(c)(1), Income Tax Regs. Second, the adviser must base his or her advice on "all pertinent facts and circumstances and the law as it relates" to them. *Id.* subpara. (1)(i). Third, the adviser must not himself or herself "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer *or any other person.*" *Id.* subpara. (1)(ii) (emphasis added).
>
> In applying these general guidelines, this Court has not articulated a uniform standard of competence that an adviser must satisfy but has instead demanded expertise commensurate with the factual circumstances of each case.[880]

In the end, the tax court concluded that Carrol could rely on Myers for two reasons. First, Carroll

was unsophisticated in financial matters and "had never before invested in even garden-variety

mutual funds and securities" and "understood only basic tax principles."[881] Second, the record

demonstrated that Myers had independently analyzed the basis boost transaction and came to his

own conclusions regarding its validity:

> Mr. Myers performed due diligence. After Mr. Hoffman pitched the Son–of–BOSS transaction to him, in an effort to better understand the proposal Mr. Myers held a conference call with Mr. Mayer. This conversation left Mr. Myers unsatisfied with his grasp of how the transaction would work, so he requested, and Mr. Mayer sent, a memorandum and an article from a tax publication describing and analyzing the transaction and citing various legal authorities. Mr. Myers reviewed Mr. Mayer's memorandum and consulted some of the legal authorities cited therein, albeit not in extreme detail. He also researched Jenkens & Gilchrist. During the implementation phase, he spoke by telephone with Mr. Mayer several times.

---

[879] *Id.* at 223.

[880] *Id.* at 223-24.

[881] *Id.* at 225.

> Mr. Myers believed that he had a good grasp of how the Son–of–BOSS transaction would work and of the legal theories behind it. Although Mr. Myers did not know all of the details of the transaction, the record does not indicate that he shared this fact with Mr. Carroll. Rather, Mr. Myers formed the opinion that the transaction was "legitimate [and] proper", and he did share this opinion with Mr. Carroll. He advised Mr. Carroll that the transaction looked like a viable way to resolve CCFH's low basis dilemma.[882]

For these reasons, the *CNT Investors* court concluded that "[t]o Mr. Carroll, a tax and financial layperson, Mr. Myers would have appeared ideal, not simply competent, to advise him on the feasibility and implications of the basis boost transaction."[883]

Here, however, Sam's and Charles' purported reliance on French presents a situation entirely different from that of *CNT Investors*. French's clients, Sam and Charles, were enormously sophisticated businessmen who knew that French was not qualified to give them tax advice on their highly complex offshore system. Moreover, the evidence unquestionably establishes that French did not believe himself qualified to advise the Wylys on the complicated tax issues raised by their offshore system—that is why he chose to consult actual tax specialists on the Wylys' behalf in order to insure that the tax aspects of their offshore system were properly analyzed and competent advice was given.

As just noted, whether Sam and Charles (and Dee derivatively) could reasonably rely on French's alleged advice about the offshore system comes down to a facts and circumstances analysis of their situations. And, as found at the outset of this section of the opinion, after considering those facts and circumstances, the Court finds that Sam and Charles (and Dee derivatively) could not rely on French's alleged tax advice because: (i) French was not competent to give them such advice as he did not have sufficient tax expertise for them to reasonably rely on

---

[882] *Id.* at 225-26.

[883] *Id.* at 226.

him, and (ii) French did not give them any tax advice of his own—his alleged tax advice was entirely derivative of the tax advice provided by Tedder, Chatzky, and/or Lubar.[884]

Returning to the issue of French's competence, the Court finds that French was not competent to give the Wylys' tax advice upon which they could reasonably rely for several reasons. First, French was not a tax lawyer; he was a securities lawyer, as Evan, Sam, and he testified.[885] In French's own words, his role in relation to the Wylys was "basically a business adviser,"[886] and was certainly not that of a tax lawyer—"I'm not the tax lawyer. I'll take that disclaimer again, okay."[887] In Sam's words: "I don't recall [French] being concerned about tax things. He was a securities lawyer, basically. He was concerned about disclosures to the SEC and things like that, I think, were his primary mission."[888]

Second, the sheer complexity of the Wylys' offshore system made it necessary for French to consult with true tax experts as opposed to attempting to engage in his own tax analysis of the offshore system. That French was not competent to give the Wylys tax advice on the offshore system is corroborated by what he did when faced with uncertainties about the tax consequences

---

[884] French also asked one of his partners at Jackson Walker, Larry Bean ("**Bean**"), about Tedder's proposed offshore annuity transactions and the tax consequences flowing from them to the Wylys. Bean advised French that Jackson Walker would not give the Wylys an opinion consistent with that the Wylys were to get from Tedder, but that Tedder's proposed scheme "may work," characterizing it, however, as aggressive. SEC Tr. Trans. 3725:6-3727:6, 3737:4-3741:12 (French). Three things of significance flow from this: (i) once again, French himself was not competent to analyze the tax consequences, (ii) French's own law firm was unwilling to give the Wylys' a favorable legal opinion upon which they could rely with respect to the 1992 IOM trusts and annuity transactions, and (iii) Sam knew that his primary outside law firm, Jackson Walker, would not give him a legal opinion corroborating the opinion he expected to receive from the promoter of the offshore system—*i.e.*, Tedder's law firm—prior to establishing the 1992 IOM trusts and undertaking the 1992 private annuity transactions.

[885] Tr. Trans. 547:5-12 (Evan) ("I've known Mike a very long time. Probably since the early 1980s he's been involved as the attorney for the family. Early on it was primarily related to securities. With the public companies and mergers and acquisitions and a lot of corporate finance activities, he was very busy with many of the companies that the family was involved in, but then also with just giving advice to the family on other activities."), 550:4-14 (Evan) (Mike French was "the general counsel of Maverick Capital as well as the general counsel for the family."), 1394:16-24 (Sam) (testifying French was primarily a securities lawyer); SEC Tr. Trans. 2116:12-20 (French testifying that he was not a tax lawyer, but that as of 1991 he had been practicing securities law for about 20 years).

[886] SEC Tr. Trans. 1707:2-4 (French).

[887] *Id.* at 3758:7-8 (French).

[888] Tr. Trans. 1394:16-24 (Sam).

associated with the 1992 IOM trusts and the annuity transactions undertaken offshore—*i.e.*, he sought a second opinion from Lubar, a highly credentialed international tax lawyer, both in 1993 and in 1997.[889] This is exactly what the Wylys expected French—who Sam described as "sort of the coordinator or the commander of the lawyers"—to do; find the best in the business in order to get the job done.[890] As the Court previously found, French's decision to seek a second opinion from Lubar confirms that: (i) French had lingering concerns about Tedder's legal opinion (ghost-written by Chatzky) concerning the tax consequences to the Wylys of the 1992 annuity transactions undertaken by Sam and Charles through the Bulldog IOM Trust and the Pitkin IOM Trust, respectively,[891] and (ii) French had no specialized tax knowledge with which to evaluate the proper status of the offshore trusts and the tax consequences flowing from the Wylys' 1992 annuity transactions.

Third, by the time the offshore system was established, both Sam and Charles had many years of experience engaging in highly sophisticated financial transactions. The idea that businessmen as sophisticated as the Wyly brothers could think it was reasonable to rely on a securities lawyer for tax advice regarding their labyrinthine offshore system is not credible. Sam

---

[889] SEC Tr. Trans. 3742:8-22 (French testifying that he went to visit Lubar in 1993 regarding the 1992 trusts), 3709:18-3711:20 (French testifying that he consulted with Lubar again in 1997. Although French's testimony in the SEC Action indicates that French reached out to Lubar at least in part to see if Morgan Lewis would represent the Wylys in an audit unrelated to the offshore system, the grantor status of the 1992 trusts was still also clearly on French's mind. A portion of French's testimony in the SEC Action that was admitted as evidence in this proceeding discusses a fax written by Lubar on June 4, 1997, which characterizes French as "concerned" about the 1992 trusts); IRS Ex. 806 (memorandum dated February 16, 1994 from Lubar to French laying out Lubar's advice on the establishment of foreign grantor trusts as to non-US citizens—the advice purportedly followed to establish the Wyly 1994 and 1995 IOM trusts).

[890] Tr. Trans. 709:1-20 (Sam explaining how French was charged to oversee the legal specialists hired to establish the trusts), 703:11-25 (Sam explaining that "he [French] was sort of the coordinator or the commander of the lawyers who -- who worked on it" while Sam considered himself more the "leader of the companies."), 548:13-16 (Evan discussing how French would seek out other attorneys to give advice—"So Mike would be kind of the lead, but he would bring in whatever specialist he needed. And if there wasn't someone at Jackson Walker that could do it, then he would bring in, you know, an outside attorney.").

[891] No doubt prompted in part by French's view of Tedder as something of a "hustler." SEC Trial Trans. 3773:5-11.

and Charles trusted French as their general counsel, but they knew he was no tax lawyer, as Sam

testified: "I don't recall [French] being concerned about tax things. He was a securities lawyer,

basically. He was concerned about disclosures to the SEC and things like that, I think, were his

primary mission."[892] Both Sam and Charles understood that any alleged tax advice they got from

French was a distillation of what actual, experienced tax lawyers had told him, and nothing more.

As French described himself when asked to confirm that he was not a tax lawyer, he stated:

"[t]hat's right, but I knew what the tax lawyers said we needed to do."[893]

This brings us to the second reason that the Court finds that Sam and Charles (and Dee

derivatively) cannot rely on French in order to establish reasonable cause or a lack of fraudulent

intent—*i.e.*, the record does not show that French actually gave any independent tax advice to the

Wylys regarding the tax treatment of their offshore system, or at least any independent tax advice

upon which they actually relied. The evidence in the record is that most independent investigations

into the offshore system French undertook were related to securities law issues, not tax law

issues.[894] French's role regarding the offshore system was akin to that of a general counsel.[895] In

---

[892] Tr. Trans. 1394:16-24 (Sam).

[893] *Id.* at 2116:12-14 (French); *see also id.* at 3758:7-8 (French) ("I'm not the tax lawyer. I'll take that disclaimer again, okay.").

[894] SEC Tr. Trans. 1725:9-1729:7, 2067:7-2068:22, 2113:11-2116:20 (French's testimony describing a memo analyzing various securities law issues related to the then-proposed offshore system), 1761:22-1765:17 (French discussing IRS Ex. 411, a March 24, 1995 memo from French to Sam addressing some securities law issues related to Tallulah IOM Trust) and 1199 at ¶¶ 11-12 (Portion of "CONSENT OF MICHAEL C. FRENCH" entered in the SEC Action describing this memo). IRS Ex. 1199 ¶¶ 11-12 (Annex A, Admissions of Defendant Michael C. French).

[895] Tr. Trans. 699:15-21 (Sam) ("Q. Okay. What role did Mr. French play in setting up the Isle of Man trusts? A. Well, he was the chief – chief lawyer, chief architect, who – I mean, there were others who worked on it, but he was the – I would say the leader of a team of lawyers and certified public accountants who worked on it."), 709:1-20 (Sam explaining how French was charged to oversee and recruit the legal specialists hired to establish the trusts), 703:11-25 (Sam explaining that "he [French] was sort of the coordinator or the commander of the lawyers who -- who worked on it," while Sam considered himself more the "leader of the companies."), 547:25-548:23, 553:11-554:15 (Evan) (French was a competent, trusted attorney and the lead person on legal matters for the Wylys but often brought in specialists), 590:22-591:21 (Evan) (Sam "felt like Mike, you know, not only evaluated it from his own perspective, but brought in whatever experts from whatever firm – whether it was Jackson Walker, Jones Day, whether it was other attorneys, Tedder, or Chatzky – Sam relied on Mike, and I relied on Mike, you know, to be our attorney and to look out for our best interest and to make sure we were doing what was legal and appropriate and right."); SEC Tr. Trans. 1957:21-1958:8 (French) ("Q [by Wyly counsel]. When Mr. Sam Wyly got married to Cheryl Wyly, his current wife

the Wylys' eyes French took the lead on legal matters; but, the Wylys also recognized that "taking the lead" more often than not involved bringing in specialist lawyers who knew more about a given area of the law than French.[896] True to this form, French's "tax advice" about the offshore system consisted of relaying the opinions of Tedder, Chatzky, and/or Lubar to Sam and Charles. As the *CNT Investors* court pointed out, whether an advisor evaluates a transaction himself and forms his own opinion independent of representations of promoters is very important in determining whether a taxpayer can rely upon that advice.[897] Here, it is clear that (i) the initial tax analysis of the 1992 IOM trusts and annuity transactions originated with Tedder and Chatzky, not French,[898] (ii) Lubar provided a second, and very different, opinion regarding the tax consequences of the 1992 IOM trusts from that provided by Tedder and Chatzky, and (iii) Lubar was the real architect of the 1994 and 1995 generations of trusts,[899] although Lubar had no way of knowing that the facts he was told by French to assume were true for purposes of his advice were not true.

Although Evan testified that French worked "as kind of a double-check on the other attorneys that worked on the project as well and, you know, wrote trusts and wrote annuities,"[900] and that French—far from warning Sam and Evan that there were problems with the 1992 IOM trusts in fact recommended that the Wylys create them—this testimony means less than it might

---

– that happened like in '94, right? A. I don't remember what year it was. Yes. Q. – he turned to you to help him get the prenuptial agreement, right? A. He asked me to get one. I got another lawyer to do it. Q. Mr. Wyly, when he needed something very personal like that, would turn to you. You weren't a family lawyer. Not for you to do it, but to go get some other lawyer to do it, right? A. Yes. Q. You acted kind of as his interface with other lawyers? A. Yes.").

[896] *See* Tr. Trans. 709:1-20 (Sam); 547:25-548:23, 553:11-554:15, 590:22-591:21 (Evan testifying that Sam relied upon French "as general counsel"); SEC Tr. Trans. 1957:21-1958:8 (French).

[897] *CNT Investors, LLC*, 144 T.C. at 226-27.

[898] SEC Tr. Trans. 1717:1-1719:17 (French describing Tedder's foreign trust presentation), Tr. Trans. 1050:19-1051:16 (Sam describing meeting with Tedder where Tedder explained what would become the offshore system); 1052:9-1059:11 (Sam) (same).

[899] IRS Ex. 806 (Memorandum dated February 16, 1994 from Lubar to French providing advice on the creation of foreign grantor trusts to non-resident aliens of the United States—*i.e.*, the Wyly 1994 and 1995 IOM trusts).

[900] Tr. Trans. 566:4-9 (Evan).

seem to at first glance.[901]  First, Evan is not a disinterested witness.[902]  Second, as already found,

French's "double-checking" consisted of (i) conferring with Bean, one of his tax partners at

Jackson Walker who said that while it was aggressive, Tedder's annuity scheme "might work" but

that Jackson Walker would not issue such a legal opinion—obviously not a rousing endorsement

of the scheme,[903] and (ii) conferring with Lubar, an expert international tax attorney who disagreed

with Tedder's and Chatzky's advice, *after* the 1992 IOM trusts were already established.

Regarding the 1994 and 1995 IOM trusts, it is even clearer that French did not

independently bless or double-check those structures.  In fact, French's conduct with respect to the

establishment of these trusts is highly suspect.  French told Lubar to assume certain facts as true

that he knew were not true; and then, when Lubar issued advice to the Wylys on how to structure

the 1994 and 1995 IOM trusts as foreign grantor trusts to King and Cairns (non-resident aliens of

the United States) rather than Sam and Charles based upon those erroneous facts, French proceeded

to try to "paper" the transactions in a way that these trusts would "fit the mold" Lubar described,

---

[901] Tr. Trans. 565:22-566:13 (Evan testifying regarding French's role double-checking transactions), 572:4-6 (Evan) ("Q. Do you recall Mr. French ever advising your father or you not to create the '92 Isle of Man trusts? A. No. In fact, he recommended it."), 568:19-569:25 (Evan stating that he understood that French was researching the 1992 trusts and that—as the family's general counsel—he was the primary liaison between the Wyly family and Tedder and Chatzky), 582:11-583:1 (Evan), 586:15-587:11 (Evan), 588:4-18 (Evan stating that French never told Charles, Sam, or him that the IOM trusts were somehow illegal, wrong, or improper; and that the Wylys were comforted by the fact that French and some of his partners setup their own IOM trusts), 701:24-702:3 (Sam stating that French and Robertson—after attending Tedder's seminar in New Orleans—told Sam that they "thought it was a good plan."). Interestingly, however, French repatriated his Isle of Man trust in 2002.  SEC Tr. Trans. 1913:9-1915:19 (French).

[902] As Sam's eldest son, Evan has an interest in seeing that Sam's liability is minimized here.  Moreover, Evan established his own IOM trust in 1996, and the outcome here may indirectly implicate the tax (and reporting) consequences to him of transactions he undertook through that trust.  Tr. Trans. 589:9-590:10 (Evan), 660:25-664:6 (Evan); 774:9-25 (Evan testifying that he performed annuity transactions through his own IOM trust—Ginger Trust—five years after 1991—*i.e.* in 1996).

[903] SEC Tr. Trans. 3738:12-14 (French) ("[Bean] thought that it might work, I believe.  That was his take on it.  Now, he also indicated to me, and I've said that before, that he felt like it was aggressive."); IRS Exs. 130, 1199 ¶ 10 (p. 7) (Annex A, Admissions of Defendant Michael C. French), which consists of admissions that French made in connection with the SEC Action and which were separately admitted as evidence in this proceeding, and which read in pertinent part as follows: "…Tedder provided a tax opinion in connection with the Wylys' proposed use of Isle of Man Trusts, which stated in substance that the securities held by the Trusts would not be subject to U.S. taxes.  French asked a tax lawyer at Jackson Walker [Bean] to review the opinion and the lawyer subsequently informed French that the position taken in the opinion was aggressive, and that Jackson Walker would not be willing to issue a similar tax opinion. French shared this information with Sam Wyly.").

through the drafting of false documents and not insuring that these trusts were actually funded by the purported grantors, King and Cairns, as the trust documents required.[904]

After a close examination of the record, the Court was only able to uncover one piece of arguably independent tax advice that French gave to the Wylys regarding the offshore system— *i.e.*, that their use of the IOM trusts and corporations as their personal piggy bank could lead to grave tax consequences. French testified repeatedly during the trial in the SEC Action that he told the Wylys—and especially Sam—that controlling the offshore system, for example by using it to purchase assets for use by members of the Wyly family, could have adverse tax consequences.[905] As French testified during the SEC Action, his warnings regarding exercising control over the offshore trusts and corporations did not change Sam's or Charles' behavior at all.[906] Thus, Sam and Charles chose to not follow the one piece of arguably independent tax advice that French may have given them. In the end, however, the Court finds that even this advice was not French's independent advice, as he himself admitted:

Q. You're not a tax lawyer, right?

A. That's right, but I knew what the tax lawyers said we needed to do.[907]

As French himself admitted, he was not a tax lawyer, and the Wylys cannot credibly claim that they viewed him as such.

---

[904] IRS Ex. 806 (Memorandum from Lubar to French providing Lubar's advice predicated on facts French told him to assume were true, but were not); Cairns Depo Tr. 46:18-47:4, 158:6-7 (Cairns testifies that French prepared a letter stating Cairns was a friend of Sam's, and that this was false). *See also* IRS Ex. 92 (Cairns letter). *See also* pp. 87-98, *supra.*

[905] SEC Tr. Trans. 1917:2-9, 1921:3-7, 1940:14-1941:5, 1952:24-1954:21 (French).

[906] *Id.* at 1917:2-16 (French).

[907] *Id.* at 2116:12-14 (French); *see also id.* at 3758:7-8 (French) ("I'm not the tax lawyer. I'll take that disclaimer again, okay.").

For all of these reasons, the Debtors cannot reasonably rely upon any alleged tax advice they claim French gave them with regard to the offshore system as part of their reasonable cause defenses.

### F. Were Gifts Made to the Wylys' Children?

The parties have stipulated to the transactions that are alleged to constitute gifts here. As to Sam:[908]

> Sam Wyly and the IRS stipulate and agree that the property transferred for which the IRS claims gift tax liability for each of the 2000 through 2005 calendar years is [1] the cash used for the purchase, maintenance, improvement and upkeep of the Cottonwood I and Cottonwood II real estate properties, and [2] the cash and other assets that were transferred into the Cayman LLCs.

As to Dee:[909]

> [Dee] & Charles and the IRS stipulate and agree that the property transferred for which the IRS claims gift tax liability [1] for each of the 2001 through 2005 calendar years is cash used for the purchase, maintenance, improvement and upkeep of the Stargate Sport Horse and the Little Woody (LL Ranch) real estate properties, and [2] for the 2010 calendar year the discharge of a promissory note due to Caroline Dee Wyly from the Caroline D. Wyly Irrevocable Trust.

With these stipulations in mind, the Court will discuss the relevant standards it must use to determine whether a gift was made, before analyzing Sam's alleged gifts and then Dee's alleged gifts.

### 1. The Relevant Standards

#### a) Defining a Gift

As initial support for its gift theory, the IRS argues, and this Court agrees, that the term "gift" is to be broadly construed to cover all transactions in which property or property rights are

---

[908] Computation Stipulations ¶ 3.

[909] *Id.* ¶ 15.

gratuitously bestowed upon another by whatever means effected.[910]  As explained in the Treasury

Regulations, gifts need not be wholly gratuitous, but may also include other transfers:[911]

> Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. A consideration not reducible to a value in money or money's worth, as love and affection, promise of marriage, etc., is to be wholly disregarded, and the entire value of the property transferred constitutes the amount of the gift.

Moreover, transactions within a family group are subject to special scrutiny, including a

presumption that a transfer between family members is a gift.[912]  In *Kimball v. U.S.*,[913] the Fifth

Circuit held, in the context of an intra-family asset sale, that:

> In *Wheeler*,[[914]] the government argued that the requirement that a sale be "bona fide" takes on heightened significance in intrafamily transfers and this court agreed. Based on this heightened scrutiny, we concluded that a court should inquire beyond the form of a transaction between family members to determine whether the substance justified the claimed tax treatment.  However, we made it clear that just because a transaction takes place between family members does not impose an additional requirement not set forth in the statute to establish that it is bona fide. A transaction that is a bona fide sale between strangers must also be bona fide between members of the same family. In addition, the absence of negotiations between family members over price or terms is not a compelling factor in the determination as to whether a sale is bona fide, particularly when the exchange value is set by objective factors.  In summary, the *Wheeler* case directs us to examine whether "the sale ... was, in fact a bona fide sale or was instead a disguised gift or a sham transaction."

---

[910] *See* 26 C.F.R. § 25.2511-1 (Transfers in general); *Dickman v. C.I.R.*, 465 U.S. 330, 334 (1984).

[911] 26 C.F.R. § 25.2512-8 (Transfers for insufficient consideration).

[912] *Harwood v. C.I.R.*, 82 T.C. 239, 259, 1984 WL 15537 (1984) ("Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift."); *see also True v. C.I.R.*, 390 F.3d 1210, 1238 (10th Cir. 2004) (citing *Harwood).*

[913] 371 F.3d 257, 263 (5th Cir. 2004) (internal citations omitted).

[914] *Wheeler v. U.S.*, 116 F.3d 749 (5th Cir. 1997).

The Court finds that the heightened scrutiny standard in *Kimball* and *Wheeler* is applicable to the transactions at hand, as each entity and individual involved in the transactions is Wyly affiliated and/or Wyly controlled.

On the other hand, the Debtors argue that there are seven factors that must be satisfied before a gift can be found to have been made: (i) a donor is competent to make the gift, (ii) a donee is capable of accepting the gift, (iii) there is a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift in praesenti, (iv) there is an irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it, (v) there is a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it, (vi) there is acceptance of the gift by the donee, and (vii) the donor did not receive full and adequate consideration for the transfer of the property.[915] Although they will be addressed in detail below, the Debtors generally argue that (i) they lacked the legal capacity to gift assets that are owned by the various IOM or domestic entities, (ii) they did not intend to make gifts of the assets, and (iii) the children never understood the assets to be gifts.

### b) Determining the Underlying Substance of the Transaction

In furtherance of its argument, the IRS also relies upon the general tax principal that the incidence of taxation depends upon the substance of a transaction, rather than its form,[916] as embodied in the judicial doctrines of economic substance, substance over form, and step-transaction, which the Court will explain in turn.

---

[915] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 32 (citing *Guest v. C.I.R.*, 77 T.C. 9, 15-16 (1981) (quoting *Weil v. C.I.R.*, 31 B.T.A. 899, 906 (1934), *aff'd*, 82 F.2d 561 (5th Cir. 1936)); 26 U.S.C. § 2512(b); 26 C.F.R § 25.2511-1(g)(1)).

[916] *See Security Indus. Ins. Co. v. U.S.*, 702 F.2d 1234, 1244 (5th Cir. 1983).

### (1)    The Economic Substance Doctrine

In *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. U.S.*,[917] the Fifth Circuit delineated a three-part test for determining whether a transaction has sufficient economic substance to be respected for tax purposes.  Specifically, whether the transaction: (i) has economic substance compelled by business or regulatory realities, (ii) is imbued with tax-independent considerations, and (iii) is not shaped totally by tax-avoidance features.[918]  As explained by the Fifth Circuit in *Southgate Master Fund, L.L.C.*,[919]

> In other words, the transaction must exhibit objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance.  While these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes, there is near-total overlap between the latter two factors.

Overall, "[t]he economic substance doctrine seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and creating a transaction to generate a tax benefit, which is illegitimate."[920]

As to the first *Klamath* factor, transactions lack objective economic reality if they do not vary, control, or change the flow of economic benefits.[921]  This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so.[922]  That inquiry must be conducted from the vantage point of the

---

[917] 568 F.3d 537 (5th Cir. 2009).

[918] *Id.* at 544.

[919] *Southgate Master Fund, L.L.C.,* 659 F.3d at 480 (footnotes, quotation marks, and internal citations omitted).

[920] *Stobie Creek Inv. LLC,* 608 F.3d at 1375 (emphasis deleted).

[921] *Klamath*, 568 F.3d at 543.

[922] *Southgate Master Fund, L.L.C.*, 659 F.3d at 481-82.

**MEMORANDUM OPINION**                                                                                    233

taxpayer at the time the transaction occurred, rather than with the benefit of hindsight.[923] As to

the remaining factors, the Fifth Circuit explained in *Southgate Master Fund, L.L.C.*[924] that:

> [t]he latter two *Klamath* factors ask whether the transaction was motivated solely by tax-avoidance considerations or was imbued with some genuine business purpose. These factors undertake a subjective inquiry into whether the taxpayer was motivated by profit to participate in the transaction. Tax-avoidance considerations are not wholly prohibited; taxpayers who act with mixed motives, seeking both tax benefits and profits for their businesses, can satisfy the business-purpose test.

### (2) The Substance Over Form Doctrine

The substance over form doctrine provides that the tax consequences of a transaction are

determined based on the underlying substance of the transaction rather than its legal form. As

explained by the Fifth Circuit in *Southgate Master Fund, L.L.C*:[925]

> Where, as here, we confront taxpayers who have taken a circuitous route to reach an end more easily accessible by a straightforward path, we look to substance over form and tax the transactions for what realistically they are. A court is not bound to accept a taxpayer's formal characterization of a transaction, even a transaction that has economic reality and substance. The major purpose of the substance-over-form doctrine is to recharacterize transactions in accordance with their true nature.

### (3) The Step Transaction Doctrine

Similar to the doctrines of economic substance and substance over form, the step-

transaction doctrine permits a court to collapse various steps in a transaction to determine its true

purpose. As explained by the Fifth Circuit in *Security Indus. Ins. Co. v. U.S.,*[926]

> Under the step transaction doctrine, the tax consequences of an interrelated series of transactions are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan. When considered individually, each step in the series may well escape taxation. The individual tax significance of each step is irrelevant, however, if the steps when viewed as a whole amount to a single taxable transaction. Taxpayers cannot compel

---

[923] *Id.*

[924] 659 F.3d at 481 (footnotes and internal citations omitted).

[925] *Id.* at 491 (footnotes and internal quotations omitted).

[926] 702 F.2d at 1244-45 (quotations and internal citation omitted).

a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of circumstances determines its tax status.

Courts in the Fifth Circuit utilize two tests when determining whether to apply the step-transaction doctrine—the "end results" test and the "interdependence" test.[927] As further explained by the Fifth Circuit in *Security Indus. Ins.*:[928]

> The test most often invoked in connection with the application of the step transaction doctrine is the "end result" test. Under this test, purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.  As the Fifth Circuit has noted, when cases involve a series of transactions designed and executed as parts of a unitary plan to achieve an intended result, the plans will be viewed as a whole regardless of whether the effect of doing so is imposition of or relief from taxation.

> A second test for determining whether the step transaction doctrine applies is labeled the "interdependence" test. This test focuses on whether the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. When it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts, step transaction treatment may be deemed appropriate.

With these standards in mind, the Court will now focus on the alleged gifts made by Sam to his children, before turning to Dee's alleged gifts.

### 2. Understanding the Transactions Alleged to be Gifts by Sam to His Children

An overview of the transactions that allegedly resulted in gifts from Sam to his children are discussed above, *see* pp. 62-64, 75-76, 102-105, *supra*.  However, due to the complexity of the transactions, certain of those facts are discussed again below for ease of reference.

### a) Formation and Funding of the Cayman LLCs

On June 1, 2001, six Cayman Island Exempted Corporations were formed and were wholly-owned by the Bessie IOM Trust—Orange L.L.C. ("**Orange**"), FloFlo L.L.C. ("**FloFlo**"),

---

[927] *Id.*

[928] *Id.* (emphasis deleted) (citations and internal quotations omitted).

Bubba L.L.C. ("**Bubba**"), Pops L.L.C. ("**Pops**"), Balch L.L.C ("**Balch**"), and Katy L.L.C. ("**Katy**" and collectively the "**Cayman LLCs**").[929]  According to Evan and Hennington, the Cayman LLCs were established so that Sam's six children could each track a portion of Bessie IOM Trust's assets for educational purposes.[930]  The Cayman LLC's were funded via loans of cash and assets from Security Capital, which Security Capital had to borrow from other Wyly IOM corporations.[931] Specifically, in June 2001, East Baton Rouge Limited (IOM), East Carroll Limited (IOM), Moberly Limited (IOM), and Yurta Faf Limited (IOM),[932] transferred a number of financial assets to Greenbriar Limited (IOM),[933] which, in turn, loaned the assets it received, together with additional financial assets of its own, to Security Capital in return for a promissory note from Security Capital to pay Greenbriar Limited (IOM) $55,815,672.03.[934]  Then, once it had liquidity, Security Capital immediately loaned approximately $8,300,000 to FloFlo and $9,500,000 to each of Balch, Bubba, Katy, Pops, and Orange.[935]  Between June 2001 and December 2004, Security Capital made subsequent loans to each of the six Cayman LLCs such that, by the end of 2004, FloFlo owed approximately $9,700,000 to Security Capital, and each of Balch, Bubba, Katy, Pops,

---

[929] Joint Stipulations ¶ 36.  Joint Exs. 11-16 (Certificate of Incorporation, Memorandum of Association, and Articles of Association for each of Orange, FloFlo, Bubba, Pops, Balch, and Katy, respectively).

[930] Tr. Trans. 625:23-626:18 (Evan), 2090:12-2091:15 (Hennington).  Although the Court questions why Evan, who had a Harvard MBA and had already established his own investment fund, would need a Cayman LLC to help "educate" him as to how foreign trusts and investments worked. *See id.* 523:23-524:2, 679:4-8 (Evan).

[931] Joint Stipulations ¶¶ 292, 303-305.

[932] The Bulldog IOM Trust owns each of these IOM corporations, except for Yurta Faf Limited (IOM), which is owned by the Bessie IOM Trust.  Joint Stipulations ¶¶ 21, 36.

[933] Greenbriar Limited (IOM) was established under the Delhi IOM Trust.  Joint Stipulations ¶ 27.

[934] Joint Stipulations ¶ 292.  East Baton Rouge Limited (IOM) and East Carrol Limited (IOM) are parties to 1992 annuity transactions, *id.* ¶¶ 119-122, while Moberly Limited (IOM) and Yurta Faf Limited (IOM) are parties to 1996 annuity transactions, *id.* ¶¶ 137-138, 141-142.

[935] *Id.* ¶ 303.

and Orange owed approximately $11,100,000 to Security Capital.[936] The "loans" were comprised of various assets consisting of cash, stocks, and investments.[937]

Boucher described the structure of the Cayman LLC's to Sam in a fax dated May 8, 2001:[938]

> The sub-funds will be Cayman LLC's [*sic*] as subsidiaries of the IOM Trusts. They will not be formal appointments out of the overall trust and will be revocable. They exist as a sub-fund via an informal understanding with the trustee whereby we account for these entities separately and liaise with particular family members regarding the underlying assets.
>
> ***
>
> Note that Laurie and Kelly both end up with relatively low liquidity. On a fairly short term basis, Kelly will need liquidity to fund construction costs of their home on Two Mile Ranch [n/k/a Rosemary Circle R Ranch]. Laurie also will need near term liquidity for renovation/reconstructions of the Mi Casa property in Dallas. I suggest either reducing or eliminating allocations of particular investments to them now, or leaving the allocations as is, requiring Laurie and Kelly to decide what to sell when the liquidity needs arise. I don't see a problem with them selling assets back to the overall trust, or in the market when the need arises.

The Cayman LLCs were subsequently formed and one share of each was issued to John Dennis Hunter,[939] although the record does not reflect who Mr. Hunter is or his relationship to the Wylys. Assets were then transferred to the Cayman LLC's, but were "allocated" to Sam's children, who were ultimately in charge of managing the assets contained in the Cayman LLC associated with him or her via the procedure described by Boucher and/or direct ownership of certain entities, as will be discussed below.

A list of the Cayman LLCs, each associated child, and a general overview of the assets transferred to the applicable Cayman LLCs follows.

---

[936] *Id.* ¶ 304.

[937] Wyly Exs. 89 (showing which LLC corresponded to which child), 90 at SEC100066426 (showing the allocation of assets among the Cayman LLCs).

[938] IRS Ex. 90 at SEC100066424.

[939] Joint Exs. 11-16 (formation documents).

| Cayman LLC | Associated Child | Assets Held/Allocated |
|---|---|---|
| Orange | Evan | • Percentage of Spitting Lion Limited (IOM) (which indirectly owned 99% of a home in University Park, Texas purchased for Rosemary Acton).<br><br>• Percentage of Cottonwood Ventures II Limited (IOM) (which indirectly owned condos and office space on 2nd Floor of Paragon Building, Aspen).<br><br>• Percentage of Rosemary Circle R Ranch Limited (IOM) (which indirectly owned approximately 98% of the Wyly family ranch near Aspen called Rosemary Circle R Ranch f/k/a Two Mile Ranch).<br><br>• Varying interests in cash, investments funds, and securities. |
| Pops | Lisa | • Percentage of Spitting Lion Limited (IOM) (which indirectly owned 99% of a home in University Park, Texas purchased for Rosemary Acton).<br><br>• Percentage of Cottonwood Ventures II Limited (IOM) (which indirectly owned condos and office space on 2nd Floor of Paragon Building, Aspen).<br><br>• Percentage of Rosemary Circle R Ranch Limited (IOM) (which indirectly owned approximately 98% of the Wyly family ranch near Aspen called Rosemary Circle R Ranch f/k/a Two Mile Ranch).<br><br>• Varying interests in cash, investments funds, and securities. |
| FloFlo | Laurie | • Percentage of Mi Casa Limited (IOM) (which indirectly owned 99% of a residence in Dallas, Texas in which Laurie lives with her family).<br><br>• Percentage of Spitting Lion Limited (IOM) (which indirectly owned 99% of a home in University Park, Texas purchased for Rosemary Acton).<br><br>• Percentage of Cottonwood Ventures II Limited (IOM) (which indirectly owned condos and office space on 2nd Floor of Paragon Building, Aspen).<br><br>• Percentage of Rosemary Circle R Ranch Limited (IOM) (which indirectly owned approximately 98% of the Wyly family ranch near Aspen called Rosemary Circle R Ranch f/k/a Two Mile Ranch).<br><br>• Varying interests in cash, investments funds, and securities. |
| Bubba | Kelly | • Percentage of Cottonwood I Limited (IOM) (which indirectly owned approximately 90% of the first floor of the Paragon Building in Aspen, where Kelly runs an art gallery).<br><br>• Percentage of Spitting Lion Limited (IOM) (which indirectly owned 99% of a home in University Park, Texas purchased for Rosemary Acton).<br><br>• Percentage of Cottonwood Ventures II Limited (IOM) (which indirectly owned condos and office space on 2nd Floor of Paragon Building, Aspen).<br><br>• Varying interests in investments funds and securities. |
| Balch | Andrew | • Percentage of Cottonwood Ventures II Limited (IOM) (which indirectly owned condos and office space on 2nd Floor of Paragon Building, Aspen).<br><br>• Percentage of Rosemary Circle R Ranch Limited (IOM) (which indirectly owned approximately 98% of the Wyly family ranch near Aspen called Rosemary Circle R Ranch f/k/a Two Mile Ranch).<br><br>• Varying interests in cash, investments funds, and securities. |

**MEMORANDUM OPINION**                                                                                       238

| Cayman LLC | Associated Child | Assets Held/Allocated |
|---|---|---|
| Katy | Christiana | • Percentage of Cottonwood Ventures II Limited (IOM) (which indirectly owned condos and office space on 2nd Floor of Paragon Building, Aspen).<br><br>• Percentage of Rosemary Circle R Ranch Limited (IOM) (which indirectly owned approximately 98% of the Wyly family ranch near Aspen called Rosemary Circle R Ranch f/k/a Two Mile Ranch).<br><br>• Varying interests in cash, investments funds, and securities. |

### b)  The Real Estate Holdings

As shown by the above chart, ownership interests in companies that held interests in real estate were a substantial asset of each Cayman LLC.[940]  These interests were generally held as follows (for property that was to be used personally by a Wyly family member):  Bessie IOM Trust established and wholly owned an IOM entity.  Then, the IOM entity and one or more members of the Wyly family (usually in a 97-99% to 1-3% ratio of the asset purchase price, respectively) would settle the domestic management trust.  The domestic management trust would then form a domestic LLC that would (i) be managed by one or more members of the Wyly family, and (ii) purchase and hold title to the real estate.[941]  In 2001, shares in the IOM entity were transferred from Bessie IOM Trust to the relevant Cayman LLC and the assets were allocated to the associated child.[942]

The structure used for investment in business use property was slightly different.[943]  In that instance, the domestic management trust was replaced with a domestic corporation and an S corporation over which a Wyly family member was president.  The domestic corporation would

---

[940] *See also* Wyly Ex. G (financial statements for Cayman LLCs).

[941] Wyly Ex. KW at SWYLY012939 (graphic depicting ownership structure for personal use real estate); *see, e.g.,* Memorandum Opinion Exhibits D-H (showing ownership structures).

[942] Joint Stipulations ¶¶ 44-47; IRS Ex. 90.  The record shows that some percentage of Mi Casa Limited (IOM) was transferred from Bessie IOM Trust to FloFlo in 2001; however, the record does not disclose when that transfer occurred or what percentage was transferred.  *See* Tr. Trans. 2519:24-2520:13 (Hennington); IRS Ex. 90 (showing allocation of assets); Wyly Ex. G at HST_PSI230998 (financial statement showing FloFlo holding an interest in "Mi Casa Limited" as of December 31, 2001).

[943] Wyly Ex. KW at SWYLY012943 (graphic depicting ownership structure for business use real estate); *see, e.g.,* Memorandum Opinion Exhibit E (showing ownership structure).

**MEMORANDUM OPINION**                                                        **239**

own a large percentage of a domestic LLC managed by a Wyly family member, with the remaining percentage being owned by a Texas S corporation with a Wyly family member as president.[944]

At trial, Pulman, a Meadows Owens partner involved in the structuring of the real estate transactions, explained the premise for this highly complex ownership structure.[945]  As Pulman testified, a disadvantage of a foreign grantor (such as King in the case of the Bessie IOM Trust and the Tyler IOM Trust) owning property in the U.S. is that if that grantor dies, the interest in the U.S. property becomes subject to U.S. estate taxes.[946]  To avoid this happening, the foreigner sets up a foreign corporation, and the foreign corporation makes the investment in U.S. real estate; therefore, when the foreigner dies, the property is not subject to U.S. estate tax.[947]  This explains the involvement of the IOM entity in the real estate transactions.

According to Pulman, the issue then became, since the IOM trust does not own the property directly, but through a foreign corporation, there could be imputation of income as a constructive dividend.[948]  To avoid this, a Wyly family member would become a 1% grantor in the domestic grantor trust.  Pulman testified that this would make the Wyly family member and the foreign corporation joint-tenants under state law, entitling both to full use of the property without the

---

[944] *See* Wyly Exs. N (showing Kelly as the manager of Cottonwood Ventures I LLC (Colorado), the domestic LLC owned by the domestic corporation and the S corporation); Joint Stipulations ¶¶ 322-326 (detailing ownership structure). *See also* Memorandum Opinion Exhibit E.

[945] Tr. Trans. 2540:1-2550:10 (Pulman) (describing general structure of real estate transactions); Wyly Ex. KW (Meadows Owens' internal memorandum detailing ownership structure for real estate, both business use and personal use).

[946] Tr. Trans. 2540:20-2541:6 (Pulman).

[947] *Id.* 2541:4-15 (Pulman).

[948] *Id.* 2541:20-2542:1 (Pulman).

underlying tax implications.[949]  According to Pulman, the management trusts were structured to expressly permit each co-grantor the right to use the real estate.[950]

Several pieces of real estate were purchased under the personal use structure, including (i) the residence in Dallas, Texas, where Laurie and her family live, which is owned by Mi Casa LLC (Texas), (ii) the residence in University Park, Texas, where Rosemary Acton lived, which is owned by Spitting Lion LLC (Texas),[951] (iii) the home(s) on Rosemary Circle R Ranch outside Aspen occupied by Lisa, Laurie, and Kelly,[952] and (iv) the second floor of the Paragon Building in Aspen Colorado, which is owned by Cottonwood Ventures II LLC (Colorado).  In each instance, the ownership and management structure resulted in a Wyly family member having control, at least initially, over how the property was occupied.

For example, Laurie wished to purchase a home in Dallas using the structure she used to build a second home on Rosemary Circle R Ranch, again utilizing offshore funds.[953]  As noted previously, Laurie did not ask any IOM trustee if he thought an IOM trust would be interested in investing in a home for her family to occupy, but instead asked her Dad if it was ok to use the Colorado structure in Dallas to acquire property and then build a home for her family to live in

---

[949] *See, e.g., id.* 2540:1-2543:10 (Pulman) (discussing concept in relation to the Woody Creek Ranch Management Trust); Wyly Ex. BG (Mi Casa Management Trust) § 2.1 ("This Trust is expressly designed to be a Grantor Trust, for purposes of Sections 671 through 679 of the Code, and as such will be ignored for Federal income tax purposes as an entity separate from its Grantors.  Therefore, the Trust Estate will be deemed to be owned by Grantors as tenants in common, each owning an undivided interest in the Trust Estate….").

[950] Tr. Trans. 2542:4-24 (Pulman).

[951] Rosemary Acton was the mother of Evan, Lisa, Laurie, and Kelly.  She lived in the home until her death.  The home is now occupied by Evan's daughter, McCary.  Tr. Trans. 677:11-12 (Sam); 1557:4-25 (Laurie); 2298:14-24 (Hennington).

[952] Allocation regarding Two Mile Ranch was split evenly among all six children.  IRS Ex. 90.  However, only Lisa, Laurie, and Kelly built homes on the property.  Tr. Trans. 931:17-932:19 (Evan); 1514:24-1515:2 (Laurie) ("I live in a house here in Dallas on Crooked Lane that is owned by – by an Isle of Man trust, and I also have a second home I – that I go to in Colorado on the ranch).  The record is unclear, however, whether there was a shared home or multiple homes.

[953] Tr. Trans. 1549:5-1550:2 (Laurie) ("Well, the concept was that Dad's kids could build property on – building on that property in Colorado, and each was allowed a certain amount.  And I reasoned, well, I'm not in Colorado year-round.  I wonder if I could do the same concept in Dallas where I live.").

using offshore funds.[954] Once Sam approved the concept, Laurie began communicating with the Wyly family office, but never spoke to anyone offshore.[955] Under the Meadow Owens structure, Laurie contributed $10,000 for a 1% share of the Mi Casa Management Trust (US).[956] In return, she picked a property, razed the existing structure, and hired architects and contractors to build the home her family would occupy.[957] Nearly $1 million in offshore funds were initially used on the project.[958] After FloFlo was formed in June 2001, the Mi Casa property was "allocated" to Laurie.[959] Although the testimony showed that some portion of Mi Casa Limited (IOM) was then transferred from Bessie IOM Trust to FloFlo, there is no evidence of when in 2001 the transfer occurred or what percentage was transferred.[960] Laurie serves as the trustee of the Mi Casa Management Trust (US) and as the manager of Mi Casa LLC (Texas).[961]

A similar series of events resulted when Evan, Laurie, Lisa, and Kelly wished to use offshore funds to purchase a home for their mother to live in.[962] The facts underlying this transaction are discussed in detail above, *see* pp. 102-105, *supra*, and will not be repeated here. But, in short, in return for a $9,000 contribution for a 1% share of the Spitting Lion Management

---

[954] *Id.* 1551:11-1552:25 (Laurie).

[955] *Id.* 1552:11-22 (Laurie).

[956] Joint Stipulations ¶ 457; Wyly Ex. BG (Trust Agreement).

[957] Tr. Trans. 1550:18-1551:10 (Laurie).

[958] Although the record does not divulge exactly how much in offshore funds were used to build the Mi Casa home, FloFlo's financial statements appear to value the home at a book value of $3,215,000 as of November 30, 2015. Wyly Ex. G (Financial Statements) at HST_PSI230623 (showing FloFlo holding a loan or account receivable from Mi Casa Limited IOM of $3,215,000. Since the record does not reflect such a loan or account receivable, the Court reasonably infers that the figure reflects the value allocated to the home).

[959] IRS Ex. 90.

[960] Tr. Trans. 2296:6-9 (Hennington); *see also* Wyly Ex. G (Financial Statements) at HST_PSI230998 (showing FloFlo holding an investment in "Mi Casa Limited" as of December 31, 2001).

[961] Wyly Exs. BG (Mi Casa Management Trust) at § 1.5 (showing Laurie as the initial trustee) and BH (Articles of Organization of Mi Casa, LLC) at Article V (showing Laurie as the manager).

[962] Tr. Trans. 1557:7-1558:12 (Laurie); IRS Ex. 87 at WYLYSEC01112940 ("Evan, Lisa, Laurie and Kelly are planning to purchase a house for their mother using off-shore funds. I think we would like to use the same Texas LLC, Texas Trust and off-shore corp. to get this done.").

Trust (US), Ms. Acton was permitted to live in the home purchased by Spitting Lion LLC (Texas) for the remainder of her life, despite the fact that she was not a beneficiary of the Bessie IOM Trust.[963] As of June 1, 2001, Spitting Lion Limited (IOM) was owned by Orange, Pops, FloFlo, and Bubba,[964] and allocated to each of Evan, Lisa, Laurie, and Kelly (Sam and Rosemary's children).[965] Ms. Acton and Lisa served as co-trustees of the Spitting Lion Management Trust (US), as well as the managers of Spitting Lion LLC.[966] Ms. Acton has since passed away.[967] On January 1, 2013, Evan's daughter McCary was added as a 1% co-grantor of the Spitting Lion Management Trust (US) and now lives in the home under the same rent-free structure her grandmother had enjoyed.[968]

This structure was also used in connection with the Rosemary Circle R Ranch property near Aspen Colorado, when Laurie, Lisa, and Kelly built homes on the Sam Wyly family ranch using offshore funds.[969] As of June 1, 2001, Rosemary Circle R Ranch Limited (IOM) was owned by Orange, Pops, FloFlo, Bubba, Balch, Katy, and Bessie IOM Trust, and allocated equally among Sam's six children.[970]

The "**Cottonwood Ventures**" properties consist of a set of condominium units on two floors of a commercial office building in downtown Aspen, Colorado, known as the Paragon Building. The first floor condominium unit (Unit 1), which is referred to by the parties as

---

[963] Joint Stipulations ¶ 466; Wyly Ex. BK (formation documents); Tr. Trans. 2282:25-2283:2 (Hennington).

[964] Joint Stipulations ¶ 46.

[965] IRS Exs. 89, 90.

[966] Wyly Exs. BK (The Spitting Lion Management Trust) at § 1.5 (showing Rosemary Acton and Lisa as the initial trustees); BL (Articles of Organization of Spitting Lion, LLC) at 2 (showing Rosemary Acton and Lisa as the initial managers).

[967] Tr. Trans. 1567:7-13 (Laurie).

[968] *See* Memorandum Opinion Exhibit G.

[969] Tr. Trans. 931:7-932:15 (Evan), 1550:4-8 (Laurie). The testimony is clear that Laurie built a second home on the ranch; however, it is unclear whether each of Lisa and Kelly built a home or whether they share a home.

[970] Joint Stipulations ¶ 47; IRS Ex. 90.

"**Cottonwood Ventures I**," is used by Kelly to operate two art galleries.  The second floor condominium units (Units 4 and 7), referred to by the parties as "**Cottonwood Ventures II**," are used as an apartment and an office.[971]  The Cottonwood Ventures properties differ from the Mi Casa, Spitting Lion, and Rosemary Circle R Ranch properties in that the record reflects substantial offshore funds were invested in the Cottonwood Ventures properties after their initial purchase.

Cottonwood I Limited (IOM) was established on July 14, 2000 and was wholly owned by the Bessie IOM Trust.[972]  Cottonwood Ventures I LLC (Colorado) was formed in July 2000,[973] and it purchased the Cottonwood Ventures I property on August 14, 2000.[974]  Cottonwood Ventures I LLC (Colorado) is owned by Cottonwood Gallery Inc. (Nevada) (89.3%) and Wyly Works (10.7%), a Texas S Corporation wholly-owned by Kelly.[975]  As of June 1, 2002, Cottonwood I Limited (IOM) was owned by Bubba and the Bessie IOM Trust and allocated to Kelly.[976]  If the Court finds that Sam made gifts of cash related to the Cottonwood Ventures I property, Sam and the IRS stipulate that the amount of the gift totals $2,855,000.[977]

Cottonwood II Limited (IOM) was established on July 14, 2000 and was wholly owned by Bessie IOM Trust.[978]  Cottonwood Ventures II, LLC (Colorado) was formed in July 2000,[979] and it purchased the Cottonwood Ventures II property on August 14, 2000.[980]  As of June 1, 2001,

---

[971] Joint Stipulations ¶ 321.

[972] *Id.* ¶ 44.

[973] *Id.* ¶ 322; Wyly Ex. N (Articles of Organization file stamped July 26, 2000). *But see* Wyly Ex. O (Operating Agreement of Cottonwood Ventures I, LLC dated as of August 1, 2000).

[974] Wyly Ex. M (Warranty Deed).

[975] Joint Stipulations ¶¶ 324-325; Wyly Exs. N (Articles of Organization for Cottonwood Ventures I, LLC), O (Operating Agreement of Cottonwood Ventures I, LLC) at SWYLY053020 (showing contribution percentages), P (Articles of Incorporation of Wyly Works, Inc. (Texas)).

[976] Joint Stipulations ¶ 44; IRS Exs. 89, 90.

[977] Computation Stipulations ¶ 4 (setting forth the amounts by tax year).

[978] Joint Stipulations ¶ 45; Wyly Ex. T (Articles of Organization).

[979] *Id.* ¶ 342; Wyly Ex. T (Articles of Organization file stamped July 26, 2000). *But see* Wyly Ex. U (Operating Agreement of Cottonwood Ventures II, LLC dated as of August 1, 2000).

[980] Wyly Ex. S (Warranty Deed).

Cottonwood II Limited (IOM) was owned by Orange, Pops, FloFlo, Bubba, Balch, Katy, and Bessie IOM Trust,[981] and allocated equally to Sam's six children.[982] Sam and Kelly served as the co-managing members of Cottonwood Ventures II LLC (Colorado).[983] If the Court finds that Sam made gifts of cash related to the Cottonwood Ventures II property, Sam and the IRS stipulate that the amount of the gift totals $10,961,000.[984]

### c) Liquidation of the Cayman LLCs

Moving forward, the Cayman LLC's were placed into voluntary liquidation in 2006. Sam's children (Evan, Lisa, Laurie, Kelly, Andrew, and Christiana) did not receive any proceeds from the liquidation of the Cayman LLCs,[985] and it appears that the only substantive effect liquidation had on the ownership structure for the domestic real estate was that the shares of the various IOM corporations that were formerly owned by the Cayman LLCs were returned to the Bessie IOM Trust.[986] Sam's children, however, retained full use and enjoyment of the real estate both pre-and post-liquidation of the Cayman LLCs, as they continued to own interests in the domestic entities each acquired with personal funds. The only evidence in the record regarding the other assets in the Cayman LLCs (cash, stocks, and investments) is that they were used to repay the loan to the applicable Cayman LLC from Security Capital.[987]

---

[981] Joint Stipulations ¶ 45.

[982] IRS Ex. 90.

[983] Wyly Ex. U (Operating Agreement of Cottonwood Ventures II, LLC) at SWYLY053079 (Kelly and Sam signing as managers).

[984] Computation Stipulations ¶ 5 (setting forth the amounts by tax year).

[985] Tr. Trans. 2092:14-18 (Hennington) ("Did any of the six children receive any of the liquidation proceeds from the Cayman Islands companies when they were liquidated? No. I would know that because I do all of the accounts for the children.").

[986] Id. at 2091:6-2092:8, 2295:3-20, 2519:14-2521:5 (Hennington).

[987] Id. at 2295:3-20 (Hennington).

**MEMORANDUM OPINION**                                                                 **245**

### 3. Analysis of Alleged Gifts Made by Sam

The IRS' arguments regarding the nature of the alleged gifts from Sam to his children are set forth in §§ 2-3 of its Pre-Trial Brief. From this briefing, the Court had difficulty understanding precisely what the gifts were. And, once the Computation Stipulations were filed shortly before closing argument, it became clear that the IRS was very troubled by the transfers of offshore (i) cash that was used to purchase, improve, and maintain the Cottonwood Ventures I and II properties, and (ii) cash and other assets into the Cayman LLCs. However, the precise legal theory or theories through which the IRS was attacking these transfers as "gifts" from Sam to one or more of his children was not crisply delineated.

Because the Court was unsure that it fully understood the IRS' theories as to Sam's alleged gifts, and it obviously felt the need to understand those theories before attempting to decide the legal issue of whether Sam made any "gift" on which he would owe gift tax, it pressed the IRS for more precision during closing arguments. At that time, the IRS clarified that, with respect to the transfers of cash used for the purchase, maintenance, improvement, and upkeep of the Cottonwood Ventures I property, gifts from Sam to Kelly allegedly occurred when funds were transferred to Cottonwood Ventures I, LLC.[988] For the Cottonwood Ventures II property, gifts from Sam to all six of his children allegedly occurred when the funds were transferred to Cottonwood Ventures II LLC.[989] With respect to Sam's alleged gifts to the Cayman LLCs, the IRS clarified during closing argument that the "gift" occurred when the Cayman LLCs were funded in June 2001.[990]

---

[988] *Id*. at 3992:25-3993:7 (Messersmith) ("when that money hits Cottonwood Ventures I LLC, that is the time at which the gift occurs, but the gift is to Kelly Wyly because she was the one controlling the LLC and all aspects of the operation").

[989] *Id*. at 3997:21-25 (Messersmith) ("The gift is when the money hits Cottonwood Ventures II LLC, and that was for the benefit -- actually, it ended up being allocated among all six of the children -- so -- yes, all six of the children").

[990] *Id*. at 4001:8-10 (Messersmith) ("The gift is the amount of money that Sam Wyly funded each of these LLCs with or the value of the assets that -- that were put in.").

The Court will now analyze the "gifts" as clarified at closing by the IRS.

### a) Cash Used to Purchase, Improve, and Maintain the Cottonwood Ventures I and II Properties

As shown by the parties' stipulations, multiple millions of dollars were transferred from various IOM corporations to purchase, improve, and maintain the Cottonwood Ventures I and II properties.[991] The issue the Court must decide is if the transfers of cash from offshore for these purposes constitutes a "gift" from Sam to Kelly, in the case of the Cottonwood Ventures I property, or from Sam to each of his children, in the case of the Cottonwood Ventures II property.

In response to the IRS' gift arguments, Sam directs the Court to the factors it is to consider to determine if a gift occurred, including whether: (i) a donor is competent to make the gift, (ii) a donee is capable of accepting the gift, (iii) there is a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift in praesenti, (iv) there is an irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it, (v) there is a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it, (vi) there is acceptance of the gift by the donee, and (vii) the donor did not receive full and adequate consideration for the transfer of the property.[992]

---

[991] *See* Joint Stipulations ¶¶ 332-341 (detailing the direct and indirect transfer of funds to Cottonwood Ventures I LLC (Colorado) from Wyly Works, Cottonwood Gallery Inc. (Nevada), Cottonwood I Limited (IOM), Greenbriar Limited (IOM), and Audubon Asset Limited (IOM)) and ¶¶ 350-377 (detailing the direct and indirect transfer of funds to Cottonwood Ventures II LLC (Colorado) from Sam, Kelly, Cottonwood II Limited (IOM), Cottonwood Management Trust (US), Greenbriar Limited (IOM), Yurta Faf Limited (IOM), and Sarnia Investments Limited (IOM)).

[992] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 32 (citing *Guest v. C.I.R.*, 77 T.C. 9, 15-16 (1981) (quoting *Weil v. C.I.R.*, 31 B.T.A. 899, 906 (1934), *aff'd*, 82 F.2d 561 (5th Cir. 1936)); 26 U.S.C. § 2512(b); 26 C.F.R § 25.2511-1(g)(1)).

In this regard, Sam argues that factors (i), (iii), and (iv), which require Sam to be a "donor" who intended to and did irrevocably transfer present legal title, cannot be met because Sam did not own the assets he purportedly gifted.[993]  In support of this argument, Sam cites to *Short v. C.I.R.*,[994] in which the tax court faced the issue of whether Short had made a charitable contribution of land to the State of Delaware.[995]  Citing to the general requirements for a gift detailed above, the tax court found that "[a]n objective inquiry must be made into the nature of the transaction to determine whether that which is labeled as a gift is in substance a gift."[996]  Ultimately, the tax court found that Short was not entitled to a charitable contribution deduction because he failed to satisfy his burden of proving he possessed good legal title to the land he purportedly gifted.[997]

Using this rationale, Sam argues that he could not make a gift of the funds transferred from the IOM corporations because he never held legal title to the funds, as he had divested himself of dominion and control.  Instead, according to Sam, the funds were held by various IOM corporations and domestic entities, which were, in turn, wholly owned or almost wholly owned, directly or indirectly, by the Bessie IOM Trust, over which the IOM trustee exercised dominion and control.

Thus, to determine whether Sam made a gift to his children, we must first examine whether Sam retained sufficient "dominion and control" over the offshore cash, and ultimately the property purchased, improved, and maintained with that cash; and, if so, did he sufficiently relinquish that

---

[993] *Id.* ¶ 37.

[994] 73 T.C.M. (CCH) 2937, 1997 WL 305863 (1997).

[995] *Id.* at *3.

[996] *Id.* (citing cases).

[997] *Id.* at *4.  The Debtors also cite to *Jordahl v. C.I.R.*, 65 T.C. 92 (1975), for the proposition that retention of certain powers does not cause inclusion of the trust's assets in the grantor's estate.

dominion and control in order to make a gift, before moving on to the other factors (if necessary).

As explained in the Treasury Regulations:[998]

> As to any property, or part thereof or interest therein, of which the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another, the gift is complete. But if upon a transfer of property (whether in trust or otherwise) the donor reserves any power over its disposition, the gift may be wholly incomplete, or may be partially complete and partially incomplete, depending upon all the facts in the particular case. Accordingly, in every case of a transfer of property subject to a reserved power, the terms of the power must be examined and its scope determined.

As this Court previously found in analyzing the various badges of fraud related to Sam's underpayment of income taxes,[999] Sam never really gave up dominion and control over the assets held in the offshore system. Although IOM trustees were in place and held legal title to the offshore assets, those trustees never exercised independent judgment in administering the trust assets, instead taking every "wish" Sam expressed to heart and faithfully executing it as directed. Indeed, the real estate transactions detailed above are but a few examples of Sam exercising effective control over the offshore funds in such a way that he and his children could use and enjoy real property, and improvements to that real property, paid for with offshore funds on a rent-free basis to them and a tax-free basis to him.

As we have discussed previously, when Laurie wanted to purchase a home for her family to occupy in Dallas using offshore funds, she did not contact an IOM trustee, she asked Sam. Once Sam approved the transaction, the Meadows Owens structure was put in place with Hennington's and Boucher's assistance, and apparently without a whimper from the trustee of the Bessie IOM Trust. The same is true when Evan, Laurie, Lisa, and Kelly wanted to purchase a home for their

---

[998] 26 C.F.R. § 25.2511-2(b).
[999] See pp. 52-154, *supra.*

mother, Sam's first wife, using offshore funds. Everyone simply assumed that the trustee of the Bessie IOM Trust would go along once Sam's approval was received. And, of course, the IOM trustee did go along. For these reasons and those set forth on pp. 98-110, *supra*, the Court finds Sam's argument that he did not have sufficient dominion and control over the cash in the offshore system to gift it to his children wholly unpersuasive.

However, based on our record, and largely for the same reason, the Court cannot find that Sam made a gift of the cash used for the purchase, maintenance, improvement, and upkeep of the (i) Cottonwood Ventures I property to Kelly, or (ii) Cottonwood Ventures II property to each of his children. In short, while Sam may have let go of the cash from the offshore system so that the Cottonwood Ventures I and II properties could be purchased, improved, and maintained, he received an asset worth equivalent value back through (i) his control over the Bessie IOM Trust, which indirectly owns the majority interest in those properties, (ii) his control over Cottonwood I Limited (IOM), which is the sole shareholder of Cottonwood Gallery Inc. (Nevada), as it relates to the Cottonwood Ventures I property, and (iii) his status as Co-Manager of Cottonwood Ventures II, LLC (Colorado) as it relates to the Cottonwood Ventures II property, all of which will be explained more fully below.

According to Treasury Regulation § 25.2511-2(b), a gift is complete only when the donor has "parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another."[1000] And, as explained above, a gift occurs only where, among other things, there is "a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift in praesenti" and an "irrevocable transfer of the present legal title and of

---

[1000] 26 C.F.R. § 2511-2(b).

the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it."[1001]

It is undisputed that cash from offshore was used to purchase the overwhelming majority interests in the Cottonwood Ventures I and II properties, along with the cash and other assets Kelly and Sam contributed.[1002] And, while Kelly and her siblings may have rent-free access to the Cottonwood Ventures properties, the simple truth is that they do not hold legal title to those properties and do not have the right to sell them and retain the proceeds upon a sale, except in accordance with the various LLC and trust agreements, which would entitle Kelly to a recovery of her investment upon liquidation and her percentage share of any profit.[1003]

First, the Court will examine the relevant governing documents as they relate to each of the Cottonwood Ventures I and II properties to determine whether Sam remains in control of those properties, starting with the Cottonwood Ventures I property owned by Cottonwood Ventures I LLC (Colorado).[1004] Cottonwood Ventures I LLC (Colorado) is managed by Kelly,[1005] and has Wyly Works (a Texas S corporation owned by Kelly) and Cottonwood Gallery Inc. (Nevada) as members.[1006] As manager of Cottonwood Ventures I LLC (Colorado), Kelly has the power to sell property of Cottonwood Ventures I LLC (Colorado),[1007] but needs the approval "of two-thirds

---

[1001] *Holmes v. C.I.R.*, 62 T.C.M. (CCH) 839, 1991 WL 188869 (1991) (quoting *Hite v. C.I.R.*, 49 T.C. 580, 594 (1968)).

[1002] Although the Cottonwood Ventures II property was allocated to each of Sam's six children, the record shows that Kelly is the only child who made a financial contribution to Cottonwood II Management Trust (US). Joint Stipulations ¶ 350. Sam also made a small financial contribution to Cottonwood II Management Trust (US). *Id.*

[1003] *See* Wyly Exs. O (Operating Agreement of Cottonwood Ventures I, LLC) at Article VIII (Company Profits, Losses, and Distributions), V (The Cottonwood Ventures II Management Trust) at Article II (Management, Use and Disposition of Trust Estate); Joint Stipulations ¶ 325. Evan, Laurie, Lisa, Andrew, and Christiana, having made no financial contribution to the Cottonwood Ventures properties, would not be entitled to any distribution under the relevant documents. *Id.*

[1004] Wyly Ex. M (Warranty Deed).

[1005] Wyly Ex. O § 1.12(n) & p. 40 (showing Kelly signing as Manager); Memorandum Opinion Exhibit E.

[1006] Joint Stipulations ¶ 324.

[1007] Wyly Ex. O § 3.1(b).

(2/3)-in interest of the Members" in order to sell "all or substantially all of the Company's business, property and assets (with or without good will), other than in the usual and regular course of the Company's business."[1008] Importantly, Kelly can be replaced as manager by "Members holding a majority of the issued and outstanding Membership Interests entitled to vote."[1009] Wyly Works has a 10.7% membership interest in Cottonwood Ventures I LLC (Colorado) and Cottonwood Gallery Inc. (Nevada) has an 89.3% membership interest in Cottonwood Ventures I LLC (Colorado).[1010] Thus, by virtue of the size of its membership interest, Kelly cannot sell all or substantially all of Cottonwood Ventures I LLC (Colorado)'s assets outside of the normal course of business without the consent of Cottonwood Gallery Inc. (Nevada) and can be replaced as manager with or without cause by Cottonwood Gallery Inc. (Nevada).[1011] And, although Kelly is the president of Cottonwood Gallery Inc. (Nevada), she can be removed and replaced as president at any time by the board of directors.[1012] In turn, the directors can be removed and replaced at any time by the shareholders of Cottonwood Gallery Inc. (Nevada).[1013] The sole shareholder of Cottonwood Gallery Inc. (Nevada) is Cottonwood I Limited (IOM).[1014] Although there are no regulations or bylaws for Cottonwood I Limited (IOM) in the record, what the record does show is that Cottonwood I Limited (IOM) is wholly owned by the Bessie IOM Trust, which is of course

---

[1008] *Id.* § 3.2(a).

[1009] *Id.* § 3.5; *see also id.* §§ 3.3, 3.4, 3.6.

[1010] *Id.* at Ex. A ("Contributions); Memorandum Opinion Exhibit E.

[1011] *Id.* § 3.

[1012] Wyly Ex. R § 5.05 ("Any officer or agent elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the corporation may be filled by the Board of Directors.").

[1013] *Id.* § 3.02 ("The Shareholders shall have the right at any special meeting to remove any Director of this corporation, with or without cause by majority vote of the issued and outstanding shares of capital stock entitled to vote on the election of Directors.").

[1014] Joint Stipulations ¶ 326; Memorandum Opinion Exhibit E.

completely controlled by Sam.[1015] Thus, in the end, Sam has total control over Cottonwood I Limited (IOM), which has total control over the directors of Cottonwood Gallery Inc. (Nevada), who in turn have total control over the management of Cottonwood Gallery Inc. (Nevada), which in turn has total control over the management of Cottonwood Ventures I LLC (Colorado), which owns the Cottonwood Ventures I property.

An even simpler analysis demonstrates Sam's continuing control over the Cottonwood Ventures II property after his alleged gift of cash was made to Cottonwood Ventures II LLC (Colorado), which used the cash (in conjunction with other funds) to buy the Cottonwood Ventures II property.[1016] Cottonwood Ventures II LLC (Colorado) is managed by Kelly and Sam, as co-managers,[1017] and has the Cottonwood II Management Trust (US) as its sole member.[1018] As co-managers, Sam and Kelly have the power to sell the property of Cottonwood Ventures II LLC (Colorado),[1019] but need the approval of its Member—Cottonwood II Management Trust (US)—to sell "all or substantially all the Company's property and assets (with or without good will), other than in the usual and regular course of the Company's business, without complying with the applicable procedures set forth in the [Colorado Limited Liability Company] Act."[1020] Sam and/or

---

[1015] Joint Stipulations ¶ 44; Memorandum Opinion Exhibit E. Although the evidence shows that at some point Bubba was transferred at least some interest in Cottonwood I Limited (IOM) in 2001, these shares were returned to Bessie IOM Trust in 2006. *Id.* In addition, the evidence in the record shows that such appointments to the Cayman LLCs were not "formal appointments out of the overall trust and will be revocable. They exist as a sub-fund via an informal understanding with the trustee whereby we account for these entities separately and liaise with particular family members regarding the underlying assets." IRS Ex. 90 at SEC100066424. In addition, Bessie IOM Trust wholly owned these Cayman LLCs. Memorandum Opinion Exhibit B.

[1016] Wyly Ex. S (Warranty Deed).

[1017] Wyly Ex. U (Operating Agreement of Cottonwood Ventures II, LLC) § 1.12(g) & p. 18 (showing Kelly and Sam as Managers).

[1018] *Id.* §§ 1.12(h), 2.1, & p. 18 (showing Cottonwood II Management Trust (US) as the "original Member entitled to vote").

[1019] *Id.* § 3.1(b).

[1020] *Id.* § 3.2(a).

---

**MEMORANDUM OPINION** 253

Kelly could be replaced as managers by Cottonwood II Management Trust (US).[1021] The initial

trustee of Cottonwood Management Trust (US) was the Highland Trust Company.[1022] However,

"SAM and/or KELLY if either is living and competent, and the Corporation" could remove and

replace the Trustee.[1023] The "Corporation" in question was Cottonwood II Limited (IOM).[1024]

Although there are no regulations or bylaws for Cottonwood II Limited (IOM) in the record, what

the record does show is that Cottonwood II Limited (IOM) is wholly owned by the Bessie IOM

Trust, which is of course completely controlled by Sam.[1025] Thus, Sam, together with Cottonwood

II Limited (IOM) (which he controls via Bessie IOM Trust), can unilaterally replace Highland

Trust Company with a new trustee.[1026] This means that, in the end, Sam has total control over

Cottonwood II Limited (IOM), which in turn has total control over who the trustee of the

Cottonwood II Management Trust (US) is, and that trustee has total control over the management

of Cottonwood Ventures II LLC (Colorado), which in turn has control over the Cottonwood

Ventures II property.

Under these facts, the Court cannot find that Sam made a gift of cash to his children here.

While the Cottonwood Ventures I and II properties were purchased using mostly offshore funds,

---

[1021] Id. §§ 3.3, 3.4, 3.5, 3.6.

[1022] Id. at 18 (reflecting Highland Trust Company as trustee of the Cottonwood Ventures II Management Trust); Wyly Ex. V (The Cottonwood Ventures II Management Trust) § 1.5. Hennington, the CFO of the Wyly family office, signed documents on behalf of Highland Trust Company. See e.g., Wyly Ex. U at 18 (showing Hennington signing as the "Authorized Officer" of Highland Trust Company).

[1023] Wyly Ex. V at § 1.5(a).

[1024] Id. § 1.3(a).

[1025] Joint Stipulation ¶ 45; Memorandum Opinion Exhibit F. Although the evidence shows that at some point Orange, Pops, FloFlo, Bubba, Katy, and Balch were transferred at least some interest in Cottonwood II Limited (IOM) in 2001, these shares were returned to Bessie IOM Trust in 2006. In addition, the evidence in the record shows that such appointments to the Cayman LLCs were not "formal appointments out of the overall trust and will be revocable. They exist as a sub-fund via an informal understanding with the trustee whereby we account for these entities separately and liaise with particular family members regarding the underlying assets." IRS Ex. 90 at SEC100066424. In addition, Bessie IOM Trust wholly owned these Cayman LLCs. Memorandum Opinion Exhibit B.

[1026] Wyly Ex. V §§ 1.5(a) ("Any Trustee may be removed…by the following individual(s) and entity(s)…[1] by SAM and/or KELLY if either is living and competent, and the Corporation"), 1.5(a) (defining Corporation as Cottonwood II Limited (IOM)).

Sam has never given up control over those properties after their purchase. While Kelly has been permitted by Sam to exercise control over those properties day-to-day, Sam can remove her at any time. Moreover, the fact that Kelly and her siblings may use the properties does not make them, or the cash used to purchase, improve, and maintain them, a gift. The Bessie IOM Trust still owns the overwhelming majority of the Cottonwood Ventures I and II properties, albeit indirectly.

The various judicial doctrines espoused by the IRS do not change this determination. As explained by the Fifth Circuit in *Klamath*,[1027] this Court must consider whether these transactions: (i) had economic substance compelled by business or regulatory realities, (ii) are imbued with tax-independent considerations, and (iii) are not shaped totally by tax-avoidance features. These factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction disregarded for tax purposes.[1028] "Thus, if a transaction lacks economic substance compelled by business or regulatory realities, the transaction must be disregarded even if the taxpayers profess a genuine business purpose without tax-avoidance motivations."[1029]

As to the first factor, the Court must make an objective inquiry from the taxpayer's vantage point at the time the transaction occurred as to whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility they would do so.[1030] Here, real money changed hands when the real estate was purchased from third parties. Although the record clearly reflects that Sam used the offshore system as his personal piggy bank, and the Court questions whether the various "loans" among the IOM corporations related to the Cottonwood Ventures I

---

[1027] 568 F.3d at 544.

[1028] *Id.*

[1029] *Id.*

[1030] *Southgate Master Fund, L.L.C.*, 659 F.3d at 481.

and II properties will be repaid; in the end, these transactions resulted in the Bessie IOM Trust investing, albeit indirectly, in U.S. real estate, a transaction that has economic substance.

The remaining *Klamath* factors, which are a subjective inquiry into whether the parties to the transaction were motivated by any legitimate, non-tax business purpose,[1031] are met for similar reasons. Here, the motivation behind the transaction was to purchase real estate chosen and to be used by certain of Sam's children, which occurred through a structure devised by Meadows Owens.[1032] Granted, investing in U.S. real estate via the Meadows Owens structure may not be the most profitable of its investments, but in the end, the Bessie IOM Trust indirectly owns valuable real estate, controls the ultimate disposition of that real estate, and the direct and indirect owners of that real estate will share proportionally in the gains or losses in accordance with the governing documents. Although the Meadows Owens structure may have been implemented to minimize taxes to the beneficiaries or avoid taxation should the foreign grantor die, there is simply nothing in the record indicating that the investment lacked a business motivation or was made solely for tax avoidance purposes.

Despite this, the IRS asks the Court to sham the transaction on the general allegation that Sam's children were allowed to use the properties so they must have received a gift. The Court is simply not willing to so find based on the record before it. From this Court's perspective, the issue returns to whether Sam exercised sufficient dominion and control over the offshore system and its funds to make a gift, which he did, and whether he completed such a gift, which he did not.

---

[1031] *Klamath,* 568 F.3d at 544; *Southgate Master Fund, L.L.C.*, 659 F.3d at 481-82.

[1032] *See, e.g.,* Tr. Trans. 1549:5-1550:2 (Laurie) ("Well, the concept was that Dad's kids could build property on – building on that property in Colorado, and each was allowed a certain amount. And I reasoned, well, I'm not in Colorado year-round. I wonder if I could do the same concept in Dallas where I live."); IRS Ex. 87 at WYLYSEC01112940 ("Evan, Lisa, Laurie, and Kelly are planning to purchase a house for their mother using off-shore funds. I think we would like to use the same Texas LLC, Texas Trust and off-shore corp. to get this done.").

The Court further finds that, in substance, the transactions were not Sam making a gift of cash to Kelly (or any other child). As explained above, while Sam may have given up control over the funds long enough that they could be used to purchase the Cottonwood Ventures I and II properties, he did not give those funds to his children nor did he give up control over the properties purchased, improved and maintained with those funds—*i.e.*, the Cottonwood Ventures I and II properties. In essence, the funds were used to purchase a substitute asset still owned today by the Bessie IOM Trust, albeit indirectly. And, although Sam permits Kelly to use and manage the Cottonwood Ventures I and II properties day-to-day, and all of his children to use the Cottonwood Ventures II property, there is simply no evidence in the record supporting an inference that he gave his children the cash so they could buy the properties and hold legal title to them (indeed, no child has ever held legal property to either property). In short, none of Sam's children may individually or collectively dispose of the properties or direct the Bessie IOM Trust to dispose of the properties, and if the properties were sold, only Kelly would be entitled to a portion of the sale proceeds commensurate with her ownership interests. And, while offshore funds were also used to improve and maintain the Cottonwood Ventures I and II properties, that does not make those funds a gift either, as the Bessie IOM Trust remains the overwhelming majority owner of the Cottonwood Ventures I and II properties, albeit indirectly, and owners normally spend money to improve and maintain their property.

A step-transaction analysis leads to a similar result. When the transactions are considered together as component parts of an overall plan, the non-gratuitous nature of the transaction becomes apparent. Sam controlled the offshore funds and, at his direction, those funds were used, along with monies contributed by Kelly in accordance with her percentage of ownership, to purchase the Cottonwood Ventures I and II properties, which properties Kelly (predominately)

uses rent-free. But, even if the transactions were collapsed to a direct purchase of real estate by the Bessie IOM Trust and Kelly (as to the Cottonwood Ventures I property on a roughly 90% to 10% ratio and as to the Cottonwood Ventures II property on a roughly 98% to 2% ratio), the record still does not reflect that Sam parted with his ability to exercise dominion and control over the assets largely purchased with the offshore cash. In fact, it demonstrates that Sam still maintains control over the assets.

Accordingly, for the reasons set forth above, the Court finds and concludes that the cash used for the purchase, maintenance, improvement, and upkeep of the Cottonwood Ventures I and II properties was not a gift by Sam to Kelly or any other of his children.

### b) Cash and Other Assets that were Transferred Into the Cayman LLCs

The second category of alleged gifts, "cash and other assets transferred into the Cayman LLCs," are comprised of transfers of (i) ownership interests in the IOM corporations that indirectly own U.S. real estate—Mi Casa Limited (IOM), Spitting Lion Limited (IOM), Rosemary Circle R Ranch Limited (IOM), Cottonwood I Limited (IOM), and Cottonwood II Limited (IOM) (collectively, the "**IOM Real Estate Companies**")—from Bessie IOM Trust to one or more of the Cayman LLCs, and (ii) cash, investments, and other financial assets to the Cayman LLCs. As alleged by the IRS, these gifts occurred when the "cash and other assets" were transferred into the Cayman LLCs in 2001.

### (1) The Interests in IOM Real Estate Companies

Before June 2001, the Bessie IOM Trust owned 100% of the interests in the IOM Real Estate Companies, other than Rosemary Circle R Ranch (IOM) that was owned by both Bessie

IOM Trust and Orange.[1033] In June 2001, the Cayman LLCs were formed and were wholly owned by the Bessie IOM Trust.[1034] Thereafter, but still in 2001, Bessie IOM Trust transferred some or all of its ownership interests in the IOM Real Estate Companies to one or more of the Cayman LLCs. Specifically, Bessie IOM Trust transferred: (i) its ownership of Spitting Lion Limited (IOM) to four of the Cayman LLCs—Orange, Pops, FloFlo, and Bubba,[1035] (ii) a portion of its ownership of Cottonwood I Limited (IOM) to one Cayman LLC—Bubba, while retaining an ownership interest,[1036] (iii) a portion of its ownership of Cottonwood II Limited (IOM) to all six of the Cayman LLCs, while retaining an ownership interest,[1037] (iv) a portion of its ownership interests in Rosemary Circle R Ranch Limited (IOM) to all six of the Cayman LLCs, while retaining an ownership interest,[1038] and (v) an unknown portion of its ownership of Mi Casa Limited (IOM) to one Cayman LLC—FloFlo.[1039]

According to the IRS, Bessie IOM Trust's transfer of these ownership interests in the IOM Real Estate Companies to the Cayman LLCs identified above resulted in a gift from Sam, as grantor of the Bessie IOM Trust,[1040] to his children, for whose benefit the Cayman LLCs were established. The IRS argues that donative intent is shown because (i) although the Cayman LLC's

---

[1033] Joint Stipulations ¶¶ 43-47. The Court notes that the parties stipulated that, as of April 11, 2000, Rosemary's Circle R Ranch Limited (IOM) was owned by the Bessie IOM Trust and Orange. *Id.* ¶ 47. There is no explanation in the record, though, how Orange could hold an interest in Rosemary Circle R Ranch Limited (IOM) in April 2000, when it was not established until June 1, 2001. *Id.* ¶ 36. The Court assumes the earlier stipulation to be in error.

[1034] *Id.* ¶ 36.

[1035] *Id.* ¶ 46.

[1036] *Id.* ¶ 44.

[1037] *Id.* ¶ 45.

[1038] *Id.* ¶ 47.

[1039] The record shows that some percentage of Mi Casa Limited (IOM) was transferred from the Bessie IOM Trust to FloFlo in 2001; however, the record does not disclose when that transfer occurred or what percentage was transferred. *See* Tr. Trans. 2519:24-2520:13 (Hennington); IRS Ex. 90 (showing allocation of assets); Wyly Ex. G at HST_PSI230998 (financial statement showing FloFlo holding an interest in "Mi Casa Limited" as of December 31, 2001).

[1040] As found by the SDNY Court in the SEC Action, to which we have applied collateral estoppel effect here. Collateral Estoppel No. 24.

were liquidated in 2006 and ownership of the IOM Real Estate Companies was returned to the Bessie IOM Trust, Sam's children still enjoy unfettered access to the underlying real estate, and (ii) both the interests in the IOM Real Estate Companies and the loans underlying those interests were transferred to the Cayman LLCs (in effect, cancelling each other out).

As an initial matter, the Court notes that the transfer of interests in the IOM Real Estate Companies did not involve multiple steps or loans among the various IOM corporations, but was instead a transfer directly from the Bessie IOM Trust to one or more of the Cayman LLCs.[1041]  As a result, the step-transaction doctrine does not apply.  The Court will, however, consider whether the transfers had economic substance or were, in substance, a gift.  The Court answers both these inquiries in the negative, as it will now explain.

The Court finds that the transfers of ownership interests in the IOM Real Estate Companies from the Bessie IOM Trust to one or more of the Cayman LLCs lacked economic substance.  It appears that the interests were merely moved from the Bessie IOM Trust to one or more of the Cayman LLCs in 2001, and then back to the Bessie IOM Trust in 2006 when the Cayman LLCs were liquidated, with no real discernable effect on anyone—business, tax, or otherwise.  Simply put, the Court is unable to tell why this transfer occurred and what material effect, if any, it had on anyone or anything.

---

[1041] As reflected in the record: (i) the Cayman LLCs were established June 1, 2001 and were wholly-owned by the Bessie IOM Trust, Joint Stipulations ¶ 36, (ii) the Mi Casa, Spitting Lion, Cottonwood Ventures I and II, and Rosemary Circle R Ranch properties were purchased prior to June 1, 2001, Wyly Exs. BJ, BN, K, L, M, and S and Joint Stipulations ¶ 307, (iii) each IOM Real Estate Company was wholly-owned by the Bessie IOM Trust as of its formation, other than Rosemary Circle R Ranch Limited (IOM), which was owned by the Bessie IOM Trust and Orange as of April 11, 2000, Joint Stipulations ¶¶ 43-47, and (iv) as of June 1, 2001, the IOM Real Estate Companies were owned wholly or partially by the various Cayman LLCs, Joint Stipulations ¶¶ 44-47 (although ¶ 44 states "as of June 1, 2002," that date appears to be in error; the date, however, does affect this Court's ruling).  Although the record shows that some percentage of Mi Casa Limited (IOM) was transferred from Bessie IOM Trust to FloFlo in 2001, the record does not disclose exactly when that transfer occurred or what percentage was transferred.  *See* Tr. Trans. 2519:24-2520:13 (Hennington); IRS Ex. 90 (showing allocation of assets); Wyly Ex. G at HST_PSI230998 (financial statement showing FloFlo holding an interest in "Mi Casa Limited" as of December 31, 2001).

But, it is also true that there was no gift here to any of Sam's children. Even if this Court steps back and considers the overall substance of the 2001 ownership interest transfers in the IOM Real Estate Companies, the IOM Real Estate Companies were still owned by the Bessie IOM Trust at all times—either directly in part and indirectly in part or entirely indirectly.[1042]   And, although Sam's children had unfettered access to the underlying real estate both before and after the Cayman LLCs were liquidated, this access was a result of the indirect ownership interests purchased by the respective Wyly family member(s), which was unaffected by the existence of the Cayman LLCs.

The Court is also not persuaded by the IRS' argument that Sam's donative intent is shown by the Cayman LLCs allegedly receiving both the ownership interests in the IOM Real Estate Companies and the account receivable related to the transfer of those interests.[1043]   Although the IRS' argument is difficult to follow, the Court interprets the argument to be that, because the Cayman LLCs received both the ownership interests in the IOM Real Estate Companies and the alleged loan incurred to obtain the ownership interests, the transactions cancel each other out, resulting in a gift. The Court, however, disagrees. As explained above, the record simply does not support a finding that the Cayman LLCs received their ownership interests in the IOM Real Estate Companies via a loan from Security Capital. To the contrary, the interests were via a direct transfer from the Bessie IOM Trust. Thus, the IRS' argument on this point fails.

---

[1042] The Bessie IOM Trust owned: (i) Spitting Lion Limited (IOM) indirectly (through its ownership of Orange, Pops, FloFlo, and Bubba), (ii) Cottonwood I Limited (IOM) directly in part and indirectly in part (through its ownership of Bubba), (iii) Cottonwood II Limited (IOM) directly in part and indirectly in part (through its ownership of the Cayman LLCs), (iv) Rosemary Circle R Ranch Limited (IOM) directly in part and indirectly in part (through its ownership of the Cayman LLCs), and (v) Mi Casa Limited (IOM) directly in part and/or indirectly in part (as the record is unclear).

[1043] IRS Pre-Trial Brief [ECF No. 1018] at 78 ("Additionally, each child had full control of the entities that directly owned the property. The 'debts' were also transferred to the Cayman LLCs which were created for the benefit of children, showing the donative nature of the transactions involving Cottonwood I and II and the Cayman LLCs. *** The listing of these obligations in the family financials records was not a sign of an actual debt, but rather to show to whom the property was assigned. This is reflected in the transfer of these 'loans' to the Cayman LLCs, which were created for the benefit of the children. Each Cayman LLC would receive the "loans" associated with the assets that they were using *i.e.* Cottonwood I to Bubba, LLC and Mi Casa to FloFlo, LLC.")

As alleged by the IRS, the gift here is the transfer of ownership interests in the IOM Real Estate Companies from Bessie IOM Trust to one or more of the Cayman LLCs in 2001. While those transfers occurred, the transfers were not a gift to one or more of Sam's children. As was the case with the Cottonwood Ventures I and II properties, while Sam's children may have unfettered use of the real estate "allocated" to them, they (i) did not own an interest in any Cayman LLC (all of which were liquidated in 2006), and (ii) do not hold legal title to the underlying real property that they use and enjoy. The Bessie IOM Trust always owned the Cayman LLCs and has always owned the IOM Real Estate Companies since their formation, either directly or indirectly.[1044] On this record, the IRS has failed in its proof.

### (2) Cash and Other Financial Assets Transferred to the Cayman LLCs

The second type of alleged gift is the cash and other financial assets that were transferred into the Cayman LLCs in 2001. As stipulated by the parties, it appears that the scope of these alleged gifts is comprised primarily, if not exclusively, of the assets loaned by Security Capital to the Cayman LLCs in June 2001.[1045] As stipulated by the parties, if the Court determines that Sam made gifts of the cash and other assets transferred in 2001, the amount of such gifts to each of the Cayman LLCs is as follows: (i) Orange, $10,753,278; (ii) Pops, $10,756,981; (iii) FloFlo, $9,045,676; (iv) Bubba, $7,944,666; (v) Balch, $10,758,263; and (vi) Katy, $10,758,217.[1046]

With respect to these transfers, the IRS urges this Court to find that the various "loans" among the IOM corporations, as well as the formation of the Cayman LLCs and the foreign and

---

[1044] As clearly shown in the record, the interests in the IOM Real Estate Companies transferred to the Cayman LLCs were returned to the Bessie IOM Trust when the Cayman LLCs were liquidated, which is directly contrary to the IRS' allegation that the interests were gifted by Sam to his children.

[1045] Joint Stipulations ¶¶ 292-304; Computation Stipulations ¶ 6.

[1046] Computation Stipulations ¶ 6. The Court is unsure whether the parties' stipulated figure is inclusive or exclusive of the ownership interests in the IOM Real Estate Companies. That determination is irrelevant, however, since the Court finds that no gift occurred in either instance.

domestic trusts, were all sham transactions in furtherance of Sam's scheme to avoid taxes.[1047] With

respect to the loans, the IRS cites to *Miller v. C.I.R.*,[1048] which held that the determination of

whether a transfer was made with a real expectation of repayment or was a sham depends on all

the facts and circumstances surrounding the transaction, including whether: (i) there was a

promissory note or other evidence of indebtedness, (ii) interest was charged, (iii) there was any

security or collateral, (iv) there was a fixed maturity date, (v) a demand for repayment was made,

(vi) any actual repayment was made, (vii) the transferee had the ability to repay, (viii) any records

maintained by the transferor and/or the transferee reflected the transaction as a loan, and (ix) the

manner in which the transaction was reported for Federal tax purposes is consistent with a loan.[1049]

Unfortunately, after identifying the relevant facts to be considered, the IRS does not analyze them

to any extent, but merely states:[1050]

> Here, there is no evidence to show that any of the obligations were paid and the notes have open maturity dates. There is no indication that any interest was charged or paid. No demand for repayment was ever made. Finally, the ability to repay the loans is also questionable because the majority of the alleged loans were used to develop and maintain real estate, and therefore, there is no cash readily available to make payments on these alleged obligations. Instead, these appear to be nothing more than entries listed on the family financials balance sheet that served to paper over the gifts.

This quote was taken from the IRS' Amended Proposed Findings of Fact and Conclusions

of Law, which the Court directed be filed after the evidentiary record was closed so that all relevant

record cites could be included for the Court's review. However, no supporting record cites were

provided by the IRS for these proposed findings. The lack of record cites may be because there is

nothing to cite to, as no testimony, promissory notes, or other documents detailing the alleged

---

[1047] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶ 97.

[1048] 71 T.C.M. (CCH) 1674, 1996 WL 10259 (1996).

[1049] IRS' Amended Proposed Findings of Fact and Conclusions of Law [ECF No. 1103] ¶ 97.

[1050] *Id.*

terms of the loans are found in the record.  As noted previously, the IRS bears the burden to prove that Sam made a gift.  If the record is deficient, it is the IRS' problem, not Sam's.

However, even assuming its proposed findings are supported by the evidence, the IRS still failed to show that the cash and other assets loaned to the Cayman LLCs by Security Capital were gifts by Sam to his children.  In fact, there is nothing in the record indicating that Sam relinquished his dominion and control over the assets transferred to the Cayman LLCs, which is particularly apparent with Sam's two youngest children, Andrew (Balch) and Christiana (Katy).  These children did not use offshore funds from the IOM corporations, the Cayman LLCs, or otherwise to purchase homes or other assets, and they are only mentioned in passing in the IRS' arguments. Overall, there is no credible evidence in the record demonstrating that any child exercised any control over the Cayman LLC "allocated" to him/her or the cash and other assets held by the Cayman LLCs.

While the Court is cognizant of the IRS' argument that the Cayman LLCs were only liquidated and their assets returned because Sam was under investigation by the SEC and audit by the IRS and had no other choice, the legal impact of that argument makes little sense here.  As it relates to the Cayman LLCs, there was nothing for the children "to return" to the offshore system, as they never owned anything and nothing ever "left" the offshore system.  The Bessie IOM Trust always owned the Cayman LLCs and it always owned the cash and other assets held in the Cayman LLCs, albeit indirectly.

For all of these reasons, the IRS has failed in its proof that any of the transfers they alleged constituted gifts were actually gifts from Sam to one or more of his children.  Because the Court determines that Sam made no gifts as alleged by the IRS, the IRS' argument that Sam fraudulently failed to file gift tax returns related to these "gifts" is unavailing.

**4.** **Understanding the Transactions Alleged to be Gifts by Dee to Her Children**

With respect to Dee, the parties have stipulated that the alleged gifts are: (i) for each of the 2001 through 2005 calendar years, the cash used for the purchase, maintenance, improvement, and upkeep of the Stargate Horse Farm and Little Woody (LL Ranch) real estate properties, and (ii) for the 2010 calendar year, the discharge of a promissory note due to Dee from the Caroline D. Wyly Irrevocable Trust."[1051] The Court will address these in turn.

**c)** **Stargate Horse Farm**

"**Stargate Horse Farm**" is a 95-acre property located in a rural area of Denton County, Texas, near the Dallas-Fort Worth metroplex, on which a state-of-the-art equestrian facility was built and operated to import, breed, train, and show internationally competitive sport horses.[1052] The background underlying Stargate Horse Farm is described in an October 16, 2000 memo from Boucher to Robertson and French:[1053]

> Charles is looking at establishing a breeding and equestrian training facility with Emily's involvement. A business plan has been presented, involving the acquisition of approximately 140 acres of land just north of DFW airport. Only 50 acres will be used for the business venture and it is likely that the remaining land will be subsequently sold. Keeley [Hennington] and I are consulting Rodney [Owens] to see if we can use a structure similar to that which was used for the gallery in Aspen, thus utilizing foreign assets for the cash injection and contributing Emily's horses in the same way Kelly contributed the gallery's inventory stocks. *** I have not seen it yet, but understand the business plan indicates the business will not likely cash flow for the first few years, and will need ongoing capital. The anticipated initial commitment will be a minimum of $3 Million.

---

[1051] Computation Stipulations ¶ 15.

[1052] Joint Stipulations ¶ 378.

[1053] IRS Ex. 1281 at CWG-000340 (section titled "Sport Horses"). *See also* Memorandum Opinion Exhibit I.

Meadows Owens set up the following ownership structure for Stargate Horse Farm.[1054] Tyler IOM Trust established and owned 100% of Stargate Farms Limited (IOM),[1055] which in turn established and owned 100% of Stargate Horse Properties, Inc. (Nevada).[1056] According to the Joint Stipulations, Stargate Sport Horses, LP (Texas) was then owned by two partners: (i) Stargate Horse Properties, Inc. (Nevada), as the 98% limited partner, and (ii) Stargate Sport Horses Management LLC (Texas), which was wholly-owned by Emily, as the 2% general partner.[1057] Stargate Sport Horses, LP (Texas) purchased the underlying real estate,[1058] was the owner of record for the real estate and improvements, and also operated the equestrian facility located on the property.[1059]

As stipulated by the parties, from 2001 through 2005 Stargate Horse Properties, Inc. (Nevada) contributed approximately 98% of the funds required to acquire, construct, and operate Stargate Horse Farm, while Stargate Sport Horse Management LLC (Texas) contributed the remaining 2%.[1060] The funds contributed by Stargate Horse Properties, Inc. (Nevada) were transferred from Elysium Limited (IOM) and Soulieana Limited (IOM) to Stargate Horse Properties, Inc. (Nevada), which then transferred the funds to Stargate Sport Horses, LP (Texas).[1061] If the Court determines that Dee (and Charles) made gifts of cash related to the

---

[1054] *See* Wyly Ex. KZ at SWYLY013139 (illustrating the ownership structure); Tr. Trans. 2553:14-2555:23 (Pulman discussing the ownership structure and related tax implications).

[1055] Joint Stipulations ¶ 87.

[1056] *Id.* ¶ 387.

[1057] *Id.* ¶¶ 380, 384. The agreed demonstrative chart provided to the Court, however, shows that Stargate Sport Horses, LP (Texas) was owned 91.21% by Stargate Horse Properties, Inc. (Nevada) and 8.79% by Stargate Sport Horse Management LLC (Texas), which are the same percentages reflected in the Agreement of Limited Partnership of Stargate Sport Horses, L.P. (Wyly Ex. X at 39). Although the Court notes this discrepancy, it is not material to its decision.

[1058] Wyly Ex. Y (General Warranty Deed).

[1059] Joint Stipulations ¶ 379.

[1060] *Id.* ¶ 390.

[1061] *Id.* ¶¶ 391-409.

MEMORANDUM OPINION                                                                                          266

purchase, maintenance, improvement, and upkeep of Stargate Horse Farm, the aggregate value of those gifts is $12,715,000, as the parties stipulated.[1062]

When additional funds were needed to operate Stargate Horse Farm, the partners of Stargate Sport Horses, LP (Texas) contributed funds in accordance with the operating agreement.[1063] After the Senate investigation began, however, Stargate Horse Properties, Inc. (Nevada) failed to fund ongoing operations, which resulted in Emily making loans to Stargate Sport Horses, LP (Texas).[1064] When Stargate Horse Farm was sold in 2009, the sale proceeds were distributed in accordance with the operating agreement—creditors were paid in full, including the loans made by Emily, then the proceeds were split between the partners.[1065] In the end, the bulk of the net proceeds, approximately 91%, were returned to Stargate Farms Limited (IOM) through its ownership of Stargate Horse Properties, Inc. (Nevada).[1066]

As noted previously, the IRS alleges that Dee (and Charles) made gifts to Emily of all the cash used for the purchase, maintenance, improvement, and upkeep of Stargate Horse Farm, with the gift being complete when the funds were transferred to Stargate Sport Horses, LP (Texas), the entity controlled by Emily.[1067]

### d) Little Woody (LL Ranch)

"**LL Ranch**," also known as Little Woody, is a 26-acre property with a residence near Aspen, Colorado that was initially acquired and owned by Little Woody, Ltd., a Texas limited

---

[1062] Computation Stipulations ¶ 16 (transfers by tax year).

[1063] Tr. Trans. 2184:13-19 (Hennington); Wyly Ex. X (Agreement of Limited Partnership of Stargate Sport Horses, L.P.) at Article IV (Capital Contributions).

[1064] Tr. Trans. 2184:20-2185:9 (Hennington).

[1065] *Id.* at 2185:14-19, 2186:4-2187:20 (Hennington). *See also* Wyly Ex. X (Agreement of Limited Partnership of Stargate Sport Horses, L.P.) at § 11.02 (Method of Liquidation).

[1066] Tr. Trans. 2187:16-20 (Hennington).

[1067] *Id.* at 3982:4-8 (Messersmith) ("The gift occurred when the money hit the LP, but – because that's when Emily got control, but the gift is to Emily, but the gift did not occur until the money hit the LP.").

partnership ("**Little Woody, Ltd. (Texas)**").[1068]  Little Woody, LLC (Colorado) was formed on October 22, 1999[1069] and was initially wholly owned by Little Woody Creek Road Limited (IOM).[1070]  In November 1999, the Little Woody Management Trust (US) was established, with Emily contributing assets equating to a 1% share, Jennifer contributing assets equating to a 1% share, and Little Woody Creek Road Limited (IOM) contributing assets equating to a 98% share.[1071]  In November 1999, Little Woody Creek Road Limited (IOM) contributed 100% of the membership interests in Little Woody, LLC (Colorado) to Little Woody Management Trust (US).[1072]  Then, in March 2001, Little Woody, Ltd. (Texas) sold LL Ranch to Little Woody LLC (Colorado).[1073]  Emily and Jennifer share a home built on the LL Ranch property.[1074]

From 2001 through 2004, Little Woody Creek Road Limited (IOM) contributed 98% of the funds transferred to Little Woody Management Trust (US), while Emily and Jennifer contributed 1% each of the funds transferred to Little Wood Management Trust (US).[1075]  As stipulated by the parties, between 2001 and 2004, approximately $6.2 million was transferred from Little Woody Creek Road Limited (IOM) to Little Woody Management Trust (US), and then from Little Woody Management Trust (US) to Little Woody LLC (Colorado).[1076]

---

[1068] Joint Stipulations ¶ 434.

[1069] *Id.* ¶ 437; Wyly Ex. BC at SWYLY053239 (Articles of Organization file stamped October 22, 1999); *but see* Wyly Ex. BC at SWYLY053271(Operating Agreement of Little Woody, LLC (Colorado) dated as of November 30, 1999).

[1070] Joint Stipulations ¶ 437.  Although the Joint Stipulations state that Little Woody, LLC was formed in Texas and refers to the entity as "Little Woody, LLC (Texas)," the entity was formed in Colorado.  Wyly Ex. BC (Articles of Organization and Operating Agreement of Little Woody LLC).  Thus, it appears to the Court that the Joint Stipulations' references to Texas in paragraphs 437, 438, 440, 442-445, and 448-455 are in error.

[1071] *Id.* ¶ 439.

[1072] *Id.* ¶ 440.

[1073] *Id.* ¶ 442.  *See also* Exhibit J attached hereto.

[1074] Tr. Trans. 2187:21-2188:7 (Hennington).

[1075] Joint Stipulations ¶ 447.

[1076] *Id.* ¶¶ 449-455 (detailing transfers by date).

The IRS alleges that Dee (and Charles) made gifts to Emily and Jennifer of all the cash used for the purchase, maintenance, improvement, and upkeep of LL Ranch, with the gifts being complete when the funds were transferred to Little Woody LLC (Colorado).[1077]  The aggregate value of those alleged gifts is $6,205,000.[1078]

### 5. Analysis of the Alleged Gifts Made by Dee

#### a) Cash Used for the Purchase, Maintenance, Improvement, and Upkeep of the Stargate Horse Farm and Little Woody (LL Ranch) Real Estate Properties

As did Sam, Dee argues that the IRS failed to prove the necessary elements of a gift,[1079] including factors (i), (iii), and (iv), which require Dee to be a "donor" who intended to and did irrevocably transfer present legal title to the cash or the real property purchased, improved, and maintained with that cash.  Pointing to the IOM trustees, Dee argues that she did not have legal title over the cash and assets held in the offshore system and, as such, did not have the legal capacity to make a gift of the funds to her daughters.  The Court finds this argument far more persuasive coming from Dee than it did coming from Sam.

Although the record is replete with instances where Charles exercised dominion and control over the funds in the offshore system through his control over the IOM trustees[1080] that is simply not the case with Dee.  The record is clear that, even though Dee purchased items that were paid for with offshore funds, she did not know that was happening.  Charles had always provided

---

[1077] Tr. Trans. 3987:1-6 (Messersmith) ("The gift is actually made, though, at the point the funds hit Little Woody, LLC, because that's when they had control of it.").  The Court notes, however, that Emily and Jennifer have no direct ownership of Little Woody LLC (Colorado).  Instead, they are each 1% co-grantors of the Little Woody Management Trust (US), the direct parent of Little Woody LLC (Colorado).

[1078] Computation Stipulations ¶ 17 (transfers by year); Joint Stipulations ¶¶ 448-455 (detailing specific transfers).

[1079] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 32 (citing *Guest v. C.I.R.*, 77 T.C. 9, 15-16 (1981) (quoting *Weil v. C.I.R.*, 31 B.T.A. 899, 906 (1934), aff'd, 82 F.2d 561 (5th Cir. 1936); 26 U.S.C. § 2512(b); 26 C.F.R. § 25.2511-1(g)(1)).

[1080] *See, e.g.,* Collateral Estoppel Nos. 52, 53.

**MEMORANDUM OPINION**                                                                      269

very well for her and their family, and Highland Stargate generally paid the bills. As explained above, pp. 21, 77-78, 133 n.573, *supra*, Dee did not discuss business with Charles, much less the complex offshore system he and Sam established in the IOM. Although Dee may have known there were offshore entities involved in the Wyly holdings, this Court is convinced that she never exercised control over those entities or would even know how to exercise control if she had wanted to do so. While Charles clearly had the ability to control the flow of funds and assets via "wishes" that were obeyed by the IOM trustees without question, there is nothing in the record to indicate that Dee held a similar power or even knew such a power existed. Based upon the record before it, the Court cannot find that Dee exercised sufficient dominion and control over the offshore funds so that she could gift them to her children.

Further, even if Dee could have gifted the assets, the record clearly shows that she did not, as the assets (whether in the form of cash or real estate) remained within the Wyly offshore system. It is undisputed that offshore cash was used to purchase the overwhelming majority interest in Stargate Horse Farm and the LL Ranch property, along with the cash and other assets that Emily contributed in the case of Stargate Horse Farm and the cash that Jennifer and Emily contributed in the case of LL Ranch. And, while Emily may have enjoyed day-to-day control over Stargate Horse Farm, the record clearly establishes that Charles retained control over the farm as a legal matter from the day it was purchased until it was sold[1081] and, upon its sale, the overwhelming majority

---

[1081] In short, (i) Charles had total control over Stargate Farms Limited (IOM) through his control over the trustee of the Tyler IOM Trust (*see* Collateral Estoppel Nos. 52, 53; Joint Stipulations ¶ 87), which (ii) had total control over the appointment of the officers and directors of Stargate Horse Properties Inc. (Nevada) (*see* Wyly Ex. AC (Bylaws of Stargate Horse Properties, Inc. (Nevada) at §§ 5.01 & 5.02 (stating chairman of the board or, if no chairman, president has operational control over the business), 3.2 & 5.02 (the shareholder has the ability to appoint and remove officers and reconstitute the board of directors); Joint Stipulations ¶ 387 (Stargate Horse Properties, Inc. (Nevada)'s sole shareholder is Stargate Farms Limited (IOM)), which (iii) in turn, had total control over the management of Stargate Sport Horses LP (Texas) (*see* Wyly Ex. X (Agreement of Limited Partnership of Stargate Sport Horses, L.P.) at §§ 6.01 (placing management of the business, including the right to sell assets, with the Managing General Partner), 10.02-10.03 & 1.01 (the Managing General Partner may be removed with the written consent of limited partners holding at least 50% of sharing ratio, as judged by investment capital), Ex. A (showing Stargate Horse Properties, Inc.

of the net sale proceeds (approximately 91%) were distributed to Stargate Farms Limited (IOM).[1082] Moreover, while Jennifer and Emily may have rent-free access to the LL Ranch property and the home they built on that property, the simple truth is that they do not hold legal title to it and do not have the right to sell it and retain the proceeds upon a sale, except in accordance with the Little Woody Management Trust (US) agreement.[1083]

Granted, while investing in U.S. real estate using the structure set up by Meadows Owens may not be the best business decision of the trustee of the Tyler IOM Trust (as controlled by Charles), it does not change the fact that, in the end, the trust owned the overwhelming majority of Stargate Horse Farm until it was sold and still owns the overwhelming majority of the LL Ranch property and the improvements made to it, albeit indirectly.

That the alleged recipients of the gifts did not/do not hold legal title to the real estate and did not/do not have the right to retain the proceeds upon a sale (except in accordance with their written agreements) is amply demonstrated by the sale of Stargate Horse Farm in 2009, which, as noted previously, resulted in the distribution of net sale proceeds in accordance with the various operating agreements, with approximately 91% of the funds returning to the IOM offshore system. Under these facts, the Court is hard-pressed to see how Dee could have made a gift to Emily, when the funds were returned to the IOM system in proportion to the parties' respective investments when Stargate Horse Farm was sold.[1084]

This same reasoning applies to Charles. Although the record shows that Charles exercised sufficient dominion and control over the offshore funds and assets to gift them, the Court finds

---

as holding an Initial Sharing Ratio of 91.21%); which (iv) in turn had control over the management of Stargate Horse Farm (*see* Joint Stipulations ¶ 378).

[1082] Tr. Trans. 2187:16-20 (Hennington).

[1083] A copy of the Little Woody Management Trust (US) agreement may be found at Wyly Ex. BD.

[1084] Tr. Trans. 2187:16-20 (Hennington).

that no such gift occurred. Simply put, there is nothing in the record showing that Charles parted with his dominion and control over the offshore funds and assets to make a gift of them to Emily, in the case of Stargate Horse Farm, and Jennifer and Emily, in the case of LL Ranch. In fact, as previously found with regard to Stargate Horse Farm, Charles retained control over the farm through his ability to control Stargate Horse Farms Limited (IOM) through his control over the trustee of the Tyler IOM Trust, which had total control over the appointment of directors of Stargate Horse Properties Inc. (Nevada), and these directors in turn had total control over the management of Stargate Horse Properties Inc. (Nevada), which in turn had total control over the management of Stargate Sport Horses LP (Texas), which in turn had control over the management of Stargate Horse Farm. [1085]

Similarly, Charles exercised total control over the LL Ranch property when the gift of cash, as alleged by the IRS, was made. To reiterate, according to the IRS, the gift here was the transfer of approximately $6.2 million of offshore funds to Little Woody LLC (Colorado), which used the cash to purchase, improve, and maintain the LL Ranch property. Little Woody Creek Road Limited (IOM) contributed that cash to Little Woody Management Trust (US) beginning in March 2001 and concluding in November 2004, which then transferred the cash, plus amounts contributed by Emily and Jennifer, to Little Woody LLC (Colorado). [1086] Little Woody Management Trust (US) owned 100% of Little Woody LLC (Colorado)[1087] and, throughout that time period, Charles

---

[1085] *See* p. 270 n.1081, *supra.*

[1086] Joint Stipulations ¶ 447-555.

[1087] *Id.* ¶¶ 439-442; Memorandum Opinion Exhibit J. Although the Joint Stipulations state that Little Woody, LLC was formed in Texas and refers to the entity as "Little Woody, LLC (Texas)," the entity was formed in Colorado. Wyly Ex. BC (Articles of Organization and Operating Agreement of Little Woody LLC). Thus, it appears to the Court that the Joint Stipulations' references to Little Woody LLC (Texas) are in error and should be references to Little Woody LLC (Colorado) (Little Woody, Ltd. is the Texas entity).

was the Manager of Little Woody LLC (Colorado),[1088] which owned the LL Ranch property.[1089]

Moreover, Robertson and French were the initial Trustees of Little Woody Management Trust

(US) when it was formed in March 1999[1090] and the Court reasonably infers that Robertson

remained as Trustee when French's relationship with the Wylys ended in early 2001.[1091] So,

throughout the period of time that the IRS' alleged gift was made by Charles to Emily and Jennifer,

Charles remained in complete control of the cash initially and then the LL Ranch property and

improvements made to that property by virtue of his complete control over the trustee of the Tyler

IOM Trust, which controlled Little Woody Creek Road Limited (IOM), which in turn was the 98%

grantor of the Little Woody Management Trust (US), whose trustee, Robertson, Charles

controlled.

As noted previously, according to Treasury Regulation § 25.2511-2(b), a gift is complete

only when the donor has "parted with dominion and control as to leave in him no power to change

its disposition, whether for his own benefit or for the benefit of another."[1092] And, as explained

above, a gift occurs only where, among other things, there is "a clear and unmistakable intention

on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and

control of the subject matter of the gift in praesenti" and an "irrevocable transfer of the present

legal title and of the dominion and control of the entire gift to the donee, so that the donor can

---

[1088] Wyly Ex. BC (Articles of Organization of Little Woody LLC) at SWYLY053239 (showing Charles as the sole manager), SWYLY053271 (Operating Agreement of Little Woody, LLC showing Charles signing as Manager). As reflected in the agreed chart submitted by the parties, Donnie Miller now serves as manager. Memorandum Opinion Exhibit J.

[1089] Joint Stipulations ¶ 442.

[1090] Wyly Ex. BD (The Little Woody Management Trust) at § 1.5.

[1091] Joint Stipulations ¶ 11 ("Mr. French served as primary counsel for Sam Wyly and Charles Wyly until early 2001 when the relationship was severed.").

[1092] 26 C.F.R. § 25.2511-2(b).

exercise no further act of dominion or control over it."[1093]  That never occurred here with respect to either Stargate Horse Farm or the LL Ranch property.

Further, as was the case with Sam, the various judicial doctrines espoused by the IRS do not change these findings—as to either Dee or Charles.  Even with the application of the substance over form, economic substance, and step-transaction doctrines, this Court must still make an independent assessment of whether the legal elements of a gift exist, which they do not.  Because Dee did not have the legal capacity to make a gift of the offshore funds to her daughters, the Court need not consider whether the transaction had economic substance because, fundamentally, a person cannot gift what they do not own (whether via legal title or, in the case of Sam and Charles, de facto control).

Thus, for the foregoing reasons, the Court finds and concludes that Dee did not make a gift to (i) Emily of the funds used for the purchase, maintenance, improvement, and upkeep of Stargate Horse Farm, and (ii) Emily and Jennifer of the funds used for the purchase, maintenance, improvement, and upkeep of the LL Ranch property.  The IRS has failed in its proof.

### b) The Promissory Note Due to Dee from the Caroline D. Wyly Irrevocable Trust

#### (1) Overview of the Transaction

Stargate, Ltd. ("**SGL**"), a Texas limited partnership, was formed effective as of December 15, 1992 under the name Brush Creek, Ltd.[1094]  Bush Creek, Ltd.'s Partnership Agreement was subsequently amended to (i) change the entity's name from Brush Creek, Ltd. to SGL, and (ii) reflect Dee's and Charles' additional contributions of various assets, including options in Michaels

---

[1093] *Holmes v. C.I.R.*, 62 T.C.M. (CCH) 839, 1991 WL 188869 (1991) (quoting *Hite v. C.I.R.*, 49 T.C. 580, 594 (1968)).
[1094] Wyly Ex. OJ (Amendment to Partnership Agreement of Stargate, Ltd) at 2.  Documents referencing the formation of SGL vary between using December 14, 1992 and December 15, 1992 as the formation date.  The actual date, however, is not material to the Court's analysis and decision.

Stores and Sterling Software and a life insurance policy.[1095]  The new contributions were valued at $44,343,615.[1096]  Prior to September 30, 1999, SGL's general partners were Dee and Charles (1.02668%), and its limited partners were Dee (47.37276%), Charles (46.16672%), and Dee and Charles' children and grandchildren and trusts set up for their respective benefits (aggregating 5.43384%).[1097]

Between 1993 and 2007, varying amounts were loaned by SGL to Dee and Charles on an unsecured basis.[1098]  As reflected on Dee's bankruptcy schedules (Schedule F), $28,080,127.92 was outstanding on this loan to Charles and her as of the date she filed her Case (the "**Unsecured Loan**").[1099]  The note receivable related to the Unsecured Loan was reflected in SGL's financial statements, and the note payable was reflected on Dee and Charles' personal balance sheet.[1100]

Near the end of 1999, Dee and Charles implemented a multi-step estate planning program involving their limited partnership interests in SGL (the "**Estate Planning Transactions**").  On October 21, 1999, Dee and Charles executed a Marital Agreement dated effective September 30, 1999, pursuant to which they partitioned the community ownership of their limited partnership interests in SGL.[1101]  Also effective September 30, 1999, Dee sold her now-separate property limited partnership interests in SGL to a newly created trust—The Caroline D. Wyly Irrevocable

---

[1095] *Id.* § 3.

[1096] *Id.*

[1097] The ownership percentages are those reflected in an agreed demonstrative chart submitted by the parties.  The Court notes, however, that the percentages vary from those set forth in the Amendment to Partnership Agreement of Stargate, Ltd (Wyly Ex. OJ) at § 2.2.  The discrepancy is minor and does not affect this Court's decision.

[1098] Tr. Trans. 2146:10-13 (Hennington) (stating the loans were between 1992 and 1999); Wyly Ex. PD (tracking balance of Unsecured Loan from 1993 through 2011, and showing borrowing as late as October 2007).

[1099] Schedule F [Case No. 14-35043, ECF No. 351] at 30; Statement of Financial Affairs [Case No. 14-35043, ECF No. 352] at Ex. 3.c.

[1100] Tr. Trans. 2147:9-14 (Hennington).  A spreadsheet tracking the Unsecured Loan between March 1993 and December 2011 may be found at Wyly Ex. PD.

[1101] Wyly Ex. OK (Marital Agreement).

Trust (the "**CDW Irrevocable Trust**").[1102] In return, the CDW Irrevocable Trust issued to Dee a Secured and Partially Guaranteed Promissory Note in the amount of $26,054,111.00 (the "**CDW Irrevocable Note**").[1103] Also in connection with this transaction, Dee's children executed a Specific Guarantee Agreement,[1104] pursuant to which they guaranteed repayment of specified amounts of the CDW Irrevocable Note in exchange for a yearly fee, and the CDW Irrevocable Trust executed a Pledge Agreement whereby it pledged to Dee its newly-acquired limited partnership interest in SGL.[1105]

At this same time, Charles entered into substantially similar transactions, transferring his now-separate property limited partnership interests in SGL to The Charles J. Wyly Irrevocable Trust (the "**CJW Irrevocable Trust**" and, together with the CDW Irrevocable Trust, the "**Irrevocable Trusts**") in exchange for a promissory note in the amount of $25,487,656 (the "**CJW Irrevocable Note**" and, together with the CDW Irrevocable Note, the "**Irrevocable Notes**").[1106] After the sale, Dee and Charles remained SGL's general partners (1.01854%) and the CDW Irrevocable Trust (46.99734%), the CJW Irrevocable Trust (45.97945%), and Dee and Charles' children and grandchildren and various trust established for their benefit (6.00467%) were the limited partners.[1107]

---

[1102] Tr. Tran. 2147:15-21 (Hennington); Wyly Ex. OL (The Caroline D. Wyly Irrevocable Trust). The beneficiaries of the CDW Irrevocable Trust are the children resulting from Dee and Charles' marriage and all of their respective descendants, whether then living or later born or adopted. *Id.* at § 1.6. Although the trust document states that the initial *res* may be found at Exhibit B to the document, Wyly Ex. OL has no Exhibit B attached.

[1103] Wyly Ex. ON. The CDW Irrevocable Note required quarterly interest payments. Quarterly principal payments of $651,350 commenced on December 31, 2009, with any unpaid interest and principal due on September 30, 2019. *Id.* at 1.

[1104] Wyly Ex. OO.

[1105] Wyly Ex. OP at 1.

[1106] *See* Tr. Trans. 2147:25-2148:11 (Hennington); Wyly Ex. OQ (The Charles J. Wyly, Jr. Irrevocable Trust), OR (Memorandum of Sale and Assignment of Partnership Interest), OS (Secured and Partially Guaranteed Promissory Note), OT (Specific Guaranty Agreement), OU (Pledge Agreement).

[1107] The ownership percentages are as reflected on an agreed demonstrative exhibit submitted by the parties. Although the Court was unable to trace these percentages through the documents (Wyly Exs. OJ-OV), the discrepancy was minor and not material to this Court's decision.

Stargate Investments (Texas) was formed on October 15, 1999.[1108] The Charles J. Wyly, Jr. Family Trust and The Caroline D. Wyly Family Trust (together, the "**Revocable Trusts**") served as both general partners (each holding 1%) and limited partners (each holding 49%) of Stargate Investments (Texas).[1109] As reflected in the partnership agreement for Stargate Investments (Texas), Dee and Charles contributed assets valued at $98,424,589[1110] to it, including their right to receive future payments under (i) all annuity agreements[1111] between each of them and the various IOM corporations, (ii) the CDW Irrevocable Note, and (iii) the CJW Irrevocable Note.[1112]

Generally under this structure, Dee and Charles would make payments to SGL on account of the Unsecured Loan.[1113] SGL would use those funds to make a distribution to its partners, including the Irrevocable Trusts.[1114] The Irrevocable Trusts would then use those funds to make payments to Stargate Investments (Texas) on account of the Irrevocable Notes.[1115] In turn, Stargate Investments (Texas) would make distributions to Dee and Charles via a deposit into their community property bank account.[1116]

---

[1108] Wyly Ex. OW (Partnership Agreement for Stargate Investments, Ltd.) § 10.13.

[1109] *Id.* § 2.2; Joint Stipulations ¶ 162.

[1110] Wyly Ex. OW at Ex A (Initial Capital Contributions).

[1111] In 1992 and 1996, Charles entered into multiple transactions whereby he transferred securities that he had earned from Sterling Software, Sterling Commerce, and Michael Stores in exchange for private annuities payable to Dee and him. *See* Joint Stipulations ¶¶ 145-160. The private annuities entitled them to contractual payments commencing at various future dates. *See* pp. 59-78, *supra,* for a detailed explanation of the annuity transactions.

[1112] Tr. Tran. 2150:1-2151:4 (Hennington); Wyly Ex. OW (Partnership Agreement for Stargate Investments, Ltd.) at Exhibit A; Joint Stipulations ¶ 161.

[1113] Tr. Trans. 2154:1-4 (Hennington).

[1114] *Id.* at 2154:8-24 (Hennington).

[1115] *Id.* at 2154:25-2155:10 (Hennington).

[1116] *See id.* 2154:25-2155:15 (Hennington); Wyly Ex. PC (showing distributions from Stargate Investments (Texas) being paid to "Charles Wyly Community Property"). Because the Revocable Trusts were settled by Dee and Charles, the distributions from Stargate Investments (Texas) flowed through the Revocable Trusts to Dee and Charles and were reported on their tax returns. 26 U.S.C. § 671; Joint Stipulations ¶ 174.

**MEMORANDUM OPINION**                                                                                      277

According to the Debtors, the Irrevocable Notes were paid in full on October 25, 2010 utilizing the above payment structure, as indicated by the hand-written notation on each note.[1117] In this regard, Hennington testified that payments on the Irrevocable Notes were made either in cash or by book entries that tracked the payables and receivables of each individual and entity.[1118] Wyly Exhibit PA is a letter composed by Hennington and sent to Christina Pfiffner, the internal revenue agent auditing certain aspects of the Wyly offshore structure and transactions. According to Hennington, the letter provides all documents necessary to show payment in full of the Irrevocable Notes, including a schedule tracking all cash and book entry payments made on the Irrevocable Notes and supporting bank statements and record entries.[1119]

The IRS is not convinced that the Irrevocable Notes were repaid, arguing instead that the circular nature of the payments merely masked the fact that no actual value changed hands, resulting in a gift by Dee to the CDW Irrevocable Trust on October 25, 2010 when the CDW Irrevocable Note was allegedly discharged, but not really repaid.[1120] According to the IRS, the Irrevocable Trusts' ability to repay the Irrevocable Notes was wholly dependent upon Dee and Charles making payments on the Unsecured Loan, which payments would then circulate to the Irrevocable Trusts and be used to pay the Irrevocable Notes, ultimately returning to Dee and Charles. According to the IRS, the true nature of this transaction is driven home by the fact that Dee is unable to show an increase in her assets corresponding to the amounts allegedly repaid on the CDW Irrevocable Note. The IRS does not challenge the Estate Planning Transactions generally, just the fact that there was no true repayment of the CDW Irrevocable Note.

---

[1117] Wyly Exs. ON (Dee), OS (Charles); Tr. Tran. 2158:3-2159:6 (Hennington).

[1118] Tr. Trans. 2163:3-13; 2169:8-12, 2171:6-23 (Hennington).

[1119] *Id.* 2163:18-2173:12 (Hennington).

[1120] *See id.* 3939:9-11 (Messersmith) ("So the gift is to the irrevocable trust, of which the kids are the sole beneficiaries, but the gift is to the irrevocable trust."); Computation Stipulations ¶ 18.

A chart prepared by the parties depicting the ownership structure and the Charles and Dee Wyly Estate Planning Transactions, is attached to this Memorandum Opinion as Exhibit K.

(2)     **Analysis of the Alleged Gift Made by Dee**

The Court initially struggled to understand the true implications of the circular transactions, as each step facially appears proper.  Indeed, the IRS does not allege that (i) the Unsecured Loan was not owed by Dee and Charles to SGL, (ii) Dee sold her limited partnership interests in SGL for insufficient value, or (iii) the CDW Irrevocable Note was not a valid promissory note.  Thus, the circular flow of funds seems appropriate, until one steps back to consider the overall effect.

Normally, when a person sells an asset, as Dee purported to do here—*i.e.,* her limited partnership interests in SGL—the purchaser pays for what it bought with its own assets.  But, that did not happen here.  As the record shows (and as described below), the funds used to pay the CDW Irrevocable Note, which Dee received in exchange for her limited partnership interests in SGL, were funds Dee was entitled to receive from other sources *prior* to the Estate Planning Transactions.  Thus, in repayment, Dee received no new value and the res of the CDW Irrevocable Trust was untouched.  What did occur was that Dee "sold" her valuable limited partnership interests in SGL to the CDW Irrevocable Trust, which was established for the benefit of her children and grandchildren, without any corresponding benefit to her or tax being paid.  These overriding facts must be kept in mind as we wade through the complexity of these transactions and whether they had economic substance as judged under the *Klamath* factors.

As to the first *Klamath* factor, the Court must make an objective inquiry from the taxpayer's vantage point at the time the transaction occurred as to whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility they would do so.[1121]  Here,

---

[1121] *Southgate Master Fund, L.L.C.*, 659 F.3d at 481.

the record clearly reflects that the CDW Irrevocable Trust's ability to repay the CDW Irrevocable Note was wholly dependent on Dee and Charles making a payment on the Unsecured Loan, which was owed by them well before they undertook the Estate Planning Transactions. In fact, the CDW Irrevocable Trust bank account that was used to repay the CDW Irrevocable Note had a zero balance prior to the trust receiving its first distribution from SGL in January 2000.[1122] And, once a distribution was made, it flowed through the system, both paying down the Unsecured Loan and paying off the CDW Irrevocable Note.

To illustrate, the Court will trace the first payment made on the Irrevocable Notes through the record. Sometime on or before January 11, 2000, Dee and Charles made an $870,000 payment to SGL on the Unsecured Loan.[1123] SGL then allocated all of those funds among its partners,[1124] and on January 11, 2000, distributed $408,876.98 to the CDW Irrevocable Trust and $400,021.13 to the CJW Irrevocable Trust[1125] (each account having a prior zero balance). That same day, the CDW Irrevocable Trust made a $407,095.48 payment to Stargate Investments (Texas) on the CDW Irrevocable Note, retaining $1,781.50,[1126] and the CJW Irrevocable Trust made a $398,244.63 payment to Stargate Investments (Texas) on the CJW Irrevocable Note, retaining $1,777.05.[1127] Then, on January 25, 2000, Stargate Investments (Texas) made a $780,000 distribution to Dee and Charles via a deposit into their community property bank account.[1128] Of the $81,138.70 that was

---

[1122] Wyly Ex. PA at 11 (bank statement).

[1123] *Id.* at 7 (page titled "Stargate Investments, Ltd. Note Payable 12/31/99 payment").

[1124] *Id.*

[1125] *Id.* at 7, 9, 11.

[1126] *Id.* at 7, 11, 13.

[1127] *Id.* at 7, 9, 10.

[1128] Wyly Ex. PC at 1 (showing transferee as "Charles Wyly Community Property"). Although the record reflects that the Revocable Trusts are the sole owners of Stargate Investments (Texas), the distributions from Stargate Investments (Texas) were made directly into Charles and Dee's community property account because the CDW Revocable Trust is a grantor trust as to Dee and the CJW Revocable Trust is a grantor trust as to Charles, so the distributions would pass through the Revocable Trusts to Dee and Charles, respectively.

not returned to Dee and Charles, $52,240.63 was distributed to the other limited partners of SGL, who are comprised mainly of the beneficiaries of the Irrevocable Trusts—*i.e.*, Dee and Charles' children and grandchildren. The chart below depicts this flow of funds:



This circular payment arrangement, with all funds used to repay the Irrevocable Notes originating with Dee and Charles (and mostly returning to Dee and Charles), can be traced consistently through the remaining 17 payments made on the CDW Irrevocable Note.[1129] Thus, although the CDW Irrevocable Trust "repaid" a $26,054,111 note (through the circulation of funds

---

[1129] *See* Wyly Exs. PA, PC, PD. There are instances where the payments are difficult to track, however. For example, Wyly Ex. PA, on pp. 56-57, indicates that a $2.45 million payment was made on the Unsecured Loan on May 5, 2009; however, a review of the attached bank statement does not reflect this payment from Dee and Charles' account. Nonetheless, according to p. 57, of this $2.45 million, $2.284 million was deposited by Stargate Investments (Texas) back into Dee and Charles' community bank account on May 7, 2008.

originating from Dee and Charles), the corpus of the trust was unaffected and all value was preserved for its beneficiaries.

It bears noting how the $870,000 payment on the Unsecured Loan would have flowed before the Estate Planning Transactions.  In that instance, Dee and Charles would make a payment to SGL on account of the Unsecured Loan.  In turn, SGL would allocate the funds among its partners and make a distribution, with the bulk of the funds returning to Dee and Charles as SGL's general partners and majority limited partners.[1130]



The ultimate outcome (money returning to Dee and Charles) is unchanged under either scenario (although more money is returned to Dee and Charles under the pre-Estate Planning Transaction structure), with the difference being ownership of Dee's (now former) limited partnership interests in SGL having been "sold" to the CDW Irrevocable Trust for the benefit of her children and grandchildren.

---

[1130] This calculation is based upon the pre-Estate Planning Transactions percentages shown on Exhibit K hereto.

The Court understands that, due to Dee's and Charles' affiliation with all of these entities, these are "captive" transactions where money flows back and forth. That, standing alone, does not trouble the Court. What troubles the Court is that the captive system was gamed to get the best of both worlds—Dee's limited partnership interests were "sold" to the CDW Irrevocable Trust in exchange for the CDW Irrevocable Note; however, the CDW Irrevocable Trust's assets were not diminished in repayment of that note. Tellingly, the record shows that, after the Irrevocable Notes were marked paid in full on October 25, 2010, Dee and Charles did not make any further payments on the Unsecured Loan through at least December 31, 2011 (the last date shown on Wyly Exhibit PD, tracking the Unsecured Loan).[1131] Indeed the only post-October 2010 payment reflected in the record is a $20,000 payment on September 4, 2014.[1132]

Simply put, there is nothing in the record objectively indicating that the payment transactions had any economic substance. The transactions did not materially vary control or change the flow of economic benefits[1133]—money merely took a more circuitous route when coming to/from Dee and Charles so that the CDW Irrevocable Note could be "repaid" without affecting the corpus of the CDW Irrevocable Trust.[1134] The Court finds that this outcome was a goal of the Estate Planning Transactions from the outset.

The remaining *Klamath* factors, which are a subjective inquiry into whether the parties to the transaction were motivated by any legitimate, non-tax business purpose,[1135] are also not met. Indeed, the Court cannot divine (nor does the record reflect), the business purpose behind Dee

---

[1131] Wyly Ex. PD at 17-19 (showing Dee and Charles' last payment on the Unsecured Note in October 2010, leaving a loan balance of $25,400,128).

[1132] Statement of Financial Affairs [Case No. 14-35043, ECF No. 352] at Ex. 3.c (showing a $20,000 payment on September 4, 2014). Schedule F, Case No. 14-35043, ECF No. 351 at 30.

[1133] *See Klamath*, 568 F.3d at 543.

[1134] Although failure to satisfy this factor alone is sufficient to disregard the transaction for income tax purposes, the Court will nonetheless consider the remaining two *Klamath* factors, which the Debtor has also failed to satisfy.

[1135] *Klamath,* 568 F.3d at 544; *Southgate Master Fund*, LLC, 659 F.3d at 481-82.

selling her limited partnership interests in SGL in return for funds she was already entitled to receive. Although parties are free to engage in estate planning, Dee's estate planning took the form of a sale for value,[1136] but that value was never truly paid by the purchaser.

Accordingly, the Court finds that the alleged payment of the CDW Irrevocable Note lacked economic substance and should be disregarded for tax purposes, resulting in a gift by Dee in an amount not greater than $50,756,841[1137] when the CDW Irrevocable Note was "discharged" on October 25, 2010.

Alternatively, the Court finds that the alleged repayment of the CDW Irrevocable Note should be recharacterized as a gift for tax purposes under the substance over form doctrine. Although Dee "sold" her limited partnership interests in SGL in exchange for the CDW Irrevocable Note; as detailed above, that note was never actually repaid by the purchaser. Instead, the CDW Irrevocable Note was simply marked paid in full when a sufficient number of circular "payments" were passed through the system. In accordance with the parties' stipulation, Dee's gift was in an amount not greater than $50,756,841.[1138]

### (3)    Is Dee Liable for Fraud Penalties on her Gift?

Because the Court finds that Dee made a gift when the CDW Irrevocable Note was "discharged," the Court must now address the IRS' allegation that Dee is liable for fraud penalties for her failure to file a related gift tax return.[1139]   Since it is undisputed that Dee did not file a gift

---

[1136] Wyly Ex. OM (Memorandum of Sale and Assignment of Partnership Interest).

[1137] *See* Computation Stipulations ¶ 18.  Respective counsel for the parties stated on the record that they believed a more precise stipulated amount could be presented to the Court after entry of this Memorandum Opinion resolving various issues.  Thus, a final amount (whether stipulated or as determined by the Court) will be included in the Final Order that will follow the issuance of this Memorandum Opinion.

[1138] *See* Computation Stipulations ¶ 18.

[1139] The Court notes that the IRS' Proof of Claim filed against Dee's estate only references fraud penalties under § 6663 (related to filed returns), not § 6651 (failure to file).  At closing argument, however, Dee's counsel stated that she would not argue that the IRS had waived its right to allege liability under § 6651. Tr. Trans. 4067:11-16 (Ross) ("we've decided, based upon the argument today, to just allow [the IRS] to argue whatever gift tax theories they have and not to brief the issue").

tax return for the 2010 tax year,[1140] 26 U.S.C. § 6651, not § 6663, is the applicable provision. The two statutes, however, share the same standard.[1141]

The IRS alleges that Dee deliberately chose not to file gift tax returns because she did not wish to disclose the existence of the offshore corporations and trusts.[1142] According to the IRS, the following badges of fraud support a finding of fraud against Dee here: (i) understatement of income by failing to report the transfers on income or gift tax returns, (ii) inadequate maintenance of records, and (iii) failure to file gift tax returns.[1143] Notably, these are several of the same badges of fraud that the IRS alleged in support of its argument that Dee should be held liable for § 6663 fraud penalties on income tax underpayments. And, for the reasons these badges fail to support a finding of fraud against Dee under § 6663, *see* pp. 52-155, *supra,* they similarly fail to support a finding of fraud against Dee under § 6651.

While Dee certainly signed the relevant documents, there is simply no persuasive evidence in the record that Dee understood how these very complicated Estate Planning Transactions worked, or was aware that they would result in her making a gift for which a gift tax return would be required. During trial, Dee credibly testified that she (i) was not involved in Charles' business affairs, (ii) never discussed business with him, and (iii) trusted him such that when he asked her to sign a document she would, without question. Although she did sign documents involved in the Estate Planning Transactions, she did so without reading them and in full reliance on Charles. To

---

[1140] *See* Debtors' Amended Proposed Findings of Fact and Conclusions of Law [ECF No. 1102] ¶ 86 ("Charles and Dee did not file gift tax returns in the years the IRS alleges that they made gifts."); IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶ 567 ("Charles and Dee Wyly did not file gift tax returns for gifts made in tax years … 2010.").

[1141] *See Enayat v. C.I.R.*, 98 T.C.M. (CCH) 436, 2009 WL 3763085, *24 (2009) ("To determine whether Woodbury fraudulently failed to file its tax return for taxable year 1999, we examine the same badges of fraud we used when considering the imposition of the fraud penalty … under section 6663(a)…."). Thus, the Court will not repeat the relevant standards previously detailed on pp. 47-48, 52-58 *supra*.

[1142] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶ 239.

[1143] *Id.*

be clear, even if Dee had read them, the Court is satisfied that she would not have understood them or the gift tax consequences flowing from them.

Further, the Court is hard pressed to see how inadequate records were maintained for the Estate Planning Transactions. To the contrary, it appears that the IRS was provided with ample explanation and documentation regarding the Estate Planning Transactions. For example, Wyly Exhibit PA is a letter from Hennington to an internal revenue agent that lays out how the alleged payments on the Irrevocable Notes were made and how funds flowed between the various entities, which was followed by the correspondence at Wyly Exhibit PB providing even more information. And, although the IRS has alleged specific instances where they had difficulty obtaining records related to the IOM trusts and corporations, the Estate Planning Transactions involved domestic entities for which no similar allegation was made.

Thus, for the reasons set forth above, as well as those set forth on pp. 52-155, *supra*, the Court finds that Dee: (i) made a gift in the 2010 calendar year from the "discharge" of the CDW Irrevocable Note due to her by the CDW Irrevocable Trust in an amount not greater than $50,756,841,[1144] and (ii) is not liable for fraud penalties under 26 U.S.C. § 6651 related to her failure to file a gift tax return for the tax year 2010.

### G. Are Penalties Owing for the Failure to File Forms 3520, 3520-A, and 5471?

#### 1. Introduction

In addition to asserting that the Debtors are liable for income tax, gift tax, interest, and fraud penalties, the IRS argues that the Debtors are liable for what are described alternately as international penalties and failure to file penalties (collectively, the "**International Penalties**"). Although the Court will use the term International Penalties, both descriptions are correct. The

---

[1144] Computation Stipulations ¶ 18.

International Penalties arise because of the Debtors' alleged failures to file with the IRS information about the various foreign trusts and corporations that comprise the Wyly offshore system. If applicable here, this information must be filed with the IRS pursuant to 26 U.S.C. §§ 6038 and 6048.

The Debtors make three primary arguments in opposition to the IRS' assertion that it is entitled to recover the International Penalties: (i) that, in many instances, the reporting obligations underlying the International Penalties are not applicable to them because the actions pointed to by the IRS as giving rise to the International Penalties were not violations of §§ 6038 and 6048, (ii) that they have reasonable cause defenses for any violations of §§ 6038 and 6048 they may have committed, and (iii) that the International Penalties are excessive fines under the Eighth Amendment of the Constitution, which should be declared unconstitutional as applied to them if they are both liable for the International Penalties and their reasonable cause defenses fail.

For the reasons explained below, the Court concludes that the Debtors did, in some instances, violate §§ 6038 and 6048, although annuity payments, loans, and real estate transactions originating from the Wyly offshore system did not need to be reported as trust distributions under § 6048(c) and cash sales of options did not need to be reported as transfers into foreign trusts under § 6048(a). The Debtors' reasonable cause defense and Eight Amendment arguments are addressed in separate sections of this Memorandum Opinion.

## 2. Statutory Overview

Before addressing the parties' particular arguments, an overview of the statutes that govern the International Penalties, 26 U.S.C. §§ 6038, 6048, and 6677, will be helpful. Section 6038 is a statutory mechanism for monitoring the dealings between a United States person and any foreign corporation, foreign partnership, or other form of foreign business entity that such person

controls.[1145]  It mandates that "[e]very United States person shall furnish, with respect to any foreign business entity which such person controls, such information as the Secretary may prescribe…" related to the nature of these controlled foreign business entities, their structure, and the transactions they undertake.[1146]  This information is normally filed on an IRS Form 5471.[1147] If a taxpayer fails to file information about foreign business entities that he or she controls on Form 5471, § 6038(b) provides that "such person shall pay a penalty of $10,000 for each annual accounting period with respect to which such failure exists."[1148]

In slight contrast, § 6048 is concerned with monitoring the dealings between a United States person and foreign trusts.[1149]  Under §§ 6048(a) and (c) a United States person must report: (i) his creation of a foreign trust,[1150] (ii) transfers of money or property to a foreign trust,[1151] or (iii) when he "receives (directly or indirectly)…any distribution from a foreign trust."[1152]  Information about these types of events is generally filed on an IRS Form 3520.[1153]  Failure to report these types of events on a Form 3520 can result in International Penalties of $10,000 or 35% of the value of the property involved in the unreported transfer or distribution, whichever is greater,[1154] as provided in 26 U.S.C. § 6677(a).

---

[1145] 26 U.S.C. § 6038.

[1146] *Id.* § 6038(a).

[1147] *Id.* §§ 6038, 6048; 26 C.F.R. § 1.6038–2(a).

[1148] 26 U.S.C. § 6038(b).

[1149] *Id.* § 6048.

[1150] *Id.* § 6048(a)(1), (a)(3)(A)(i).

[1151] *Id.* § 6048(a)(1), (a)(3)(A)(ii).

[1152] *Id.* § 6048(c)(1).

[1153] *Id.*; 26 C.F.R. §§ 16.3–1, 404.6048–1.

[1154] 26 U.S.C. § 6677(a).  The Court notes that the $10,000 alternative minimum penalty is only effective for notices and returns required to be filed after December 31, 2009.  Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, § 535, 124 Stat 71 (2010). However, since the $10,000 alternative minimum penalty is not applicable to any of the failures to file forms at issue in these Cases, this fact does not affect the Court's analysis.

Section 6048(b) also requires anyone who is treated as the owner of a foreign trust under the rules of subpart E of part I of subchapter J of chapter 1 of the Internal Revenue Code (better known as the grantor trust rules of 26 U.S.C. §§ 671-679) (the "**Grantor Trust Rules**") to annually submit "such information as the Secretary may prescribe with respect to such trust for such year."[1155]   It also requires anyone treated as the owner of a foreign trust under the Grantor Trust Rules to provide all required information to the IRS, to United States owners of the trusts, and to United States persons receiving distributions from the trusts.[1156]  The annual information required to be filed by grantors of grantor trusts under § 6048(b) is usually provided on an IRS Form 3520-A.[1157]  Failure to file a Form 3520-A can result in International Penalties of $10,000 or 5% of the gross value of the relevant trust's assets, whichever is greater,[1158] as provided in 26 U.S.C. § 6677(b).[1159]

As noted previously, the SDNY Court determined in the SEC Action that, as to Sam, the Bulldog IOM Trust, the Lake Providence IOM Trust, the Delhi IOM Trust, the Bessie IOM Trust, and the La Fourche IOM Trust are grantor trusts under the applicable Grantor Trust Rules, and this Court has accorded collateral estoppel effect to that determination.  These trusts will be collectively referred to in this section of the opinion as the "**Sam International Penalty Trusts**."  Similarly, the SDNY Court determined in the SEC Action that, as to Charles, the Pitkin IOM Trust, the Castle Creek IOM Trust, the Tyler IOM Trust, and the Red Mountain IOM Trust are grantor trusts under the applicable Grantor Trust Rules and this Court has accorded collateral estoppel effect to that

---

[1155] *Id.* § 6048(b).

[1156] *Id.* § 6048(b)(1).

[1157] *Id.* § 6048(b); 26 C.F.R. §§ 16.3–1, 404.6048–1.

[1158] 26 U.S.C. § 6677(b).  Again, the Court notes that the $10,000 alternative minimum penalty is only effective for notices and returns required to be filed after December 31, 2009 and that this fact does not affect the Court's analysis.

[1158] *Id.*

[1159] *Id.*

determination.[1160]  These trusts will be collectively referred to in this section of the opinion as the

"**Charles and Dee International Penalty Trusts**."

With this background in mind, we turn to the International Penalties at issue here.

a) **§ 6038 and Failures to File Form 5471**

For the reasons explained more fully below, the Court concludes that Sam, Charles, and

Dee violated § 6038 by failing to file Forms 5471 with respect to the various IOM corporations

and/or Cayman LLCs owned by the Sam International Penalty Trusts and the Charles and Dee

International Penalty Trusts.  In fact, the Debtors do not seem to dispute the effect of the SDNY

Court's determination that these trusts were Wyly grantor trusts on their respective obligations to

have filed Forms 5471 under § 6038.

But, even if they do, an analysis of the relevant statutes and regulations confirms their

respective obligations to file Forms 5471 with respect to the foreign corporations the Sam

International Penalty Trusts and the Charles and Dee International Penalty Trusts owned

(collectively, the "**Foreign Corporations**").[1161]  According to 26 U.S.C. § 6038(a), a Form 5471

must be filed annually by every United States taxpayer "with respect to any foreign business entity

which such person controls."[1162]  It is undisputed that Sam, Charles, and Dee are United States

taxpayers.  Moreover, the parties have stipulated that the Foreign Corporations for which the IRS

asserts that Forms 5471 should have been filed are all IOM corporations or Cayman LLCs that are

wholly-owned subsidiaries of one of the Sam International Penalty Trusts or one of the Charles

---

[1160] Collateral Estoppel Nos. 53, 54.

[1161] When the Court references the Foreign Corporations as to Dee, it is only referring to those of the Foreign Corporations owned by the Charles and Dee International Penalty Trusts.  Similarly, when the Court references the Foreign Corporations as to Sam, it is only referring to those of the Foreign Corporations owned by the Sam International Penalty Trusts.

[1162] 26 U.S.C. § 6038(a).

**MEMORANDUM OPINION**                                                                                          **290**

and Dee International Penalty Trusts.[1163] Thus, all that is left for this Court to decide relating to the Debtors' liability for International Penalties under § 6038(a) is whether the SDNY Court's determination that the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts are grantor trusts necessarily means that the Debtors controlled the Foreign Corporations for purposes of § 6038. The Court concludes that it does, as explained below.

Section 6038 defines "[c]ontrol of corporation" for the purpose of Form 5471 filings:

> A person is in control of a corporation if such person owns stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock, of a corporation. …For purposes of this paragraph, the rules prescribed by section 318(a) for determining ownership of stock shall apply…[1164]

Turning to 26 U.S.C. § 318(a)(2)(B)(ii), we see why the SDNY Court's grantor trust determinations lead to a finding of control under § 6038. Section 318(a)(2)(B)(ii) states that "[s]tock owned, directly or indirectly, by or for any portion of a trust of which a person is considered the owner under [the Grantor Trust Rules] shall be considered as owned by such person."[1165] The SDNY Court determined that the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts are grantor trusts to Sam and/or Charles through application of the Grantor Trust Rules.[1166] Thus, taken together, these statutes dictate that Sam

---

[1163] *See* Computation Stipulations ¶¶ 9.A-9.E and 22.A-22.E.

[1164] 26 U.S.C. § 6038(e)(2). 26 C.F.R. § 1.6038-2(b) in turn defines "control" for the purposes of 26 U.S.C. § 6038 and Form 5471 in the following way:

> A person shall be deemed to be in control of a foreign corporation if at any time during that person's taxable year it owns stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the total value of shares of all classes of stock of the foreign corporation. A person in control of a corporation which, in turn, owns more than 50 percent of the combined voting power, or of the value, of all classes of stock of another corporation is also treated as being in control of such other corporation. The provisions of this paragraph may be illustrated by the following example:
>
> Example. Corporation A owns 51 percent of the voting stock in Corporation B. Corporation B owns 51 percent of the voting stock in Corporation C. Corporation C in turn owns 51 percent of the voting stock in Corporation D. Corporation D is controlled by Corporation A.

[1165] 26 U.S.C. § 318(a)(2)(B)(ii).

[1166] *See id.* §§ 671-679; Collateral Estoppel Nos. 53, 54.

---

**MEMORANDUM OPINION**                                                              291

and Charles owned and thus controlled the Foreign Corporations for the purposes of § 6038 and reporting on Form 5471 because they are the grantors of the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts, respectively, one of which trusts owns each of the Foreign Corporations.

That leaves only Dee, who is also considered to "control" the Foreign Corporations for the purpose of § 6038. Under 26 U.S.C. § 318(a)(1)(A), "[a]n individual shall be considered as owning the stock owned, directly or indirectly, by or for…his spouse."[1167] Thus, Dee is considered to own and control the Foreign Corporations because she was Charles' spouse, at least until the time of his death, when Charles' ownership interest passed to his probate estate. Under § 318(a)(2), "[s]tock owned, directly or indirectly, by or for a partnership or estate shall be considered as owned proportionately by its partners or beneficiaries"[1168] and "[s]tock owned, directly or indirectly, by or for a trust … shall be considered as owned by its beneficiaries in proportion to the actuarial interest of such beneficiaries in such trust."[1169] Although it has been represented to this Court in earlier proceedings in her Case that Dee is "the primary beneficiary" of Charles' probate estate, there is insufficient evidence in this record for the Court to determine whether Dee controls the Foreign Corporations by virtue of her status as a beneficiary of Charles' probate estate. Thus, § 318(a)(1)(A) and the evidence requires the Court to find that Dee controlled the Foreign Corporations at all times up until Charles' death, but not after Charles' death.

However, if Dee is considered a grantor of the Charles and Dee International Penalty Trusts, she "controls" the Foreign Corporations through her status as grantor.[1170] And, from this

---

[1167] 26 U.S.C. § 318(a)(1)(A)(i).

[1168] *Id.* § 318(a)(2)(A).

[1169] *Id.* § 318(a)(2)(B)(i).

[1170] *Id.* § 318(a)(2)(B)(ii).

Court's perspective, Dee is also a grantor of the Charles and Dee International Penalty Trusts because those trusts were funded with community property. Under Texas law, property possessed by either spouse during marriage is presumed to be community property unless clear and convincing evidence establishes otherwise.[1171] No party has presented evidence that Charles funded the Charles and Dee International Penalty Trusts with anything other than community property. And, since the Charles and Dee International Penalty Trusts were presumably funded with community property, Dee is the grantor of these trusts to the same extent as Charles.

Dee does not argue otherwise. Rather, Dee's arguments focus solely on her defenses to her liability for the International Penalties—*i.e.*, reasonable cause and excessive fines under the Eighth Amendment. In fact, Debtors' counsel waived any argument that Dee was not a grantor of the Charles and Dee International Penalty Trusts during closing argument.[1172] At that time, the Court asked Debtors' counsel to elaborate on the Debtors' side of the argument regarding contested issue of law D from the Joint Pre-Trial Order.[1173] Contested issue of law D reads as follows:

> Whether the District Court's finding in *SEC v. Wyly* that the IOM Trusts are "grantor trusts" applies to years after those in the SEC litigation, *i.e.*, 2005-2013, if, as the United State alleges, the Debtors cannot identify material factual or legal changes relating to the IOM Trusts beyond 2004 (the final year addressed in the District Court's findings)?[1174]

---

[1171] TEX. FAM. CODE ANN. § 3.003 (providing that, under Texas law, "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property" and that "[t]he degree of proof necessary to establish that property is separate property is clear and convincing evidence").

[1172] Tr. Trans. 3484:19-3485:9, 3489:15-17. During these transcript excerpts, the Court and the parties are discussing a list of joint questions that the Court provided to the Debtors and the IRS in writing in advance of closing arguments in hopes of getting detailed answers to the Court's questions during closing arguments.

[1173] This question was also from the list that the Court provided to the parties in advance of closing arguments. It reads as follows:

> 15. The parties' briefing on Contested Issue of Law D is thin, why wouldn't the grantor trust determination of the SDNY Court continue to apply after 2004 unless there were material factual or legal changes relating to the IOM Trusts?
>
> a. Debtors need to help me understand their argument here. No cases cited by either party, but IRS argument makes sense to me.
>
> b. If I'm overlooking briefing, where is it more fully briefed?

[1174] Joint Pre-Trial Order [ECF No. 1014] at 36.

Debtors' counsel answered the Court's question by stating that "…this ties into a later question as well…but -- the only thing that happened after 2004 that could -- could impact this is that Mr. Wyly passed away. That could have an impact on whether Dee Wyly is a grantor, but I don't think we're going to pursue that, so I don't think that's a live issue." The Court then replied by sating "Okay. So it's moot. Okay."[1175] Closing arguments then proceeded on to other questions on the Court's list, including one about contested issue of law CC from the Joint Pre-Trial Order and whether the parties had briefed it.[1176] Contested issue of law CC reads as follows:

> Whether Dee has any grantor tax liability for 2011, 2012, and 2013 since she was never a grantor and they ceased to be grantor trusts on Charles' death. [1177]

Debtors' counsel responded to the Court's question regarding this contested issue of law by stating "[t]hat's the one we just talked about."[1178]

Thus, it is clear based on the statements of Dee's counsel in open court that Dee was no longer attempting to argue that she should not be treated as a grantor of the Charles and Dee International Penalty Trusts. As the Fifth Circuit has held, "a district judge must be able to winnow the issues for trial. This includes reliance on statements made by counsel in open court disavowing specific claims."[1179]

For these reasons, the Court concludes that Sam, Charles, and Dee controlled the Foreign Corporations and were required to file Forms 5471 in accordance with 26 U.S.C. § 6038, which they did not do. This means that, absent a viable reasonable cause defense or relief under the

---

[1175] Tr. Trans. 3485:2-9.

[1176] This question was also from the list that the Court provided to the parties in advance of closing arguments.

[1177] Joint Pre-Trial Order [ECF No. 1014] at 39.

[1178] Tr. Trans. at 3489:15-17.

[1179] *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 599-600 (5th Cir. 1996).

Eighth Amendment, the Debtors are liable for International Penalties under § 6038(b) for their respective failures to file Forms 5471.[1180]

### b) § 6048(b) and Failures to File Form 3520-A

The Court next examines whether the Wylys violated § 6048(b) by failing to file Forms 3520-A regarding the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts. As explained below, the SDNY Court's grantor trust determinations necessarily lead to the conclusion that § 6048(b) violations occurred when Forms 3520-A were not filed regarding the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts.

26 U.S.C. § 6048(b) provides that "[i]f, at any time during any taxable year of a United States person, such person is treated as the owner of any portion of a foreign trust under the [Grantor Trust Rules], such person shall submit such information as the Secretary may prescribe."[1181] Given the SDNY Court's determination in the SEC Action, to which this Court has given collateral estoppel effect, Sam and Charles are treated as the owners of the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts, respectively. Accordingly,

---

[1180] *See* 26 U.S.C. § 6038(b):

> **(b) Dollar penalty for failure to furnish information.--**
>
> **(1) In general.**--If any person fails to furnish, within the time prescribed under paragraph (2) of subsection (a), any information with respect to any foreign business entity required under paragraph (1) of subsection (a), such person shall pay a penalty of $10,000 for each annual accounting period with respect to which such failure exists.
>
> **(2) Increase in penalty where failure continues after notification.**--If any failure described in paragraph (1) continues for more than 90 days after the day on which the Secretary mails notice of such failure to the United States person, such person shall pay a penalty (in addition to the amount required under paragraph (1)) of $10,000 for each 30-day (or fraction thereof) during which such failure continues with respect to any annual accounting period after the expiration of such 90-day period. The increase in any penalty under this paragraph shall not exceed $50,000.

The Computation Stipulations break down the exact amount of penalties for which Sam and Dee respectively will be liable if this Court does not grant relief due to reasonable cause or under the Eighth Amendment. Computation Stipulations ¶¶ 10 and 23.

[1181] 26 U.S.C. § 6048(b).

Sam and Charles were required to file Forms 3520-A throughout the life of the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts, respectively.[1182] And, as just explained above, Dee is also treated as a grantor of the Charles and Dee International Penalty Trusts by virtue of the fact that community property was used to create those trusts and by virtue of the fact that her counsel conceded this issue during closing arguments.

Accordingly, under 26 U.S.C. §§ 6048(b) and 6677, Sam, Charles, and Dee are liable for penalties equal to the greater of $10,000 or 5% of the gross value of the Sam International Penalty Trusts' assets and the Charles and Dee International Penalty Trusts' assets, respectively, for each year that they failed to file a Form 3520-A unless they can establish a right to relief under the reasonable cause provisions of § 6677 or the Eighth Amendment.[1183] Since the value of the trust assets at issue here was enormous, the penalty in all instances will be equal to 5% of the gross value of the trusts' assets.[1184]

### c)    § 6048(c) and Failures to File Form 3520

### (1)    In General

The Court now turns to the issue of whether the Debtors violated § 6048(c) by failing to report certain trust distributions, which analysis is more complicated.  The IRS asserts that the Debtors are liable for International Penalties because they failed to file Form 3520 when they were required to do so under 26 U.S.C. § 6048(c).  As noted above, § 6048(c) requires a Form 3520 to be filed "[i]f any United States person receives (directly or indirectly) during any taxable year of such person any distribution from a foreign trust."[1185]  "Distribution" is not defined for the

---

[1182] *See* Computation Stipulations ¶¶ 7.A-8 and 20.A-21 (breaking down the trusts for which Forms 3520-A should have been filed and the total amount of applicable penalties).

[1183] *See* 26 U.S.C. §§ 6038(b), 6677.

[1184] *See* Computation Stipulations ¶¶ 8 and 21 (indicating amounts much greater than $10,000 for each year at issue).

[1185] 26 U.S.C. § 6048(c)(1).

purposes of 26 U.S.C. § 6048(c). Black's Law Dictionary defines a trust distribution as "[t]he cash or other property paid or credited to a trust beneficiary."[1186] IRS Notice 97-34, the only existing and still valid regulatory authority that interprets § 6048 in any depth, states that "[e]xcept as otherwise provided below, a distribution from a foreign trust includes any gratuitous transfer of money or property from a foreign trust, whether or not the trust is owned by another person."[1187]

Here, there are three different types of transactions that the IRS asserts should have been reported as "distributions" on Form 3520 for the purposes of 26 U.S.C. § 6048(c): (i) certain annuity payments received by Sam, Charles, and Dee; (ii) offshore funds used to purchase domestic real estate, and (iii) certain loans made to Sam, Charles, and certain Wyly-related entities.[1188] For the reasons explained more fully below, the Court concludes that (i) Sam, Charles, and Dee did not violate § 6048(c) by failing to report annuity payments as distributions, (ii) Sam, Charles, and Dee did not violate § 6048(c) by failing to report the use of offshore funds to purchase domestic real estate as distributions, and (iii) Sam, Charles, and Dee did not violate § 6048(c) by failing to report certain loans made to them and to Wyly-related entities as distributions. The Court reaches these conclusions in part based on its rejection of the IRS' invitation to apply the doctrines of substance over form, economic substance, and step transaction to these alleged distributions, as explained below.

---

[1186] DISTRIBUTION, Black's Law Dictionary (10th ed. 2014).

[1187] IRS Notice 97-34, Information Reporting on Transactions with Foreign Trusts and on Large Foreign Gifts, 1997 WL 337826, at *14 ("**IRS Notice 97-34**"). IRS Notice 97-34 is the only regulatory authority that purports to directly interpret 26 U.S.C. § 6048, and the IRS draws on it heavily for the purposes of its analysis. This notice is not entitled to deference under *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *BMC Software, Inc. v. C.I.R.*, 780 F.3d 669, 675 (5th Cir. 2015). This is because the IRS Notice has not gone through the notice and comment rulemaking process. However, this notice has persuasive weight under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

[1188] IRS Post-Trial Brief [ECF No. 1118] at 30. Note that because of the operation of community property laws, any distributions received by either Charles or Dee are treated as received by both Charles and Dee. *See* TEX. CONST. art. 16, § 15; TEX. FAM. CODE ANN. §§ 3.001-3.003.

### (2)    Annuity Payments

The IRS argues that Sam, Charles, and Dee should have reported the annuity payments they received from certain of the Foreign Corporations that had issued annuities to them on Forms 3520. According to the IRS, this is because the Foreign Corporations with the annuity obligations to them are wholly owned by one of the Sam International Penalty Trusts or the Charles and Dee International Penalty Trusts, and that by not reporting the annuity payments Sam, Charles, and Dee violated § 6048(c).[1189]  The Court disagrees, as explained below.

Normally, income received as a result of an annuity transaction entered into between a foreign corporation and a United States taxpayer would not need to be reported on Form 3520 in order to satisfy § 6048(c). This is because such a transaction would not involve a gratuitous transfer from a foreign trust.[1190]  Here, however, the IRS argues that the Wylys needed to report the annuity payments they received through the offshore system on Form 3520 for three reasons. First, the IRS argues that the text of § 6048(c) makes it clear that the Court may treat these annuity payments as if they came directly from foreign trusts despite the fact that they actually issued from various of the Foreign Corporations that were wholly owned by one of the Sam International Penalty Trusts or one of the Charles and Dee International Penalty Trusts. Second, the IRS argues that IRS regulations indicate that the non-gratuitous nature of the annuities can be disregarded under § 6048(c). Third, the IRS argues that the application of the substance over form doctrine, the economic substance doctrine, or the step transaction doctrine[1191] make it clear that the private

---

[1189] *See* Computation Stipulations ¶¶ 12.B and 25.B (listing annuity income for which the IRS believes that Forms 3520 should have been filed).

[1190] *See* 26 U.S.C. § 6048(c); *see also* IRS Notice 97-34 at *14 (distinguishing gratuitous distributions from compensation or certain transfers otherwise taxable).

[1191] As was the case in their gift analysis, the IRS merges and melds these doctrines in their post-trial briefing. *See* IRS Post-Trial Brief [ECF No. 1118] at 38-42. Although the heading of the portion of the IRS' post-trial brief covering these issues discusses only what "the substance of the transactions, rather than their form" demands, the brief also discusses the economic substance doctrine and the step transaction doctrine.

annuity transactions entered into by the Wylys were both (i) not true annuity transactions, meaning that the annuity "payments" were in fact gratuitous transfers to the Wylys, and (ii) were actually transactions entered into directly between Sam, Charles, and Dee on the one hand and the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts, respectively, on the other hand.

Conversely, the Debtors argue that the annuity payments cannot be reportable distributions under the statutory language for three reasons. First, the annuity payments received from the offshore system were not made by trusts, but rather by subsidiary IOM corporations owned by the applicable trust—*i.e.*, one of the Foreign Corporations, and so the payments are not distributions "from a foreign trust" that are reportable under § 6048(c).[1192] Second, the Debtors argue that the annuity payments are not gratuitous, and that they therefore do not need to be reported as distributions.[1193] Third, the Debtors argue that they met any reporting obligation under § 6048(c) that does exist by reporting these annuity payments on their annual income tax returns. Each of the Debtors' arguments will be addressed in turn.

Returning to the Debtors' first argument—*i.e.*, that the annuity payments were not made by a foreign trust but were rather made by a wholly owned corporation of a foreign trust—it is fair to say that the IRS and the Debtors read § 6048(c) differently. Pointing to the statute, the IRS notes that it requires reporting "[i]f any United States person receives *(directly or indirectly)*…any distribution from a foreign trust."[1194] The IRS then argues that the Debtors misread § 6048(c)'s "directly or indirectly" language as modifying only "receives" and not "from a foreign trust;" and as encompassing only situations where a distribution "starts" in a foreign trust, travels through one

---

[1192] Debtors' Post-Trial Brief [ECF No. 1117] at 58.
[1193] 26 U.S.C. § 6048(c).
[1194] *See id.* § 6048(c)(1) (emphasis added).

or more intermediaries, and then ends up in the hands of a United States person. According to the IRS, the statutory language, "directly or indirectly," modifies both "receives" and "from a foreign trust," a reading that captures situations like this one where an entity that is wholly owned by a foreign trust makes a distribution to a United States person.

In order to decide which of these two readings of the statute is better, the Court must construe the language of § 6048(c). In 2015, the Fifth Circuit laid out the following "roadmap" for the type of statutory construction in which the Court must now engage:

> The starting point in discerning congressional intent is the existing statutory text. When faced with questions of statutory construction, we must first determine whether the statutory text is plain and unambiguous and, if it is, we must apply the statute according to its terms. The parties disagree on whether the plain text of the statute needs to be found ambiguous before a canon of construction, such as ejusdem generis, can be applied…. In any case, there is no doubt that legislative history can only be a guide after the application of canons of construction. Only after application of principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history. For the language to be considered ambiguous, however, it must be susceptible to more than one reasonable interpretation or more than one accepted meaning.[1195]

As the Fifth Circuit has held, for statutory language to be ambiguous, "it must be susceptible to more than one reasonable interpretation or more than one accepted meaning."[1196] When a statute is not ambiguous, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."[1197]

Moreover, while rules of grammar are helpful in interpreting statutes, "we should not be guided by a single sentence or member of a sentence; rather, we must look to the provisions of the whole law, and to its object and policy."[1198] Statutes should be interpreted as a whole rather than

---

[1195] *U.S. v. Kaluza*, 780 F.3d 647, 658-59 (5th Cir. 2015) (footnotes and internal citations omitted).

[1196] *Carrieri*, 393 F.3d at 518-19 (citing *Kay*, 359 F.3d at 743).

[1197] *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

[1198] *U.S. v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 494 (5th Cir. 2014) (internal citations and quotation marks omitted).

by just reading one isolated clause.[1199]  Courts should "consider the text holistically, accounting

for the 'full text, language as well as punctuation, structure, and subject matter.'"[1200]  Courts do

not review statutes "as a panel of grammarians," but neither do they "regard ordinary principles of

English prose as irrelevant to a construction of those enactments."[1201]

      With these principles of statutory construction firmly in mind, the Court turns to the text

of the statute, which provides:

> If any United States person receives (directly or indirectly) during any taxable year
> of such person any distribution from a foreign trust, such person shall make a return
> with respect to such trust for such year which includes…[1202]

Again, the Debtors argue that the parenthetical phrase "directly or indirectly" modifies only the

word "receives" in § 6048(c).  The IRS argues that the parenthetical phrase "directly or indirectly"

also modifies "from a foreign trust."

      Initially, the Court notes that for the IRS' interpretation of § 6048(c) to be correct, it seems

that the statute should read as follows:

> 6048(c)-If any United States person receives (directly or indirectly) during any
> taxable year of such person any distribution from a foreign trust *(directly or
> indirectly)*, such person shall make a return with respect to such trust for such year
> which includes…[1203]

The addition of a second "(directly or indirectly)" immediately after "from a foreign trust," if it

appeared in the statute, would unquestionably support the IRS' interpretation.  However, the

statute does not contain this additional phrase.  The phrase "directly or indirectly" is contained

within a parenthetical in only one location in the statute.  Placing modifying words within

---

[1199] *Id.*

[1200] *Elgin Nursing and Rehab. Center v. U.S. Dept. of Health and Human Services*, 718 F.3d 488, 494 (5th Cir. 2013) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)).

[1201] *Flora v. U.S.*, 362 U.S. 145, 150 (1960).

[1202] 26 U.S.C. § 6048(c).

[1203] *Id.* at § 6048(c) (emphasis added).

parentheses indicates a limiting or cabining effect. It would be at least somewhat unnatural to read a parenthetical phrase as expansively modifying multiple clauses in a sentence as opposed to only the clause that the parenthetical phrase follows.

Thus, it seems that a plain language reading of § 6048(c) unambiguously favors the Debtors' interpretation that "directly or indirectly" modifies only "receives" in § 6048(c). However, even if § 6048(c) is "susceptible to more than one reasonable interpretation or more than one accepted meaning" such that we need to apply canons of statutory interpretation, the IRS' reading is further weakened by application of these canons.[1204]

The canon of statutory construction called the last antecedent rule (the "**Last Antecedent Rule**") is relevant here. The Last Antecedent Rule is described in the following way by a widely cited treatise on statutory construction:

> Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence. Thus a proviso usually applies to the provision or clause immediately preceding it. A qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one. As with all the rules of interpretation, the last antecedent rule is merely another aid to discover legislative intent or statutory meaning, and is not inflexible and uniformly binding. In general, then, where the sense of an entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the qualifying word or phrase is not restricted to its immediate antecedent.[1205]

An illustration of the Last Antecedent Rule in action is helpful. If, in order to get a pilot's license, a statute requires that an applicant "undergo a physical examination, obtain a passing score on a certification test, and complete forty hours of in-flight training within six months prior to submitting an application," there is an arguable ambiguity. Does "six months prior to submitting

---

[1204] *Carrieri*, 393 F.3d at 518-19 (citing *Kay*, 359 F.3d at 743).
[1205] 2A Sutherland Statutory Construction § 47:33 (7th ed.) (internal marks omitted).

an application" modify all of the requirements, or only the in-flight training requirement? According to the Last Antecedent Rule, the answer is that it only modifies the in-flight training requirement. An applicant could obtain a passing score on a certification test eight months prior to submitting an application and still be eligible for a pilot's license, as long as she completed her forty hours of in-flight training within six months prior to submitting her application.

Although the Last Antecedent Rule is not absolute, "and can assuredly be overcome by other indicia of meaning," it is nevertheless widely used.[1206] The Supreme Court has endorsed the Last Antecedent Rule, and reversed the Third Circuit's refusal to apply the rule because to do so would lead to what was viewed by the circuit court as an undesirable result in a case.[1207] The Fifth Circuit has also cited the Last Antecedent Rule as a canon of statutory construction,[1208] and has stated that the doctrine requires that "qualifying words, phrases, and clauses are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to or including others more remote."[1209]

Achieving the IRS' reading of § 6048(c) requires us to ignore the Last Antecedent Rule. The Last Antecedent Rule counsels that "directly or indirectly" should modify only the word "receives" in § 6048(c) because this is the antecedent that immediately precedes "directly or indirectly." In contrast, the IRS wants to read the qualifying words "directly or indirectly" as modifying a *post*cedent that appears later on in the statutory text. Such a reading runs counter to the Last Antecedent Rule.

---

[1206] *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (quoting *Nobelman v. American Sav. Bank*, 508 U.S. 324, 330 (1993)).
[1207] *Id.* at 28.
[1208] *D.G. ex rel. LaNisha T. v. New Caney Indep. School Dist.*, 806 F.3d 310, 317 (5th Cir. 2015).
[1209] *U.S. v. Campbell*, 49 F.3d 1079, 1086 (5th Cir. 1995) (quoting *Quindlen v. Prudential Ins. Co.*, 482 F.2d 876, 878 (5th Cir. 1973) (internal quotation marks omitted)).

Another principle of statutory construction supports the Debtors' reading of § 6048(c)—

*i.e.*, the canon of resolving ambiguities in tax statutes, and especially tax statutes imposing

penalties, in the taxpayers' favor. As the Supreme Court stated:

> In the interpretation of statutes levying taxes it is the established rule not to extend
> their provisions by implication, beyond the clear import of the language used, or to
> enlarge their operation so as to embrace matters not specifically pointed out. In case
> of doubt they are construed most strongly against the government, and in favor to
> the citizen.[1210]

This maxim holds particularly true in the context of tax penalties, where the Supreme Court notes

"one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.'"[1211] The

Fifth Circuit agrees that tax penalties should "be interpreted liberally in favor of the taxpayer and

strictly against the Government."[1212] Although many of the strongest pronouncements that tax

statutes should be construed strictly in favor of the taxpayer come from older cases, the Fifth

Circuit has also very recently stated that "if the words of a tax statute are doubtful, the doubt must

be resolved against the government and in favor of the taxpayer."[1213] More recent tax court

decisions also confirm that the doctrine of construing tax penalties strictly in favor of the taxpayer

is alive and well.[1214]

---

[1210] *Gould v. Gould*, 245 U.S. 151, 153 (1917).

[1211] *C.I.R. v. Acker*, 361 U.S. 87, 91 (U.S. 1959) (quoting *Keppel v. Tiffin Savings Bank*, 197 U.S. 356, 362); *see also Ivan Allen Co. v. U. S.*, 422 U.S. 617, 627 (U.S. 1975) (tax penalties are strictly construed); *Rand v. C.I.R.*, 141 T.C. 376, 393 (T.C. 2013) (stating that "[t]he law is settled that 'penal statutes are to be construed strictly,' and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it'" and refusing to apply a penalty under § 6662.); *Mohamed v. C.I.R.*, 106 T.C.M. 537, 2013 WL 5988943, at *10 (T.C. 2013) (strictly construing a tax penalty statute in favor of the taxpayer while noting that "[t]he application of that strict-construction canon to tax law no longer enjoys universal approval.").

[1212] *Stephan v. C. I. R.*, 197 F.2d 712, 714 (5th Cir. 1952).

[1213] *U.S. v. Marshall*, 798 F.3d 296, 318 (5th Cir. 2015) ("We also heed the longstanding canon of construction that if the words of a tax statute are doubtful, the doubt must be resolved against the government and in favor of the taxpayer." (internal quotation marks omitted)); *see Allen v. Atlanta Metallic Casket Co.*, 197 F.2d 460, 461 (5th Cir. 1952).

[1214] *Rand,* 141 T.C. at 393 (stating that "[t]he law is settled that 'penal statutes are to be construed strictly,' and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it'" and refusing to reply a penalty under § 6662.); *Mohamed*, 2013 WL 5988943 at *10 (strictly construing a tax penalty statute in favor of the taxpayer).

The IRS' reading of § 6048(c) violates the canon of resolving ambiguity in tax penalty statutes in favor of the taxpayer and against the government. As the Court indicated in its analysis of the grammatical structure of § 6048(c), the IRS' reading of the statute is a strained one. Imposing penalties on the Debtors in the face of such a strained reading runs counter to the canon of statutory interpretation that resolves any such ambiguities in the taxpayer's favor.

Thus, the Court concludes that the Wylys did not violate § 6048(c) by not reporting annuity payments they received from certain of the Foreign Corporations on Form 3520 because these annuity payments were not distributions "from a foreign trust" within the meaning of § 6048(c). But, there is another reason why the annuity payments did not need to be reported on Form 3520— they were not gratuitous transfers, as explained below.

The Wylys argue that private annuity payments are not reportable distributions under § 6048(c) because they are payments made pursuant to a contract as opposed to gratuitous transfers.[1215] Conversely, the IRS argues that the non-gratuitous nature of the annuity transactions should be ignored under 26 C.F.R. § 1.679-4(c).[1216]

The Court disagrees[1217] with the IRS because 26 C.F.R. § 1.679-4(c) applies "[s]olely for the purposes of this section."[1218] 26 C.F.R. § 1.679-4 and the statute it interprets, 26 U.S.C. § 679, discuss when a United States person who transfers property to a foreign trust will be treated as the owner of the portion of such trust attributable to such property.[1219] Specifically, § 1.679-4(b)

---

[1215] Debtors' Post-Trial Brief [ECF No. 1117] at 59.

[1216] 26 C.F.R. § 1.679-4(c) (discussing when certain obligations can be ignored for the purposes of § 679).

[1217] Although, as explained in at p. 310 n.1237, *infra*, the Court finds that the IRS is estopped from arguing that the annuity payments were gratuitous transfers based upon its agreements in the Computation Stipulations, the Court will nonetheless consider this argument.

[1218] *Id.* at § 1.679-4(c).

[1219] 26 U.S.C.§ 679(a)(1); 26 C.F.R. §§ 1.679-1, 1.679-4.

discusses an exception to this rule for transfers for fair market value.[1220] Section 1.679-4(c) in turn discusses exceptions to this § 1.679-4(b) exception, *i.e.* certain supposedly fair market value transfers that will be ignored for the purposes of 26 U.S.C. § 679.[1221] The function of these overlapping statutes and regulations is to ignore certain transactions for the limited purpose of determining whether a transferor of property to a foreign trust should be treated as an owner of any part of that trust. The IRS seeks to invalidate the annuity transactions on a much broader level than the one envisioned by 26 U.S.C. § 679 and 26 C.F.R. § 1.679-4.[1222]

The Court agrees with the Debtors' argument that the annuity payments here were not gratuitous transfers. In exchange for their indirect transfers of options and warrants to one of the Foreign Corporations, Sam, Charles, and Dee received a private annuity of equivalent value, a fact that the IRS did not contest at trial. The annuity obligations are documented in private annuity agreements. The applicable Foreign Corporation was/is contractually obligated to make the annuity payments at issue here. When payments were made to Sam, Charles, and Dee, it was pursuant to those agreements. On this record, there is no basis upon which to conclude that the annuity payments were gratuitous transfers, let alone gratuitous transfers from a foreign trust.

This brings us to the IRS' last argument—*i.e.*, that the application of one of the various judicial doctrines—substance over form, economic substance, or step transaction—can transmute the Wyly annuity payments into a different, reportable type of transaction that is both (i) gratuitous,

---

[1220] 26 C.F.R. § 1.679-4(b); *see* 26 U.S.C. § 679(a)(2).

[1221] 26 C.F.R. § 1.679-4(c); *see* 26 U.S.C. § 679(a)(3).

[1222] In support of its argument that the private annuity payments should be treated as gratuitous transfers rather than fair market value exchanges for the purpose of § 6048(c), the IRS also points to language in IRS Notice 97-34 that defines a distribution as "any gratuitous transfer of money or property from a foreign trust." However, the IRS cites no statutory or regulatory authority that indicates that annuity payments can be construed as gratuitous transfers. *See* IRS Post-Trial Brief [ECF No. 1118] at 37.

and (ii) ignores the role of the Foreign Corporations. The Court rejects the IRS' attempts to apply these doctrines in this context for the reasons explained below.

As the Court has noted in its gift analysis, the IRS has invoked the doctrines of substance over form, economic substance, and step transaction in a haphazard manner. The IRS raised the novel argument that both the annuities and the Foreign Corporations should be disregarded under these doctrines as it relates to the imposition of International Penalties for the first time in post-trial briefing. This is troubling, because the IRS' post-trial argument that the Foreign Corporations and annuities should be disregarded runs directly counter to positions taken by the IRS in (i) its Proofs of Claim, (ii) the Computation Stipulations, and (iii) statements made by its counsel in open court. For the reasons explained below, the IRS is foreclosed from arguing that either the Foreign Corporations or the annuities should be disregarded under the doctrines of substance over form, economic substance, or step transaction as it relates to the imposition of International Penalties.

After an enormous amount of work by both parties, the IRS and the Debtors entered into the Computation Stipulations, which resolved almost all issues regarding how to calculate the Debtors' income tax, gift tax, and penalty liability. The Computation Stipulations resolved the amount that the Debtors would owe to the IRS if this Court determined that they were liable for gift taxes or penalties; and definitively resolved the question of how much income tax the Debtors owe but for a few ancillary issues.[1223] For example, the Computation Stipulations state:

> The Parties agree that, due to the Memorandum Opinion and Order issued in this Section 505 proceeding (docket numbers 789 and 791) relating to collateral estoppel and the classification of the Isle of Man trusts at issue in this proceeding, the IRS is not pursuing its alternative income tax position set forth in the POC that the IOM entities are shams or its alternative gift tax position that Debtors made gifts during the 1992 and 1996 calendar years. However, should that Memorandum

---

[1223] Computations Stipulations ¶¶ 1-2 (Sam income tax and penalty liability), 3-6 (Sam gift tax and penalty liability), 7.A-12.B (Sam International Penalties liability), 13-14 (Dee income tax and penalty liability), 15-19 (Dee gift tax and penalty liability), 20.A-25.B (Dee International Penalties liability). The Computation Stipulations are subject to certain contingencies. *See id.* ¶¶ 26-32.

> Opinion and Order be reversed or otherwise overturned, the United States reserves its rights to pursue any and all alternative theories in the Debtors' 505 motions, including but not limited to the tax treatment of the offshore Isle of Man trusts, and any gift tax transactions involving the Isle of Man trusts.[1224]

As the language quoted above indicates, the parties' Computation Stipulations are based on calculations in the IRS' Proofs of Claim.[1225] These calculations, in turn, are based on the premise that income from the offshore system needed to be reported as "ordinary income under Subpart F of the Internal Revenue Code."[1226] Income under Subpart F of the Internal Revenue Code is income from a controlled foreign corporation.[1227] The IRS' alternative theory, upon which the Computation Stipulations were not based, was that

> [t]he foreign entities (the foreign trusts and the foreign corporations owned by foreign trusts), have been determined to be shams. The income from these sham foreign entities was required to be reported on the Debtor's individual income tax returns (Form 1040). The character of the unreported income is ordinary income, short term capital gains and long term capital gains.[1228]

The IRS' main and alternative theories are mutually exclusive. The main theory, which is embodied in the Computation Stipulations, expressly relies on the existence of the Foreign Corporations to support the existence of Subpart F income. The alternative theory, a theory that the IRS expressly disclaims in the Computation Stipulations, relies on the non-existence of the Foreign Corporations.

Now, in the context of their attempt to recover International Penalties, the IRS argues—without using the word "sham"—that the Foreign Corporations should be disregarded. As the Debtors point out in their own post-trial briefing, in asserting that the Foreign Corporations should

---

[1224] *See id.* ¶ 32.

[1225] *See id.* ¶¶ 1, 13.

[1226] *Id.* ¶¶ 1, 13; Proof of Claim (Sam) at note 1(b); Proof of Claim (Dee) at note 1(b).

[1227] *See* 26 U.S.C. § 952(a) ("For purposes of this subpart, the term 'subpart F income' means, in the case of any controlled foreign corporation, the sum of—…").

[1228] Proof of Claim (Sam) at note 1(b); Proof of Claim (Dee) at note 1(b).

be disregarded for the purposes of reporting distributions under § 6048(c), the IRS fails to mention that disregarding these entities would make any § 6038 penalties inapplicable (because there would be no controlled foreign corporations for which the Debtors failed to file Forms 5471) and would result in a much lower income tax liability for the Debtors.[1229]  The Debtors also point out—in the context of conflicting IRS arguments regarding the nature of real estate transactions the Wylys entered into utilizing offshore system monies—that the positions taken by the IRS in its post-trial briefing directly contradict those it takes in the Computation Stipulations.[1230]

The Court notes that the Fifth Circuit has opined that, as a general rule, "parties entering into stipulations during the course of a judicial proceeding are estopped to take positions inconsistent therewith."[1231]  In addition, the Fifth Circuit held in *Ergo Science, Inc. v. Martin*[1232] that a district court did not abuse its discretion when it prevented a party from arguing a position that its counsel had expressly disavowed at an earlier point in the proceeding.  The Fifth Circuit's reasoning for this conclusion was that "faced with a burgeoning docket and with a complex commercial lawsuit at hand, a district judge must be able to winnow the issues for trial. This includes reliance on statements made by counsel in open court disavowing specific claims."[1233] The reasoning of *Ergo Science* is very much applicable here.

On January 6, 2016, the Court was advised by the IRS' counsel that the IRS had been authorized to enter into the Computation Stipulations by the Associate Attorney General of the United States.  While it took the parties time to "tweak" the language of the Computation

---

[1229] Debtor's Reply to IRS' Post-Trial Brief [ECF No. 1121] at 67-68.

[1230] *Id.* at 70 ("[T]he Debtors are not certain of the IRS' current position as to that agreement given its request that this Court find for it on both its gift tax argument and its Form 3520 reporting argument without disclosing the contradictory nature of those positions.").

[1231] *Markow v. Alcock*, 356 F.2d 194, 198 (5th Cir. 1966).

[1232] 73 F.3d 595, 598 (5th Cir. 1996).

[1233] *Id.* at 599-600.

Stipulations, it was finalized and filed with the Court on January 26.[1234] The Computation Stipulations were based on adjustments to figures in the IRS' Proofs of Claim, which calculated income tax liability specifically on the basis that the Foreign Corporations are not shams. Moreover, the Computation Stipulations provide that "the IRS is not pursuing its alternative income tax position set forth in the POC that the IOM entities are shams."[1235] Finally, IRS counsel also stated—in open court—that it agreed that "the Isle of Man trusts are grantor trusts, and if they're grantor trusts, the corporations are controlled foreign corporations."[1236]

Now the IRS has raised—for the first time in its post-trial briefing—arguments that the Debtors have failed to report transactions under § 6048(c) that specifically rely on the Court disregarding and/or shamming the Foreign Corporations. The Court does not see how it can disregard and/or sham the Foreign Corporations for International Penalties purposes without doing so for income tax purposes, which cannot be done consistent with the Computation Stipulations. Thus, the Court concludes that the IRS is estopped from arguing that the Foreign Corporations should be disregarded.[1237]

The Court also refuses to apply the substance over form, economic substance, or step transaction doctrines to find that annuity payments received by the Wylys were reportable under § 6048(c) for a different reason. This is because the use of these doctrines seems particularly

---

[1234] *See* Computation Stipulations ¶ 40 (noting a date of January 26, 2016).

[1235] *Id.* ¶ 32.

[1236] Tr. Trans. 3461:1-6 (Adams).

[1237] For the same reasons, the Court also concludes that the IRS is estopped from arguing that the annuity payments were gratuitous transfers. During closing arguments, the Court asked Debtors' counsel what the consequences would be if the Court found that the annuity transactions were flawed, and specifically whether this would allow the annuity payments to be treated as distributions and what the tax consequences of treating the annuities as flawed would be. Tr. Trans. 3462:17-3466:15 (closing question no. 9). After responding that this question "was a doozy," Debtors' counsel stated that the status of the annuities was not an issue in the case anymore because of the Computation Stipulations. *Id.* 3462:17-3466:15. When Debtors' counsel asked the IRS' counsel whether he agreed, IRS counsel replied that "…I – to use Your Honor's words, listening check, I – that sounds right based on the comp stip that Mr. Cole and Mr. Lan and I worked on for quite a while. That sounds right, Your Honor." *Id.* at 3466:12-15. Debtors' counsel then replied "I'm very happy with that answer. I don't have to brief that." *Id.* at 3466:20-21.

inappropriate in the context of the International Penalties. The parties have not cited, nor has the Court been able to locate through its own research, a single case where the IRS successfully used, or even attempted to use, one of the doctrines the IRS relies on here for the purpose of creating a reporting requirement and then assessing penalties for the taxpayer's violation of that newly-created requirement. This makes sense, as the Court believes that these doctrines were not created for this purpose.

The purpose of the economic substance doctrine is to prevent taxpayers "from reaping tax benefits from transactions lacking in economic reality."[1238] Likewise, the purpose of the substance over form doctrine—of which the step transaction doctrine is a corollary[1239]—is to ensure that "the tax consequences of a transaction are determined based on the underlying substance of the transaction rather than its legal form."[1240] These doctrines are designed to make sure that transactions are taxed properly; they are "judicial anti-abuse doctrines, which prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit."[1241] In essence, they are judge-created doctrines that provide some common sense boundaries on the idea that it is "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits."[1242]

In this regard, the Debtors have already lost the tax benefits of their offshore system by virtue of the SDNY Court's grantor trust determinations. Now the IRS wants to go further. The

---

[1238] *Klamath*, 568 F.3d at 543 (citing *Coltec Indus., Inc. v. U.S.*, 454 F.3d 1340, 1353–54 (Fed. Cir. 2006)).

[1239] *Security Indus. Ins. Co.*, 702 F.2d at 1244.

[1240] *Southgate Master Fund, L.L.C.*, 659 F.3d at 479.

[1241] *Chemtech Royalty Assoc., L.P. v. U.S.*, 766 F.3d 453, 460 (5th Cir. 2014) (quoting *Southgate Master Fund, L.L.C.*, 659 F.3d at 479).

[1242] *Gregory v. Helvering*, 293 U.S. 465, 469 (U.S. 1935).

IRS wants to apply the doctrines of substance over form, economic substance, and step transaction in order to make the Debtors liable for reporting penalties—after the proper tax treatment of the Debtors' transactions has already been determined and in ways that are counter to the IRS' previous positions. Applying the substance over form, economic substance, or step transaction doctrines solely to create reportable transactions and to then impose failure to file penalties runs counter to the Supreme Court's mandate that "one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.'"[1243] Thus, this Court declines the IRS' invitation to use these doctrines purely for the purpose of conjuring up reporting requirements for which it can then recover penalties for the Wylys' failure to report.

While no longer necessary, in the interests of completeness, the Court will rule on the Wyly's third argument as to why their annuity payments did not need to be reported on Form 3520—*i.e.*, they did not need to report the annuity payments because those payments were reported on their tax returns as income.[1244] The Court rejects this argument. Throughout trial, the IRS has pointed to the manner in which the Wylys reported annuity income from the offshore system—on Schedule C attached to their tax return as opposed to on Line 1 or on the face of the return—as deceptive and misleading.[1245] The Debtors have explained that this reporting method was necessary in order to make sure that these annuity payments were properly subject to self-employment tax.[1246] The IRS, in turn, has countered that "[t]here is no provision under the Internal

---

[1243] *Acker*, 361 U.S. at 91 (quoting *Keppel*, 197 U.S. at 362); *see also Ivan Allen Co. v. U. S.*, 422 U.S. 617, 627 (1975) (tax penalties are strictly construed); *Rand*, 141 T.C. at 393 (stating that "[t]he law is settled that 'penal statutes are to be construed strictly,' and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it'" and refusing to reply a penalty under § 6662.); *Mohamed*, 2013 WL 5988943 at *10 (strictly construing a tax penalty statute in favor of the taxpayer).

[1244] *See* Debtors' Post-Trial Brief [ECF No. 1117] at 60.

[1245] *See, e.g.,* Tr. Trans. 1592:22-1593:4 (IRS Agent Herrick testifying that the Wylys' manner of reporting annuity income was "unusual").

[1246] *See, e.g., id.* 1914:4-1915:14 (Hennington testifying that there was no way in their tax program to make sure that additional self-employment tax was added in without reporting the income on Schedule C, and that Pulman and French

---

Revenue Code that imposes the self-employment tax under 26 U.S.C. § 1401(a) to annuity income, even though all or a part of the annuity income may be subject to income tax."[1247]

Regardless of whether the Wylys needed to subject their annuity payments to self-employment tax, § 6048(c)(1)(A) settles the debate as to whether reporting these annuity payments on Form 1040 also satisfied Form 3520 reporting obligations. It did not. Section 6048(c)(1)(A) requires that the name of the trust from which a distribution is received be reported in order to satisfy Form 3520 reporting requirements. This is no mere technicality, as the entire point of § 6048 is to allow the IRS to monitor the movement of funds through offshore trusts, a task that is not possible without knowing which trusts are involved in particular transactions. There is no evidence in the record that the Wylys identified the trusts from which the annuity payments arguably came on their tax returns, as would be required in order to satisfy § 6048(c)(1)(A). In fact, the Wylys simply listed these payments as "ANNUITIES" without further elaboration on their tax returns.[1248] Thus, the Wylys reporting of their receipt of annuity payments on their tax returns would not relieve them of liability under § 6048(c) if there was such liability.

Nevertheless, for the reasons stated above, the Court concludes that the Wylys did not violate § 6048(c) by failing to report annuity payments received from the Wyly offshore system as distributions on Form 3520 because the annuity payments were not: (i) distributions from a foreign trust, or (ii) gratuitous.

---

advised the Wylys that the annuity payments were subject to self-employment tax), 2210:5-19 (Hennington, however, later testified that she could override the system, but only does so "if it is absolutely necessary.").

[1247] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF 1103] ¶ 118. The IRS has also stated that "[b]ecause the maximum amount of taxable earnings subject to the self-employment tax went from a maximum of $87,000 in 2003 to a maximum of $113,700 in 2013, none of the annuity income reported on the Schedules C to their income tax returns increased the amount of the Wylys' self-employment tax since they earned more than the maximum subject to the tax from other sources of income properly listed on the Schedules C. All annuity income reported on the Schedule C, however, would have been subject to the 2.9% hospital insurance (HI) tax." *Id.* ¶ 119.

[1248] *See, e.g.,* Joint Ex. 111 (Sam 2007 tax return) at SWYLY 023031; Tr. Trans. 1596:10-1598:23 (Herrick describing how the reporting of the annuity payments simply as "ANNUITIES" was how they were reported on Wyly 1040s).

### (3)    Real Estate Transactions

The second category of "distributions" that the IRS argues the Wylys were required to report pursuant to § 6048(c) are real estate transactions indirectly involving one or more of the Sam International Penalty Trusts or the Charles and Dee International Penalty Trusts.  Specifically, the IRS argues that Sam should have reported on Form 3520 transfers of offshore funds involving the acquisition of (i) the Cottonwood Ventures I property, (ii) the Cottonwood Ventures II property, and (iii) the Rosemary's Circle R Ranch property.[1249]  The IRS also argues that Charles and Dee should have reported on Form 3520 transfers of offshore funds involving the acquisition of (i) the LL Ranch property, and (ii) Stargate Horse Farm.[1250]  Conversely, the Debtors argue that the real estate transactions at issue:

> were merely investments by subsidiaries of the IOM trusts in U.S. entities that themselves invested in U.S. real estate. In exchange for their investment in the U.S. entities, the IOM subsidiaries received a pro rata interest in those entities. Accordingly, these transactions were simply investments by subsidiaries of the trusts. They were not distributions by the trusts because the trusts did not part with legal title to any trust asset.
>
> The IRS's inability to articulate a coherent position as to why these real estate transactions constituted gifts further illustrates that they were not reportable transactions. Furthermore, the IRS's gift theory was that the purported gift was made either to an entity or to a family member of the Debtors. Accordingly, those transactions would not be reportable by the Debtors in any event.[1251]

The Court largely agrees with the Debtors.  From the Court's perspective, the IRS' arguments here suffer from the same flaw in statutory construction as did its initial argument regarding the annuity payments that Sam, Charles, and Dee received from one or more of the Foreign Corporations.  While it is true that offshore funds were largely used to purchase domestic

---

[1249] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶¶ 418-21; IRS Post-Trial Brief [ECF No. 1118] at 68-79.

[1250] IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶¶ 430-33; IRS Post-Trial Brief [ECF No. 1118] at 61-68.

[1251] Debtors' Post-Trial Brief [ECF No. 1117] at 61.

**MEMORANDUM OPINION**                                                                     **314**

real estate, and the domestic entities holding title to that real estate are or were largely owned by a Foreign Corporation, albeit indirectly, none of the transfers of offshore funds that occurred here was a transfer "from a foreign trust" within the meaning of § 6048(c).

Moreover, the IRS identifies no statutory, regulatory, or case law authorities that would allow the Court to ignore the non-gratuitous nature of the real estate investments that it identifies as distributions reportable under § 6048(c). In exchange for the transfers of offshore funds, the applicable Foreign Corporation received an equivalent ownership interest in the domestic entities that hold legal title to the real estate. Under any circumstance that makes the transfers not gratuitous.

Finally, even if the prior two reasons are incorrect, the IRS seeks to recover from the wrong "recipient." Sam, Charles, and Dee did not receive the offshore funds. Rather, the applicable domestic entity did; and thus, it is the "United States person" who was obligated to report to the IRS. For all of these reasons, the Court concludes that the Debtors are not liable for violations of § 6048(c) by virtue of not reporting the transfers of offshore funds used to purchase domestic real estate as distributions on Form 3520.

Although the IRS argues that these real estate transactions can be treated as gratuitous distributions directly from the IOM trusts by ignoring (i) the existence of the Foreign Corporations and the domestic entities, and (ii) the non-gratuitous nature of the transfers via application of the doctrine of substance over form, the Court declines to do so here because, as discussed above in the context of the annuity payments: (a) the IRS is estopped from arguing that the Foreign Corporations should be disregarded, and (b) it is inappropriate to apply the doctrines of substance over form, economic substance, or step transaction purely for the purpose of creating a reportable transaction through which penalties can then be extracted from the Wylys.

### (4)     Security Capital Loans

The last form of "distribution" that the IRS asserts the Wylys were required to report on Form 3520 under § 6048(c) are loans received by Sam, Charles, and certain Wyly-related entities from Security Capital, who obtained the money it loaned out from one or more of the Foreign Corporations. As explained below, there are actually three sets of loans at issue. With respect to each loan, the IRS argues that it should have been reported on Form 3520 as distributions under § 6048(c) both because the text of the statute requires it and because the loans were gratuitous transfers as opposed to true loans under IRS regulations and the doctrine of substance over form.[1252]

As just noted, three sets of loans are at issue here. The first set of loans was made to Charles. These loans included a $6,000,000 loan from Security Capital to Charles made in October 2002 and an additional $25,000,000 loan from Security Capital to Charles made in March 2003.[1253] In order to make these two loans to Charles, Security Capital borrowed the money from Gorsemoor Limited (IOM), which is wholly owned by the Tyler IOM Trust.[1254] Charles is the grantor of the Tyler IOM Trust by operation of the SDNY Court's grantor trust determination.[1255]

The second set of loans was made to Sam. These loans included a $10,000,000 loan to Sam from Security Capital made in July 2003.[1256] In order to make this loan to Sam, Security Capital borrowed the money from Newgale Limited (IOM),[1257] which is wholly owned by the Bessie IOM Trust.[1258] Sam is the grantor of the Bessie IOM Trust by operation of the SDNY

---

[1252]IRS Post-Trial Brief [ECF No. 1118] at 59-61; *see also* Computation Stipulations ¶¶ 12.B; 25.B.

[1253] *See* IRS Post-Trial Brief [ECF No. 1118] at 59; Joint Stipulations ¶¶ 297, 299.

[1254] Joint Stipulations ¶¶ 87, 297.

[1255] Collateral Estoppel Nos. 21-24.

[1256] *See* IRS Post-Trial Brief [ECF No. 1118] at 60; Joint Stipulations ¶ 301.

[1257] Joint Stipulations ¶ 301.

[1258] *Id.* ¶ 36.

Court's grantor trust determination.[1259] This second set of loans also included a $15,000,000 loan that Security Capital made to Sam with money borrowed from Greenbriar Limited (IOM) and Newgale Limited (IOM) in January 2002.[1260] Greenbriar Limited (IOM) is wholly owned by the Delhi International IOM Trust.[1261] Sam is the grantor of the Delhi International IOM Trust by operation of the SDNY Court's grantor trust determination.[1262]

The third set of loans was made to what are characterized by the IRS as various Wyly-related entities. These loans include $11,500,000 loaned from Security Capital to Green Mountain Energy Resources, LLC **("Green Mountain Energy")** in 1998.[1263] Security Capital borrowed the money it needed to make this loan from Richland Limited (IOM), Morehouse Limited (IOM), and East Carroll Limited (IOM),[1264] each of which are wholly owned by the Bulldog IOM Trust.[1265] These loans also include a $3,000,000 loan from Security Capital to the Chief Executive Officer of Green Mountain Energy in January 1999.[1266] Security Capital borrowed the money it needed to make this loan from East Carroll Limited (IOM), another entity that is wholly owned by the Bulldog IOM Trust.[1267] These loans further include an $8,000,000 loan from Security Capital to The Sam Wyly 1978 Malibu Revocable Trust in 1999.[1268] Security Capital borrowed the money it needed to make this loan from Locke Limited (IOM) and Moberly Limited (IOM), which are each wholly owned by the Bulldog IOM Trust.[1269] This set of loans also includes a loan of

---

[1259] Collateral Estoppel Nos. 21-24.

[1260] Joint Stipulations ¶¶ 293, 294; Debtors' Ex. B.

[1261] Joint Stipulations ¶ 27.

[1262] Collateral Estoppel Nos. 17, 47-54.

[1263] *See* IRS Post-Trial Brief [ECF No. 1118] at 60; Joint Stipulations ¶¶ 287, 288.

[1264] Joint Stipulations ¶¶ 287, 288.

[1265] *Id.* ¶ 21.

[1266] *See* IRS Post-Trial Brief [ECF No. 1118] at 60; Joint Stipulations ¶ 289.

[1267] Joint Stipulations ¶¶ 21, 289.

[1268] *See* IRS Post-Trial Brief [ECF No. 1118] at 60; Joint Stipulations ¶ 290.

[1269] Joint Stipulations ¶¶ 21, 289.

financial assets valued at $55,815,672.03 from Security Capital to the various Cayman LLCs in 2001.[1270] Security Capital obtained the financial assets it loaned to the Cayman LLCs from East Baton Rouge Limited (IOM), East Carroll Limited (IOM), and Moberly Limited (IOM), each of which are wholly owned by the Bulldog IOM Trust,[1271] and Yurta Faf Limited (IOM), which is wholly owned by the Bessie IOM Trust.[1272] Finally, this set of loans includes a $5,000,000 loan from Security Capital to Wrangler Trust (US).[1273] Security Capital borrowed the money it needed to make this loan from Locke Limited (IOM), which is wholly owned by the Bulldog IOM Trust.[1274] Sam is the grantor of the Bulldog IOM Trust and the Bessie IOM Trust by virtue of the SDNY Court's grantor trust determination.[1275]

The Court rejects the IRS' argument that these loans are reportable distributions under § 6048(c) for three reasons. First, § 6048(c) does not require a United States person to report a loan that they receive from a foreign grantor trust; it only requires that loans from a foreign non-grantor trust be reported. That makes sense because reporting a loan from a foreign grantor trust would be like reporting a loan to yourself—completely unnecessary. But, further explanation may be helpful. Section 6048(c) does not discuss loan transactions as distributions.[1276] Although IRS Notice 97-34 discusses reporting loans from foreign trusts as distributions under § 6048(c), this discussion appears in the context of an explanation of reporting obligations under 26 U.S.C. §

---

[1270] *See* IRS Post-Trial Brief [ECF No. 1118] at 61; Joint Stipulations ¶ 292 ("In June 2001, East Baton Rouge Limited (IOM), East Carroll Limited (IOM), Moberly Limited (IOM), and Yurta Faf Limited (IOM), transferred a number of financial assets to Greenbriar Limited (IOM), which in turn, loaned the assets it received, together with additional financial assets of its own to Security Capital in return for a promissory note from Security Capital to pay Greenbriar Limited (IOM) $55,815,672.03."). Security Capital then loaned the financial assets to the various Cayman LLCs. *Id.* ¶ 303.

[1271] Joint Stipulations ¶ 21.

[1272] *Id.* ¶ 36.

[1273] *See* IRS Post-Trial Brief [ECF No. 1118] at 60; Joint Stipulations ¶ 295.

[1274] Joint Stipulations ¶¶ 21, 295.

[1275] *See* IRS Post-Trial Brief [ECF No. 1118] at 59-60; Joint Stipulations ¶ 21; Collateral Estoppel No. 54.

[1276] *See* 26 U.S.C. § 6048(c).

643(i).[1277]  26 C.F.R. § 1.641(a)-0 indicates that § 643 has "no application to any portion of the corpus or income of a trust which is to be regarded, within the meaning of the Code, as that of the grantor or others treated as its substantial owners."[1278]  In other words, § 643 and its accompanying regulations are not applicable to grantor trusts, which the trusts at issue here are.[1279]  Furthermore, § 643(i) is, by its own terms, a definition that applies "[f]or purposes of subparts B, C, and D."[1280]  The rules governing grantor trusts such as the ones at issue here are located in subpart E.  Thus, IRS Notice 97-34's requirement to report loans from foreign trusts on Form 3520 in order to comply with § 6048(c) only applies to loans from foreign non-grantor trusts.  Because the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts are all foreign grantor trusts, § 6048(c) is not applicable.[1281]

Second, there are no grounds on which the Court could conclude that these loans were in fact gratuitous transfers to Sam or Charles.  This is especially true regarding loans made to the alleged Wyly-related entities as opposed to Sam and Charles, as the IRS offers almost no evidence from which the Court could draw the conclusion that these loans were, in substance, gratuitous transfers to Sam and Charles.  But even as it relates to loans to Sam and Charles themselves, and although the loans bordered on sweetheart deals, the loans to Sam and Charles were nonetheless

---

[1277] *See* IRS Notice 97-34, at *14-15.

[1278] 26 C.F.R. § 1.641(a)-0.

[1279] *See* Federal Tax Coordinator 2d (RIA), ¶ C-1002, Taxation of Grantor Trusts, 19xx WL 218101 (2016) ("To the extent that the grantor trust rules apply, the regular rules for taxing trusts and their beneficiaries… do not apply.").

[1280] 26 U.S.C. § 643(i).

[1281] Reprising an argument that it made in the context of the annuity payments, the IRS also argues that the loans should be treated as gratuitous transfers rather than loans under the principles of 26 U.S.C. § 679 and 26 C.F.R. § 1.679-4.  This argument was addressed in the context of the annuity transactions, and the analysis is the same here.  The statutes and regulations cited by the IRS are not applicable to this situation.  *See* pp. 305-306, *supra*.

genuine loans complete with interest rates, repayment terms, and documentation.[1282] On this record, the Court cannot find that they were gratuitous transfers.[1283]

For example, Charles signed a note payable to Security Capital in connection with his $6,000,000 October 2002 loan.[1284] According to the note, Charles' $6,000,000 loan had a ten year term and called for annual, interest-only payments (at a rate of 4.90%) with unpaid interest and principal due on the tenth anniversary of the loan in October 2012.[1285] As the Court noted previously, Charles died in 2011 before the loan matured. Hennington testified that although interest payments were made on Charles' loans from Security Capital, that after Charles' death they "continued to be kind of hung up in the probate estate."[1286] Similarly, Charles signed a note payable to Security Capital in connection with his $25,000,000 March 2003 loan.[1287] This $25,000,000 loan also calls for annual, interest-only payments, but has a fifteen year maturity and an interest rate of 4.80%.[1288] Thus, according to the note, all principal and unpaid interest is due on February 28, 2018.[1289] Again, Hennington's testimony suggests that Charles made interest payments on this loan until his death.[1290] Security Capital has filed a proof of claim against Dee, seeking to collect both of these loans.[1291]

---

[1282] *See* Wyly Exs. B (Sam), D (Charles), E (Charles), (F) Sam.

[1283] Sam's January 2002 loan from Security Capital is factually different from his other loans from Security Capital in one potentially material respect—*i.e.*, Sam was unable to repay the loan at maturity and Security Capital and he agreed to restructure the loan on favorable terms. However, Sam reduced the principal amount outstanding on this loan by $1,500,000 and paid an overdue annual interest payment to Security Capital in order to obtain an extension of the original maturity date to July 14, 2018. From this Court's perspective, this difference does not make the loan a gratuitous transfer.

[1284] Wyly Ex. D.

[1285] *Id.* at SWYLY053519.

[1286] Tr. Trans. 2089:1-6 (Hennington).

[1287] Wyly Ex. E.

[1288] *Id.* at SWYLY053511.

[1289] *Id.*

[1290] Tr. Trans. 2089:1-6 (Hennington).

[1291] *See* Case No. 14-35074, Claim Nos. 6-1, 7-1. Security Capital seeks to collect $6,000,000 in principal and $598,610.96 in pre-petition interest related to Charles' October 2002 loan, along with additional interest, attorney

Sam also signed a note payable to Security Capital in connection with his $10,000,000 July 2003 loan.[1292]  This $10,000,000 loan calls for annual, interest-only payments at 4.17% per annum and matures on July 14, 2018.[1293]  Hennington testified that Sam "made all annual interest payments" on his Security Capital loans.[1294]  Security Capital has filed a proof of claim against Sam, seeking to collect this loan.[1295]

Moreover, Sam signed a note payable to Security Capital in connection with his $15,000,000 January 2002 loan.  This $15,000,000 loan[1296] calls for annual, interest-only payments at 5.5% per annum and matured on February 15, 2012.[1297]  Although Sam defaulted on this loan by not repaying it then, Security Capital agreed to amend the note in 2013 and a new maturity date of July 14, 2018 was agreed upon.[1298]  In exchange for this new maturity date, Sam (i) paid $1,500,000 to Security Capital, reducing his total indebtedness to $13,500,000; (ii) paid his single overdue annual interest payment, and (iii) agreed to continue paying interest at the rate of 5.5%.[1299]

The evidence in the record—as well as Security Capital's proofs of claim, of which this Court takes judicial notice—indicates that the loans that Security Capital made to Sam and Charles were in fact treated as loans by all of the parties involved.  The IRS has the burden of showing that penalties such as the International Penalties are applicable in the first instance under 26 U.S.C. § 7491(c).  In the absence of sufficient evidence that the loans to Sam and Charles were in fact

---

fees, and costs.  Security Capital also seeks to collect $25,000,000 in principal and $5,503,561.64 in pre-petition interest related to Charles' March 2003 loan, along with additional interest, attorney fees, and costs.

[1292] Wyly Ex. F.

[1293] *Id.* at SWYLY053503.

[1294] Tr. Trans. 2088:13-25 (Hennington).

[1295] *See* Case No. 14-35043, Claim No. 12-1. The Security Capital Proof of Claim seeks $10,089,149.33 plus costs, attorney fees, and additional interest related to this loan. $10,000,000 of the Proof of Claim represents the unpaid principal of the $10,000,000 July 2003 loan, and $89,149.33 represents pre-petition interest.

[1296] Wyly Ex. B.

[1297] *Id.*

[1298] *Id.*

[1299] *Id.* at 17-18.

gratuitous transfers, the Court cannot conclude that the Debtors needed to report these loans on Form 3520 under § 6048(c).

Third, as the Court has explained before in the context of its analysis of the annuity payments and the real estate transactions, the IRS misinterprets the language of § 6048(c) to attempt to capture these loans as "distributions" to Sam and Charles "from a foreign trust." All of the loans at issue here were loans from Security Capital, a Cayman Islands company setup in order to administer loan transactions made at the Wylys' direction.[1300] To facilitate its loans to Sam and Charles, Security Capital borrowed money from certain of the Foreign Corporations that were wholly owned by the Sam International Penalty Trusts or the Charles and Dee International Penalty Trusts.[1301] But, the loans at issue here were not made by any foreign trust.[1302] Thus, these loans were not "from a foreign trust" within the meaning of 26 U.S.C. § 6048(c).

Once again, the IRS argues that, in spite of the Court's conclusion that the text of § 6048(c) does not require reporting of these loans on Form 3520, these loans were in actuality gratuitous transfers directly from a Sam International Penalty Trust and a Charles and Dee International Penalty Trust to Sam and Charles, respectively. For the reasons explained in the context of analyzing the annuity payments and the real estate transactions, the Court rejects this argument for two reasons. First, this argument relies on the Court disregarding the Foreign Corporations (along with Security Capital), and the Court has determined that the IRS may not make an argument that relies on this step based on its position in the Computation Stipulations, its Proofs of Claim, and in statements made by its counsel in open court. Second, utilizing judge-made doctrines—

---

[1300] *See* Wyly Exs. D, E, and F (promissory notes); Joint Stipulations ¶¶ 285-302.

[1301] *See* pp. 316-317, *infra*.

[1302] *See* Wyly Post-Trial Brief at 63; Joint Stipulations ¶¶ 27, 36, 87, 297, 292, 293, 297, 299, and 301 (charting the paths of the loans at issue that were received by the Wylys).

substance over form, economic substance, or step transaction—in order to create reporting obligations that are not clearly imposed by § 6048(c) in order to impose penalty liability on the Debtors here is improper.

### (5)    Sales of Options to IOM Corporations

Finally, the Court must determine whether the Debtors violated § 6048(a) by failing to report the sale of options to certain of the Foreign Corporations.  Section 6048(a)(3)(A)(ii) requires a United States person who transfers money or property to a foreign trust to file a Form 3520 alerting the IRS that one of these events has occurred.[1303]

As relevant here, in 1999, Charles sold stock options to Quayle Limited (IOM) and Elegance Limited (IOM) and Sam sold stock options to Greenbriar Limited (IOM) and East Carroll Limited (IOM) (collectively, the "**1999 Option Sales**").[1304]  Each of these entities are wholly owned by Castle Creek IOM Trust, Red Mountain IOM Trust, Delhi IOM Trust, and Bulldog IOM Trust, respectively, of which Charles or Sam is the grantor by virtue of the SDNY Court's grantor trust determination.[1305]  The IRS argues that the 1999 Option Sales needed to be reported on Form 3520 under § 6048(a)(3)(A)(ii).[1306]  The Court disagrees, as explained below.

The relevant text of 26 U.S.C. § 6048(a)(3)(A)(ii) reads as follows:

> The term "reportable event" means… the transfer of any money or property (directly or indirectly) to a foreign trust by a United States person…

Notably, the structure of § 6048(a)(3)(A)(ii) mirrors that of § 6048(c).  Although in its briefing the IRS does not appear to argue that the 1999 Option Sales are reportable events under the text of § 6048(a)(3)(A)(ii) and instead relies exclusively on the doctrine of substance over form, the Court

---

[1303] 26 U.S.C. § 6048(a).
[1304] Joint Stipulations ¶¶ 168 and 169.
[1305] *Id.* at ¶¶ 19, 21, 25 27, 78, 80, 88, and 94; Collateral Estoppel Nos. 21-24.
[1306] IRS Post-Trial Brief [ECF No. 1118] at 79-80.

notes that the same statutory analysis that it applied to § 6048(c) applies here. The 1999 Option Sales were not sales to foreign trusts; rather, they were sales to certain of the Foreign Corporations, which are wholly owned by one of the Sam International Penalty Trusts or the Charles and Dee International Penalty Trusts.[1307] And, for the reasons stated above in its statutory construction of § 6048(c), the Court concludes that the 1999 Option Sales are not reportable events within the meaning of § 6048(a)(3)(A)(ii).[1308] The Court also concludes that, for the reasons stated above, it is inappropriate to apply the doctrines of substance over form, economic substance, or step transaction to attempt to create reportable events for which penalties can then be recovered from the Debtors.

For these reasons, the Debtors are liable for the following: (i) International Penalties under 26 U.S.C. § 6038(b) because they failed to file Forms 5471 as required by 26 U.S.C. § 6038(a), and (ii) International Penalties under 26 U.S.C. § 6677 because they failed to file Forms 3520-A as required by 26 U.S.C. § 6048(b). The Debtors are not liable for any other International Penalty.

### H. Did the Debtors Establish Their Reasonable Cause Defenses to the Imposition of International Penalties?

#### 1. Introduction

Because the Court has concluded that the Debtors are liable for certain of the International Penalties, the Court must now evaluate their respective reasonable cause defenses to this liability. For the reasons explained more fully below, the Court concludes that Sam has not established his reasonable cause defenses by a preponderance of the credible evidence, but that Dee has established her reasonable cause defenses and thus, will not be held liable for the International Penalties.

---

[1307] Joint Stipulations ¶¶ 168 and 169.

[1308] *See* pp. 299-302, *supra*.

### a)     Review of Provisions of § 6038

As just discussed, 26 U.S.C. § 6038(a)(1) requires every United States person who controls a foreign business entity to file a Form 5471.   Under § 6038(a)(2) and its accompanying regulations, Forms 5471 are due at the same time as the United States person's tax return.[1309]  As previously found, the Debtors failed to file Forms 5471 for the Foreign Corporations throughout the life of the offshore system, and are thus liable for penalties under 26 U.S.C. § 6038(b).   The parties have stipulated to the amount of these penalties.[1310]

However, § 6038's reasonable cause provision may provide the Debtors with an avenue of relief from this liability.   Specifically, § 6038(c)(4)(B) provides that "the time prescribed under paragraph (2) of subsection (a) to furnish information…shall be treated as being not earlier than the last day on which (as shown to the satisfaction of the Secretary) reasonable cause existed for failure to furnish such information."[1311]   Thus, if either Sam or Dee can establish that they had "reasonable cause" for not filing Forms 5471 for the Foreign Corporations, then they will not be liable for penalties under § 6038(b).   The meaning of the phrase "reasonable cause" is discussed in greater detail below.

### b)     Review of Provisions of §§ 6048(b) and 6677

As just discussed, § 6048(b) requires every United States person who is treated as the owner of any portion of a foreign trust under the Grantor Trust Rules to submit an annual Form 3520-

---

[1309] 26 U.S.C. § 6038(a)(2) (Secretary determines when Form 5471 is due); 26 C.F.R. § 1.6038-2(i) ("Returns on Form 5471 required under paragraph (a) of this section shall be filed with the United States person's income tax return on or before the date required by law for the filing of that person's income tax return. Directors of Field Operations and Field Directors are authorized to grant reasonable extensions of time for filing returns on Form 5471 in accordance with the applicable provisions of § 1.6081–1 of this chapter. An application for an extension of time for filing a return of income shall also be considered as an application for an extension of time for filing returns on Form 5471.").

[1310] *See* Computation Stipulations ¶¶ 9.A-10, 22.A-23.

[1311] 26 U.S.C. § 6038(c)(4)(B).  This reasonable cause provision operates to relieve taxpayers from liability under § 6038(b) as well as under § 6038(c)(1), which penalizes taxpayers for violations of § 6038(a) by reducing their foreign tax credits; however, § 6038(c)(1) is not at issue here.  In addition, § 6038(c)(4)(B) also operates to extend the 90-day period relevant for post-notification penalties under § 6038(b)(2).

A.[1312]  According to the instructions to Form 3520-A, the form must be filed "by the 15th day of the 3rd month after the end of the trust's tax year."[1313]  Section 6677 imposes penalties for violations of § 6048(b).[1314]  As previously found, the Debtors failed to file Forms 3520-A throughout the life of the offshore system and are thus liable for penalties under § 6677.  The parties have stipulated to the amount of these penalties.[1315]

However, penalties under § 6677 will not be imposed "on any failure which is shown to be due to reasonable cause and not due to willful neglect."[1316]  Thus, if either Sam or Dee is able to establish that they had reasonable cause for not filing Forms 3520-A and that their failures to file Forms 3520-A were not due to willful neglect, then they will not be liable for penalties under § 6677.  The meaning of the phrases "reasonable cause" and "willful neglect" are discussed in greater detail below.

## 2. Reasonable Cause and Lack of Willful Neglect

### a) In General

Reasonable cause is determined on a case-by-case basis, taking into account all of the facts and circumstances.[1317]  According to Fifth Circuit precedent, "the plaintiff bears the burden of proof on a reasonable cause defense."[1318]  As the Fifth Circuit has stated in the context of avoiding accuracy-related or fraud penalties, the most important factor in evaluating a taxpayer's reasonable cause defense is "the extent of the taxpayer's effort to assess his proper liability in light of all the

---

[1312] *See id.* § 6048(b)(1).

[1313] 2015 Instructions for Form 3520-A.

[1314] 26 U.S.C. § 6677.

[1315] *See* Computation Stipulations ¶¶ 7.A-8, 20.A-21.

[1316] 26 U.S.C. § 6677(d). The fact that a foreign jurisdiction would impose a civil or criminal penalty on the taxpayer (or any other person) for disclosing the required information is not reasonable cause. 26 U.S.C. § 6677(d).

[1317] *Brinkley*, 808 F.3d at 668 (internal quotation marks omitted) (quoting 26 C.F.R. § 1.6664–4(b)(1)); *Whitehouse Hotel Ltd. P'ship*, 755 F.3d at 249.

[1318] *Klamath*, 568 F.3d at 548 (citing *Montgomery*, 127 T.C. at 66).

circumstances."[1319]    A taxpayer's experience, knowledge, and education are relevant in determining whether reasonable cause has been established.[1320]   In defining reasonable cause in general, many courts rely on 26 C.F.R. § 1.6664-4(b), which interprets the meaning of "reasonable cause" and "good faith" (though good faith is not a part of the Court's consideration in connection with the Debtors' liability for International Penalties) for the purposes of avoiding penalties under §§ 6662 and 6663.  Treasury Regulation  § 1.6664-4(b) provides:[1321]

> (b) Facts and circumstances taken into account—(1) In general. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. (See paragraph (e) of this section for certain rules relating to a substantial understatement penalty attributable to tax shelter items of corporations.) Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith. Reliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith. Similarly, reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect. Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith…

The Court must stress that, as in its analysis of the Debtors' attempted use of reliance on the advice of counsel to negate fraudulent intent under § 6663 and to establish reasonable cause for avoidance of fraud penalties under § 6664, this regulation is a helpful guide but is not controlling.  This is because this regulation does not expressly apply to penalties under §§ 6663, 6038(c)(4)(B), or 6677(d), and—unlike under § 6664—the Court need not evaluate whether the

---

[1319] *Brinkley*, 808 F.3d at 669 (quoting *Klamath*, 568 F.3d at 548); *Streber*, 138 F.3d at 223.

[1320] *Streber,* 138 F.3d at 223 (quoting *Heasley v. C.I.R.*, 902 F.2d 380, 385 (5th Cir. 1990) (overruled on other grounds)).

[1321] 26 C.F.R. § 1.6664-4(b).

Debtors here have displayed "good faith" in order to relieve them of liability for International

Penalties. Rather, as relevant here, the Debtors need only establish "reasonable cause" under §

6038(c)(4)(B) and both "reasonable cause" and lack of "willful neglect" under § 6677(d).

In the context of establishing reasonable cause for failing to file a return on time, the

Supreme Court stated in *U.S. v. Boyle*[1322] that "'reasonable cause' is not defined in the Code, but

the relevant Treasury Regulation calls on the taxpayer to demonstrate that he exercised 'ordinary

business care and prudence' but nevertheless was 'unable to file the return within the prescribed

time.'" Courts have adopted the Supreme Court's definition of reasonable cause in *Boyle*—*i.e.*,

"ordinary business care and prudence"—as the proper definition of reasonable cause throughout

the Internal Revenue Code and especially in failure to file situations.[1323] The *Boyle* Court also

defined the term "willful neglect," stating that it should be understood as "a conscious, intentional

failure or reckless indifference."[1324] Again, courts have adopted *Boyle's* definition of willful

neglect as the proper definition of the phrase as it is used throughout the Internal Revenue Code.[1325]

Although there are very few cases and no regulations defining "reasonable cause" or

"willful neglect" within the specific contexts of §§ 6038(c)(4)(B) and 6677(d), those few cases

that do exist tend to adopt *Boyle's* definitions of these phrases, assuming that the meanings of the

phrases "reasonable cause" and "willful neglect" are the same throughout the penalty provisions

---

[1322] 469 U.S. at 246 (citing 26 C.F.R. § 301.6651(c)(1)); *see Ferguson v. C.I.R.*, 568 F.3d 498, 501 (5th Cir. 2009); *see also Staff IT, Inc. v. U.S.*, 482 F.3d 792, 798-99 (5th Cir. 2007) ("For failure-to-file situations under § 6651(a), the Treasury Regulations explain: If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to reasonable cause." (internal formatting omitted)).

[1323] *Staff IT, Inc.*, 482 F.3d at 798-99 (failure to file under § 6651); *Neonatology Associates*, 115 T.C. at 98 (penalties under § 6662).

[1324] *Boyle*, 469 U.S. at 245.

[1325] *Staff IT, Inc.*, 482 F.3d at 798-99 (adopting *Boyle* definition of willful neglect in a case involving failure to file under § 6651); *Nance v. U.S.*, 2013 WL 1500987, at *5 (W.D. Tenn. 2013) (adopting *Boyle* definition of willful neglect in case involving penalties under § 6677).

of the Internal Revenue Code.[1326]  This Court agrees with this approach, especially in light of the fact that there are no regulations that specifically interpret the meaning of the phrases "reasonable cause" and "willful neglect" in §§ 6038(c)(4)(B) and 6677(d).

### b) Reliance on the Advice of Professionals

The Debtors rely almost exclusively on the fact that they relied on the advice of professionals in order to establish their reasonable cause defenses to their liability for International Penalties.  The Court discussed the legal standards relevant to establishing reasonable cause by relying on the advice of tax professionals earlier in this opinion in its discussion of Sam's attempt to use his purported reliance on the advice of counsel to negate fraudulent intent under § 6663 and to establish reasonable cause for avoidance of fraud penalties under § 6664.[1327]  The Court will briefly review these legal standards here for the sake of clarity.

To reiterate, when a professional advises a taxpayer on a matter of tax law, such as whether a liability exists or whether a return must be filed, it is reasonable for the taxpayer to rely on that advice without seeking a second opinion, even if that advice turns out to be wrong.[1328]  This is because "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney."[1329]  However, "reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance

---

[1326] *James v. U.S.*, 2012 WL 3522610, at *3 (M.D. Fla. 2012) (interpreting reasonable cause under § 6048); *Congdon v. U.S.*, 2011 WL 3880524, at *2 (E.D. Tex., 2011) (interpreting reasonable cause under § 6038).

[1327] *See* pp. 177-230, *supra*.

[1328] *See Boyle*, 469 U.S. at 251; *Whitehouse Hotel Ltd. P'ship*, 755 F.3d at 249; *Stanford*, 152 F.3d at 461-62.  The Court notes that most of the Fifth Circuit cases that it cites in its discussion of the legal standards related to establishing a reasonable cause defense based on reliance on the advice of counsel are decided in the context of § 6664, which requires a taxpayer to establish both "reasonable cause" and "good faith" in order to escape liability.  Here, only "reasonable cause" and lack of "willful neglect" (under § 6677 only) are the relevant standards.  The Court notes that these Fifth Circuit cases draw their analysis from *U.S. v. Boyle*, a Supreme Court case where "reasonable cause" and lack of "willful neglect" were the relevant standards.  Thus, the Court views the reasoning of these Fifth Circuit cases as applicable in the context of the reasonable cause defenses that the Debtors are raising to the International Penalties.

[1329] *Whitehouse Hotel Ltd. P'ship*, 755 F.3d at 249 (quoting *Boyle*, 469 U.S. at 251-52).

turns on the quality and objectivity of the professional advice which they obtained."[1330] To establish reasonable cause based on a professional's advice, the professional's advice must: (i) be reasonable and made in good faith, (ii) not be based on unreasonable factual or legal assumptions, and (iii) not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person.[1331] According to the Fifth Circuit, "[i]f a tax advisor's opinion is shown to be based on unreasonable factual or legal assumptions, that is, upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, then the taxpayer's reliance on that opinion does not constitute reasonable cause."[1332] Furthermore, if a taxpayer does not actually follow the advice that he or she receives from a tax professional, reliance on that advice cannot establish reasonable cause.[1333] The tax court has summarized the relevant considerations for establishing reasonable cause based on reliance on the advice of counsel in this way:

> To establish reasonable cause through reliance on the advice of a tax adviser, the taxpayer must meet the following three-prong test, laid out in *Neonatology Assocs., P.A. v. Commissioner,* 115 T.C. at 98–99: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer relied in good faith on the adviser's judgment.[1334]

Before proceeding to analyze whether the Debtors have met their burden of establishing their reasonable cause defenses here, one final set of legal principles must be analyzed. Specifically, can a taxpayer establish his reasonable cause defense based on an "honest difference of opinion?"

---

[1330] *Brinkley*, 808 F.3d at 669 (internal marks omitted) (quoting *Klamath*, 568 F.3d at 548); *see Whitehouse Hotel Ltd. P'ship,* 755 F.3d at 249; *Southgate Master Fund, L.L.C.*, 659 F.3d at 493.

[1331] *Brinkley*, 808 F.3d at 669; *Southgate Master Fund, L.L.C.,* 659 F.3d at 493.

[1332] *Southgate Master Fund, L.L.C.*, 659 F.3d at 493 (quoting 26 C.F.R. § 1.6664-4).

[1333] *Id.*

[1334] *Thomas*, 2013 WL 690599, at *3.

MEMORANDUM OPINION                                                                                      330

### c) Honest Difference of Opinion

The Debtors assert what they characterize as a separate reasonable cause argument from their reliance on the advice of professionals argument. Specifically, the Debtors argue that there was an honest difference of opinion as to whether the Sam International Penalty Trusts and the Charles and Dee International Penalty Trusts were non-grantor trusts, and that this honest difference of opinion establishes reasonable cause for the Debtors' failure to file Forms 3520-A and 5471.

Throughout their Pre-Trial Brief, the Debtors maintain that reasonable cause can be established when there is an honest difference of opinion on the law.[1335] They also argue that an honest difference of opinion on the law can negate fraudulent intent.[1336] Authority does exist that supports the Debtors' argument. For example, the Debtors cite *Robinson v. U.S.*,[1337] a decision where "[t]he credibility of the Plaintiff's testimony regarding his belief that he was not required to file a return, the uncertainty of the existing statutory and regulatory definition of a broker, and the lack of legal force of the proposed amendments to Treasury Regulation[s]" were sufficient to establish reasonable cause, despite the fact that the taxpayer had not consulted his accountant regarding the matter at issue. The Debtors also cite *Rice v. C.I.R.*[1338] for the proposition that "some difference of opinion" regarding a legal position is sufficient to establish reasonable cause and/or a lack of fraudulent intent. Finally, the Debtors cite *Carter v. C.I.R.*,[1339] a case where the court held that where there was a "complex legal issue on which there can be an honest difference of

---

[1335] *See* Debtors' Pre-Trial Brief [ECF No. 1015] at 62-74, 106-07.

[1336] *See id.* at 62-74.

[1337] 1995 WL 322722, at *4 (M.D. Fla. 1995).

[1338] *Rice v. C.I.R.*, 14 T.C. 503, 508 (1950); Debtors' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1102] at 191. *Rice* involved a taxpayer who held a common misconception about a certain deduction that—despite having a common sense appeal—was nevertheless erroneous. *Id.* This misconception was insufficient to prove fraud. *Id.*

[1339] 36 T.C.M. (CCH) 1295, 1977 WL 3048 (1977).

opinion," the failure of a taxpayer to reach the right conclusion on that issue was insufficient to establish negligence.

However, as applied here, this Court sees little, if any, difference between the Debtors' "honest difference of opinion" argument and their reliance on the advice of counsel argument. Indeed, the Debtors meld the two arguments in their own pleadings. For example, in the Debtors' Amended Proposed Findings of Fact and Conclusions of Law dedicated to their honest difference of opinion argument, the Debtors ask the Court to find that:

> When the law is unsettled or unclear, a belief based on a review of the existing authorities establishes reasonable cause for failure to file a form… Given the complexity and uncertainty of the law during the years at issue, it was entirely reasonable for the Wylys to rely on their professional advisors and believe their advice that the IOM trusts were indeed not grantor trusts to Sam and Charles and that they had filed all required tax returns and forms.[1340]

As this proposed finding makes clear, the Debtors' "honest difference of opinion" argument is identical to their "reliance on the advice of professionals" argument. In fact, the argument has to be the same because there is no evidence in the record that the Debtors had any "honest difference of opinion" about how to interpret the relevant tax law independent of the analyses provided to them by their tax advisors. Neither Sam nor Dee ever read any of the legal opinions that form the basis of their reliance on the advice of counsel argument,[1341] and both admitted that they did not independently analyze the relevant tax issues.[1342] As such, the Debtors' "honest difference of

---

[1340] Debtors' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1102] at 206-07.

[1341] The evidence shows that Dee relied entirely on Charles regarding all business, tax, and legal matters throughout their marriage. Tr. Trans. 159:20-160:15 (Dee testified that she relied entirely on husband throughout marriage), 159:13-19 (Dee) ("Q. Have you ever prepared a tax return? A. Oh, heavens no."), 172:17-19 (Dee never discussed tax matters with husband), 1073:14-1075:2 (Sam testifying that he has not read a legal opinion), 387:10-388:11 (Sam testifying how he came to rely on tax professionals and that he did not understand the tax laws and regulations). Tr. Trans. 1074:18-1075:2 (Sam testifying that he did not personally read the opinion letter at IRS Ex. 177 addressed to him).

[1342] Tr. Trans. 159:13-160:15, 293:2-294:23 (Dee testifying that she relied entirely on Charles to handle all tax and legal matters throughout their marriage, and it was her practice to simply sign whatever tax return was put in front of her without reviewing it), 389:25-390:17 (Sam testifying that he has not prepared his own tax returns or the underlying figures for his tax returns since the 1960s), 400:16-401:18 (Sam testifying that he relied on accountants and tax lawyers

---

**MEMORANDUM OPINION**

opinion" argument and their "reliance on the advice of counsel" argument will be analyzed together as they are one and the same.

This Court's conclusion that these are not separate bases upon which to establish a reasonable cause defense here is bolstered by examining cases where courts have found that a taxpayer had reasonable cause based on an honest difference of opinion. Generally, the "honest difference of opinion" argument is used by courts to provide relief to taxpayers who did not rely on counsel or other professional advisors but made a legal mistake when confronted with a confusing provision of the tax law that they interpreted on their own.[1343]  The difference here, however, is that none of the cases cited by the Debtors, and almost none of the additional cases the Court found discussing this kind of "honest difference of opinion" basis for a reasonable cause defense, involved taxpayers who relied on counsel or other advisors at all.[1344]  Indeed, where

---

to prepare his tax returns because "Well, they had experience in doing it. They knew how to do it. They had dealt with it, and it's not something I had personally done…And—and I had a lot of other things to do."), 414:9-25, 703:4-25 (in describing his management style, Sam testified that "I did what I learned. I – I needed to get real good people who knew how to do whatever it is that they did in all kinds of areas, whether they were technology or accounting or law or what have you. And I needed to let these people do what they do, because everybody knew more about anything than I would personally know"), 709:1-20 (Sam testified that he delegated the specifics of the offshore system to French and that "I didn't confer with Michael French on every specific of how he and other lawyers were setting up trusts and doing the legal things that they did."), 722:13-725:2 (Sam, describing the process that went into preparing his tax returns from 1992 through 2013, and testifying that he did not carefully read his 1992 tax return because "I can't say I was competent to read it" and that he signed it because "it was prepared by people that knew what they were doing. They were professional people, accountants, and they were lawyers…").

[1343] *Yelencsics v. C.I.R.*, 74 T.C. 1513, 1533 (1980) (leading case on this issue invoking "honest difference of opinion" where taxpayer did not consult any advisors); *But see Lemery v. C.I.R.*, 54 T.C. 480, 485 (1970) (Taxpayer's accountant apparently advised taxpayer—a Canadian—that he could establish Canadian residency for the year in question and would thus not need to report certain income. The tax court, without relying on the fact that the taxpayer received advice from his accountant, concluded that "while the issue is not free from doubt, we feel that O.D. 468 [(1920)], supra, [referring to Office Decisions, a type of Revenue Ruling issued before 1954] created such confusion and uncertainty on the question of this petitioner's residence that we cannot say his actions were due to 'negligence or intentional disregard of rules and regulations.'").

[1344] *See, e.g.*, *Barter Systems, Inc. of Wichita v. C. I. R.*, 59 T.C.M. (CCH) 72, 1990 WL 25024 (1990); *Lemery,* 54 T.C. at 490; *Marcello v. C.I.R.*, 43 T.C. 168, 182 (1964), *aff'd in part and remanded in part*, 380 F.2d 499 (5th Cir. 1967); *see also Foster v. C.I.R.*, 756 F.2d 1430, 1439 (9th Cir. 1985) (refusing to apply the negligence penalty in a "case of first impression with no clear authority to guide the decision makers as to the major and complex issues"); *Bergersen v. C.I.R.*, 70 T.C.M. (CCH) 568, 1995 WL 510012, at *26 (1995); *Rosen v. C.I.R.*, 67 T.C.M. (CCH) 2082, 1994 WL 26314, at *9 (1994) ("Imposition of the addition to tax for negligence is inappropriate if the deficiency turns on relatively complex legal issues with respect to which there can be an honest difference of opinion"); *Little v. C.I.R.*, 65 T.C.M. (CCH) 3025, 1993 WL 231723, at *12 (1993); *Howard v. C.I.R.*, 109 T.C.M. (CCH) 1193, 2015 WL

---

taxpayers have attempted to rely on an "honest difference of opinion" argument while at the same time relying on the professional advice of a tax advisor, their "honest difference of opinion" argument has not resonated with the courts.[1345]  In the few cases where taxpayers establish reasonable cause both because they relied on advisors and because they had an honest difference of opinion regarding the law, the courts tend to analyze the taxpayer's honest difference of opinion as a component of his reliance on the advice of counsel, defaulting to a reliance on the advice of counsel framework in order to evaluate the taxpayer's reasonable cause.[1346]

Here, the Wylys did not analyze the law independently.  They relied on their advisors to analyze the law for them.  As such, the Court will treat the Debtors' "honest difference of opinion" and "reliance on counsel" reasonable cause arguments as one and the same.

### d) Application to Both Debtors

In their pre-trial briefing, the Debtors sum up their reasonable cause defenses to International Penalties in this way:[1347]

> As already described above, the Wylys were continually told by their advisors that the 1992 IOM trusts were non-grantor trusts and that the 1994 and 1995 IOM trusts were grantor trusts to Messrs. King and Cairns, respectively. Consistent with this advice, the Wylys properly filed Forms 3520 for the IOM trusts for the years they created and funded such trusts, and filed the Forms 3520-A (required for grantor trusts owned by a U.S. person) annually for the IOM grantor trusts they created until they were terminated in 1996.
>
> No further Forms 3520 or 3520-A were filed, and no Forms 5471 were filed, because the Wylys' advisors did not tell them to make any additional filings. *Based on the conclusions reached by these advisors regarding the characterization of the*

---

1060434 (2015) (taxpayer read relevant law but misinterpreted it, reasonable cause established because of taxpayer's attempt to comply by reading the law).

[1345] *Carlins v. C.I.R.*, 55 T.C.M. (CCH) 228, 1688 WL 13212 (1988) (refusing to allow taxpayer to escape negligence penalties by asserting honest difference of opinion where there was reliance on counsel and taxpayers were knowledgeable tax lawyers); *Gerdau Macsteel, Inc. v. C.I.R.*, 139 T.C. 67, 188 (2012) (same result in a case involving "well-educated tax professionals with extensive tax experience").

[1346] *See, e.g., Bruce v. C.I.R.*, 108 T.C.M. (CCH) 230, 2014 WL 4336234 (2014).

[1347] *See* Debtors' Pre-Trial Brief [ECF No. 1015] ¶¶ 151-54, 165 (emphasis added).

*trusts and the nature of certain other transactions, no such additional information returns should have been filed.*

Furthermore, even after the Wylys were told in 2003 that Morgan Lewis thought there was a risk that the 1992 trusts could be treated as grantor trusts to Sam and Charles, they were not advised of any potential need to file these forms. Although the IRS continues to focus on the views of Morgan Lewis to support these penalties, Debtors reiterate that (i) other advisors (principally Messrs. Chatzky, Tedder, and French, and Meadows Owens) interpreted the same statutory provisions differently, (ii) Morgan Lewis could not (and did not) point to conclusive authority supporting its views because such authority did not exist, (iii) when the Wylys learned about Morgan Lewis' contrary views, they began disclosing the issues on their federal income tax returns, and (iv) even after being informed of Morgan Lewis' concerns, the Debtors were not advised to file these information reports. The contrary views were not resolved until the Disgorgement Opinion was issued in 2014. This is further evidence that the state of the law was unclear.

On their advisors' counsel, the Wylys properly filed all of the tax forms their advisors told them to file, including Forms 3520 for the IOM trusts they settled and funded, Forms 3520-A each year for the trusts those advisors told them were grantor trusts to them, and other obscure forms when advised to file them, such as FBARs and Forms 8938.

\*\*\*

At no point during the 22-year period at issue in these Cases were Sam and Charles Wyly ever advised by any of their lawyers they engaged to file the Forms 5471, 3520 or 3520-A at issue. And, furthermore, for the first 12 years of this period (until 2003), the Wylys were not advised that there was even a meaningful risk that the trusts were grantor trusts – the prerequisite finding necessary to trigger the Form 3520-A and 5471 filing requirements.

Moreover, the Debtors rely upon the Supreme Court's decision in *U.S. v. Boyle*[1348] for the

proposition that taxpayers are not required to seek second opinions or monitor whether their

counsel is giving correct advice in order to rely on that advice for reasonable cause purposes. The

Debtors acknowledge that any advice they received regarding the need to file Forms 3520, 3520-

A, or Form 5471 was "implicit,"[1349] and that this advice was linked to their advisors' understanding

that "the 1992 IOM trusts were non-grantor trusts and that the 1994 and 1995 IOM trusts were

---

[1348] *See id.* ¶ 157 (citing *Boyle*, 469 U.S. at 251).

[1349] *See id.* ¶ 159.

grantor trusts to Messrs. King and Cairns, respectively."[1350]  Finally, the Debtors argue that while there are IRS procedures for filing protective or conditional forms in certain instances, no such procedures exist for Forms 3520, 3520-A, or 5471.[1351]

The IRS objects to the Debtors' reasonable cause defenses on multiple grounds; specifically that: (i) Tedder and Chatzky (and at times Meadows Owens' attorneys) are promoters of the Wyly offshore system on whose advice the Wylys may not rely, (ii) the advice that Sam and Charles was given regarding the offshore system was based on facts that Sam and Charles knew to be false, (iii) the Debtors never actually heard any of the advice on which they purport to rely firsthand, and (iv) the Debtors cannot actually produce any of the advice that was supposedly given to them by Meadows Owens or substantiate what facts were given to Meadows Owens to produce that advice.[1352]  Finally, the IRS argues that the Debtors' advisors gave them a great deal of advice about reporting requirements, as follows:[1353]

> In 1991, the memorandum to the Wylys included advice from Tedder stating that (1) Form 3520 must be filed when a foreign trust is formed; (2) attach a copy of the Trust Agreement to the Form 3520 for safety; and (3) file Form 3520-A annually to keep confirming that the Trust is in existence. Tedder specifically advised "Always over disclose to the IRS." Throughout the time that the Offshore System was operating, the Wylys also received additional advice as to these forms. In December 2002, Keeley Hennington, the Wylys agent, acknowledged the Form 3520 filing requirement and awareness of the same. In August 2003, Lubar, another Wyly agent, informed Keeley Hennington and Boucher, two additional Wyly agents, that Form 5471s must be filed. In October 2003, Todd Welty, then with the Meadows firm, also discussed the penalties associated with not filing a Form 3520 and 5471 with Keeley Hennington. While silence of advisors is not sufficient to establish a reasonable cause defense, the record here is clear that the Wylys were actually advised to file these forms and received this advice as early as 1991 in advance of their implementing the Offshore System.

---

[1350] *See id.* ¶ 151.

[1351] *See id.* ¶ 167.

[1352] According to the IRS, neither Sam nor Evan could state a single fact that Meadows Owens relied on in giving the advice. IRS Post-Trial Brief at 17 (citing Tr. Trans. 1703:15-23 (Sam); 1851-1853(Evan)).

[1353] IRS Post-Trial Reply Brief [ECF No. 1120] at 10-11 (footnotes omitted).

As shown by the excerpted arguments above, the Debtors' arguments as to why they are not liable for International Penalties are the same arguments they made with respect to their liability for fraud penalties—*i.e.*, that they were given advice from many professionals that the IOM trusts were non-grantor trusts as to Sam and Charles, and that their reliance on that advice was reasonable despite the fact that it was wrong. Since the Debtors' arguments regarding their reasonable cause defense to the International Penalties are the same as their arguments with respect to their reasonable cause defense to fraud penalties, the Court's earlier analysis with respect to Sam is equally applicable here, as discussed below.

### (1) As to Sam

As to Sam, the IRS asserts International Penalties beginning in 1996.[1354] So, what advice did Sam get that is relevant here? For context, Sam argues that he was consistently advised that the Sam International Penalty Trusts were either non-grantor trusts as to him (Bulldog IOM Trust, Lake Providence IOM Trust, and Delhi IOM Trust) or foreign grantor trusts as to King and Cairns (Bessie IOM Trust and La Fourche IOM Trust, respectively). However, the credible evidence at trial does not support Sam's argument, as explained below.

As previously found, Sam never received an opinion that the Bulldog IOM Trust was a non-grantor trust as to him.[1355] The legal opinions that Sam received in 1992 when the Bulldog IOM Trust was settled and the initial annuity transactions were undertaken from Pratter, Tedder & Graves addressed the tax consequences of the annuity transactions, *assumed* that the annuity

---

[1354] *See* Computation Stipulations ¶¶ 9.A-10, 22.A-23.

[1355] Chatzky said that he believed such an opinion was issued, but no such opinion was admitted into evidence. Tr. Trans. 1170:1-11 (Chatzky). In fact, while Debtors' counsel attempted to refresh Chatzky's recollection using a draft opinion letter dated February 2, 1992, that draft is unsigned and was not offered into evidence. Accordingly, there is no evidence in the record as to whether an opinion regarding the Bulldog IOM Trust was ever finalized, signed and issued to Sam. It goes without saying, therefore, that we have no idea on this record what such an opinion, if ever finalized, signed and issued would have said.

transactions would be undertaken through entities wholly owned by a foreign non-grantor trust, but did not address the issue of the proper legal characterization of that trust—*i.e.*, the Bulldog IOM Trust—as a grantor or non-grantor trust.

Sam next argues that French told him that the Bulldog IOM Trust was a non-grantor trust. But, there are numerous problems with Sam relying on any tax advice French allegedly gave him, as discussed *supra* at pp. 216-230. First, French was not competent to give Sam advice regarding the proper legal characterization of the Bulldog IOM Trust as he was a securities lawyer, not a tax lawyer. That French was not competent to give such advice is demonstrated by the fact that the Wylys hired expert tax lawyers to advise them—*i.e.*, Lubar, Owens, Pulman, Chamberlain Hrdlicka, DeCastro West, and arguably Tedder and Chatzky. Further, that Larry Bean, a tax lawyer at French's law firm (Jackson Walker), reviewed the offshore system as proposed by Tedder early on and advised French that it "might work," after stating that their firm, Jackson Walker,[1356] would not issue any such legal opinion to the Wylys, is of little comfort to the reasonableness of Sam's reliance on the advice of counsel defense here. Finally, that French himself realized that he was not competent to advise the Wylys about the tax consequences of their offshore system is amply demonstrated by what French did—*i.e.*, after the Wylys received "advice" from Tedder, Chatzky, and Bean, French remained concerned about the legal characterization of the 1992 IOM trusts, so, in 1993, French sought out an extremely well credentialed international tax expert, Lubar, to get another opinion about the tax consequences flowing from the 1992 annuity transactions as discussed below. In short, Sam never received advice upon which he can reasonably rely regarding the proper characterization of the Bulldog IOM Trust as a non-grantor trust when that trust was first settled.

---

[1356] SEC Tr. Trans. 3738:11-3738:14 (French).

**MEMORANDUM OPINION**                                                                      338

As previously found, on May 19, 1993, Sam did receive opinion letters from Tedder, Chatzky & Berends[1357] addressing the proper legal characterization of two other trusts Sam settled in December 1992—*i.e.*, the Lake Providence IOM Trust and the Delhi IOM Trust. The letters are identical and, based on the factual assumptions contained in the letters, the firm opined that "it is more likely than not that the trust will be construed to constitute a valid non-grantor trust for United States taxation purposes provided that the trust operates in accordance with the terms and provisions contained in the Trust Agreement." However, as previously held, Sam cannot rely upon these opinions for his reasonable cause defense because that advice was provided by the firm that promoted the offshore system to the Wylys.[1358]

As previously found, in 1993 Sam's trusted advisor and agent, French, sought and received an opinion regarding the proper legal characterization of the 1992 IOM trusts that Sam had settled—*i.e.,* Bulldog IOM Trust, Lake Providence IOM Trust, and Delhi IOM Trust. French was concerned about the conclusions reached by Tedder and Chatzky and so French went to an international tax specialist, Lubar, for advice on the Wylys' behalf.[1359] As previously found, Lubar advised French that there was a "significant risk" that the 1992 IOM trusts were properly characterized as grantor trusts to Sam, which would dramatically change the tax consequences of the 1992 annuity transactions and the reporting requirements imposed under U.S. tax laws.[1360]

---

[1357] Chatzky testified that he worked with Tedder's firm from time to time on particular clients, but that at some point in time they became partners in the same firm. While Chatzky could not be precise as to the timing, it was sometime between the April 1992 opinion letters just discussed and the May 19, 1993 opinion letters. Tr. Trans. 1134:12-1136:24 (Chatzky). Moreover, by February 22, 1996, Tedder and Chatzky were no longer law partners because Tedder "had a penchant for making statements to people that were either questionable or flatly untrue …." *Id.* at 1137:15-17. According to Chatzky, this made him uncomfortable, so the firm dissolved and Chatzky returned to practicing through his own firm, Chatzky & Associates. *Id.* at 1138:18-1139:9. After the dissolution of their firm, Chatzky testified that he no longer worked on common clients with Tedder, *id.* at 1139:16-20, and has never seen him, *id.* at 11411-5.

[1358] *See* pp. 213-214, *supra.*

[1359] *See* pp. 26-28, 84-87, *supra.*

[1360] *See id.*

And, as previously found, French was authorized to seek such advice by the Wylys.[1361] As one of French's principals, Sam is charged with knowledge of the facts French learned from Lubar, including the fact that Lubar believed that the 1992 IOM trusts were properly characterized as grantor trusts as to Sam.[1362]

That brings us to the settling of the IOM trusts in 1994 and 1995. As previously found, the settling of these trusts was highly irregular from the outset. Lubar advised French, as the Wylys' agent, on the settling of the 1994 and 1995 IOM trusts.[1363] But, Lubar's advice was predicated on three significant facts that French told Lubar to assume were true.[1364] Although Lubar did not know it, those facts were not true; they were lies.[1365] Because the factual predicate underlying Lubar's advice about the proper legal characterization of the Bessie IOM Trust and the La Fourche IOM Trust was incorrect, Lubar's advice cannot be relied upon here to support a reasonable cause defense by Sam.[1366]

As previously found, Sam turned to Owens for legal advice on tax issues beginning around 1998. However, as previously found, there is no credible evidence in the record that Owens' firm, Meadows Owens, independently analyzed the proper legal characterization of the Sam International Penalty Trusts until late October 2003.[1367] And, as previously found, the Meadows Owens analysis was precipitated by Lubar's more comprehensive review of the Wyly offshore system in mid-2003, which reconfirmed Lubar's original views that the 1992 IOM trusts were

---

[1361] *See* pp. 84-87, *supra.*

[1362] *See id.*

[1363] *See* pp. 87-98, 203-208, *supra.*

[1364] *See* pp. 203-208, *supra.*

[1365] *See* pp. 87-98, *supra.*

[1366] *See* pp. 177-230, *supra.*

[1367] *See* pp.199-201, *supra.*

properly characterized as grantor trusts as to Sam.[1368]  As previously found, Pulman of Meadows Owens concluded that Sam had a "reportable position" that the 1992 IOM trusts were foreign non-grantor trusts—a position inconsistent with Lubar's conclusions.[1369]  So, in short and at best, by late 2003 Sam had received conflicting advice from experienced tax professionals regarding whether the 1992 IOM trusts were grantor or non-grantor trusts as to him—in essence, dueling opinions from respected tax lawyers that he hired to give him that advice.  From the Court's perspective, Sam cannot now pick the advice he prefers—*i.e.*, Pulman's advice—and then claim to have reasonably relied upon it in connection with his reasonable cause defense to his liability for International Penalties.

As discussed above, Sam's liability for International Penalties flows from the characterization of the Sam International Penalty Trusts as grantor trusts to Sam.  For the reasons just explained, Sam failed to prove that he received advice on which he can reasonably rely that characterizes the Sam International Penalty Trusts as non-grantor trusts as to him and his reasonable cause defense fails.

For the sake of completeness, one final argument will be addressed—*i.e.*, Sam's argument that his professionals never advised him to file Forms 3520-A and 5471 and that he relied upon this failure in concluding that he had filed all required forms.  As the Debtors' note in their briefing, the failure of Sam's professionals to advise him to file Forms 3520-A and 5471 was "[b]ased on the conclusions reached by these advisors regarding the characterization of the trusts."[1370]  The implicit advice not to file Forms 3520-A and 5471—if it had in fact been explicit—would have

---

[1368] *See* pp. 26-28, 199-201, *supra*.

[1369] *See id.*  In fact, Meadows Owens did not opine on the proper legal characterization of the Sam International Penalty Trusts at that time either. Rather, they simply concluded that the Wylys had a "reportable position" for tax purposes.

[1370] *See* Debtors' Pre-Trial Brief [ECF No. 1015] ¶¶ 151-54, 165.

boiled down to this: you do not need to file Forms 3520-A and 5471 *because* you are not the grantor of the Sam International Penalty Trusts.[1371]

The Court takes no issue with the Debtors' contention that an advisor's failure to mention that a form must be filed can constitute advice that the form does not need to be filed.[1372]  A tax advisor does not need to go through every possible IRS form and mention specifically that it does not have to be filed in order for a taxpayer to have received advice that he has met all of his filing requirements.  A normal W-2 wage earner with no foreign dealings can rest easy despite the fact that his accountant does not discuss with him whether he needs to file a Form 3520-A or a Form 5471.  The problem here, however, is that the implicit advice Sam received not to file these forms flows directly from the advice that the Court has concluded Sam could not reasonably rely on.  If Sam cannot reasonably rely on the alleged explicit advice that the 1992 IOM trusts are non-grantor trusts as to him and the 1994 and 1995 IOM trusts are foreign grantor trusts as to King and Cairns, then it follows that Sam cannot rely on implicit advice that flowed from this alleged explicit advice.

What is more, Sam was aware that there were reporting requirements whose applicability depended upon the proper legal characterization of the Wyly offshore trusts as non-grantor trusts as to Sam or as foreign grantor trusts as to King and Cairns.  As Sam's counsel noted, Sam filed Forms 3520-A for offshore trusts that he was advised were grantor trusts as to him—*i.e.*, certain of the offshore trusts involved in the 1996 private annuity transactions.[1373]  Moreover, acting on Sam's behalf, Hennington and Boucher received a memo dated May 15, 2001 from Owens stating that "foreign grantor trusts [Bessie IOM Trust and La Fourche IOM Trust] are exempt from all

---

[1371] That this was in fact the nature of the implicit advice given is supported by the fact that Sam's advisors did have him file Forms 3520 and 3520-A for foreign trusts that they did believe Sam was the grantor of. *See* Joint Exs. 142-175.

[1372] *See Nance v. U.S.*, 2013 WL 1500987 (W.D. Tenn. 2013) (attorney did not indicate that Forms 3520-A needed to be filed to report offshore transactions).

[1373] *See* Debtors' Pre-Trial Brief [ECF No. 1015] ¶¶ 151-54, 165; Joint Exs. 142-175.

U.S. taxation *as well as all U.S. reporting requirements* so long as such trusts are characterized as foreign grantor trusts [as to King and Cairns, non-resident aliens of the U.S.]," and Hennington's and Boucher's knowledge is imputed to Sam based on agency principles.[1374]  In addition, the memorandum presented to Hennington by Pulman and Cousins of Meadows Owens in October 2003 regarding what actions Sam should take in light of Lubar's conclusions regarding the proper legal characterization of the 1992 IOM Trusts as grantor trusts to Sam noted that (i) there were penalties associated with not filing Forms 3520 and 5471, and (ii) "the biggest penalty risk is under § 6677, which provides for a penalty of 5% of the gross asset of the trust at the end of the year."[1375] Perhaps most telling of all, on June 12, 1991, Robertson sent Sam, Charles, Evan, and French notes that she took at one of Tedder's seminars.[1376]  At the very top of this section, there is a note that says "[w]hen in doubt file a form even if you have to make up the form."[1377]  From the very beginning, Sam was aware of these forms and their importance.

Thus, the evidence shows that Sam was aware—at least to some extent—of the reporting requirements that flowed from his status as a U.S. citizen grantor of foreign trusts.  More importantly, Sam was aware that all of the advice he was given about tax consequences and reporting requirements regarding the Wyly offshore system depended on the fact that he was not the grantor of the Sam International Penalty Trusts.  And, for the reasons discussed above and in the Court's analysis of Sam's reasonable cause defense to the imposition of fraud penalties, Sam had no advice on which he could reasonably rely that established this crucial fact.  For all of these

---

[1374] Wyly Ex. LN.  This memorandum is addressing the Red Mountain IOM Trust, a trust settled by Cairns in 1995. But this trust is identical to the La Fourche IOM Trust settled by Cairns in 1995 on Sam's behalf.  *See* IRS Exs. 17 (Deed of Settlement, La Fourche IOM Trust) and 42 (Deed of Settlement, Red Mountain IOM Trust).

[1375] Wyly Ex. OC at WYLYSEC01105085.

[1376] IRS Ex. 85.

[1377] *Id.* at SECI00150285.

reasons, Sam has not established his reasonable cause defense under either § 6038(c)(4)(B) or § 6677(d).

Although Sam's lack of reasonable cause is enough to make him liable for International Penalties under both §§ 6038(c)(4)(B) and 6677(d), the Court also finds that Sam displayed willful neglect in failing to file Forms 3520-A and 5471 in relation to the Foreign Corporations. Sam's failure to file these forms was due to "a conscious, intentional failure or reckless indifference."[1378]

As with Sam's tax fraud, there is little direct evidence that Sam intentionally failed to file Forms 3520-A and 5471. This is unsurprising. It would be unrealistic to expect Sam—in a Perry Mason moment—to confess that he knew all along that he needed to file these forms but did not. The evidence does show, however, that Sam was aware that the decisions he was making regarding the offshore system were not based on a foundation of uniform, reliable tax advice. For the reasons explained below, this fact, among others, establishes that Sam's decisions to not file Forms 3520-A and 5471 regarding the Foreign Corporations for over two decades was a product of at least reckless indifference.

Sam was aware from the outset of his offshore system that the tax positions he was taking regarding the 1992 IOM trusts and the annuity transactions he undertook through them were aggressive.[1379] Sam was also aware that Tedder had advised early on to over report to the IRS about the offshore system.[1380] Moreover, Sam was aware as early as July 1993 that there was a

---

[1378] *Boyle*, 469 U.S. at 245.

[1379] *See, e.g.,* IRS Ex. 85 at SECI00150263 (Robertson's 1991 notes on a Tedder seminar describing an annuity transaction involving a foreign corporation, "Problems: $1,000,000,000 funds is going into annuities annually. The IRS will address soon, if you wish tax advantage of this loophole do now. Tedder considers this the best estate planning tool. This is an aggressive tax mode to take – be sure to file every tax form available and any support schedule that seems pertinent."); Tr. Trans. 1038:19-1044:4 (On cross examination, Sam admitted that he received these notes in 1991 and was on notice that the structures Tedder proposed were aggressive).

[1380] *See, e.g.,* IRS Ex. 85 at SECI00150263 (Robertson's 1991 notes on a Tedder seminar stating "Always over disclose what you've done to the IRS…Always show your chart to the creditor, rely on law not secrecy."), SECI00150266 (Robertson's notes on a 1991 Tedder seminar examining a real estate transaction and private annuity structure similar to that used by the Wylys and stating "Tedder says under the tax code this seems to work, but is aggressive. Be sure

significant risk that the 1992 IOM trusts he settled would be characterized as grantor trusts as to him when his agent, French, sought a second opinion on his behalf regarding the proper legal characterization of the 1992 IOM trusts and the tax consequences flowing from the annuity transactions undertaken through those trusts from an international tax expert, Lubar.[1381]   In addition, Sam was aware that the factual foundation upon which Lubar based his advice that King and Cairns—rather than Sam—were the grantors of the Bessie IOM Trust and the La Fourche IOM Trust was false.[1382]   Finally, Sam was aware from the inception of the offshore system that there were reporting requirements related to offshore trusts—particularly those trusts of which he was the grantor.

Sam testified at trial that he hired tax professionals because he realized that the United States tax laws were complicated, and that he needed experts to assist him in complying with those laws, going so far as to testify that he was not competent to even read his own tax returns due to their complexity.[1383]   Of course, this testimony leads to Sam's argument—under *Boyle*—that he

---

[1380] to file lots of forms."), SECI00150285-SECI00150286 (Robertson's 1991 notes on a Tedder seminar describing numerous tax forms—including Forms 3520, 3520-A, and 5471—and stating "When in doubt file a form even if you have to make up the form.").

[1381] *See* pp. 26-27, 84-87, *supra*.

[1382] *See* pp. 87-98, *supra*.

[1383] Tr. Trans. 387:10-388:11 (Sam testifying how he came to rely on tax professionals and that he did not understand the tax laws and regulations), 389:25-390:17 (Sam testifying that he has not prepared his own tax returns or the underlying figures for his tax returns since the 1960s), 400:16-401:18 (Sam testifying that he relied on accountants and tax lawyers to prepare his tax returns because "Well, they had experience in doing it. They knew how to do it. They had dealt with it, and it's not something I had personally done…And—and I had a lot of other things to do."), 414:9-25, 703:4-25 (in describing his management style, Sam testified that "I did what I learned. I – I needed to get real good people who knew how to do whatever it is that they did in all kinds of areas, whether they were technology or accounting or law or what have you. And I needed to let these people do what they do, because everybody knew more about anything than I would personally know"), 709:1-20 (Sam testified that he delegated the specifics of the offshore system to French and that "I didn't confer with Michael French on every specific of how he and other lawyers were setting up trusts and doing the legal things that they did."), 722:13-725:2 (Sam, describing the process that went into preparing his tax returns from 1992 through 2013, and testifying that he did not carefully read his 1992 tax return because "I can't say I was competent to read it" and that he signed it because "it was prepared by people that knew what they were doing. They were professional people, accountants, and they were lawyers…").

should not be subject to penalties because he received high quality tax advice that he was not competent to independently evaluate.

The Court agrees that Sam should not be charged with the responsibility to independently evaluate the correctness of the tax advice he received. Moreover, the Court does not expect Sam to be competent to determine which of his expert[1384] tax advisors was correct regarding the proper legal characterization of the 1992 IOM trusts and the tax consequences of the annuity transactions undertaken through them. But, as a well-educated, experienced, and sophisticated businessman, Sam was competent to understand that he had received conflicting advice from the tax professionals he had hired to give him that advice—*i.e.*, Tedder and Chatzky on the one hand and Lubar on the other hand. Specifically, Tedder and Chatzky advised in May 1993 that it was more likely than not that the Lake Providence IOM Trust and the Delhi IOM Trust would be characterized as *nongrantor* trusts as to Sam, while Lubar advised in July 1993 that there was a significant risk that those two trusts, along with the earlier settled Bulldog IOM Trust, would be characterized as *grantor* trusts as to Sam. And, as previously found, the correct legal characterization of the 1992 IOM trusts—particularly the Bulldog IOM Trust through which the annuity transactions had been undertaken—drives both the tax consequences to Sam of the annuity transactions and his reporting obligations.

So, what did Sam do when he learned in 1993 that his expert advisers disagreed over the proper legal characterization of the 1992 IOM trusts and the tax consequences flowing from the annuity transactions undertaken through them? Similarly, what did Sam do knowing that the

---

[1384] Based on the testimony provided at trial, the Court has questions about characterizing Tedder as a tax expert, but the Court is satisfied that Chatzky is a knowledgeable tax lawyer and that Lubar is an exceptionally well credentialed and knowledgeable tax lawyer.

factual predicate underlying Lubar's advice regarding the characterization of the Bessie IOM Trust and the La Fourche IOM Trusts as grantor trusts as to King and Cairns, respectively, was wrong?

In short, Sam did nothing. He simply ignored their disagreement and the factual lies upon which the 1994 and 1995 IOM trusts were predicated and proceeded to undertake more annuity and other business transactions through the Sam International Penalty Trusts for the next decade until his hand was forced by a chance encounter that Boucher had with Lubar in the Cayman Islands in 2003. At that time Boucher learned of Lubar's 1993 advice to Sam's agent, French,[1385] and, as previously found, that led to a flurry of activity.[1386]

Specifically, Boucher and Hennington, also acting as Sam's agents, met with Lubar in London (just as French had done literally a decade earlier) and, after understanding Lubar's earlier concerns, Boucher and Hennington prepared a written memorandum addressed to their principal, Sam (among others), disclosing what they had learned.[1387] This led to Lubar being asked to reanalyze the Wyly offshore system, which he did and which reconfirmed his original conclusions about the proper legal characterization of the 1992 IOM trusts as foreign grantor trusts as to Sam and raised new concerns about the tax consequences of the annuity transactions undertaken through them.

And, as previously found, after a failed anonymous meeting with the IRS to try to resolve the Wyly's looming tax problems that Lubar undertook on Sam's and Charles' behalf in August

---

[1385] IRS Ex. 96 (memorandum dated June 30, 2003 from Hennington and Boucher to, among others, Sam and Charles discussing concerns); Tr. Trans. 1924:24-1925:16 (Hennington testified that she learned about Lubar and his connection with the Wyly family when she "received a – a call from Michelle Boucher relating to me that she had run into Mr. Lubar at a conference in the Cayman Islands, and that Mr. Lubar had made a comment to her that he thought there were issues with the '92 trusts and that he had told Mike that back years ago, and basically that she needed to look into it.")

[1386] Tr. Trans. 1924:24-1951:24 (Hennington described the investigations that were done in response to Lubar's concerns); IRS Ex. 96 (a memo reporting to Sam, Charles, Evan, and Donnie what Hennington and Boucher had learned from investigating Lubar's concerns regarding the offshore system).

[1387] IRS Ex. 96.

2003, Hennington approached Pulman at Meadows Owens for further advice in late September 2003 due to the looming due date of Sam's 2002 tax return (October 15, 2003). By late October, Hennington learned that Pulman believed that Sam had a "reportable position" that the 1992 IOM trusts were foreign non-grantor trusts. But, at best, that simply put Sam back where he was in 1993—*i.e.*, two tax experts hired to advise him about the offshore system disagreed as to whether the 1992 IOM trusts were grantor or non-grantor trusts as to Sam and the tax and reporting consequences flowing from those trusts. One difference here, however, from 1993 is that even Pulman warned Sam about the significant penalties attendant to his failing to report to the IRS.[1388] Another significant difference is that by late 2003, Sam knew several other things—he knew that (i) the IRS had expressed concerns in August 2003, at the anonymous meeting Lubar had with them on Sam's behalf, that there had been incomplete Form 3520 reporting, (ii) the legal advice on which the offshore system was based was in conflict with Lubar's advice and had been provided by promoters, and (iii) the entire offshore structure was fundamentally flawed.[1389] Notes from this meeting even indicate that Lubar agreed that the Wylys had neglected their obligation to file Forms 5471, and that one IRS representative commented that the Wylys would now be on notice that they had an obligation to file Forms 3520, 3520-A, and 5471.[1390]

So, once again, the question must be asked—what did Sam do to resolve the legal uncertainty and clarify his reporting obligations? The answer this time is slightly different but, as

---

[1388] *See* Wyly Exs. OC at WYLYSEC01105084-85 (outline of meeting of Hennington, Pulman, and other Meadows Owens lawyers that, among other things, explained that "Todd Welty went through the penalties associated with not filing a 3520 and 5471. He went on to say that the disclosure would alleviate some of the accuracy-related penalties under §6662, but if the transaction was a tax shelter, the disclosure would not alleviate potential penalties. Todd Welty stated the biggest penalty risk is under §6677, which provides a for a penalty of 5% of the gross asset of the trust at the end of the year."), OD (similar outline of a meeting that Cousins held with Sam and Evan on October 15, 2003 outlining potential penalties for failures to file Forms 3520-A and 5471); Tr. Trans. 1787:9-18 (Cousins) (identifying Wyly Ex. OD as his meeting outline for a meeting he held with Sam and Evan).

[1389] Wyly Ex. OB.

[1390] *Id.* at WYLYSEC01112419-2420. The meeting notes refer to Form "3528," which the Court believes is actually a reference to Form 3520-A.

relevant here, the difference is not meaningful. While Sam did nothing to attempt to resolve the legal uncertainty, he did start filing Forms 8275 with the IRS disclosing the possibility that the IOM trusts were grantor trusts as to him, that there were possible funding issues with the 1994 and 1995 trusts, and that property had been exchanged with subsidiaries of these foreign trusts in exchange for private annuities.[1391] But, this was not meaningful disclosure compared to Sam's obligation to file Forms 3520-A and 5471 because the Forms 8275 did not provide the essential information required in order to satisfy Sam's obligations under 26 U.S.C. §§ 6038 and 6048.[1392] These sections of the Internal Revenue Code require a taxpayer to provide detailed information about foreign trusts and corporations so that the IRS is able to monitor taxpayer compliance. The Forms 8275 that Sam filed did not provide the names of the Sam International Penalty Trusts or the Foreign Corporations, information about trustees or beneficiaries of the Sam International Penalty Trusts, financial information about the Sam International Penalty Trusts or the Foreign Corporations, or detailed information about the transactions engaged in by any of these entities.[1393] All of this information is required in order to satisfy Sam's reporting obligations under §§ 6038 and 6048.[1394]

And, in early 2004, the IRS began its audit of Sam, the focal point of which was Sam's offshore system and the transactions undertaken offshore as Hennington testified.[1395] By then,

---

[1391] See pp. 150-152, supra.

[1392] 26 U.S.C. §§ 6038, 6048.

[1393] See Joint Exs. 110 (Sam 2006), 111 (Sam 2007), 112 (Sam 2008), 130 (Dee and Charles 2003), 133 (Dee and Charles 2006), 134 (Dee and Charles 2007), 135 (Dee and Charles 2008), IRS Exs. 40 (Dee and Charles 2004), 42 (Dee and Charles 2005), 50 (Dee and Charles 2009), 52 (Dee and Charles 2010), 54 (Dee and Charles 2011), 71 (Sam 2002) 74 (Sam 2004), 75 (Sam 2005), 155 (Sam 2003), 159 (Sam 2009), 160 (Sam 2010), 161 (Sam 2011), 162 (Sam 2012), 163 (Sam 2013).

[1394] 26 U.S.C. §§ 6038, 6048.

[1395] Tr. Trans. 2072:17-2074:13 (Hennington) ("[The IRS] made clear that [the foreign trusts and annuities] was the focus of their audit when they started in '04." Hennington also testified that the IRS' audit of Sam and Charles began sometime in "Early 2004," after Sam filed his first Form 8275 disclosure).

Sam had to know that the secrecy surrounding his offshore system was about to be destroyed and the IRS was going to learn the extent of his offshore holdings. At this point there was no reason not to file all *possibly* required forms with the IRS; even if they were later determined not to have been required, filing them would insure that Sam would not be held liable for failing to file them when litigation with the IRS arose, as Sam had to know it would.[1396]

But, again, what did Sam actually do? Nothing of real consequence—he simply waited for the IRS to come after him, all the while continuing his offshore activities. Such a caviler attitude towards his reporting obligations for 20 plus years reflects, at a minimum, reckless indifference. For these reasons, the Court concludes that Sam acted with willful neglect when he failed to file Forms 3520-A and 5471.

### (2)    As to Dee

Since the Court found that Dee is not liable for fraud penalties under § 6663, the Court has not previously examined Dee's reasonable cause defenses. Like Sam, Dee attempts to establish her reasonable cause and lack of willful neglect by her purported reliance on the advice of professionals. According to Dee, her reasonable cause defense boils down to this:

> Dee Wyly reasonably relied on her husband to handle the couple's financial, tax, and legal affairs. Dee Wyly never had any reason to suspect that Charles Wyly ever engaged in illegal or fraudulent activity, and there is no evidence that he ever did. Dee Wyly had no reason to suspect that the legal, financial, and tax professionals retained by her husband provided anything other than competent professional advice and counsel.[1397]

---

[1396] As we know, Sam had been audited before and had been the subject of prior tax court decisions. *See* Joint Exs. 188 (tax court decision related to Sam for 1998), 189 (tax court decision related to Sam for 1999); Tr. Trans. 2448:6-2462:16 (Hennington describing previous audits involving Sam and Wyly-related entities Computer Associates and Green Funding Corporation).

[1397] *See* Debtors' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1102] ¶ 371. The IRS is more blunt in its characterization: "Caroline Wyly did not raise a reasonable cause defense; rather; [*sic*] her only defense to the penalties in this case is that she didn't know about, and relied on her husband with respect to, transactions that were part of the Offshore System." IRS Post-Trial Brief [ECF No. 1118] at 5.

In other words, when it came to tax matters Dee relied on her husband, Charles, who in turn relied on professionals, and Dee should be able to rely on the advice of professionals to the same extent Charles did. Through this reasoning, Dee attempts to use the same facts and circumstances as Sam did in order to establish reasonable cause and lack of willful neglect. Although the law on this issue pulls in somewhat conflicting directions, the Court ultimately concludes that Dee has established that she acted with reasonable cause and without willful neglect based on reliance on the advice of professionals, as explained below.

Under 26 C.F.R. § 1.6664-4 (which the Court acknowledges is not controlling here but is nevertheless helpful), advice "is any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly."[1398] Under this regulation there are thus grounds to define advice broadly, and it seems at least conceivable that Dee could rely on the advice of professionals through her husband as Debtors have argued.

However, if Dee is to rely on professionals through her reliance on Charles, then there is an argument that her reliance can only establish reasonable cause to the same extent as Charles' reliance could. This is important, because, like Sam, any reasonable cause defense asserted by Charles (or more accurately, by his probate estate) would fail here for the same reasons Sam's reasonable cause defenses failed. A brief reminder is appropriate. Although the names of Charles' offshore trusts and corporations were different than Sam's, and he established fewer offshore trusts and corporations than Sam, Charles' actions and the advice he received is identical, in all material respects, to that of Sam. In short, the two brothers implemented a substantively identical system

---

[1398] 26 C.F.R. § 1.6664–4(c)(2).

of offshore trusts and corporations in the IOM through which they undertook substantively identical transactions from 1992 through 2011 when Charles died. Thus, for the reasons just explained as to Sam, Charles would not be able to prove that he received advice on which he can reasonably rely that characterizes the Charles and Dee International Penalty Trusts as non-grantor trusts as to him. And, for the same reasons that Sam's reasonable cause defenses to the imposition of International Penalties failed, any such defenses asserted by Charles (or his probate estate) would also fail.

Despite the problems Charles (or his probate estate) would have establishing a reasonable cause defense here, the case of *Reser v. C.I.R.*[1399] strongly suggests that Dee, as opposed to Charles, can establish reasonable cause through her indirect reliance on this advice. While the Court was somewhat surprised by this, it is prudent for it to follow the Fifth Circuit's decision and analysis in *Reser,* to which we now turn.

The taxpayers in *Reser* were a husband ("**Don**") and wife ("**Rebecca**"), both of whom were highly educated and had obtained their law degrees.[1400] Don and Rebecca's problems began when Don formed a subchapter S corporation (**"DRPC"**) of which he was the sole shareholder, and then obtained a joint loan with this corporation from Frost Bank.[1401] Don had complete control over the use of the loan proceeds, and used them for both personal expenses and as operating capital for DRPC.[1402] Don and DRPC eventually defaulted on their loan with Frost Bank.[1403]

---

[1399] 1995 WL 700551, at *1, *aff'd in part, reversed in part,* 112 F.3d 1258 (5th Cir. 1997).

[1400] *Reser*, 1995 WL 700551, at *1.

[1401] *Id.* at *1.

[1402] *Id.*

[1403] *Id.*

Tax issues arose when Don attempted to claim losses related to DRPC on his tax return.[1404] Don argued that he should be able to claim losses related to the Frost Bank loans, because in fact these loans had been made to Don who in turn lent the money to DRPC.[1405] The only evidence that Don presented in order to substantiate his claim that he had lent money to DRPC was a series of promissory notes.[1406] However, these promissory notes first appeared after the IRS made its final determination of tax liability. Don had not produced the notes in response to earlier IRS document requests, which caused the tax court to disregard them at trial.[1407] The tax court held that since there was no "actual, substantive debt" owed by DRPC to Don that losses related to these loans could not be deducted on Don's and Rebecca's joint tax return.[1408]

The IRS also sought to recover various penalties from Don and Rebecca related to the overstated losses stemming from the Frost Bank loans.[1409] Don and Rebecca argued that they should not be liable for these penalties because they relied on accountants to prepare their returns.[1410] The tax court rejected this argument, stating that:[1411]

> Stewart Goodson, the certified public accountant who prepared the returns here, testified that John Gwaltney, DRPC's accountant, told him to treat loans listed on the financial statements as coming from the bank as loans from [Don], and that such loans were in fact from [Don]. Mr. Goodson, an agent of DRPC, thus treated the loans as loans from [Don]. In light of our finding that there was no separate loan from [Don] to [DRPC], we find that [Don's] reliance on Mr. Goodson was not reasonable, as based on inaccurate information that Mr. Goodson made no effort to verify, and that appears to have been furnished to him on [Don's] instructions.

---

[1404] *Id.* at *3.

[1405] *Id.* at *4.

[1406] *Id.*

[1407] *Id.*

[1408] *Id.* at *6.

[1409] *Id.* at *8.

[1410] *Id.*

[1411] *Id.*

Apparently not eager to be held liable for tax penalties because of a dubious tax position taken by her husband, Rebecca also attempted to obtain penalty relief based on the innocent spouse defense.[1412] The tax court rejected her innocent spouse defense, stating that:[1413]

> Petitioner wife, an attorney, signed the 1987 tax return. She undoubtedly noticed that the losses attributable to her husband's corporation would act to shelter her income. Given the circumstances, we find that a reasonably prudent taxpayer should have known that the tax liability stated was erroneous, or that further investigation was warranted. We find that petitioner wife should have investigated whether the losses were properly deductible.

> Since we hold that petitioner wife should have known, or was on reasonable notice, that the loss was improper, we must conclude that she does not qualify for treatment as an innocent spouse under section 6013(e).

Thus, the tax court held that Rebecca was liable for both tax and penalties because her husband claimed erroneous deductions on their joint tax return.[1414]

Rebecca, but not Don, appealed the tax court's decision to the Fifth Circuit.[1415] The Fifth Circuit affirmed the tax court's decision that the losses related to the Frost Bank loans were not deductible, but reversed the tax court's decision to hold Rebecca liable for penalties.[1416] The Fifth Circuit held that the tax court's finding that Rebecca was not an innocent spouse was clearly erroneous.[1417] The Fifth Circuit based this conclusion, in part, on its determination that Rebecca did not actually know, did not have reason to know, and did not have a duty to inquire as to whether deducting the DRPC losses related to the Frost Bank loans was proper.[1418] The Fifth Circuit reached this conclusion for the following reasons:[1419]

---

[1412] *Id.* at *9.

[1413] *Id.* at *10 (internal citations omitted).

[1414] *Reser,* 112 F.3d at 1260.

[1415] *Id.*

[1416] *Id.*

[1417] *Id.* at 1262.

[1418] *Id.* at 1268.

[1419] *Id.*

The relevant factors that we are to consider indicate that [Rebecca] did not know and did not have reason to know that the deductions in question would give rise to a substantial understatement on the 1987 joint return. First, [Rebecca's] education, albeit advanced, provided her with no special knowledge of complex tax issues such as basis computation. She had a background in history and practiced personal injury law. Second, [Rebecca] was not personally involved with DRPC's business and financial affairs to any significant degree; rather, she was engaged full-time in her law practice and was the family's sole source of financial support. In addition, she gave birth to their second child in 1987. Third, the record is devoid of evidence of lavish or unusual expenditures compared to the Resers' normal standard of living and spending patterns, which exhibits no notable changes during the years in question. To the contrary, they invested most of [Rebecca's] income into DRPC and consumed the rest on the family's living expenses. In addition, they incurred substantial debt when borrowing money to invest in DRPC. And ultimately, the Resers divorced, and Don filed for bankruptcy. Finally, [Rebecca] cannot be penalized for Don's discredited efforts to recast the Frost Bank loan in a tax-favorable light. Indeed, [Rebecca] was not even aware of the second set of "promissory notes" until 1991, several years after she had signed the 1987 joint return.

The Fifth Circuit also noted that the ultimate conclusion that these losses were not deductible by Don and Rebecca rested on the application of "an extremely difficult and technical process" that had been hotly contested and on which IRS agents had reached two different conclusions.[1420] Most importantly, the Fifth Circuit noted that Rebecca had been reasonable in relying on accountants to prepare her taxes, and had no duty to inquire as to the propriety of the deductions:[1421]

Had [Rebecca] asked Don, [or the accountants] about the deductions, they would have told her what they believed-that DRPC's losses were properly deductible in full. Neither the court nor the law will penalize [Rebecca] for failing to perform the hollow act of asking questions, the answers to which would have provided no new or different information.

On this basis, the Fifth Circuit found that the tax court had been clearly erroneous in finding that Rebecca was not an innocent spouse.[1422]

---

[1420] *Id.*

[1421] *Id.*

[1422] *Id.*

However, there were certain penalties for which Rebecca did not qualify for innocent spouse relief based on a technicality, namely that the tax liability from which she sought relief was not a high enough amount.[1423] Thus, the Fifth Circuit explored whether she could be released from these liabilities for penalties based on other grounds—*i.e.*, absence of negligence and, as relevant to Dee, reasonable cause. The Court concluded first that Rebecca had not been negligent:[1424]

> The relevant inquiry for the imposition of a negligence penalty is whether the taxpayer acted reasonably in claiming the loss. The Tax Court found that [Rebecca's] reliance on Stewart Goodson, the CPA who prepared the 1988 joint return, was not reasonable, as based on inaccurate information, in light of its decision that there was no separate loan from Don to DRPC. We find clear error in this conclusion of the Tax Court. For the same reasons that we concluded that [Rebecca] did not have reason to know of the substantial understatement on the 1987 joint return, we conclude that she acted reasonably in relying on the professionals who prepared the 1988 joint return. In fact, but for her failure to meet a technical requirement, she would have been an innocent spouse for purposes of the 1988 joint return. Goodson and Bryan, two CPA's at a national accounting firm, both agreed that the Resers' basis in DRPC was sufficient to claim the losses as deductions. As we stated in *Chamberlain v. Commissioner*, "[t]o require the taxpayer to challenge the [expert], to seek a 'second opinion,' or try to monitor [the expert] on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." Furthermore, [Rebecca] was wholly unaware of Don's belated attempt to recast the Frost Bank loan to his tax advantage.

The Fifth Circuit then considered whether, in addition to not being negligent, Rebecca had established that she had acted with reasonable cause and good faith.[1425] The Court concluded that Rebecca had established reasonable cause and good faith because:[1426]

> We have just concluded that [Rebecca] acted reasonably in relying on the professionals who prepared the 1988 joint return and would have been an innocent spouse for purposes of that return but for her failure to meet a technical requirement…we exonerate her from liability for this penalty. Any other conclusion would be absurdly inconsistent with our earlier holdings.

---

[1423] *Id.* at 1270.

[1424] *Id.* at 1271.

[1425] *Id.* at 1271-72.

[1426] *Id.* at 1272.

In this way, Rebecca escaped all liability for taxes or penalties related to erroneous deductions taken by her husband on their joint return.[1427]

Thus, in *Reser*, the Fifth Circuit stated that it would be "absurdly inconsistent" to hold that an innocent spouse who had no actual knowledge or reason to know of a tax liability caused by her husband's actions did not also have reasonable cause in relation to penalties caused by those same actions. The Fifth Circuit reached this conclusion in part on the basis that a spouse who did not know that the professional advice she relied on was based on incorrect facts provided by her husband could still rely on that advice, especially when that advice was regarding complicated tax law. There was no indication in the Fifth Circuit's reasoning that it was important whether Rebecca relied on this advice on her own or "through her husband," and the court's admonition against punishing Rebecca based on the hollow act of asking Don or the accountants questions would be inconsistent with a need for direct reliance. If Rebecca had been relying on advice directly, she would not have needed to ask questions, because she would have known the advice's contents already.

Finally, the Fifth Circuit held that Rebecca had acted with reasonable cause despite the fact that she was a highly educated lawyer who was at least somewhat involved in her husband's financial affairs.

There are numerous similarities between Dee's situation here and Rebecca's situation in *Reser*. Like Rebecca, Dee has been found to be an innocent spouse with respect to their income tax underpayments because she did not know or have reason to know of the income coming in from the offshore system.[1428] This finding was based on Dee's credible testimony at trial that she

---

[1427] *Id.*

[1428] *See* pp. 159-177, *supra.*

relied entirely on Charles to handle all tax and business matters throughout their marriage.[1429]  Dee has never prepared a tax return or discussed tax matters with her husband or any tax professional.[1430]  In fact, Dee testified that it was her practice to sign whatever tax return Charles or someone from the Wyly family office gave her without reviewing it or asking questions about it throughout their fifty plus year marriage.[1431]

The evidence shows that even to this day Dee is completely unaware of the intricacies of the offshore system Charles established.[1432]  At trial, Dee testified that she did not know what an annuity or a grantor or non-grantor trust was, and that she never discussed the offshore trusts or the other offshore corporations with her husband or with any other person.[1433]  That Dee is largely unaware of even the basics of the offshore system is not incredible at all, as Dee testified that she "literally never" discussed business issues with Charles.[1434]  Thus, Dee's lack of knowledge regarding the offshore system is presumably far greater than Rebecca's lack of knowledge regarding DRPC and its losses in *Reser*.  Despite the fact that Rebecca was a highly educated lawyer who actually did have some involvement in her husband's business affairs, the Fifth Circuit found that Rebecca's education and experience and her level of involvement in her family's

---

[1429] Tr. Trans. 159:20-160:15 (Dee) (relied entirely on husband throughout marriage).

[1430] *Id.* at 159:13-19 (Dee) ("Q. Have you ever prepared a tax return? A. Oh, heavens no."); 172:17-19 (Dee never discussed tax matters with husband).

[1431] *Id.* at 159:13-160:9, 293:2-294:23 (Dee).

[1432] *Id.* at 1336:17-1338:12 (Donnie Miller) ("Q. And did you ever discuss the offshore trust system with Dee Wyly? A. No, I didn't. Q. Did you ever hear Charles talk business with Dee? A. No. Q. Did you ever hear anyone talk about business with Dee Wyly? A. No. Q. In the 34 years, thereabouts, that you've known Dee Wyly, have you ever talked business with her? A. No. Q. To your knowledge, did anyone inform Dee Wyly about the intricacies of the offshore trust system? A. Not to my knowledge, no."), 164:5-165:3 (Dee) (first heard the name Soulieana at her deposition in July 2015, never discussed IOM structure with anyone before bankruptcy case filed), 165:22-166:23; 174:16-24 (Dee) (didn't ever see Eiseman or Marguerite Green invoices at the time purchases were made), 182:10-183:3; 183:18-20 (Dee) (never heard of Tyler IOM Trust or Keith King), 184:20-185:11, 186:12-15 (Dee) (never heard of Red Mountain IOM Trust or Shaun Cairns), 322:6-14 (Dee) (does not know what a limited partner, general partner, limited partnership, or annuity is), 188:22-189:9 (Dee) (never heard of Lincoln Creek IOM Trust), 192:8-11 (Dee) (never heard of Maroon Limited (IOM)).

[1433] *Id.* at 164:5-165:3 (Dee); 322:13-14 (Dee).

[1434] *Id.* at 151:8-24 (Dee).

finances made it clear that she had no reason to know of the understatements caused by her husband.[1435]  Dee's argument is much stronger than Rebecca's, as there is no evidence in the record that she has any business experience and she has credibly testified that she never even spoke about business matters with Charles.[1436]

Just as Rebecca in *Reser* was unaware that her husband had mischaracterized the nature of the DRPC loans to his professionals in seeking their advice, Dee was unaware (i) of the specifics of the advice that Charles had received, (ii) whether the advice actually addressed the relevant factual and legal issues that needed to be addressed, (iii) what factual assumptions served as the predicate for the advice, and (iv) whether there was anything wrong with the advice that was given to her husband by the many professionals that were consulted on his behalf regarding the offshore system.  Although Charles is charged with knowledge of the contents of the advice that he received, albeit mostly indirectly through French, Robertson, Hennington and Boucher, and Charles is also charged with the knowledge that there were missing legal opinions, conflicting legal opinions, and legal opinions based on false factual assumptions that all impacted the tax status of the offshore system and his obligation to file reports about it with the IRS, Dee had no way of knowing any of that.  In fact, had Dee sought out this information regarding the offshore system she—even more so than Rebecca in *Reser*—would in all likelihood have been told that nothing was amiss.  Sam has consistently proclaimed his innocence of any wrongdoing here because, according to him, every professional he consulted told him all was fine with the offshore system.  There is no reason to believe that Charles would have said anything different.  And, while the Court has not found

---

[1435] *Reser*, 112 F.3d at 1268.
[1436] *See* p. 133 n.573, *supra.*

Sam's testimony credible given its review of the actual advice on which Sam purports to rely, Dee would have had no way of knowing that reassurances from Sam and Charles, if given, were untrue.

The Fifth Circuit refused to penalize Rebecca in *Reser* "for failing to perform the hollow act of asking questions, the answers to which would have provided no new or different information," especially when she had no knowledge that Don had falsely told their accountants that he had loaned money to DRPC.[1437] The rationale for refusing to penalize Dee is even stronger here, where Dee's asking questions would have been an even hollower act than Rebecca's. While the Court believes that Dee is an intelligent woman, the Court is satisfied that her absolute lack of business sophistication would have left her unable to ask the relevant questions of Charles. Dee has three years of college, no business or legal experience, and was faced with a set of transactions much more complicated than the ones at issue in *Reser*—transactions which the IRS' expert—a highly experienced forensic accountant—called "if not the most complicated, one of the most complicated cases" that he had ever investigated.[1438] It would have been all but impossible for Dee to "fact check" the advice Charles received regarding the offshore system.

Dee's case is also similar to Rebecca's in *Reser* in that Dee is not entitled to innocent spouse relief for International Penalties due to a technicality. The technicality in *Reser* was that, at that time, only tax liabilities greater than 25% of the adjusted gross income for the preadjustment year were eligible for innocent spouse relief.[1439] This restriction has since been repealed.[1440] For Dee, the technicality is that innocent spouse relief applies only to income tax liability, not liability for International Penalties.[1441] This is despite the fact that Dee is liable for International Penalties

---

[1437] *Reser*, 112 F.3d at 1269.

[1438] Tr. Trans. 3027:14-16 (Dubinsky).

[1439] *Reser*, 112 F.3d at 1262 n.11.

[1440] *See* 26 U.S.C. § 6013.

[1441] *See id.* §§ 6013, 6038, 6048, 6677.

for essentially the same reason that she would have been liable for income tax underpayments but for her innocent spouse defense—*i.e.*, because the Charles and Dee International Penalty Trusts were grantor trusts as to Charles and her.

While the legal and factual issues are not identical, the similarity of Dee's situation to that of Rebecca in *Reser* strongly suggests that the Fifth Circuit would conclude that Dee acted with reasonable cause and not with willful neglect for the purposes of §§ 6038(c)(4)(B) and 6677(d). As the Fifth Circuit noted, it would be absurdly inconsistent to hold that Dee is an innocent spouse for the purposes of Charles' and her income tax underpayments but that she is not able to establish reasonable cause for the purposes of avoiding liability for the International Penalties, which flow from the same legal characterization of the Charles and Dee International Penalty Trusts as grantor trusts.

At trial, Dee credibly testified that, after Charles' death, she continued to rely on the Wyly family office to prepare her tax returns and to handle her finances, and that she has never had any reason to suspect that they were deficient in their duties.[1442]  The fact that Charles died did not give Dee any new reason—or any new ability—to question whether she was filing all of the reports required by the IRS with respect to the offshore system.

In light of all of these facts and the legal principles articulated in *Reser*, the Court holds that Dee has established that she acted with reasonable cause and without willful neglect for all of the tax years at issue.  Thus, Dee has established her reasonable cause defenses with respect to her liability for the International Penalties.

In coming to its conclusion as stated above, this Court has reviewed the cases that, on first reading, counsel for a different result.  The tax court has stated that "the fact that a husband assumes

---

[1442] Tr. Trans. 160:10-161:14 (Dee).

the duty to file a tax return and fails to do so does not of itself provide the wife with reasonable cause for failure to file, at least where the wife has not taken steps to assure that her husband has performed this duty.[1443] The tax court's refusal to allow reliance on a husband, standing alone, to constitute reasonable cause extends to situations where one wonders what more a wife could be asked to do. For example, *Estate of Molever v. C.I.R.*[1444] involved the following facts:

> Mr. Molever always prepared joint Federal income tax returns for himself and [Mrs. Molever], and [Mrs. Molever] relied on him, as an accountant, to do it properly. If she questioned anything he did, he thundered at her and accused her of ignorance. He assured her that he was in frequent consultation with two certified public accountants in Phoenix. In fact, Mr. Molever was deducting the expenses of his litigation as business expenses, assuring petitioner that he had "loss carryforwards." Among these expenses he deducted 40 percent of the Molevers' living expenses (rent, electricity, water, and telephone). Mr. Molever insisted that petitioner file a Form W–4 for 1987 on which she claimed 10 dependency exemptions. For 1988, petitioner filed a Form W–4 claiming 2 exemptions. Mr. Molever became enraged when he learned of this, and insisted petitioner again claim 10 exemptions for 1989. When correspondence or calls from the IRS arrived, petitioner directed them to Mr. Molever and relied on him to handle all tax matters.
>
> ***
>
> In early 1988, Mr. Molever was very ill with cancer and emphysema. After the episode in which he threatened petitioner with a gun, Mr. Molever's doctor advised petitioner that shortage of oxygen to his brain could explain his irrational episodes. Eventually, he required oxygen full-time. On April 10, 1991, Mr. Molever died.

Even in this situation, involving a wife faced with an irrational and violent husband who actively resisted her attempts to do what was right under the Internal Revenue Code, the tax court held that

---

[1443] *Belk v. C.I.R.*, 93 T.C. 434 (1989); *see also Sanders v. C.I.R.*, 21 T.C. 1012, 1040 (1954) ("A wife required to file a return because of income of her husband in a community property state or who joins in a joint return cannot shed the responsibility for delinquency by saying that she relied entirely on her husband, not a specially qualified tax authority."). *But see Fleming v. C.I.R.*, 47 T.C.M. (CCH) 1281, 1984 WL 15452 (1984) ("Petitioner recognized the need to file tax returns, and occasionally asked her husband and his counsel about filing returns. In response to her inquiries, she was told that filing returns was not her concern."); *Connor v. C.I.R.*, 44 T.C.M. (CCH) 6, 1982 WL 10600 (1982) (husband was travelling musician who concealed finances from wife. Wife was honestly ignorant of husband's large income and had all inquiries about financial matters angrily rebuffed); *Crane v. C.I.R.*, 44 T.C.M. (CCH) 213, 1982 WL 10648 (1982) (husband was a tax protestor who refused to tell wife how much he earned and who actively dissuaded her from trying to file her own tax return).

[1444] 64 T.C.M. (CCH) 1662, 1992 WL 385385, at *2 (1992).

the taxpayer was negligent for not filing her tax return on time, and that reliance on her husband was insufficient to establish reasonable cause.[1445]

Dee's situation is distinguishable from the above cases in an important respect. Courts holding that reliance on a husband is insufficient to establish reasonable cause have so held in the context of wives who failed to file standard income tax returns, a document U.S. taxpayers generally know is required to be filed annually.[1446] In contrast, Dee's liability for International Penalties arises as a result of a failure to file information returns related to foreign corporations and foreign trusts, documents that most U.S. taxpayers would be unaware of. Dee relied on legal professionals—albeit through Charles—to tell her whether these information returns should be filed. The women in the above-cited cases were relying on their husbands to make sure that returns they knew or should have known were due were in fact filed. The Supreme Court in *U.S. v. Boyle* has made it clear that it is reasonable to rely on a professional's advice as to *whether* a certain return should be filed, but that it is an individual taxpayer's responsibility to ensure that returns which they know are due are filed and filed timely.[1447] The Court thus distinguishes these cases from Dee's case.

For all of these reasons, the Court concludes that Dee has established her reasonable cause defenses to her liability for the International Penalties under 26 U.S.C. §§ 6038(c)(4)(B) and 6677(d).

---

[1445] *Id.* at *5.
[1446] *See, e.g., id.*
[1447] *Boyle*, 469 U.S. at 251.

## I.     Does the Imposition of the International Penalties Violate the Eighth Amendment?

### 1.     Applicable Supreme Court Precedent

The Debtors final argument to avoid liability for the International Penalties is that those penalties constitute excessive fines under the Eighth Amendment of the United States Constitution, which provides, as relevant here, that: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[1448]  The Debtors' argument concerns only the excessive fines clause of the Eighth Amendment (the "**Excessive Fines Clause**")—*i.e.*, that portion of the Eighth Amendment that provides that excessive fines shall not be imposed.[1449] Specifically, the Debtors argue that a quartet of relatively recent Supreme Court cases stand for the proposition that the International Penalties are unconstitutionally excessive fines as applied to them.[1450]

In contrast, while the IRS does not dispute the importance of these four Supreme Court decisions, it argues that under their holdings: (i) the International Penalties are not "fines" as that term is defined for purposes of the Excessive Fines Clause, and (ii) even if the International Penalties are "fines," they are not excessive.  The IRS also correctly notes that almost all of the relatively few cases that have interpreted the Excessive Fines Clause "concern forfeitures related to crimes;" and thus, the IRS cautions this Court against expanding the Supreme Court's Excessive

---

[1448] U.S. CONST. amend. VIII.

[1449] *U.S. v. Bajakajian*, 524 U.S. 321, 327 (1998) (labeling the relevant portion of the Eighth Amendment as the "Excessive Fines Clause").

[1450] These four cases are *U.S. v. Halper*, 490 U.S. 435 (1989); *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989); *Austin v. U.S.*, 509 U.S. 602 (1993); and *U.S. v. Bajakajian*, 524 U.S. 321 (1998).  The Court notes that the Debtors do not ask the Court to find that the International Penalties are unconstitutional on their face, but only as applied to them here.  This approach is consistent with the Supreme Court's Excessive Fines Clause jurisprudence, which has exclusively considered whether a fine is excessive as to a particular person as opposed to in all instances.  *See, e.g., U.S. v. Bajakajian*, 524 U.S. 321 (1998).

Fines Clause jurisprudence into the realm of civil tax penalties, where it has never before been successfully used to strike down a civil tax penalty as unconstitutional.[1451]

For the reasons explained below, the Court largely agrees with the IRS and concludes that the International Penalties are not fines. Alternatively, the Court concludes that if the International Penalties are properly construed as fines, they (i) are not excessive as applied to Sam, and (ii) are excessive as applied to Dee.

<strong>a)      The Supreme Court Decisions</strong>

The Debtors rely upon *U.S. v. Halper*,[1452] which, although not explicitly stated in their briefing, is helpful to them because it defines the concept of "punishment" broadly and only sanctions that are "punishment" can be considered to be "fines" under the Excessive Fines Clause.[1453] Halper submitted 65 Medicare reimbursements that were overstated by $9 each, for a total of $585.[1454] For this overbilling, Halper was assessed a criminal fine of $5,000 and imprisoned for two years.[1455] A civil False Claims Act suit was subsequently brought against him.[1456] Since Halper had violated the relevant statute under the False Claims Act 65 separate times, and each violation of the statute called for a penalty of $2,000, double damages, and costs; a total civil liability of $130,000 was assessed against him.[1457] Halper argued that this nominal

---

[1451] IRS Post-Trial Brief [ECF No. 1118] at 95.

[1452] *U.S. v. Halper*, 490 U.S. 435 (1989).

[1453] *See Bajakajian,* 524 U.S. at 327 ("We have, however, explained that at the time the Constitution was adopted, the word fine was understood to mean a payment to a sovereign as punishment for some offense. The Excessive Fines Clause thus limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." (internal cites and quotation marks deleted) (quoting *Austin*, 509 U.S. at 609–610; *Browning–Ferris Indus.*, 492 U.S. at 265.

[1454] *Halper*, 490 U.S. at 437.

[1455] *Id.*

[1456] *Id.*

[1457] *Id.*

civil penalty raised implications under the Double Jeopardy Clause, which states that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb...."[1458]

Thus, the *Halper* Court addressed the question of "whether a civil sanction, in application, may be so divorced from any remedial goal that it constitutes 'punishment' for the purposes of double jeopardy analysis."[1459] The *Halper* Court held that "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution."[1460] In defining remedial versus deterrent or retributive sanctions, the *Halper* Court noted that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment."[1461] The Court also noted that both civil and criminal sanctions constitute punishment when "as applied in the individual case" they serve the goals of punishment.[1462]

It is important to stress that *Halper* is a double jeopardy case, and that a later Supreme Court case—*Hudson v. U.S.*—"in large part disavow[ed] the method of analysis used in *United States v. Halper*" in the double jeopardy context and called the *Halper* framework "ill considered" and "unworkable."[1463] Furthermore, the *Halper* Court itself noted that the rule it announced "is a rule for the rare case…where a fixed-penalty provision subjects a prolific but small-gauge offender

---

[1458] U.S. CONST. amend. V.

[1459] *Halper*, 490 U.S. at 443.

[1460] *Id.* at 448-49.

[1461] *Id.*

[1462] *Id.* at 448.

[1463] *Hudson v. U.S.*, 522 U.S. 93, 96, 101, 102 (1997). The Debtors fail to mention *Hudson* in their briefing. However, the *Hudson* Court also notes that some of the concerns addressed in *Halper* are addressed more appropriately by the Excessive Fines Clause than the Double Jeopardy Clause. *Id.* at 102-03.

to a sanction overwhelmingly disproportionate to the damages he caused"[1464] and that "the only proscription established by our ruling is that the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment not rationally related to the goal of making the Government whole."[1465]  The *Halper* Court also noted that, despite its holding, "the Government is entitled to rough remedial justice…according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages...,"[1466] and acknowledged that drawing the line between remedial and punitive sanctions is always an imprecise science and often an impossible one.[1467]

The second case relied upon by the Debtors here is *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,*[1468] which held that "[w]hatever the outer confines of the [Excessive Fines Clause's] reach may be, we now decide only that it does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded."  Thus, the Supreme Court did not apply the Excessive Fines Clause to a jury's award of punitive damages in a private, civil lawsuit.[1469]  The relevance of this holding to the Motions and Claim Objections is not immediately apparent.  However, the Debtors

---

[1464] *Halper*, 490 U.S. at 449.

[1465] *Id.* at 451.

[1466] *Id.* at 446.

[1467] *Id.* at 449 ("We acknowledge that this inquiry will not be an exact pursuit. In our decided cases we have noted that the precise amount of the Government's damages and costs may prove to be difficult, if not impossible, to ascertain. *See, e.g., Rex Trailer*, 350 U.S. at 153, 76 S. Ct., at 222. Similarly, it would be difficult if not impossible in many cases for a court to determine the precise dollar figure at which a civil sanction has accomplished its remedial purpose of making the Government whole, but beyond which the sanction takes on the quality of punishment. In other words, as we have observed above, the process of affixing a sanction that compensates the Government for all its costs inevitably involves an element of rough justice. Our upholding reasonable liquidated damages clauses reflects this unavoidable imprecision. Similarly, we have recognized that in the ordinary case fixed-penalty-plus-double-damages provisions can be said to do no more than make the Government whole.")

[1468] 492 U.S. at 263-64.

[1469] *Id.* at 280.

cite it for the proposition that the word "fine" in the context of the Excessive Fines Clause means "a payment to a sovereign as punishment for some offense."[1470]

The Debtors next rely upon *Austin v. U.S.,*[1471] which answered the question of "whether the Excessive Fines Clause of the Eighth Amendment applies to forfeitures of property under 21 U.S.C. §§ 881(a)(4) and (a)(7)." The *Austin* Court held that it did, because the forfeitures in question constituted "payment to a sovereign as punishment for some offense."[1472] The *Austin* Court reached this conclusion on the basis that, in certain cases, civil sanctions could be considered to be punishment under the Excessive Fines Clause:[1473]

> The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, "as *punishment* for some offense." [*Browning–Ferris*, 492 U.S. at 265.] (emphasis added). "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *United States v. Halper,* 490 U.S. 435, 447–448, 109 S.Ct. 1892, 1901, 104 L.Ed.2d 487 (1989). "It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties." *Id.,* at 447, 109 S.Ct., at 1901. *See also United States ex rel. Marcus v. Hess,* 317 U.S. 537, 554, 63 S.Ct. 379, 389, 87 L.Ed. 443 (1943) (Frankfurter, J., concurring). Thus, the question is not, as the United States would have it, whether forfeiture under §§ 881(a)(4) and (a)(7) is civil or criminal, but rather whether it is punishment.
>
> In considering this question, we are mindful of the fact that sanctions frequently serve more than one purpose. We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however, must determine that it can only be explained as serving in part to punish. We said in *Halper* that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." 490 U.S., at 448, 109 S.Ct., at 1902.

---

[1470] *Id.* at 265.

[1471] 509 U.S. at 604.

[1472] *Id.* at 609-10, 622 (quoting *Browning–Ferris Indus.*, 492 U.S. at 265 (internal quotation marks omitted)).

[1473] *Id.* at 609-10.

The *Austin* Court noted that the determination of whether a sanction was a punishment and therefore a fine under the Excessive Fines Clause was governed by *Halper*: "[u]nder [*Halper*], the question is whether forfeiture serves in part to punish, and one need not exclude the possibility that forfeiture serves other purposes to reach that conclusion."[1474]  In rejecting the argument that the forfeitures in question were purely remedial, the Supreme Court noted "forfeiture of property is a penalty that has absolutely no correlation to any damages sustained by society or to the cost of enforcing the law."[1475]

The *Austin* Court concluded that forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7) did not serve a *solely* remedial purpose in light of (i) the historical understanding of forfeiture as punishment, (ii) the clear focus of the forfeiture statutes in question on the culpability of the owner, and (iii) evidence that Congress understood these provisions as serving to deter and punish.[1476]  In a footnote, the *Austin* court drew a distinction between forfeitures and other types of monetary sanctions:[1477]

> In *Halper*, we focused on whether "the sanction as applied in the individual case serves the goals of punishment." 490 U.S., at 448, 109 S.Ct., at 1902. In this case, however, it makes sense to focus on §§ 881(a)(4) and (a)(7) as a whole. *Halper* involved a small, fixed-penalty provision, which "in the ordinary case ... can be said to do no more than make the Government whole." *Id.*, at 449, 109 S.Ct., at 1902. The value of the conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7), on the other hand, can vary so dramatically that any relationship between the Government's actual costs and the amount of the sanction is merely coincidental. *See Ward*, 448 U.S., at 254, 100 S.Ct., at 2644. Furthermore, as we have seen, forfeiture statutes historically have been understood as serving not simply remedial goals but also those of punishment and deterrence. Finally, it appears to make little practical difference whether the Excessive Fines Clause applies to all forfeitures under §§ 881(a)(4) and (a)(7) or only to those that cannot be characterized as purely remedial. The Clause prohibits only the imposition of

---

[1474] *Id.* at 620 n.12.

[1475] *Id.* at 621 (alterations in original omitted) (quoting *U.S. v. Ward*, 448 U.S. 254 (1980)).

[1476] *Id.* at 621-22.

[1477] *Id.* at 622 n.14.

MEMORANDUM OPINION

369

"excessive" fines, and a fine that serves purely remedial purposes cannot be considered "excessive" in any event.

The *Austin* Court did not articulate a test for determining whether a particular forfeiture or other type of punishment is excessive under the Excessive Fines Clause. Instead, it held only that payments to a sovereign that are made as punishment for some offense are subject to the limitations of the Excessive Fines Clause, and that a sanction is punishment under the Excessive Fines Clause if it serves a retributive or deterrent purpose.[1478]

Finally, the Debtors rely upon *U.S. v. Bajakajian*.[1479] *Bajakajian* was the first—and to date is the only—Supreme Court case that actually applies the Excessive Fines Clause.[1480] Bajakajian was convicted of willfully failing to report the fact that he was transporting more than $10,000 in currency out of the country.[1481] The penalty for this offense was the forfeiture of the entire amount that Bajakajian failed to report—$357,144.[1482] Bajakajian was transporting these funds to repay a lawful debt, and his failure to report the funds was not connected to any kind of unlawful activity, including tax evasion.[1483] The Supreme Court noted that the district court had found that Bajakajian "failed to report that he was taking the currency out of the United States because of fear stemming from cultural differences: Respondent, who had grown up as a member of the Armenian minority in Syria, had a distrust for the Government."[1484]

---

[1478] *Id.* at 610-11, 622.

[1479] 524 U.S. 321 (1998).

[1480] *Id.* at 327 ("This Court has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause.").

[1481] *Id.* at 325.

[1482] *Id.*

[1483] *Id.* at 325, 339.

[1484] *Id.* at 326.

The *Bajakajian* Court adopted the *Austin* Court's analysis, and stated that "[f]orfeitures—payments in kind—are thus 'fines' if they constitute punishment for an offense."[1485] The *Bajakajian* Court also adopted the *Austin* Court's assertion that even if a forfeiture is only punitive in part that it is still within the purview of the Excessive Fines Clause.[1486] Having decided that the forfeiture in question was a fine within the meaning of the Excessive Fines Clause, the *Bajakajian* Court then turned to the question of whether that fine was excessive,[1487] holding that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."[1488] The Supreme Court reasoned that a forfeiture must be *grossly* disproportional to the gravity of a defendant's offense based on two observations: (i) "judgments about the appropriate punishment for an offense belong in the first instance to the legislature,"[1489] and (ii) "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise."[1490] According to the Court, these two observations, taken together, "counsel against requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense;"[1491] "[i]f the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."[1492]

---

[1485] *Id.* at 328.

[1486] *Id.* at 329 n.4 ("We do not suggest that merely because the forfeiture of respondent's currency in this case would not serve a remedial purpose, other forfeitures may be classified as nonpunitive (and thus not 'fines') if they serve some remedial purpose as well as being punishment for an offense. Even if the Government were correct in claiming that the forfeiture of respondent's currency is remedial in some way, the forfeiture would still be punitive in part. (The Government concedes as much.) This is sufficient to bring the forfeiture within the purview of the Excessive Fines Clause. *See Austin*, 509 U.S. at 621–622, 113 S. Ct. 2801, 2811–2812, 125 L.Ed.2d 488 (1993)").

[1487] *Id.* at 333.

[1488] *Id.* at 334.

[1489] *Id.* at 336 (citing *Solem v. Helm*, 463 U.S. 277, 290 (1983) ("Reviewing courts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes"); *Gore v. U.S.*, 357 U.S. 386, 393, 78 S. Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958) ("Whatever views may be entertained regarding severity of punishment, ... these are peculiarly questions of legislative policy")).

[1490] *Id.*

[1491] *Id.*

[1492] *Id.* at 337.

Applying this standard, the Supreme Court held that the forfeiture imposed on Bajakajian was grossly disproportional to the gravity of his offense, and thus violated the Excessive Fines Clause because[1493]

> Respondent's crime was solely a reporting offense. It was permissible to transport the currency out of the country so long as he reported it. Section 982(a)(1) orders currency to be forfeited for a "willful" violation of the reporting requirement. Thus, the essence of respondent's crime is a willful failure to report the removal of currency from the United States. Furthermore, as the District Court found, respondent's violation was unrelated to any other illegal activities. The money was the proceeds of legal activity and was to be used to repay a lawful debt. Whatever his other vices, respondent does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader…And under the Sentencing Guidelines, the maximum sentence that could have been imposed on respondent was six months, while the maximum fine was $5,000.
>
>    ***
>
> The harm that respondent caused was also minimal. Failure to report his currency affected only one party, the Government, and in a relatively minor way. There was no fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country.
>
> ***
>
> Comparing the gravity of respondent's crime with the $357,144 forfeiture the Government seeks, we conclude that such a forfeiture would be grossly disproportional to the gravity of his offense. It is larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the Government.

Thus, these cases—beginning with *Halper* and ending with *Bajakajian*—lay out a framework for how to apply the Excessive Fines Clause. In sum, to be constrained by the Excessive Fines Clause, a sanction must be (i) a fine, and (ii) excessive.[1494] A sanction is a "fine" if it is "payment to a sovereign as punishment for some offense."[1495] A payment is made "as

---

[1493] *Bajakajian*, 524 U.S. at 337-40.

[1494] *Id.* at 334.

[1495] *Austin*, 509 U.S. at 622 (quoting *Browning–Ferris*, 492 U.S. at 265).

punishment for some offense" when its purpose is—even in part—retribution or deterrence.[1496] A fine is excessive when it is "grossly disproportional to the gravity of the defendant's offense."[1497] In order to evaluate whether a fine is grossly disproportional to the gravity of a defendant's offense, courts should consider the *Bajakajian* factors, including: (i) the essence of the violator's wrongdoing and its relation to other illegal activity, (ii) whether the violator fits into the class of persons for whom the statute was principally designed, (iii) the nature of the harm caused by the violator's conduct, and (iv) the maximum non-forfeiture sentence and fine that could have been imposed.[1498]

### b) Lower Courts' Interpretations of Supreme Court Precedent

The most recent of the Supreme Court cases just discussed, *Bajakajian*, was decided over fifteen years ago. Since *Bajakajian* was decided, lower courts have had ample opportunity to apply its holdings to monetary sanctions. Significantly, neither party has cited a case to the Court, nor has the Court been able to locate one through its own research, invalidating a non-forfeiture, legislative civil penalty under the Excessive Fines Clause.[1499] Indeed, the post-*Austin* and post-*Bajakajian* cases that the Court has reviewed largely counsel against a holding that the International Penalties are fines,[1500] or that they are excessive, as will be discussed below.

---

[1496] *Id.* at 621 (citing *Halper*, 490 U.S. at 448).

[1497] *Bajakajian*, 524 U.S. at 337.

[1498] *Id.* at 337-40; *U.S. v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009).

[1499] The Debtors cite two district court cases—*Callister Nebeker & McCullough v. U.S.* and *Crawford v. U.S. Dept. of the Treasury*—that do not decide whether tax penalties under 26 U.S.C. § 6708 and 31 U.S.C. § 5314 are excessive due to lack of a sufficient factual record and neglect to discuss whether they are fines. *Callister Nebeker & McCullough v. U.S.* 2015 WL 5918494 (D. Utah Oct. 9, 2015); *Crawford v. U.S. Dept. of the Treasury*, 2015 WL 5697552, at *4 (S.D. Ohio Sept. 29, 2015). The Debtors also cite a case in which a district court judge lowered the criminal contempt fine imposed by a bankruptcy judge from $10,000 to $3,000. *In re Swaffar*, 253 B.R. 441, 451 (Bankr. E.D. Ark. 2000). As the Eleventh Circuit has noted, the concerns at play when evaluating a judicially imposed fine are very different than those that are at play when evaluating a legislatively imposed fine.). *U.S. v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1309 (11th Cir. 1999).

[1500] The Court does recognize that the Supreme Court has declared a unique and obviously punitive tax to be punishment for the purposes of a double jeopardy analysis. *See Dept. of Rev. of Mont. v. Kurth Ranch*, 511 U.S. 767 (1994) (characterizing a tax as punishment for the purposes of a double jeopardy analysis but in discussing the Eighth

## 2. Are the International Penalties "Fines"?

Various courts of appeals have categorically refused to extend *Austin* and *Bajakajian* into the realm of civil tax penalties. For example, in *McNichols v. C.I.R.*,[1501] McNichols forfeited all of the proceeds of his drug dealing to the United States.[1502] In addition, the IRS assessed fraud penalties against McNichols.[1503] The First Circuit held that the assessment of fraud penalties against McNichols on property that he had already forfeited to the government as a part of a criminal plea agreement was not a fine that could be limited by the Excessive Fines Clause, explaining that:[1504]

> Using *Austin* as a springboard, petitioner argues that the additions to the income tax were punitive, and that, by seizing his property and then subjecting that same property to an income tax along with penalties and interest, the IRS has violated the proportionality requirements of the Eighth Amendment. We decline to take the giant leap that petitioner urges for several reasons. First there is an insurmountable wall of tax cases, discussed *infra*, holding that the government has a right to do precisely what it has done here. Second, the instant case is a civil income tax not a forfeiture case as was *Austin*. And *Austin* does not directly or impliedly suggest that either its holding or statements to the effect that a forfeiture can be an excessive fine under the Eighth Amendment are or should be applicable to any actions other than forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7). Nor, under the facts of this case, do we perceive any reason for applying the principles of *Austin* to petitioner. Petitioner agreed to the forfeiture. He stipulated to the tax court that he derived unreported taxable income in 1981 and 1982 from the sale of marijuana. The plea agreement warned petitioner that income tax might be due. Indeed, prior to signing the plea agreement, petitioner was sent a notice of deficiency assessing taxes and penalties for the years 1981 and 1982. The Supreme Court in *James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961) made an observation that applies to petitioner:
>
> > We should not continue to confound confusion, particularly when the result would be to perpetuate the injustice of relieving embezzlers of the duty of paying income taxes on the money they enrich themselves with

---

Amendment specifically noting that "[a] civil forfeiture may violate the Eighth Amendment's proscription against excessive fines. *Austin v. U.S.*, 509 U.S. 602, 113 S. Ct. 2801, 125 L.Ed.2d 488 (1993).").

[1501] 13 F.3d 432 (1st Cir. 1993).

[1502] *Id.* at 434.

[1503] *Id.*

[1504] *Id.* at 434-35.

through theft while honest people pay their taxes on every conceivable type of income.

*Id.* at 221, 81 S.Ct. at 1056. We find no Eighth Amendment violations.

As is obvious from its decision, the First Circuit refused to read the *Austin* Court's definition of "fines" as encompassing civil tax penalties. The *McNichols* court also rejected an attempt to use *Halper* for the purpose of characterizing civil tax penalties as fines, stating that "[t]o use *Halper* as a base for vaulting into the tax arena would be to misapply the case and distort its holding."[1505] The *McNichols* court also noted—as does the IRS in its briefing here—that characterizing civil tax penalties as having the kind of punishment purpose that would make them fines under *Austin* runs counter to the Supreme Court decision in *Helvering v. Mitchell*,[1506] where the Court characterized additions to tax for fraud as remedial as opposed to punitive:[1507]

> The remedial character of sanctions imposing additions to a tax has been made clear by this Court … They are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud.

Holding that *Helvering v. Mitchell* was "the foundation stone" for "the wall of cases" that barred McNichols' Excessive Fines Clause defense, the First Circuit concluded that the *Helvering* Court's characterization of civil tax penalties as remedial meant that civil tax penalties are not fines, and that because they are not fines they are not subject to the Excessive Fines Clause's limitations.[1508]

While the Fifth Circuit has not spoken as directly as some of the other circuits on the issue of whether civil tax penalties can ever be "fines" under *Austin*, decisions of the Fifth Circuit that touch upon this issue also counsel against a holding that the International Penalties are fines. For

---

[1505] *Id.* at 435.

[1506] 303 U.S. 391 (1938).

[1507] *Id.* at 401. In fairness, *Helvering v. Mitchell* and *McNichols* both involved fraud penalties, which are different in many respects from the International Penalties at issue here. In addition, *Helvering v. Mitchell* was decided before *Austin* recast the inquiry of what constitutes "punishment" under the Eighth Amendment.

[1508] *Id.*

example, in the context of a double jeopardy analysis, the Fifth Circuit noted that a civil penalty for failure to file an information return "is analogous to the fraud penalty at issue in *Helvering*," and for that reason found the civil penalty for failure to file an information return to be remedial rather than punitive for double jeopardy purposes.[1509] The Fifth Circuit has also noted that *Austin* did not overrule an earlier Supreme Court decision—*Ingraham v. White*—where "the Court explicitly described the Eighth Amendment as being 'designed to protect those convicted of crimes.'"[1510] And, of course, both *Austin* and *Bajakajian* involved individuals who had been convicted of crimes, unlike the Debtors here.

As relevant here then, under *Austin*, a monetary sanction is a "fine" if it is "payment to a sovereign as punishment for some offense,"[1511] and a payment is made "as punishment for some offense" when its purpose is—even in part—retribution or deterrence.[1512] It is clear that the International Penalties have at least some deterrent purpose. The Joint Committee on Taxation explained in its report titled "General Explanation of Tax Legislation Enacted in the 104th Congress" that 26 U.S.C. §§ 6038, 6048, and 6677 were amended into their present forms because:

> The Congress was informed that certain U.S. settlors established foreign trusts, including grantor trusts, in tax haven jurisdictions. Income from such foreign grantor trusts was taxable on a current basis to the U.S. grantor, but the Congress understood that there was noncompliance in this regard. The Congress was concerned that the prior-law civil penalties for failure to comply with the reporting requirements applicable to foreign trusts established by U.S. persons had proven to be ineffective. *In order to deter noncompliance*, the Congress believed that it is appropriate to expand the reporting requirements relating to activities of foreign trusts with U.S. grantors or U.S. beneficiaries and to increase the civil penalties applicable to a failure to comply with such reporting requirements.[1513]

---

[1509] *Bickham Lincoln-Mercury Inc. v. U.S.*, 168 F.3d 790, 795 (5th Cir. 1999).

[1510] *John Corp. v. City of Houston*, 214 F.3d 573, 580 (5th Cir. 2000) (quoting *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)).

[1511] *Austin*, 509 U.S. at 622 (quoting *Browning–Ferris Indus.*, 492 U.S. at 265).

[1512] *Id.* at 602.

[1513] JCS-12-96 NO 9 (I.R.S.), 1996 WL 34405424, at *56 (Dec. 18, 1996) (emphasis added) (hereinafter "**General Explanation**"). The Debtors correctly point out that this report of the Joint Committee on Taxation is not true

The "prior-law civil penalties" that the Joint Committee on Taxation described had been limited to a maximum of $1,000.[1514] Today, the penalty for each violation of § 6038 is $10,000.[1515] The penalty for violations of § 6048(b) is $10,000, or 5% of the gross value of the relevant trust's assets, whichever is greater.[1516]

The explanation of the Joint Committee on Taxation cited above indicates that the International Penalties are aimed at preventing—or deterring—the precise actions that the Wylys have engaged in here—*i.e.*, surreptitious transactions by U.S. taxpayers with foreign trusts on whose income tax should have been paid, and whose existence and taxability went undetected for many years, in part because reporting requirements were not followed. The International Penalties represent more than housekeeping requirements. As the IRS notes, the International Penalties "are connected to tax evasion."[1517] They operate to deter misconduct in an international sphere that, as the Joint Committee on Taxation pointed out, can be dominated by secrecy.[1518]

---

legislative history, as it was prepared *after* the passage of the Small Business Job Protection Act of 1996. *See Estate of Wallace v. C.I.R.*, 965 F.2d 1038, 1050 n.15 (11th Cir. 1992) ("We cite the General Explanation not as an expression of legislative intent, as it was prepared by committee staff after enactment of the statute, but as a valuable aid to understanding the statute. We accord it no weight as binding authority on legislative intent."). However, the Fifth Circuit has noted in a tax context that the views of such Joint Committee Reports "are entitled to great respect." *McDonald v. C.I.R.*, 764 F.2d 322, 336 (5th Cir. 1985) ("The Joint Committee is a staff committee, and its 'Explanation' was issued after the fact. Hence it does not directly represent the views of the legislators or an explanation available to them when acting on the bill. The Joint Committee's views, however, are entitled to great respect."). The Court also notes that while the statutory penalty amounts under 26 U.S.C. § 6038 were not increased until 1997, the 1996 General Explanation explicitly names § 6038 as one of the subsections that is being changed because of concerns regarding noncompliance with laws related to foreign trusts. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105–34, § 6038, 111 Stat 788 (1997) (increasing penalties for violations of § 6038); General Explanation at *54-56 (listing § 6038 as one of the sections that the General Explanation is discussing).

[1514] General Explanation, 1996 WL 34405424, at *55.

[1515] 26 U.S.C. § 6038(b).

[1516] *Id.* at §§ 6048(b), 6677. Violations of § 6048(a) or (c)—for which this Court has held the Debtors are not liable—result in penalties of $10,000 or 35% of the value of the property involved in the unreported transfer or distribution, whichever is greater. 26 U.S.C. §§ 6048(a), (c), 6677.

[1517] *See* IRS' Amended Proposed Findings of Facts and Conclusions of Law [ECF No. 1103] ¶ 270.

[1518] General Explanation, 1996 WL 34405424, at *56 ("The Congress understood that some of the jurisdictions in which U.S. settlors established foreign trusts have strict secrecy laws. The Congress was concerned that the secrecy laws may effectively preclude the Treasury Department from obtaining information necessary to determine the tax liabilities of the U.S. grantors or U.S. beneficiaries with respect to items related to such foreign trusts.").

Under *Austin*, this deterrence factor weighs in favor of holding that the International Penalties have at least some punishment purpose, and are therefore fines that can be limited by the Excessive Fines Clause. However, there are also numerous factors that weigh against such a holding. Even the *Austin* Court noted—citing *Halper*—that in the ordinary case a small, fixed-penalty provision "can be said to do no more than make the government whole" and that such penalties are therefore remedial.[1519] Both *Austin* and *Bajakajian* were decided within the specific context of forfeitures that were imposed in connection with some crime.

The parties have not cited, nor has the Court located through its own research, a single case that holds that a tax penalty such as the International Penalties is a fine under the Excessive Fines Clause, let alone an excessive fine. As discussed above, most circuit courts that have considered the question of whether it is appropriate to treat tax penalties as fines under the Excessive Fines Clause have answered that question with a categorical "no," and the tax court has followed suit. The one circuit court that has left the door open to even the *possibility* of a tax penalty being treated as a fine under the Excessive Fines Clause has stated that such penalties could only be fines where "*no* remedial purpose" was served or where such penalties are "several times greater than necessary to achieve a remedial purpose."[1520] These courts rely on the Supreme Court's characterization of tax penalties as purely remedial in *Helvering v. Mitchell* as support for their analysis, an analysis that can be extended to the International Penalties.

Such a strong consensus among the circuit courts—as well as the tax court—that *Austin* and *Bajakajian* should not be extended into the tax realm counsels against treating the International Penalties as fines. Although the Fifth Circuit has not spoken as clearly on this issue as other courts,

---

[1519] *Austin.*, 509 U.S. at 622 n.14 (quoting *Halper*, 490 U.S. at 448).
[1520] *U.S. v. Alt*, 83 F.3d 779, 782 (8th Cir. 1996) (emphasis in the original).

its precedent also counsels this result. The Fifth Circuit has specifically stated that a civil penalty for failure to file an information return "is analogous to the fraud penalty at issue in *Helvering*" and is thus purely remedial.[1521] The Fifth Circuit has also held that an administrative fine cannot be excessive as long as it "does not exceed the limits of the statute authorizing it."[1522] This statement leads to the inference that—under Fifth Circuit precedent—a non-forfeiture fine such as the International Penalties cannot violate the Eighth Amendment.

From this Court's perspective, a holding that the International Penalties are not fines is consistent with relevant Supreme Court precedent, including *Austin* and *Bajakajian*. First, both of those cases were decided within the narrow context of forfeitures related to crimes, and extending their holdings to the realm of civil tax penalties would be, as the First Circuit said, a "giant leap."[1523]

Second, when the Supreme Court disavowed the reasoning of *Halper* in *Hudson v. U.S.*, it observed that "all civil penalties have some deterrent effect."[1524] This observation makes sense. No one wants to pay a penalty, and thus the imposition of a penalty will always have at least *some* deterrent effect. But, this observation is in natural tension with *Austin's* statement that a "civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term."[1525] However, if *any* deterrent purpose is sufficient in order to declare a civil sanction to be punishment and therefore a fine, then all civil sanctions are necessarily punishment, and it therefore becomes unnecessary to evaluate whether a civil sanction is a "fine"

---

[1521] *Bickham Lincoln-Mercury Inc.*, 168 F.3d at 795.

[1522] *Newell Recycling Co., Inc. v. U.S. E.P.A.*, 231 F.3d 204, 210 (5th Cir. 2000).

[1523] *McNichols*, 13 F.3d at 434.

[1524] *Hudson*, 522 U.S. at 102.

[1525] *Austin*, 509 U.S. at 621 (emphasis in original) (quoting *Halper*, 490 U.S. at 448).

MEMORANDUM OPINION                                                                 379

under the Excessive Fines Clause. A court can simply proceed to analyze whether the civil sanction is excessive in every instance, because the answer to whether a particular civil sanction is a fine will always be "yes." This cannot be the proper result in light of the Supreme Court's decision in *Helvering v. Mitchell,* which declares civil tax penalties to be remedial. It also cannot be the proper result in light of the fact that *Austin* does not declare it unnecessary to analyze whether civil sanctions are fines, and the fact that *Bajakajian* declares that traditional, civil, *in rem* forfeitures as they were understood at the time the Eighth Amendment was enacted are not fines.[1526]

In sum, those courts that have been faced with the dilemma of how to apply an Excessive Fines Clause analysis to civil tax penalties have all arrived at largely the same answer—*i.e.*, civil tax penalties such as the International Penalties are not fines, and therefore the Excessive Fines Clause is not applicable to them. This Court likewise concludes that the International Penalties are not fines, adopting the reasoning of those courts.

### 3. Alternatively, Are the International Penalties "Excessive?"

Alternatively, even if this Court concluded that the International Penalties are fines, lower court cases interpreting *Bajakajian* make strong arguments that fines such as the International Penalties under § 6677 can almost never be excessive. In *Bajakajian*, the Supreme Court held that in order to determine if a forfeiture is excessive, a court must: "compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."[1527] Although

---

[1526] *Bajakajian*, 524 U.S. at 331.
[1527] *Id.* at 336-37.

decided prior to *Bajakajian*, the Fourth Circuit's observations in *Thomas*[1528] regarding percentage-based tax penalties are nevertheless still applicable here:

> Even assuming arguendo that the Excessive Fines Clause is implicated in this case, there is no basis for concluding that the $44,068 sanction is excessive. If the addition to tax is always calculated as fifty percent of the tax deficiency regardless of the means by which the income is accrued, the sanction could not be excessive as to one person, but not excessive as to another. All persons forced to pay additions to tax for civil fraud are treated in the same manner.

Moreover, the tax court agreed with the *Thomas* court's observation in a post-*Bajakajian* context in *Gorra v. C.I.R.*,[1529] noting that a civil tax penalty calculated as a percentage of an underpayment "could not be excessive to one person, but not excessive as to another" and that such a penalty by its nature "bears a relationship to the gravity of the offense that it is designed to remedy."

There is also a strong argument that a fixed-penalty provision such as the $10,000 fine assessed under § 6038 should rarely be considered excessive. The Supreme Court in *Halper* noted that "the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages" without such a sanction being labeled as punishment.[1530] The *Halper* court also noted that its holding that a fixed-damages provision was punishment was a rule for the rare case.[1531] Indeed, it is telling that the Debtors have not cited to a case that declares a fixed, non-forfeiture, legislative fine such as the one imposed under § 6038 unconstitutional, nor has the Court been able to locate such a case through its own research.

---

[1528] *Thomas*, 62 F.3d 97, 103 (4th Cir. 1995).

[1529] 106 T.C.M. (CCH) 523, 2013 WL 5988939, at *26-27 (2013) (citing *Thomas*, 62 F.3d at 103, and holding that 26 U.S.C. § 6662(h) did not violate the Excessive Fines Clause).

[1530] *Halper*, 490 U.S. at 446.

[1531] *Id.* at 449.

MEMORANDUM OPINION                                                              381

Another factor counseling against declaring the International Penalties excessive here is that even in the realm of forfeitures—where offenders may be punished with a total surrender of property *on top of* the maximum statutory fine—courts have been reluctant to find that those forfeitures are "grossly disproportional." For example, in *U.S. v. Wallace,*[1532] the Fifth Circuit found that punishing a pilot for a simple failure to register his airplane by forcing him to forfeit that airplane was not a grossly disproportional fine. In arriving at this conclusion, the Fifth Circuit noted that the forfeiture was within the range of fines prescribed by Congress for the pilot's reporting violation, and that this created "a strong presumption…that the forfeiture is constitutional."[1533]

The Eleventh Circuit explained the rationale for this conclusion in *U.S. v. 817 N.E. 29th Drive, Wilton Manors, Fla.,*[1534] where it noted that

> Translating the gravity of a crime into monetary terms—such that it can be proportioned to the value of forfeited property—is not a simple task. Fortunately for us, this task has already been performed by two very competent bodies. The first is Congress, which, in enacting criminal laws, has specified the maximum permissible fine for a given offense. Because Congress is a representative body, its pronouncements regarding the appropriate range of fines for a crime represent the collective opinion of the American people as to what is and is not excessive. Given that excessiveness is a highly subjective judgment, the courts should be hesitant to substitute their opinion for that of the people. Consequently, if the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional.

The Eleventh Circuit also noted in *Wilton Manors* that "[i]t is important to remember that the Excessive Fines Clause was drafted in an era in which the amount of a fine was determined solely by the judiciary; the Clause was thus intended as a limitation on courts, not legislatures."[1535]

---

[1532] 389 F.3d 483 (5th Cir. 2004).

[1533] *Id.* at 486 (quoting *817 N.E. 29th Drive*, 175 F.3d at 1309).

[1534] 175 F.3d 1304 (11th Cir. 1999).

[1535] *Id.* at 1309. *See Browning–Ferris Indus.,* 492 U.S. at 290 (O'Connor, J., concurring in part and dissenting in part) (stating that in seventeenth-century England, the imposition of fines was solely a judicial function).

MEMORANDUM OPINION                                                                                    382

Here, the International Penalties represent the very maximum fine that the Fifth Circuit would use as a benchmark for assessing proportionality. Moreover, the Fifth Circuit in *Wallace* also noted that the pilot's violation was more serious than the one at issue in *Bajakajian*, as it was a continuing violation occurring over the course of seven years as opposed to a one-time violation.[1536] Finally, the *Wallace* court also considered the degree to which the pilot benefited from his violation.[1537]

Both *Wallace* and an additional Fifth Circuit case—*Newell Recycling Co., Inc. v. U.S. E.P.A.*[1538]—indicate that the Fifth Circuit would consider almost any fine that was within the statutory maximum to be non-excessive under the Excessive Fines Clause. In *Newell Recycling*, the Fifth Circuit held that "[n]o matter how excessive (in lay terms) an administrative fine may appear, if the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment."[1539] Although *Newell Recycling* was decided after both *Austin* and *Bajakajian*, it cites neither of these cases, which leads to an inference that the Fifth Circuit reads *Austin* and *Bajakajian* narrowly and to not apply outside of the context of forfeitures.[1540] If an administrative body's application of a maximum statutory fine is per se constitutional as the Fifth Circuit held in *Newell Recycling*, there is no reason to think that a court's application of a maximum statutory fine in a court proceeding would not also be per se constitutional.

---

[1536] *Id.* at 487; *see also U.S. v. George*, 779 F.3d 113 (2d Cir. 2015) (considering the ongoing nature of a violation in the context of an Excessive Fines Clause analysis).

[1537] *U.S. v. Wallace*, 389 F.3d 487 (5th Cir. 2004).

[1538] 231 F.3d 204 (5th Cir. 2000).

[1539] *Id.* at 210. The Debtors argue in their post-trial reply that an interpretation of the Excessive Fines Clause where a statutory maximum is always constitutionally permissible is one where "the statute would swallow the Constitution." *See* Debtors' Post-Trial Reply Brief [ECF No. 1121] at 80. However, the Debtors' argument ignores the fact that *Austin* and *Bajakajian* were decided in the context of forfeitures, sanctions that are not just different in degree but different in kind from the International Penalties. The Debtors also fail to reconcile their approach with the Fifth Circuit's pronouncements in *Wallace* and *Newell Recycling*.

[1540] *But see Vanderbilt Mortg. and Fin., Inc. v. Flores*, 692 F.3d 358, 374 (5th Cir. 2012) ("Even assuming that the Clause has been incorporated against the states, the fine in question—$10,000 for filing a fraudulent lien—is not 'grossly disproportional to the gravity of a defendant's offense.'" (quoting *Bajakajian*, 524 U.S. at 334)).

### a) As to Sam

With these standards in mind, we turn to the International Penalties at issue here. According to the Computation Stipulations, Sam owes \$427,614,822 in International Penalties related to failures to file Forms 3520-A and 5471.[1541] To reiterate, a fine is excessive when it is "grossly disproportional to the gravity of [Sam's] offense."[1542] And, in order to evaluate whether a fine is grossly disproportional to the gravity of Sam's offense, this Court is to consider the following factors: (i) the essence of Sam's wrongdoing and its relation to other illegal activity, (ii) whether Sam fits into the class of persons for whom the statute was principally designed, (iii) the nature of the harm caused by Sam's conduct, and (iv) the maximum non-forfeiture sentence and fine that could have been imposed.[1543] Sam has the burden of proof on the issue of excessiveness.[1544] For the reasons stated below and after analyzing the *Bajakajian* factors just identified, this Court finds that the International Penalties are not grossly disproportional to the gravity of Sam's offense, assuming that the International Penalties are fines.

First, it is important to note that the International Penalties are an inherently different type of penalty than the forfeitures at issue in *Austin* and *Bajakajian*. Unlike fixed penalty provisions such as the International Penalties, "forfeiture of property is a penalty that has absolutely no correlation to any damages sustained by society or to the cost of enforcing the law."[1545] Forfeitures thus have an inherent risk of disproportionality that is simply not present in the context of the International Penalties. Moreover, in *Bajakajian*, the Supreme Court pointed out that it was impossible to prove that the harm from Bajakajian's failure to report that he was taking \$357,144

---

[1541] Computation Stipulations ¶¶ 7.A through 9. Were the Court to include the Form 3520 penalties for which it has found that Sam is not liable in the first instance, this figure would climb to \$590,428,940. *Id.*

[1542] *Bajakajian*, 524 U.S. at 337.

[1543] *Id.* at 337-40; *Varrone*, 554 F.3d at 331.

[1544] *U.S. v. Ahmad*, 213 F.3d 805 (4th Cir. 2000).

[1545] *Austin*, 509 U.S. at 621 (quoting *U.S. v. Ward*, 448 U.S. 254 (1980)).

out of the country was "anywhere near 30 times greater than that caused by a hypothetical drug dealer who willfully fails to report taking $12,000 out of the country in order to purchase drugs."[1546] This conclusion was possible because the harm to the government—information loss—was not related to the amount of money at issue.

Here, that disconnect is lacking. Section 6677(b) penalizes United States persons who are treated as owners of foreign trusts under the Grantor Trust Rules.[1547] To the extent that a taxpayer is treated as an owner of a foreign trust, that trust's income is taxable to that United States person under 26 U.S.C. § 671. Thus, every dollar unreported by the United States taxpayer is also—in most instances, and especially in Sam's instance—a dollar untaxed, lending an inherent proportionality to penalties under § 6677(b).[1548] This analysis is in line with the Fourth Circuit's observation that penalties assessed on a percentage basis are inherently proportional.[1549] Indeed, the parties have not cited, nor has the Court located through its own research, a single case that has invalidated a percentage calculation penalty, such as the International Penalties assessed under § 6677, under the Excessive Fines Clause.

What is more, many courts—including the Fifth Circuit—have held that a forfeiture that involves property of a value that falls within the maximum statutory fine that could be imposed for the same offense is strongly presumed to be constitutional.[1550] These holdings lead to an

---

[1546] *Bajakajian*, 524 U.S. at 339.

[1547] 26 U.S.C. § 6677(b).

[1548] This analysis is different for violations of § 6038. Although income from controlled foreign corporations is taxable to the controlled foreign corporation's owner under 26 U.S.C. § 951, violations of § 6038 result in a flat fine of $10,000 per violation. Although in certain cases this could make penalties under § 6038 more disproportional than penalties under § 6677, the Court notes that this is certainly not the case here. The minimum penalty under § 6677 is $10,000 per violation, and percentage-based penalties apply here because of the extent of the Wyly wealth that was placed offshore and that Debtors did not report on Form 3520-A. *See* 26 U.S.C. § 6677. Less than 5% of Sam's or Dee's liability for International Penalties is for violations of § 6038. *See* Computation Stipulations ¶¶ 9.A through, 10, 22.a through 23.

[1549] *Thomas*, 62 F.3d at 103.

[1550] *See, e.g., U.S. v. Wallace*, 389 F.3d 483 (5th Cir. 2004) (quoting *U.S. v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir.1999)).

inference that a fixed or percentage-based fine that falls within the statutory maximum is also strongly presumed to be constitutional.[1551]   Here, there is no forfeiture involved, and the International Penalties themselves are the very maximum statutory fine that the Fifth Circuit and other courts would use as a benchmark to measure proportionality.  Such an approach leaves this Court with little opportunity to declare that the International Penalties are grossly disproportional to the gravity of Sam's offense.

An assessment of the *Bajakajian* factors also leads the Court to the conclusion that the International Penalties are not grossly disproportional as to Sam.  The first *Bajakajian* factor—the essence of the violator's wrongdoing and its relation to other illegal activity[1552]—weighs against a finding that the International Penalties are grossly disproportional to the gravity of Sam's offense. Although Sam is liable for International Penalties as a result of "mere reporting offenses," the similarities to *Bajakajian* end there.  Sam's reporting offense was very much related to other illegal activity—namely his decades long tax fraud and his violations of the securities laws.  Indeed, as discussed above in the Court's reasonable cause and fraud analyses, Sam and his agents avoided reporting requirements such as those required by the International Penalties' provisions specifically in order to facilitate his tax fraud.[1553]  Any need to file international reporting forms was of great concern to the Wyly family office, and Hennington in particular expressed a

---

[1551] *See, e.g., Wallace*, 389 F.3d at 485-86 (quoting *817 N.E. 29th Drive*, 175 F.3d at 1309).

[1552] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

[1553] *See* IRS Exs. 567 (Hennington writes to Alan Stroud, a lawyer at Meadows Owens "I am sure I read this at the time and overlooked or did not pay attention to the 3520 filing requirement. It seems that we would have preferred to not have anything reportable on the note if that was a possibility."), 570 (email between Hennington and Boucher where Hennington expresses a lot of concern that certain loans may be subject to reporting requirements); SEC Tr. Trans. 1720:14-1721:6 (French) (Tedder said to Sam that making SEC filing could jeopardize the tax status of the offshore system).

preference for transactions that did not come with reporting requirements[1554]—no doubt because of her principals' views.

Just as Sam avoided SEC reporting requirements by structuring the securities held in the offshore system so that no single entity held a reportable amount of stock in order to avoid an SEC position that was inconsistent with his tax position, Sam avoided filing Forms 3520-A and 5471 in order to conceal the extent of the Wyly offshore system and to avoid an IRS audit.[1555] Forms 3520-A and 5471 are information returns, and as the Joint Committee on Taxation noted in its report on §§ 6038, 6048, and 6677, they are necessary "because some of the jurisdictions in which U.S. settlors established foreign trusts have strict secrecy laws…[that] may effectively preclude the Treasury Department from obtaining information necessary to determine the tax liabilities of the U.S. grantors or U.S. beneficiaries with respect to items related to such foreign trusts."[1556] Sam's lack of reporting was thus a key component of his tax fraud. All of these factors indicate that Sam's violation of a reporting requirement was thus, unlike the violation in *Bajakajian*, related to other illegal activity besides the reporting requirement itself.

The second *Bajakajian* factor—whether the violator fits into the class of persons for whom the statute was principally designed[1557]—also weighs against Sam. The International Penalties were designed in order to combat a very specific problem—*i.e.*, United States persons establishing

---

[1554] *See* IRS Exs. 567, 570.

[1555] *See* IRS Ex. 412 (French fax noting the need to avoid SEC reporting requirements); IRS Exs. 567 and 570; SEC Tr. Trans. 1720:14-1721:6 (French) (Tedder said to Sam that making SEC filing could jeopardize the tax status of the offshore system); Joint Exs. 142, 175 (Forms 3520 and 3520-A that the Wylys did file gave a false impression of the offshore system, as they did not include forms for the trusts through which most of the offshore transactions flowed, many of these forms were not dated or signed, and were filed on versions of IRS forms that indicated the forms had been filed late).

[1556] General Explanation, 1996 WL 34405424, at *56. Of note is the fact that the IRS Agent in charge of the international side of the audit of Sam and Charles noted that, as of the time of trial, the IRS had still not received any documents directly from the Cayman Islands. Tr. Trans. 1581:21-1582:17 (Herrick).

[1557] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

foreign grantor trusts in tax haven jurisdictions and then failing to report the income from these trusts as taxable to them.[1558]  Sam is a United States person who established multiple foreign trusts in a known tax haven.[1559]  He then proceeded to not report the income from the grantor trusts as taxable income to him, which in turn led to an IRS audit, the filing of his Case here, and the filing of the Motion and Claim Objection in the Case.  Sam falls squarely within the class of persons for whom the International Penalties statutes were designed.  It is difficult to imagine an offender who "fits the mold" of the International Penalties better than Sam.

The third *Bajakajian* factor— the nature of the harm caused by the violator's conduct[1560]— also weighs against Sam.  The *Bajakajian* Court noted that the reporting offense at issue there resulted in very little harm—the government was faced with a loss of information only, and there was no harm "to the public fisc."[1561]  Here, the circumstances are starkly different.  Sam's reporting failure allowed him to avoid paying hundreds of millions of dollars of tax liability, which in turn deprived the United States government of hundreds of millions of dollars of revenue, and which may now be more difficult for the government to collect given the passage of time and the dissipation of Sam's wealth.  According to the Debtors' post-trial reply, Sam owes $121,193,181 in federal income tax liability for the years 1996 through 2013, the years at issue for which the IRS asserts International Penalties liability.[1562]  This is a staggering amount of taxes to have failed

---

[1558] General Explanation, 1996 WL 34405424, at *56.

[1559] *See* IRS Exs. 85 (June 12, 1991 memorandum from Robertson to Sam, Charles, Evan, French, and Ethel Ketter, in-house CPA for the Wyly family office, discussing Tedder's seminar on asset protection and tax deferral) at SECI00150278 (discussing controlled foreign corporations and recommending multiple jurisdictions, including Cayman and IOM, followed by the statement that "Tedder says all tax haven governments are stable at this time"), 111 (Wyly Family Foreign Trust Planning Confidential Conference Outline dated September 7, 2000) at SWYLY009418, § II.C.2 (referring to the 1992 IOM trusts as having "tax haven status").

[1560] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

[1561] *Bajakajian*, 524 U.S. at 338.

[1562] Debtors' Post-Trial Reply Brief [ECF No. 1121] at 81.  The Court notes an issue with this number.  The IRS maintains, without providing its own figure, that the Debtors "conveniently ignore the substantial amounts of interest due on their unpaid income tax liabilities for all of the years during which they use of funds [*sic*] belonging to the United States." IRS Post-Trial Reply Brief [ECF No. 1120] at 71.  The Debtors also note in their post-trial reply that

---

to pay. As the Debtors point out, however, Sam's International Penalties liability for those same years is $427,614,822, which is more than three times his tax liability.[1563]

While interesting, Sam's argument lacks force. First, Sam has no one to blame but himself for the enormous amount of International Penalties he is liable for. As early as 1993, Sam's trusted agent, French, was made aware that there was a significant risk that the 1992 IOM trusts were grantor trusts as to Sam. This characterization of the trusts as grantor trusts, if correct, would change both the tax consequences of the trusts to Sam and Sam's reporting obligations. This knowledge is imputed to Sam under agency principles.[1564] Moreover, the factual predicates for the 1994 and 1995 IOM trusts being foreign grantor trusts as to King and Cairns were not satisfied, as Sam either knew or should have known.[1565] However, Sam chose to (i) ignore these problems, and (ii) fail to report his ownership interest in these offshore trusts on Form 3520-A or his ownership interest in the Foreign Corporations on Form 5471. As the years wore on and the International Penalties grew, so too did the magnitude of Sam's tax fraud, and therefore the magnitude of the harm caused by Sam's reporting violations.

Second, the harm caused by Sam's reporting violations should not be measured merely against the amount of Sam's tax liability. Sam should have paid the taxes he owes without the need for a lengthy audit and a multi-year federal court proceeding. Moreover, Sam had the use of

---

their estimate could be revised to be even lower "when the stipulated income figures are worked through the 'tax return' software of the IRS for the appropriate years, after the Court renders its decision. Debtors' Post-Trial Reply Brief [ECF No. 1121] at 81 n.219. Based on its own calculations derived from the Computation Stipulations, the Court calculates Sam's tax liability for years 1996 through 2013 to exceed $300,000,000. *See* Computation Stipulations Attachment A. For the purposes of its Excessive Fines Clause analysis, the Court will assume that the Debtors' figure, which according to the IRS and the Court's own calculations is low, is correct.

[1563] Sam's counsel also argued at closing, without citation to evidence, that these penalties are 1.4 times greater than the stipulated-to income amounts. Tr. Trans. 3630:5-15 (Cole) ("[M]ost of the money at issue here is from these failure to file penalties. They exceed not only the income tax, but the total income that the parties have stipulated to").

[1564] *See* pp. 85-86, 194-203, *supra.*

[1565] *See* pp. 95-98, 203-208, *supra.*

the $121 million of income taxes he owed for the period that he failed to pay his tax obligation. Obviously, the ongoing harm of Sam's reporting violations—in addition to the base amount of taxes owed—is compounded by: (i) the time value of money lost by the government, (ii) the significant costs incurred by the government in pursuing Sam, (iii) the general blow to the integrity of the tax system caused by Sam's conduct, and (iv) the risk of collection the government now faces given the passage of time and the dissipation of Sam's assets. While the penalties assessed against Sam are vast, so too is the harm that he caused. Thus, the third *Bajakajian* factor weighs against a finding that the International Penalties are grossly disproportional to the gravity of Sam's offense.

The final *Bajakajian* factor—the maximum non-forfeiture sentence and fine that could have been imposed[1566]—also weighs against a holding that the International Penalties are grossly disproportional to the gravity of Sam's offense. This is because the International Penalties *are* one of the relevant, non-forfeiture fines that can be imposed against Sam. It is also noteworthy that the International Penalties under § 6677 have their own built-in maximum:[1567]

> At such time as the gross reportable amount with respect to any failure can be determined by the Secretary, any subsequent penalty imposed under this subsection with respect to such failure shall be reduced as necessary to assure that the aggregate amount of such penalties do not exceed the gross reportable amount (and to the extent that such aggregate amount already exceeds the gross reportable amount the Secretary shall refund such excess to the taxpayer).

For the purposes of Sam's violations of § 6048(b), "gross reportable amount" is defined as "the gross value of the portion of the trust's assets at the close of the year treated as owned by the United States person."[1568] Thus, a percentage-based penalty under § 6677 can never result in a penalty

---

[1566] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

[1567] 26 U.S.C. § 6677.

[1568] *Id.* § 6677(c)(2).

more severe than total forfeiture of all assets in the trust.[1569]  This cap, which places an upper limit on the percentage-based penalty under § 6677, lends even more weight to the idea that a penalty under § 6677 is strongly presumed to be constitutional and that the International Penalties here are not grossly disproportional as to Sam.

For all of these reasons, even if the International Penalties are fines, they are not excessive fines as applied to Sam.

### b)      As to Dee

According to the Computation Stipulations, Dee owes $277,312,325 in International Penalties related to failures to file Forms 3520-A and 5471.[1570]  Dee's Eighth Amendment argument is more compelling than Sam's if the International Penalties are properly construed as fines.  The analysis the Court is about to undertake is once again done in the alternative to its previous holding that the International Penalties are not fines to which the Eighth Amendment applies.

In assessing whether the International Penalties are grossly disproportional to the gravity of Dee's violation, the Court is guided by the Second Circuit's decision in *von Hofe v. U.S.*[1571] *Von Hofe* is a forfeiture case, and it is one of the very few forfeiture cases that the Court found declaring the forfeiture of an individual's interest in a home to be an excessive fine under the Excessive Fines Clause.[1572]  *Von Hofe* involved a husband ("**Harold**") and a wife ("**Kathleen**") who each faced forfeiture of their one half interest in their marital home.[1573]  Harold and Kathleen

---

[1569] *Id.*

[1570] Computation Stipulations ¶¶ 20.A - 21.  If the Court included the Form 3520 penalties, for which it has found that Dee is not liable, this figure would climb to $341,348,276. *Id.*

[1571] 492 F.3d 175 (2d Cir. 2007).

[1572] *Id.*

[1573] *Id.* at 179.

MEMORANDUM OPINION                                                                                           391

had both been convicted of drug offenses under Connecticut law as a part of a plea agreement.[1574] Harold was convicted of manufacturing and/or distributing a controlled substance and Kathleen was convicted of possession of a controlled substance.[1575] The government subsequently brought a civil *in rem* forfeiture action against the von Hofes, seeking forfeiture of their home.[1576]

This series of events came about because Harold had engaged in a relatively small-time marijuana cultivation operation in the couple's basement.[1577] Although a jury found that Kathleen was not an innocent owner who "did not know of the conduct giving rise to the forfeiture,"[1578] the district court found in a subsequent evidentiary hearing that she was not aware that anyone was selling marijuana in her home.[1579] The Second Circuit applied the *Bajakajian* factors, and held that "[b]ecause the extent of the forfeiture bears no correlation either with Mrs. von Hofe's minimal culpability or any harm she purportedly caused, the Excessive Fines Clause precludes forfeiture of her entire one-half interest in 32 Medley Lane."[1580] The Second Circuit noted that Kathleen's culpability was "best described as turning a blind eye to her husband's marijuana cultivation in their basement."[1581] In describing Kathleen's situation, the Second Circuit was candid:[1582]

> Mrs. von Hofe's offensive conduct boils down to her joint ownership of 32 Medley Lane and silence in the face of her husband's decision to grow marijuana in their basement almost thirty years into their marriage. And yet she is being punished as if she were distributing drugs, when the district court concluded as a matter of fact that she had no knowledge of any distribution or remuneration. The government cannot justify forfeiture of Mrs. von Hofe's interest in 32 Medley Lane, for the

---

[1574] *Id.*

[1575] *Id.*

[1576] *Id.*

[1577] *Id.*

[1578] *Id.* at 180.

[1579] *Id.* at 188-189.

[1580] *Id.* at 179.

[1581] *Id.* at 189.

[1582] *Id.* at 191.

> punishment bears no reasonable correlation either to her minimal culpability or any harm she caused.

The Second Circuit reached the opposite conclusion regarding Harold, holding that "Mr. von Hofe's lengthy and extensive involvement in the manufacture and distribution of marijuana from his basement, the seriousness of his offenses and their relationship to his other criminal activity, allow us to easily conclude that forfeiture of his one-half interest in 32 Medley Lane is not an excessive fine."[1583]

The key takeaway that this Court draws from *von Hofe* is the need to apply the *Bajakajian* factors in view of each offender's particular involvement in the relevant offense. For example, in assessing the harm factor against Dee, it is the harm caused *by Dee*, not the harm caused by the reporting failure in the abstract that is relevant. With this in mind, the Court applies the *Bajakajian* factors to Dee.

The first *Bajakajian* factor—the essence of the violator's wrongdoing and its relation to other illegal activity[1584]—weighs in favor of a holding that the International Penalties are grossly disproportional to the gravity of Dee's offense. Dee's violation of §§ 6038 and 6048 are simple reporting violations, which were not made to conceal other illegal activity on her part. As found previously, Dee lacked anything but the most basic knowledge regarding the offshore system throughout the period for which the IRS seeks to recover International Penalties.[1585] Dee did not commit tax fraud, she was not willfully blind, and she is entitled to the innocent spouse defense regarding her income tax underpayments. Dee's level of culpability is low; her biggest "offense" was trusting her husband of fifty plus years, which "offense," if it is one, is minor.

---

[1583] *Id.* at 188.

[1584] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

[1585] Tr. Trans. 151:8-24 (Dee testifying that she "literally never" discussed business with Charles), 164:5-165:3 (Dee), 322:13-14. (Dee testifying that she never discussed the offshore system with any other person).

The second *Bajakajian* factor—whether the violator fits into the class of persons for whom the statute was principally designed[1586]—also weighs in favor of a holding that the International Penalties are grossly disproportional to the gravity of Dee's offense. The International Penalties were designed in order to combat the problem of United States persons establishing foreign grantor trusts in tax haven jurisdictions and failing to report the income from these trusts as taxable to them.[1587] Although Dee and Charles should have paid taxes and reported on the Charles and Dee International Penalty Trusts, Dee did not (i) cause those trusts to be established in tax haven jurisdictions, and (ii) make the decision to not (a) pay taxes on the trust income, or (b) file the required reporting forms. Dee relied entirely on Charles to handle all tax and business matters throughout their marriage.[1588] Dee has never prepared a tax return and never discussed tax matters with Charles.[1589] Dee testified that it was her practice to sign whatever tax return Charles gave her without reviewing it and without asking questions about it throughout their fifty plus year marriage.[1590] Unlike Kathleen in *von Hofe*, Dee did not "turn a blind eye" to Charles' and Sam's fraudulent activities.[1591] The record shows that Dee had no knowledge of, and was not engaged in, their fraudulent activities. For these reasons, Dee does not fit into the class of persons for whom the International Penalties were principally designed.

The third *Bajakajian* factor— the nature of the harm caused by the violator's conduct[1592]— also weighs in favor of a holding that the International Penalties are grossly disproportional to the

---

[1586] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

[1587] General Explanation, 1996 WL 34405424, at *56.

[1588] Tr. Trans. 159:20-160:15 (Dee testifying that she relied entirely on husband throughout marriage).

[1589] *Id.* at 159:13-19 (Dee) ("Q. Have you ever prepared a tax return? A. Oh, heavens no."), 172:17-19 (Dee testifying that she never discussed tax matters with husband).

[1590] *Id.* at 159:13-160:9, 293:2-294:23 (Dee).

[1591] *Von Hofe*, 492 F.3d at 189.

[1592] *Bajakajian*, 524 U.S. at 337-40; *Varrone*, 554 F.3d at 331.

gravity of Dee's offense. Dee's reporting violations did cause harm. It facilitated Charles' tax fraud. However, as did the Second Circuit in *von Hofe*, the Court here finds it significant that Dee was in no sense the engine that drove these reporting failures. As the Court discussed in its assessment of the first two *Bajakajian* factors, Dee had no knowledge of, and did not participate in, Charles' tax fraud. The harm that Dee herself caused was minimal.

The final *Bajakajian* factor—the maximum non-forfeiture sentence and fine that could have been imposed against Dee, does weigh against a holding that the International Penalties are grossly disproportional to the gravity of Dee's offense. As with Sam, the International Penalties are the relevant, non-forfeiture fines that can be imposed against Dee.

After assessing the *Bajakajian* factors as they apply to Dee, this Court concludes that the International Penalties—both under §§ 6038 and 6677—are excessive fines as to Dee. In spite of its general concerns about finding a percentage-based or flat fine (such as the International Penalties) excessive, the Court cannot ignore the extent to which the *Bajakajian* factors favor Dee. Of course, one last reminder, this conclusion that the International Penalties as applied to Dee are excessive fines under the Eighth Amendment is an alternative conclusion to an alternative conclusion. The Court's primary conclusions are that: (i) Dee is not liable for International Penalties because she established her reasonable cause defenses, and (ii) the International Penalties are not "fines" under the Excessive Fines Clause. The Court's conclusion that the International Penalties are excessive as to Dee is only reached if one or both of its other conclusions are held to be in error.

**J.     Do the Equitable Doctrines of Laches or Estoppel Apply Here, or Does the Court have Discretion Regarding the Assessment of Taxes or Penalties Against the Debtors?**

**1.   Does Laches Apply Here?**

The Debtors argue that those IRS claims that are not barred by a statute of limitations should be barred by laches.  Laches is an equitable defense,[1593] and thus the Debtors have the burden of proving that it applies.  The Court rejects the Debtors' argument that laches should bar the IRS' claims for three reasons: (i) many of the IRS' claims are subject to express statutes of limitation that then preclude the application of laches, (ii) there is strong precedent indicating that the doctrine of laches may not be asserted against the United States in order to prevent the collection of taxes and tax penalties, and (iii) even if the doctrine of laches is applicable here, the Debtors' failed in their proof to establish its required elements.  Each reason is explained below.

While the Debtors state that the Fifth Circuit's decision in *Sage v. U.S.*[1594] supports their position that the doctrine of laches applies here, their reliance on this case is misplaced.  *Sage's* holding was that the bringing of an action by the IRS to collect penalties under 26 U.S.C. § 6700 is not subject to any statute of limitations.[1595]  In reaching this conclusion, the *Sage* court noted that the doctrine of laches could still, potentially, curb the IRS' penalty assessment power under § 6700.[1596]  The idea that laches could apply to an IRS claim not subject to any express statute of limitations is of no moment here.  That is because the IRS' claims for taxes here are subject to a specific statute of limitations—*i.e.*, 26 U.S.C. § 6501.[1597]  As relevant here, this explicit statute of

---

[1593] *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 (2014) (characterizing laches as an equitable defense); FED. R. CIV. P. 8(c) (listing laches as an affirmative defense).

[1594] 908 F.2d 18 (5th Cir. 1990).

[1595] *Id.* at 19.

[1596] *Id.* at 25.

[1597] 26 U.S.C. § 6501.  It is unclear whether § 6501 applies to the IRS' claims for penalties.  Although § 6501 is a limitation on the time period for assessment of "taxes" and not "penalties," 26 U.S.C. § 6665(a)(2) states that "[a]ny reference in this title to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional

limitations is kept open by §§ 6501(c)(1) and/or (c)(8).[1598]  As the Supreme Court noted in *Petrella v. Metro-Goldwyn-Mayer, Inc.*,[1599] there is no case where the Supreme Court "has approved the application of laches to bar a claim for damages brought within the time allowed by a federal statute of limitations."  Thus, to the extent that a statute of limitation exists for the IRS' claims here, and the claims are brought within that limitations period, the application of the equitable doctrine of laches is not appropriate.

Even if all of the IRS' claims here were not subject to an express statute of limitation, Fifth Circuit precedent has also clearly established that the doctrine of laches may not be invoked by taxpayers in order to prevent the IRS from collecting taxes or penalties.  In discussing whether a debtor in bankruptcy could invoke the doctrine of laches in order to prevent the IRS from collecting taxes and penalties, the Fifth Circuit stated in *In re Fein*:[1600]

---

amounts, and the penalties provided by this chapter."  26 U.S.C. § 6663 is a part of the chapter to which § 6665 refers, and could thus be encompassed by the language of § 6501 referring to "taxes." Despite this reading, under *Sage*, it is arguable that there is no statute of limitations for collection of fraud penalties, as no statute of limitations appears on the face of § 6663 and the *Sage* court refused to apply language similar to § 6665 in order to expand the § 6501 statute of limitations.  *Sage*, 908 F.2d at 25.  However, it must be remembered that the *Sage* court reached this conclusion and allowed the IRS to assert penalties in part because of the Supreme Court's mandate that "[s]tatutes of limitations must receive a strict construction in favor of the government."  *Id.* at 24 (citing *Badaracco v. C.I.R.*, 464 U.S. 386 (1984)).  Another issue is that even if § 6501 does create a statute of limitations applicable to the assessment of fraud penalties, these penalties may be sought "at any time" under the terms of § 6501(c)(1).  An effectively unlimited statute of limitations may be subject to the same analysis as a lack of a statute of limitations where laches is concerned. Finally, no statute of limitations appears on the face of those statutes that impose the International Penalties.  *See* 26 U.S.C. §§ 6038, 6048, 6677. *But see* 26 U.S.C. § 6501(c)(8) ("(A) In general.--In the case of any information which is required to be reported to the Secretary pursuant to an election under section 1295(b) or under section 1298(f), 6038, 6038A, 6038B, 6038D, 6046, 6046A, or 6048, the time for assessment of any tax imposed by this title with respect to any tax return, event, or period to which such information relates shall not expire before the date which is 3 years after the date on which the Secretary is furnished the information required to be reported under such section. (B) Application to failures due to reasonable cause.--If the failure to furnish the information referred to in subparagraph (A) is due to reasonable cause and not willful neglect, subparagraph (A) shall apply only to the item or items related to such failure.").  Regardless of whether § 6501 does or does not apply to certain of the IRS' claims, the Court still concludes that laches does not bar any of the IRS' claims because laches may not be invoked in order to prevent the collection of taxes and because the elements of laches have not been satisfied.

[1598] 26 U.S.C. §§ 6501(c)(1), (c)(8).

[1599] 134 S. Ct. at 1974.

[1600] 22 F.3d 631, 634 (5th Cir. 1994); *Lucia v. U.S.*, 474 F.2d 565, 570 (5th Cir. 1973) (acknowledging in dicta that there are cases—including one from the Supreme Court—that hold that "in the enforcement of Government tax claims, the United States is not barred by a laches defense."); *see also U.S. v. Weintraub*, 613 F.2d 612, 618 (6th 1979) (holding that the government is exempt from the consequences of laches); *Jacksonville Paper Co. v. Tobin*, 206 F.2d

---

We need not reach the substantive issue of whether the circumstances of this case are appropriate for the invocation of laches, as laches "may not be asserted against the United States when it is acting in its sovereign capacity to enforce a public right or protect the public interest." *See United States v. Popovich*, 820 F.2d 134, 136 (5th Cir.), *cert. denied*, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). The timeliness of government claims is governed by the statute of limitations enacted by Congress. *See United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *Chevron, U.S.A., Inc. v. United States*, 705 F.2d 1487, 1491 (9th Cir.1983). Fein admits that the government timely asserted the federal tax liabilities.

The Fifth Circuit has relied upon this well-known rule in multiple situations where the United States sought to collect outstanding tax deficiencies.[1601]   The Fifth Circuit's conclusions in those cases are based on the Supreme Court's observations in *U.S. v. Summerlin*[1602] that "[i]t is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights."

It is beyond dispute that the United States is enforcing its own rights when it seeks to collect taxes and penalties, as it is doing here.   As the Seventh Circuit noted in *U.S. v. Administrative Enterprises, Inc.*,[1603] "[t]here is no better illustration of the enforcement of a sovereign right than the use of compulsory process to determine liability for unpaid taxes."   In addition, the Fifth Circuit affirmed, albeit in an unpublished opinion, a tax court decision that held that the doctrine of laches did not prevent the IRS from assessing taxes or penalties where "section 6501(c)(1), which we

---

333, 334 (5th Cir. 1953) (referring to the "well established rule that the United States is not bound by state statutes of limitations or by laches."); *Redstone v. C.I.R.*, 110 T.C.M. (CCH) 564, 2015 WL 8479063, at * 8 (2015) (citing to *Fein* in refusing to apply laches).

[1601] *See, e.g., U.S. v. Fernon*, 640 F.2d 609, 612 (5th Cir. Unit B 1981) ("it is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights" (internal citations and quotation marks omitted) (quoting *U.S. v. Summerlin*, 310 U.S. 414, 416 (1940)).

[1602] 310 U.S. 414, 416 (1940).

[1603] 46 F.3d 670, 673 (7th Cir. 1995); s*ee also Dial v. C.I.R.*, 968 F.2d 898, 904 (9th Cir. 1992) ("laches is not a defense to the United States' enforcement of tax claims.").

have determined to be applicable, expressly authorizes respondent to assess deficiencies against petitioner 'at any time.'"[1604]

Since the doctrine of laches may not be used in order to bar the United States from collecting taxes, the Debtors' defense of laches cannot succeed.

Alternatively, even if the doctrine of laches was applicable here, the Debtors have failed in their proof.  Under Fifth Circuit precedent, "[t]o establish that a cause of action is barred by laches, the defendant must show (1) a delay in asserting the right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the defendant."[1605]   The Debtors state the allegations that underlay their laches defense in their pre-trial briefing:

> The [IRS] claims are extremely late; they were filed a dozen years after attorney Charles Lubar met on behalf of the Wylys with senior IRS officials in Washington in August 2003, in which meeting the IRS advised that it was going to appoint a "champion" to address and resolve all offshore-related issues not only with the IOM trusts related to the Wylys but also any other similarly situated taxpayers' trusts, and after the Wylys had first included Form 8275 in their annual tax returns.  The claims come eleven years after the IRS commenced audits of Charles and Sam's 2000 returns in early 2004, and nine years after a Senate investigation made public the same facts on which the IRS relies; and four years after a key witness, Charles Wyly, died.  The delay is not excusable and it has prejudiced the Debtors, subjecting the IRS Proofs of Claim, not to limitations, but to the defense of equitable laches; and the Debtors so assert.[1606]

Putting aside for the moment the fact that the Debtors lump together all of the tax years for which the IRS has filed a Proof of Claim as if the delay alleged was equal for all of the years at issue (which it is not), the Debtors have presented no evidence that an eleven-year period between the commencement of an audit and the filing of a proof of claim constitutes an inexcusable "delay" under the unique facts of these Cases.  As the Court has noted many times, these are fraud cases

---

[1604] *Tregre v. C.I.R.*, T.C. Memo 1996-243, 1996 WL 272947, at *11 (1996), *aff'd*, 129 F.3d 609 (5th Cir. 1997) (unpublished).

[1605] *Johnson v. Crown Enter., Inc.*, 398 F.3d 339, 344 (5th Cir. 2005) (internal quotation marks omitted) (quoting *Goodman v. Lee*, 78 F.3d 1007, 1014 (5th Cir.1996) (quoting *Geyen v. Marsh,* 775 F.2d 1303, 1310 (5th Cir.1985)).

[1606] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 188.

of incredible complexity. A cursory examination of civil tax fraud cases show that multi-year delays between the commencement of an IRS investigation and a tax court decision are not uncommon, even in run-of-the-mill cases.[1607] That these Cases—which all parties acknowledge are unusually complex—should take longer than "normal" to proceed from audit to decision is not remarkable.

This same complexity makes the IRS' delay—if in fact it has delayed—excusable. The Cases involve dozens of offshore entities that engaged in a myriad of complicated financial transactions that were designed—by the Wylys and their sophisticated advisors—to be difficult to unravel.[1608] That the IRS took time to investigate the Wylys' offshore system and the transactions undertaken offshore was—far from being an inexcusable mistake—probably the most prudent course. Moreover, that the IRS would await the outcome of the SEC Action in the SDNY Court is also not terribly surprising, as the same offshore trusts and corporations were at issue there too, at least in large part.

Finally, the Debtors have failed to show that the IRS' supposedly inexcusable delay has unduly prejudiced them. Although the Debtors allege that Charles was a key witness, they fail to point to any additional facts or insights that Charles would have provided here that Sam or Evan was not capable of providing. The evidence presented at trial shows that Sam and Charles largely moved in lockstep with respect to their respective offshore systems and the transactions undertaken through them. In fact, from the mountain of evidence presented at trial, it appears to this Court that Sam was the instigator of moving Wyly wealth offshore and that Charles simply followed in his brother's footsteps. In short, the Debtors' failed to offer any evidence to support their argument

---

[1607] *See, e.g., Niedringhaus*, 99 T.C. at 209 (six years elapsed between beginning of criminal investigation and tax court decision); *Paschal v. C.I.R.*, 68 T.C.M. (CCH) 366, 1994 WL 424015 (1994) (Over ten years elapsed between when taxpayer was notified that he was subject to a criminal investigation and the tax court decision).

[1608] *See* pp. 59-77, 133, *supra.*

that Charles' passing has unduly prejudiced them. If anything, Charles' passing may have strengthened Dee's other defenses, as there is no witness available to question her testimony about what Charles and she discussed throughout their marriage.

For all of these reasons, the Debtors' defense of laches fails.

## 2. Does Estoppel Apply Here?

The Debtors also assert that estoppel should bar the IRS' claim(s) again them. Estoppel is an equitable doctrine, and it may be invoked in order to avoid injustice in a particular case.[1609] According to the Fifth Circuit, a party seeking to establish estoppel against the United States must prove five things:

> (1) affirmative misconduct by the government, (2) that the government was aware of the relevant facts and (3) intended its act or omission to be acted upon, (4) that the party seeking estoppel had no knowledge of the relevant facts and (5) reasonably relied on the government's conduct and as a result of his reliance, suffered substantial injury.[1610]

The first element, affirmative misconduct, is unique to instances where the party against whom estoppel is sought is the government. The Fifth Circuit has noted that "[c]ourts have been exceedingly reluctant to grant equitable estoppel against the government."[1611] In fact, it appears to be an open question in the Fifth Circuit whether equitable estoppel may *ever* be applied against

---

[1609] *Michigan Exp., Inc. v. U.S.*, 374 F.3d 424, 427 (6th Cir. 2004) (internal quotation marks omitted) (*quoting Fisher v. Peters*, 249 F.3d 433, 444 (6th Cir.2001)).

[1610] *Knapp v. U.S. Dept. of Agriculture*, 796 F.3d 445, 461 (5th Cir. 2015). Since the party seeking to invoke estoppel must establish these things, the burden of proof is on the party asserting estoppel. *See id.*; *see also* FED. R. CIV. P. 8(c)(1) (identifying estoppel as an affirmative defense).

[1611] *Robertson-Dewar v. Holder*, 646 F.3d 226, 229 (5th Cir. 2011) (internal quotation marks omitted) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990) (noting that the Supreme Court has "reserved every finding of estoppel that we have reviewed")).

the government.[1612] What is known is that "the rarity of this remedy means that the burden that a petitioner must meet is very high."[1613]

There are strong policy reasons underlying courts' reluctance to apply equitable estoppel against the government. As the Supreme Court has pointed out:

> When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.[1614]

In terms of when it might be appropriate to apply equitable estoppel against the government, the Fifth Circuit and the Supreme Court agree that "estoppel might be appropriate when the public interest in ensuring that the Government can enforce the law free from estoppel is outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government."[1615] And, although certain courts have applied estoppel

---

[1612] *Knapp*, 796 F.3d at 461 ("Our court has not decided whether equitable estoppel may lie against the government, but even if it does, 'the burden that a petitioner must meet is very high.') (quoting *Robertson-Dewar*, 646 F.3d at 230); *see also Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60 (U.S.,1984) ("We have left the issue open in the past, and do so again today."). *But see Simmons v. U.S.,* 308 F.2d 938, 945 (5th Cir. 1962) ("it is well settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate caution, may be invoked against the United States in cases involving internal revenue taxation.").

[1613] *Id.* at 460; *Robertson-Dewar*, 646 F.3d at 230; *see also U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1351 (5th Cir. 1996). ("the burden on a party seeking to estop the United States is heavy indeed."); *Jones v. Dept. of Health & Human Services*, 843 F.2d 851, 853 (5th Cir. 1988) ("A private individual asserting estoppel against the government has a very heavy burden to bear.").

[1614] *Heckler*, 467 U.S. at 60; *see also Marine Shale Processors*, 81 F.3d at 1349 (noting that applying the doctrine of equitable estoppel against the government can raise a variety of potential separation of powers problems). The tax court made similar observations in a tax context. *Nadler v. C.I.R.*, 64 T.C.M. (CCH) 70, 1992 WL 156029 (1992) ("a person might sustain such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not be allowed to inflict the injury. It is to be emphasized that such situations must necessarily be rare, for the policy in favor of an efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context." (quoting *Schuster v. C.I.R.*, 312 F.2d 311, 317 (9th Cir. 1962)).

[1615] *Fano v. O'Neill*, 806 F.2d 1262, 1265 (5th Cir. 1987) (citation and internal quotation marks omitted) (quoting *Heckler*, 467 U.S. at 60-61). *See also Fredericks v. C.I.R.*, 126 F.3d 433, 443 (3d Cir. 1997); *Walsonavich v. U.S.*, 335 F.2d 96, 101 (3d Cir. 1964) ("While it is true estoppel is to be rarely invoked against the United States …there are circumstances where the Government should be required by our law to stand behind the written agreements of a high public official like the Commissioner…in order to prevent manifest injustice.") (internal citations omitted).

in order to restrain the IRS from collecting tax penalties, the Debtors' situations do not present the sort of extreme case where the application of estoppel against the government is appropriate.

Here, the Debtors have failed in their proof. Specifically, the Debtors have not proven the first element of their estoppel defense against the government—*i.e.*, that the IRS engaged in any affirmative misconduct. The Debtors allege that estoppel should apply here for largely the same reasons that they believe that laches should apply—because of "the IRS's failure to act during its interminable auditing process."[1616] However, the Fifth Circuit has held that "affirmative misconduct is something more than merely negligent conduct."[1617] Indeed, the Fifth Circuit has clearly stated that "to state a cause of action for estoppel against the government, a private party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline"[1618] and that "[a]ffirmative misconduct requires an affirmative misrepresentation or affirmative concealment of a material fact by the government."[1619] Since the IRS' alleged failure to act here is simply its delay in acting and not an affirmative misrepresentation or affirmative concealment, it cannot qualify as affirmative misconduct.

---

[1616] Debtors' Pre-Trial Brief [ECF No. 1015] at ¶ 194.

[1617] *Marine Shale Processors*, 81 F.3d at 1350; *Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Comp. Programs, U.S. Dept. of Labor*, 976 F.2d 934, 938 (5th Cir. 1992); *see Michigan Exp., Inc. v. U.S.*, 374 F.3d 424, 427 (6th Cir. 2004) ("Finding the common approach of sister circuits prudential, we hold that "affirmative misconduct" is more than mere negligence. It is an act by the government that either intentionally or recklessly misleads the claimant. The party asserting estoppel against the government bears the burden of proving an intentional act by an agent of the government and the agent's requisite intent.").

[1618] *Fano*, 806 F.2d at 1265; *see also Peacock v. U.S.*, 597 F.3d 654, 661 (5th Cir. 2010) (where the United States did not realize that a doctor who had allegedly performed an operation negligently was not its employee for over a year, and upon discovering this information filed a successful motion to dismiss plaintiff's claims against it, "[w]hile the length of time it took for this information to come to light was unreasonably long, this is not an indication of willful misconduct on the Government's part. Thus, the district court did not abuse its discretion in rejecting Peacock's argument that the Government should be judicially estopped from claiming that Dr. Warner was an independent contractor.").

[1619] *Robertson-Dewar*, 646 F.3d at 229 (internal marks omitted) (quoting *Linkous v. U.S.*, 142 F.3d 271, 278 (5th Cir.1998)); *Moosa v. I.N.S.*, 171 F.3d 994, 1004 (5th Cir. 1999) (internal marks omitted) (quoting *Linkous*, 142 F.3d at 278)).

The only conduct that the Debtors' arguably point to that could potentially qualify as an affirmative misrepresentation or affirmative concealment by the IRS is that allegedly "the IRS advised that it was going to appoint a 'champion' to address and resolve all offshore-related issues not only with the IOM trusts related to the Wylys but also any other similarly situated taxpayers' trusts."[1620] However, the evidence does not establish that the IRS ever definitively advised the Wylys that it was going to appoint such a champion. Notes taken by a Wyly lawyer during the anonymous meeting where the IRS supposedly made the representation that it would appoint an issue champion also indicate that the IRS' lawyers who were present at the meeting made it clear that they had no authority to settle the taxpayers' claims, especially on an anonymous basis, and that they would have to defer to their client—the IRS.[1621] Even taking a single line of these notes out of the context of multiple other portions of the notes where the IRS' lawyers indicated their lack of authority to settle, this alleged statement hardly amounts to an affirmative misrepresentation or affirmative concealment.[1622] The Debtors have not offered any evidence that IRS personnel or lawyers were lying or concealing facts when they allegedly stated that they were going to appoint an issue champion. It is just as plausible—if not more plausible—to infer that

---

[1620] Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 188.

[1621] Wyly Ex. OB at WYLYSEC01112418 ("All here are with Counsel. We do not have settlement authority. Our Client is the operational side of IRS…"), WYLYSEC01112421 ("Don't usually do this much on anonymous basis. At what point will you say who you are? … Counsel can only do so much as to general resolution. We can give input into how to resolve these cases, more globally for all affected cases."), WYLYSEC01112422 ("Someone has to say it's okay to settle."), WYLYSEC01112423 ("Can't give you any promises"). An IRS Counsel attorney who was at the meeting testified that no IRS client representative attended the meeting. Tr. Trans. 2864:8-10 (Grimm). Furthermore, Lubar testified regarding this meeting that "I think they were prepared to have one more meeting without identifying the clients, but they made it clear that after that, if we really wanted to try to settle this, obviously we had to reveal who the clients were, and that was a big step, of course." Lubar Depo. Trans. 79:18-80:4.

[1622] Wyly Ex. OB at WYLYSEC01112422. Furthermore, one of the IRS Office of the Chief Counsel attorneys to whom this statement is attributed—Grimm—said that "the Office of Chief Counsel never selects an issue champion. It's the IRS that does, and they don't always select an issue champion for issues." Tr. Trans. 2871:7-13 (Grimm). Grimm also specifically testified that "[n]o one in Chief Counsel has ever had the authority to select or appoint an issue champion" and that an issue champion does not have the authority to enter into a settlement agreement directly with a taxpayer. *Id.* at 2873:23-2874:3, 2876:11-14 (Grimm).

the idea of appointing an issue champion to resolve the offshore tax issues of the Wylys and other similarly situated taxpayers simply never panned out, as it is to infer that the IRS was making an affirmative misrepresentation or affirmatively concealing facts when its lawyer allegedly stated that an issue champion would be appointed.

Furthermore, a rebuttal witness called by the IRS who attended the anonymous meeting in August 2003, Danielle Grimm ("**Grimm**"), specifically denied that it was ever represented at that meeting that an issue champion would be appointed.[1623] Given that the Wyly lawyer who took the notes did not testify at trial and that Grimm did, the Court doubts that there was ever anything approaching an explicit promise to appoint an issue champion made by anyone who attended the meeting on behalf of the IRS. Even if there was, neither such an explicit promise nor the mere fact of the IRS' delay amount to the kind of affirmative misconduct necessary to satisfy the first element necessary to estop the government.

Moreover, it is also important to remember that cases on equitable estoppel against the government generally state that the government can only be bound by the acts or statements of its agents that are within the scope of those agents' authority.[1624] In other words—as the Fifth Circuit has explained—"courts have insisted that any estoppel against the government result from a representation of an official acting within the scope of her official authority, thus implying that the concept of apparent authority does not apply in the case of a government estoppel."[1625] Indeed,

---

[1623] Tr. Trans. at 2876:15-18 (Grimm).

[1624] *See, e.g., Walsonavich*, 335 F.2d at 101; *Sanders v. C.I.R.*, 225 F.2d 629, 634 (10th Cir. 1955); *Graff v. C.I.R.*, 74 T.C. 743, 762 (1980) (citing *Wilber Nat. Bank v. U.S.*, 294 U.S. 120, 123 (1935)); *Utah Power & Light Co. v. U.S.*, 243 U.S. 389, 409 (1917); *Goldstein v. U.S.*, 227 F.2d 1, 4 (8th Cir. 1955); *Midwest Motor Express, Inc. v. C.I.R.*, 27 T.C. 167 (1956), *aff'd,* 251 F.2d 405 (8th Cir. 1958), *cert. denied*, 358 U.S. 875 (1958)).

[1625] *Marine Shale Processors*, 81 F.3d at 1349 (citing *U.S. v. Walcott*, 972 F.2d 323, 325 (11th Cir.1992)); *see U.S. v. Thompson*, 749 F.2d 189, 193 (5th Cir. 1984) ("the government cannot be bound by unauthorized or incorrect statements of its agents."); *Bay Sound Transp. Co. v. U.S.*, 410 F.2d 505, 510 (5th Cir. 1969) ("the Government will not be estopped by the unauthorized statements of its agents."); *see also Wright v. Allstate Ins. Co.*, 415 F.3d 384, 388 (5th Cir. 2005) ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays

the Fifth Circuit has specifically noted that "the government cannot be bound by unauthorized or incorrect statements of its agents."[1626] Thus, even if the IRS lawyers who attended the August 2003 meeting did in fact unequivocally state that an issue champion would be appointed to resolve the Wylys' tax issues, the IRS could not be estopped by such a statement if that promise was not within the scope of those IRS lawyers' authority. As Grimm testified, and as the notes from the meeting indicate, no one present at the meeting had the authority to appoint an issue champion.[1627] Thus, even if someone at the meeting had explicitly asserted that the IRS was going to appoint an issue champion, the lack of authority of anyone at the meeting to take that step would prevent the application of estoppel against the IRS here.[1628]

While it is clear that the Debtors have failed to prove that the IRS engaged in the kind of affirmative misconduct that is necessary to estop it here, Debtors have also failed to prove other of the more traditional elements of estoppel. For example, the Debtors have not proven the third

---

[1626] within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." (quoting *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)).

[1626] *Triplett v. Heckler*, 767 F.2d 210, 213 (5th Cir. 1985) (internal quotation marks omitted) (quoting *Thompson*, 749 F.2d at 193; *Hicks v. Harris*, 606 F.2d 65, 69 (5th Cir.1979)).

[1627] Tr. Trans. 2871:7-13 (Grimm). Tr. Trans. 2873:23-2874:3, 2876:11-14 (Grimm). Wyly Ex. OB at WYLYSEC01112418 ("All here are with Counsel. We do not have settlement authority. Our Client is the operational side of IRS…."), WYLYSEC01112421 ("Don't usually do this much on anonymous basis. At what point will you say who you are? … Counsel can only do so much as to general resolution. We can give input into how to resolve these cases, more globally for all affected cases."), WYLYSEC01112422 ("Someone has to say it's okay to settle."), WYLYSEC01112423 ("Can't give you any promises"). An IRS Counsel attorney who was at the meeting testified that no IRS client representative attended the meeting. Tr. Trans. 2564:8-10 (Grimm). Furthermore, Lubar testified regarding this meeting that "I think they were prepared to have one more meeting without identifying the clients, but they made it clear that after that, if we really wanted to try to settle this, obviously we had to reveal who the clients were, and that was a big step, of course." Lubar Depo. Trans. 79:18-80:4.

[1628] *U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1349 (5th Cir. 1996) (citing *Walcott*, 972 F.2d at 325); *see Thompson*, 749 F.2d at 193 ("the government cannot be bound by unauthorized or incorrect statements of its agents."), *Bay Sound Transp. Co.*, 410 F.2d at 510 ("the Government will not be estopped by the unauthorized statements of its agents."); *see also Wright*, 415 F.3d at 388 ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." (quoting *Merrill*, 332 U.S. at 384).

element of estoppel—*i.e.,* that the government intended its act or omission to be acted upon—or the fifth element of estoppel—*i.e.*, that the Debtors reasonably relied on the government's conduct and, as a result of their reliance, suffered substantial injury. The Debtors' attempt to compare the IRS' silence after the August 2003 meeting and the commencement of the audit of Sam's and Charles' 2000 tax returns in February 2004 to the facts of *Fredericks v. C.I.R.*[1629] is unavailing, as explained below.

In *Fredericks*, the taxpayer ("**Fredericks**") filed a form consenting to an unlimited extension of the statute of limitations for the assessment of taxes.[1630] Fredericks was then told by the IRS that this unlimited extension form was never received, and subsequently submitted (at the IRS' request) numerous forms consenting to a series of 1-year extensions of the statute of limitations.[1631] Sometime before the Fredericks' final 1-year extension expired, the IRS discovered that it actually did have the unlimited extension form, but did not inform Fredericks of this fact.[1632] The IRS allowed the final 1-year form to expire, and then proceeded to rely on the unlimited extension form (which as far as the Fredericks knew the IRS had never received) to investigate Fredericks for another 8 years and eventually assess tax deficiencies, interest, and penalties.[1633] It is important to note that the unlimited extension form could have been revoked by Fredericks, had Fredericks in fact known that the IRS had received an unlimited extension form from him.[1634]

---

[1629] 126 F.3d 433 (3d Cir. 1997).

[1630] *Id.* at 435.

[1631] *Id.*

[1632] *Id.*

[1633] *Id.*

[1634] *Id.* at 442.

Moreover, in *Fredricks*, the IRS used silence for the specific purpose of creating a misapprehension of the facts in the mind of the taxpayer.[1635]  As just noted, had Fredricks known that the IRS had received the unlimited extension form, he could have revoked that form at any time and prevented the IRS from continuing its investigation.[1636]  In order to prevent this from happening, the IRS lied by omission to Fredericks so that it could continue its investigation.

Here, however, there is simply no evidence that the IRS intended to cause the Wylys to take any action one way or the other as a result of its lawyers' alleged representations at the August 2003 meeting or due to the time it took to conduct its audit of Sam's and Charles' tax returns.  In the first place, there is no evidence that the IRS knew at the time of the August 2003 meeting with Lubar that it was speaking with a Wyly representative.[1637]  It is difficult to imagine how the IRS could attempt to induce the Wylys to refrain from taking action without knowing that the Wylys were even involved.  Furthermore, Grimm testified that no one at the IRS has ever told a taxpayer's representative to continue on as they were until an issue champion was appointed.[1638]  It is equally implausible to infer that the IRS intended—through auditing the Wylys for an extended period—to induce the Wylys to continue in their use of the offshore system and thereby cause interest and penalty amounts to increase due to the passage of time.  Had the Wylys chosen to unwind the

---

[1635] *Id.* at 441 ("We reject the notion that IRS agents examining Fredericks' file sometime in 1984 could have discovered a Form 872-A that was signed in 1980 and not known that the taxpayer had been misled as to its existence given that the three subsequently executed Forms 872 were also in Fredericks' file. It is exactly this combination of written agreements entered into by the IRS and Fredericks that prompted the IRS to forego soliciting additional one-year extensions.").

[1636] *Id.* at 442 ("Fredericks argues that if he had known the IRS was in possession of the Form 872-A, he would have filed the necessary document (Form 872-T) to terminate the indefinite consent. Relying on the IRS' misrepresentation that the Form 872-A was not in his file, followed by the IRS' repeated requests for Form 872 agreements, Fredericks concluded that it was unnecessary to terminate a consent agreement which the IRS maintained that it never received. He concluded that the subsequent Forms 872 were the only agreements relevant to his 1977 return. On June 30, 1984, when the last one-year Form 872 extension expired, Fredericks believed that the statute of limitations prevented the IRS from assessing any deficiencies.").

[1637] In fact, Grimm testified that she did not discover the identity of the taxpayers being represented at the anonymous meeting until late 2015. Tr. Trans. 2869:9-2870:4 (Grimm).

[1638] *Id.* at 2878:13-17 (Grimm).

offshore system in the face of an IRS audit and repatriate the offshore assets, as French did even without an IRS audit, the IRS—far from being disappointed that its supposed scheme to inflate interest and penalty amounts had been thwarted—doubtless would have been thrilled that the offshore assets were now in the United States and subject to its claims.  Thus, there is no credible evidence that the third element of estoppel—that the government intended its act or omission to be acted upon—is satisfied here.

Similarly, there is no evidence that the fifth element of estoppel—that the Debtors reasonably relied on the government's conduct and as a result of their reliance, suffered substantial injury—is satisfied here. This is because there is no evidence that the Wylys' actions were influenced in any way by the IRS' conduct at the August 2003 meeting or over the course of the audit.  The basic structure of the offshore system has not changed since its inception.  The idea that Sam and Charles—who are/were incredibly sophisticated businessmen and who have/had the advantage of incredibly sophisticated counsel—could reasonably rely on the fact that the IRS indicated it might appoint an issue champion and that the IRS had begun auditing the offshore system to continue on their present course without change defies common sense.  If anything, these facts—which so clearly indicated that the IRS thought there was something amiss with the offshore system—should have caused Sam and Charles to consider unravelling the offshore system or at least start reporting based upon the potential that the reporting was required.  Had Sam and Charles taken this step, much of the sting of the IRS' so-called delay would be removed, as almost ten years' worth of taxes, fraud penalties, and International Penalties would not be in dispute today. As the Supreme Court has pointed out: "the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse[,] and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have

known that its adversary's conduct was misleading."[1639]   The Debtors have not changed their position in any way in reliance on the IRS, and the blame for any increase in interest and penalty amounts due to the passage of time is most properly placed on Sam and Charles, rather than the IRS.[1640]

The Debtors have also not proven the second and fourth elements of estoppel.  The second element of estoppel is that the government was aware of the relevant facts and the fourth element of estoppel is that that the party seeking estoppel had no knowledge of the relevant facts.[1641]  When the *Fredericks* court found that equitable estoppel could be applied against the IRS, it noted that "[t]he IRS was the only party with knowledge of all the facts in this case."[1642]  Here, the situation is almost entirely reversed.  At the August 2003 meeting, the Wylys did not even reveal their identities, let alone all of the relevant facts surrounding their offshore system.[1643]  The details surrounding the offshore system were only revealed to the IRS over the course of the audit process and litigation in this Court, and were at all times known to the Wylys.  The information imbalance present in these Cases—far from presenting a case for estoppel—explains why the IRS' audit process took so long, as there were many facts about the offshore system that were known to the Wylys but unknown to the IRS, and it took a long time for all of these facts to come to light.  Thus, the second and fourth elements of estoppel against the government are not satisfied.

---

[1639] *Heckler*, 467 U.S. at 59.

[1640] *See id.* at 61-62 (1984); *Cf. Linkous*, 142 F.3d at 278 ("Although the Plaintiffs baldly assert that Linkous 'relied on the government's actions in holding Dr. Sims out as its employee to her detriment,' the Plaintiffs fail to indicate what Linkous would have done differently had she known that Dr. Sims was a government contractor.").

[1641] *Knapp*, 796 F.3d at 461.

[1642] *Fredericks,* 126 F.3d at 441.

[1643] Wyly Ex. OB.

Because the Debtors have not satisfied any of the elements necessary for the Court to invoke the rare remedy of estopping the government, the Court rejects the Debtors' estoppel defense.

### 3. Does the Court have Discretion to Alter the Penalty Amounts?

Although the Joint Pre-Trial Order filed by the parties indicates that one of the issues to be resolved is "[w]hether the Bankruptcy Court has discretion regarding the assessment or amounts of any penalty sought by the IRS," this issue does not appear to be discussed in any of the Debtors' briefing or in their proposed findings of fact and conclusions of law.[1644]  Happily, this issue is easily resolved; finally, an easy one.  The Fifth Circuit has specifically held in a tax context that "equity will not bar the imposition of a statutory penalty"[1645] and more generally that "there is no inherent power for the judiciary to mitigate congressionally-mandated penalties."[1646]  As the Supreme Court observed long ago, to hold otherwise would be to violate one of the most basic elements of the principle of Separation of Powers—*i.e.*, that the judiciary must interpret the laws as Congress has written them.[1647]

For these reasons, the Court has no discretion to modify the penalties Congress imposed by statute on the Wylys in these Cases.

### K. Suspension of Interest Under 26 U.S.C. § 6404(g)

The Debtors also argue that they are entitled to mandatory interest suspension for tax years 1998 through 2010[1648] in accordance with 26 U.S.C. § 6404(g), which provides as follows:

---

[1644] Joint Pre-Trial Order [ECF No. 1014] at 5.Y.

[1645] *Valley Ice & Fuel Co., Inc. v. U.S.*, 30 F.3d 635, 640 (5th Cir. 1994) (citing *U.S. v. Coastal Ref. & Mktg, Inc.*, 911 F.2d 1036, 1043 (5th Cir.1990)).

[1646] *Coastal Ref. and Mktg, Inc.*, 911 F.2d at 1043.

[1647] *Clark v. Barnard*, 108 U.S. 436, 457 (1883).

[1648] *See* Debtors' Pre-Trial Brief [ECF No. 1015] ¶ 179 (arguing suspension is mandated beginning with the 1998 tax year), 179 n.170 ("There is no suspension for the 2011 and later tax years because the IRS Proofs of claim were issued before the suspension period would begin.").

(g) Suspension of interest and certain penalties where Secretary fails to contact taxpayer.--

(1) Suspension.--

> (A) In general.--In the case of an individual who files a return of tax imposed by subtitle A for a taxable year on or before the due date for the return (including extensions), if the Secretary does not provide a notice to the taxpayer specifically stating the taxpayer's liability and the basis for the liability before the close of the 36-month period[1649] beginning on the later of--

>> (i) the date on which the return is filed; or

>> (ii) the due date of the return without regard to extensions,

>> the Secretary shall suspend the imposition of any interest, penalty, addition to tax, or additional amount with respect to any failure relating to the return which is computed by reference to the period of time the failure continues to exist and which is properly allocable to the suspension period.

> (B) Separate application.--This paragraph shall be applied separately with respect to each item or adjustment.

> If, after the return for a taxable year is filed, the taxpayer provides to the Secretary 1 or more signed written documents showing that the taxpayer owes an additional amount of tax for the taxable year, clause (i) shall be applied by substituting the date the last of the documents was provided for the date on which the return is filed.

According to the Debtors: (i) both Sam and Dee timely filed their 1998 through 2010 tax returns, as stipulated by the parties,[1650] and (ii) prior to the IRS filing its Proofs of Claim, the Debtors were never provided with the notice referenced in § 6404(g)(1)(A); thus, they are entitled to **mandatory** suspension of interest for the relevant years.

---

[1649] As explained by the Code of Federal Regulations, "[t]he suspension period … begins the day after the close of the 18–month period (36–month period, in the case of notices provided after November 25, 2007…) beginning on the later of the date on which the return is filed or the due date of the return without regard to extensions. The suspension period ends 21 days after the earlier of the date on which the IRS mails the required notice to the taxpayer's last known address, the date on which the required notice is hand-delivered to the taxpayer, or the date on which the IRS receives an amended return or other signed written document showing an increased tax liability."  26 C.F.R. § 301.6404-4(a)(4).

[1650] Joint Stipulations ¶¶ 183-196 (Sam) and 206-217 (Dee).

The IRS disagrees, arguing that mandatory interest suspension under § 6404(g) does not apply (i) because the "return of tax" referenced in § 6404(g)(1)(A) is a Form 5471[1651] that was never filed (so that interest suspension was never triggered), (ii) to any gross misstatement of income,[1652] and/or (iii) to cases involving fraud.[1653]  The IRS further argues that, in any event, this Court lacks jurisdiction to consider interest suspension under § 6404(g) based upon the mandates of 26 U.S.C. § 6404(h), as interpreted by the Supreme Court in *Hinck v. U.S.*[1654] and the tax court in *Corbalis v. C.I.R.*[1655]  Because the latter two arguments are dispositive of this issue, the Court will address the IRS' arguments in reverse order.

### 1. This Court has Jurisdiction to Determine the Amount of Interest Payable by the Debtors, Including Whether the Debtors Are Entitled to Mandatory Interest Suspension under 26 U.S.C. § 6404(g)

Before turning to the IRS' argument that this Court lacks jurisdiction, it is helpful to understand the process involved when a taxpayer believes he is entitled to interest suspension under 26 U.S.C. § 6404(g).  As explained in Revenue Procedure 2005-38:[1656]

> taxpayers may notify the Service that interest was assessed in violation of section 6404(g) by submitting Form 843, "Claim for Refund and Request for Abatement." Taxpayers should write "Section 6404(g) Notification" at the top of the Form 843. The Service will review the Form 843 notification, decide whether to abate interest under section 6404(a), and notify the taxpayer of its decision. Because section 6404(g) is an interest suspension provision, rather than an interest abatement provision, and because section 6404(b) generally bars claims for abatement with respect to income tax, the notification to the taxpayer of the Service's abatement

---

[1651] Form 5471 is titled "Information Return of U.S. Persons with Respect to Certain Foreign Corporations."

[1652] 26 U.S.C. § 6404(g)(2)(D).

[1653] *Id.* § 6404(g)(2)(B).  Mandatory suspension does not apply to gift taxes.  *Id.* § 6404(g)(1)(A) (suspending interest for items relating to "a return of tax imposed by subtitle A"—*i.e.*, income taxes); Debtors' Pre-Trial Brief [ECF No. 1015] at ¶ 179 n.168.

[1654] 550 U.S. 501 (2007).

[1655] 142 T.C. 46 (2014).

[1656] Rev. Proc. 2005-38, 2005 WL 1597834, at *3 (eff. July 11, 2005).

determination does not constitute a final determination letter from which the taxpayer can petition the Tax Court under section 6404(h).[1657]

If the Service does not exercise its authority under section 6404(a) to abate interest alleged to have been assessed in violation of section 6404(g), the taxpayer may pay the disputed interest assessment, file an administrative claim for refund and, if that claim is denied or not acted upon within six months from the date of filing, bring suit for refund under section 7422 and 28 U.S.C. § 1346(a)(1).

Returning to the statute, 26 U.S.C. § 6404(h) provides that:

[t]he Tax Court shall have jurisdiction over any action brought by a taxpayer who meets the requirements referred to in section 7430(c)(4)(A)(ii) [providing net worth limitations] to determine whether the Secretary's failure to abate interest under this section was an abuse of discretion, and may order an abatement, if such action is brought within 180 days after the date of the mailing of the Secretary's final determination not to abate such interest.

The Supreme Court interpreted 26 U.S.C. § 6404(h) in the case of *Hinck v. U.S.*,[1658] where

it held that the tax court has exclusive jurisdiction to review the IRS' refusal to abate interest under

26 U.S.C. § 6404(e)(1):

[Section 6404(h)] is a precisely drawn, detailed statute that, in a single sentence, provides a forum for adjudication, a limited class of potential plaintiffs, a statute of limitations, a standard of review, and authorization for judicial relief. And Congress enacted this provision against a backdrop of decisions uniformly rejecting the possibility of any review for taxpayers wishing to challenge the Secretary's § 6404(e)(1)[1659] determination. Therefore, despite Congress's failure explicitly to define the Tax Court's jurisdiction as exclusive, we think it quite plain that the terms of § 6404(h)—a precisely drawn, detailed statute filling a perceived hole in the

---

[1657] The tax court has refused to give deference to this provision of the Revenue Procedure. *See Corbalis*, 142 T.C. at 54 (holding that § 6404(h) gives the tax court authority to review the both the IRS' decisions not to abate interest under § 6404(e) and suspend interest under § 6404(g)).

[1658] 550 U.S. 501 (2007). The Hincks filed a claim with the IRS contenting that, because of IRS errors and delays, the interest assessed against them for specified periods should be abated under § 6404(e)(1). *Id.* at 505. The IRS denied the request, and the Hincks then filed suit in the U.S. Court of Federal Claims seeking judicial review of the refusal to abate. *Id.* at 505-06. The Federal Claims court granted the government's motion to dismiss for lack of jurisdiction based upon § 6404(h), and the taxpayers appealed. *Id.* The U.S. Court of Appeals for the Federal Circuit affirmed, and Certiorari was granted. *Id.* at 506. The Supreme Court ruled that § 6404(h) granted the tax court exclusive jurisdiction to review the IRS' refusal to abate under § 6404(e)(1). *Id.* at 506.

[1659] "In the case of any assessment of interest on ... any deficiency attributable in whole or in part to any error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial act ... the Secretary may abate the assessment of all or any part of such interest for any period." 26 U.S.C. § 6404(e)(1) (1994 ed.).

law—control all requests for review of § 6404(e)(1) determinations. Those terms include the forum for adjudication.

In *Corbalis v. C.I.R.*,[1660] the tax court was faced with the issue of whether § 6404(h) applied equally to § 6404(e), as addressed in *Hinck*, and § 6404(g). The tax court held that § 6404(h) applies equally to both subsections, finding that: (i) because § 6404 is titled "Abatements," a claim for suspension of interest under § 6404(g) was the logical equivalent of a claim for abatement under § 6404(e), and (ii) there was no reason for nondiscretionary acts under § 6404(g) ("the Secretary shall suspend") to be less susceptible to judicial review than discretionary acts under § 6404(e)(1) ("the Secretary may abate").

According to the IRS, the reasoning in *Hinck* and *Corbalis* applies equally here, leaving the tax court with exclusive jurisdiction to consider the Debtors' claims for interest abatement under § 6404(g). As explained below, this Court disagrees.

Notably, both *Hinck* and *Corbalis* are procedurally distinct from the Cases. There, the taxpayers requested abatement or suspension, and the IRS issued a final determination as required by the statute. It was the request/refusal process that implicated § 6404(h) and judicial review by the tax court to determine whether the IRS abused its discretion. Here, there is nothing in the record showing that (i) the Debtors filed a Form 843, or (ii) that the IRS mailed a "final determination" refusing to suspend interest. Thus, this Court has not been placed into a position where it must review the IRS' decision for an abuse of discretion. Simply put, the statutory prerequisites to § 6404(h) have not been met, and the statute does not apply to the facts of the Cases.[1661]

---

[1660] 142 T.C. 46 (2014).

[1661] The parties have also cited to *In re Gurley*, 335 B.R. 289 (Bankr. W.D. Tenn. 2005), where the bankruptcy court held it lacked jurisdiction under 11 U.S.C. § 505 to review the IRS' decision not to abate interest and penalties because exclusive jurisdiction rested with the tax court under 26 U.S.C. § 6404(h). *Gurley*, however, also involved judicial

Instead, from this Court's perspective, the relevant statute is 11 U.S.C. § 505(a), which states in relevant part:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine--

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title[.]

As explained by the Fifth Circuit in *In re Luongo*,[1662] § 505(a) is a "broad grant of jurisdiction" and "absent the express statutory limitations in § 505(a)(2)(A) and (B), bankruptcy courts have universally recognized their jurisdiction to consider tax issues brought by the debtor, limited only by their discretion to abstain." Thus, based upon the facts of the Cases and the jurisdiction conferred under 11 U.S.C. § 505(a), this Court concludes that it has jurisdiction to determine the proper amount of interest payable by the Debtors, including whether the Debtors are entitled to mandatory interest suspension under 26 U.S.C. § 6404(g).

## 2. Mandatory Suspension of Interest Does Not Apply in Any Case Involving Fraud, Precluding Suspension for Sam in the Relevant Years

As set forth in 26 U.S.C. § 6404(g)(2)(B), interest suspension shall not apply to "any interest, penalty, addition to tax, or additional amount in a case involving fraud." As explained by the Code of Federal Regulations,[1663] suspension:

---

review of the IRS' decision not to abate interest. *Id.* at 394-95. Here, no request for final determination was ever made.

[1662] 259 F.3d at 329-30 (footnotes and internal citations omitted).

[1663] 26 C.F.R. § 301.6404-4(b)(2).

does not apply to any interest, penalty, addition to tax, or additional amount for a year involving a false or fraudulent return. If a taxpayer files a fraudulent return for a particular year, paragraph (a) [suspension] of this section may apply to any other tax year of the taxpayer that does not involve fraud. Fraud affecting a particular item on a return precludes paragraph (a) of this section from applying to any other items on that return.

Although few courts have addressed the meaning of "fraud" in relation to § 6404(g), those addressing it have interpreted the term consistent with its use in other portions of the statute:[1664]

> The dispute underlying this motion is whether Sala's return is a "case involving fraud" under § 6404(g). While no court has addressed fraud under this statute, it is well established that the Government must prove fraud in other parts of the tax code by clear and convincing evidence. *Upshaw's Estate v. C.I.R.*, 416 F.2d 737, 741 (7th Cir. 1969); *Hebrank v. C.I.R.*, 81 T.C. 640, 642, 1983 WL 14880 (1983); *Petzoldt v. C.I.R.*, 92 T.C. 661, 699, 1989 WL 27845 (1989). I conclude that the Government's burden of proof under 6404(g) is also clear and convincing evidence.

Thus, to the extent that this Court has found fraud in existence for any given tax year, interest suspension under § 6404(g) is not available for any item on the return.

With respect to Sam, the Court has found fraud in each of tax years 1998 through 2010, the years for which Sam claims to be entitled to interest suspension under § 6404(g).[1665] Thus, the Court concludes that Sam is not entitled to the suspension of interest under 26 U.S.C. § 6404(g) for any of these tax years.

### 3. Interest Suspension is Moot as to Dee Because She Did Not Commit Tax Fraud and She is Entitled to Innocent Spouse Relief from the Income Tax Underpayments to Which § 6404(g) Interest Suspension Would Apply

Section 6404(g) states that "[i]n the case of an individual who files a return of tax imposed by subtitle A [titled "Income Tax"] … the Secretary shall suspend the imposition of any interest, penalty, addition to tax, or additional amount with respect to any failure relating to the return which

---

[1664] *Sala v. U.S.*, 552 F.Supp.2d 1157, 1162 (D. Colo. 2007); *see also Bolton v. U.S.*, 2014 WL 5786575, at *2 (W.D. Tenn. Oct. 20, 2014) ("In order to prove tax fraud, the Government must show by clear and convincing evidence that Plaintiffs intentionally evaded taxes they knew they owed.").

[1665] *See* pp. 52-155, *supra*.

**MEMORANDUM OPINION**         

is computed by reference to the [relevant time period]." On its face, § 6404(g) applies only to income tax-related interest, penalties, additions to tax, or additional amounts. And, as previously found, Dee did not commit fraud[1666] and, because of the success of her innocent spouse defense, Dee is not liable for subtitle A income tax underpayments alleged by the IRS in its Proof of Claim in any year when interest suspension would apply. Thus, interest suspension is moot as to her.

## V.    CONCLUSION

Although there were numerous other issues to be addressed (as is obvious from our over 400-page opinion), the heart of the Motions largely boiled down to the Court answering two questions. First, did Sam and Charles commit tax fraud?[1667] Second, if they did, what role, if any, did Dee have in that fraud?

And, as noted at the outset of this opinion, the parties' respective views on how these questions should be answered varied widely. The Court acknowledged at the outset of this opinion that its responsibility was to thoughtfully evaluate the evidence and the parties' legal arguments in order to come to its own determination of what happened.

After (i) three weeks of trial, (ii) days spent reading designated portions of deposition testimony or trial testimony from the SEC Action of eleven (11) witnesses who did not offer live testimony here,[1668] (iii) two days of closing arguments, (iv) careful analysis of the parties' pre and post-trial briefs, along with its own legal research, and (v) literally countless hours spent pouring over those one hundred (100) formal written legal opinions, legal memoranda, trust agreements

---

[1666] *See id.*

[1667] While most of the Court's summary of what happened here will only refer to Sam, it applies equally to Charles, whose transactions and activities offshore mirrored Sam's in every relevant detail. That the Court must determine whether Charles committed tax fraud is clear since the IRS is asserting fraud penalties against Dee from 1992 through 2013, and during most of those years Dee and Charles filed joint tax returns.

[1668] Accordingly, when the Court cites to transcripts in this Memorandum Opinion, it is only referring to the designated portions of the testimony.

**MEMORANDUM OPINION**                                                                     **418**

and related formation documents (along with amendments to those documents), annuity agreements and amendments to annuity agreements, internal communications, letters of wishes, communications from trust protectors to trustees, SEC filings, tax returns, formation documents of offshore and domestic entities, real estate documents, and hundreds of other exhibits admitted into evidence at trial, the Court is convinced—by clear and convincing evidence—that Sam and Charles committed tax fraud. That the tax scheme implemented here was "papered" in such a way as to attempt to shield the Wylys from this outcome is equally clear. But the substance of those documents, if carefully examined, reveals the truth.

The Wylys' version of the truth is simply too glib. We received all this tax advice from a myriad of capable professionals, so we cannot have committed tax fraud. Now, we didn't read any of the advice ourselves, or hear most of the advice directly, but what we were told about the advice by French, Robertson, Boucher, and Hennington was enough to make our hearts pure.

But, to accept the Wylys' explanation requires the Court to be satisfied that it is appropriate for extraordinarily wealthy individuals to hire middlemen to do their bidding in order to insulate themselves from wrong-doing so that, when the fraud is ultimately exposed, they have plausible deniability. To put a finer point on it—here is the Court's version of what happened, which it has come to after much thought and analysis.

Sam likes what Tedder has to sell in 1991—a scheme to put hundreds of millions of dollars of wealth offshore in exchange for unsecured private annuities that will only be taxed—at ordinary income rates—when Sam actually receives annuity payments years in the future. So Sam tells his chief outside lawyer, French, who is not a tax lawyer (French is a securities lawyer), to make it happen from a legal perspective, while telling the chief financial officer of the Wyly family office, Robertson, to make it happen from an administrative perspective.

So, it happens—Sam settles the Bulldog IOM Trust with $100 in early 1992 and then enters into six extremely complicated private annuity transactions in February 1992 involving six newly created domestic corporations and six newly created IOM corporations, all of which are owned, directly or indirectly, by Bulldog IOM Trust. Why so many entities to do the private annuity transactions in 1992? Simple – the options Sam assigned to the Nevada corporations are for the stock of public companies on whose boards Sam sat. Sam wanted to keep each corporation under the SEC reporting threshold so that the extent of his offshore system did not become public for fear of jeopardizing the anticipated tax benefits from the offshore system.

No tax is paid when these annuity transactions are undertaken. Why? Because Sam received—although he never read—written legal opinions from the lawyer who promoted the scheme to him that there would be no tax consequences to him at the time of implementation. However, a key predicate for that legal advice was that the Bulldog IOM Trust had to be a valid foreign non-grantor trust. And, while that's certainly what the trust formation documents say, surprisingly, in the one hundred formal written legal opinions Sam received over the years concerning the offshore system (including for the 1992 annuity transactions), he never received a written legal opinion stating that the Bulldog IOM Trust was a valid foreign non-grantor trust— from the promoter or anyone else—until 2003, when he got conflicting advice from two different tax professionals Hennington hired on his behalf—Lubar (in mid-2003) and Pulman (in late October 2003), both pieces of advice relayed to him by Hennington, about the characterization of the Bulldog IOM Trust as a grantor or non-grantor trust—Lubar opining that it was a foreign grantor trust as to Sam and Pulman opining that Sam had a "reportable position" that it was not. Of course, simple math tells us that this advice was received over twenty-one years after the

Bulldog IOM Trust was established and began conducting business offshore tax-free. But we get ahead of ourselves in the Court's version of what happened here.

Returning to the 1990s, Sam's trusted securities lawyer, French, has lingering concerns about the tax consequences flowing from the 1992 annuity transactions, so French goes to London in 1993 to meet with an extremely well-credentialed international tax lawyer, Lubar, to get a second opinion concerning the status of the Bulldog IOM Trust as a foreign non-grantor trust and the tax consequences flowing from Sam's 1992 private annuity transactions. French learns that Lubar has concluded that there is a "significant risk" that the Bulldog IOM Trust (and two other similar trusts established in late 1992) will be characterized as foreign *grantor* trusts to Sam, which dramatically changes the tax consequences flowing from Sam's 1992 private annuity transactions and any other business transaction undertaken through the Bulldog IOM Trust along with Sam's reporting obligations.

Although Sam never directly testified he did not know about the fact that French got this advice from Lubar in 1993, we are asked to conclude that Sam did not know about this advice because the IRS failed to prove that Sam knew about it. In fact, Sam wants us to believe that he did not even know that French went to see Lubar to get a second opinion (again because the IRS failed to prove that he did), although the Court reasonably infers from the trial record that Lubar did not work for free, but instead billed the Wylys for his advice and that the Wyly family office paid those bills.

Given Lubar's conclusions about the offshore structure used in 1992, French asks Lubar about an alternate structure that might work better and Lubar advises that a foreign grantor trust settled by an individual who is a nonresident alien of the United States could be a better device through which to accomplish the Wylys' goals. In February 1994, Lubar issues a memorandum

to French that states his specific advice about such a foreign grantor trust.[1669] However, of critical importance to Lubar's advice were three facts he was told to assume were true by French: (i) the grantor of the trust has known the Wylys "for a considerable period of time," (ii) the trust is being established as "an entirely gratuitous act," and (iii) the grantor has not received and will not receive any "consideration, reimbursement or other benefit" for settling the trust, "directly or indirectly."[1670] Those three factual assumptions are expressly and unequivocally stated in the written memorandum containing Lubar's advice to French, who was acting as the Wylys' agent.

French apparently told Sam about at least part of this advice from Lubar, because an individual residing in the IOM who Sam barely knew, King, settled a trust in February 1994 naming Sam and his family members as beneficiaries.[1671] That trust was the Bessie IOM Trust. Of course, Sam wants to rely on Lubar's advice (as contained in his February 1994 memorandum to French) for the tax consequences flowing from transactions undertaken by Sam through the Bessie IOM Trust—*i.e.*, no tax (or other reporting) is due because King is not subject to tax or reporting in the United States, but Sam denies knowing the predicate facts upon which that favorable advice depended—*i.e.*, that King had known Sam for a considerable period of time, that King established the Bessie IOM Trust as an entirely gratuitous act, and that King would not receive any benefit for settling the trust, which were untrue. And, although the Deed of Settlement for the Bessie IOM Trust states that King settled the trust with $25,000, that too was a lie, which Sam again denies knowing. Once the Bessie IOM Trust was settled, however, Sam starts transacting business through it offshore by undertaking two more complicated private annuity

---

[1669] IRS Ex. 806.

[1670] *Id.* at WYLYSEC00010967 ¶ 1.

[1671] Joint Ex. 4 (The Bessie Trust agreement).

**MEMORANDUM OPINION** 422

transactions in 1996[1672] and a myriad of extremely complicated real estate transactions involving, among other things, homes, an art gallery, and an office for himself and other family members in Texas and Colorado in the late 1990s and early 2000s[1673]—all tax and reporting free.

Then, in 1995, another purported foreign grantor trust—La Fourche IOM Trust—is settled,[1674] again naming Sam and his family as beneficiaries—this time by Cairns, an IOM resident who did not know Sam *at all*[1675] and who signed a letter prepared by French[1676] that falsely states:[1677]

> I wanted to take this opportunity to let you know what a pleasure it has been knowing you over the past years and dealing with you on both business and social matters. I appreciate your many courtesies. As you know, I have established a trust with Wychwood Trust Limited, called The La Fourche Trust, for the benefit of you and your family, and have provided this trust with the sum of $25,000.00. This is to show my gratitude for your loyalty to our mutual ventures and your personal support and friendship. I hope that, wisely managed, this trust fund can grow for many years and inure to the benefit of many generations of your family.

All of this is a lie, except that the La Fourche IOM Trust was established with Wychwood Trust Limited.[1678] When asked why he would sign a letter full of lies, he glibly responded that he was a friend of Ronnie Buchanan.[1679] So, who was Ronnie Buchanan and why would he ask Cairns to

---

[1672] These annuities involved Yurta Faf Limited (IOM) and Audubon Asset Limited (IOM). Joint Stipulations ¶¶ 36 (showing both entities are wholly-owned by Bessie IOM Trust), 131, and 141 (describing annuity transactions).

[1673] *See, e.g.,* Joint Stipulations ¶¶ 292 (financial assets transferred from Yurta Faf Limited (IOM) to Greenbriar Limited (IOM), which Greenbriar Limited (IOM) then loaned to Security Capital and that were ultimately used to fund the Cayman LLCs), 357-359, 364-366 (funds related to the Cottonwood Ventures II property).

[1674] Joint Ex. 17 (La Fourche Trust agreement).

[1675] Collateral Estoppel No. 22; Cairns Depo Tr. 46:22-47:4, 48:5-49:2.

[1676] Collateral Estoppel No. 22; Cairns Depo. Tr. 43:1-14; 46:16-21.

[1677] IRS Ex. 92.

[1678] Ironically, Wychwood Trust Limited was Cairns' trust company, through which he then collected trust management fees from Sam related to the La Fourche IOM Trust he purportedly settled for Sam "as an entirely gratuitous act."

[1679] Cairns Depo. Tr. 47:2-4.

MEMORANDUM OPINION                                                                        423

sign a false letter? Buchanan was the primary Wyly contact at Lorne House Trust, who served as trustee for Bessie IOM Trust as well as other Wyly IOM trusts.[1680]

The Court has no idea why Buchanan would ask a friend of his to lie for the Wylys, wealthy Americans Cairns had never laid eyes on, although it is likely explained by the fact that Buchanan continued to serve as a trustee of the Bessie IOM Trust through 1998,[1681] earning fees for those trust management services. Similarly, the Court has no idea why Cairns would sign a letter full of lies addressed to someone he didn't even know—Sam—although it is likely explained by the fact that shortly after signing it, Cairns' trust management company was hired to serve as trustee for some of the Wylys' IOM trusts, including La Fourche IOM Trust.[1682]

Although the Deed of Settlement for the La Fourche IOM Trust states that Cairns settled the trust with $25,000, that too was a lie. And, once the La Fourche IOM Trust was purportedly "settled," Sam starts transacting business through it offshore including undertaking another complicated private annuity transaction in 1996.

Once again, Sam wants to rely on Lubar's advice as contained in the February 15, 1994 memorandum addressed to French for the tax consequences flowing from transactions undertaken by him through the La Fourche IOM Trust—*i.e.*, no tax (or other reporting) is due because Cairns is not subject to tax or reporting in the United States, but Sam denies knowing the predicate factual assumptions upon which that favorable advice depended—*i.e.*, that Cairns had known Sam for a considerable period of time, that Cairns established the La Fourche IOM Trust as an entirely

---

[1680] Tr. Trans. 2029:3-9 (Sam); Joint Stipulations ¶¶ 66, 67, 102, 103, 114, 116 (showing Lorne House Trust as having served as trustee for various Wyly-related trusts, including the Bulldog IOM Trust, Bessie IOM Trust, Tallulah IOM Trust, Pitkin IOM Trust, Tyler IOM Trust, and Woody International IOM Trust).

[1681] Joint Stipulations ¶ 66 (showing Lorne House Trust serving as trustee of the Bessie IOM Trust from 1994-1998).

[1682] Collateral Estoppel No. 22; Joint Stipulations ¶¶ 66 (showing Cairns' trust company, Wychwood Trust Limited, serving as trustee for Delhi IOM Trust and La Fourche IOM Trust) and 102 (Red Mountain IOM Trust).

gratuitous act, and that Cairns would not benefit from his settling of the trust, all of which were untrue.

Although fourteen more offshore entities wholly owned by Bessie IOM Trust were established at Sam's direction in the IOM or the Cayman Islands in the late 1990s and early 2000s, by 1996 the heart of the Wyly offshore system had been established through deceptive and fraudulent actions. While Sam wants us to believe that he had no idea of these fraudulent and deceptive acts, his silence is deafening, as he never denied knowledge of the "bad acts." Moreover, even assuming Sam did not know about all of the "bad acts" undertaken to benefit him because he hired others to "make it happen," the fact that Sam had the financial wherewithal to attempt to insulate himself from the "bad acts" that occurred here cannot change the proper outcome or, if it does, an appellate court will have to so rule.

From this Court's perspective, Sam cannot have the good without taking the bad. Sam never actually read any of the legal opinions or memoranda he received in connection with the offshore system and that he claims his reliance upon defeats his fraudulent intent or proves his reasonable cause and good faith defense; nor was he required to do so, as he can receive advice indirectly under the tax regulation at issue. Moreover, Sam rarely dealt directly with a lawyer, choosing again to deal with them through middlemen—*i.e.*, French, Robertson, Hennington, and Boucher, which the tax regulation also permits. But it is hard to believe that those middlemen chose to only tell Sam about the favorable aspects of the advice they were given on his behalf by the tax professionals they hired on his behalf. We certainly know Hennington and Boucher didn't, as reflected by what happened in 2003 when Boucher had a chance meeting with Lubar in the Cayman Islands, which led to Hennington's and Boucher's discovery of many disconcerting facts about the Wyly offshore system and the tax consequences of the transactions undertaken through

the offshore system, all of which were reported to Sam, among others, in writing, in detail, immediately.

That Sam may have only heard what he wanted to hear from some of those middlemen—*i.e.*, the favorable aspects of the advice upon which he purports to rely here—is certainly possible, but the Court rejects the argument that he never knew or understood the assumptions upon which that favorable advice depended. In short, Sam cannot rely on the favorable portions of the professional's advice he sought, while feigning ignorance of the factual predicates upon which that advice relied for its accuracy. For example, did Sam not wonder why King and Cairns, one individual he barely knew and the other who he did not know at all, each settled a trust with $25,000 in the IOM and named him and his wife and children as beneficiaries? Perhaps that happens all the time in Sam's life, but if it happened in mine, I would be asking questions—lots of them.

Sam is a sophisticated and well-educated businessman that accumulated great wealth through his business acumen and hard work. And, while he may be an "idea guy" that leaves the day-to-day business details to professional managers and advisors he hires, it is clear that he expects results and is knowledgeable about the results they obtain on his behalf. He does not simply turn his wealth over to others and wish them luck. As relevant here, the Court is convinced Sam knew what was happening in connection with the offshore system and that no money or assets moved within that system without Sam's knowledge and express direction. Let me be clear, that Sam's directions to the offshore trustees was usually done through the formality of Sam making his "wishes" known to them—directly or through the trust protectors he appointed—is of little consequence. The IOM trustees *never* refused to follow Sam's "wishes"—even when that made

little sense—as they understood that their jobs depended upon it. If a Sam "wish" was not granted, they would be removed—plain and simple.

The Court does not believe that the law permits Sam to hide behind others and claim not to have known what was going on around him. This Court has taken its responsibility to sift through the mountains of evidence presented here seriously; it had the benefit of seeing the witnesses and evaluating their credibility and it spent countless hours reviewing the documents introduced into evidence, including those that were created to attempt to shield Sam from the fraud that the Court is convinced—by clear and convincing evidence—occurred here.

At the same time, the Court is equally convinced that Dee is innocent of any wrongdoing. That she did not know the details of what Sam and Charles had done offshore is clear. And, there was nothing that should have "tipped her off" that something was amiss. She did not commit fraud, she did not participate in any fraud, she was not willfully blind, and she is entitled to the benefit of the innocent spouse defense.

Orders reflecting these rulings shall be entered separately in each of the Cases. The Court hereby directs the parties' counsel to confer with each other and attempt to submit agreed forms of orders to the Court consistent with this Memorandum Opinion and allowing the IRS' claims in agreed amounts within thirty days of the entry of this Memorandum Opinion on the Court's docket. If no agreement can be reached, each party shall submit its own proposed form of order on or before the forty-fifth day after entry of this Memorandum Opinion on the Court's docket, along with an explanation of why the other side's proposed order is improper.

### # # END OF MEMORANDUM OPINION # # #

**Collateral Estoppel Findings**

1. Between 1992 and 1996, Sam and Charles Wyly created a number of IOM trusts, each of which owned several subsidiary companies. Michael French, the Wylys' family attorney, Sharyl Robertson, the Chief Financial Officer ("CFO") of the Wyly family office, and Michelle Boucher, the CFO of the Irish Trust Company, a Wyly-related entity in the Cayman Islands, served as protectors of the IOM trusts. French, Robertson, and Boucher conveyed the Wylys' investment recommendations to the trust management companies administering the Wylys' IOM trusts (the "IOM trustees"). All of the IOM trustees' securities transactions were based on the Wylys' recommendations and the IOM trustees never declined to follow a Wyly recommendation.

2. The Wylys served as directors of Michaels Stores, Sterling Software, Sterling Commerce, and Scottish Annuity and Life Holdings, Ltd. ("Scottish Re"). As part of their compensation, the Wylys received stock options and warrants. "Between 1992 and 1999, Sam and Charles Wyly sold or transferred to the [IOM] trusts and companies stock options in Michaels Stores, Sterling Software and Sterling Commerce" in exchange for private annuities while simultaneously disclaiming beneficial ownership over the securities in public filings with the SEC. Between 1995 and 2005, the IOM trusts and companies exercised these options and warrants, separately acquired options and stock in all four companies, and sold the shares, without filing disclosures.

3. The jury found that the Wylys were beneficial owners of the Issuer securities transferred to, held, and sold by the IOM trusts because the Wylys, directly or indirectly, had or shared voting and/or investment power over these securities. Thus, the jury concluded that the Wylys failed to accurately disclose the extent of their beneficial ownership in the Issuer securities under sections 13(d) and 16(a) of the Securities Exchange Act (the "Exchange Act"). The jury also found that the Wylys caused the Issuers to violate section 14(a) of the Exchange Act, because the Wylys misrepresented the extent of their beneficial ownership to the Issuers in their Director and Officer ("D&O") questionnaires, which were incorporated by the Issuers in proxy statements.

4. In addition to these disclosure violations, the Wylys were found liable for securities fraud in violation of section 10(b) of the Exchange Act and section 17(a) of the Securities Act of 1933 (the "Securities Act"), and for aiding and abetting the Issuers' and the IOM trusts' securities law violations.

5. In early to mid-1991, Sam Wyly asked Robertson to attend a seminar held by lawyer and trust promoter David Tedder on the use of foreign trusts as a method of asset protection and tax deferral. Shortly thereafter, the Wylys, Robertson, and French attended another Tedder seminar in New Orleans. Tedder, French, and the Wylys then had a private meeting at Sam Wyly's house in Malibu, California. At that meeting, Tedder "talked about establishing trusts that would provide tax deferral, and how the Wylys could transfer assets to those trusts and get tax deferral on the growth of those assets."

6. Specifically, Tedder recommended transferring the Wylys' stock options in Sterling Software and Michaels Stores to a foreign trust in exchange for a private annuity "in a tax-free kind of transaction." Under Tedder's plan, it was "expressly intended that [the Wylys]… irrevocably

**Exhibit A**

**Collateral Estoppel Findings**

surrender the enjoyment, control, ownership, and all economic benefits attributable to the ownership of the [options] which are sold in exchange for the private annuity."

7. The Wylys pursued the offshore program primarily for its tax advantages.

8. However, because Tedder suggested transferring stock options in publicly traded companies – Sterling Software and Michaels Stores – any such transaction would implicate the securities laws. French testified that he raised concerns about whether the Wylys would continue to have filing obligations as directors of Sterling Software and Michaels Stores, even after the transfers. Tedder responded that making SEC filings could threaten the Wylys' tax benefits, because "disclosure of the offshore trusts in SEC filings may lead the IRS to discover and investigate the tax issue, and . . . the IRS might use the Wylys' SEC filings against them if the tax issue was ever litigated."

9. But Sam Wyly corroborated French's account by testifying that Tedder told him that SEC filings "could trigger tax problems if you had these things on file and [were] reporting the trust shares on [Schedule] 13Ds." Further, it would be logical to draw an inference that the Wylys would have been concerned about taking inconsistent positions in their SEC and IRS filings when millions of dollars of tax savings were at stake.

10. The jury found that the Wylys *always* had beneficial ownership over the options, warrants, and securities held by the IOM trusts.

11. Thus, the Wylys were obligated to disclose, on the filings required by sections 13 and 16, any time they *or* the trusts transacted in those securities. Because beneficial ownership under the securities laws turns on having voting and/or investment power, truthful SEC filings would have forced the Wylys to admit having some element of control over the securities held by the trusts. To the Wylys, this would mean conceding some element of control over the trustees. But the Wylys believed – rightly or wrongly – that it was critical to conceal their control of the trustees in order to maintain the tax-free status of the trusts, including income from transactions in the Issuer securities.

12. Footnote 91. (Sam Wyly) ("We took steps to avoid control, and those are steps to create the appearance of avoiding control. It's reality and it's appearance. You want the appearance to match the reality.") *Accord* PX 890 (11/3/00 email from Robertson to Evan Wyly) ("Remember that it is critical from a U.S. tax standpoint that there is no appearance that the Wyly's [sic] are in control of the trusts or the protectors.").

13. Because the Wylys made public filings showing the transfer of options to foreign trusts, and at other times publicized their relationship to the foreign trusts, the Wylys also took affirmative steps to minimize the trusts' SEC filings to conceal the ultimate exercise and sale of those options. For example, the Wyly family office tracked the percentage of ownership each trust management company had in a particular Issuer to avoid triggering mandatory SEC reporting. Thus, as Sam Wyly testified, not making SEC filings was logically "something that consistently went on" throughout the duration of the offshore system.

**Exhibit A**

**Collateral Estoppel Findings**

14. Even when it would have been otherwise helpful to assert beneficial ownership over the stock held by the foreign trusts, such as during Sam Wyly's proxy battle for control of Computer Associates (the acquirer of Sterling Software) in February 2002, the Wylys chose not to do it in fear of inconsistent tax positions. From these facts, it is logical to draw the inference that making misleading statements in SEC filings, or not making SEC filings at all, was part of the Wylys' plan to maintain the appearance of separation and independence from the foreign trusts.

15. Footnote 95. *See* PX 1101 (2/26/02 email from Keeley Hennington, tax director and, starting in 2000, CFO of the Wyly family office, to Boucher, attaching Hennington's note to Sam Wyly) ("The trusts are record owners of the shares on C[omputer] A[ssociates]' books. If it is represented [that] there are $2.9 shares [sic], I think it is likely CA may say we show the Wyly's [sic] only own 1.5M options and again the difference would need to be explained… Our friendly IRS agent is still looming around and although he has verbally agreed not to look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.").

16. The Wylys ultimately hired Tedder to help establish the first group of offshore trusts and subsidiary companies in 1992 (together with the Plaquemines Trust, the "Bulldog Trusts"). These trusts were settled by Sam or Charles Wyly and had beneficiaries including the Wylys' wives and children and several charitable organizations. The trust deeds permitted the protectors to "add[] or substitut[e]" a charitable organization "by notice in writing to the trustees." These trusts were explicitly set up as "non-grantor trust[s] rather than [] grantor trust[s] under Section 671-678 of the Code." Under the terms of the trusts, no United States beneficiary could receive a distribution from the trust until two years after the settlor's death.

17. Footnote 97. (Robertson). The 1992 Trusts relevant to the remedies phase are: 1) the Bulldog Non-Grantor Trust; 2) Lake Providence International Trust; 3) the Delhi International Trust; 4) the Pitkin Non-Grantor Trust; and 5) the Castle Creek International Trust. In 1995, the Bulldog Trust settled the Plaquemines Trust, which had a class of beneficiaries including Sam Wyly's children. These trusts are referred to as the "Bulldog Trusts" for purposes of this Opinion and Order. The terminology was coined by defendants' expert, Professor Robert Danforth, and has been adopted by the parties in their briefing and argument.

18. In 1993, French approached the law firm of Morgan, Lewis & Brockius ("Morgan Lewis") to discuss whether the Bulldog Trust was a "grantor or non-grantor trust." Morgan Lewis prepared a memorandum concluding 1) that there was a "significant risk that the [Bulldog] Trust will be characterized as a grantor trust under § 679 [because] income is being currently accumulated for the benefit of U.S. beneficiaries," and 2) that "[i]t is also likely that the Trustee's power to add or substitute other foreign charities (within the class [of beneficiaries]) causes the Trust to be characterized as a grantor trust under §674. Charles Lubar, the partner at Morgan Lewis retained to work on this matter, gave the memorandum to French and spoke with him about its conclusions.

19. The following year, French asked Lubar to advise the Wylys about whether a trust settled by "a foreign person who had done business with Sam Wyly" would be treated as a grantor trust.

**Exhibit A**

**Collateral Estoppel Findings**

Lubar advised that "as long as there wasn't an indirect transfer of assets by the U.S. person and the foreign person put the money up, and there were certain powers in the trust, then it would be a foreign grantor trust, and the distributions then would not be taxable." For the purposes of rendering his opinion, Lubar assumed that the foreign grantor would be the "sole transferor of property to the trust[]," unless the taxpayers transferred funds "on an 'arm's length' basis."

20. In 1994 and 1995, two foreign citizens established several trusts for the benefit of the Wylys and their families (collectively, the "Bessie Trusts"). The Bessie Trust and the Tyler Trust were purportedly settled by Keith King, an individual associated with Ronald Buchanan, an IOM trustee selected by the Wylys, with initial contributions of $25,000 each. However, no such contribution was ever made. The trusts "were settled with a factual dollar bill . . . plus an indebtedness of $24,999 each on the part of Keith King as settlor." That indebtedness was immediately forgiven.

21. Footnote 107. The 1994/1995 trusts relevant to this Opinion and Order are: 1) the Bessie Trust; 2) the La Fourche Trust; 3) the Red Mountain Trust; and 4) the Tyler Trust. These trusts will be referred to as the "Bessie Trusts," as per Professor Danforth's grouping.

22. The La Fourche Trust and the Red Mountain Trusts were purportedly settled by Shaun Cairns, another individual associated with Buchanan, also with initial contributions of $25,000 each. Cairns testified that French prepared letters stating that Cairns was establishing the trusts "to show [his] gratitude for [the Wylys'] loyalty to our mutual ventures and [their] personal support and friendship," and asked Cairns to sign them. In truth, Cairns had never met nor dealt with the Wylys before establishing the trusts, and had provided only $100 towards the trusts. Shortly after these trusts were settled, Cairns's trust management company was hired to serve as trustee for some of the Wylys' IOM trusts.

23. These transactions were shams intended to circumvent the grantor trust rules. French and Buchanan, acting as the Wylys' agents, recruited King and Cairns to create a falsified record of a gratuitous foreign grantor trust. The trust documents are admittedly false – King and Cairns never contributed $25,000 towards the initial settlement.

24. There were no gratuitous transfers here. *First*, I am doubtful that King provided even the factual $1 towards the trusts. In a November 26, 1995 fax to French, Buchanan writes that "Keith never produced the money." Buchanan explains that the King-related trusts "were settled with a factual dollar bill" only so that "there [was] no question of the[] [trusts] being voidable by reason of the absence of assets" pending the Wylys' transfer of options. Even if King had contributed the $1, the premise that an unreimbursed dollar bill is sufficient to establish a tax-free foreign grantor trust cannot be taken seriously. *Second*, Cairns's transfer of $100 cannot be considered gratuitous because shortly after settling these trusts, he received lucrative work from the Wylys as trustee. Finally, in light of the falsified trust deeds and supporting documentation surrounding these trusts, it would be unjust to consider anyone but the Wylys to be the true grantors of these trusts.

**Exhibit A**

**Collateral Estoppel Findings**

25. The trusts were administered by professional asset management companies located on the Isle of Man. The trustees were selected by the Wylys or the protectors. The protectors, all of whom were Wyly agents, had the authority to remove and replace trustees. As mentioned earlier, the protectors also transmitted the Wylys' investment recommendations to the trustees. Defendants have presented no evidence of an investment made by the IOM trusts that did not originate with the Wylys' recommendations. Nor have defendants presented evidence of an IOM trustee rejecting a Wyly recommendation.

26. The SEC, on the other hand, has identified several transactions where the Wylys bypassed the trustees altogether. In October 2001, Keeley Hennington, who replaced Robertson as the head of the Wyly family office in June 2000, called Lehman Brothers and directed it to sell 100,000 shares of Michaels Stores held by Quayle Limited, an IOM company, at Charles Wyly's request. Neither Wyly nor Hennington contacted the trustees before placing the sell order. On another occasion in June 2002, Sam Wyly contacted a broker directly and instructed him to "hold on" to 100,000 shares of TYCO stock, overriding a previous order from the IOM trustee, based on an earlier Wyly recommendation, to sell all TYCO shares.

27. The SEC also presented evidence of transactions that no independent trustee would reasonably initiate.

28. For example, on September 26, 1998, Boucher contacted an IOM trust to recommend a ten million dollar investment in the Edinburgh Fund. On September 28, Boucher told the trustee for the first time that the Edinburgh Fund was a fund run by Sam Wyly's son-in-law and that it did not have a prospectus or subscription documents. Despite knowing nothing about the investment beyond its connection to the Wyly family, the trustee agreed to "forward the necessary instructions to Lehman Brothers." One day later, Boucher followed up with the trustee "to ask for an update on progress with regard to making funds available for the proposed investment in the Edinburgh Fund…. [Boucher] mentioned that the Fund had already commenced trading and that the funds would therefore be required urgently."

29. Some of the Wylys' recommendations had nothing to do with securities at all. Among the many personal purchases, loans, and investments the Wylys directed the IOM trustees to make, were businesses for Wyly children and family members, real estate, artwork, jewelry, collectibles, and furniture.

30. "In April 1992, Sam and Charles Wyly transferred 960,000 Michaels Stores options and 1,983,588 Sterling Software options to ten Nevada companies indirectly owned by two Isle of Man trusts in exchange for deferred private annuity agreements." In 1995 and 1996, the Wylys transferred 1,350,000 Michaels Stores options, 2,650,000 Sterling Software options, and 4,600,000 Sterling Commerce options to the IOM trusts, also in exchange for annuities.

31. In June 1997, French approached Morgan Lewis to discuss the tax consequences of the private annuity transaction. Lubar remembers that he was "really concerned about the transaction" and "worried that the transfer of the options to a company that didn't have any other assets in exchange for a private annuity raised a question about whether that was an

**Exhibit A**

**Collateral Estoppel Findings**

arms-length transfer." However, Lubar acknowledged that "other tax lawyers would look at a transfer of a private annuity in different ways."

32. After studying the issue, Lubar advised French that the transfers created potential problems under sections 674 and 679, amongst other provisions.

33. Ordinarily, a company granting stock options as compensation issues a Form 1099 or W2 reporting income to the director or officer and takes a corresponding deduction for the compensation expense when the option is exercised. When the Wylys transferred their stock options to the IOM trusts in exchange for private annuities, the Issuers of the options – that is, Sterling Software and Michaels Stores – had to decide whether that transfer was a taxable event that required issuing a Form 1099 or W2 to report income to the Wylys. To address these concerns, Tedder sent an opinion letter to both companies explaining that the Wylys should not have to recognize income because the annuity did not require payment until a date certain in the future.

34. Jeannette Meier, general counsel of Sterling Software, asked French's law firm, Jackson Walker, to give a "back up" tax opinion to support Tedder's letter. French provided a draft opinion, but never finalized the letter. Nevertheless, based on French and Tedder's representations, Sterling Software decided not to issue a Form 1099 to the Wylys and declined to take a corresponding deduction for compensation expense. But Meier testified that the company was "concerned about . . . whether, not having gotten a backup opinion from Jackson Walker, [it] was on good ground not to have to put [the compensation expense] in the [Section] 10-Q [financial statements.]" The value of the options was "a big number" and "would have affected the accuracy of the public filings" if Sterling Software had decided to report it as compensation.

35. Michaels Stores treated the transfer of options identically. In addition, French instructed Mark Beasley, general counsel for Michaels Stores, not to issue Form 1099s for any of the foreign trust entities upon those companies' exercise of stock options.

36. In March 2000, SBC Communications Inc. ("SBC") acquired Sterling Commerce, which had been spun off from Sterling Software in 1995. "As part of [the] acquisition . . . all outstanding options to purchase shares of Sterling [Commerce] were canceled. All option holders received cash . . . based on the excess of the stock purchase price over the option price." On January 11, 2001, SBC notified the Wylys that it was planning "to issue a Form 1099 to [the respective Wylys]/[their] trusts showing taxable income" in the total amount of $73,912,500. The Wylys, through Boucher and Robertson, reached out to Rodney Owens, a partner at the Meadows Owens law firm in Dallas, to write a memo to SBC explaining why a 1099 should not be issued. On January 26, 2001, Owens wrote in a letter to SBC that "it is not appropriate for SBC to file a 1099 or any other reporting papers regarding this transaction because [the IOM entity] is a foreign corporation, and the income from the purchase of the stock is not subject to U.S. taxation." After receiving the letter, SBC sought additional information about the private annuity transaction, including whether the transfer of options had been recognized as a taxable event at the time of the original transaction, and if not, what the schedule of

**Collateral Estoppel Findings**

annuity payments was. Although French's relationship with the Wylys had broken down by this point, he agreed to write a memorandum supporting the tax treatment of the annuities.

37. All in all, between 1992 and 2004, the Issuers never reported income related to the exercise of options or warrants transferred to the foreign trusts. Their decision not to report was a result of the Wylys' deceptive behavior and affirmative misrepresentations. Because the Wylys disclaimed beneficial ownership of the options upon transfer, convinced the Issuers that the private annuity transactions were not taxable events, and did not disclose their beneficial ownership of the securities held by the IOM trusts in their Director and Officer questionnaires, the Issuers did not attribute taxable income to the Wylys.

38. The annuity payments for the original option transfers had been due to commence in the late 1990s, but that period was extended to 2004. In early 2003, Boucher and Hennington approached Lubar to discuss potential issues arising from the upcoming annuity payments. Lubar told Hennington and Boucher that, as he explained to French years before, he believed the trusts were grantor trusts under either sections 674 or 679 and should have been taxable to the Wylys all along. Further, Lubar believed the IRS would challenge the private annuity transactions. Lubar and other Morgan Lewis attorneys suggested approaching the IRS "on a no-name basis" to see "where the negotiations with the IRS might lead" in the event the Wylys wanted to pursue a voluntary disclosure.

39. Boucher and Hennington summarized Lubar's advice in a July 2, 2003 memorandum to Sam Wyly, Charles Wyly, Evan Wyly, and Donald Miller. The memorandum addressed several concerns about the "logistical problems of paying the annuities." Hennington and Boucher were concerned that "[i]t is almost certain given the large amount of these payments that the reporting will result in an IRS audit. [Further], [t]here is also a high likelihood that as a result of this audit the entire structure of the foreign system will be audited by the IRS."

40. Additionally, Hennington and Boucher reported that [t]he annuity payments will bankrupt several of the IOM companies, which could bring the validity of the annuity transaction into question. [And] [a]fter a few years of payments, [other] companies will be left with non-liquid assets, which will result in payments being made in kind…[which] may also call into question the validity of the transaction and the 'arms length' nature of the transaction.

41. On August 13, 2003, several attorneys representing the Wyly family met with Internal Revenue Service ("IRS") officials. Lubar gave the IRS some details about the trusts, and admitted that there was a "serious risk [that] they were grantor trusts from the beginning." Lubar also explained the private annuity transactions, and told the IRS, after questioning, that the options were for stock in publicly traded corporations, that no income was reported upon exercise, and that the corporations claimed no deductions.

42. According to attorney notes memorializing the meeting, an IRS officer asked if the taxpayers were "significant enough shareholders that their holdings would be listed on SEC filings" and asked if the "SEC filings show[ed] beneficial interest in shares." Lubar said that he believed they were significant enough shareholders for "at least [the] first two [companies]" but did not know if the filings showed beneficial ownership. Hennington and Boucher reported to the Wylys that the IRS was primarily interested in the structure of the annuity,

**Exhibit A**

## Collateral Estoppel Findings

but added that one of the IRS representatives "seemed very interested in any SEC reporting of the initial transactions [even though] [t]his seems out of their area of expertise or control."

43.  The Wylys did not proceed with Morgan Lewis on a voluntary disclosure path. But by February 2, 2004, Charles Wyly received a notice of audit. Shortly thereafter, Sam Wyly asked Hennington, Boucher, and Charles Pulman, another attorney at Meadows Owens, "to explore what happens [for purposes of taxation] if he is not a U.S. citizen." The firm concluded that an expatriate U.S. citizen who has a net worth of more than $622,000 "will be treated as having a principal purpose of tax avoidance" and will continue to be taxed pursuant to several special provisions.

44.  From May to August 2004, the IRS sent a number of information document requests ("IDRs") to both Sam and Charles Wyly. In at least one of the IDRs, the IRS requested additional information about a transfer of Michaels Stores options to an independent trust, such as "the identity of all original and current beneficiaries, including their nationality, place of residence, and current mailing address" as well as the identity of "the grantor(s) of the trust(s)." At an October 21, 2004 meeting between attorneys representing the Wyly family and the IRS, an IRS agent said that the IDRs regarding the options transfers were based on information "pulled from SEC filings." At that meeting, the IRS agents also asked questions about the trusts, including about why Keith King set up the Tyler Trust.

45.  The SEC has not shown that the Wylys' or Issuers' SEC filings *launched* the IRS audit of the Wylys and the offshore system, or even that accurate filings would have been likely to trigger an earlier examination. However, it is evident from the IDRs and from the October 2004 meeting, that once the IRS investigation was under way, agents and investigators were consulting SEC filings as part of their fact finding process and identified numerous issues and misstatements.

46.  The IOM trusts sold 1.8 million shares of unregistered stock between June and December 1997, at prices ranging from approximately $21 per share in the summer to approximately $35 per share in the fall. The trusts sold 200,000 of these shares less than one year after the December 1996 private placement, in violation of the terms of the purchase agreement. In 1998, the IOM trusts sold a small number of shares at approximately $32 per share. In 2000 and 2001, the IOM trusts sold approximately 1.2 million shares at prices ranging from approximately $40 per share in September 2000 to approximately $55 per share in November 2001.

47.  Defendants must concede that if I conclude that the Wylys were the real grantors of the Bessie Trusts, then the profits earned on the sale of Issuer securities by those trusts are taxable to the Wylys, not the purported foreign grantors. Because I conclude that the purported foreign grantors made no gratuitous contributions, "the trusts at issue [are] clearly grantor trusts taxable to the domestic grantors."

48.  Section 674(a) provides that: "[t]he grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom *is subject to a power of disposition*, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party." Quoting a prominent tax treatise,

defendants concede that the "power of disposition" includes "powers to 'effect such major changes in the enjoyment of a trust's income and corpus as the addition and elimination of beneficiaries' as well as 'minor and customary power[s]' over income and corpus distribution." Because a non-beneficiary trustee is considered a non-adverse party under the statute, "[s]ection 674(a) captures virtually every trust, including the [IOM] trusts." Thus, defendants concede that "[u]ltimate liability under [s]ection 674[] . . . turns on whether any of the statutory exceptions apply."

49.  According to defendants, the Bulldog Trusts are not grantor trusts because they fall under the section 674(c) exemption. Under that exemption, section 674(a) does not apply to "certain powers that are exercisable by independent trustees." According to the corresponding IRS regulation, which summarizes the statute, [t]he powers to which section 674(c) apply are powers (a) to distribute, apportion, or accumulate income to or for a beneficiary or beneficiaries, or to, for, or within a class of beneficiaries, or (b) to pay out corpus to or for a beneficiary or beneficiaries or to or for a class of beneficiaries (whether or not income beneficiaries). In order for such a power to fall within the exception of section 674(c) it must be exercisable solely (without the approval or consent of any other person) by a trustee or trustees none of whom is the grantor and no more than half of whom are related or subordinate parties who are subservient to the wishes of the grantor.

50.  To determine whether the Bulldog Trusts are covered by this exception, it is necessary to answer three questions: 1) Did the IOM trustees have the power to "distribute, apportion, or accumulate income" or "pay out corpus" to or for a beneficiary or beneficiaries?; 2) Were the IOM trustees a) the grantor, or b) a "related or subordinate" party as defined by the statute?; and 3) Were the trustees able to "exercis[e] [those powers] solely (without the approval or consent of any other person)"?

51.  The first two questions are straightforward. *First*, the IOM trustees certainly had the power, as set out in the trust deeds, to "distribute, apportion, or accumulate income" or "pay out corpus" to or for a beneficiary. *Second*, the IOM trustees were neither the grantor, nor one of the individuals on the exclusive list of "related or subordinate" parties defined by the statute. The only remaining question is whether the IOM trustees were able to exercise those powers "solely" or "without the approval or consent of any other person."

52.  The Wylys, through the trust protectors who were all loyal Wyly agents, retained the ability to terminate and replace trustees. The Wylys expected that the trustees would execute their every order, and that is exactly what the trustees did.

53.  The evidence amply shows that the IOM trustees followed every Wyly recommendation, whether it pertained to transactions in the Issuer securities, making unsecured loans to Wyly enterprises, or purchases of real estate, artwork, collectibles, and other personal items for the Wylys and their children. The trustees made no meaningful decisions about the trust income or corpus other than at the behest of the Wylys. On certain occasions, such as the establishment of the Bessie Trusts, the IOM trustees actively participated in fraudulent activity along with the Wylys. The Wylys freely directed the distribution of trust assets for personal purchases and personal use. Because the Wylys and their family members were

## Collateral Estoppel Findings

beneficiaries, the IOM trustees were thus "distributing" income *for* a beneficiary at the direction of the grantors – the Wylys.

54. Footnote 218. Because I conclude that both the Bulldog and Bessie Trusts were grantor trusts under Section 674, I need not reach the issue of whether they were also grantor trusts under Section 679.

55. The Wylys engaged in a thirteen year fraud, creating seventeen trusts and forty subsidiary companies, employing numerous IOM trustees, a veritable "army of lawyers," hiring an offshore accountant to hold records outside the United States, and delegating several domestic employees to handle the administration of the trusts.

56. Reasonable and savvy businessmen do not engage in such activity unless it is profitable. Of course it was profitable – by transferring property, including valuable options and warrants, to the trusts, exercising the options and trading in secret, and using the proceed to reinvest in other ventures, the Wylys were able to accumulate tremendous tax-free wealth.

57. The jury found that the Wylys were beneficial owners of all of the Issuer securities – from the time the options were transferred to the trusts to the time the trusts exercised the options or otherwise acquired stock to the time they were sold. The jury also found that the Wylys' pervasive failure to disclose beneficial ownership constituted securities fraud. There is no evidence in the record that the purpose of this fraud was to manipulate or distort the market.

58. There *is* ample evidence, however, that the driving purpose of the securities fraud was to conceal the Wylys' relationship to the IOM trusts and preserve the preferential tax treatment on secret offshore profits for as long as possible.

59. *First,* defendants' motivation to preserve tax benefits was important to their decision to misrepresent their beneficial ownership. Admitting beneficial ownership would have forced defendants to take conflicting positions with two separate government agencies. Even if admission of "beneficial ownership" on a schedule 13D would not immediately reveal a fact that would establish control of an offshore trust, it would at least be facially inconsistent with a tax reporting position that did not include the profits from trades made by that offshore trust. It would have been reasonable, and in fact, prudent, for the Wylys to be concerned about taking conflicting positions in public SEC filings and on their tax returns because that SEC filing could constitute an admission for purposes of future tax litigation.

60. Given the Wylys' high profile background, tremendous wealth, and history of litigation with the IRS, the possibility of an IRS audit was not remote. In fact, it was highly likely. Thus, even if the Wylys had no reason to believe that SEC filings could *trigger* an audit, they certainly had reason to believe and fear that the IRS would consult all public filings in the event of an audit.

**Exhibit A**

**Collateral Estoppel Findings**

61. *Second,* the securities fraud was intimately connected to protecting the tax benefits in other ways. The Wylys took numerous steps to prevent the Issuers from issuing Forms 1099 to report income to either the Wylys in an individual capacity or to the offshore entities. The Issuers did not report income to the Wylys after the 1992 private annuity transaction because of the Wylys' misrepresentations about disclaiming beneficial ownership over the options, and French and Tedders' misrepresentations about the economic substance of that transaction. In 2001, nearly ten years later, the Wylys continued the fraud by convincing SBC not to issue 1099s based on the same misrepresentations. None of the four Issuers reported income to the Wylys in connection with the options granted as compensation and transferred to the trusts, even though the Wylys certainly enjoyed the benefit of those options once they were exercised and the stock was sold.

62. The Wylys engaged in securities fraud to conceal their relationship to and control of the IOM trusts in order to maintain the secrecy of the offshore system and preserve their tax benefits. The unlawful gains causally related to the securities violations found by the jury, is an amount equivalent to the taxes avoided on the profits the Wylys realized on the sale of Issuer securities.

63. The Wylys' securities violations helped them establish the offshore system, conceal their trading profits, and use those trading profits to invest in other ventures and amass tremendous untaxed wealth.

64. Sam Wyly engaged in a large securities fraud spanning thirteen years, involving multiple trusts and entities and hundreds, if not thousands, of misstatements, all while being subject to a previous injunction entered in 1979.

**Exhibit A**

Trusts and Subsidiary Companies – Sam Wyly Related



Exhibit B

**Exhibit B**

# Trust Settlor, Trustee, Protector & Beneficiaries – Sam Wyly Related



**Bulldog Non-Grantor Trust** 3/11/1992

Settlor: **Sam Wyly**

Trustee:* First Names Group IOM

Protectors:
Mike French (1992-2001)
Shari Robertson (1992-2004)
Michelle Boucher (2001-present)

Current Beneficiaries:
- British Red Cross
- Community Chest of Hong Kong

Contingent Beneficiary:
Two years follow death of Sam Wyly
- Children & Issue of Sam Wyly

---

**Lake Providence International Trust** 12/4/1992

Settlor: **Sam Wyly**

Trustee:* First Names Group IOM

Protectors:
Mike French (1992-2001)
Shari Robertson (1992-2004)
Michelle Boucher (2001-present)

Current Beneficiaries:
- British Red Cross
- Community Chest of Hong Kong

Contingent Beneficiary:
Two years follow death of Sam Wyly
- Children & Issue of Sam Wyly

---

**Delhi International Trust** 12/14/1992

Settlor: **Sam Wyly**

Trustee:* First Names Group IOM

Protectors:
Mike French (1992-2001)
Shari Robertson (1992-2004)
Michelle Boucher (2001-present)

Current Beneficiaries:
- British Red Cross
- Community Chest of Hong Kong

Contingent Beneficiary:
Two years follow death of Sam Wyly
- Children & Issue of Sam Wyly

---

**Bessie Trust** 2/2/1994

Settlor: **Keith King** (c)

Trustee:* First Names Group IOM

Protectors:
Mike French (1992-2001)
Shari Robertson (1992-2004)
Michelle Boucher (2001-present)

Current Beneficiaries:
- Keith King
- Sam Wyly
- Wife of Sam Wyly
- Children & Issue of Sam Wyly
- Other US Charities (a)

---

**LaFourche Trust** 7/18/1995

Settlor: **Shaun Cairns** (c)

Trustee:* InterContinental Management Limited

Protectors:
Mike French (1992-2001)
Shari Robertson (1992-2004)
Michelle Boucher (2001-present)

Current Beneficiaries:
- Shaun Cairns
- Sam Wyly
- Wife of Sam Wyly
- Children & Issue of Sam Wyly
- Other US charities (b)

---

(a) Other US Charities include University of Michigan, Church of Christ Scientist, Community Foundation of Texas

(b) Other US Charities include University of Michigan, Church of Christ Scientist, The Leaves, Community Foundation of Texas, Denison University, A Grass Roots Aspen Experience and The Humbolt Legal Foundation

(c) Debtors understood this Court to be requesting charts based on what the documents in evidence provide. Pursuant to the Trust Deeds, King and Cairns were the grantors of the 94/95 trusts. However, the IRS points out that Judge Scheindlin found that "the trusts at issue [are] clearly grantor trusts as to the domestic grantors." Disgorgement Opinion, at 62-63.

*See Joint Stipulation #66 for predecessor trustees

**Exhibit B**

## Sam Wyly – 1992 Trust/Private Annuity Transaction



SW Transfers
200,000 SSW
Warrants
$2,525,000

West Carroll
Ltd.
(Nevada) *
Est 1992/Liq 1996

West Carroll
Limited
(IOM)

200,000
Options &
Private
Annuity obligation

Private
Annuity

---

SW Transfers
240,000 SSW
Warrants
$3,030,000

Richland Ltd.
(Nevada) *
Est 1992/Liq 1996

Richland
Limited
(IOM)

240,000
Options &
Private
Annuity obligation

Private
Annuity

---

SW Transfers
110,000 MIK
Options
100,000 MIK
Warrants
$3,701,250

Tensas Ltd.
(Nevada)*
Est 1992/Liq 1996

Tensas Limited
(IOM)

210,000
Options/Warrants &
Private
Annuity obligation

Private
Annuity

---

SW Transfers
204,725 SSW
Warrants
$2,584,653

Morehouse
Ltd.
(Nevada) *
Est 1992/Liq 1996

Morehouse
Limited
(IOM)

204,725
Options &
Private
Annuity obligation

Private
Annuity

---

SW Transfers
667,000
SSW Options
$8,420,875

East Carroll
Ltd.
(Nevada) *
Est 1992/Liq 1996

East Carroll
Limited
(IOM)

667,000
Options &
Private
Annuity obligation

Private
Annuity

---

SW Transfers
375,000
MIK Options
$6,609,375

East Baton
Rouge Ltd.
(Nevada) *
Est 1992/Liq 1996

East Baton
Rouge Limited
(IOM)

375,000
Options &
Private
Annuity Obligation

Private
Annuity

---

Dollar value reflects the value assigned under the annuity contracts

* Dubinsky testified that his research showed that Ms. Robertson was the initial Director, President, Vice President, Secretary and Treasurer. Tr. 3266

## Sam Wylly – 1996 Trust/Private Annuity Transaction



Exhibit B

Dollar value reflects the value assigned under the annuity contracts

Exhibit C

## Trust & Subsidiary Companies – Charles Wyly Related



**Exhibit C**

## Trust Settlor, Trustee, Protector & Beneficiaries – Charles Wyly Related



(a) Other US charities include First Church of Christ Scientist or any United States Church associated with the Christian Science Faith and Lady Thatcher's Archive at the Cambridge Foundation

(b) Other US charities include First Church of Christ Scientist or any United States Church associated with the Christian Science Faith

(c) Debtors understood this Court to be requesting charts based on what the documents in evidence provide. Pursuant to the Trust Deeds, King and Cairns were the grantors of the 94/95 trusts. However, the IRS points out that Judge Scheindlin found that "the trusts at issue [are] clearly grantor trusts to the domestic grantors." Disgorgement Opinion, at 62-63.

*See Joint Stipulation #102 for predecessor trustees

**Exhibit C**

## Charles Wyly – 1992 Trust/Private Annuity Transaction



Dollar value reflects the value assigned under the annuity contracts

\* Dubinsky testified that his research showed that Ms. Robertson was the initial Director, President, Vice President, Secretary and Treasurer. Tr 3266.

**Exhibit C**

## Charles Wylly – 1996 Trust/Private Annuity Transaction



Dollar value reflects the value assigned under the annuity contracts



**Exhibit D**

## MiCasa

FloFlo LLC

2001 – Shares of Mi Casa Limited IOM

2006 – Liquidation of LLC's - Shares returned to Bessie Trust

Bessie Trust IOM

100%

Shares

Mi Casa Limited IOM
*(Established 3/28/2001)*

$990,000

Laurie Matthews Trustee

99%

Mi Casa Management Trust
*(US Trust Dated 3/20/2001)*

$985,000

Laurie Matthews Manager

100%

Mi Casa LLC
*(Texas LLC Formed 3/20/2001)*

Real Property
Deed of Trust
4/13/2001

1%

$10,000

Laurie Wyly Matthews

Ownership

Funding

Notes:
Following initial funding shown here, additional amounts were contributed to fund construction and expenses in 1%/99% ratio until 2005.



**Exhibit E**

Cottonwood I

Notes:
Following initial funding shown here, additional amounts were contributed to fund expenses until 2005.



Cottonwood II

Exhibit F

Notes:
Following initial funding shown here, additional amounts were contributed to fund expenses in 2%/98% ratio until 2005.



Exhibit G

## Spitting Lion

2001 – Shares in Spitting Lion Limited IOM

Orange LLC
Pops LLC
FloFlo LLC
Bubba LLC

2006 – Liquidation of LLC's – Shares returned to Bessie Trust

Bessie Trust IOM

100%

Shares

Spitting Lion Limited IOM
*(Established 2/3/2000)*

99%

$891,000

CoTrustees:
Rosemary Acton
Lisa Lyn Wyly

Spitting Lion Management Trust
*(US Trust Dated 2/7/2000)*

1%

$9,000

$895,000

Managers:
Rosemary Acton
Lisa Lyn Wyly

100%

Spitting Lion, LLC
*(Texas LLC Formed 2/7/2000)*

Real Property Warranty Deed dated 2/10/2000

Rosemary Acton**
McCary (1/1/13) - $10,000

$9,000

Ownership

Funding

Notes:
Following initial funding shown here, additional amounts were contributed to fund expenses in 1%/99% ratio until 2005.

**Upon the death of Rosemary Acton, her interest in Spitting Lion Management Trust was inherited by her four children. McCary Wyly was admitted as Co-grantor 1/1/2013.

# Rosemary Circle R Ranch

*(formerly Two Mile Ranch, Woody Creek Ranch and Rocky Mountain Serenity Ranch)*

**Exhibit H**



Notes:
Following initial funding shown here, additional amounts were contributed to fund construction and expenses in 1%/99% ratio until 2005.
*On 1/1/2013, Kelly Wyly, Lisa Wyly and Laurie Matthews were admitted as additional co-grantors.

Exhibit I



# Stargate Horse Farm

Notes:
Following initial funding shown here, additional amounts were contributed by IOM companies to Stargate Farms Limited IOM to fund construction and expenses until 2005.

*Sold 9/30/2009. Proceeds distributed to Emily Wyly and Stargate Farms Limited in sharing ratio.



Little Woody

Notes:
Following initial funding shown here, additional amounts were contributed to fund expenses in 2%/98% ratio until 2005.

Exhibit J

## Charles and Dee Wyly Domestic Estate Planning



9/30/1999 – Charles and Dee sell their L/P interest in Stargate, Ltd. to new trusts in exchange for notes 'The Irrevocable Trust Notes'



Effective 10/15/1999 – Charles and Dee contribute the notes made payable to Charles and Dee and annuity receivables to Stargate Investments, Ltd.



**Exhibit K**